UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ARCHEGOS CAPITAL MANAGEMENT, LP and PATRICK HALLIGAN,<br><br>Defendants. | Case No. 22-CV-3401<br><br>ECF Case<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**<br><br>**JURY TRIAL DEMANDED** |

## I.  SUMMARY

1.      In the span of a year, between March 2020 and March 2021 ("Relevant Period"), Archegos Capital Management, LP ("Archegos") and Archegos's Chief Financial Officer, Patrick Halligan (collectively, "Defendants"), and others acting on their behalf or under their direction ("Accomplices"), engaged in a scheme whereby they intentionally and/or recklessly provided false or misleading material information and/or omitted to provide such material information to their trading swap counterparties ("Swap Counterparties").  During this period, the value of Archegos's portfolio increased fifteen-fold before it abruptly collapsed, causing its Swap Counterparties to suffer losses totaling billions of dollars.

2.      Archegos's spectacular rise and catastrophic fall arose from a pattern of deceit in which Defendants and their Accomplices routinely led Archegos's Swap Counterparties to falsely believe that the portfolio of Archegos Fund, LP ("Archegos Fund"), a fund managed by Archegos, was far less risky than it actually was.

3.     Beginning in March 2020, Archegos Fund embarked on a new trading strategy that was materially different from its historical practice.  Under the new strategy, Archegos, as investment manager of Archegos Fund, caused Archegos Fund to enter into hundred million-dollar swap trades on a daily basis that focused on a concentrated group of securities.  Due to the size of Archegos Fund's positions, they could not easily be liquidated.  These trades were spread across at least eight different counterparties, and therefore each Swap Counterparty saw only a fraction of Archegos Fund's total exposure.  Swap Counterparties thus engaged in frequent oral and written communications with Archegos's representatives to try to understand the aggregate composition of Archegos Fund's holdings and to gauge the risk associated with Archegos Fund's whole portfolio.

4.     During the course of these communications, Defendants and their Accomplices repeatedly misrepresented material facts or omitted to state material facts relevant to assessing the risk of Archegos Fund's portfolio, including the size of its largest long positions, aggregate gross exposure, amount of unencumbered cash, and liquidity.  Defendants and their Accomplices misrepresented and/or hid material facts in order to conceal the true risk of Archegos Fund's portfolio so that Archegos Fund could obtain additional capacity to trade even greater volumes of highly leveraged, concentrated, and illiquid long positions, while maintaining favorable margin rates.

5.     The Swap Counterparties tried to mitigate the risk posed by Archegos Fund's portfolio, including by requiring Archegos Fund to maintain sizable short swap positions. Archegos Fund met these short requirements primarily through swaps based on exchange-traded funds ("ETF Swaps") and custom baskets ("Custom Basket Swaps," and collectively with the ETF Swaps, "Broad-Based Security Index Swaps") that referenced large and liquid sections of

the market.  These Broad-Based Security Index Swaps were designed to act as hedges to mitigate the risks imposed by Archegos Fund's portfolio.  Without truthful information from Archegos, however, Archegos Fund's Swap Counterparties could not accurately assess the risk posed by Archegos Fund's aggregate positions and could not accurately calibrate the appropriate level of risk controls.  If Archegos Fund's Swap Counterparties had known the full scope of its long positions, they would have taken risk control measures including, in part, limiting, restricting, or reducing Archegos Fund's trade capacity, enhancing margin requirements, and maintaining appropriate levels of Broad-Based Security Index Swaps that would better mitigate the risk of Archegos Fund's overall portfolio.

6.     The lies of Defendants and their Accomplices disguised the fact that Archegos Fund was a house of cards that was one bad week away from ruin.  That week was the week of March 22, 2021.  Starting on Tuesday, March 23, and continuing through the rest of the week, virtually all of Archegos Fund's largest long positions sharply declined, triggering a cascade of margin calls from its Swap Counterparties totaling over $13 billion.  The margin calls far exceeded Archegos Fund's available cash, causing it to collapse, dismiss employees, and cease operations.

7.     Many of Archegos Fund's Swap Counterparties suffered the consequences of Archegos Fund's trading strategy, which was based on repeated lies.  This is so because to hedge Archegos Fund's swap positions, its Swap Counterparties typically took cash positions in the same referenced asset—for example, if Archegos Fund entered into a long swap referencing Stock A, its Swap Counterparty would buy an equivalent notional value of Stock A.  When Archegos Fund failed to pay its margin calls and defaulted on its swaps, counterparties were forced to unwind the swaps and liquidate the hedges by selling the underlying securities (e.g.,

Stock A) back into the market at prices well below what they had originally paid.  As a result, one of Archegos Fund's Swap Counterparties lost over $5 billion; another lost almost $3 billion; and in total, Archegos Fund's Swap Counterparties lost over $10 billion.

8.      By the aforementioned conduct, Defendants have engaged, are engaging in, or are about to engage in practices that violate the provisions of the Commodity Exchange Act ("Act") and the Commission's regulations ("Regulations"), including Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021).

9.      Archegos is also liable for the actions of its officers, employees, or agents pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

10.      Halligan aided and abetted Archegos's violations and is therefore also liable for those violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(b).

11.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including but not limited to trading and registration bans, restitution, disgorgement, and such other relief as this Court may deem necessary or appropriate.

## II.      JURISDICTION AND VENUE

12.      **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345, which provide that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief and to enforce compliance with the Act whenever it shall

appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.  The Broad-Based Security Index Swaps traded by Archegos are "swaps" within the definition set forth in Section 1a(47)(A) and (B) of the Act, 7 U.S.C. § 1a(47)(A) and (B), and are subject to the Commission's jurisdiction.  As described throughout this Complaint, the Broad-Based Security Index Swaps were an integral component of Defendants' fraudulent scheme, and thus Defendants engaged in fraud "in connection with" swaps subject to the Commission's jurisdiction.  Section 6(c)(1) of the Act, 7 U.S.C. § 9(1); Regulation 180.1(a)(1)– (3), 17 § C.F.R. 180.1(a)(1)-(3) (2021).

13.     **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District, and because the acts and practices in violation of the Act have occurred within this District, among other places.

## III.     THE PARTIES

14.     Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its Eastern Regional Office at 290 Broadway, 6th Floor, New York, New York 10007.

15.     Defendant **Archegos Capital Management, LP** is a limited partnership formed in Delaware and having its principal place of business in New York, NY.  Archegos has never been registered with the Commission in any capacity.

16.     Defendant **Patrick Halligan** is an individual residing in Syosset, New York. Halligan was the Chief Financial Officer of Archegos.  Halligan has never been registered with

the Commission in any capacity.  Before Archegos, Halligan was employed by Tiger Asia

Management, LLC ("Tiger Asia"), Archegos's predecessor.

## IV.  OTHER RELEVANT PERSONS

17.    **Archegos Fund, LP** is a limited partnership formed in Delaware and having its

principal place of business in New York, NY.  Pursuant to the Amended and Restated

Investment Management Agreement ("Investment Management Agreement") between Archegos

and Archegos Fund dated June 30, 2014, Archegos is the Investment Manager of Archegos

Fund.  Archegos had broad authority to act on behalf of Archegos Fund, including authority to

deal in commodity contracts, securities, and swaps; conduct margin accounts with brokers; and

"act for [Archegos] Fund in all other matters."  Archegos and Archegos Fund shared an office

and were each wholly owned and controlled by its founder ("Founder") for the common purpose

of managing and investing the assets of the Founder and the Founder's family.  The Founder

served as the managing member of Archegos Fund's general partner and the principal of

Archegos and signed the Investment Management Agreement on behalf of both Archegos and

Archegos Fund.  Archegos Fund has never been registered with the Commission in any capacity.

18.    **Trader 1** was the head trader of Archegos during the Relevant Period and was an

accomplice to this fraudulent scheme.  Trader 1 has never been registered with the Commission

in any capacity.  Before Archegos, Trader 1 was employed by Tiger Asia.

19.    **Risk Officer 1** was the Director of Risk Management of Archegos during the

Relevant Period.  Risk Officer 1 reported directly to Halligan and was an accomplice to this

fraudulent scheme.  Risk Officer 1 has never been registered with the Commission in any

capacity.  Before Archegos, Risk Officer 1 was employed by Tiger Asia.  Risk Officer 1 reported

to Halligan during his entire tenure at Tiger Asia and Archegos.

## V.   FACTS

### A.   Tiger Asia and Archegos

20.     Archegos's predecessor, Tiger Asia, was founded in 2001.  Tiger Asia was one of the so-called "Tiger Cub" funds, a group of hedge funds that were spun off from Tiger Management Corp., which in the late 1990s was one of the largest hedge fund sponsors in the world.

21.     On December 12, 2012, Tiger Asia and its founder entered into a settlement with the United States Securities and Exchange Commission ("SEC") concerning allegations that they committed insider trading by entering into "wall-crossing" agreements for three private placements of Chinese bank stocks, and later violating those agreements by short selling those stocks and covering the short positions with private placement shares purchased at a discount. The settlement also resolved claims that Tiger Asia and its founder attempted to manipulate the prices of publicly traded Chinese bank stocks in which it held substantial short positions by placing losing trades in an attempt to lower the price of the stocks and increase the value of the short positions, enabling Tiger Asia to illicitly collect higher management fees from investors. As part of the settlement, Tiger Asia paid $44 million in disgorgement and penalties, and the SEC banned Tiger Asia's founder from managing money on behalf of clients for at least five years.  Complaint, *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECF No. 1; Consent of Tiger Asia Management, LLC, *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECF No. 3-1.

22.     In a parallel action brought by the United States Department of Justice, on December 12, 2012, Tiger Asia pleaded guilty to one count of criminal wire fraud and admitted the same or similar facts set forth in the SEC settlement pertaining to insider trading.  Tiger Asia

was sentenced to one year of probation and agreed to forfeit more than $16 million in illegal

profits.  Information, *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12, 2012),

ECF No. 1; Plea Agreement,  *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12,

2012), ECF No. 3.

23.     In connection with these settlements, Tiger Asia returned all outside investor

capital, and its founder converted Tiger Asia to a family office, rebranding it as "Archegos."

The founder of Tiger Asia thus became the founder and Chief Executive Officer of Archegos.

**B.     Archegos Fund's Broad-Based Index Swaps**

24.     During the Relevant Period, Archegos, as investment manager for Archegos

Fund, caused Archegos Fund to enter into hundreds of swap transactions with several different

Swap Counterparties, including many Swap Counterparties that were provisionally

registered with the Commission as swap dealers.

25.     A swap is an exchange of one asset or liability for a similar asset or liability for

the purpose of shifting risks.  Archegos sought exposure to equities, among other ways, by

entering into total return swaps ("TRS").  A TRS is a type of swap in which one counterparty

receives the total return (i.e., interest payments and any capital gains or losses) from a

specified reference asset (e.g., a stock), and the other counterparty receives a specified fixed or

floating cash flow that is not related to the creditworthiness of the reference asset.  Total-return

equity swaps involve an exchange of the income stream from:  (1) a specified number of shares

in a designated company's stock; and (2) a specified interest rate on a specified principal amount.

The party that receives the stock-based return is called the "receiver."  The party that receives the

interest-based return (and pays the stock-based return) is called the "payer."  These contracts do

not transfer title to the underlying assets or require that either party actually own them.  Rather,

in a total-return equity swap, the receiver periodically sends to the payer a sum calculated by

applying an agreed-upon interest rate to an agreed-upon notional amount of principal, as if the receiver had borrowed that amount of money from the payer. Meanwhile, the payer periodically pays the receiver a sum equivalent to the return to a shareholder in a specified company—the increased value of the shares, if any, plus income from the shares—as if the receiver owned actual shares in that company. As a result, the financial return to a receiver in a total-return equity swap is roughly equivalent to the return when borrowed capital is used to purchase shares in the referenced company.

26.     Archegos Fund entered into TRS referencing single-name securities, as a receiver, with at least ten different Swap Counterparties. The vast majority of these single-name TRS positions were "long," meaning that Archegos Fund would receive payment under the TRS if the underlying security appreciated. In addition, in order to hedge the risk imposed by its long single-name TRS exposure, Archegos Fund entered into TRS positions that were based on: (i) ETF Swaps that provided exposure to indexes of hundreds of component securities; and (ii) Custom Basket Swaps which were designed to closely mimic the same broad-based securities indexes as the ETF Swaps. These Broad-Based Security Index Swaps were "short" positions, meaning that Archegos Fund would receive payment under the TRS if the value of the underlying securities declined.

27.     An ETF is a type of investment fund that tracks an index, sector, or other asset, whose shares can be bought or sold on an exchange like a stock. Archegos Fund entered into ETF Swaps that tracked broad-based indexes like the S&P 500 index and the MSCI Emerging Markets Index. Each of those indexes (and hence, each ETF Swap based on those indexes) is based on hundreds of individual component securities, and neither index meets the weighting or trading volume criteria of a narrow-based security index set forth in Section 1a(35) of the Act,

7 U.S.C. § 1a(35).  During the Relevant Period, Archegos Fund traded a net notional value of $19 billion in ETF Swaps in 256 transactions with nine different Swap Counterparties.

28.     Archegos Fund's Custom Basket Swaps largely tracked broad-based indexes like the S&P 500 and MSCI Emerging Markets Index, but they were customized in various ways (for example, to remove certain securities in which Archegos Fund held significant long positions). Archegos Fund's Custom Basket Swaps each referenced hundreds of securities, and the weighting and trading volume of the component securities in each Custom Basket Swap did not meet the definition of a narrow-based security index as set forth in 7 U.S.C. § 1a(35).  During the Relevant Period, Archegos Fund traded a net notional value of $33 billion in Custom Basket Swaps in 185 transactions with six different counterparties.

29.     To hedge Archegos Fund's long single-name TRS positions, Swap Counterparties typically bought long cash positions in the same securities underlying the swaps.  For example, when Archegos Fund purchased a long swap referencing $100 million of GSX Techedu Inc. ("GSX")[1] stock, a Swap Counterparty would typically hedge the swap by going into the market and buying $100 million of GSX stock.  In this way, from the Swap Counterparty's perspective, the combination of Archegos Fund's long TRS and the Swap Counterparty's cash position hedge would be market neutral—any amount that the Swap Counterparty was required to pay to Archegos Fund under the terms of the swap would be equal to the amount that the Swap Counterparty would receive through direct ownership of the actual stock.  The Swap Counterparty would then profit from the arrangement, in theory, through Archegos Fund's payment of the fixed rate fee established in the swap agreement.

---

[1] GSX has since changed its name to Gaotu Techedu Inc.

30.     Although this kind of hedging reduced Swap Counterparties' market risk arising from changes in the prices of securities underlying the swaps, Swap Counterparties were still exposed to other kinds of risk.  For example, Swap Counterparties were exposed to Archegos Fund's credit risk, i.e., the risk that Archegos Fund would not or could not pay what it owed under the terms of the swap agreements.  For this reason, Archegos Fund's swap transactions were generally subject to credit and risk limitations imposed by its Swap Counterparties.  In particular, certain of Archegos Fund's Swap Counterparties permitted Archegos to transact on a leveraged basis, provided it met certain margin requirements.

31.     Margin is the amount of money or collateral deposited by a customer (i.e., Archegos Fund) with its swap dealer (i.e., Swap Counterparties).  (1) Initial margin is the amount of margin required by the dealer when a swaps position is opened, and (2) maintenance margin is an amount that must be maintained on deposit at all times.  If the equity in a customer's account drops to or below the level of maintenance margin because of adverse price movement, the dealer must issue a margin call to the customer, requiring that the customer post additional margin to restore its equity to the initial level.

32.     When Archegos Fund entered into swaps, it typically was required to deposit with its Swap Counterparties only a fraction of the total notional value of the swap as initial margin. To give a simplified hypothetical example, if Archegos Fund entered into a swap that gave Archegos Fund exposure to $100 million in GSX stock, its Swap Counterparties might require Archegos Fund to deposit only 10% of that amount upfront—$10 million—to be held by the Swap Counterparty as margin.  If the value of GSX stock then declined by 10%, decreasing the notional value of Archegos Fund's exposure to $90 million, the Swap Counterparty would be entitled to take the $10 million margin into its own account; then, Archegos Fund would be

required to post additional margin equal to 10% of the new notional value of the underlying stock, i.e., $9 million.  Conversely, if the value of GSX stock increased by 10%, Archegos Fund would be required to maintain its $10 million margin with the counterparty, but it would also receive $10 million from the Swap Counterparty due to the appreciation of the stock.

33.     Margin frameworks differed materially from one Swap Counterparty to another. In contrast to the example above, certain counterparties would have required the posting of additional margin to account for the appreciation of the asset and to maintain a margin rate equal to 10% of the value of Archegos Fund's positions.  Thus, in the above hypothetical, if the value of GSX stock increased by 10%, certain counterparties would have required Archegos Fund to post an additional $1 million in margin, and Archegos Fund would receive $9 million due to the appreciation of the stock.

34.     Unless the margin rate is 100%, however (i.e., the swap is not leveraged at all), margin does not eliminate credit risk altogether.  Swap Counterparties remained exposed to the risk that the stock underlying a swap will depreciate by more than the amount of posted margin, and that Archegos Fund would be unable or unwilling to pay the difference.  For this reason, it was critically important for Archegos Fund's Swap Counterparties to do their due diligence when analyzing their risk, impose credit and risk limitations, and carefully analyze and adjust Archegos Fund's margin rates based on the facts and circumstances as they understood them.

35.     As part of this risk analysis, Archegos Fund's Swap Counterparties analyzed, among other variables, the size, composition, and liquidity of Archegos Fund's portfolio, both within the Swap Counterparty's own portfolio and (to the extent possible) across all other financial institutions.  Archegos Fund's Swap Counterparties also paid particular attention to

Archegos Fund's available free cash that could be used to satisfy further margin requirements, if needed.

36.     Swap Counterparties also imposed formal or informal credit- and risk-related limitations on Archegos Fund's ability to transact swaps, such as setting limits on the total notional value of Archegos Fund's portfolio with that Swap Counterparty; requiring that Archegos Fund maintain a certain ratio of long to short positions ("long/short ratio") in its portfolio at that Swap Counterparty (which Archegos met on the short side primarily by maintaining short Broad-Based Security Index Swap positions); and/or requiring that Archegos Fund enter into highly liquid diversified swap positions.  If Archegos Fund failed to adhere to these requirements, a Swap Counterparty typically would consider limiting further trading and/or requiring Archegos Fund to post additional margin to reduce the Swap Counterparty's risk.

37.     Archegos Fund's Broad-Based Security Index Swaps also played a critical role in Swap Counterparties' assessment and management of Archegos Fund's credit risk.  The Broad-Based Security Index Swaps were typically placed as short positions and thus served as a general market hedge and risk-reducing measure.  Archegos Fund's largest positions were long TRS positions in single securities; as such, there was a risk that certain market-wide factors would negatively impact these long positions.  By shorting a large section of the market, the Broad-Based Security Index Swaps were designed to hedge against the risk of a market decline impacting the long TRS positions.  The idea behind this trading strategy was that because the Broad-Based Security Index Swaps were less volatile, more diverse, and more liquid, they could more easily and quickly be unwound.  In addition, the short Broad-Based Security Index Swaps would not necessarily be subject to the same losses suffered by the long TRS positions in the event of a market decline.  Because of their risk-reducing properties, Archegos's placement of

substantial short Broad-Based Security Index Swap positions during the Relevant Period was instrumental to Archegos's ability to obtain additional capacity and favorable margin rates. For similar reasons, some Swap Counterparties requested that Archegos Fund place new short Broad-Based Security Index Swap positions concurrently with new long single name positions in order to meet required long/short ratios.

**C. Archegos Fund's Trading Between March 2020 and March 2021**

38.     Before the Relevant Period, Archegos Fund adhered to a long-term strategy that prioritized liquid stocks and infrequent trading. But beginning in or around March 2020, Archegos Fund's trading strategy changed dramatically. Archegos Fund began building massive, highly concentrated, illiquid positions in a small number of single securities through long TRS. Archegos Fund's positions were also highly leveraged.

39.     At the beginning of March 2020, Archegos Fund's aggregate gross exposure was $19 billion, and its net exposure was $7 billion long, consisting of $13 billion in aggregate long exposure and $6 billion in aggregate short exposure. A little over a year later, as of March 19, 2021, Archegos Fund's exposure had grown to, approximately, $160 billion in aggregate gross exposure and $52 billion long in net exposure, consisting of $106 billion in aggregate long exposure and $54 billion in aggregate short exposure. During the same time period, Archegos Fund grew fifteen-fold, from about $1.5 billion to $35 billion in assets under management. As of March 19, 2021, a little over half of Archegos Fund's gross portfolio, about $86 billion, consisted of long TRS positions referencing single securities. At the same time, about 20% of Archegos's gross portfolio—$32 billion—consisted of Custom Basket Swaps. Archegos Fund also held about $14 billion in ETF Swaps. The remainder of Archegos Fund's portfolio consisted predominantly of long cash securities and short swaps referencing single securities.

40.     Archegos Fund's long TRS positions during this time were heavily concentrated in swaps referencing just a handful of individual securities, including ViacomCBS Inc. ("ViacomCBS"), Baidu Inc. ("Baidu"), Tencent Music Entertainment Group ("Tencent Music"), Discovery Communications Inc. ("Discovery") and iQIYI ("IQ").  Although these securities were listed on public exchanges and traded millions of shares per day, Archegos Fund's positions in these companies were so large in comparison to their average daily trading volumes that they could not easily be liquidated.

41.     Beginning in the fall of 2020, Archegos Fund entered into large long TRS trades in GSX and certain other stocks.  Trader 1 understood that the price of GSX affected Archegos Fund's margin requirements with its Swap Counterparties because margin was determined based on the daily closing price of its positions.  Accordingly, if the price of GSX increased at close of the market, the Swap Counterparties would be required to post margin to Archegos Fund's accounts based upon the daily appreciation in Archegos Fund's long GSX swap positions.  Indeed, as Archegos Fund added to its long GSX positions and the price of GSX stock rose, Archegos Fund received margin payments from its Swap Counterparties, and typically would then use this additional margin to further enlarge its GSX position.

42.     As the size of Archegos Fund's portfolio expanded during the Relevant Period, it began to approach the limits of its Swap Counterparties' risk management tolerances.  Certain Swap Counterparties, for example, refused to allow Archegos Fund to execute additional long TRS positions in concentrated names; others refused to allow such transactions without the positing of additional margin.  Archegos thereafter engaged in an unrelenting search for additional trade capacity in Archegos Fund's concentrated positions.  To that end, Archegos, primarily through Trader 1, spoke daily with Archegos Fund's existing Swap Counterparties

about increasing its notional limits in securities like ViacomCBS and GSX.  Induced by

numerous false and misleading statements by Defendants, described herein, Swap Counterparties

frequently agreed to grant additional capacity to enter into long TRS positions, but not before

requiring Archegos Fund to agree to additional risk-reducing measures, often in the form of

additional short Broad-Based Security Index Swap positions.

      43.    Archegos also sought to enlist new Swap Counterparties so that it could continue

to rapidly grow its concentrated and illiquid positions without triggering the risk management

controls of its existing counterparties and without paying higher margin.  By adding new Swap

Counterparties, Archegos Fund could effectively start from scratch with new position limits and

lower margin rates, unload high-margin positions to the new Swap Counterparty at lower margin

rates, and retain other existing positions with its other Swap Counterparties.  Thus, Archegos

Fund entered into a new Swap Counterparty relationship with Swap Counterparty 1 in November

2020.  By March 22, 2021, Archegos Fund had over $15 billion in long swap exposure at Swap

Counterparty 1 and almost $10 billion in short TRS exposure (much of this in the form of Broad-

Based Security Index Swaps).  In or around March 2021, Archegos was also in the process of

seeking additional relationships with four additional counterparties, though none of these came

to fruition before Archegos Fund collapsed.

      44.    Archegos Fund's trading in Broad-Based Security Index Swaps was critical to

inducing its Swap Counterparties to allow Archegos Fund to continue to build its highly

leveraged, concentrated, and illiquid long positions.  As Archegos Fund's portfolio became more

concentrated in long TRS positions referencing single securities ("long single-name TRS

positions"), its portfolio at each of its Swap Counterparties also included short Broad-Based

Security Index Swaps positions, which were needed to satisfy counterparty credit and risk

management requirements.  In several instances, in order to increase the size of its concentrated

long single-name TRS positions while obtaining or maintaining favorable margin rates,

Archegos Fund's swap counterparties required Archegos Fund to increase the size of its short

positions.  Generally, Archegos Fund satisfied this short requirement through Broad-Based

Security Index Swaps.

45.     For example, in connection with a potential agreement with Swap Counterparty 2

regarding a new margin and risk management framework, Archegos Fund "agreed to hedge 50%

of any new long exposure"—in other words, Archegos Fund agreed that for every $100 of new

long exposure, Archegos Fund would also add $50 worth of short exposure, typically in the form

of Broad-Based Security Index Swaps.

46.     Swap Counterparties also required that Archegos Fund add short Broad-Based

Security Index Swap positions in order to maintain specific margin rates, or in connection with

specific requests by Archegos to increase the size of Archegos Fund's concentrated long

positions.  For example, on February 2, 2021, Trader 1 asked Swap Counterparty 1 for an

increase in its capacity to trade GSX.  At the same time, Trader 1 stated that Archegos Fund

would "keep adding index shorts [i.e., Broad-Based Security Index Swaps] . . . as we buy long

[GSX]."  Swap Counterparty 1 responded, "That would be great."  Similarly, on February 24,

2021, in a communication with Trader 1, Swap Counterparty 1 approved an increase in Archegos

Fund's capacity to trade GSX.  At the same time, Swap Counterparty 1 told Trader 1 that Swap

Counterparty 1 remained "very focused on the shorts [i.e., the Broad-Based Security Index

Swaps]" and Archegos Fund's ability to maintain a "balanced" long/short ratio by adding

Custom Basket Swaps.

**D.     Defendants' Misrepresentations Concerning Archegos Fund's Portfolio Prior
to March 22, 2021**

47. Archegos Fund was able to build its giant portfolio only by concealing its true size and characteristics from its Swap Counterparties. Each of Archegos Fund's Swap Counterparties could see only a small portion of Archegos Fund's overall portfolio and therefore relied on Archegos to supply information about the rest. Rather than provide truthful information, Defendants and their Accomplices repeatedly misled Swap Counterparties about Archegos Fund's aggregate positions, which caused each Swap Counterparty to believe that Archegos Fund's total portfolio was far less risky than it actually was.

48. From the beginning, Archegos operated under a culture of secrecy, dictated, in part, from the Founder and Halligan. The Founder repeatedly stressed that Archegos representatives should not discuss its positions with anyone outside the firm, and Halligan endorsed this view as well. In early 2021, for example, Halligan spoke with Archegos's executive chairman about the type of information that Archegos provided to its Swap Counterparties. Halligan reported, in substance, that when dealing with its Swap Counterparties, Risk Officer 1 was intentionally vague in response to Swap Counterparties' questions.

49. Archegos's culture of secrecy during the Relevant Period frequently crossed the line into outright deception. As Archegos caused Archegos Fund to increase the size and concentration of its long single-name TRS positions during the fall of 2020 and into 2021, Defendants' and their Accomplices, including Trader 1 and Risk Officer 1, periodically communicated with representatives of Archegos Fund's Swap Counterparties and were typically asked questions about Archegos Fund's largest positions, gross exposure, unencumbered cash, and liquidity, among other things. From the perspective of the Swap Counterparties, the objective of these conversations was to gather information about Archegos Fund in order to make credit and risk management decisions about its portfolio at their respective institutions.

From the perspective of Defendants and their Accomplices, the purpose was to coax additional funding and favorable terms for Archegos Fund by whatever means necessary, including fraud.

50.     During the course of these discussions, Risk Officer 1, at the direction of Halligan, and Trader 1 intentionally and/or recklessly gave false or misleading information and/or omitted to state material facts necessary to make that information not untrue or misleading, regarding the size, composition, and liquidity of Archegos Fund's overall portfolio. They gave this false and misleading information and omitted material facts in order to secure additional trade capacity for Archegos Fund to enlarge its long single-name TRS positions; to obtain or maintain favorable margin rates; and, during the week of March 22, 2021, to attempt to satisfy margin calls.  The false or misleading information provided by Risk Officer 1 and Trader 1 concerned facts or omitted facts that were important for Archegos Fund's Swap Counterparties to know in making credit and risk management decisions about Archegos Fund's swap portfolio at that counterparty, including decisions regarding margin and position size.

51.     Risk Officer 1 learned to misrepresent the size of Archegos Fund's largest positions from Halligan, who preceded Risk Officer 1 as the Swap Counterparties' primary contact at Archegos for credit risk-related issues.  In or around 2016 and 2017, Risk Officer 1 began shadowing Halligan on calls with Swap Counterparties in anticipation that Risk Officer 1 would take over those responsibilities from Halligan going forward.  Risk Officer 1 observed that in response to common questions from Swap Counterparties, like the size of Archegos Fund's largest positions, Halligan purposely understated the true figures.  Risk Officer 1 also observed that Halligan routinely misrepresented to Swap Counterparties the amount of Archegos's available cash.

52.     When Risk Officer 1 took over the role of dealing with Swap Counterparties on

credit risk-related issues in or around 2018, Halligan told Risk Officer 1 that he should tell all

Swap Counterparties that Archegos Fund's largest position was 35% of NAV, regardless of the

true figure.  Halligan also directed Risk Officer 1 not to provide any specific information about

Archegos Fund's positions and to respond to specific questions only with generalities.  Risk

Officer 1 followed these directions with Swap Counterparties as a matter of course going

forward.  Risk Officer 1 did not question or dispute Halligan's instruction because he understood

this kind of deception to be a part of Archegos's culture.  As Risk Officer 1's direct superior,

Halligan knew that Risk Officer 1's job responsibilities included frequent and regular calls with

Swap Counterparties regarding credit risk issues, including but not limited to position size.

Halligan therefore knew or had reason to know that Risk Officer 1 continued to have such calls

with Archegos Fund's Swap Counterparties after he directed Risk Officer 1 to provide false

information to the Swap Counterparties, and Halligan knew or was reckless in not knowing that

Risk Officer 1 would provide false information to Archegos Fund's Swap Counterparties as

instructed.

53.     During the Relevant Period, when Swap Counterparties asked about Archegos

Fund's largest positions across its entire portfolio (including at other Swap Counterparties), Risk

Officer 1 typically represented that Archegos Fund's largest position was approximately 35% of

its net asset value ("NAV"), despite knowing that this 35% figure was not true.  For example, in

late 2020 or early 2021, Risk Officer 1 had a telephone call with Swap Counterparty 3.  At that

time, Risk Officer 1 knew that Archegos Fund's largest long single-name TRS position,

ViacomCBS, had grown significantly larger than 35% of Archegos Fund's NAV, and he was

concerned that Swap Counterparty 3 would ask questions about the position.  Risk Officer 1

asked Halligan how he should proceed, and Halligan, also knowing that Viacom had grown well

above 35% of Archegos Fund's NAV, nonetheless directed Risk Officer 1 to continue to falsely

represent that Archegos Fund's largest position was approximately 35% of its NAV.  Following

Halligan's direction, Risk Officer 1 falsely represented to Swap Counterparty 3 that Archegos

Fund's largest investment was only 35% of its NAV.  Based on Halligan's prior direction, Risk

Officer 1 also made similar misrepresentations to Swap Counterparty 4 on a recorded telephone

call on March 8, 2021; and to Swap Counterparty 5 on telephone calls on January 28, 2021 and

March 1, 2021.  By misrepresenting that Archegos Fund's largest position was only 35% of

NAV, rather than 70%, Risk Officer 1 misrepresented that Archegos Fund's portfolio was

materially less concentrated (and hence materially less risky) than it actually was.

      54.    Risk Officer 1 also intentionally misrepresented the composition of Archegos

Fund's total portfolio across all of its Swap Counterparties.  For example, on March 8, 2021, in a

recorded telephone call with Swap Counterparty 4, Risk Officer 1 intentionally falsely

represented that Archegos Fund's top ten largest positions at Swap Counterparty 4 were

materially different than the top ten largest positions in Archegos Fund's overall portfolio.  In

fact, most of Archegos Fund's top ten positions with Swap Counterparty 4 were also among

Archegos Fund's top ten positions with other Swap Counterparties.  For example, Archegos

Fund's largest position with Swap Counterparty 4 at this time was ViacomCBS, which was in the

range of $1-2 billion; during February and March 2021, Archegos Fund held positions ranging

from $100 million to over $5 billion with eight other Swap Counterparties, and there was

substantial overlap among several other large positions as well.  Also, during the March 8,

telephone call, Risk Officer 1 falsely represented that Archegos Fund's position in GSX, which

was about $1 billion at the time, was much larger at Swap Counterparty 4 than it was at any other

Swap Counterparty.  In fact, Archegos Fund held larger GSX positions with three different Swap

Counterparties, including a position with Swap Counterparty 1 that was nearly double the size of

Archegos Fund's position with Swap Counterparty 4.

55.     Risk Officer 1 also intentionally misrepresented to Swap Counterparties that

Archegos Fund's total portfolio across all of its Swap Counterparties was more liquid than it

was.  For example, on March 8, 2021, on a recorded telephone call with Swap Counterparty 4,

Risk Officer 1 represented that Archegos Fund could liquidate almost its entire portfolio in about

two weeks.  In a subsequent call, Swap Counterparty 4 asked for additional information about

Archegos Fund's liquidity, and Risk Officer 1 agreed to report back to Swap Counterparty 4.

Thereafter, Trader 1, Risk Officer 1, and Halligan held a conference call in which they conspired

to provide false liquidation statistics for Risk Officer 1 to report back to Swap Counterparty 4.

56.     Consequently, in a recorded telephone call with Swap Counterparty 4 on March

10, 2021, Risk Officer 1 intentionally or recklessly misrepresented that Archegos Fund could

liquidate:  (i) about half of its total portfolio in ten days; (ii) seventy-five per cent of its total

portfolio within twenty days; and (iii) its entire portfolio in about a month.  Risk Officer 1 told

Swap Counterparty 4 that this was based on liquidation at a rate of 10-15% of average daily

trading volume, which was meant to convey liquidation at a rate that would not significantly

impact market prices.  At the time Risk Officer 1 made these representations to Swap

Counterparty 4, Risk Officer 1 knew or was reckless in not knowing, based on the size and

composition of Archegos Fund's portfolio compared to relevant average daily trading volumes,

that his representation about the liquidation of the entire portfolio was false or misleading.  Risk

Officer 1 knew or was reckless in not knowing that Archegos Fund's portfolio could not be

unwound at the stated rate and in the stated time period without significantly impacting the

market price, based on market conditions and the positions to be liquidated.  Risk Officer 1
similarly misrepresented that Archegos Fund could liquidate 50% of its entire portfolio in ten
days in a telephone call with Swap Counterparty 3 in late 2020 or early 2021, and in a telephone
call with Swap Counterparty 2 on March 19, 2021.  By intentionally or recklessly
misrepresenting the time in which Archegos Fund could liquidate its positions, Risk Officer 1
concealed that Archegos Fund's portfolio was materially less liquid (and hence materially
riskier) than it actually was.

57.    Trader 1 also made multiple misrepresentations to Swap Counterparties.  In
connection with Archegos Fund's onboarding of Swap Counterparty 1, Trader 1 represented that
Archegos Fund's portfolio with Swap Counterparty 1 would be different from its portfolios with
other Swap Counterparties.  This was untrue—in fact, Archegos Fund sought to onboard Swap
Counterparty 1 because it needed additional capacity to trade many of the same securities it was
trading with its other Swap Counterparties, including GSX and ViacomCBS.

58.    In or around November 11, 2020, Swap Counterparty 6 expressed concern to
Archegos that the amount of margin that Archegos Fund had posted with Swap Counterparty 6
was insufficient to account for the risk associated with Archegos Fund's positions.  As a result,
Swap Counterparty 6 asked Trader 1 to have Archegos Fund reduce risk by transferring
concentrated and illiquid (and therefore riskier) positions to other Swap Counterparties and
transferring more liquid (and hence less risky) positions from other Swap Counterparties to Swap
Counterparty 6.  Before responding, Trader 1 conferred with the Founder and conveyed the
urgency of the situation, noting that Swap Counterparty 6's risk management profile of Archegos
Fund had considerably worsened.  The Founder responded, in substance, that Archegos Fund just
needed to get through the end of the year.  Accordingly, on November 11, 2020, Trader 1 told

Swap Counterparty 6, in substance, that Archegos Fund could not move these positions as requested due to year-end tax planning concerns.  Trader 1 knew this statement was false or misleading.  Trader 1 knew that Archegos Fund was unable to move its concentrated illiquid positions from Swap Counterparty 6 to other Swap Counterparties either because Archegos Fund had exhausted all of its available capacity at other dealers or because increasing those positions at other Swap Counterparties would have resulted in higher margin rates.  In addition, Trader 1 knew that Archegos Fund could not transfer liquid positions from other dealers to Swap Counterparty 6 because other dealers required Archegos Fund to maintain those liquid positions as a risk-reducing measure, and failing to maintain those liquid risk-reducing positions would also have resulted in higher margin rates.  Trader 1 knew and understood that he had concealed from Swap Counterparty 6 material reasons why these positions could not be moved as requested, and his omissions concealed the true risk of Archegos Fund's swap positions with Swap Counterparty 6.  Thereafter, on multiple occasions between December 2020 and March 2021, Swap Counterparty 6 imposed increased margin requirements on Archegos Fund's positions.

59.     On or around January 29, 2021, Trader 1 and Risk Officer 1 had a telephone call with Swap Counterparty 1 to discuss GSX.  During this call, Trader 1 provided information to Swap Counterparty 1 that omitted material information regarding the size of Archegos Fund's overall position in GSX, one of Archegos Fund's largest positions.  Prior to the call, Swap Counterparty 1 learned from certain public filings that several other swap dealers were among GSX's largest shareholders.  During this call, Swap Counterparty 1 inquired about why so many other swap dealers were large shareholders of GSX.  Trader 1 conveyed, in substance, that the other swap dealer shareholders related to other hedge funds that invested in GSX through swap

transactions.  This statement was false and misleading because it only referred to other hedge

funds who invested in GSX while omitting the material fact that Archegos Fund had invested in

GSX through TRS with many of the same swap dealers that Swap Counterparty 1 was inquiring

about.  Trader 1 failed to provide this material information to Swap Counterparty 1 in order to

conceal the true size and risk of Archegos Fund's total GSX position.

60.     Prior to the call with Swap Counterparty 1 that occurred on or around January 29,

2021, Halligan told Risk Officer 1 that Risk Officer 1 should participate in all calls that Trader 1

was having with Archegos's Swap Counterparties so that Risk Officer 1 would know what

Trader 1 was saying to the Swap Counterparties.  Risk Officer 1 understood that Halligan wanted

to ensure that Risk Officer 1 and Trader 1 were telling counterparties a consistent story, and that

if Trader 1 was providing misleading information to a Swap Counterparty, it would be important

for Risk Officer 1 to do the same.  After the January 29 call with Swap Counterparty 1, Risk

Officer 1 told Halligan, in substance, that he had adhered to Trader 1's talking points regarding

GSX, to which Halligan responded, in sum and substance, "if they only knew."  Risk Officer 1

interpreted this to mean that Halligan was reflecting on what would happen if Swap Counterparty

1 knew the truth about Archegos Fund's GSX positions, including the fact that Archegos Fund

held substantial positions in GSX with several other Swap Counterparties.  Such statements were

common from Halligan, and Risk Officer 1 interpreted this to mean that Halligan knew that Risk

Officer 1 and Trader 1 were providing false and misleading information and/or concealing

material information from Archegos Fund's Swap Counterparties, and that Archegos Fund's

Swap Counterparties would have taken protective countermeasures if they knew the truth.  In

this way, Halligan intentionally or recklessly encouraged Risk Officer 1 to provide false or

misleading information and/or omit material facts in conversations with Swap Counterparties.

61.     Halligan, Trader 1, and Risk Officer 1 engaged in a fraudulent scheme whereby they intentionally and/or recklessly provided false or misleading information and/or omitted to state material facts necessary to make that information not untrue or misleading to Archegos Fund's Swap Counterparties in order to maintain existing trade capacity, secure additional capacity for Archegos Fund to enlarge its swap trading positions, and to obtain or maintain favorable margin rates.  Halligan, Trader 1, and Risk Officer 1 understood that if they told the truth about Archegos Fund's portfolio, its Swap Counterparties might take measures such as increasing Archegos Fund's margin requirements or refusing to extend Archegos Fund additional capacity to transact.  By providing false information to (or omitting material information from) Archegos Fund's Swap Counterparties, Halligan, Trader 1, and Risk Officer 1 were able to maintain and/or enlarge Archegos Fund's long single-name TRS positions, secure additional capacity to enlarge its long TRS positions, and obtain or maintain favorable margin rates.  Halligan, Trader 1, and Risk Officer 1 also understood, based on conversations between Archegos personnel and Swap Counterparties, that Archegos Fund needed to maintain and/or increase its short exposure in order to maintain favorable margin rates and/or enlarge its long single-name TRS positions.  As a practical matter, Archegos Fund typically increased its short exposure through Broad-Based Security Index TRS positions, as those positions had been approved and encouraged by several Swap Counterparties as a risk-reducing measure.

62.     Beginning in mid-2020, Risk Officer 1 began preparing daily "capacity notes," which calculated Archegos Fund's current capacity limitations at each Swap Counterparty.  Risk Officer 1 sent the capacity notes to Halligan and Trader 1, among others, and Trader 1 prepared written summaries of the reports for the Founder.

63.     The Founder routinely directed Trader 1 and others to acquire additional trade capacity that would allow Archegos Fund to continue to grow its concentrated positions.  Trader 1 explained to the Founder that it was becoming increasingly difficult to obtain additional trade capacity due to Swap Counterparties' risk models, but the Founder nonetheless demanded additional capacity anyway.  At the same time, the Founder directed Trader 1 and others to obtain and maintain more favorable margin rates.  Trader 1 informed the Founder that if Swap Counterparties knew about the true size and composition of Archegos Fund's positions, they would want even more margin, but the Founder again still demanded that Trader 1 secure lower margin rates.  To achieve the Founder's dual goals of increased trade capacity and lower margin, Defendants and their Accomplices, Trader 1 and Risk Officer 1, resorted to misrepresenting the true nature of Archegos Fund's positions.

### E.     Archegos Fund's Mounting Losses on March 23 and March 24, 2021

64.     During the week of March 22, 2021, the prices of securities underlying Archegos Fund's concentrated long single-name TRS positions plummeted, triggering a cascade of margin calls in the following days and the total collapse of the firm.

65.     On March 22, 2021, after the market closed, ViacomCBS announced a $2 billion equity offering.  The following day, March 23, ViacomCBS stock dropped substantially, and other Archegos holdings, including GSX, declined as well.  These declines in Archegos Fund's portfolio triggered $2.5 billion in margin calls, due at the end of the day on March 24, which Archegos Fund was able to meet.

66.     ViacomCBS stock declined even further on March 24.  In addition, the SEC proposed new guidelines and restrictions applicable to Chinese issuers.  Consequently, Archegos's holdings in Chinese issues like GSX, IQ, Baidu, and Tencent Music declined significantly as well.  Archegos Fund's substantial losses on the day triggered margin calls from

its Swap Counterparties totaling $10.7 billion. The margin calls were issued the morning of

March 25 and were due by the end of that day.

## F. Defendants' Misrepresentations During the Week of March 22, 2021

67. During the week beginning March 22, 2021, Trader 1, Risk Officer 1, and

Halligan continued to intentionally and/or recklessly make false or misleading statements to

Archegos Fund's Swap Counterparties in connection with Archegos Fund's attempts to meet its

rapidly escalating margin calls.

68. On March 23, 2021, Risk Officer 1 had a telephone call with Swap Counterparty

7. On the call, Risk Officer 1 again falsely represented that Archegos Fund's largest position

was only 35% of NAV, even though Archegos Fund's largest long single-name TRS position,

ViacomCBS, had grown to roughly 70% of Archegos's NAV by that time.

69. On March 24, 2021, as Archegos Fund's margin calls mounted and its portfolio

continued to decline, Archegos gave false assurances to Archegos Fund's Swap Counterparties

that Archegos Fund would be able to meet the margin calls. For example, during a recorded

March 24 telephone call with Swap Counterparty 7, Trader 1 intentionally misrepresented that

although Archegos Fund had a liquidity problem, it did not have a solvency problem. Due to

Archegos Fund's dire financial situation, Trader 1 believed at this point that Archegos Fund

could not recover from this crisis and that the fund would soon fail. Other Archegos

representatives made similar statements to Swap Counterparties on March 24 and March 25,

2021.

70. In an effort to meet the margin calls, Halligan instructed Risk Officer 1 to contact

Swap Counterparties to request the return of any excess margin in Archegos Fund's accounts—

i.e., any margin above the specific thresholds set by each Swap Counterparty. Archegos Fund

28

was reliant on its Swap Counterparties to release the excess margin, and Risk Officer 1 believed

that if the Swap Counterparties became aware of Archegos Fund's true financial position, they

might refuse or delay the release excess margin.  Therefore, Risk Officer 1 lied to the Swap

Counterparties in order to secure the immediate release of excess margin.  For example, on

March 24, Archegos representatives requested that Swap Counterparty 2 return excess margin to

Archegos Fund.  In order to induce Swap Counterparty 2 to return those funds, Risk Officer 1

intentionally falsely represented to Swap Counterparty 2 that Archegos Fund's cash position was

$9 billion, when in fact the true amount of available cash was closer to $2 billion (and,

practically speaking, was even lower because much of that amount was locked in a lending

facility that Archegos Fund could not immediately access).  Risk Officer 1 also intentionally

gave false assurances to Swap Counterparty 2 that Archegos Fund was not in a distress situation.

After the call, in reliance on Risk Officer 1's misrepresentations, Swap Counterparty 2 returned

approximately $250 million in excess margin to Archegos Fund.

71.    Also on March 24, 2021, in a recorded telephone call with representatives of

Swap Counterparty 4, Risk Officer 1 again represented  that Archegos Fund's largest positions at

Swap Counterparty 4 were materially different than its largest positions at other financial

institutions.  This representation was false.

72.    In the evening of March 24, 2021, in order to prepare for responding to questions

the next day from its Swap Counterparties, Risk Officer 1 prepared a document memorializing

certain talking points proposed by Halligan and Trader 1 during a call that evening.  The

document contained several false and misleading statements.  For example, in response to an

anticipated question about the progress of Archegos Fund's portfolio liquidation, the talking

points indicated that Risk Officer 1 should falsely respond that he did not have access to

Archegos Fund's trade blotter.  In response to a question regarding the total margin calls received by Archegos Fund across all of its Swap Counterparties, the talking points indicated that Risk Officer 1 should falsely respond that he "did not have access to that data point."  And, in response to an anticipated question about the performance of Archegos Fund's portfolio during the day, the talking points indicated that Risk Officer 1 should falsely respond that he did not have access to Archegos Fund's live portfolio.  Risk Officer 1 understood that each of these representations in the talking points was false and misleading.  Risk Officer 1 sent the document to Halligan for his review by email on the morning of March 25.  Shortly thereafter, Risk Officer 1 spoke with Halligan by phone to discuss the document, and Halligan vetted and approved it. Halligan intentionally and/or recklessly proposed and approved these false and misleading talking points in order for Risk Officer 1 to provide false and misleading information to Archegos Fund's Swap Counterparties.

73.     On March 25, 2021, Archegos Fund unwound its positions at multiple Swap Counterparties in a continuing effort to meet its margin calls.  In response to ongoing inquiries from its Swap Counterparties, Defendants and their Accomplices continued to make false assurances regarding its positions, liquidity status, and solvency.  For example, Halligan directed Risk Officer 1 to falsely tell counterparties that Risk Officer 1 did not have insight into Archegos's plan to reduce Archegos Fund's exposure.  At Halligan's direction, Risk Officer 1 made several misstatements to Swap Counterparties on March 25 that knowingly concealed his knowledge of Archegos Fund's financial state and plans to reduce exposure, including that he did not have access to Archegos Fund's trade blotter, did not have access to information regarding the total volume of margin calls, and did not have access to Archegos Fund's live portfolio.

### G. March 25 and March 26, 2021 – Archegos Collapses

74.     The markets on March 25 brought further losses to Archegos Fund's portfolio. Archegos Fund's margin calls due March 25 exceeded its available free cash at the end of the day.  When Archegos Fund was unable to meet the full amount of its margin calls, its Swap Counterparties began exercising their rights under their respective swap agreements.  In the evening of March 25, Swap Counterparty 3 issued a notice of default, and Swap Counterparty 7 issued a notice to Archegos Fund exercising its early termination rights.  Swap Counterparty 8, Swap Counterparty 1, and Swap Counterparty 6 each issued margin failure notices.  Over the next two days, several additional Swap Counterparties issued notices of default and/or exercised early termination rights with respect to Archegos Fund.

75.     The events of default allowed Archegos Fund's counterparties to unwind Archegos Fund's positions, which they proceeded to do on Friday, March 26, 2021.  With respect to Archegos Fund's long single-name TRS positions, this meant terminating the swaps and exiting the associated hedges.  Because the Swap Counterparties typically hedged Archegos Fund's long single-name TRS by buying the same security referenced in the swap, exiting the hedges typically meant selling into the market the same securities underlying Archegos Fund's long single-name TRS.  As the Swap Counterparties sold large volumes of these securities into the market on March 26, the prices of these securities declined even further, causing additional losses in Archegos's portfolio.

76.     In addition to deepening Archegos Fund's already crippling losses, these declines also caused enormous losses for many of Archegos Fund's counterparties, who had bought these securities at higher prices during the previous months as a hedge on Archegos Fund's swaps, and who were now forced to sell them back into market at rapidly declining prices.  Swap

Counterparty 3, for example, lost over $5 billion due to Archegos Fund's collapse; Swap

Counterparty 5 lost almost $3 billion; and Swap Counterparty 4 lost over $700 million.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## COUNT ONE

### FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE – VIOLATION OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1) AND REGULATION 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021)

77.     Paragraphs 1 through 77 are re-alleged and incorporated herein by reference.

78.     7 U.S.C. § 9(1) makes it unlawful for any person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

79.     17 C.F.R. § 180.1(a) provides, in part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

80.     During the Relevant Period, as described above, Defendants Archegos and

Halligan violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) by, among other things,

engaging in a fraudulent scheme whereby they intentionally and/or recklessly provided false or

misleading information and/or omitted to state material facts necessary to make that information

not untrue or misleading to Archegos Fund's Swap Counterparties in order to secure additional

capacity to enlarge Archegos Fund's swap trading positions; to obtain or maintain favorable margin rates; and, during the week of March 22, 2021, to attempt to satisfy margin calls.  The false or misleading information Defendants and their Accomplices, Risk Officer 1 and Trader 1, provided included information about the size, composition, and liquidity of Archegos Fund's entire portfolio across financial institutions, as well as information provided in connection with attempts to satisfy Archegos Fund's margin calls.  The false or misleading information provided by Defendants concerned facts that were important for Archegos Fund's Swap Counterparties to know in making credit and risk management decisions about Archegos Fund's swap portfolio at that counterparty.

81.    Risk Officer 1, Trader 1, and Defendant Halligan committed the acts, omissions, and/or failures alleged herein within the scope of their employment, agency, or office with Defendant Archegos.  Therefore, Defendant Archegos is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021), as principal for the acts, omissions, or failures as alleged herein.

82.    Defendant Halligan willfully aided, abetted, counseled, commanded, induced, or procured the commission of the acts constituting violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021), committed by Defendant Archegos.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Halligan is therefore responsible as if he were a principal for Defendant Archegos's violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021).

83.    Each act of:  (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or

misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## VI.    <u>RELIEF REQUESTED</u>

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Find that Defendants Archegos Capital Management, L.P. and Patrick Halligan violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021);

B. Find that Defendant Archegos Capital Management, L.P. is liable under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2021) as principal for the acts, omissions, or failures as alleged herein;

C. Find that Defendant Patrick Halligan is liable under Section 13(a) of the Act, 7 U.S.C. § 13c(a), as if he were a principal for Defendant Archegos's violations of 7 U.S.C. § 9(1), and 17 C.F.R. § 180.1(a)(1)–(3) as alleged herein;

D. Enter an order of permanent injunction enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from violating 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3);

E. Enter an order of permanent injunction restraining and enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and persons in active concert with them, from directly or indirectly:

   1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

2)  Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the name of any Defendant or for any account in which any Defendant has a direct or indirect interest;

3)  Having any commodity interests traded on any Defendant's behalf;

4)  Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)  Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6)  Applying for registration or claim exemption from registration with the Commission in any capacity, or engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

7)  Acting as a principal (as that term is defined in Regulation 3.l(a), 17 C.F.R. § 3.1 (a) (2021)), agent or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

F.  Enter an order directing Defendants to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599–600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act and Regulations, as described herein;

G.  Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees,

revenues, and trading profits derived, directly or indirectly, from the acts or practices which constituted violations of the Act, as described herein, including pre-judgment and post-judgment interest;

H.  Enter an order directing Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

I.  Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

J.  Enter an order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

*     *     *

## VIII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.


Dated:  April 27, 2022                         Respectfully submitted,

**ATTORNEYS FOR PLAINTIFF**

**COMMODITY FUTURES
TRADING COMMISSION**

Manal M. Sultan
Deputy Director
Commodity Futures Trading Commission
Division of Enforcement

By: /s/ John C. Murphy
Steven I. Ringer, Chief Trial Attorney
Alejandra de Urioste, Chief Trial Attorney
John C. Murphy, Trial Attorney
Jacob Mermelstein, Trial Attorney
Benjamin J. Rankin, Trial Attorney

COMMODITY FUTURES
TRADING COMMISSION
Ted Weiss Federal Office Building
290 Broadway, Suite 600
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9938
sringer@cftc.gov
adeurioste@cftc.gov
jmurphy@cftc.gov
jmermelstein@cftc.gov
brankin@cftc.gov