UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                          Plaintiff,

            vs.

ARCHEGOS CAPITAL MANAGEMENT, LP and
PATRICK HALLIGAN,

                          Defendants.

No. 1:22-cv-3401 (JPO)

**DEFENDANT ARCHEGOS CAPITAL MANAGEMENT, LP'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT**

Carmen J. Lawrence
William F. Johnson
Russell W. Johnston
Eric A. Hirsch
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100

*Attorneys for Defendant
Archegos Capital Management, LP*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 3

LEGAL STANDARD.............................................................................................................. 12

ARGUMENT .......................................................................................................................... 13

I.   The CFTC Has Jurisdiction Only Over Claims Involving  Conduct "In
     Connection With" Index Basket Swaps.................................................................... 13

II.  None of the Alleged Misrepresentations Were  Made "In Connection With" Index
     Basket Swaps ............................................................................................................ 15

III. The Communications Described in the Complaint Do Not Support the CFTC's
     Allegations that Archegos Was "Required" to Trade Index Basket Swaps...................... 20

CONCLUSION........................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*,
No. 96 Civ. 2549 (RWS), 1997 WL 97837 (Mar. 6, 1997) ....................................................16

*Anatian v. Coutts Bank (Switzerland) Ltd.*,
193 F.3d 85 (2d Cir. 1999) ..............................................................................................19

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .................................................................................................12, 16

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ...................................................................................... *passim*

*In re Bristol-Meyers Squibb Secs. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................................22

*Chadbourne & Park LLP v. Troice*,
571 U.S. 377 (2014) ...............................................................................................15, 17

*Charles Schwab Corp. v. Bank of Am. Corp.*,
883 F.3d 68 (2d Cir. 2018) ..............................................................................................18

*Chemical Bank v. Arthur Andersen & Co.*,
726 F.2d 930 (2d Cir. 1984) ....................................................................................... 17-19

*Citibank N.A. v. K-H Corp.*,
No. 89 Civ. 3609 (PKL), 1991 WL 35951 (S.D.N.Y. Mar. 14, 1991), *aff'd on other grounds*, 968 F.2d 1489 (2d Cir. 1992) ...........................................................16

*In re Citigroup, Inc.*,
2011 WL 744745 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*,
471 F. App'x 30 (2d Cir. 2012) .........................................................................................3

*Gallop v. Cheney*,
642 F.3d 364 (2d Cir. 2011) ............................................................................................12

*Kearney v. Prudential-Bache Secs. Inc.*,
701 F. Supp. 416 (S.D.N.Y. 1988) ..............................................................................14, 19

*Levitin v. Paine Webber Inc.*,
933 F. Supp. 325 (S.D.N.Y. 1996), *aff'd on other grounds*, 159 F.3d 698 (2d
Cir. 1998) ...............................................................................................................16

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................................................................14

*In re NYSE Specialists Secs. Litig.*,
    503 F.3d 89 (2d Cir. 2007) ..............................................................................................12

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019) ..............................................................................................13

*Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund*,
    6 F. Supp. 2d 236 (S.D.N.Y. 1998) .................................................................................15

*Rinfret, Inc. v. Drexel Burnham Lambert Inc.*,
    661 F. Supp. 611 (S.D.N.Y. 1987) .............................................................................14, 20

*Sarafianos v. Shandong Tada Auto-Parking Co.*,
    No. 13-cv-3895 (SAS), 2014 WL 7238339 (S.D.N.Y. Dec. 19, 2014) ...........................18

*Saxe v. E.F. Hutton & Co.*,
    789 F.2d 105 (2d Cir. 1986) ............................................................................................20

*SEC v. Zandford*,
    535 U.S. 813 (2002) .........................................................................................................14

*Taylor v. Westor Capital Group*,
    943 F. Supp. 2d 397 (S.D.N.Y. 2013) ..............................................................................15

*Wu v. Bitfloor*,
    460 F. Supp. 3d 418 (S.D.N.Y. 2020) ..............................................................................13

**Statutes**

7 U.S.C. § 2(a)(1)(B) ...............................................................................................................12 n.12

7 U.S.C. § 1a(47)(A) & (B) ......................................................................................................14 n.14

7 U.S.C. § 9(1) ........................................................................................................................13

15 U.S.C. § 78bb(f)(1)(A).........................................................................................................17

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................................12

Federal Rule of Civil Procedure 9(b) ............................................................................. 12-13, 23

George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid Disclosure? Evidence from Confidential 13F Filings* ...........................................................10

*Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation,* 76 FR 41398-01 (July 14, 2011) ...........................................................................................13

**PRELIMINARY STATEMENT**

Defendant Archegos Capital Management, LP ("ACM"), the management company of the Archegos family office ("Archegos"), submits this brief in support of its motion to dismiss the Commodity Futures Trading Commission's ("CFTC") Complaint with prejudice.  The Complaint should be dismissed because it fails to state a claim over which the CFTC has jurisdiction.

Archegos invested in the securities markets by purchasing equity shares and total return swaps ("swaps").  Swaps are derivative securities that provided Archegos with economic exposure to the equity shares referenced by the swaps, but no actual ownership of the referenced equity shares.  Archegos hedged those investments mostly through short positions in two products:  (1) swaps that referenced broad-based indices known as exchange-traded funds (ETF); and (2) custom index basket swaps that, like the ETF swaps, provided Archegos economic exposure to a broad index of hundreds of different securities (together, "Index Basket Swaps"). The CFTC has the authority to regulate investments in broad-based index securities like the Index Basket Swaps, but jurisdiction over investments in regular shares or single-name total return swaps is reserved for the SEC, which, as the Court is aware, has filed its own separate claims against ACM arising out of the same time period as the CFTC's action.

In its Complaint, the CFTC alleges that ACM employees violated the Commodity Exchange Act ("CEA") by making misrepresentations to Archegos' bank counterparties in an effort to obtain more favorable credit terms:  better margin rates and additional trading capacity. The CFTC lacks jurisdiction to pursue these claims.  Although the CFTC broadly asserts that the Index Basket Swaps were an "integral component" of the alleged fraud scheme (Compl. ¶ 12), none of the alleged misrepresentations relate to the nature or value of any Index Basket Swaps traded between Archegos and its counterparties.  Instead, the alleged misrepresentations relate to

1

the characteristics of Archegos' portfolio or Archegos' solvency during the week of March 22,

2021, and were made during discussions with counterparties that were evaluating the risk

characteristics of that portfolio for the purpose of determining whether to extend credit.  The

Supreme Court and Second Circuit have made clear that fraud claims are outside the scope of the

CEA unless they relate to the value of securities traded or consideration received in connection

with those trades.  Alleging that counterparties might have asked Archegos to "maintain[]

appropriate levels" (Compl. ¶ 5) of the Index Basket Swaps had there been more transparency

into Archegos' portfolio does not equate to a claim that the counterparties were deceived about

the value or nature of the Index Basket Swaps.  The allegations boil down to an assertion that

counterparties might have wanted Archegos to trade in more of the same derivatives it already

had, not that the counterparties were deceived about the essence of those derivatives in any

specific transaction with Archegos.  These allegations are therefore insufficient to state a CEA

claim.

The CFTC also cannot manufacture jurisdiction, as it attempts to do here, through

allegations that Archegos' counterparties "required" Archegos to enter into Index Basket Swaps

trades.  Describing the Index Basket Swaps as "required" does not transform the context and

characteristics of the alleged misrepresentations into conduct that would fall within the scope of

the CEA.  Nevertheless, the Complaint fails to allege sufficient facts to support the conclusory

allegation that the Index Basket Swaps were "required".  Relying on incomplete excerpts from

Bloomberg chats, the CFTC suggests that Archegos' counterparties required Archegos to trade in

the products over which it has jurisdiction.  The only requirements, however, were that Archegos

maintain certain long/short ratios in its portfolio – Archegos had the sole discretion to determine

the particular products used to achieve that ratio.  The CFTC does not cite to a single contract

provision that requires that Archegos use Index Basket Swaps to hedge, and none of the communications quoted in the Complaint – when read in full – represent a demand by a counterparty that Archegos trade in those products.

Because the CFTC has failed to adequately state a claim for fraud and failed to plead its purported fraud claim with particularity, the Court should dismiss all of the CFTC's claims with prejudice.

## STATEMENT OF FACTS[1]

*The Archegos Family Office.*  Defendant ACM is the investment manager for the Archegos family office.  Archegos had no outside investors or clients.  It invested only funds that derived from Sung Kook (Bill) Hwang's family's personal wealth.[2]  Compl. ¶ 17 (referring to Mr. Hwang as the "Founder").[3]  ACM and Archegos have never been registered with the CFTC in any capacity, and the CFTC does not allege that any of their business activities required them to be.  Compl. ¶ 15.  Patrick Halligan served as the Chief Financial Officer of ACM.  Compl. ¶ 16.  William Tomita served as its Head Trader (identified as Trader 1 in the Complaint), and

---

[1] On a motion to dismiss, the Court can consider matters of public record, including court filings, securities prices, news articles and press releases.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007); *In re Citigroup, Inc.*, 2011 WL 744745, at *5 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012).

[2] The CFTC does not identify by name those individuals and entities that are not parties to this matter.  Because the individuals associated with Archegos are identified by name in the related case before this Court, *SEC v. Hwang, et al.*, 1:22-cv-03402, they are identified by name herein for the Court's convenience.

[3] The family office was formed after Mr. Hwang and two entities founded by Mr. Hwang, Tiger Asia Management, LLC ("TAM") and Tiger Asia Partners, LLC, settled claims of insider trading and attempted market manipulation brought by the SEC in 2012.  Compl. ¶¶ 21-23.  In connection with the settlement, Mr. Hwang neither admitted nor denied the SEC's claims.  *See* July 1, 2022 Declaration of Russell W. Johnston, Ex. 1 (January 22, 2013 Order in *In re Sung Kook Hwang* § II).  In a separate criminal action, TAM pled guilty to one count of wire fraud in connection with a charge of insider trading.  Compl. ¶ 22.  That criminal action did not name Mr. Hwang as a defendant.  *Id.*

Scott Becker was the Chief Risk Officer (identified as Risk Officer 1 in the Complaint). Compl. ¶¶ 18–19.

*Archegos' Investments.*  Archegos' investments were primarily made in equity shares (i.e., stock) and in total return security-based swaps.  The SEC, not the CFTC, has regulatory authority over Archegos' stock and single-name swaps investments, which comprised the majority of Archegos' long positions.  Like many investors, Archegos purchased stock and swaps on margin.  That is, Archegos borrowed money from its counterparties, using the securities in its brokerage accounts as collateral.  Compl. ¶¶ 30–31.

Archegos' swaps were private contractually based arrangements with individual bank counterparties.  When Archegos and a counterparty bank – one of Archegos' prime brokers or another large financial institution – entered into a swap, they agreed to exchange cash flows depending on the price of the referenced security.  Compl. ¶ 25.  In other words, if Archegos entered into a swap for ViacomCBS, the parties would then only use ViacomCBS as the reference asset.  Thereafter, if the value of ViacomCBS stock increased, Archegos would receive payments from its counterparty based on the increase in the value of ViacomCBS stock.  If the value of ViacomCBS stock subsequently decreased, Archegos would pay its counterparty.  Archegos would also pay an agreed-upon interest rate to the counterparty, so "the financial return to [Archegos] in a total-return equity swap is roughly equivalent to the return when borrowed capital is used to purchase shares in the referenced company."  *Id.*  The swaps were derivative securities and represented synthetic exposure to an underlying equity security – the swaps contracts did "not transfer title to the underlying assets or require that either party actually own them."  *Id.*

Archegos hedged its long positions (positions that Archegos was investing in with the expectation that they would appreciate in value) with, among other things, short positions in two types of swaps that referenced the securities of broad pools of companies, rather than a single security.  First, Archegos purchased short positions in ETF index swaps – investment funds that track an index, sector, or other asset.  Shares of an ETF can be bought or sold like shares of stock.  Compl. ¶ 27.  Second, Archegos also purchased short positions in custom basket swaps, which the CFTC alleges were swaps that also tracked broad-based indices like the S&P 500 and MSCI Emerging Markets Index, but were customized, for example, to remove certain securities from the reference pool in which Archegos had long positions.  Compl. ¶ 28.  These two types of positions (referred to herein as "Index Basket Swaps") are the only securities identified in the Complaint over which the CFTC has jurisdiction.  Compl. ¶¶ 27–28.  The CFTC alleges that, by March 2021, Archegos traded in a combined $52 billion in short positions in Index Basket Swaps.  Compl. ¶¶ 27–28.  Because these were short positions, Archegos would receive payments from its counterparties if the value of the Index Basket Swaps declined.  Compl. ¶ 26.

The CFTC alleges that when Archegos' counterparties entered into a long single-name swap with Archegos, the counterparty would "typically" purchase shares of the referenced issuers in the market.  Compl. ¶ 29.  The CFTC does not quantify these counterparty purchases, allege that Archegos directed or had any control over these counterparty purchases, or allege that these counterparty purchases were required by the contracts governing the swaps traded between Archegos and its counterparties.  It is well known in the industry that there are other commonly used ways that a bank can hedge its swap exposure – beyond purchasing the underlying shares –

that would have no impact on the market prices of the shares at issue, including by entering into offsetting swap contracts with another customer.[4]

Certain of Archegos' counterparties imposed limitations on Archegos' swaps transactions.  Those limitations were typically in the form of capacity restrictions – i.e., limits on the total notional value of Archegos' portfolio with that counterparty, or requests that Archegos maintain a certain ratio of long to short positions in its portfolio with that counterparty.  Compl. ¶ 36.  Although the CFTC characterizes these as "requirements," it does not allege the contracts between Archegos and its counterparties mandated that Archegos put on these positions, and the CFTC acknowledges that some of these limits were "informal."  *Id.*  It also alleges that if Archegos failed to adhere to these "requirements," the counterparties would "consider limiting further trading," and/or require that Archegos post additional margin.  *Id.*  The CFTC does not allege that any of Archegos' counterparties ever stopped trading with Archegos based on its failure to meet these so-called "requirements."

The CFTC claims that the Index Basket Swaps "played a critical role" in the counterparties' "assessment and management" of Archegos' credit risk (that is, the risk to the counterparties that Archegos would be unable to repay its margin loans).  Compl. ¶ 37.  Even assuming that allegation is correct, the CFTC does not allege that Archegos was contractually required to enter into the Index Basket Swaps positions, or that a counterparty ever specifically required Archegos to enter into a particular Index Basket Swap position (as opposed to any other

---

[4]  *See* Johnston Decl. Ex. 2 (July 29, 2021 Credit Suisse Group Special Committee of the Board of Directors Report on Archegos Capital Management, pp. 38-39); Ex. 3 (Brief of Amici Curiae International Swaps and Derivatives Association, Inc. and Securities Industry and Financial Markets Association at 10, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.* (S.D.N.Y. June 2, 2008), ECF No. 80 (summarizing testimony)); Ex. 4 (Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference Annex 4:  Survey on Contracts for Difference by PricewaterhouseCoopers LLP for the Financial Services Authority, p. 16 (November 2007)), Ex. 5 (Matt Levine, *Take the Swaps Off the Balance Sheet*, Bloomberg, May 24, 2022 at 2-3).

short position).  At all times, Archegos retained full discretion over the transactions in its portfolio, and the CFTC does not allege anything to the contrary.

*Archegos' Portfolio.*  Between March 2020 and March 2021, Archegos' family office grew from a fund with approximately $1.5 billion in assets under management to a family office with approximately $35 billion in assets under management.  Compl. ¶ 39.  After the COVID-19 induced equities market crash in March 2020, Archegos transitioned its top investments to companies that it believed were well positioned to succeed in the changed environment.  Compl. ¶¶ 38, 40.  Those companies included U.S. and China-based media companies with streaming services (ViacomCBS, Inc., two share classes of Discovery, Inc., Tencent Music Entertainment Group, and iQiyi, Inc.), a China-based online education company (GSX Techedu, Inc.), and China's largest internet and artificial intelligence company (Baidu, Inc.).  Compl. ¶¶ 40–41, 66. These issuers comprised Archegos' top long positions in individual companies ("Archegos' Top Holdings") after the pandemic.

Between March 20, 2020 and March 19, 2021, the market rebounded, and both the S&P 500 and the Dow Jones Industrial Average increased by 70%.[5]

---

[5]  *See* Johnston Decl. Exs. 6, 7 (March 20, 2020 – March 19, 2021 closing prices for the S&P 500 and Dow Jones Industrial Average, respectively).



During this period, Archegos took advantage of the depressed market conditions by continuously adding to the size of its investments in its top companies, with the view that although their prices were temporarily suppressed by the pandemic, they would eventually rise again.  The CFTC does not allege that in doing so, Archegos violated any rules or regulations concerning concentration limits or exposure, and there are none that are applicable to a family office such as Archegos.

Archegos also added additional counterparties during this time period – the CFTC alleges that Archegos used at least ten, and was in discussions with four more.  Compl. ¶¶ 26, 43.  The practice of using multiple counterparties is not at all unusual, and is a practice employed lawfully by hedge funds across Wall Street.[6]

The CFTC alleges that as Archegos' portfolio grew, Archegos' counterparties "required" Archegos to increase the size of its short positions, either to obtain more capacity or to maintain specific margin rates.  Compl. ¶¶ 42, 46.  The CFTC does not allege facts supporting the claim

---

[6] *See* Johnston Decl. Ex. 8. (Form ADVs of Hudson Bay Capital Mgmt. disclosing 11 custodians, including 8 prime brokers; Paloma Partners, disclosing 24 custodians, including 17 prime brokers, and Samlyn Capital, disclosing 13 custodians, including 6 prime brokers).

that counterparties required Archegos to add any specific type of short position (single-name equity shares, single-name swaps, index positions, or index swaps) in order to maintain the long/short balance of its portfolio. *See* Compl. ¶ 45 (alleging Archegos "agreed to hedge 50% of any new long exposure"). At most, the CFTC alleges that in response to counterparty requests that Archegos agree to risk-reducing measures, Archegos would "generally" or "typically" add short positions in Index Basket Swaps. Compl. ¶¶ 42, 44, 61.

The CFTC cites two discussions with counterparties that specifically reference Index Basket Swaps. In one, Mr. Tomita (Trader 1) volunteered to "keep adding index shorts" in connection with a request for additional capacity. Compl. ¶ 46. In the other, the same counterparty approved an increase in Archegos' capacity with respect to GSX, and commented that it "remained 'very focused on the shorts [i.e., the Broad-Based Security Index Swaps]' and Archegos Fund's ability to maintain a 'balanced' long/short ratio by adding Custom Basket Swaps." *Id.* (excerpts and alterations of original by CFTC). Nowhere in either of these exchanges does the counterparty appear to require Archegos to trade Index Basket Swaps. In the first exchange, Archegos volunteered to put on those positions in connection with a request for additional capacity. In the second exchange, after the counterparty had already granted additional capacity, the quoted language from the counterparty only comments that they were focused on Archegos' long/short ratio.[7]

*The Alleged Misrepresentations*. The CFTC alleges that certain Archegos employees made misrepresentations to Archegos' counterparties in connection with inquires by those

---

[7] The complete Bloomberg chats selectively quoted by the CFTC in their Complaint are attached as Exhibits 9 and 10 to the Johnston Declaration. Because the CFTC has selectively quoted these Bloomberg chats, the Court can consider the chat in full on a motion to dismiss. *ATSI*, 493 F.3d at 98 (holding, on a motion to dismiss, "we may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

counterparties about Archegos' portfolio.  According to the Complaint, the counterparties made these inquiries to "gather information about Archegos Fund in order to make credit and risk management decisions about its portfolio at their respective institutions."  Compl. ¶ 49.  These alleged misrepresentations concerned Archegos' largest positions, gross exposure, unencumbered cash, and liquidity.  Compl. ¶ 49.  Although the CFTC alleges that there was a "culture of secrecy" at Archegos (Compl. ¶ 48), the CFTC does not cite any contractual provisions that required Archegos to make specified disclosures to its counterparties.  There are legitimate reasons for portfolio managers to keep information about their positions confidential.[8]

More fundamentally, none of the alleged misrepresentations described in the Complaint concerned the terms of any Index Basket Swap trade or the consideration received by the counterparties for Archegos' Index Basket Swap trades.  *See* Compl. ¶¶ 52–63.  And although the CFTC alleges that Mr. Hwang (the Founder) "demanded additional capacity" and routinely directed Archegos employees to obtain it (Compl. ¶ 63), the CFTC does not allege that Mr. Hwang ever directed any Archegos employee to deceive Archegos' counterparties, nor is that a plausible inference from the specific facts alleged.

*Archegos' Collapse.*  Several significant events occurred in short sequence in March 2021 that contributed to the downfall of Archegos.  After market close on March 22, 2021, ViacomCBS announced a $3 billion secondary offering, which was not well received by the market.  Compl. ¶ 65.  On Wednesday morning, March 24, 2021, ViacomCBS's share price

---

[8]  Hedge funds that are required to make disclosures of their positions through Form 13F filings can, under certain circumstances, request confidential treatment of their positions for a limited amount of time.  One study reviewed the performance of positions where such confidential treatment was requested and found "evidence suggesting that hedge fund managers seek confidential treatment in order to avoid the costs of front-running by outside investors who anticipate a fund's trades and then trade against the fund."  George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid Disclosure?  Evidence from Confidential 13F Filings*, 48 J. Fin. & Quantitative Analysis 1499, 1517 (2013).

declined even further. *Id.* ¶ 66. That same day, the SEC announced new reporting requirements for Chinese companies flowing from the Holding Foreign Companies Accountable Act, resulting in significant losses in Archegos' China-based positions.[9] *Id.* Archegos' positions continued to deteriorate over the course of the week, and by Thursday, March 25, 2021, Archegos faced margin calls totaling $10.7 billion. Compl. ¶ 66.

The CFTC alleges that Archegos continued to make misrepresentations to its counterparties during the course of this week, "in connection with Archegos Fund's attempts to meet its rapidly escalating margin calls." Compl. ¶ 67. The CFTC does not allege that these discussions with counterparties had anything to do with Archegos' short positions in Index Basket Swaps – whether adding more of those positions, maintaining those positions, or unwinding those positions. *See* Compl. ¶¶ 68–73.

Ultimately, because Archegos was unable to satisfy margin calls, its counterparties unwound Archegos' positions and delivered default notices. Compl. ¶ 74. In connection with unwinding Archegos' single-name swap positions, Archegos' counterparties sold "large volumes" of the referenced securities into the market on March 26, 2021, causing the prices of those securities to decline even further, and Archegos to suffer "crippling" losses. Compl. ¶ 75.

*The Government Actions.* On April 27, 2022, Mr. Hwang and Mr. Halligan were indicted by the U.S. Attorney's Office for the Southern District of New York ("SDNY") for violations of RICO and the securities laws based, in part, on the same alleged conduct charged by the CFTC in its Complaint. Both have pled not guilty to the Government's charges.[10]

---

[9]  Relevant press the morning of March 24, 2021 also included reports of increased scrutiny from the Chinese government on tech companies. *See* Johnston Decl. Ex. 11 (Lulu Yilun Chen, *China Considers Creating State-Backed Company to Oversee Tech Data*, Bloomberg, March 24, 2021).

[10]  *See* Johnston Decl. Ex. 12 (reports of proceedings reflecting Mr. Hwang's and Mr. Halligan's not guilty pleas in *United States of America v. Hwang & Halligan*). In addition to claims based on alleged misrepresentations to counterparties, the indictment asserts a novel claim – never before successfully charged as a criminal matter in the

Also on April 27, 2022, in coordination with the SDNY and SEC, the CFTC filed this action against ACM and Mr. Halligan.[11]  In a single count, the Complaint charges ACM with violations of Sections 6(c)(1) of the Commodity Exchange Act, and Regulation 180.1(a)(1)-(3) thereunder, based on alleged misrepresentations by Archegos' employees to Archegos' counterparties concerning the characteristics of Archegos' portfolio.[12]

## LEGAL STANDARD

"To survive a motion to dismiss" under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although a court should assume the truth of factual allegations that are "well-pleaded," it should not accept as true any "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678–79.  Complaints containing only "conclusory, vague, or general allegations," supported by only "speculation and conjecture," "cannot withstand a motion to dismiss." *Gallop v. Cheney*, 642 F.3d 364, 368–69 (2d Cir. 2011) (citation and quotation omitted); *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (on a motion to dismiss, a court "need not accord legal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness") (citations and quotations omitted).

Because the CFTC's claims are based on fraud, they must also satisfy Rule 9(b) of the Federal Rules of Civil Procedure.  *See ATSI*, 493 F.3d at 101.  Accordingly, the CFTC must "(1)

---

Second Circuit – that Mr. Hwang engaged in market manipulation through open-market trading in Archegos' top positions.

[11]  The SEC filed a civil action against ACM, Mr. Hwang, Mr. Halligan, Mr. Tomita, and Mr. Becker on April 27, 2022 that included charges based on alleged misrepresentations to counterparties.  On June 28, 2022, ACM, Mr. Hwang, and Mr. Halligan moved to dismiss the SEC Complaint.

[12]  On April 27, 2022, Mr. Tomita and Mr. Becker settled claims brought by the CFTC based on the misrepresentations alleged herein.  The CFTC alleges that ACM is responsible for the conduct of its employees pursuant to § 2(a)(1)(B) of the CEA and Regulation 1.2 promulgated thereunder.  7 U.S.C. § 2(a)(1)(b), 17 C.F.R. § 1.2.

specify the statements that [it] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* at 99; *Wu v. Bitfloor*, 460 F. Supp. 3d 418, 423 (S.D.N.Y. 2020) (holding that where "plaintiffs' allegations suggest fraudulent conduct on defendants' part, the CEA claims are subject to the heightened pleading requirements of Rule 9(b)") (citation and quotation omitted).

**ARGUMENT[13]**

**I.    The CFTC Has Jurisdiction Only Over Claims Involving Conduct "In Connection With" Index Basket Swaps**

Under Section 6(c)(1) of the Commodity Exchange Act, it is "unlawful for any person . . . to use or employ . . . in connection with any swap . . . any manipulative or deceptive device or contrivance . . . ." 7 U.S.C. § 9(1); *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019). Rule 180.1(a) states that it is unlawful for any person to "intentionally or recklessly" commit one of the following acts "in connection with any swap":

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

> (2) Make or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. § 180.1(a)(1)–(3) (2021). In its adopting rules release, the CFTC explained that Rule 180.1 was modeled after the SEC's Rule 10b-5. *See Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation,* 76 FR 41398-01, 41399 (July 14, 2011) ("Given the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the Commission deems it appropriate and in the

---

[13] ACM incorporates by reference, as if fully set forth herein, all arguments made in the brief in support of the motion to dismiss the CFTC's Complaint filed by Mr. Halligan.

public interest to model final Rule 180.1 on SEC Rule 10b-5.").  The term "swap," as used in the CEA and Rule 180.1, is defined to include the Index Basket Swaps at issue here, but does not include the single-name swaps that Archegos transacted with its counterparties.[14]

The CEA does not provide the CFTC jurisdiction over general claims of fraud.  Rather, to be actionable under the CEA, there must be a nexus between the alleged manipulative scheme and the covered swaps (here, the Index Basket Swaps).  In analyzing this language in the CEA, "courts generally have applied interpretations of the 'in connection with' requirement of § 10(b) of the Securities Exchange Act of 1934 . . . ."  *Kearney v. Prudential-Bache Secs., Inc.*, 701 F. Supp. 416, 424 (S.D.N.Y. 1988); *see also Rinfret, Inc. v. Drexel Burnham Lambert Inc.*, 661 F. Supp. 611, 614 (S.D.N.Y. 1987).  This threshold issue is precisely where the CFTC's claims fall apart – none of the misrepresentations alleged in the Complaint relate, in any respect, to the nature or value of Archegos' Index Basket Swaps.

Although the Supreme Court has stated that Section 10(b) "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes,'" it has also cautioned that it "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)."  *SEC v. Zandford*, 535 U.S. 813, 820 (2002) (citations omitted).  In other words, "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security . . . .'" *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 266–67 (2010) (citations omitted).  "Those purchase-and-sale transactions are the objects of the statute's solicitude.  It is those transactions that the statute seeks to 'regulate' . . . ."  *Id.* at 266–67 (citations omitted).  Most recently, in

---

[14]  *See* CEA § 1a(47)(A) and (B), codified at 7 U.S.C. §1a(47)(A) and (B) (defining swaps to include security-based swap agreements based on the value of any group or index of securities, but excluding from that definition security-based swaps, which include swaps referencing a single security); *see also* Compl. ¶¶ 27-28.

*Chadbourne & Park LLP v. Troice,* 571 U.S. 377 (2014), the Court explained: "a fraudulent misrepresentation or omission is not made in connection with such a purchase or sale of a covered security unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security." *Id.* at 387 (citations omitted). An application of these principals here confirms that the CFTC lacks jurisdiction to pursue these claims.

## II.   None of the Alleged Misrepresentations Were Made "In Connection With" Index Basket Swaps

The CFTC's claims are based on allegations that Mr. Tomita and Mr. Becker made misrepresentations to counterparties concerning the characteristics of Archegos' portfolio in order to obtain additional trading capacity, more favorable margin rates, and (during the week of March 22, 2021) to satisfy margin calls. Compl. ¶ 50. The CFTC alleges that these misrepresentations were made during discussions with counterparties, the objective of which (from the counterparty perspective) "was to gather information about Archegos Fund in order to make credit and risk management decisions about its portfolio at their respective institutions." Compl. ¶ 49. What the CFTC does not allege is that during the course of those discussions (or at any time), Archegos made misrepresentations concerning the attributes of the Index Basket Swaps that it traded with its counterparties.

Focusing first on the pre-March 22, 2021 allegations, none concern the characteristics of the Index Basket Swaps. *See Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 403 (S.D.N.Y. 2013) ("courts have drawn a line separating fraud claims that impact the fundamental valuation of the securities at issue, and the operation of securities markets, as distinguished from those that do not."); *Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund*, 6 F. Supp. 2d 236, 239 (S.D.N.Y. 1998) (citation omitted) ("[n]umerous decisions in this district have applied *Chemical Bank* to dismiss securities fraud claims when the alleged misrepresentations

did not pertain to the 'fundamental nature' of the securities . . . ."); *Levitin v. Paine Webber Inc.*, 933 F. Supp. 325, 328 (S.D.N.Y. 1996)*, aff'd on other grounds*, 159 F.3d 698 (2d Cir. 1998) (stating, in dismissing § 10(b) claim alleging broker misappropriated customer assets to earn interest payments, that "the misrepresentation or omission must pertain to the securities themselves; allegations of fraud merely involving securities are not sufficient.").[15]  Instead, the alleged misrepresentations related to the size of Archegos' largest position, the amount of Archegos' available cash, the liquidity of Archegos' portfolio, whether the positions traded with a particular counterparty were unique to that counterparty, and the composition of the portfolio.[16] The CFTC's allegations that the purpose of these discussions was to enable the counterparties to "make credit and risk management decisions about [Archegos'] portfolio at their respective institutions" (Compl. ¶ 49) are insufficient.[17]  Allegations that the counterparties might have asked Archegos to add more of the Index Basket Swaps – with no accompanying allegations that the counterparties were lied to or deceived about the composition, value, or nature of the Index Basket Swaps – are insufficient to state a CEA claim.

---

[15]  *See also Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96 Civ. 2549 (RWS), 1997 WL 97837, at * 5 (Mar. 6, 1997) (dismissing claims "because they do not relate to the fundamental investment attributes of the securities"); *Citibank N.A. v. K-H Corp.*, No. 89 Civ. 3609 (PKL), 1991 WL 35951 at * 4 (S.D.N.Y. Mar. 14, 1991), *aff'd on other grounds*, 968 F.2d 1489 (2d Cir. 1992) (dismissing claim where "there is no allegation that defendants actually made any representation as to the nature or value of the stock").

[16]  *See* Compl. ¶¶ 51-53, 68 (alleged representations concerning the size of Archegos' largest position); ¶¶ 51, 70 (alleged representations concerning the amount of available cash); ¶¶ 54, 57, 71 (alleged representations concerning the uniqueness of a counterparty's portfolio), ¶¶ 55-56 (alleged representations concerning liquidity), ¶¶ 58, 59 (alleged representations concerning portfolio composition, generally and at other counterparties).

[17]  Indeed, these allegations do not even satisfy the *Iqbal* plausibility standard.  The CFTC alleges that Mr. Hwang demanded that Mr. Tomita acquire additional trade capacity and more favorable margin rates.  Compl. ¶ 63.  It further alleges that Mr. Tomita told Mr. Hwang that if counterparties knew the "true size and composition" of Archegos' portfolio, they would increase Archegos' margin rates.  *Id.*  The CFTC then goes on to allege that Mr. Hwang nonetheless directed Mr. Tomita to secure lower margin rates, but nowhere does the CFTC allege that Mr. Hwang directed Mr. Tomita or Mr. Becker to lie to obtain those lower margin rates or any increased capacity.  *Id.*  It is not plausible that Mr. Tomita and Mr. Becker would have reasonably understood that Mr. Hwang's request for more capacity and more favorable margin rates was an instruction for them to resort to lies to obtain it.

In *Chadbourne & Park*, the Supreme Court considered whether the Securities Litigation Uniform Standards Act ("SLUSA") required the dismissal of the plaintiffs' state law claims. SLUSA bars plaintiffs from bringing large securities class actions based on state law alleging "a misrepresentation or omission of a material fact *in connection with* the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A) (emphasis added). Analyzing this identical statutory language, the Supreme Court concluded that the plaintiffs' claims were barred. In doing so, it rejected an interpretation of the "in connection with" requirement that would cover "a lawsuit brought by creditors of a small business that falsely represented it was creditworthy, in part because it owns or intends to own exchange-traded stock." *Chadbourne & Park*, 571 U.S. at 391. In other words, misrepresentations concerning creditworthiness – like those alleged here by the CFTC – are not enough to satisfy the "in connection with" requirement where there is, at best, a tenuous relationship to the covered securities at issue.

The Second Circuit's decision in *Chemical Bank* is also instructive. There, certain banks agreed to provide loans to Frigitemp Corporation and its wholly owned subsidiary, Elsters, Inc. The loan to Elsters was guaranteed by Frigitemp and secured by 100% of Elsters common stock. After Frigitemp filed for bankruptcy, the banks sued Frigitemp's outside auditor under § 17(a) of the Securities Act of 1933 and § 10(b) of the Securities Exchange Act of 1934, alleging that Frigitemp's financial statements were false and misleading, and had induced the banks to extend loans to Frigitemp and Elsters. *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 933 (2d Cir. 1984). The Second Circuit explained:

> The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

17

*Id.* at 943; *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (same). The court went on to dismiss the securities law claims because the defendant's misrepresentations concerning Frigitemp were made in connection with obtaining the loans, not the pledge of Elsters stock. *Chemical Bank*, 726 F.2d at 945; *see also Sarafianos v. Shandong Tada Auto-Parking Co.*, No. 13-cv-3895 (SAS), 2014 WL 7238339, at * 4 (S.D.N.Y. Dec. 19, 2014) ("courts in this Circuit routinely reject attempts to transform putative fraud or breach of contract claims into section 10(b) claims."). Here, the CFTC fails to allege that any supposed misrepresentations regarding the size, composition, liquidity, and uniqueness of Archegos' portfolio, or the amount of available cash, were "in connection with" transactions involving Index Basket Swaps.

The CFTC's allegations concerning the week of March 22, 2021 are even further attenuated from any possible CEA claim. That week, the CFTC alleges that Archegos employees made misrepresentations about Archegos' solvency, the reasons why Archegos was calling back excess margin, and Mr. Becker's access to trade information.[18] These allegations are totally unrelated to Index Basket Swaps and the CFTC makes no allegations that bridge this gap. The CFTC does not allege, for example, that Archegos' counterparties expressed any view during that week as to whether Archegos should enter into more Index Basket Swaps. Nor does the CFTC allege that any swaps counterparty would have recommended different, alternative, or additional Index Basket Swaps had Archegos been transparent about its circumstances during that week.

Even if the CFTC did include such allegations, it would not be enough to satisfy the "in connection with" requirement. The Second Circuit has made clear that claiming that securities

---

[18] *See* Compl. ¶¶ 69, 70 (alleged representations concerning solvency); ¶ 73 (Mr. Becker's access to trade information).

transactions would or would not have occurred absent the alleged misrepresentations does not satisfy the "in connection with" element.  This precise argument was considered – and rejected – in *Chemical Bank*, where the court held that such "'but for' causation is not enough." *Chemical Bank*, 726 F.2d at 943.  Section 10(b) and Rule 10b-5 "impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." *Id.*; *see also Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (finding that the "purported misrepresentations as to the authority of the [bank] representatives to loan money in excess of the bank's lending requirements . . . do not pertain to the purchase or sale of a security.").  Here, like the plaintiffs in *Chemical Bank*, Archegos' counterparties chose to make loans (i.e., extend margin) and extend trading capacity based on certain oral representations. These claims, like the claims in *Chemical Bank*, must fail because they amount to nothing more than allegations that the supposed misrepresentations induced the *loan*, not the securities *transactions*.

Both before and after the week of March 22, the CFTC does not allege that Archegos made misrepresentations to counterparties in connection with Index Basket Swaps trades after the counterparties had extended trading capacity or modified margin rates for Archegos.  As one court explained, "[t]he 'in connection with' requirement mandates that the alleged fraud concern the fundamental *nature* of the commodity futures contract:  namely, the characteristics and attributes that would induce an investor to buy or sell the particular commodity future contract." *Kearney*, 701 F. Supp. at 424 (emphasis in original).  In *Kearney*, the court dismissed a CEA claim based on allegations that a broker provided fraudulent tax advice concerning the plaintiffs' commodities account.  Relying on *Chemical Bank* and other Second Circuit precedent, the court

concluded "[t]hese cases teach that, in order for a misrepresentation to be actionable under the Securities Exchange Act and the Commodity Exchange Act, it must be fundamental to the nature of a particular securities or commodity trading device." *Id.* at 426; *see also Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) (allowing CEA claim to survive but dismissing securities law claims where defendants' misrepresentations caused plaintiff to liquidate securities account in order to open and trade in a commodities account); *Rinfret*, 661 F. Supp. at 614-615 (dismissing CEA claim based on misrepresentations by defendant that plaintiff would be paid commissions on commodities trades).

The CFTC has not alleged that Archegos made any misrepresentations concerning the fundamental nature of the Index Basket Swaps.  If trading in the Index Basket Swaps was such an "integral component" of the alleged fraudulent scheme as the CFTC suggests – that it was "required," "played a critical role," and "instrumental" (*see, e.g.,* Compl. ¶¶ 5, 12, 37, 42, 44, 46) – it is telling that Index Basket Swaps are never mentioned in the CFTC's pages-long descriptions of the alleged misrepresentations.  *See* Compl. ¶¶ 47–60, 67–76.  The reality is that the CFTC has failed to allege that any of the misrepresentations were made in connection with the purchase or sale of the Index Basket Swaps, and their claims should be dismissed.

**III.    The Communications Described in the Complaint Do Not Support the CFTC's Allegations that Archegos Was "Required" to Trade Index Basket Swaps**

As explained above, the allegations that Archegos caused its counterparties to misjudge the risk associated with Archegos' portfolio are not viable claims under the CEA because those alleged misrepresentations have nothing to do with the fundamental nature or characteristics of the Index Basket Swaps, and are therefore not "in connection with" such Swaps.  The CFTC appears to be suggesting that Archegos' counterparties "required" Archegos to add Index Basket Swap positions in an attempt to establish a nexus between those Index Basket Swap transactions

and Archegos' statements about the risk profile of its portfolio so that the CFTC can then argue

the supposed nexus illustrates the alleged statements are "in connection with" the swaps.

Compl. ¶ 46.  The CFTC's conclusory allegations on this point are not supported by the facts

alleged in the Complaint.  The only allegations in the Complaint describing interactions between

Archegos and a counterparty concerning Index Basket Swaps demonstrate that there was no

requirement that Archegos purchase these swaps in order to hedge its positions.[19]

The CFTC alleges that in a Bloomberg chat on February 2, 2021, Mr. Tomita asked a

counterparty for an increase in its trading capacity with respect to GSX.  Compl. ¶ 46.  It also

alleges that Mr. Tomita volunteered that Archegos would continue to add Index Basket Swaps to

its portfolio, but the allegation does not say that the counterparty required Archegos to put on

these positions.  Compl. ¶ 46 ("At the same time, Trader 1 stated that Archegos Fund would

'keep adding index shorts [i.e. Broad-Based Security Index Swaps]' . . . as we buy long

[GSX].'") (alterations per Complaint).  Furthermore, an examination of this selectively quoted

Bloomberg chat confirms there was no such requirement.  The counterparty asked Archegos if it

would consider entering into either more FAANG trades (trades in Facebook, Amazon, Apple,

Netflix, or Google) *or* Index Basket Swaps:  "If we were to do the additional 2mm shares at

75%, could we also do additional FAAMG [sic] at 30% or some more index shorts?"  Johnston

Decl. Ex. 9.  Far from strengthening any claim based on a requirement from the counterparties

that Archegos enter into Index Basket Swaps trades, this allegation only serves to confirm that

trades in these commodities were made at Archegos' complete discretion, as Archegos could

have chosen to enter *securities-based* FAANG trades.

---

[19] Elsewhere in the Complaint, the CFTC alleges that some counterparties "required" Archegos to maintain a particular long/short ratio, and that the Index Basket Swaps were "typically" placed by Archegos at the "request" of counterparties, not that these specific swaps were "required."  Compl. ¶¶ 37, 42, 44, 45, 61.

The CFTC then alleges that on February 24, 2021, the same counterparty approved an increase in Archegos' capacity to trade GSX.  Compl. ¶ 46.  But the CFTC does not allege that the counterparty required Archegos to put on any additional Index Basket Swaps in exchange for increased capacity.  After approving the increased capacity, the counterparty added a comment that it "remained 'very focused on the shorts . . . .'"  Compl. ¶ 46.  The CFTC's selected language from this Bloomberg chat implies that the counterparty was conditioning the capacity approval on Archegos adding more Index Basket Swaps, but the counterparty did no such thing. The complete quote in the Bloomberg chat reads as follows ". . . and then along with all of the names we outlined, folks are still very focused on the shorts as well – net ratio remains balanced with the custom basket."  Johnston Decl. Ex. 10.  In other words, rather than requesting that Archegos add short positions, the counterparty was simply commenting that Archegos' long/short profile remained balanced, based on the existing Index Basket Swap that Archegos had already put on and the separate FAANG single-name short positions.[20]

That there was no "requirement" concerning Index Basket Swaps is further confirmed by the absence of any allegations in the Complaint regarding what the standard International Swaps and Derivatives Association agreements between Archegos and its counterparties required with respect to Archegos' hedging.  The only contractual language the CFTC refers to is a "potential agreement" with one counterparty that proposed a 2:1 long/short ratio.  Compl. ¶ 45.  The CFTC does not allege that there was any requirement in this proposed agreement about the type of securities that Archegos had to use to satisfy that requirement (e.g., Index Basket Swaps), or anything about what the final version of this agreement provided, if anything.  Speculation based

---

[20] *See In re Bristol-Meyers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004) ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

on a "proposed agreement" is not sufficient to state a claim under Rule 9(b). *ATSI*, 493 F.3d at 103 (rejecting allegations based on "speculative inferences" as inadequate under Rule 9(b)).

Other allegations in the Complaint also undercut any notion that Archegos' counterparties "required" it to trade in Index Basket Swaps as a hedge. The CFTC alleges that in November 2020, another counterparty expressed concern to Archegos about the amount of margin posted, and asked Archegos to transfer positions to another counterparty. Compl. ¶ 58. Archegos declined to do so before the end of the year, and the CFTC alleges that in response, "on multiple occasions between December 2020 and March 2021, Swap Counterparty 6 imposed increased margin requirements on Archegos Fund's positions." *Id.* The CFTC does not allege that the counterparty required Archegos to put on more short positions, or required Archegos to purchase more Index Basket Swaps to manage its credit risk.

To the extent the CFTC contends that Archegos was under any requirement, based on its portfolio risk, to specifically trade in Index Basket Swaps, there are no factual allegations to support any such claim. As explained above, however, even if there were such a requirement, it would not be sufficient to support the CFTC's claims that Archegos' alleged misstatements to its counterparties were made "in connection with" trading in Index Basket Swaps.

**CONCLUSION**

For the reasons set forth above, ACM respectfully requests that the Court enter an order

dismissing the Complaint as to ACM in its entirety, with prejudice.

Dated:  New York, New York
   July 1, 2022        **KING & SPALDING LLP**

          By:  */s/ Carmen J. Lawrence*
             Carmen J. Lawrence
             William F. Johnson
             Russell W. Johnston
             Eric A. Hirsch
             1185 Avenue of the Americas
             New York, NY 10036-4003
             Tel: (212) 556-2100
             Email: clawrence@kslaw.com

             *Attorneys for Defendant*
             *Archegos Capital Management, LP*