UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                          :

COMMODITY FUTURES TRADING
COMMISSION,                              :

                           :

                   Plaintiff,         :        No. 22-cv-3401 (JPO)

                           :

      - against -                 :

                           :

ARCHEGOS CAPITAL MANAGEMENT, LP and   :
PATRICK HALLIGAN               :
                  Defendants.     :

                           :
-------------------------------------------------------------------x

 

## MEMORANDUM OF LAW IN SUPPORT OF PATRICK HALLIGAN'S MOTION TO DISMISS THE COMPLAINT

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

7 Times Square
New York, NY  10036-6516
(212) 833-1100

July 1, 2022              *Attorneys for Patrick Halligan*

3672238.1

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES .................................................................................................... i

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF ALLEGED FACTS ..................................................................................... 3

    A.    Halligan's Role at Archegos .................................................................................. 3

    B.    Archegos's Long-Term Contractual Relationships with Its Counterparties ........... 4

    C.    The CFTC's Allegations Regarding Statements to ACM's Counterparties ........... 5

    D.    The Week of March 22, 2021 .............................................................................. 6

ARGUMENT ........................................................................................................................ 8

I.    THE CFTC HAS FAILED TO ALLEGE THAT HALLIGAN ENGAGED IN
FRAUD "*IN CONNECTION WITH*" CFTC-REGULATED SWAPS .............................. 9

II.    THE CFTC HAS FAILED TO ALLEGE A PRIMARY VIOLATION........................... 14

    A.    The CFTC Has Failed to Adequately Plead Halligan's Scienter or
    Negligence ...................................................................................................... 14

        1.    The CFTC Has Not Pled Facts Giving Rise to a Strong Inference of
        Scienter ................................................................................................ 14

            a.    The CFTC's Allegations of Motive are Insufficient .................... 15

            b.    The Allegations of Conscious Misbehavior or
                Recklessness Fail .................................................................... 15

    B.    Halligan Did Not "Make" Any Alleged Material Misrepresentation .................. 18

    C.    The CFTC Has Failed to Allege that Halligan Committed Any
    Deceptive Act.................................................................................................. 21

III.    THE CFTC HAS FAILED TO ALLEGE A SECONDARY VIOLATION .................... 23

    A.    The Complaint Fails to Plead a Primary Violation ............................................. 23

    B.    The Complaint Fails to Plead Halligan's Knowledge of a Primary
    Violation ........................................................................................................ 24

    C.    The Complaint Fails to Plead Halligan's Substantial Assistance ........................ 25

CONCLUSION.................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*380544 Can., Inc. v. Aspen Tech., Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008)....................................................................15

*Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*,
   No. 96 Civ. 2549 RWS, 1997 WL 97837 (S.D.N.Y. Mar. 6, 1997)......................10

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................8

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................8

*Bissell v. Merrill Lynch & Co., Inc.*,
   937 F. Supp. 237 (S.D.N.Y. 1996) ...................................................................11, 13

*In re Blech Sec. Litig.*,
   961 F. Supp. 569 (S.D.N.Y. 1997) ........................................................................22

*CFTC v. Gorman*,
   No. 21 Civ. 870 (VM), 2022 WL 596261 (S.D.N.Y. Feb. 28, 2022) ...........8, 19, 21

*Chadbourne & Park LLP v. Troice*,
   571 U.S. 571 U.S. 377, 391 (2014).................................................................12, 13

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018)................................................................................11, 12

*Chem. Bank v. Arthur Andersen & Co.*,
   726 F.2d 930 (2d Cir. 1984)..........................................................................9, 10, 13

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)............................................................................15, 16

*In re Commodity Exch., Inc.*,
   213 F. Supp. 3d 631 (S.D.N.Y. 2016).....................................................................9

*Crummere v. Smith Barney, Harris Upham & Co., Inc.*,
   624 F. Supp. 751 (S.D.N.Y. 1985) ...................................................................10, 11

*ECA v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)............................................................................14, 15

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
　352 F. Supp. 2d 429 (S.D.N.Y. 2005) ..................................................................................23

*Ganino v. Citizens Utils. Co.*,
　228 F.3d 154 (2d Cir. 2000) ................................................................................................7

*Gissin v. Endres*,
　739 F. Supp. 2d 488 (S.D.N.Y. 2010) ................................................................................15

*Harris v. Mills*,
　572 F.3d 66 (2d Cir. 2009) ..................................................................................................8

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
　No. 10 Civ. 371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) .......................................20

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
　564 U.S. 135 (2011) .........................................................................................2, 8, 19, 20

*Jing v. Sun*,
　No. Civ. 21-2350 (GRB) (AYS), 2022 WL 1505950 (E.D.N.Y. Jan. 4, 2022) ...................9, 10

*Kolbeck v. LIT Am., Inc.*,
　923 F. Supp. 557 (S.D.N.Y. 1996) .....................................................................................21

*Landy v. Mitchell Petrol. Tech. Corp.*,
　734 F. Supp. 608 (S.D.N.Y. 1990) .....................................................................................23

*Loginovskaya v. Batratchenko*,
　764 F.3d 266 (2d Cir. 2014) ..............................................................................................10

*Lorenzo v. SEC*,
　139 S. Ct. 1094 (2019) ..................................................................................................2, 22

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
　518 F. Supp. 3d 772 (S.D.N.Y. 2021) ................................................................................17

*Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co. Inc.*,
　770 F. Supp. 176 (S.D.N.Y. 1991) .....................................................................................10

*Matsumura v. Benihana Nat'l Corp.*,
　542 F. Supp. 2d 245 (S.D.N.Y. 2008) ................................................................................16

*Matusovsky v. Merrill Lynch*,
　186 F. Supp. 2d 397 (S.D.N.Y. 2002) ..................................................................................8

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
　No. 19 Civ. 7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .........................21, 22

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..................................................................................15

*In re NQ Mobile, Inc. Sec. Litig.*,
    2015 WL 1501461 (S.D.N.Y. Mar. 27, 2015) ......................................................21

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017)..............................................................21, 25

*Prodanova v. H.C. Wainwright & Co., LLC*,
    993 F.3d 1097 (9th Cir. 2021) ......................................................................18, 19

*Puddu v. 6D Glob. Techs., Inc.*,
    No. 15 Civ. 8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ...............22

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
    2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007)......................................................23

*Ring v. AXA Fin., Inc.*,
    483 F.3d 95 (2d Cir. 2007)..................................................................................13

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)..................................................................................16

*SEC v. Apuzzo*,
    689 F.3d 204 (2d Cir. 2012)................................................................................25

*SEC v. Carrillo Huettel LLP*,
    No. 13 Civ. 1735 (GBD), 2014 WL 12785242 (S.D.N.Y. June 4, 2014)...............17

*SEC v. Cedric Kushner Promotions, Inc.*,
    417 F. Supp. 2d 326 (S.D.N.Y. 2006)..................................................................16

*SEC v. Collins & Aikman Corp.*,
    524 F. Supp. 2d 477 (S.D.N.Y. 2007)..................................................................22

*SEC v. Kelly*,
    817 F.Supp.2d 340 (S.D.N.Y. 2011)....................................................................23

*SEC v. Mudd*,
    885 F.Supp.2d 654 (S.D.N.Y. 2012)....................................................................25

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*,
    296 F.R.D. 241 (S.D.N.Y. 2013) ........................................................................24

*SEC v. Paulsen*,
    No. 18 Civ. 6718 (PGG), 2019 WL 13063380 (S.D.N.Y. Feb. 13, 2019) .............25

*SEC v. Paulsen,*
    No. 18 Civ. 6718 (PGG), 2020 WL 1911208 (S.D.N.Y. Apr. 18, 2020) ..............................25

*SEC v. Rio Tinto plc,*
    No. 17 Civ. 7994 (AT) (DCF), 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) .....................19

*SEC v. Rio Tinto PLC,*
    No. 17 Civ. 7994 (AT) (DCF), 2021 WL 818745 (S.D.N.Y. Mar. 3, 2021) ...................22, 25

*SEC v. Sugarman,*
    No. 19 Civ. 5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ...........................................21

*SEC v. Syron,*
    934 F. Supp. 2d 609 (S.D.N.Y. 2013)....................................................................................16

*SEC v. Wey,*
    246 F. Supp. 3d 894 (S.D.N.Y. 2017)..............................................................................21, 23

*SEC v. Yorkville Advisors, LLC,*
    305 F. Supp. 3d 486 (S.D.N.Y. 2018)....................................................................................23

*SEC v. Zandford,*
    535 U.S. 813 (2002).................................................................................................................13

*Taylor v. Westor Cap. Grp.,*
    943 F. Supp. 2d 397 (S.D.N.Y. 2013)..............................................................................12, 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)...................................................................................................................3

*In re Tether & Bitfinex Crypto Asset Litig.,*
    2021 WL 4452181 (S.D.N.Y. Sept. 28, 2021).......................................................................23

*In re Teva Sec. Litig.,*
    No. 17 Civ. 558 (SRU), 2021 WL 1197805 (D. Conn. Mar. 30, 2021) .................................22

## STATUTES

7 U.S.C. § 1a(47) .............................................................................................................................4

7 U.S.C. § 9........................................................................................................................ *passim*

15 U.S.C. § 78j(b) ............................................................................................................. *passim*

## RULES AND REGULATIONS

17 C.F.R. § 1.3 .................................................................................................................................4

17 C.F.R. § 43.2 ...............................................................................................................................4

17 C.F.R. § 240.10b-5 ................................................................................................ *passim*

17 C.F.R. § 180.1 ...................................................................................................8, 9, 10, 19

76 Fed. Reg. 41398-01, 41,399 (July 14, 2011) (*codified at* 17 C.F.R. pt. 180) ....................9, 10

Fed. R. Civ. P. 9(b) ................................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6)...........................................................................................................8

**OTHER AUTHORITIES**

Lydia Beyoud et ano., "Archegos Spurs CFTC Boss's Vow to Scrutinize Family
    Offices," BLOOMBERG (May 9, 2022), *available at* https://bloom.bg/3I2CMnp ......................1

NASDAQ, "Prime Broker," *available at*:
    https://www.nasdaq.com/glossary/p/prime-broker ...............................................................4

SEC Proposed Rule 9j-1, 17 C.F.R. 240.9j-1, *available at*
    https://www.sec.gov/rules/proposed/2021/34-93784.pdf (last visited July 1,
    2022) .........................................................................................................................14

Patrick Halligan respectfully submits this memorandum of law in support of his motion to dismiss the complaint filed by the Commodity Futures Trading Commission ("**CFTC**") in this action. Halligan expressly incorporates, as if set forth herein, all arguments made in the motion to dismiss filed by Archegos Capital Management, LP ("**ACM**" or "**Archegos**").

## PRELIMINARY STATEMENT

In the wake of ACM's March 2021 collapse—a stunning, sudden loss of over $30 billion caused by factors outside of ACM's control—CFTC Chair Rostin Behnam proclaimed that his agency had failed.[1] The CFTC's rules *allow* family offices like ACM to build up large, unreported swap positions across multiple counterparties, and to do so with leverage. The CFTC has not alleged that ACM operated outside these rules, and instead through this action defies the limitations of those rules by bringing claims that it lacks jurisdiction to assert, based on conduct that is not actionable. And in doing so, it seeks to cast Halligan—a back-office employee with no role in trading—as somehow responsible for events caused by regulatory inaction, counterparties' voracious appetites for profit-taking, and a perfect storm of market conditions. This effort is factually wrong, and, for the reasons discussed below, it is also defective as a matter of law.

*First*, the Complaint should be dismissed in its entirety, with prejudice, because the conduct it alleges, even if wrongful, is outside of the CFTC's statutory jurisdiction. The allegations against Halligan arise from alleged misrepresentations that others at ACM allegedly made to ACM's swap counterparties, regarding the credit relationship between ACM and those counterparties. These statements, even if false, are not actionable under CFTC antifraud rules.

While ACM suffered extreme losses in connection with its trading of single-issuer total return swaps ("**TRS**"), those instruments are within the exclusive jurisdiction of the SEC (not the CFTC), so this case *cannot* be about them, or any statement allegedly "in connection with" their

---

[1] Lydia Beyoud et ano., "Archegos Spurs CFTC Boss's Vow to Scrutinize Family Offices," Bloomberg (May 9, 2022), *available at* https://bloom.bg/3I2CMnp.

purchase, sale, or offer.[2] Instead, the only CFTC-regulated swaps that ACM traded are basket or index swaps that tracked the securities of dozens or hundreds of issuers, which ACM typically held as short investments, and which the CFTC does not allege contributed in any way to the losses that ACM or anyone allegedly suffered during or after its collapse. The misstatements alleged in the Complaint did not occur during negotiations over the terms of these basket swaps; they did not relate to the value or pricing of any basket swaps; and in fact they had nothing at all to do with any basket swaps. Rather, they related to characteristics of ACM itself, and were provided, the CFTC alleges, in connection with the counterparties' due diligence regarding their contractual and credit relationships with ACM. But statements relating to the contractual and credit relationship between swap counterparties—even if they are flatly false—are too attenuated from any CFTC-regulated swap to be subject to CFTC jurisdiction under 7 U.S.C. § 9(1). *See* Pt. 1.

Dismissal is also required because the CFTC has not pled the essential elements of its claims. It has brought a one-count complaint asserting that Halligan is primarily and secondarily liable for violating § 6(c)(1) of the Commodity Exchange Act ("**§ 6(c)(1)**" and the "**CEA**," respectively), based on misrepresentations allegedly made by his colleagues. But the CFTC has failed to allege that *Halligan* was the "maker" of any material misrepresentation, as would be required for misstatement liability after *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), *see* Pt. II.B, or that *Halligan* engaged in deceptive conduct as would be required for scheme liability after *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019), *see* Pt. II.C. Nor has the CFTC sufficiently pled under Rule 9(b) that Halligan acted with the requisite scienter—he is a back-

---

[2] On the same day the SEC filed the Complaint, the U.S. Attorney's Office for the Southern District of New York ("**SDNY**") indicted Halligan and Sung Kook (Bill) Hwang for alleged federal RICO and securities laws violations (*U.S. v. Hwang et ano.*, No. 22-cr-240 (Hellerstein, J.)), and the Securities and Exchange Commission ("**SEC**") filed a civil action against Halligan, ACM, Hwang, Scott Becker, and William Tomita based on alleged misrepresentations to counterparties (*SEC v. Hwang et al.*, No. 22-cv-3402 (Oetken, J.)). Halligan and Hwang have pled not guilty in the SDNY action, and Halligan, ACM, and Hwang have moved to dismiss the SEC action. Halligan's motion to dismiss the SEC action explains that, among other defects in the pleading, the alleged conduct is not actionable under SEC rules because it did not occur "in connection with" the purchase, sale, or offer of any SEC-regulated security.

office professional with no conceivable motive to seek to deceive trading counterparties, and the CFTC's allegations that he must have or should have known about the alleged misconduct of his junior colleagues fail as a matter of law. *See* Pt. II.A.

Finally, the CFTC's aiding and abetting claim amounts to no more than "guilt by association," and fails to adequately allege facts that, if true, would show that Halligan had knowledge of any primary violation or substantially assisted any primary violation, and thus fails as a matter of law as well. *See* Pt. III.

## STATEMENT OF ALLEGED FACTS

The allegations of fact in the Complaint are presumed to be true only for the purposes of this motion, and only to the extent they are not contradicted by judicially noticeable material. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### A.    Halligan's Role at Archegos

ACM was established in 2013 as a family office to manage personal funds of its founder, Bill Hwang (referred to in the Complaint as "Founder"). Cpl. ¶¶ 17, 23. The Complaint alleges that Halligan was ACM's CFO, but otherwise offers no well-pled facts regarding his responsibilities at ACM. Among other things, it does not allege that Halligan had any role in investment decisions or trading at ACM. *Id.* ¶¶ 16, 19, 51. Hwang made all investment decisions at ACM. *Id.* ¶¶ 17, 63. Trading at ACM was conducted by a dedicated trading desk, including head trader William Tomita (referred to in the Complaint as "Trader 1"), who reported to Hwang. *Id.* ¶¶ 18, 63. Halligan is not alleged to have had any role or responsibility in supervising Tomita. *See id.* ¶¶ 16, 18.

The Complaint alleges that Halligan supervised ACM's Director of Risk Management, Scott Becker (referred to in the Complaint as "Risk Officer 1"), and further alleges that during at least the period from March 2020 through March 2021 (defined in the Complaint as the "Relevant Period"), Becker was the "primary contact at Archegos for credit risk-related issues." *Id.* ¶ 51.

**B.      Archegos's Long-Term Contractual Relationships with Its Counterparties**

ACM's trading counterparties were the world's most sophisticated banks and prime

brokers[3] (the "**Counterparties**"). ACM's relationships with its Counterparties were contractual.

*Id.* ¶¶ 25, 29-33, 36, 74. The CFTC has not alleged that Halligan made, knew of, or participated in

any misrepresentations or omissions to procure Counterparties' agreement to these contracts.

Most of ACM's trading was conducted through TRSs, which are agreements under which

the buyer (here, ACM) and the seller (here, the Counterparties) agree to exchange cash flows tied

to the price of referenced securities. *Id.* ¶ 25. TRSs referencing single issuers (as opposed to basket

swaps, discussed below) of the sort traded by ACM are within the exclusive jurisdiction of the

SEC and are not subject to regulation by the CFTC. *See* 7 U.S.C. § 1a(47).

In addition to its long positions in single-name TRSs, ACM also acquired substantial short

positions in "basket" swaps, which instead of referencing a single issuer, reference dozens or

hundreds of underlying issuers. Some of the "basket" swaps traded by ACM referenced exchange-

traded funds, or "ETFs," which are correlated to hundreds of underlying securities, and others

referenced custom collections of underlying securities (we refer to the "basket" swaps traded by

ACM collectively as the "**Basket Swaps**"). The short Basket Swaps generally provided protection

against downward market movements, because ACM would be entitled to payment under these

contracts if the underlying securities declined in value. Unlike the single-issuer TRSs, the Basket

Swaps are subject to the CFTC's jurisdiction and antifraud rules. S*ee* 7 U.S.C. § 1a(47)(A). The

CFTC does not allege that Halligan had *any* role in the negotiation of Basket Swaps, the execution

of Basket Swaps, or decisions as whether to invest in Basket Swaps.

---

[3]  Prime brokerage is a bundle of services provided by investment banks and broker-dealers to sophisticated investors, typically hedge funds, institutional investors, and family offices, in exchange for a fee. Traditionally, prime brokerage has been a financing business, where a prime broker lends money or securities to its clients. Prime brokers may also provide other related services, such as trade execution and clearing and settlement.  17 C.F.R. §§ 1.3; 43.2.  *See also* NASDAQ, "Prime Broker," *available at*: https://www.nasdaq.com/glossary/p/prime-broker.

ACM's contracts with its Counterparties also allowed it to trade using leverage (*i.e.*, on margin)—meaning that it would post an agreed-upon amount of cash collateral with its Counterparty, and it could buy swaps that exceeded the value of the collateral. The CFTC does not allege that trading in highly leveraged positions (as ACM did) is wrongful.

C.       **The CFTC's Allegations Regarding Statements to ACM's Counterparties**

The Complaint alleges that beginning in March 2020 and continuing through ACM's collapse in March 2021, ACM engaged in a scheme to mislead the Counterparties regarding the amount of risk associated with its investment portfolio. Cpl. ¶¶ 1, 61-63, 80. The CFTC alleges that the purpose of this was to allow ACM to "obtain additional capacity to trade even greater volumes of highly leveraged, concentrated, and illiquid long [TRS] positions, while maintaining favorable margin rates." *Id.* ¶ 4. The Complaint alleges that if ACM had provided Counterparties with accurate information about its portfolio, the Counterparties would have extended less capacity to trade long TRSs (which, as noted, are *not* regulated by the CFTC) and would have required ACM to post more collateral to finance those long TRSs. *Id.* ¶¶ 4-5, 61. The Complaint does not allege that the misrepresentations induced Counterparties into extending capacity for Basket Swaps that they otherwise would have withheld—nor would such an allegation make sense, as the purpose of the Basket Swaps was to reduce the market risk of the portfolio. *Id.* ¶ 5.

The Complaint alleges that Becker and Tomita (never Halligan) made misrepresentations during *ad hoc* conversations with Counterparties' credit and risk officers. *Id.* ¶¶ 42, 46, 49-60, 68-71. The Complaint makes clear that these conversations did not relate to the terms of any TRS or Basket Swap trades that ACM engaged in with the Counterparties, and instead related to the contractual and credit relationship between the Counterparties and ACM. *Id.* It alleges that as a result of some of these conversations, Counterparties agreed to capacity increases and more favorable margin rates for TRSs. *Id.* ¶¶ 42, 46.

5

The CFTC alleges that Becker (and in several instances Tomita, but *never* Halligan) made misrepresentations in three categories:

- ***Portfolio Concentration*** – the Complaint alleges that at various times, Becker told Counterparties that ACM's largest single position represented 35% of its NAV. *Id.* ¶¶ 53, 68. In most instances, the Complaint does not allege what the truthful figure would have been. *See, e.g.*, Cpl. ¶ 53. The Complaint alleges that "in or around 2018" (years before the Relevant Period), Halligan told Becker to provide Counterparties with this 35% figure "regardless of the true figure." *Id.* ¶ 52. However, the Complaint does not allege that the 35% was untrue at the time, fails to explain when it became untrue, and does not identify any internal records that monitored this metric (far less allege who had access to, and reviewed, such records). The Complaint also offers no cogent explanation for why Halligan would have said this to Becker "in or around 2018" (which was years before ACM is even alleged to have begun to run into limits on its capacity at the Counterparties), or why Becker would have relied on the instruction for years.

- ***Liquidity*** – the Complaint alleges that Becker and Tomita provided Counterparties with inaccurate metrics of how long it would take ACM to liquidate (*i.e.*, sell) some or all of its portfolio. *Id.* ¶¶ 55-56. As with the alleged concentration misstatements, the Complaint only sometimes alleges what a purportedly accurate figure would have been (*see id.*), and does not allege that Halligan had access to or reviewed internal records that would have demonstrated the accurate metrics. *Id.* Nor does the Complaint allege that Halligan ever directed Becker or Tomita to misstate the liquidity profile. In only one instance, the Complaint alleges that the three discussed the liquidity profile before it was provided to the Counterparty, but the Complaint does not allege that Halligan was aware that the proffered profile was inaccurate, far less that he directed Becker to provide it. *Id.*

- ***Portfolio Composition*** – the Complaint alleges that Becker and Tomita provided Counterparties with inaccurate descriptions of the investments that it held, for example stating that it held less GSX stock than it actually held at the time. *Id.* ¶ 54. The Complaint does not allege that Halligan ever discussed these alleged misrepresentations with Becker or Tomita, or even that he was aware of them.

As to each of these categories, the Complaint does not allege that ACM was required to maintain any particular metric (*e.g.*, concentration under 35%; a certain liquidity profile; or a particular portfolio composition) as a term of any Basket Swap (or TRS) transaction.

## D.   The Week of March 22, 2021

ACM suffered extreme losses in the value of its TRS investments during the week of March 22, 2021. *Id.* ¶¶ 64-66. The losses were triggered by events outside of ACM's control, including (1) a secondary offering in ViacomCBS (ACM's largest position) that priced

substantially below the market price of the company's stock, *id.*, setting off massive declines in that and correlated investments,[4] and (2) an announcement by the SEC that it was enhancing regulation on China-based companies, which put pressure on many such issuers, including a number of ACM's largest positions, *id.* ¶ 66.[5] These losses are not alleged to have been incurred in connection with the Basket Swaps.

The Complaint alleges that Becker made several misrepresentations to Counterparties during that week. Specifically, it alleges that Becker told Swap Counterparty ("**SC**") 2 on March 24 that ACM had $9B in cash on hand and was not facing a "distress situation," at a time when the family office allegedly had less than $2B in available cash. *Id.* ¶ 70. Halligan is not alleged to have participated in this conversation, or even known about it. Becker also allegedly prepared a set of talking points, which he allegedly discussed with Halligan, that included supposedly false information about the amount of real-time information that Becker had access to (specifically, ACM's live trade blotter and the total amount of margin calls it had received). *Id.* ¶ 72. Becker had conversations with Counterparties on March 25, but the Complaint does not allege whether he used the talking points on those calls. *Id.* Finally, the Complaint alleges that Becker, at times at "Halligan['s] direct[ion]," claimed not to have insight into ACM's "financial state and plans to reduce exposure," and while the Complaint does not specify what information Becker (or Halligan) actually possessed regarding these matters, it summarily alleges that Becker's statements were false. *Id.* ¶¶ 72-73. The Complaint does not allege that these supposed misstatements during the week of March 22, 2021 related in any way to any transaction involving CFTC-regulated swaps, including the Basket Swaps. *See id.* ¶¶ 67-73.

---

[4] ViacomCBS declined 51.4% between March 22 and 26; the correlated Discovery stocks (Class A and Class C shares) both declined 46% over that same period. *See* Exs. G, H. The Court may take judicial notice of the price of stocks traded on major exchanges. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

[5] Between March 22 and 26, iQIYI declined 37.6%; Baidu, Inc. declined 20%; Tencent Music Entertainment declined 33%; GSX Techedu declined 55%; Vipshop declined 31.1%. *See* Exs. A-F.

## ARGUMENT

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the CFTC must push its claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While factual allegations are accepted as true, "legal conclusions" and "legal conclusion[s] couched as [] factual allegation[s]" are not. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (cleaned up), and allegations "contradicted" by documents referenced in the complaint "are insufficient." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002). Because the CFTC's claims are based on fraud, they must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b) and "state with particularity the circumstances constituting" the alleged fraud. *See CFTC v. Gorman*, No. 21 CIV. 870 (VM), 2022 WL 596261, at *8 (S.D.N.Y. Feb. 28, 2022).

Here, the CFTC alleges that Halligan committed primary and secondary violations of § 6(c)(1) of the CEA and Regulation 180.1(a)(1)-(3). In Section I, we explain that all of those claims fail because the CFTC has not alleged that Halligan engaged in fraud "in connection with" swaps that are regulated by the CFTC. In Section II.A, we explain that all of the CFTC's primary liability claims against Halligan fail because it has not alleged that he acted with scienter. In Section II.B, we explain that the CFTC's misstatement claims under § 6(c)(1) fail because Halligan is not the "maker" of any material misstatement under *Janus*. In Section II.C, we explain that the CFTC's scheme liability claims under §6(c)(1) fail because the CFTC has not alleged that Halligan engaged in any deceptive act. And in Section III, we explain that the aiding and abetting claims fail because the CFTC has not adequately pled that Halligan knew of and substantially assisted any primary violation.

**I.**

**THE CFTC HAS FAILED TO ALLEGE THAT HALLIGAN ENGAGED IN FRAUD
*"IN CONNECTION WITH"* CFTC-REGULATED SWAPS**

All of the CFTC's claims against Halligan must be dismissed because the conduct he is

alleged to have engaged in—supposed misstatements to ACM's Counterparties regarding its

creditworthiness—did not occur "in connection with" any CFTC-regulated swap. Even if it is

assumed *arguendo* that the statements at issue were false; were material; were made by Halligan;

and were made with scienter, dismissal would be required because the nexus between these

statements and any CFTC-regulated swap is too attenuated to support an action under the CEA.

*See Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).

Section 6(c)(1) reaches only conduct that occurs "in connection with" CFTC-regulated

swaps. The CFTC acknowledged in its commentary regarding the implementing rule (Rule 180.1)

that the "in connection with" language in the CEA was modeled after, and would be interpreted in

conformity with, the parallel provision of the Exchange Act and its implementing rule (Section

10(b) and Rule 10b-5, respectively). 76 FR 41398-01, at 41406. While the Exchange Act

provisions reach conduct "in connection with the purchase or sale" of SEC-regulated securities,

and the CEA provisions reach conduct "in connection with" CFTC-regulated swaps, the CFTC and

courts have agreed that they should be interpreted consistently. *See Jing v. Sun*, No. Civ. 21-2350

(GRB) (AYS), 2022 WL 1505950, at *17 (E.D.N.Y. Jan. 4, 2022); *In re Commodity Exch., Inc.*,

213 F. Supp. 3d 631, 672 (S.D.N.Y. 2016) ("Because of the differences between the securities

markets and the derivatives markets, however, the CFTC has stated that it is 'guided, but not

controlled, by the substantial body of judicial precedent applying the comparable language of SEC

Rule 10b-5.'") (*quoting* Prohibition on the Employment, or Attempted Employment, of

Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398-

01, 41,399 (July 14, 2011) (*codified at* 17 C.F.R. pt. 180)). Accordingly, courts apply the far more

well-developed jurisprudence interpreting Section 10(b) and Rule 10b-5 to resolve disputes

9

regarding the scope of the "in connection with" requirement of the CEA. *See Jing*, 2022 WL 1505950, at *17; *Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014).

Turning to that requirement, assessing whether the required "stringent connection" has been established requires "a cautious case-by-case approach," *Chem. Bank*, 726 F.2d at 942 (cleaned up). It is not enough for a plaintiff to allege fraudulent conduct between transactional counterparties; the antifraud provisions of neither the Exchange Act nor the CEA govern counterparty relationships generally. *See Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96 Civ. 2549 (RWS), 1997 WL 97837, at *6 (S.D.N.Y. Mar. 6, 1997) (dismissing § 10(b) claim brought by securities clearing broker against counterparty bank, where the broker alleged that the bank had misrepresented that funds were available to purchase the securities at issue). Nor is it enough that covered securities or swaps are somehow involved in the transaction in which the fraud is alleged to have occurred. *Chem. Bank*, 726 F.2d at 943 (dismissing claim where securities were pledged as security in the transaction in which fraud was alleged to have occurred). Rather, the plaintiff must specifically demonstrate that the alleged fraud was connected to the purchase, sale, or offer of regulated instruments. *Id.; Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co. Inc.*, 770 F. Supp. 176, 181 (S.D.N.Y. 1991) ("more than a 'de minimis' relationship between the fraudulent scheme and the purchase or sale of securities is required").

In *Chemical Bank* and subsequent cases, courts have rejected plaintiffs' efforts to package related but individually non-actionable transactions—where some involve covered instruments (but no fraud) while others involve fraud (but no covered instruments)—into a single actionable transaction. *See Crummere v. Smith Barney, Harris Upham & Co.*, 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("the misrepresentation must relate to the securities alleged to satisfy the purchase and sale requirement, and not just to the transaction in its entirety."). For example, in *Bissell v. Merrill Lynch & Co.*, the court dismissed the complaint on this basis where a brokerage customer

alleged that a broker fraudulently retained interest on collateral that the customer posted to secure securities trades. 937 F. Supp. 237, 243 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998). The court explained that even though the collateral account undoubtedly facilitated the customer's securities transactions with the broker, the alleged fraud in connection with "the alleged nondisclosure at issue . . . pertains not to the sale of the securities or the value of the securities themselves, ***but to the terms of the relationship between the broker and the customer***." *Id.* at 243-44 (emphasis added, cleaned up).

These principles are fatal to the CFTC's claims against Halligan. The CFTC does not allege that he had *any* role in the Basket Swap transactions between ACM and the Counterparties—he did not make investment decisions (*i.e.*, deciding which Basket Swaps to buy or sell); did not negotiate the terms of the Basket Swaps, such as their pricing, duration, or composition; and is not alleged to have engaged in *any* trading with the Counterparties at all. Whatever vague role he is alleged to have had in the supposed fraud, it is not "in connection with" swap trades in which he had no part.[6]

Nor does the CFTC allege that Halligan (or anyone else at ACM, for that matter) made any fraudulent or deceptive statement that was relevant to the terms of the Basket Swap transactions—to the contrary, the Counterparties received exactly what they bargained for in the Basket Swap trades. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (affirming dismissal where alleged misrepresentations did not relate to the "value of the securities" or the "consideration [seller] received," and plaintiff "received exactly what it expected" in disputed securities transactions). Likewise, the Complaint does not allege that Halligan (or anyone else at ACM) made any misrepresentation about the value of the Basket Swaps, or the consideration that

---

[6] In fact, in most instances, the CFTC does not even allege or identify the existence of any specific swap transaction between ACM and the Counterparties at all. *See, e.g.*, Cpl. ¶¶ 53-55 (SCs 3, 4, and 5, no transactions alleged); *id.* ¶ 56 (SC 2, same); *id.* ¶ 57 (SC 1, same); *id.* ¶ 58 (SC 6, same). Even more tellingly, the CFTC does not allege or identify a single Basket Swap—the only transactions at issue that are actually governed by the CFTC—between ACM and any particular Counterparty, let alone how the alleged misrepresentations were made "in connection with" those swaps.

11

ACM would pay in the transactions. *See Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 403

(S.D.N.Y. 2013) ("courts have drawn a line separating fraud claims that impact the fundamental

valuation of the securities at issue, and the operation of securities markets, as distinguished from

those that do not."). To the contrary, the alleged misrepresentations related to metrics associated

with ACM's overall investment portfolio—but those metrics were not a term or condition of any

swap transaction (including the Basket Swaps), nor was ACM required to disclose any of them

pursuant to any swap transaction (including the Basket Swaps). *See supra* at p.6.

The CFTC concedes as much, acknowledging that the alleged misrepresentations occurred

during *ad hoc* due diligence calls between Becker or Tomita and the Counterparties. Cpl. ¶¶ 53-56.

But these conversations lack any well-pled nexus to a Basket Swap transaction. For example, the

CFTC alleges that in "late 2020 or early 2021, Risk Officer 1 [Becker] had a telephone call with

[SC] 3" in which the Counterparty inquired about ACM's largest holdings, *id.* ¶ 53, in response to

which Becker allegedly misrepresented the size of ACM's largest positions. The CFTC alleges that

other misrepresentations took place on calls on which the Counterparty asked about "the

composition of Archegos Fund's total portfolio across all of its Swap Counterparties," *id.* ¶ 54, or

about the amount of time it would take to liquidate ACM's portfolio. *Id.* ¶¶ 55-56. By the very

terms of the Complaint, these conversations were not conducted in connection with Basket Swap

transactions, but rather were conducted in connection with the overall assessment of ACM's credit

risk. *Id.* ¶¶ 53-56. And that dooms the Complaint, because as the U.S. Supreme Court held in

*Chadbourne & Park LLP v. Troice*, misrepresentations by an investor that "it was creditworthy"

do not satisfy the "in connection with" requirement. 571 U.S. 377, 391 (2014).

The allegations about alleged misstatements during the week of March 22, 2021 fail for the

same reason. The Complaint alleges that Becker and Tomita made misrepresentations to SC 7 on

March 23 and 24, but it does not allege that ACM entered into any Basket Swap transactions with

that Counterparty that week. *See id.* ¶¶ 68-69. The Complaint alleges that on March 24, ACM made misrepresentations to SC 2 when demanding the return of excess margin pursuant to the parties' margin agreement, but the transfer of margin is not a Basket Swap transaction.

The Complaint fares no better with its allegations that the misrepresentations induced Counterparties to extend more credit or provide more favorable margin rates to ACM. *See* Cpl. ¶ 5. *First*, the CFTC's "but for" thesis—*i.e.*, that the Counterparties would have required ACM to enter into additional Basket Swap transactions with ACM "but for" ACM's misrepresentations—is foreclosed by *Chemical Bank*. There, the plaintiff alleged that it would have refrained from engaging in a transaction involving securities but for the defendant's misrepresentations, and the court held that "but-for causation is not enough." 726 F.2d at 943.[7] *Second*, the Counterparties' credit and margin arrangements are not transactions in CFTC-regulated swaps. Rather, they are the operational "terms of the relationship between the customer and the broker," and cannot support liability under the securities laws. *See Bissell*, 937 F. Supp. at 243; *Taylor*, 943 F. Supp. 2d at 40; *see also Chadbourne & Park*, 571 U.S. at 391.

Finally, the conclusion that § 6(c)(1) does not reach alleged misrepresentations made by swap counterparties in the course of negotiating the terms of their relationships (such as margin rates and capacity limits) is confirmed by the SEC's recent rulemaking efforts. As noted above, the scope and meaning of the limiting language "in connection with" found in § 6(c)(1) is largely based on the meaning of the parallel language in Section 10(b) and Rule 10b-5. *See supra*, at pp. 9-10.[8] In a direct response to ACM's collapse and what the SEC apparently perceived as gaps in existing rules, it dusted off a rule proposal that it had first made following the financial crisis

---

[7] Courts in other circuits have questioned whether *Chemical Bank* remains authoritative after the U.S. Supreme Court's decision in *SEC v. Zandford*, 535 U.S. 813 (2002). The Second Circuit has made clear that it does. *See Ring v. AXA Fin., Inc.*, 483 F.3d 95, 101 (2d Cir. 2007) (rejecting party's argument that *Chem. Bank* was "archival").

[8] As noted in fn. 2, Halligan has moved to dismiss the SEC's complaint against him, which is based on the same events as the CFTC's action. In his motion, he explains that the alleged misrepresentations were not "in connection with" the purchase, sale, or offer of any TRS trades (just as they are not "in connection with" the Basket Swaps).

over a decade ago *but failed to implement*, which would significantly expand the reach of the anti-fraud provisions to cover conduct that does not occur in connection with the entry of a swap transaction (*i.e.*, purchase or sale of the swap), but occurs within the context of the transactional relationship more generally. *See* SEC Proposed Rule 9j-1. The SEC's proposing release explained plainly that the expanded rule "would apply not only to the 'purchase' or 'sale' of security-based swaps," but would also apply to various other aspects of the trading relationship more generally. SEC Rel. No. 93784 (Dec. 15, 2021), 2021 WL 6755214 at *11. In fact, the alleged misrepresentations at issue in this case are so attenuated from the Basket Swap transactions that they would not even satisfy this greatly expanded proposed rule (because credit and margin terms, and a counterparty's portfolio composition, are not rights or obligations that arise under the Basket Swaps, but rather relate only to the parties' general course of dealing), only underscoring that they are not covered by the existing rules under the CEA.

## II.
## THE CFTC HAS FAILED TO ALLEGE A PRIMARY VIOLATION

**A.**     <u>The CFTC Has Failed to Adequately Plead Halligan's Scienter or Negligence</u>

     **1.**     <u>The CFTC Has Not Pled Facts Giving Rise to a Strong Inference of Scienter</u>

The CFTC's primary liability claims against Halligan under § 6(c)(1) fail because the Complaint does not allege facts giving rise to a strong inference of Halligan's intent to commit fraud. To meet this burden, the CFTC must show either "(1) motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Moreover, "[a] complaint adequately pleads scienter only if a reasonable person would deem the inference of scienter both 'cogent' and 'at least as likely as any plausible opposing inference.'" *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008) (cleaned up).

3672238.1

### a.   **The CFTC's Allegations of Motive are Insufficient**

To establish a strong inference of "motive," the CFTC must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996). In other words, the defendant must have "benefited in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-8 (2d Cir. 2000). General motives, like "[t]he motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a[n organization], but does not 'entail concrete benefits.'" *Chill*, 101 F.3d at 267 (cleaned up).

But the Complaint alleges no discernible motive at all for Halligan to defraud ACM's Counterparties. Indeed, the CFTC does not even allege a motive for the overall "scheme," other than "to maintain existing trade capacity, secure additional capacity for Archegos Fund to enlarge its swap trading positions, and to obtain or maintain favorable margin rates"—in other words, in order to continue trading TRSs (not Basket Swaps). Cpl. ¶ 61. Yet Halligan was not a trader, and the CFTC nowhere alleges that Halligan had any role in trading. *Id*. ¶ 16. The Complaint's naked assertion that Halligan generally participated in an effort to mislead Counterparties through misrepresentations, without any plausible explanation for why he would do so, is insufficient. *Gissin v. Endres*, 739 F. Supp. 2d 488, 513-14 (S.D.N.Y. 2010) ("implausible" and "generalized" allegations insufficient to establish scienter).

### b.   **The Allegations of Conscious Misbehavior or Recklessness Fail**

Having failed to allege a plausible motive, the CFTC bears a heightened burden to allege facts giving rise to a strong inference of Halligan's conscious misbehavior or recklessness. *SEC v. Syron*, 934 F. Supp. 2d 609, 631-32 (S.D.N.Y. 2013). There, too, it falls short. Recklessness means "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (cleaned up). "The facts alleged to support recklessness must be strong circumstantial

evidence of that recklessness . . . such that it gives rise to a strong inference of fraudulent intent."
*Chill*, 101 F.3d at 267. Although the Complaint recites rote boilerplate that Halligan "knew or was
reckless in not knowing" that statements were false, Cpl. ¶ 52, and generalized allegations that he
"intentionally or recklessly encouraged" Becker to mislead ACM's Counterparties, *id.* ¶ 60, these
conclusory contentions are insufficient as a matter of law. *See SEC v. Cedric Kushner Promotions,
Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006) (dismissing aiding and abetting claims where the
SEC made only "general assertions" that the defendant "must have known of material
misstatements" because of his "constant e-mail and telephonic communication with members of
the . . . team that prepared, reviewed and filed the [forms]").

The CFTC attempts to impute scienter to Halligan based on his supervisory relationship to
Becker, but this fails as well. *See* Cpl. ¶ 52. Similarly, the allegation that Halligan knew as
Becker's "direct supervisor" that Becker was speaking with Counterparties, and that those
conversations would have sometimes involved discussion of ACM's position sizes, *id.* ¶ 52, is a
deficient effort to assign scienter to Halligan "by virtue of his status" and seniority at ACM. *See
Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 255 (S.D.N.Y. 2008) ("[I]t is well-
established that a corporate officer or director by virtue of his status cannot, without more, be
charged with knowledge of activities within the corporation.").

Stripped of these generic allegations, the Complaint is left with only four instances in
which Halligan is alleged to have actually engaged with Becker *at all* in connection with Becker's
alleged misrepresentations. None of these is well pled.

- *First*, the CFTC alleges that Becker, Tomita, and Halligan "held a conference call
  in which they conspired to provide false liquidation statistics" for Becker's call with
  SC 4 in March 2021. Cpl. ¶ 55. But the Complaint does not allege anything more
  specific as to Halligan, such as that he *knew* that the liquidity profile was false (far
  less materially so); had access to supposedly contradictory "internal analyses"; or
  discussed with Becker or Tomita the supposed falsity of the liquidity information.
  The allegation that he participated in a call after which *someone else* made a
  misrepresentation does not show scienter. *See Maloney v. Ollie's Bargain Outlet*

*Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) ("simply alleging that executive defendants are closely involved in running their business is not enough to show that they had access to contrary information") (cleaned up) (Oetken, J.).

- *Second*, the CFTC alleges that Halligan told Becker to use the 35% concentration figure "in late 2020 or early 2021" in connection with a due diligence call with CP8. Cpl. ¶ 53. The CFTC makes the conclusory allegation that Halligan instructed Becker "knowing that Viacom had grown well above 35% of Archegos Fund's NAV," *id.*, but fails to allege *how* Halligan knew that the figure was false at that time or that Halligan had access to and reviewed internal data that would have allowed him to determine the truth or falsity of the information. *See SEC v. Carrillo Huettel LLP*, 13 Civ. 1735-GBD, 2014 WL 12785242, at *3 (S.D.N.Y. June 4, 2014) (regulator must plead facts establishing that defendant "knew the true relevant information," how he "knew the true relevant information, and the circumstances surrounding, and purpose behind, [his] decision to cover it up").

- *Third*, the CFTC alleges that "on or around January 2021," Halligan told Becker to join some of Tomita's calls with Counterparties, and Becker "understood that Halligan wanted to ensure that [Becker] and [Tomita] were telling counterparties a consistent story, and that if [Tomita] was providing misleading information to a [SC], it would be important for [Becker] to do the same." Cpl. ¶ 60. The CFTC further alleges that when Becker relayed the substance of a January 29 call he had with SC 1 regarding GSX to Halligan, Halligan responded "if they only knew," which Becker interpreted as meaning "that Halligan knew that [Becker] and [Tomita] were providing false and misleading information." *Id.* But these allegations are solely about *Becker's* understanding, and nothing in what Halligan is purported to have said supports Becker's interpretations. There are no allegations about *Halligan's* knowledge, or whether or how he knew that the information Becker and Tomita were providing was false.

- *Fourth*, the CFTC alleges that on March 24, 2021, Halligan and Tomita "proposed" certain "talking points" for conversations with Counterparties, which Becker then memorialized in a document. *Id.* ¶ 72. Halligan then "vetted and approved" the document, which contained "false and misleading" statements that Becker "did not have access" to certain data including the "total margin calls" ACM had received, or ACM's "live portfolio." *Id.* But the CFTC does not explain how these statements were false—*e.g.* what "data" Becker had "access" to—let alone whether Halligan knew they were false or how he would have known that. The CFTC does not even allege that the talking points were used in connection with Becker's calls with Counterparties. *Id.* As the CFTC has alleged, ACM's TRS (not Basket Swap) positions that week "plummeted," causing ACM to face a "cascade of margin calls" over a short series of days, resulting in the "collapse of the firm." *Id.* ¶ 64. In such a hectic, deteriorating environment, a myriad of factors could make real-time data unavailable or unreliable, rendering the CFTC's conclusory allegation insufficient.

Next, the CFTC relies on a conversation that allegedly occurred in "around 2018" during which Halligan supposedly told Becker that he should tell Counterparties that "Archegos's largest

position was 35% of NAV, regardless of whether that was true." *Id.* ¶ 52. Specifically, the CFTC

alleges that Becker "learned to misrepresent the size of Archegos Fund's largest positions from

Halligan" by "shadowing Halligan on calls with [SCs]" in *2016 and 2017*, and that *in 2018*

Halligan instructed Becker "that he should tell all [SCs] that [ACM's] largest position was 35% of

NAV, regardless of the true figure." *See id.* ¶¶ 51-52. But these allegations make no sense in the

context of the Complaint's other allegations—the CFTC does not allege that the 35% figure was

even false in "around 2018"; the CFTC offers no explanation for why Halligan would have

"directed" Becker to use a false number years before the alleged scheme to defraud even began;

there is no allegation that ACM's Counterparties imposed any meaningful TRS trading constraints

in 2018 (*see id.* ¶ 42, alleging constraints later in the "Relevant Period" that begins March 2020);

and there is no allegation that Halligan believed that providing the accurate figure (if 35% was

inaccurate, which the CFTC does not allege) would have had any impact on anything at all.

Nor does the Complaint offer any plausible basis to understand why Becker—ACM's

Chief Risk Officer—would accede to a hypothetical instruction to provide Counterparties false

information in the event the 35% figure ever became inaccurate in the future. In sum, the

Complaint paints a picture of Halligan misleading the Counterparties for no reason at all, and

because this theory is implausible as alleged, the Court need not credit it. *See Prodanova v. H.C.*

*Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021) (court may dismiss scienter theory

that is not "persuasive or plausible," and is "divorced from common experience").

**B.   Halligan Did Not "Make" Any Alleged Material Misrepresentation**

The CFTC's misrepresentation claims against Halligan must be dismissed because, under

the U.S. Supreme Court's holding in *Janus*, Halligan is not the "maker" of the misrepresentations

alleged in the Complaint.[9] In *Janus*, the Court held that because Rule 10b-5 prohibits "mak[ing]

---

[9] Although the Court in *Janus* addressed misrepresentations under Section 10(b) and Rule 10b-5, due to the "dearth of law analyzing Section 6(c)(1) and Rule 180.1(a)," courts regularly "analyze the case law regarding Section 10(b) and

any untrue statement of a material fact" in connection with the purchase or sale of securities, an individual may be liable under the Rule only if he or she "made" the statement at issue. 564 U.S. at 141. For the purposes of the Rule, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142. The Court and lower courts following *Janus* have explained that establishing "ultimate authority" over a statement requires two elements—control over its content, and control over whether and how to communicate the statement (*i.e.*, its delivery). *Id.*; *see also SEC v. Rio Tinto plc*, 2019 WL 1244933, at *13 (S.D.N.Y. Mar. 18, 2019). The Supreme Court illustrated this rule by reference to a speechwriter, explaining that even though a speechwriter drafts a speech, "*the content is entirely within the control of the person who delivers it*," and thus the speechwriter is not the "maker" for the purposes of the securities laws. *Janus*, 564 U.S. at 143 (emphasis added).

The Complaint itself forecloses any claim that Halligan can be the "maker" of any of the statements at issue, because it expressly alleges that Halligan *did not* have "ultimate authority" over ACM's communications with Counterparties. *See* Cpl. ¶¶ 17, 63 (Hwang "controlled" ACM). The Complaint alleges that the purpose of the misstatements was allegedly "[t]o achieve the Founder's dual goals of increased trade capacity and lower margins," and that "the Founder" "directed" the defendants to achieve these goals. *See id.* ¶ 63. Furthermore, the Complaint alleges that Hwang directed both the content and delivery of the alleged statements when he "repeatedly stressed that Archegos representatives should not discuss its positions with anyone outside the firm" (*the content*), and "routinely directed [Tomita] and others to acquire additional trade capacity" and "to obtain and maintain more favorable margin rates" (*the delivery*). Cpl. ¶¶ 17,

---

Rule 10b-5 to evaluate whether the CFTC has plausibly alleged a Section 6(c)(1) and Rule 180.1 claim." *See Gorman*, 2022 WL 596261, at *8 and cases cited *supra* at pp. 9-10.

63.[10] These allegations compel dismissal of the CFTC's claims against Halligan. *See Hawaii Ironworkers Annuity Tr. Fund v. Cole*, No. 10 Civ. 371, 2011 WL 3862206, at *5 (N.D. Ohio Sept. 1, 2011), *as amended* (Sept. 7, 2011) (allegation that senior management imposed a "directive" on defendants to misstate financial information was effectively a concession that defendants lacked "ultimate authority" over the content of the statements).

The Complaint's overly general allegation that Halligan at times "directed" Becker in his communications with Counterparties is insufficient. *See* Cpl. ¶ 52. In violation of Rule 9(b), the Complaint provides no particularity as to what this "direction" entailed, and in fact appears to rely for the most part on a supposed conversation that happened *years* before Becker made the alleged misstatements, and *years* before the alleged market manipulation scheme began, at a time when the representation at issue is not even alleged to have been false. *See id*. The Complaint does not allege that Becker attributed a single misstatement to Halligan when speaking with the Counterparties, *see Janus*, 564 U.S. at 147, n.11 ("[m]ore may be required to find that a person or entity made a statement indirectly, but attribution is necessary"), nor does it allege with particularity that Halligan "directed" Becker to have any specific conversations with Counterparties, or that Becker reported back to Halligan after having any such conversations.[11] Courts routinely reject similarly vague allegations, and that result is appropriate here. *See SEC v. Sugarman*, No. 19 Civ. 5998, 2020 WL 5819848, at *5–6 (S.D.N.Y. Sept. 30, 2020) (disregarding conclusory allegations, unsupported by facts, that scheme participants carried out acts taken with defendant's "knowledge and approval" or "knowledge and consent"); *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 569

---

[10]  Halligan does not suggest or concede that the CFTC plausibly or sufficiently alleges that Hwang directed Becker or Tomita to lie or make misrepresentations to achieve these "dual objectives," or explains why Becker or Tomita would have understood a direction to obtain better credit terms as somehow an instruction to engage in fraudulent conduct.

[11]  *See, e.g.*, Cpl. ¶ 53 (mentioning Becker's conversations with two Counterparties, without alleging that Halligan "directed" Becker in those conversations); ¶ 54 (describing Becker's conversation with a Counterparty on March 8, 2021 concerning ACM's "top ten positions," without alleging that Halligan directed Becker in that conversation). The sole example of Becker "reporting back" to Halligan is his conversation in January 2021 with SC 1 regarding GSX. *Id.* ¶ 72. As discussed *supra*, p. 17, the CFTC does not allege that Becker told Halligan about specific misstatements he made to SC 1, and alleges only that Halligan "directed" Becker to join calls with Tomita.

(S.D.N.Y. 1996), *aff'd* 152 F.3d 918 (2d Cir. 1998) (plaintiff cannot satisfy Rule 9(b) with

"conclusory assertions that one defendant controlled another, or that some defendants are guilty

because of their association with others.").[12]

## C.     The CFTC Has Failed to Allege that Halligan Committed Any Deceptive Act

The scheme liability claim against Halligan fails for the fundamental reason that the CFTC

has not adequately alleged that Halligan committed a single deceptive act. *See Gorman*, 2022 WL

596261, at *8 ("A 'scheme liability' claim is aimed at 'inherently deceptive conduct,'" and

requires the CFTC to allege that defendant "committed a manipulative or deceptive act"); *SEC v.

Wey*, 246 F. Supp. 3d 894, 917 (S.D.N.Y. 2017) ("[c]laims for scheme liability hinge" on the

commission of a deceptive act) (cleaned up). The CFTC seeks to impose liability through a theory

of "guilt by association," and its effort should be rejected.

A plaintiff asserting a scheme liability claim must allege with sufficient particularity: "that

the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged

scheme to defraud, (3) with scienter." *Gorman*, 2022 WL 596261, at *8. It must "state with

particularity what deceptive or manipulative acts were performed, which defendants performed

them, and when the acts were performed." *Menora Mivtachim Ins. Ltd. v. Int'l Flavors &

Fragrances Inc.*, 2021 WL 1199035, at *9 (S.D.N.Y. Mar. 30, 2021) (cleaned up).

The alleged "scheme" described in the Complaint was to make material misstatements "in

order to maintain existing trade capacity, secure additional capacity for Archegos Fund to enlarge

its swap trading positions, and to obtain or maintain favorable margin rates." *See* ¶ 61. Here,

Halligan's only alleged role in conduct described in the Complaint is that he supposedly

---

[12]  *See also In re NQ Mobile, Inc. Sec. Litig.*, No. 13 Civ 7608, 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015) (finding claims that a defendant performed audit services "on the authority of, at the direction of, under the control of, and for the sole benefit of" another defendant to be "conclusory allegations" with "no facts to substantiate" them); *cf. PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (describing assertions that individuals acted "at [defendant's] direction," "as part of [defendant's] scheme to defraud [the plaintiff]," and "with his knowledge and approval" as conclusory and dismissing those unsupported by particularized factual allegations) (cleaned up).

participated in the commission of misrepresentations to Counterparties. *See* ¶¶ 61, 67, 70, 72-73. The CFTC does not allege that Halligan was a trader, but clearly alleges that Tomita, as ACM's head trader, was responsible for entering larger TRS positions and obtaining favorable margin rates for the TRS trades. *See, e.g. id.* ¶¶ 42, 46, 58. This alone dooms the scheme liability claims against Halligan, because such claims cannot be premised exclusively on misstatements. *In re Teva Sec. Litig.*, No. 17 Civ. 558 (SRU), 2021 WL 1197805, at *6 (D. Conn. Mar. 30, 2021); *SEC v. Rio Tinto PLC*, No. 17 Civ. 7994 (AT) (DCF), 2021 WL 818745, at *2 (S.D.N.Y. Mar. 3, 2021) ("The Court disagrees with the SEC's contention that [*Lorenzo*] holds that 'misstatements can form the basis for liability under Rule 10b–5(a) and (c).'").[13]

Even setting that defect aside, the Complaint does not plead with particularity any deceptive or fraudulent conduct that *Halligan* took, as opposed to conduct by Becker and/or Tomita. Halligan's general awareness that his former colleagues engaged in "frequent and regular calls with [SCs] regarding credit risk issues," *see* Cpl. ¶ 52, provides no help to the CFTC, because there is nothing "inherently deceptive" about speaking with Counterparties—indeed, the CFTC implicitly concedes that ACM had non-fraudulent communications with the Counterparties for many years preceding the Relevant Period. S*ee SEC v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011) ("[s]cheme liability hinges on the performance of an inherently deceptive act") (cleaned up).

Similarly, the CFTC's allegations that Halligan conferred with Becker or Tomita before certain of the misstatements also fall short, because they, too, fail to identify any specific fraudulent or deceptive act *by Halligan. See In re Refco Capital Mkts., Ltd. Brokerage Customer*

---

[13] Since *Lorenzo*, "[c]ourts are split on [the] issue" of whether misrepresentations can form the "manipulative or deceptive act" for the purposes of scheme liability. *Puddu v. 6D Glob. Techs., Inc.*, No. 15-CV-8061 (AJN), 2021 WL 1198566, at *10-11 (S.D.N.Y. Mar. 30, 2021) (disagreeing with *Rio Tinto*). The Court can dismiss the CFTC's claims against Halligan without reaching this question, because it is undisputed that scheme liability requires sufficiently pled allegations *that the defendant committed a deceptive act*. Without a deceptive act, "mere 'participation' is legally insufficient." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 484-86 (S.D.N.Y. 2007); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 584 (S.D.N.Y. 1997) (knowledge of a fraudulent scheme is not sufficient without a well-pled allegation of a deceptive act).

*Sec. Litig.*, 2007 WL 2694469, at *7 (S.D.N.Y. Sept. 13, 2007), *aff'd sub nom. Capital Mgmt Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012) ("the most basic element of all fraud claims is that the victim must be deceived *by the perpetrator's words or actions*") (emphasis added). As discussed above, all of the alleged misstatements were made *by Becker and Tomita*, and the bald assertion that Halligan conferred with colleagues before they made the statements at issue amounts to insinuation by association. But "guilt by association is not a sufficient pleading of fraud under Rule 9(b)." *Landy v. Mitchell Petrol. Tech. Corp.*, 734 F. Supp. 608, 620 (S.D.N.Y. 1990); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 461 (S.D.N.Y. 2005) (rejecting "essentially a 'guilt by association' argument").

## III.
## THE CFTC HAS FAILED TO ALLEGE A SECONDARY VIOLATION

The CFTC's aiding and abetting claims fare no better. It must sufficiently plead "the defendant (i) had knowledge of the principal's intent to violate the CEA; (ii) intended to further that violation; and (iii) committed some act in furtherance of the principal's objective." *See In re Tether & Bitfinex Crypto Asset Litig.*, 2021 WL 4452181, at *33 (S.D.N.Y. Sept. 28, 2021). The CFTC must still allege facts giving rise to a "strong inference" of fraudulent intent, *Wey*, 246 F. Supp. 3d at 927-28, and "[m]ere negligence does not suffice." *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018). The Complaint fails on each element.

### A.    <u>The Complaint Fails to Plead a Primary Violation</u>

The CFTC's aiding and abetting counts against Halligan are premised exclusively on Becker's and Tomita's alleged primary violations. Cpl. ¶¶ 82. However, because Becker's and Tomita's alleged misstatements were not "in connection with" the Basket Swaps, *see* Pt. I, they cannot constitute a primary violation of the CEA, and therefore cannot be the predicate for Halligan's secondary liability either.

**B.**    **The Complaint Fails to Plead Halligan's Knowledge of a Primary Violation**

As this Court has held, the knowledge element of an aiding and abetting claim cannot be met by "[p]iling inference upon inference." *SEC v. One or More Unknown Traders in Secs. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 253 (S.D.N.Y. 2013) (Oetken, J.). Here, inferences are all that the CFTC has alleged, and its failure to sufficiently plead Halligan's knowledge of a primary violation follows for many of the same reasons as its failure to adequately plead Halligan's scienter with respect to the alleged primary violations. *See* Pt. II.A.

The CFTC ubiquitous allegation that Becker relied for years on a 2018 "direction" from Halligan to provide false information to Counterparties, *see* Cpl. ¶¶ 52, 53, 68, is deficient because it hinges on the unpled inference that Halligan *knew* that Becker provided this figure to specific Counterparties, and *knew* that the figure had become false as of these supposed conversations (as noted, there is no allegation that the 35% figure was false in 2018). The Complaint alleges only one instance in which Halligan supposedly knew that Becker was going to provide the 35% concentration metric to a Counterparty, *id.* ¶ 53, but it states only that Halligan directed Becker to disclose that the concentration was "*approximately* 35%," does not state whether "approximately 35%" was inaccurate, and makes no claim that *Halligan knew* that metric was false *at that time*, far less how he would know that based on real-time data. *See id.*

The Complaint's remaining allegations also fail to plead with sufficient particularity that Halligan was aware of the conversations in which Tomita or Becker allegedly made false statements to Counterparties, *see* Cpl. ¶¶ 53-60, 68-72; that the information that Tomita or Becker were providing to Counterparties was inaccurate, *see id.*; or both. In the absence of well-pled allegations that Halligan *knew* that Becker was making false statements to Counterparties, the CFTC cannot ask the Court to infer that he knew of a primary violation.

**C.      The Complaint Fails to Plead Halligan's Substantial Assistance**

Even if the Complaint sufficiently alleged knowledge, "mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance." *SEC v. Paulsen*, No. 18 Civ. 6718 (PGG), 2020 WL 1911208, at *5 (S.D.N.Y. Apr. 18, 2020) (cleaned up). The aiding and abetting claims against Halligan fail for the additional reason that the CFTC has not shown that Halligan "consciously assisted the commission of the specific crime in some active way." *SEC v. Apuzzo*, 689 F.3d 204, 212 n.8 (2d Cir. 2012) (cleaned up).

Halligan's proximity to Becker is not a proxy for substantial assistance. Courts allow aiding and abetting claims to proceed only where a defendant has "associate[d] himself with the venture . . . participate[d] in it as in something that he wishe[d] to bring about, [and] . . . [sought] by his action to make it succeed." *Id.* at 212. Halligan did none of these things. Nor did he do any of the other things that courts have found sufficient to establish "substantial assistance," such as lie to cover up alleged wrongdoing, *see S.E.C. v. Paulsen*, 2019 WL 13063380 (S.D.N.Y. Feb. 13, 2019), or actively reiterate the primary violator's alleged misstatements to investors, *see SEC v. Mudd*, 885 F.Supp.2d 654, 671 (S.D.N.Y. 2012). In contrast, even if Halligan were aware of and failed to stop Becker's violative conduct (which the CFTC has not alleged), that failure would not amount to substantial assistance. *See Rio Tinto,* 2019 WL 124493, at *18. To hold otherwise would effectively make supervisors the guarantors of subordinates' compliance with the securities laws, which is not the law. *See PetEdge,* 234 F. Supp. at 493 (dismissing claim against CEO that "seem[s] to rest on a belief that [the CEO] is liable because he was a senior officer of [the company] and, thus, must bear some personal liability for the acts of the company through his subordinates").

<u>**CONCLUSION**</u>

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:   New York, New York
         July 1, 2022

Respectfully Submitted,

FRIEDMAN KAPLAN SEILER &
  ADELMAN LLP

*s/ Mary E. Mulligan*
Mary E. Mulligan (mmulligan@fklaw.com)
Bonnie M. Baker (bbaker@fklaw.com)
Timothy M. Haggerty (thaggerty@fklaw.com)
Anil K. Vassanji (avassanji@fklaw.com)
Dielai Yang (dyang@fklaw.com)
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Patrick Halligan*

3672238.1