UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | Case No. 22-CV-3401 |
| Plaintiff, | ECF Case |
| v. | **COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS** |
| ARCHEGOS CAPITAL MANAGEMENT, LP and PATRICK HALLIGAN, | |
| Defendants. | **JURY TRIAL DEMANDED** |

## I.     SUMMARY

1.     In the span of a year, between March 2020 and March 2021 ("Relevant Period"), Archegos Capital Management, LP ("Archegos") and Archegos's Chief Financial Officer, Patrick Halligan (collectively, "Defendants"), and others acting on their behalf or under their direction ("Accomplices"), engaged in a scheme whereby they intentionally and/or recklessly made and disseminated false or misleading material information and/or omitted to make and disseminate such material information to their trading swap counterparties ("Swap Counterparties") and took steps to deliberately conceal the true nature and extent of this scheme from their Swap Counterparties.  During this period, the value of Archegos's portfolio increased fifteen-fold before it abruptly collapsed, causing its Swap Counterparties to suffer losses totaling billions of dollars.

2.     Archegos's spectacular rise and catastrophic fall arose from a pattern of deceit in which Defendants and their Accomplices routinely led Archegos's Swap Counterparties to

falsely believe that the portfolio of Archegos Fund, LP ("Archegos Fund"), a fund managed by Archegos, was far less risky than it actually was.

3.     Beginning in March 2020, Archegos Fund embarked on a new long/short trading strategy that was materially different from its historical practice. The portfolio for this new trading strategy consisted, in large part, of: (1) long total return swaps ("TRS") referencing single-name securities; and (2) short TRS designed to partially hedge the risk of the long swaps, based on exchange-traded funds ("ETF Swaps") and custom baskets ("Custom Basket Swaps," and collectively with the ETF Swaps, "Broad-Based Security Index Swaps").[1]

4.     Under this new strategy, Archegos, as investment manager of Archegos Fund, caused Archegos Fund to enter into hundred million-dollar long single-name TRS on a daily basis that focused on a concentrated group of securities. Due to the size of Archegos Fund's positions, they could not easily be liquidated. These trades were spread across at least eight different counterparties, and therefore each Swap Counterparty saw only a fraction of Archegos Fund's total exposure. Swap Counterparties thus engaged in frequent oral and written communications with Archegos's representatives to try to understand the aggregate composition

---

[1] A swap is an exchange of one asset or liability for a similar asset or liability for the purpose of shifting risks. Archegos sought exposure to equities, among other ways, by entering into TRS. A TRS is a type of swap in which one counterparty receives the total return (i.e., interest payments and any capital gains or losses) from a specified reference asset (e.g., a stock), and the other counterparty receives a specified fixed or floating cash flow that is not related to the creditworthiness of the reference asset. A "single name" swap refers to a swap that references a single issuer, e.g., Facebook or Netflix. Total-return equity swaps involve an exchange of the income stream from: (1) a specified number of shares in a designated company's stock; and (2) a specified interest rate on a specified principal amount. The party that receives the stock-based return is called the "receiver." The party that receives the interest-based return (and pays the stock-based return) is called the "payer." These contracts do not transfer title to the underlying assets or require that either party actually own them. Rather, in a total-return equity swap, the receiver periodically sends to the payer a sum calculated by applying an agreed-upon interest rate to an agreed-upon notional amount of principal, as if the receiver had borrowed that amount of money from the payer. Meanwhile, the payer periodically pays the receiver a sum equivalent to the return to a shareholder in a specified company—the increased value of the shares, if any, plus income from the shares—as if the receiver owned actual shares in that company. As a result, the financial return to a receiver in a total-return equity swap is roughly equivalent to the return when borrowed capital is used to purchase shares in the referenced company.

of Archegos Fund's holdings and to gauge the risk associated with Archegos Fund's whole portfolio.

5.     During the course of these communications, Defendants and their Accomplices repeatedly misrepresented material facts or omitted to state material facts relevant to assessing the risk of Archegos Fund's portfolio, including the size and concentration of its largest long positions, amount of unencumbered cash, and liquidity.  Defendants and their Accomplices misrepresented and/or hid material facts in order to conceal the true risk of Archegos Fund's portfolio so that Archegos Fund could obtain additional capacity to trade even greater volumes of highly leveraged, concentrated, and illiquid long positions, while maintaining favorable margin rates.  Accordingly, Archegos misled its Swap Counterparties into believing that they had truthful information regarding Archegos's portfolio.

6.     The Swap Counterparties tried to mitigate the risk posed by Archegos Fund's long single-name TRS by requiring Archegos Fund to maintain sizable short swap positions. Archegos Fund met these short requirements primarily through Broad-Based Security Index Swaps that referenced large and liquid sections of the market.  These Broad-Based Security Index Swaps were designed to act as hedges to mitigate the risks imposed by the long single-name TRS positions in Archegos Fund's portfolio.  Due to Archegos's misrepresentations, Archegos Fund's Swap Counterparties relied on material false information and in turn could not accurately assess the risk posed by Archegos Fund's aggregate positions and could not accurately calibrate the appropriate level of risk controls.  For example, if Archegos Fund's Swap Counterparties had known the full scope of its long single-name TRS positions and the true facts regarding its unencumbered cash, they would have taken risk control measures including, in part, limiting, restricting, or reducing Archegos Fund's trade capacity, enhancing

3

margin requirements, and maintaining appropriate levels of Broad-Based Security Index Swaps that would better mitigate the risk of Archegos Fund's overall portfolio.

7.      The lies of Defendants and their Accomplices disguised the fact that Archegos Fund was a house of cards that was one bad week away from ruin.  That week was the week of March 22, 2021.  Starting on Tuesday, March 23, and continuing through the rest of the week, virtually all of Archegos Fund's largest long positions sharply declined, triggering a cascade of margin calls from its Swap Counterparties totaling over $13 billion.  The margin calls far exceeded Archegos Fund's available cash, causing it to collapse, dismiss employees, and cease operations.  During this week, Defendants took steps to conceal the true nature and extent of the scheme from its Swap Counterparties.

8.      Many of Archegos Fund's Swap Counterparties suffered the consequences of Archegos Fund's trading strategy, which was based on repeated lies.  This is so because to hedge Archegos Fund's long single-name swap positions, its Swap Counterparties typically took cash positions in the same referenced asset—for example, if Archegos Fund entered into a long swap referencing Stock A, its Swap Counterparty would buy an equivalent notional value of Stock A. When Archegos Fund failed to pay its margin calls and defaulted on its swaps, counterparties were forced to unwind the swaps and liquidate the hedges by selling the underlying securities (e.g., Stock A) back into the market at prices well below what they had originally paid.  As a result, one of Archegos Fund's Swap Counterparties lost over $5 billion; another lost almost $3 billion; and in total, Archegos Fund's Swap Counterparties lost over $10 billion.

9.      By the aforementioned conduct, Defendants have engaged, are engaging in, or are about to engage in practices that violate the provisions of the Commodity Exchange Act ("Act")

and the Commission's regulations ("Regulations"), including Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021).

10.     Archegos is also liable for the actions of its officers, employees, or agents pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021).

11.     Halligan aided and abetted Archegos's violations and is therefore also liable for those violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(b).

12.     Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel compliance with the Act.  In addition, the Commission seeks civil monetary penalties and remedial ancillary relief, including but not limited to trading and registration bans, restitution, disgorgement, and such other relief as this Court may deem necessary or appropriate.

## II.     **JURISDICTION AND VENUE**

13.     **Jurisdiction**.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345, which provide that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress.  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that district courts have jurisdiction to hear actions brought by the Commission for injunctive relief and to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.  The Broad-Based Security Index Swaps traded by Archegos are "swaps" within the definition set forth in Section 1a(47)(A) and (B) of the Act, 7 U.S.C. § 1a(47)(A) and (B), and are subject to the Commission's jurisdiction.  As described throughout this Complaint,

the Broad-Based Security Index Swaps were an integral component of Defendants' fraudulent scheme, and thus Defendants engaged in fraud "in connection with" swaps subject to the Commission's jurisdiction.  Section 6(c)(1) of the Act, 7 U.S.C. § 9(1); Regulation 180.1(a)(1)–(3), 17 § C.F.R. 180.1(a)(1)-(3) (2021).

14.    **Venue**.  Venue properly lies with the Court pursuant to Section 6c(e) of the Act, 7 USC. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District, and because the acts and practices in violation of the Act have occurred within this District, among other places.

### III.    THE PARTIES

15.    Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act and the Regulations.  The Commission maintains its Eastern Regional Office at 290 Broadway, 6th Floor, New York, New York 10007.

16.    Defendant **Archegos Capital Management, LP** is a limited partnership formed in Delaware and having its principal place of business in New York, NY.  Archegos has never been registered with the Commission in any capacity.

17.    Defendant **Patrick Halligan** is an individual residing in Syosset, New York. Halligan was the Chief Financial Officer of Archegos.  Halligan has never been registered with the Commission in any capacity.  Before Archegos, Halligan was employed by Tiger Asia Management, LLC ("Tiger Asia"), Archegos's predecessor.

### IV.    OTHER RELEVANT PERSONS

18.    **Archegos Fund, LP** is a limited partnership formed in Delaware and having its principal place of business in New York, NY.  Pursuant to the Amended and Restated Investment Management Agreement ("Investment Management Agreement") between Archegos

and Archegos Fund dated June 30, 2014, Archegos is the Investment Manager of Archegos
Fund.  Archegos had broad authority to act on behalf of Archegos Fund, including authority to
deal in commodity contracts, securities, and swaps; conduct margin accounts with brokers; and
"act for [Archegos] Fund in all other matters."  Archegos and Archegos Fund shared an office
and were each wholly owned and controlled by its founder ("Founder") for the common purpose
of managing and investing the assets of the Founder and the Founder's family.  The Founder
served as the managing member of Archegos Fund's general partner and the principal of
Archegos and signed the Investment Management Agreement on behalf of both Archegos and
Archegos Fund.  Archegos Fund has never been registered with the Commission in any capacity.

19.     **William Tomita** was the head trader of Archegos during the Relevant Period and
was an accomplice to this fraudulent scheme.  Tomita has never been registered with the
Commission in any capacity.  Before Archegos, Tomita was employed by Tiger Asia.  On April
22, 2022, Tomita pled guilty pursuant to an information to criminal law violations concerning the
facts alleged in this Amended Complaint.  *See United States v. Scott Becker and William Tomita*,
22 Cr. 231 (S.D.N.Y.). Tomita also consented to an administrative order issued by the CFTC on
April 27, 2022, in which he admitted to participating in the scheme alleged in this Amended
Complaint.  *See In the Matter of Tomita*, CFTC No. 22-15, 2022 WL 1404268, at *1, *3-5 (Apr.
22, 2022) (consent order).

20.     **Scott Becker** was the Director of Risk Management of Archegos during the
Relevant Period.  Becker reported directly to Halligan and was an accomplice to this fraudulent
scheme.  Becker has never been registered with the Commission in any capacity.  Before
Archegos, Becker was employed by Tiger Asia.  Becker reported to Halligan during his entire
tenure at Tiger Asia and Archegos.  On April 21, 2022, Becker pled guilty pursuant to an

7

information to criminal law violations concerning the facts alleged in this Amended Complaint. *See United States v. Scott Becker and William Tomita*, 22 Cr. 231 (S.D.N.Y.). Becker also consented to an administrative order issued by the CFTC on April 27, 2022, in which he admitted to participating in the scheme alleged in this Amended Complaint. *In the Matter of Becker*, CFTC No. 22-14, 2022 WL 1404267, at *1, *3-5 (Apr. 22, 2022) (consent order).

## V.     FACTS

### A.     Tiger Asia and Archegos

21.     Archegos's predecessor, Tiger Asia, was founded in 2001. Tiger Asia was one of the so-called "Tiger Cub" funds, a group of hedge funds that were spun off from Tiger Management Corp., which in the late 1990s was one of the largest hedge fund sponsors in the world.

22.     On December 12, 2012, Tiger Asia and its founder entered into a settlement with the United States Securities and Exchange Commission ("SEC") concerning allegations that they committed insider trading by entering into "wall-crossing" agreements for three private placements of Chinese bank stocks, and later violating those agreements by short selling those stocks and covering the short positions with private placement shares purchased at a discount. The settlement also resolved claims that Tiger Asia and its founder attempted to manipulate the prices of publicly traded Chinese bank stocks in which it held substantial short positions by placing losing trades in an attempt to lower the price of the stocks and increase the value of the short positions, enabling Tiger Asia to illicitly collect higher management fees from investors. As part of the settlement, Tiger Asia paid $44 million in disgorgement and penalties, and the SEC banned Tiger Asia's founder from managing money on behalf of clients for at least five years. Complaint, *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECF No. 1;

Consent of Tiger Asia Management, LLC, *SEC v. Tiger Asia Mgmt.*, No. 12-cv-7601 (D.N.J. Dec. 12, 2012), ECF No. 3-1.

23.     In a parallel action brought by the United States Department of Justice, on December 12, 2012, Tiger Asia pleaded guilty to one count of criminal wire fraud and admitted the same or similar facts set forth in the SEC settlement pertaining to insider trading.  Tiger Asia was sentenced to one year of probation and agreed to forfeit more than $16 million in illegal profits.  Information, *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12, 2012), ECF No. 1; Plea Agreement, *United States v. Tiger Asia Mgmt.*, No. 12-cr-808 (D.N.J. Dec. 12, 2012), ECF No. 3.

24.     In connection with these settlements, Tiger Asia returned all outside investor capital, and its founder converted Tiger Asia to a family office, rebranding it as "Archegos." The founder of Tiger Asia thus became the founder and Chief Executive Officer of Archegos.

**B.    Archegos Fund's Broad-Based Index Swaps**

25.     During the Relevant Period, Archegos, as investment manager for Archegos Fund, caused Archegos Fund to enter into thousands of swap transactions—including hundreds of Broad-Based Securities Index Swaps—with several different Swap Counterparties, including many Swap Counterparties that were provisionally registered with the Commission as swap dealers.

26.     Archegos Fund entered into TRS referencing single-name securities, as a receiver, with at least eight different Swap Counterparties.  The vast majority of these single-name TRS positions were "long," meaning that Archegos Fund would receive payment under the TRS if the underlying security appreciated.  In addition, in order to hedge the risk imposed by its long single-name TRS exposure, Archegos Fund entered into TRS positions that were based on: (i) ETF Swaps that were based on and provided exposure to indexes of hundreds of component

securities; and (ii) Custom Basket Swaps which were designed to closely mimic the same broad-based securities indexes as the ETF Swaps. These Broad-Based Security Index Swaps were "short" positions, meaning that Archegos Fund would receive payment under the TRS if the value of the underlying securities declined.

27.     An ETF is a type of investment fund that tracks an index, sector, or other asset, whose shares can be bought or sold on an exchange like a stock. Archegos Fund entered into ETF Swaps that tracked broad-based indexes like the S&P 500 index; and the MSCI Emerging Markets Index. Each of those indexes (and hence, each ETF Swap based on those indexes) is based on hundreds of individual component securities, and neither index meets the weighting or trading volume criteria of a narrow-based security index set forth in Section 1a(35) of the Act, 7 U.S.C. § 1a(35). During the Relevant Period, Archegos Fund shorted a net notional value of $19 billion in ETF Swaps in 256 transactions with at least eight different Swap Counterparties, including multi-billion-dollar short positions in SPDR S&P 500 ETF Trust ("SPY") and iShares MSCI Emerging Markets ETF ("EEM").

28.     Archegos Fund's Custom Basket Swaps largely tracked broad-based indexes like the S&P 500 and MSCI Emerging Markets Index, but they were customized in various ways (for example, to remove certain securities in which Archegos Fund held significant long positions). Archegos Fund's Custom Basket Swaps each referenced hundreds of securities, and the weighting and trading volume of the component securities in each Custom Basket Swap did not meet the definition of a narrow-based security index as set forth in 7 U.S.C. § 1a(35). During the Relevant Period, Archegos Fund traded a net notional value of $33 billion in Custom Basket Swaps in 185 transactions with at least six different counterparties.

29.     To hedge Archegos Fund's long single-name TRS positions, Swap Counterparties typically bought long cash positions in the same securities underlying the swaps.  For example, when Archegos Fund purchased a long swap referencing $100 million of GSX Techedu Inc. ("GSX")[2] stock, a Swap Counterparty would typically hedge the swap by going into the market and buying $100 million of GSX stock.  In this way, from the Swap Counterparty's perspective, the combination of Archegos Fund's long TRS and the Swap Counterparty's cash position hedge would be market neutral—any amount that the Swap Counterparty was required to pay to Archegos Fund under the terms of the swap would be equal to the amount that the Swap Counterparty would receive through direct ownership of the actual stock.  The Swap Counterparty would then profit from the arrangement, in theory, through Archegos Fund's payment of the fixed rate fee established in the swap agreement.

30.     Although this kind of hedging reduced Swap Counterparties' market risk arising from changes in the prices of securities underlying the swaps, Swap Counterparties were still exposed to other kinds of risk.  For example, Swap Counterparties were exposed to Archegos Fund's credit risk, i.e., the risk that Archegos Fund would not or could not pay what it owed under the terms of the swap agreements.  For this reason, Archegos Fund's swap transactions were generally subject to credit and risk limitations imposed by its Swap Counterparties.  In particular, certain of Archegos Fund's Swap Counterparties permitted Archegos to transact on a leveraged basis, provided it met certain margin requirements.

31.     Margin is the amount of money or collateral deposited by a customer (i.e., Archegos Fund) with its swap dealer (i.e., Swap Counterparties).  Initial margin is the amount of margin required by the dealer when a swaps position is opened, and maintenance margin is an

---

[2] GSX has since changed its name to Gaotu Techedu Inc.

amount that must be maintained on deposit at all times.  If the equity in a customer's account drops to or below the level of maintenance margin because of adverse price movement, the dealer must issue a margin call to the customer, requiring that the customer post additional margin to restore its equity to the initial level.

32.     When Archegos Fund entered into swaps, it typically was required to deposit with its Swap Counterparties only a fraction of the total notional value of the swap as initial margin. To give a simplified hypothetical example, if Archegos Fund entered into a swap that gave Archegos Fund exposure to $100 million in GSX stock, its Swap Counterparties might require Archegos Fund to deposit only 10% of that amount upfront—$10 million—to be held by the Swap Counterparty as margin.  If the value of GSX stock then declined by 10%, decreasing the notional value of Archegos Fund's exposure to $90 million, the Swap Counterparty would be entitled to take the $10 million margin into its own account; then, Archegos Fund would be required to post additional margin equal to 10% of the new notional value of the underlying stock, i.e., $9 million.  Conversely, if the value of GSX stock increased by 10%, Archegos Fund would be required to maintain its $10 million margin with the counterparty, but it would also receive $10 million from the Swap Counterparty due to the appreciation of the stock.

33.     Margin frameworks differed materially from one Swap Counterparty to another. In contrast to the example above, certain counterparties would have required the posting of additional margin to account for the appreciation of the asset and to maintain a margin rate equal to 10% of the value of Archegos Fund's positions.  Thus, in the above hypothetical, if the value of GSX stock increased by 10%, certain counterparties would have required Archegos Fund to post an additional $1 million in margin, and Archegos Fund would receive $9 million due to the appreciation of the stock.

34.     Unless the margin rate is 100%, however (i.e., the swap is not leveraged at all), margin does not eliminate credit risk altogether.  Swap Counterparties remained exposed to the risk that the stock underlying a swap will depreciate by more than the amount of posted margin, and that Archegos Fund would be unable or unwilling to pay the difference.  For this reason, it was critically important for Archegos Fund's Swap Counterparties to do their due diligence when analyzing their risk, impose credit and risk limitations, and carefully analyze and adjust Archegos Fund's margin rates based on the facts and circumstances as they understood them.

35.     As part of this risk analysis, Archegos Fund's Swap Counterparties analyzed, among other variables, the size, composition, and liquidity of Archegos Fund's portfolio, both within the Swap Counterparty's own portfolio and (to the extent possible) across all other financial institutions.  Archegos Fund's Swap Counterparties also paid particular attention to Archegos Fund's available free cash that could be used to satisfy further margin requirements, if needed.

36.     Swap Counterparties also imposed formal or informal credit- and risk-related limitations on Archegos Fund's ability to transact swaps, such as setting limits on the total notional value of Archegos Fund's portfolio with that Swap Counterparty; requiring that Archegos Fund maintain a certain ratio of long to short positions ("long/short ratio") in its portfolio at that Swap Counterparty (which Archegos met on the short side primarily by maintaining short Broad-Based Security Index Swap positions); and/or requiring that Archegos Fund enter into highly liquid diversified swap positions.  If Archegos Fund failed to adhere to these requirements, a Swap Counterparty typically would consider limiting further trading and/or requiring Archegos Fund to post additional margin to reduce the Swap Counterparty's risk.

37.     Archegos Fund's Broad-Based Security Index Swaps played a critical role in Swap Counterparties' assessment and management of Archegos Fund's credit risk.  The Broad-Based Security Index Swaps were typically placed as short positions and thus served as a general market hedge and risk-reducing measure.  Archegos Fund's largest long positions were TRS positions in single securities; as such, there was a risk that certain market-wide factors would negatively impact these long positions.  By shorting a large section of the market, the Broad-Based Security Index Swaps were designed to hedge against the risk of a market decline impacting the long TRS positions, since the short Broad-Based Security Index Swaps would not necessarily be subject to the same losses suffered by the long TRS positions in the event of a market decline.  In addition, because the Broad-Based Security Index Swaps were less volatile, more diverse, and more liquid, they could more easily and quickly be unwound.  Because of their risk-reducing properties, Archegos's placement of substantial short Broad-Based Security Index Swap positions during the Relevant Period was instrumental and essential to Archegos's ability to obtain additional capacity and favorable margin rates.  For similar reasons, some Swap Counterparties requested that Archegos Fund place new short Broad-Based Security Index Swap positions concurrently with new long single name positions in order to meet required long/short ratios.  During the Relevant Period, Archegos entered into numerous transactions in Broad-Based Security Index Swaps, including those set forth in Appendix A.  Many of Archegos Fund's Broad-Based Security Index Swaps positions remained open through the week of March 22, 2021.

### C.     Archegos Fund's Trading Between March 2020 and March 2021

38.     Before the Relevant Period, Archegos Fund adhered to a long-term strategy that prioritized liquid stocks and infrequent trading.  But beginning in or around March 2020, Archegos Fund's trading strategy changed dramatically.  Pursuing a long/short strategy,

Archegos Fund began building massive, highly concentrated, illiquid long positions in a small number of single securities through long TRS, while partially hedging those long positions through short positions in Broad-Based Security Index Swaps.  Archegos Fund's positions were also highly leveraged.

39.     At the beginning of March 2020, Archegos Fund's aggregate gross exposure was $19 billion, and its net exposure was $7 billion long, consisting of $13 billion in aggregate long exposure and $6 billion in aggregate short exposure.  A little over a year later, as of March 19, 2021, Archegos Fund's exposure had grown to approximately $160 billion in aggregate gross exposure and $52 billion long in net exposure, consisting of $106 billion in aggregate long exposure and $54 billion in aggregate short exposure.  During the same time period, Archegos Fund grew over twenty-fold, from about $1.5 billion to $35 billion in assets under management. As of March 19, 2021, a little over half of Archegos Fund's gross portfolio, about $86 billion, consisted of long TRS positions referencing single securities.  At the same time, about 20% of Archegos's gross portfolio—$32 billion—consisted of Custom Basket Swaps.  Archegos Fund also held about $14 billion in ETF Swaps.  The remainder of Archegos Fund's portfolio consisted predominantly of long cash securities and short swaps referencing single securities.

40.     Archegos Fund's long TRS positions during this time were heavily concentrated in swaps referencing just a handful of individual securities, including ViacomCBS Inc. ("ViacomCBS"), Baidu Inc. ("Baidu"), Tencent Music Entertainment Group ("Tencent Music"), Discovery Communications Inc. ("Discovery") and iQIYI ("IQ").  Although these securities were listed on public exchanges and traded millions of shares per day, Archegos Fund's positions in these companies were so large in comparison to their average daily trading volumes that they could not easily be liquidated.

41.     Beginning in the fall of 2020, Archegos Fund entered into large long TRS trades in GSX and certain other stocks.  Tomita understood that the price of GSX affected Archegos Fund's margin requirements with its Swap Counterparties because margin was determined based on the daily closing price of its positions.  Accordingly, if the price of GSX increased at close of the market, the Swap Counterparties would be required to post margin to Archegos Fund's accounts based upon the daily appreciation in Archegos Fund's long GSX swap positions.  Indeed, as Archegos Fund added to its long GSX positions and the price of GSX stock rose, Archegos Fund received margin payments from its Swap Counterparties, and typically would then use this additional margin to further enlarge its GSX position.

42.     As the size of Archegos Fund's portfolio expanded during the Relevant Period, it frequently approached the limits of its Swap Counterparties' risk management tolerances. Certain Swap Counterparties, for example, refused to allow Archegos Fund to execute additional long TRS positions in concentrated names; others refused to allow such transactions without the positing of additional margin.  Archegos thereafter engaged in an unrelenting search for additional trade capacity in Archegos Fund's concentrated positions.  To that end, Archegos, primarily through Tomita, spoke daily with Archegos Fund's existing Swap Counterparties about increasing its notional limits in securities like ViacomCBS and GSX, among others.  Induced by numerous false and misleading statements by Defendants, described herein, Swap Counterparties frequently agreed to grant additional capacity to enter into long TRS positions, but not before requiring Archegos Fund to agree to additional risk-reducing measures, often in the form of additional short Broad-Based Security Index Swap positions.

43.     Archegos also sought to enlist new Swap Counterparties so that it could continue to rapidly grow its concentrated and illiquid positions without triggering the risk management

controls of its existing counterparties and without paying higher margin.  By adding new Swap

Counterparties, Archegos Fund could effectively start from scratch with new position limits and

lower margin rates, unload high-margin positions to the new Swap Counterparty at lower margin

rates, and retain other existing positions with its other Swap Counterparties.  Thus, Archegos

Fund entered into a new Swap Counterparty relationship with Swap Counterparty 1 in November

2020.  By March 22, 2021, Archegos Fund had over $15 billion in long swap exposure at Swap

Counterparty 1 and almost $10 billion in short TRS exposure (much of this in the form of Broad-

Based Security Index Swaps).  In or around March 2021, Archegos was also in the process of

seeking additional relationships with four additional counterparties, though none of these came

to fruition before Archegos Fund collapsed.

      44.    Archegos Fund's trading in Broad-Based Security Index Swaps was an integral

and critical part in inducing its Swap Counterparties to allow Archegos Fund to continue to build

its highly leveraged, concentrated, and illiquid long positions.  As Archegos Fund's portfolio

became more concentrated in long TRS positions referencing single securities ("long single-

name TRS positions"), its portfolio at  certain Swap Counterparties also included short Broad-

Based Security Index Swaps positions, which were needed to satisfy counterparty credit and risk

management requirements, including long/short ratios and sector limits.  For example, Archegos

Fund agreed to maintain a long/short ratio of 2:1 with Swap Counterparty 2 and 3:2 with Swap

Counterparty 4.  Archegos Fund agreed with its Swap Counterparties that if Archegos Fund

wanted to place additional long single-name TRS positions, it would also need to place

additional short positions to meet the long/short ratios.  The Swap Counterparties (including but

not limited to Swap Counterparty 2 and Swap Counterparty 4) knew and understood that as a

general matter, Archegos would add short Broad-Based Security Index Swaps to meet these

long/short ratios.  Throughout the Relevant Period, when Archegos Fund placed additional long single-name TRS positions, it also transacted additional Broad-Based Security Index Swaps contemporaneously (often on the same day or within a day or two) in order to maintain the required long/short ratios and sector requirements.  Thus, the placement of Broad-Based Security Index Swaps was designed to and did in fact frequently coincide with the placement of long swap positions.

45.    In several instances, in order to increase the size of its concentrated long single-name TRS positions while obtaining or maintaining favorable margin rates, Archegos Fund's Swap Counterparties asked or required that Archegos Fund increase the size of its short Broad-Based Security Index Swap positions, and Archegos Fund obliged.

46.    For example, in connection with a potential agreement with Swap Counterparty 2 in March 2021 regarding a new margin and risk management framework, at the request of Swap Counterparty 2, Archegos Fund "agreed to hedge 50% of any new long exposure" with Broad-Based Security Index Swaps—in other words, Archegos Fund agreed that for every $100 of new long exposure, Archegos Fund would also add $50 worth of short exposure in the form of Broad-Based Security Index Swaps.  Moreover, as early as the end of 2020, all requests by Archegos for additional long exposure at Swap Counterparty 2 were conditioned on Archegos also adding Broad-Based Security Index Swaps to maintain the required long/short ratio.

47.    Similarly, in connection with a request by Archegos Fund to add additional long exposure with Swap Counterparty 1 on December 14, 2020, Tomita stated that Archegos Fund "would add index shorts, namely SPY, EEM and [a Custom Basket Swap] in a 2:1 long short ratio to put these on."  In an internal email, Swap Counterparty 1 confirmed its understanding that "$1 of index short will come with $2 of new long exposure."  A few weeks later, on January

8, 2021, in connection with a request to trade additional long swaps relating to multiple existing concentrated positions, Tomita represented to Swap Counterparty 1 that Archegos Fund would trade short Broad-Based Security Index Swaps "[a]s needed to maintain 2:1 L/S [long/short ratio]." And on February 2, 2021, Tomita asked Swap Counterparty 1 for an increase in its capacity to trade GSX. At the same time, Tomita stated that Archegos Fund would "keep adding index shorts [i.e., Broad-Based Security Index Swaps] . . . as we buy long [GSX]." Swap Counterparty 1 responded, "That would be great."

48.     On February 1, 2021, Swap Counterparty 8 informed Tomita that Swap Counterparty 8 was "in desperate need of the index shorts . . . given how much [Archegos Fund's] long book has appreciated without the shorts growing." Thereafter, Swap Counterparty 8 agreed to allow Archegos to trade an additional $200 million in GSX—but only if Archegos Fund also traded $200 million in short ETF Swaps. Archegos Fund traded $80 million in short swaps referencing SPY with Swap Counterparty 8 on February 1, 2021 and $120 million in short swaps referencing SPY with Swap Counterparty 8 on February 2, 2021.

49.     On February 5, 2021, Swap Counterparty 7 informed Archegos that if it wanted to trade additional long swaps relating to one of Archegos's existing concentrated positions, Archegos would need to hedge the long positions with an additional short position in EEM.

50.     On February 24, 2021, in a communication with Tomita, Swap Counterparty 1 approved an increase in Archegos Fund's capacity to trade GSX. At the same time, Swap Counterparty 1 told Tomita that Swap Counterparty 1 remained "very focused on the shorts - net ratio remains balanced with the custom basket [i.e., a Broad-Based Security Index Swap]."

51.     On February 26, 2021, in connection with a request by Archegos Fund to add to its existing concentrated long TRS positions, Swap Counterparty 5 noted that it "expect[ed] short hedges in the form of ETFs . . . and custom baskets to accompany the longs."

52.     Overall, Archegos Fund's short Broad-Based Security Index Swap positions were massive, including over $6 billion in EEM, over $9 billion in SPY, and $30 billion in Custom Basket Swaps as of March 23, 2021.  Representatives of Swap Counterparty 1, which transacted approximately $7 billion in short Custom Basket Swaps with Archegos Fund, remarked that Archegos Fund was its "#1 custom basket client" and held "the biggest basket position [they] had ever seen."

**D.     Defendants' Misrepresentations Concerning Archegos Fund's Portfolio Prior to March 22, 2021**

53.     Archegos Fund was able to build its giant portfolio only by concealing its true size and characteristics from its Swap Counterparties.  Each of Archegos Fund's Swap Counterparties could see only a small portion of Archegos Fund's overall portfolio and therefore relied on Archegos to supply information about the rest.  Rather than provide truthful information, Defendants and their Accomplices repeatedly misled Swap Counterparties about Archegos Fund's aggregate positions, which caused the Swap Counterparties to believe that Archegos Fund's total portfolio was far less risky than it actually was.

54.     From the beginning, Archegos operated under a culture of secrecy, dictated, in part, from the Founder and Halligan.  The Founder repeatedly stressed that Archegos representatives should not discuss its positions with anyone outside the firm, and Halligan endorsed this view as well.  In early 2021, for example, Halligan spoke with Archegos's executive chairman about the type of information that Archegos provided to its Swap

Counterparties.  Halligan reported, in substance, that when dealing with its Swap Counterparties, Becker was intentionally vague in response to Swap Counterparties' questions.

55.     Archegos's culture of secrecy during the Relevant Period frequently crossed the line into outright deception.  As Archegos caused Archegos Fund to increase the size and concentration of its long single-name TRS positions during the fall of 2020 and into 2021, Defendants' and their Accomplices, including Tomita and Becker, periodically communicated with representatives of Archegos Fund's Swap Counterparties and were typically asked questions about Archegos Fund's largest positions, gross exposure, unencumbered cash, and liquidity, among other things.  From the perspective of the Swap Counterparties, the objective of these conversations was to gather information about Archegos Fund in order to make credit and risk management decisions about its portfolio, including, but not limited to, the need for short Broad-Based Security Index Swaps, at their respective institutions.  From the perspective of Defendants and their Accomplices, the purpose was to coax additional funding and favorable terms for Archegos Fund by whatever means necessary, including through fraud and concealment of this scheme.  As Tomita admitted in his allocution in connection with his guilty plea to criminal law violations concerning the facts alleged in this Amended Complaint, he participated in a scheme to "carry out the business of Archegos through a pattern of . . . deceiving counterparties," including through false and misleading statements that were intended to "mislead counterparties as to the true risks presented by [Archegos Fund]."

56.     During the Relevant Period, Becker, at the direction of Halligan, and Tomita intentionally and/or recklessly gave false or misleading information to Swap Counterparties and/or omitted to state material facts necessary to make that information not untrue or misleading, regarding the size, composition, and liquidity of Archegos Fund's overall portfolio.

They gave this false and misleading information to Swap Counterparties and omitted material

facts in order to secure additional trade capacity for Archegos Fund to enlarge its long single-

name TRS positions; to obtain or maintain favorable margin rates; and, during the week of

March 22, 2021, to attempt to satisfy margin calls.  The false or misleading information provided

by Becker and Tomita concerned facts or omitted facts that were important for Archegos Fund's

Swap Counterparties to know in making credit and risk management decisions about Archegos

Fund's swap portfolio at that counterparty, including decisions regarding margin, position size,

the long short ratio, and the need for short Broad-Based Security Index Swaps.  As Becker

admitted in his allocution in connection with his guilty plea to criminal law violations concerning

the facts alleged in this Amended Complaint:

> I understood that [swap counterparties] would not open relationships with Archegos,
> extend Archegos trading capacity, or offer Archegos favorable margin rates without
> certain representations to them about the overall holdings within the Archegos portfolio.
> In order to induce [swap counterparties] to, among other things, extend Archegos the
> credit necessary to purchase equities or engage in swap transactions, on several
> occasions, in coordination with others at Archegos, I made false or misleading statements
> to the [swap counterparties] about Archegos's portfolio.  For example, in 2021, I falsely
> represented to certain financial institutions that Archegos's largest position was
> approximately 35 percent of its net asset value when, in fact, I knew the largest position
> had grown to significantly higher -- to a significantly higher percentage than that.  At
> around the same time, I also falsely represented to one of its counterparties that
> Archegos's portfolio with that specific counterparty was materially different than
> Archegos's portfolio overall.  I knew these statements to be untrue.  I made these and
> other similar misstatements to induce the [swap counterparties] to continue extending
> Archegos trading capacity as well as to dissuade these [swap counterparties] from
> liquidating positions held in Archegos's account or to take other action that might hurt
> Archegos's overall portfolio.

57.     Becker learned to misrepresent the size of Archegos Fund's largest positions from

Halligan, who preceded Becker as the Swap Counterparties' primary contact at Archegos for

credit risk-related issues.  In or around 2016 and 2017, Becker began shadowing Halligan on

calls with Swap Counterparties in anticipation that Becker would take over those responsibilities

from Halligan going forward.  Becker observed that in response to common questions from Swap Counterparties, like the size of Archegos Fund's largest positions, Halligan purposely understated the true figures.  Becker also observed that Halligan routinely misrepresented to Swap Counterparties the amount of Archegos's available cash.

58.     When Becker took over the role of dealing with Swap Counterparties on credit risk-related issues in or around 2018, Halligan told Becker that he should tell all Swap Counterparties that Archegos Fund's largest position was 35% of NAV, regardless of the true figure.  Halligan also directed Becker not to provide any specific information about Archegos Fund's positions and to respond to specific questions only with generalities.  Becker followed Halligan's directions as a matter of course going forward, including in connection with numerous misrepresentations made by Becker in furtherance of the fraudulent scheme.  Becker did not question or dispute Halligan's instruction because he understood this kind of deception to be a part of Archegos's culture.  As Becker's direct superior, Halligan knew that Becker's job responsibilities included frequent and regular calls with Swap Counterparties regarding credit risk issues, including but not limited to position size.  Halligan therefore knew or had reason to know that Becker continued to have such calls with Archegos Fund's Swap Counterparties after he directed Becker to disseminate false information to the Swap Counterparties, and Halligan knew or was reckless in not knowing that Becker would disseminate such false information to Archegos Fund's Swap Counterparties as instructed.

59.     During the Relevant Period, when Swap Counterparties asked about Archegos Fund's largest long positions across its entire portfolio (including at other Swap Counterparties), Becker typically represented that Archegos Fund's largest position was approximately 35% of its net asset value ("NAV"), despite knowing that this 35% figure was not true.  For example, in late

2020 or early 2021, Becker had a telephone call with Swap Counterparty 3.  At that time, Becker received daily reports detailing the size of Archegos Fund's positions.  He therefore knew that Archegos Fund's largest long single-name TRS position, ViacomCBS, had grown significantly larger than 35% of Archegos Fund's NAV, and he was concerned that Swap Counterparty 3 would ask questions about the position.  Becker asked Halligan how he should proceed. Halligan received the same daily position reports as Becker and therefore also knew that Viacom had grown well above 35% of Archegos Fund's NAV; nonetheless, Halligan directed Becker to continue to falsely represent that Archegos Fund's largest position was approximately 35% of its NAV.  Following Halligan's direction, Becker falsely represented to Swap Counterparty 3 that Archegos Fund's largest investment was only 35% of its NAV.  Based on Halligan's prior direction, Becker also made similar misrepresentations, for example, to Swap Counterparty 5 on telephone calls on January 28, 2021 and March 1, 2021; to Swap Counterparty 1 on February 3, 2021, and to Swap Counterparty 4 on recorded telephone calls on February 8, 2021 and March 8, 2021.[3]  Archegos also made similar misrepresentations to Swap Counterparty 8 on or about February 28, 2021 and March 8, 2021.  In fact, Archegos Fund's largest position was over 60% of its NAV on each of the foregoing dates.  By misrepresenting that Archegos Fund's largest position was only 35% of NAV, Becker misrepresented that Archegos Fund's portfolio was materially less concentrated (and hence materially less risky) than it actually was.

60.      Becker misrepresented not only the size of Archegos Fund's largest long position, but also the size of its top 10 largest long positions.  For example, in or around February 2021,

---

[3] Coinciding with the above misrepresentations, Archegos traded over $400 million in short Broad-Based Security Index Swaps with Swap Counterparty 5 on or around January 27, 2021; over $9 million in short Broad-Based Security Index Swaps with Swap Counterparty 1 on or around February 3, 2021; over $185 million in short Broad-Based Security Index Swaps with Swap Counterparty 5 on or around March 1, 2021; and over $230 million in short Broad-Based Security Index Swaps with Swap Counterparty 4 on or around March 8, 2021.  *See* Appendix A.

Becker told Swap Counterparty 4 that Archegos Fund's ten largest positions were approximately equally weighted within the portfolio, each accounting for between 30-35% of the fund's NAV. In fact, at this time, Archegos Fund's largest long position was over 60% of its NAV, whereas its ninth and tenth largest positions were each less than 10%. Becker made a similar misrepresentation to Swap Counterparty 5 in early March 2021, stating that Archegos Fund's top 10 positions were each approximately 30% of its NAV. In fact, at this time, Archegos Fund's largest position was over 80% of its NAV, while its tenth largest position was approximately 5% of its NAV.

61.     Becker also misled Archegos Fund's Swap Counterparties into believing that the fund's largest positions consisted of highly liquid tech stocks. For example, on March 8, 2021, Becker falsely told Swap Counterparty 4, in substance, that the fund's largest positions included highly liquid mega-cap stocks like Amazon, Alphabet, Microsoft, and Apple. At that time, however, none of those stocks were among Archegos Fund's ten largest holdings. To the contrary, Amazon, Alphabet, and Microsoft each represented approximately 3% of the fund's NAV, and the fund had no investments in Apple. Instead, Archegos Fund's overall portfolio at the time was concentrated in less liquid and comparatively smaller cap China-based issuers and U.S. media and technology companies, such as ViacomCBS, Baidu, GSX and Tencent Music.

62.     Becker also intentionally misled Swap Counterparties about the extent to which Archegos Fund held the same or similar overlapping positions across all of its Swap Counterparties. For example, in a recorded telephone call with Swap Counterparty 4 on March 8, 2021, Becker intentionally falsely represented that Archegos Fund's top ten largest long positions at Swap Counterparty 4 were materially different than the top ten largest positions in

Archegos Fund's overall portfolio.[4]  In fact, most of Archegos Fund's top ten positions with Swap Counterparty 4 were also among Archegos Fund's top ten positions with other Swap Counterparties.  For example, Archegos Fund's largest position with Swap Counterparty 4 at this time was ViacomCBS, which was in the range of $1-2 billion; during February and March 2021, Archegos Fund held positions ranging from $100 million to over $5 billion with eight other Swap Counterparties, and there was substantial overlap among several other large positions as well.  Also, during the March 8, telephone call, Becker falsely represented that Archegos Fund's position in GSX, which was about $1 billion at the time, was much larger at Swap Counterparty 4 than it was at any other Swap Counterparty.  In fact, Archegos Fund held larger GSX positions with three different Swap Counterparties, including a position with Swap Counterparty 1 that was nearly double the size of Archegos Fund's position with Swap Counterparty 4.

63.      Becker also intentionally misrepresented to Swap Counterparties that Archegos Fund's total portfolio across all of its Swap Counterparties was more liquid than it was.  For example, on March 8, 2021, on a recorded telephone call with Swap Counterparty 4, Becker falsely represented that Archegos Fund could liquidate almost its entire portfolio (including the Broad-Based Security Index Swaps) in about two weeks.  In a subsequent call, Swap Counterparty 4 asked for additional information about Archegos Fund's liquidity, and Becker agreed to report back to Swap Counterparty 4.  Thereafter, Tomita, Becker, and Halligan held a conference call in which they developed and conspired to provide false or misleading liquidation statistics for Becker to report back to Swap Counterparty 4.  Tomita, Becker, and Halligan each received or had access to periodic reports detailing the amount of time required to liquidate

---

[4] Coinciding with the above misrepresentations, on or around March 8, 2021, Archegos traded over $230 million in short Broad-Based Security Index Swaps with Swap Counterparty 4.

Archegos Fund's portfolio, and each therefore knew that the liquidation statistics that they developed during this conference call were false or misleading.

64.     Subsequently, in a recorded telephone call with Swap Counterparty 4 on March 10, 2021, at the direction of Halligan, Becker again conveyed false or misleading liquidation statistics.  Specifically, Becker intentionally or recklessly misrepresented that Archegos Fund could liquidate:  (i) about half of its total portfolio in ten days; (ii) seventy-five per cent of its total portfolio within twenty days; and (iii) its entire portfolio in about a month (each figure inclusive of the Broad-Based Security Index Swaps).[5]  Becker told Swap Counterparty 4 that this was based on liquidation at a rate of 10-15% of average daily trading volume, which was meant to convey liquidation at a rate that would not significantly impact market prices.  At the time Becker made these representations to Swap Counterparty 4, Becker knew or was reckless in not knowing, based on the size and composition of Archegos Fund's portfolio compared to relevant average daily trading volumes, that his representation about the liquidation of the entire portfolio was false or misleading.  Becker knew or was reckless in not knowing that Archegos Fund's portfolio could not be unwound at the stated rate and in the stated time period without significantly impacting the market price, based on market conditions and the positions to be liquidated.  Becker similarly misrepresented that Archegos Fund could liquidate 50% of its entire portfolio (including the Broad-Based Security Index Swaps) in ten days in a telephone call with Swap Counterparty 3 in late 2020 or early 2021, and in a telephone call with Swap Counterparty 2 on March 19, 2021.  Archegos additionally misrepresented to Swap Counterparty 8 on or about March 8, 2021 that Archegos could liquidate its entire portfolio (including the Broad-Based Security Index Swaps) in two weeks at a liquidation rate of 10-20% of average daily trading

_____

[5] Coinciding with the above misrepresentations, on or around March 12, 2021, Archegos traded over $160 million in short Broad-Based Security Index Swaps with Swap Counterparty 4.

volume.  By intentionally or recklessly misrepresenting the time in which Archegos Fund could

liquidate its positions without significantly impacting market price, Becker and Archegos

concealed that Archegos Fund's portfolio was materially less liquid (and hence materially

riskier) than it actually was.

65.    Tomita also made multiple misrepresentations to Swap Counterparties.  Tomita

misrepresented to various Swap Counterparties that certain of Archegos Fund's positions with

that Swap Counterparty were unique and not held by Archegos Fund at other Swap

Counterparties.  For example, in or around September 2020, Tomita led Swap Counterparty 4 to

believe, falsely, that Archegos Fund held GSX positions only with Swap Counterparty 4; in

truth, Archegos Fund held substantial GSX positions with several other counterparties at that

time.  Similarly, in connection with Archegos Fund's onboarding of Swap Counterparty 1 in the

fall of 2020, Tomita falsely represented that Archegos Fund's portfolio with Swap Counterparty

1 would be different from its portfolios with other Swap Counterparties.  Tomita, at the

Founder's direction, additionally provided Swap Counterparty 1 with "decoy" names during the

onboarding process in order to conceal Archegos Fund's primary interest in GSX and conceal its

true trading strategy.  In fact, Archegos Fund sought to onboard Swap Counterparty 1 because it

needed additional capacity to trade many of the same securities it was trading with its other Swap

Counterparties, including GSX and ViacomCBS.  Similarly, In or around November 11, 2020,

Swap Counterparty 6 expressed concern to Archegos that the amount of margin that Archegos

Fund had posted with Swap Counterparty 6 was insufficient to account for the risk associated

with Archegos Fund's positions.  As a result, Swap Counterparty 6 asked Tomita to have

Archegos Fund reduce risk by transferring concentrated and illiquid (and therefore riskier)

positions to other Swap Counterparties and transferring more liquid (and hence less risky)

positions from other Swap Counterparties to Swap Counterparty 6.  Before responding, Tomita

conferred with the Founder and conveyed the urgency of the situation, noting that Swap

Counterparty 6's risk management profile of Archegos Fund had considerably worsened.  The

Founder responded, in substance, that Archegos Fund just needed to get through the end of the

year.  Accordingly, on November 11, 2020, Tomita told Swap Counterparty 6, in substance, that

Archegos Fund could not move these positions as requested due to year-end tax planning

concerns.[6]  Tomita knew this statement was false or misleading.  Tomita knew that Archegos

Fund was unable to move its concentrated illiquid positions from Swap Counterparty 6 to other

Swap Counterparties either because Archegos Fund had exhausted all of its available capacity at

other dealers or because increasing those positions at other Swap Counterparties would have

resulted in higher margin rates.  In addition, Tomita knew that Archegos Fund could not transfer

liquid positions from other dealers to Swap Counterparty 6 because other dealers required

Archegos Fund to maintain those liquid positions as a risk-reducing measure, and failing to

maintain those liquid risk-reducing positions would also have resulted in higher margin rates.

Tomita knew and understood that he had concealed from Swap Counterparty 6 material reasons

why these positions could not be moved as requested, and his omissions concealed the true risk

of Archegos Fund's swap positions with Swap Counterparty 6.

66.     On or around January 29, 2021, Tomita and Becker had a telephone call with

Swap Counterparty 1 to discuss GSX.  During this call, Tomita provided information to Swap

Counterparty 1 that omitted material information regarding the size of Archegos Fund's overall

position in GSX, one of Archegos Fund's largest positions.  Prior to the call, Swap Counterparty

1 learned from certain public filings that several other swap dealers were among GSX's largest

---

[6] Coinciding with the above misrepresentations, on or around November 10, 2020, Archegos traded over $60 million in short Broad-Based Security Index Swaps with Swap Counterparty 6.

shareholders.  During this call, Swap Counterparty 1 inquired about why so many other swap

dealers were large shareholders of GSX.  Tomita conveyed, in substance, that the other swap

dealer shareholders related to other hedge funds that invested in GSX through swap transactions.

Tomita made a similar statement to Swap Counterparty 7 on February 18, 2021.  These

statements were false and misleading because they only referred to other hedge funds who

invested in GSX while omitting the material fact that Archegos Fund had invested in GSX

through TRS with many of the same swap dealers that Swap Counterparty 1 and Swap

Counterparty 7 were inquiring about.  Tomita failed to provide this material information to Swap

Counterparty 1 and Swap Counterparty 7 in order to conceal the true size and risk of Archegos

Fund's total GSX position.[7]

67.     Prior to the call with Swap Counterparty 1 that occurred on or around January 29,

2021, Halligan told Becker that Becker should participate in all calls that Tomita was having

with Archegos's Swap Counterparties so that Becker would know what Tomita was saying to the

Swap Counterparties.  Becker understood that Halligan wanted to ensure that Becker and Tomita

were telling counterparties a consistent story, and that if Tomita was providing misleading

information to a Swap Counterparty, it would be important for Becker to do the same.  After the

January 29 call with Swap Counterparty 1, Becker told Halligan, in substance, that he had

adhered to Tomita's talking points regarding GSX, to which Halligan responded, in sum and

substance, "if they only knew."  Becker interpreted this to mean that Halligan was reflecting on

what would happen if Swap Counterparty 1 knew the truth about Archegos Fund's GSX

positions, including the fact that Archegos Fund held substantial positions in GSX with several

---

[7] Coinciding with the above misrepresentations, on or around January 29, 2021, Archegos traded over $150 million in short Broad-Based Security Index Swaps with Swap Counterparty 1; and on or around February 16, 2021, Archegos traded approximately $1.5 million in short Broad-Based Security Index Swaps with Swap Counterparty 7.

other Swap Counterparties.  Such statements were common from Halligan, and Becker interpreted this to mean that Halligan knew that Becker and Tomita were disseminating false and misleading information and/or concealing material information from Archegos Fund's Swap Counterparties, and that Archegos Fund's Swap Counterparties would have taken protective countermeasures if they knew the truth.  In this way, Halligan intentionally or recklessly directed, encouraged and/or taught Becker to provide false or misleading information and/or omit material facts in conversations with Swap Counterparties and to conceal the true nature and extent of this scheme.

68.     Halligan, Tomita, Becker, and Archegos engaged in a fraudulent scheme whereby they intentionally and/or recklessly provided false or misleading information and/or omitted to state material facts necessary to make that information not untrue or misleading to Archegos Fund's Swap Counterparties in order to further Archegos Fund's trading strategy, maintain existing trade capacity, secure additional capacity for Archegos Fund to enlarge its swap trading positions, obtain or maintain favorable margin rates, and dissuade swap counterparties from liquidating Archegos Fund's positions or taking other risk-reducing measures that could adversely impact Archegos Fund.  Halligan, Tomita, and Becker understood that if they told the truth about Archegos Fund's portfolio, its Swap Counterparties might take measures such as increasing Archegos Fund's margin requirements or refusing to extend Archegos Fund additional capacity to transact.  By providing false information to (or omitting material information from) Archegos Fund's Swap Counterparties, and by concealing the true nature and extent of this scheme, Halligan, Tomita, and Becker were able to maintain and/or enlarge Archegos Fund's long single-name TRS positions, secure additional capacity to enlarge its long TRS positions, and obtain or maintain favorable margin rates.

31

69.     Halligan, Tomita, and Becker also understood, based on conversations between Archegos personnel and Swap Counterparties, that Archegos Fund needed to maintain and/or increase its short exposure in order to maintain favorable margin rates and/or enlarge its long single-name TRS positions.  As a practical matter, Archegos Fund typically increased its short exposure through Broad-Based Security Index TRS positions, as those positions had been approved and encouraged by several Swap Counterparties as a risk-reducing measure.  Although Archegos Fund typically increased its short exposure this way in order to mitigate the risk of its TRS long swap positions, Archegos's material misrepresentations to Swap Counterparties concerning its portfolio, including those relating to its long positions, resulted in Swap Counterparties taking inadequate risk-reducing measures.

70.     Beginning in mid-2020, Becker began preparing daily "capacity notes," which calculated Archegos Fund's current capacity limitations at each Swap Counterparty.  Becker sent the capacity notes to Halligan and Tomita, among others, and Tomita prepared written summaries of the reports for the Founder.

71.     The Founder routinely directed Tomita and others to acquire additional trade capacity that would allow Archegos Fund to continue to grow its concentrated positions.  Tomita explained to the Founder that it was becoming increasingly difficult to obtain additional trade capacity due to Swap Counterparties' risk models, but the Founder nonetheless demanded additional capacity anyway.  At the same time, the Founder directed Tomita and others to obtain and maintain more favorable margin rates.  Tomita informed the Founder that if Swap Counterparties knew about the true size and composition of Archegos Fund's positions, they would want even more margin, but the Founder again still demanded that Tomita secure lower margin rates.  To achieve the Founder's dual goals of increased trade capacity and lower margin,

Defendants and their Accomplices, Tomita and Becker, resorted to misrepresenting the true nature of Archegos Fund's positions.

72.     Certain of Archegos Fund's swap counterparties required Archegos Fund to certify in writing that its positions were below specified thresholds.  For example, Archegos Fund's ISDA Master Agreement with Swap Counterparty 9 required Archegos to sign transaction confirmations upon the consummation of each TRS swap transaction with Swap Counterparty 9, which contained the representation that "the aggregate amount of all Shares beneficially owned by [Archegos] for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative positions, is less than 5% of the outstanding shares."  Beginning in mid-2020, Halligan signed these transaction confirmations, which were disseminated to Swap Counterparty 9.  At the time Halligan signed these transaction confirmations, based on his knowledge of and access to information about Archegos Fund's portfolio, Halligan knew or recklessly disregarded that certain of those transaction confirmations were false because Archegos's combined exposure, including underlying long derivative TRS positions, exceeded 5% of the outstanding shares of multiple issuers.

### E.     Archegos Fund's Mounting Losses on March 23 and March 24, 2021

73.     During the week of March 22, 2021, the prices of securities underlying Archegos Fund's concentrated long single-name TRS positions plummeted, triggering a cascade of margin calls in the following days and the total collapse of the firm.

74.     On March 22, 2021, after the market closed, ViacomCBS announced a $2 billion equity offering.  The following day, March 23, ViacomCBS stock dropped substantially, and other Archegos holdings, including GSX, declined as well.  These declines in Archegos Fund's

portfolio triggered $2.5 billion in margin calls, due at the end of the day on March 24, which Archegos Fund was able to meet.

75.      ViacomCBS stock declined even further on March 24.  In addition, the SEC proposed new guidelines and restrictions applicable to Chinese issuers.  Consequently, Archegos's holdings in Chinese issues like GSX, IQ, Baidu, and Tencent Music declined significantly as well.  Archegos Fund's substantial losses on the day triggered margin calls from its Swap Counterparties totaling $10.7 billion.  The margin calls were issued the morning of March 25 and were due by the end of that day.

**F.      Defendants' Misrepresentations and Concealment of the Scheme During the Week of March 22, 2021**

76.      During the week beginning March 22, 2021, Tomita, Becker, and Halligan continued to intentionally and/or recklessly make and disseminate false or misleading statements to Archegos Fund's Swap Counterparties in order to attempt to meet its rapidly escalating margin calls and delay the failure of the firm.  Also during this week, as described further below, Defendants and their accomplices took steps to conceal the true nature and extent of this scheme.

77.      On March 23, 2021, Becker had a telephone call with Swap Counterparty 7.  On the call, Becker again falsely represented that Archegos Fund's largest position was only 35% of NAV, even though Archegos Fund's largest long single-name TRS position, ViacomCBS, had grown to roughly 70% of Archegos's NAV by that time.

78.      On March 24, 2021, as Archegos Fund's margin calls mounted and its portfolio continued to decline, Archegos gave false assurances to Archegos Fund's Swap Counterparties that Archegos Fund would be able to meet the margin calls.  For example, during a recorded March 24 telephone call with Swap Counterparty 7, Tomita intentionally misrepresented that although Archegos Fund had a liquidity problem, it did not have a solvency problem.  Due to

Archegos Fund's dire financial situation, Tomita believed at this point that Archegos Fund could not recover from this crisis and that the fund would soon fail.  Other Archegos representatives made similar statements to Swap Counterparties on March 24 and March 25, 2021.

79.     In an effort to meet the margin calls, Halligan instructed Becker to contact Swap Counterparties to request the return of any excess margin in Archegos Fund's accounts—i.e., any margin above the specific thresholds set by each Swap Counterparty.  Archegos Fund was reliant on its Swap Counterparties to release the excess margin, and Becker believed that if the Swap Counterparties became aware of Archegos Fund's true financial position, they might refuse or delay the release excess margin.  Therefore, Becker lied to the Swap Counterparties in order to secure the immediate release of excess margin.  For example, on March 24, Archegos representatives requested that Swap Counterparty 2 return excess margin to Archegos Fund.  In order to induce Swap Counterparty 2 to return those funds, Becker intentionally falsely represented to Swap Counterparty 2 that Archegos Fund's cash position was $9 billion, when in fact the true amount of available cash was closer to $2 billion (and, practically speaking, was even lower because much of that amount was locked in a lending facility that Archegos Fund could not immediately access).  Becker also intentionally gave false assurances to Swap Counterparty 2 that Archegos Fund was not in a distress situation.  After the call, in reliance on Becker's misrepresentations, Swap Counterparty 2 returned approximately $250 million in excess margin to Archegos Fund.

80.     Also on March 24, 2021, in a recorded telephone call with representatives of Swap Counterparty 4, Becker again represented that Archegos Fund's largest positions at Swap Counterparty 4 were materially different than its largest positions at other financial institutions. This representation was false.

81.    In the evening of March 24, 2021, in order to prepare for responding to questions the next day, and to conceal the true nature and extent of this scheme from Swap Counterparties, Becker prepared a document memorializing certain talking points proposed by Halligan and Tomita during a call that evening.  In particular, Halligan directed that Becker falsely tell Swap Counterparties that Becker did not have access to Archegos Fund's up-to-date financial information.  At Halligan's direction, the talking points therefore contained several false and misleading statements.  For example, in response to an anticipated question about the progress of Archegos Fund's portfolio liquidation, the talking points indicated that Becker should falsely respond that he did not have access to Archegos Fund's trade blotter.  In response to a question regarding the total margin calls received by Archegos Fund across all of its Swap Counterparties, the talking points indicated that Becker should falsely respond that he "did not have access to that data point."  And, in response to an anticipated question about the performance of Archegos Fund's portfolio during the day, the talking points indicated that Becker should falsely respond that he did not have access to Archegos Fund's live portfolio.  Becker understood that each of these representations in the talking points was false and misleading.  Becker sent the document to Halligan for his review by email on the morning of March 25.  Shortly thereafter, Becker spoke with Halligan by phone to discuss the document.  Halligan, as Becker's direct supervisor, knew that Becker in fact did have access to Archegos Fund's trade blotter, live portfolio, and up-to-date margin calculations and therefore knew that several representations in the talking points were false or misleading.  Nevertheless, Halligan reviewed and approved the document.  Becker thereafter used these talking points to guide his discussions with Swap Counterparties throughout the day.  Halligan intentionally and/or recklessly proposed and approved these false and misleading talking points in order for Becker to provide false and misleading information to

Archegos Fund's Swap Counterparties, to attempt to delay the failure of Archegos Fund, and to conceal the true nature and extent of this scheme.

82.     On March 25, 2021, Archegos Fund unwound its positions at multiple Swap Counterparties in a continuing effort to meet its margin calls.  In response to ongoing inquiries from its Swap Counterparties, Defendants and their Accomplices continued to make false assurances regarding its positions, liquidity status, and solvency to once again conceal the true nature and extent of this scheme and attempt to delay the failure of Archegos Fund.  For example, Halligan directed Becker to falsely tell counterparties that Becker did not have insight into Archegos's plan to reduce Archegos Fund's exposure.  At Halligan's direction, Becker made several misstatements to Swap Counterparties on March 25 that knowingly concealed his knowledge of Archegos Fund's financial state and plans to reduce exposure, including that he did not have access to Archegos Fund's trade blotter, did not have access to information regarding the total volume of margin calls, and did not have access to Archegos Fund's live portfolio.  In truth, in connection with his role as Director of Risk Management, Becker had access to all of this information.

83.     As the crisis unfolded on March 25, Swap Counterparties began to realize that they had been deceived.  For example, on March 25, a prime brokerage officer at Swap Counterparty 4 wrote in an internal email:  "It appears that they may have mislead [sic] us on the positions held away from [Swap Counterparty 4], and they have more concentration across the street [i.e., at other banks]. . . .  I had spoken with [Becker] earlier this afternoon and was given the impression it was a bad day but no issues expected meeting our call due to their large free cash positions they had confirmed with [Swap Counterparty 4] just 2 weeks ago."

G.      **March 25 and March 26, 2021 – Archegos Collapses**

84.      The markets on March 25 brought further losses to Archegos Fund's portfolio. Archegos Fund's margin calls due March 25 exceeded its available free cash at the end of the day.  When Archegos Fund was unable to meet the full amount of its margin calls, despite Defendants' efforts to conceal the true nature and extent of the scheme, Archegos's Swap Counterparties began exercising their rights under their respective swap agreements.  In the evening of March 25, Swap Counterparty 3 issued a notice of default, and Swap Counterparty 7 issued a notice to Archegos Fund exercising its early termination rights.  Swap Counterparty 8, Swap Counterparty 1, and Swap Counterparty 6 each issued margin failure notices.  Over the next two days, several additional Swap Counterparties issued notices of default and/or exercised early termination rights with respect to Archegos Fund.

85.      The events of default allowed Archegos Fund's counterparties to unwind Archegos Fund's positions, including the Broad-Based Security Index Swaps, which they proceeded to do on Friday, March 26, 2021.  With respect to Archegos Fund's long single-name TRS positions, this meant terminating the swaps and exiting the associated hedges.  Because the Swap Counterparties typically hedged Archegos Fund's long single-name TRS by buying the same security referenced in the swap, exiting the hedges typically meant selling into the market the same securities underlying Archegos Fund's long single-name TRS.  As the Swap Counterparties sold large volumes of these securities into the market on March 26, the prices of these securities declined even further, causing additional losses in Archegos's portfolio.

86.      In addition to deepening Archegos Fund's already crippling losses, these declines also caused enormous losses for many of Archegos Fund's counterparties, who had bought these securities at higher prices during the previous months as a hedge on Archegos Fund's swaps, and who were now forced to sell them back into market at rapidly declining prices.  Swap

Counterparty 3, for example, lost over $5 billion due to Archegos Fund's collapse; Swap

Counterparty 5 lost almost $3 billion; and Swap Counterparty 4 lost over $700 million.

## VIOLATIONS OF THE COMMODITY EXCHANGE ACT

## COUNT ONE

### FRAUD BY DECEPTIVE DEVICE OR CONTRIVANCE – VIOLATION OF SECTION 6(c)(1) OF THE ACT, 7 U.S.C. § 9(1) AND REGULATION 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021)

87.     Paragraphs 1 through 86 are re-alleged and incorporated herein by reference.

88.     7 U.S.C. § 9(1) makes it unlawful for any person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

89.     17 C.F.R. § 180.1(a) provides, in part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

90.     During the Relevant Period, as described above, Defendants Archegos and

Halligan violated 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) by, among other things,

engaging in a fraudulent scheme whereby they intentionally and/or recklessly provided false or

misleading information and/or omitted to state material facts necessary to make that information

not untrue or misleading to Archegos Fund's Swap Counterparties in order to secure additional

capacity to enlarge Archegos Fund's swap trading positions; to obtain or maintain favorable

margin rates; and, during the week of March 22, 2021, to attempt to satisfy margin calls.  The

false or misleading information disseminated by Defendants and their Accomplices, Becker and

Tomita, included information about the size and composition of Archegos Fund's entire portfolio

across financial institutions; the time it would take to liquidate Archegos Fund's entire portfolio,

including the Broad-Based Security Index Swaps; and information provided in connection with

Archegos Fund's attempts to satisfy margin calls.  The false or misleading information provided

by Defendants concerned facts that were essential for Archegos Fund's Swap Counterparties to

know in making credit and risk management decisions about Archegos Fund's swap portfolio at

that counterparty, including, but not limited to, the need for short Broad-Based Security Index

Swaps.  Further, during the Relevant Period, Defendants took steps to deliberately conceal the

true nature and extent of this scheme from their Swap Counterparties

91.     Becker, Tomita, and Defendant Halligan committed the acts, omissions, and/or

failures alleged herein within the scope of their employment, agency, or office with Defendant

Archegos.  Therefore, Defendant Archegos is liable under Section 2(a)(1)(B) of the Act, 7 U.S.C.

§ 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2021), as principal for the acts, omissions, or

failures as alleged herein.

92.     Defendant Halligan willfully aided, abetted, counseled, commanded, induced, or

procured the commission of the acts constituting violations of Section 6(c)(1) of the Act,

7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021), committed

by Defendant Archegos.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Halligan is

therefore responsible as if he were a principal for Defendant Archegos's violations of Section

6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021).

93.     Each act of:  (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in any act, practice, or course of business, which operated or would operate as a fraud or deceit upon any person, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3).

## VI.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Find that Defendants Archegos Capital Management, L.P. and Patrick Halligan violated Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021);

B. Find that Defendant Archegos Capital Management, L.P. is liable under 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2 (2021) as principal for the acts, omissions, or failures as alleged herein;

C. Find that Defendant Patrick Halligan is liable under Section 13(a) of the Act, 7 U.S.C. § 13c(a), as if he were a principal for Defendant Archegos's violations of 7 U.S.C. § 9(1), and 17 C.F.R. § 180.1(a)(1)–(3) as alleged herein;

D. Enter an order of permanent injunction enjoining Defendants and any of their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from violating 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3);

E.  Enter an order of permanent injunction restraining and enjoining Defendants and any
of their affiliates, agents, servants, employees, successors, assigns, attorneys, and
persons in active concert with them, from directly or indirectly:

1)  Trading on or subject to the rules of any registered entity (as that term is
defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40);

2)  Entering into any transactions involving "commodity interests" (as that term is
defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the
name of any Defendant or for any account in which any Defendant has a
direct or indirect interest;

3)  Having any commodity interests traded on any Defendant's behalf;

4)  Controlling or directing the trading for or on behalf of any other person or
entity, whether by power of attorney or otherwise, in any account involving
commodity interests;

5)  Soliciting, receiving, or accepting any funds from any person for the purpose
of purchasing or selling any commodity interests;

6)  Applying for registration or claim exemption from registration with the
Commission in any capacity, or engaging in any activity requiring such
registration or exemption from registration with the Commission except as
provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

7)  Acting as a principal (as that term is defined in Regulation 3.l(a), 17 C.F.R.
§ 3.1 (a) (2021)), agent or any other officer or employee of any person
registered, exempted from registration, or required to be registered with the
Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

F.  Enter an order directing Defendants to pay a civil monetary penalty assessed by the
Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the
Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil
Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit.

42

VII, § 701, 129 Stat. 584, 599–600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act and Regulations, as described herein;

G.  Enter an order directing Defendants, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from the acts or practices which constituted violations of the Act, as described herein, including pre-judgment and post-judgment interest;

H.  Enter an order directing Defendants, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

I.  Enter an order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2) (2012); and

J.  Enter an order providing such other and further relief as the Court may deem necessary and appropriate under the circumstances.

*      *      *

## VIII. DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated:  September 2, 2022

Respectfully submitted,

**ATTORNEYS FOR PLAINTIFF**

**COMMODITY FUTURES
   TRADING COMMISSION**

Manal M. Sultan
Deputy Director
Commodity Futures Trading Commission
Division of Enforcement

By: /s/ Benjamin J. Rankin
Steven I. Ringer, Chief Trial Attorney
Alejandra de Urioste, Chief Trial Attorney
John C. Murphy, Trial Attorney
Jacob Mermelstein, Trial Attorney
Benjamin J. Rankin, Trial Attorney

COMMODITY FUTURES
   TRADING COMMISSION
Ted Weiss Federal Office Building
290 Broadway, Suite 600
New York, NY 10007
Phone: (646) 746-9700
Fax: (646) 746-9938
sringer@cftc.gov
adeurioste@cftc.gov
jmurphy@cftc.gov
jmermelstein@cftc.gov
brankin@cftc.gov