UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

                           Plaintiff,

       v.

ARCHEGOS CAPITAL MANAGEMENT, LP and
PATRICK HALLIGAN,

                           Defendants.

**No. 1:22-cv-3401 (JPO)**

**DEFENDANT ARCHEGOS CAPITAL MANAGEMENT, LP'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT**

Carmen J. Lawrence
William F. Johnson
Eric A. Hirsch
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100

*Attorneys for Defendant
Archegos Capital Management, LP*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

LEGAL STANDARD.......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

I.      The CFTC Does Not Have Jurisdiction Over The ETF/Basket Swaps ............................ 11

        A.      The ETF Swaps Are SEC-Regulated Security-Based Swaps ............................... 12

        B.      The Custom Basket Swaps Are SEC-Regulated Security-Based Swaps.............. 15

II.     The CFTC Can Only Bring Fraud Claims Involving  Conduct "In Connection
        With" Swaps ........................................................................................................ 17

III.    None of the Alleged Misrepresentations Were  Made "In Connection With"
        ETF/Basket Swaps .............................................................................................. 19

        CONCLUSION.......................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*,
  No. 96 Civ. 2549 (RWS), 1997 WL 97837 (Mar. 6, 1997) ...........................................20 n. 20

*Anatian v. Coutts Bank (Switzerland) Ltd.*,
  193 F.3d 85 (2d Cir. 1999)..........................................................................................23

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...............................................................................................10, 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)......................................................................................3 n. 1

*Chadbourne & Park LLP v. Troice*,
  571 U.S. 377 (2014)...............................................................................................19, 21

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)..........................................................................................22

*Chemical Bank v. Arthur Andersen & Co.*,
  726 F.2d 930 (2d Cir. 1984)................................................................................. *passim*

*Citibank N.A. v. K-H Corp.*,
  No. 89 Civ. 3609 (PKL), 1991 WL 35951 (S.D.N.Y. Mar. 14, 1991), *aff'd*,
  968 F.2d 1489 (2d Cir. 1992).................................................................................20 n. 20

*In re Citigroup, Inc.*,
  No. 08 Civ. 3095(LTS), 2011 WL 744745 (S.D.N.Y. Mar. 1, 2011), *aff'd sub
  nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012) .......................................3 n. 1

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991).........................................................................................12 n. 13

*Gallop v. Cheney*,
  642 F.3d 364 (2d Cir. 2011)..........................................................................................11

*Kearney v. Prudential-Bache Secs., Inc.*,
  701 F. Supp. 416 (S.D.N.Y. 1988) ......................................................................... 18, 24-25

*Levitin v. PaineWebber Inc.*,
  933 F. Supp. 325 (S.D.N.Y. 1996) .................................................................................20

*In re Merrill Lynch Auction Rate Sec. Litig.*,
    704 F. Supp. 2d 378 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch
    & Co.*, 671 F.3d 120 (2d Cir. 2011)...................................................................12 n. 13

*Morrison v. Nat'l Australia Bank Ltd.*,
    561 U.S. 247 (2010)......................................................................................................19

*Munno v. Town of Orangetown*,
    391 F. Supp. 2d 263 (S.D.N.Y. 2005)........................................................12 n. 13

*In re NYSE Specialists Secs. Litig.*,
    503 F.3d 89 (2d Cir. 2007)...........................................................................................11

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
    937 F.3d 94 (2d Cir. 2019)...........................................................................................17

*Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*,
    6 F. Supp. 2d 236 (S.D.N.Y. 1998) .........................................................................20

*Rinfret, Inc. v. Drexel Burnham Lambert Inc.*,
    661 F. Supp. 611 (S.D.N.Y. 1987) ....................................................................18, 25

*Sarafianos v. Shandong Tada Auto-Parking Co.*,
    No. 13-cv-3895 (SAS), 2014 WL 7238339 (S.D.N.Y. Dec. 19, 2014) ..............22

*Saxe v. E.F. Hutton & Co.*,
    789 F.2d 105 (2d Cir. 1986)........................................................................................25

*SEC v. Zandford*,
    535 U.S. 813 (2002)...............................................................................................18, 19

*Taylor v. Westor Capital Grp.*,
    943 F. Supp. 2d 397 (S.D.N.Y. 2013).....................................................................20

*Wu v. Bitfloor*,
    460 F. Supp. 3d 418 (S.D.N.Y. 2020).....................................................................11

**Statutes**

7 U.S.C. § 1a(47)(A)..............................................................................................12 n. 14

7 U.S.C. § 1a(47)(B)(x) .........................................................................................14 n. 16

7 U.S.C. § 2(a)(1)(B) .............................................................................................10 n. 10

7 U.S.C. § 9(1) .......................................................................................................................17

15 U.S.C. § 78bb(f)(1)(A)......................................................................................................21

15 U.S.C. § 78c(a)(55)(B) ...................................................................................13 n. 14

15 U.S.C. § 78c(a)(68) ........................................................................12 n. 14, 14 n. 16

Dodd-Frank Wall Street Reform and Consumer Protection Act §§ 712, 761 ...............11, 12 n. 12

**Other Authorities**

Fed. R. Civ. P. 9(b) ...................................................................................2, 11, 23

Fed. R. Civ. P. 12(b)(6) ...................................................................................10

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
    Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
    77 Fed. Reg. 48207 (Aug. 13, 2012) ............................................................... *passim*

Prohibition on the Employment, or Attempted Employment, of Manipulative and
    Deceptive Devices and Prohibition on Price Manipulation,
    76 Fed. Reg. 41398-01 (July 14, 2011) .............................................................18

George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid
    Disclosure? Evidence from Confidential 13F Filings* (2013).............................................8 n. 6

## PRELIMINARY STATEMENT

Defendant Archegos Capital Management, LP ("ACM"), the management company of the Archegos family office ("Archegos"), submits this brief in support of its motion to dismiss the Commodity Futures Trading Commission's ("CFTC") Amended Complaint with prejudice because the CFTC's claims are outside of its jurisdiction.

Archegos invested in the securities markets through equity shares and total return swaps ("swaps"). Swaps are derivative securities that provided Archegos with economic exposure to the equity shares referenced by the swaps, but no actual ownership of the referenced equity shares. The CFTC bases its claims on Archegos' hedging activity in two types of swaps: (1) swaps that referenced exchange-traded funds ("ETF Swaps") that are intended to track broad-based indexes like the S&P 500; and (2) custom index basket swaps ("Custom Basket Swaps") that referenced a portfolio of hundreds of different securities and were intended to generally mimic the performance of indexes like the S&P 500 (together, "ETF/Basket Swaps"). These swaps are not subject to the Commodity Exchange Act ("CEA") and fall outside of the CFTC's jurisdiction, mandating dismissal of its claims.

Jurisdiction over investments in single-name swaps is reserved for the SEC, which, as the Court is aware, has filed its own claims against ACM arising out of the same conduct at issue in the CFTC's action. Archegos' ETF Swaps are swaps that reference single names (the ETFs), and thus fall squarely within the SEC's exclusive jurisdiction. And although swaps that reference broad-based security indexes are generally under the CFTC's jurisdiction, Archegos' Custom Basket Swaps are outside of that jurisdiction because they fall under an exception carved out for circumstances where, as here, one or both parties to the swap transaction have the discretion to add or remove component securities from the basket of reference securities. For these reasons alone, the CFTC's Amended Complaint should be dismissed with prejudice.

The Amended Complaint suffers from an additional deficiency.  The CFTC alleges that ACM employees violated the CEA by making misrepresentations to Archegos' counterparties in an effort to obtain more favorable credit terms:  better margin rates and additional trading capacity.  These claims are outside of the scope of the CEA.  Although the CFTC broadly asserts that the ETF/Basket Swaps were an "integral component" of the alleged fraud scheme (AC ¶ 13), none of the alleged misrepresentations relate to the nature or value of any ETF/Basket Swaps traded between Archegos and its counterparties.  Instead, the alleged misrepresentations relate to the characteristics of Archegos' portfolio or Archegos' solvency during the week of March 22, 2021, and were made during discussions with counterparties that were evaluating the risk characteristics of that portfolio for the purpose of determining whether to extend credit.

The Supreme Court and Second Circuit have made clear that fraud claims are outside the scope of the CEA unless they relate to the value of securities traded or consideration received in connection with those trades.  Alleging that counterparties might have asked Archegos to "maintain[] appropriate levels" (AC ¶ 6) of the ETF/Basket Swaps had there been more transparency into Archegos' portfolio does not equate to a claim that the counterparties were deceived about the value or nature of these swaps.  The CFTC's allegations boil down to an assertion that counterparties might have wanted Archegos to trade in more of the same swaps it already had, not that the counterparties were deceived about the nature or value of those swaps.  The CFTC's vague allegations that the ETF/Basket Swaps were an "integral component" of an alleged fraud should also be rejected, as they fail to satisfy Fed. R. Civ. P. 9(b).

Because the CFTC has no jurisdiction over the ETF/Basket Swaps and has failed to plead a fraud claim covered by the CEA or has failed to do so with particularity, the Court should dismiss all of the CFTC's claims with prejudice.

## STATEMENT OF FACTS[1]

*The Archegos Family Office.*  Defendant ACM is the investment manager for the Archegos family office.  Archegos had no outside investors or clients.  It invested only funds that derived from Sung Kook (Bill) Hwang's family's personal wealth.  AC ¶ 18 (referring to Mr. Hwang as the "Founder").[2]  ACM and Archegos have never been registered with the CFTC in any capacity, and the CFTC does not allege that any of its business activities required them to be.  AC ¶ 16.  Patrick Halligan served as the Chief Financial Officer of ACM.  AC ¶ 17.  William Tomita served as its Head Trader, and Scott Becker was its Chief Risk Officer.  AC ¶¶ 19-20.

*Archegos' Investments.*  Archegos' investments were primarily made in equity shares (i.e., stock) and in total return security-based swaps.  The SEC, not the CFTC, has regulatory authority over Archegos' stock and single-name swaps investments, which comprised the majority of Archegos' long positions.  Like many investors, Archegos purchased stock and swaps on margin.  That is, Archegos borrowed money from its counterparties, using the securities in its brokerage accounts as collateral.  AC ¶¶ 30-31.

Archegos' swaps were private contractually based arrangements with individual bank counterparties.  When Archegos and a counterparty bank – one of Archegos' prime brokers or another large financial institution – entered into a swap, they agreed to exchange cash flows depending on the price of the referenced security.  AC ¶ 3 n.1.  In other words, if Archegos

---

[1] On a motion to dismiss, the Court can consider matters of public record, including court filings, securities prices, news articles and press releases.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)*; In re Citigroup, Inc.*, No. 08 Civ. 3095(LTS), 2011 WL 744745, at *5 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012).

[2] The family office was formed after Mr. Hwang and two entities founded by Mr. Hwang, Tiger Asia Management, LLC ("TAM") and Tiger Asia Partners, LLC, settled claims of insider trading and attempted market manipulation brought by the SEC in 2012.  AC ¶¶ 22-24.  In connection with the settlement, Mr. Hwang neither admitted nor denied the SEC's claims.  *See* November 1, 2022 Declaration of Eric A. Hirsch, Ex. 1 (January 22, 2013 Order in *In re Sung Kook Hwang* § II).  In a separate criminal action, TAM pled guilty to one count of wire fraud in connection with a charge of insider trading.  AC ¶ 23.  That criminal action did not name Mr. Hwang as a defendant.  *Id.*

entered into a swap for ViacomCBS, the parties would then use ViacomCBS as the reference

asset.  Thereafter, if the value of ViacomCBS stock increased, Archegos would receive payments

from its counterparty based on the increase in the value of ViacomCBS stock.  If the value of

ViacomCBS stock decreased, Archegos would pay its counterparty.  Archegos would also pay an

agreed-upon interest rate to the counterparty, so "the financial return to [Archegos] in a total-

return equity swap is roughly equivalent to the return when borrowed capital is used to purchase

shares in the referenced company." *Id.*  The swaps were derivative securities and represented

synthetic exposure to an underlying equity security – the swaps contracts did "not transfer title to

the underlying assets or require that either party actually own them." *Id.*

Archegos hedged its long positions (positions that Archegos was investing in with the

expectation that they would appreciate in value) with, among other things, short positions in two

types of swaps that tracked the performance of multiple public companies or indexes, rather than

a single security.  First, Archegos purchased short positions in ETF Swaps – investment funds

that offer securities to the public that are intended to track an index, sector, or other asset.  Shares

of an ETF can be bought or sold like shares of stock.  AC ¶ 27.  Second, Archegos also

purchased short positions in Custom Basket Swaps, which the CFTC alleges were swaps whose

value was based on the performance of a portfolio of hundreds of individual securities.  The

Custom Basket Swaps were designed to mimic the performance of indices like the S&P 500, but

were customized, for example, to remove certain securities from the reference portfolio in which

Archegos had long positions.  AC ¶ 28.  These two types of positions (the ETF/Basket Swaps)

are the only securities identified in the Amended Complaint over which the CFTC claims

jurisdiction.  AC ¶¶ 27-28.  The CFTC alleges that, by March 2021, Archegos traded in a

combined $52 billion in short positions in ETF/Basket Swaps.  AC ¶¶ 27-28.  Because these

were short positions, Archegos would receive payments from its counterparties if the value of the ETF/Basket Swaps declined.  AC ¶ 26.

The CFTC alleges that when Archegos' counterparties entered into a long single-name swap with Archegos, the counterparty would "typically" purchase shares of the referenced issuers in the market.  AC ¶ 29.  The CFTC does not allege any details regarding these counterparty purchases, allege that Archegos directed or had any control over these counterparty purchases or how long they might be held, allege that these counterparty purchases were required by the contracts governing the swaps traded between Archegos and its counterparties, or allege what effect any such counterparty purchases had on market prices.  It is well known in the industry that there are other commonly used ways that a bank can hedge its swap exposure – beyond purchasing the underlying shares – that would have no impact on the market prices of the shares at issue, including by entering into offsetting swap contracts with another customer.[3]

Certain of Archegos' counterparties imposed limitations on Archegos' swaps transactions.  Those limitations were typically in the form of capacity restrictions – i.e., limits on the total notional value of Archegos' portfolio with that counterparty, or requests that Archegos maintain a certain ratio of long to short positions in its portfolio with that counterparty.  AC ¶ 36. The CFTC also alleges that as Archegos' portfolio grew, Archegos' counterparties "required" Archegos to increase the size of its short positions, either to obtain more capacity or to maintain specific margin rates.  AC ¶¶ 42, 46.  The CFTC claims that the ETF/Basket Swaps "played a

---

[3]  *See* Hirsch Decl. Ex. 2 (July 29, 2021 Credit Suisse Group Special Committee of the Board of Directors Report on Archegos Capital Management, pp. 38-39); Ex. 3 (Brief of Amici Curiae International Swaps and Derivatives Association, Inc. and Securities Industry and Financial Markets Association at 10, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.* (S.D.N.Y. June 2, 2008), ECF No. 80 (summarizing testimony)); Ex. 4 (Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference Annex 4:  Survey on Contracts for Difference by PricewaterhouseCoopers LLP for the Financial Services Authority, p. 16 (November 2007)), Ex. 5 (Matt Levine, *Take the Swaps Off the Balance Sheet*, Bloomberg, May 24, 2022 at 2-3).

critical role" in the counterparties' "assessment and management" of Archegos' credit risk (that is, the risk to the counterparties that Archegos would be unable to satisfy margin requirements). AC ¶ 37.  The CFTC does not allege, however, that Archegos was contractually required to put on these positions, and the CFTC acknowledges that some of these limits were "informal." AC ¶ 36.

*Archegos' Portfolio.*  Between March 2020 and March 2021, Archegos' family office grew from a fund with approximately $1.5 billion in assets under management to a family office with approximately $35 billion in assets under management.  AC ¶ 39.  After the COVID-19 induced equities market crash in March 2020, Archegos transitioned its top investments to companies that it believed were well positioned to succeed in the changed environment.  AC ¶¶ 38, 40.  Those companies included U.S. and China-based media companies with streaming services (ViacomCBS, Inc., two share classes of Discovery, Inc., Tencent Music Entertainment Group, and iQiyi, Inc.), a China-based online education company (GSX Techedu, Inc.), and China's largest internet and artificial intelligence company (Baidu, Inc.).  AC ¶¶ 40-41, 75. These issuers comprised Archegos' top long positions in individual companies after the pandemic.

Between March 20, 2020 and March 19, 2021, the market rebounded, and both the S&P 500 and the Dow Jones Industrial Average increased by 70%.[4]

---

[4]  *See* Hirsch Decl. Exs. 6, 7 (March 20, 2020 – March 19, 2021 closing prices for the S&P 500 and Dow Jones Industrial Average, respectively).



During this period, Archegos took advantage of the depressed market conditions by continuously adding to the size of its investments in its top companies, with the view that although their prices were temporarily suppressed by the pandemic, they would eventually rise again. The CFTC does not allege that in doing so, Archegos violated any rules or regulations concerning concentration limits or exposure, and there are none that are applicable to a family office such as Archegos.

Archegos also added additional counterparties during this time period – the CFTC alleges that Archegos used at least eight, and was in discussions with four more. AC ¶¶ 26, 43. The practice of using multiple counterparties is not at all unusual, and is a practice employed lawfully by hedge funds across Wall Street.[5]

*The Alleged Misrepresentations*. The CFTC alleges that certain Archegos employees (Mr. Becker and Mr. Tomita) made misrepresentations in conversations with Archegos' counterparties in connection with inquires by those counterparties about Archegos' portfolio.

---

[5] *See* Hirsch Decl. Ex. 8. (Form ADVs of Hudson Bay Capital Mgmt. disclosing 11 custodians, including 8 prime brokers; Paloma Partners, disclosing 24 custodians, including 17 prime brokers, and Samlyn Capital, disclosing 13 custodians, including 6 prime brokers).

According to the Amended Complaint, the counterparties made these inquiries to "gather information about Archegos Fund in order to make credit and risk management decisions about its portfolio, including, but not limited to, the need for short [ETF/Basket Swaps], at their respective institutions."  AC ¶ 55.  These alleged misrepresentations concerned Archegos' largest positions, gross exposure, unencumbered cash, and liquidity.  AC ¶ 55.  Although the CFTC alleges that there was a "culture of secrecy" at Archegos (AC ¶ 54), there are legitimate reasons for portfolio managers to keep information about their positions confidential.[6]  And although the CFTC alleges that Mr. Hwang (the Founder) "demanded additional capacity" and routinely directed ACM employees to obtain it (AC ¶ 71), the CFTC does not allege that Mr. Hwang ever directed any ACM employee to deceive Archegos' counterparties, nor is that a plausible inference from the specific facts alleged.

More fundamentally, none of the alleged misrepresentations described in the Amended Complaint concerned the terms of any ETF/Basket Swap trade or the consideration received by the counterparties for Archegos' ETF/Basket Swap trades.  *See* AC ¶¶ 58-71.

In the Amended Complaint, the CFTC adds new allegations that – prior to the week of March 22, 2021 – Archegos traded ETF/Basket Swap positions days before, the day of, or a few days after Mr. Becker or Mr. Tomita made misrepresentations to Archegos' counterparties.  AC ¶¶ 59 n.3, 62 n.4, 64 n.5, 65 n.6, 66 n.7.  These allegations do not remedy the CFTC's claims because the defect relates to the substance of the calls, not their timing, and it has not alleged the

---

[6]  Hedge funds that are required to make disclosures of their positions through Form 13F filings can, under certain circumstances, request confidential treatment of their positions for a limited amount of time.  One study reviewed the performance of positions where such confidential treatment was requested and found "evidence suggesting that hedge fund managers seek confidential treatment in order to avoid the costs of front-running by outside investors who anticipate a fund's trades and then trade against the fund."  George O. Aragon, Michael Hertzel & Zhen Shi, *Why Do Hedge Funds Avoid Disclosure?  Evidence from Confidential 13F Filings*, 48 J. Fin. & Quantitative Analysis 1499, 1517 (2013).

required nexus between the misrepresentations and the ETF/Basket Swaps.  The CFTC has also not alleged that Mr. Becker or Mr. Tomita discussed the ETF/Basket Swaps positions on any of the calls in which they purportedly made misstatements about Archegos' portfolio.

*Archegos' Collapse.*  Several significant events occurred in short sequence in March 2021 that contributed to the downfall of Archegos.  After market close on March 22, 2021, ViacomCBS announced a $3 billion secondary offering, which was not well received by the market.  AC ¶ 74.  On Wednesday morning, March 24, 2021, ViacomCBS's share price declined even further.  AC ¶ 75.  That same day, the SEC announced new reporting requirements for Chinese companies flowing from the Holding Foreign Companies Accountable Act, resulting in significant losses in Archegos' China-based positions.[7]  *Id.*  Archegos' positions continued to deteriorate over the course of the week, and by Thursday, March 25, 2021, Archegos faced margin calls totaling $10.7 billion.  AC ¶ 75.

The CFTC alleges that Archegos continued to make misrepresentations to its counterparties during the course of this week, "in order to attempt to meet its rapidly escalating margin calls and delay the failure of the firm."  AC ¶ 76.  The CFTC does not allege that these discussions with counterparties had anything to do with Archegos' short positions in ETF/Basket Swaps – whether adding more of those positions, maintaining those positions, or unwinding those positions.  *See* AC ¶¶ 77-82.

Ultimately, because Archegos was unable to satisfy margin calls, its counterparties unwound Archegos' positions and delivered default notices.  AC ¶ 84.  In connection with unwinding Archegos' single-name swap positions, Archegos' counterparties sold "large

---

[7]  Relevant press the morning of March 24, 2021 also included reports of increased scrutiny from the Chinese government on tech companies.  *See* Hirsch Decl. Ex. 9 (Lulu Yilun Chen, *China Considers Creating State-Backed Company to Oversee Tech Data*, Bloomberg, March 24, 2021).

volumes" of the referenced securities into the market on March 26, 2021, causing the prices of those securities to decline even further, and Archegos to suffer "crippling" losses.  AC ¶¶ 85-86.

*The Government Actions.*  On April 27, 2022, Mr. Hwang and Mr. Halligan were indicted by the U.S. Attorney's Office for the Southern District of New York ("SDNY") for violations of RICO and the securities laws based, in part, on the same alleged conduct charged by the CFTC in its Amended Complaint.  Both have pled not guilty to the Government's charges.[8]

Also on April 27, 2022, in coordination with the SDNY and SEC, the CFTC initiated this action against ACM and Mr. Halligan.[9]  ACM and Mr. Halligan moved to dismiss the original complaint on July 1, 2022.  Dkt #24; Dkt. #27.  In response, the CFTC filed the Amended Complaint on September 2, 2022.  In a single count, the Amended Complaint charges ACM with violations of Sections 6(c)(1) of the Commodity Exchange Act, and Regulation 180.1(a)(1)-(3) thereunder, based on alleged misrepresentations by ACM's employees to counterparties concerning the characteristics of Archegos' portfolio.[10]

## LEGAL STANDARD

"To survive a motion to dismiss" under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although a court should assume the truth of factual allegations that are "well-

---

[8] *See* Hirsch Decl. Ex. 10 (reports of proceedings reflecting Mr. Hwang's and Mr. Halligan's not guilty pleas in *United States of America v. Hwang & Halligan*).

[9] The SEC filed a civil action against ACM, Mr. Hwang, Mr. Halligan, Mr. Tomita, and Mr. Becker on April 27, 2022 that included charges based on alleged misrepresentations to counterparties.  ACM, Mr. Hwang, and Mr. Halligan moved to dismiss that complaint on June 24, 2022, and in response the SEC filed an amended complaint on August 26, 2022.  On October 25, 2022, ACM, Mr. Hwang, and Mr. Halligan moved to dismiss the SEC's amended complaint.

[10] On April 27, 2022, Mr. Tomita and Mr. Becker settled claims brought by the CFTC based on the misrepresentations alleged herein.  The CFTC alleges that ACM is responsible for the conduct of its employees pursuant to § 2(a)(1)(B) of the CEA and Regulation 1.2 promulgated thereunder.  7 U.S.C. § 2(a)(1)(B), 17 C.F.R. § 1.2.

pleaded," it should not accept as true any "legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678-79. Complaints containing only "conclusory, vague, or general allegations," supported by only "speculation and conjecture," "cannot withstand a motion to dismiss." *Gallop v. Cheney*, 642 F.3d 364, 368-69 (2d Cir. 2011) (citation and quotation omitted); *see also In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (on a motion to dismiss, a court "need not accord legal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness") (citations and quotations omitted).

Because the CFTC's claims are based on fraud, they must also satisfy Rule 9(b) of the Federal Rules of Civil Procedure and state the "circumstances constituting fraud … with particularity." Fed. R. Civ. P. 9(b); *Wu v. Bitfloor*, 460 F. Supp. 3d 418, 423 (S.D.N.Y. 2020) (holding that where "plaintiffs' allegations suggest fraudulent conduct on defendants' part, the CEA claims are subject to the heightened pleading requirements of Rule 9(b)") (citation and quotation omitted).

## ARGUMENT[11]

### I.    The CFTC Does Not Have Jurisdiction Over The ETF/Basket Swaps

This Action can be easily disposed of by this Court because the CEA does not apply to, and the CFTC does not have jurisdiction over, the securities at issue here. The CFTC claims that its ability to bring this Action is based on Archegos' trading in two different products – the ETF Swaps and the Custom Basket Swaps. AC ¶¶ 13, 27-28. In the 2010 Dodd-Frank Act, Congress added provisions to the CEA and the Exchange Act that set forth which agency – the SEC or CFTC – had jurisdiction over which types of swaps. The SEC has jurisdiction over "security-

---

[11] ACM incorporates by reference, as if fully set forth herein, all arguments made in Mr. Halligan's brief in support of his motion to dismiss the CFTC's Amended Complaint.

based swaps," and the CFTC has jurisdiction over "swaps."[12]  The Dodd-Frank Act directed the agencies to promulgate rules further defining those terms, which they did in a 2012 joint rules release.  *See* 77 Fed. Reg. 48207 (Aug. 13, 2012) (the "Joint Rules Release").  Based on the provisions of the CEA, the Exchange Act, and the Joint Rules Release, Archegos' ETF Swaps and Custom Basket Swaps are security-based swaps within the sole purview of the SEC, and are not subject to regulation under the CEA.[13]

### A.    The ETF Swaps Are SEC-Regulated Security-Based Swaps

The SEC has jurisdiction over single-name swaps and swaps that reference a narrow-based security index (such as an index with nine or fewer component securities), and the CFTC – subject to the exception described in Part I.B *infra* – has jurisdiction over swaps that reference a broad-based security index (such as an index with more than nine component securities).[14]

---

[12] *See* Dodd-Frank Wall Street Reform and Consumer Protection Act §§ 712, 761 (July 21, 2010); Joint Rules Release, 77 Fed. Reg. 48207, at 48262 ("Pursuant to the regulatory framework established in [the Dodd-Frank Act], the CFTC has regulatory authority over swaps, and the SEC has regulatory authority over security-based swaps.").

[13] The determination that the ETF Swaps are outside of the CFTC's jurisdiction is apparent from the prospectuses of the ETFs at issue, which are public documents filed with the SEC, and therefore permissible for the Court to consider on a motion to dismiss.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC . . . ."); *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 386 n.5 (S.D.N.Y. 2010), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011) ("[T]he Court may take judicial notice of the prospectuses for the securities at issue without converting the motion to dismiss into a motion for summary judgment.").  The determination that the Custom Basket Swaps are outside of the CFTC's jurisdiction is apparent from the swaps contracts between Archegos and its counterparties.  Those documents were produced by Archegos to the CFTC in connection with its investigation of Archegos, and thus were in the CFTC's possession when they filed the Amended Complaint, and – as they are necessary for the CFTC's determination of jurisdiction here – are integral to the CFTC's claims.  *See Cortec*, 949 F.2d at 48 ("The stock purchase agreement, Bowles' offering memorandum, and the warrant were documents plaintiffs had either in its possession or had knowledge of and upon which they relied in bringing suit. It did not lack notice of those documents; these papers were integral to its complaint. Consequently, . . . [the district court] could have viewed them on the motion to dismiss because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim."); *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))  ("[I]t is well-established that the court may consider a document, even if not attached or incorporated by reference, where the complaint 'relies heavily upon its terms and effect,' thus rendering the document 'integral' to the complaint.").

[14]  7 U.S.C. § 1a(47)(A) (excluding a "security-based swap" from the definition of "swap" in the CEA); 15 U.S.C. § 78c(a)(68) (defining "security-based swap" in the Exchange Act as a swap based on "(I) an index that is a narrow-

Archegos' ETF Swaps referenced shares of exchange traded funds, not an index or portfolio of securities. Those exchange traded funds are trusts that issue securities to investors. The value of those securities is based on a portfolio of securities held by the fund, which is intended to track a broad-based security index (such as the S&P 500 and the iShares MSCI Emerging Markets ETF). AC ¶ 27. The ETFs are not, however, themselves broad-based security indexes. As is explained in the SPDR S&P 500 ETF Trust Prospectus: "The Trust was created to provide investors with the opportunity to purchase a security representing a proportionate undivided interest in a portfolio of securities consisting of substantially all of the component common stocks, in substantially the same weighting, which comprise the Standard & Poor's 500 Index …." (Hirsch Decl. Ex. 13, Jan. 14, 2021 SPDR S&P 500 ETF Trust Prosp. at 25).[15]

Furthermore, as the prospectuses for the ETFs disclose, the ETF shares do not perfectly track the performance of the underlying portfolio of securities purchased by the fund or the associated index. The transaction costs and operating expenses of the funds are priced into the

---

based security index, including any interest therein or on the value thereof; (II) a single security or loan, including any interest therein or on the value thereof …."). A "narrow-based security index" is defined as an index "(i) that has 9 or fewer component securities; (ii) in which a component security comprises more than 30 percent of the index's weighting; (iii) in which the five highest weighted component securities in the aggregate comprise more than 60 percent of the index's weighting; or (iv) in which the lowest weighted component securities comprising, in the aggregate, 25 percent of the index's weighting have an aggregate dollar value of average daily trading volume of less than $50,000,000 …." 15 U.S.C. 78c(a)(55)(B). Subject to the exception described below, where the "underlying reference of the instrument is a security index that is not a narrow-based security index (i.e., the index is broad-based)" the instrument "is a swap subject to regulation by the CFTC." Joint Rules Release, 77 Fed, Reg. 48207, at 48271.

[15] *See, e.g.*, AC Appendix A (listing Archegos' investments in swaps referencing four different ETFs – SPDR S&P 500 ETF Trust, Invesco QQQ Trust, Financial Sector SPDR Fund, iShares MSCI Emerging Markets ETF); January 31, 2020 Invesco QQQ Trust[SM], Series 1 Prosp. at 3 ("The Invesco QQQ Trust[SM], Series 1… is a unit investment trust … that issues fractional undivided interests in the Trust called Invesco QQQ Shares …. The investment objective of the Trust is to seek to track the investment results, before fees and expenses, of the [NASDAQ-100] Index ….") (Hirsch Decl. Ex. 14); January 31, 2020 The Financial Select Sector SPDR Fund Prosp. Supp. at 1 ("The Financial Select Sector SPDR Fund (the 'Fund') seeks to provide investment results that, before expenses, correspond generally to the price and yield performance of publicly traded equity securities of companies in the Financial Select Sector Index.") (Hirsch Decl. Ex. 16); December 30, 2020 iShares MSCI Emerging Markets Prospectus at 1 ("ETFs are funds that trade like other publicly-traded securities. The Fund is designed to track an index. Similar to shares of an index mutual fund, each share of the Fund represents an ownership interest in an underlying portfolio of securities and other instruments intended to track a market index.") (Hirsch Decl. Ex. 18).

value of the ETF shares, and there can be other issues – such as the unavailability of certain securities in the secondary market due to extraordinary circumstances – that can cause valuation differences between the ETF shares and the associated index.  *See* Jan. 31, 2021 Invesco QQQ Trust Prosp. at 31 (describing "non-correlation risk") (Hirsch Decl. Ex. 15); Jan. 14, 2021 SPDR S&P 500 ETF Trust at 4 (describing "index tracking risk") (Hirsch Decl. Ex. 13); Dec. 30, 2020 iShares Inc. Prosp. Supp. at S-5, S-10 (describing "index-related risk" and "tracking error risk") (Hirsch Decl. Ex. 18).  In other words, not only are the ETF shares, the underlying portfolio of securities from which they derive their value, and the associated indexes completely different financial instruments, the funds that offer ETF shares to the public do not guarantee that their values are economically equivalent.

Put simply, a swap that references a share of an ETF like the SPDR S&P 500 ETF references a security in a single name – i.e., a share of that fund – it does not refence a broad-based security index.  Swaps that are based on a single name are "security-based swaps," under the exclusive purview of the SEC.  Joint Rules Release, 77 Fed. Reg. 48207, at 48264 ("where a TRS [total-return swap] is based on a single security or loan … the TRS would be a security-based swap.").[16]  This is consistent with the view of the Staff of the SEC's Division of Trading & Markets, which explains in a FAQ available on the SEC website that it considers swaps that reference ETFs to be security-based swaps:

> In the staff's view, the swap based on the shares of an exchange traded fund (ETF) that tracks a broad-based securities index, such as the S&P 500, is a security-based swap.  Section 3(a)(68)(A)(ii)(II) of the Exchange Act provides in

---

[16] *See also* 15 U.S.C. § 78c(a)(68)(A)(ii)(III) (defining "security-based swaps" to include swaps based on "a single security or loan"); 7 U.S.C. § 1a(47)(B)(x) (excluding from the CEA security-based swaps, other than security-based swaps that are "mixed swaps").  "Mixed swaps" are a narrow category of security under the jurisdiction of both the SEC and CFTC.  As examples, the Joint Rules Release describes a mixed swap as a swap "in which the underlying references are the value of an oil corporation stock and the price of oil" or "a portfolio of both securities … and commodities").  Joint Rules Release, 77 Fed. Reg. 48207, at 48291.  The CFTC does not allege that any of Archegos' swaps are mixed swaps.

part that a security-based swap means any agreement, contract, or transaction that is a swap as defined under section 1a of the Commodity Exchange Act and, among other things, is based on a single security or loan, including any interest therein or on the value thereof.  Interests, or shares, in an ETF … are securities under Section 2(a)(1) of the Securities Act of 1933 (Securities Act) and Section 3(a)(10) of the Exchange Act.  Such shares represent undivided interests in the underlying assets of the ETF or other similar exchange-traded product.  ETFs and other similar exchange-traded products register offerings of shares under the Securities Act, and list such shares for trading on national securities exchanges. *Accordingly, a swap based on shares of an ETF … meets the definition of a security-based swap because it is based on a single security or loan, including any interest therein or on the value thereof.*[17]

The ETF Swaps are not regulated by the CEA, and the CFTC has no jurisdiction over matters related to trading in these securities.

### B.      The Custom Basket Swaps Are SEC-Regulated Security-Based Swaps

The CFTC describes the Custom Basket Swaps as swaps that "largely tracked broad-based indexes" but were customized to remove certain securities in which Archegos held significant long positions.  AC ¶ 28.  In contrast to the ETF Swaps, these Custom Basket Swaps did reference a large portfolio of component securities.  *Id..*  If the number of referenced securities were the only relevant criteria, the Custom Basket Swaps would be considered "swaps" and be subject to the CFTC's jurisdiction.  The CFTC overlooks, however, that there is an exception to the categorization of such securities as "swaps" under the CEA that is applicable here and by its terms excludes these securities from its jurisdiction.

The Joint Rules Release promulgated by the SEC and CFTC states that:

In some cases, the Title VII instrument[18] may give one or both of the counterparties, either directly or indirectly (e.g., through an investment adviser or

---

[17] Hirsch Decl. Ex. 11 (*Frequently Asked Questions Regarding Security-Based Swaps*, available at https://www.sec.gov/files/faqs-security-based-swaps.pdf (last visited October 24, 2022)) (emphasis added).

[18] The Joint Rules Release refers to "swaps" and "security-based swaps" collectively as "Title VII instruments," because Title VII of the Dodd-Frank Act added the concepts of swaps and security-based swaps to the CEA and Exchange Act.  Joint Rules Release, 77 Fed. Reg. 48207, at 48209.

through the third-party index provider), discretionary authority to change the
composition of the security portfolio, including, for example, by adding or
removing securities in the security portfolio on an "at-will" basis during the term
of the Title VII instrument.  Where the counterparties, either directly or indirectly
(e.g., through an investment adviser or through the third-party index provider),
have this discretionary authority to change the composition or weighting of
securities in a security portfolio, that security portfolio will be treated as a narrow-
based security index, *and therefore a Title VII instrument on that security
portfolio is a security-based swap.*

Joint Rules Release, 77 Fed. Reg. 48207, at 48285 (emphasis added).  In other words, where one

or both of the parties to a swap agreement have discretion to add or remove securities within a

securities portfolio (such as a custom index basket), that security portfolio falls under the

jurisdiction of the SEC.  Here, because Archegos' swaps agreements with its counterparties

made clear that one or both parties had the ability to make those types of modifications, the

Custom Index Baskets fall squarely within this exception.

For example, the relevant swaps agreement with UBS stated, under the heading "Basket

Swaps," "Counterparty may remove one or more Shares from the Basket at any time, subject to

UBS's prior consent, which consent shall not be unreasonably withheld."  Hirsch Decl. Ex. 27

(Feb. 4, 2020 UBS Portfolio Swap Master Confirmation at 15).  Other swaps agreements, such as

Archegos' agreement with Nomura, permitted one or both parties to terminate a portion of a

swaps transaction, thereby removing a component from a basket:

Counterparty may request on any Scheduled Trading Day … that Nomura may
enter into an SPB Transaction or effect an SPB Transaction Unwind (each an
"SPB Transaction Request").  Such SPB Transaction Request shall specify, at a
minimum, the number of Units, the Underlying(s) and whether such transaction is
to be an SPB Transaction … or an SPB Transaction Unwind.

Hirsch Decl. Ex. 25 (Mar. 18, 2016 Nomura Amended and Restated Synthetic Prime Brokerage

Master Confirmation § 3.1).[19]  The term "Units" is defined in the agreement to include "in the

---

[19]  The relevant swaps agreements with the seven counterparties that Archegos traded Custom Basket Swaps with
are attached as Exhibits 19-27 to the Hirsch Declaration.  In addition to the examples described above, the relevant
portions of those agreements are summarized in ¶¶ 20-38 of the Hirsch Declaration.

case of an Underlying that is Custom Basket Shares, the number of Shares of each Issuer included in a single SPB Custom Basket." *Id.*, Schedule 3.  These provisions confirm that Archegos and its counterparties had the discretion to add or remove securities referenced by the Custom Basket Swaps, and that therefore, these securities were security-based swaps subject to exclusive SEC jurisdiction under the exception identified in the Joint Rules Release.  77 Fed. Reg. 48207, at 48285.  Notably, this is consistent with the CFTC's own allegation, which acknowledges that these swaps were customized "to remove certain securities in which Archegos Fund held significant long positions…."  AC ¶ 28.  The modification provisions provided Archegos the continued flexibility to remove securities from the Custom Basket Swaps – which were short positions – in the event it decided to take a long position in one of the securities in the basket.  The CFTC thus has no authority under the CEA to pursue claims related to these swaps.

Accordingly, because the CFTC has alleged its jurisdiction is based on Archegos' trading in ETF Swaps and Custom Basket Swaps (AC ¶¶ 3, 13), and because those securities fall exclusively within the SEC's jurisdiction, the Court should dismiss the CFTC's claims in their entirety, with prejudice.

## II.    The CFTC Can Only Bring Fraud Claims Involving Conduct "In Connection With" Swaps

Even if Archegos traded in swaps that were within the CFTC's jurisdiction, the allegations here would still fail to state a fraud claim because there is no nexus between the trading in those securities and the misrepresentations at issue.  Under Section 6(c)(1) of the Commodity Exchange Act, it is "unlawful for any person . . .  to use or employ . . . in connection with any swap . . . any manipulative or deceptive device or contrivance . . . ."  7 U.S.C. § 9(1); *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 107 (2d Cir. 2019).  Rule 180.1(a) states that

17

it is unlawful for any person to "intentionally or recklessly" commit one of the following acts "in connection with any swap":

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

17 C.F.R. §§ 180.1(a)(1)-(3) (2022).  In its adopting rules release, the CFTC explained that Rule 180.1 was modeled after the SEC's Rule 10b-5.  *See Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation,* 76 Fed. Reg. 41398-01, 41399 (July 14, 2011) ("Given the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b-5.").

The CEA does not permit the CFTC to pursue general claims of fraud.  Rather, to be actionable under the CEA, there must be a nexus between the alleged manipulative scheme and the swaps subject to CFTC jurisdiction.  In analyzing the relevant language in the CEA, "courts generally have applied interpretations of the 'in connection with' requirement of § 10(b) of the Securities Exchange Act of 1934 . . . ."  *Kearney v. Prudential-Bache Secs., Inc.*, 701 F. Supp. 416, 424 (S.D.N.Y. 1988) (dismissing CEA claim that failed to satisfy this requirement); *see also Rinfret, Inc. v. Drexel Burnham Lambert Inc.*, 661 F. Supp. 611, 614 (S.D.N.Y. 1987) (same). None of the misrepresentations alleged in the Amended Complaint relate, in any respect, to the nature or value of Archegos' ETF/Basket Swaps.

Although the Supreme Court has stated that Section 10(b) "should be 'construed not technically and restrictively, but flexibly to effectuate its remedial purposes,'" it has also

cautioned that it "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)."  *SEC v. Zandford*, 535 U.S. 813, 820 (2002) (citations omitted).  In other words, "Section 10(b) does not punish deceptive conduct, but only deceptive conduct 'in connection with the purchase or sale of any security . . . .'" *Morrison v. Nat'l Australia Bank Ltd*., 561 U.S. 247, 266-67 (2010) (citations omitted).  "Those purchase-and-sale transactions are the objects of the statute's solicitude.  It is those transactions that the statute seeks to 'regulate' . . . ." *Id*. at 266-67 (citations omitted).  Most recently, in *Chadbourne & Park LLP v. Troice,* 571 U.S. 377 (2014), the Court explained:  "a fraudulent misrepresentation or omission is not made in connection with such a purchase or sale of a covered security unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security."  *Id.* at 387 (citations omitted).  An application of these principals here confirms that the CFTC lacks jurisdiction to pursue these claims.

## III.    None of the Alleged Misrepresentations Were Made "In Connection With" ETF/Basket Swaps

The CFTC's claims are based on allegations that Mr. Tomita and Mr. Becker made misrepresentations to counterparties concerning the characteristics of Archegos' portfolio in order to obtain increased trading capacity, more favorable margin rates, and (during the week of March 22, 2021) to satisfy margin calls.  AC ¶ 56.  The CFTC alleges that these misrepresentations were made during conversations with counterparties, the objective of which (from the counterparty perspective) "was to gather information about Archegos Fund in order to make credit and risk management decisions about its portfolio, including, but not limited to, the need for short [ETF/Basket Swaps], at their respective institutions."  AC ¶ 55.  In the Amended Complaint, the CFTC has added allegations that Archegos' trades in the ETF/Basket Swaps were made on or near the same day when the calls between Mr. Becker, Mr. Tomita and the

counterparties took place.  What the CFTC does not allege, however, is that during the course of

those discussions (or at any time), Archegos made misrepresentations concerning the attributes

of the ETF/Basket Swaps that it traded with its counterparties.

Focusing first on the pre-March 22, 2021 allegations, none concern the characteristics of

the ETF/Basket Swaps.  *See Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397, 403 (S.D.N.Y.

2013) ("courts have drawn a line separating fraud claims that impact the fundamental valuation

of the securities at issue, and the operation of securities markets, as distinguished from those that

do not."); *Production Resource Grp., L.L.C. v. Stonebridge Partners Equity Fund, L.P.*, 6 F.

Supp. 2d 236, 239 (S.D.N.Y. 1998) (citation omitted) ("[n]umerous decisions in this district have

applied *Chemical Bank* to dismiss securities fraud claims when the alleged misrepresentations

did not pertain to the 'fundamental nature' of the securities . . . ."); *Levitin v. PaineWebber Inc.*,

933 F. Supp. 325, 328 (S.D.N.Y. 1996) (stating, in dismissing § 10(b) claim alleging broker

misappropriated customer assets to earn interest payments, that "the misrepresentation or

omission must pertain to the securities themselves; allegations of fraud merely involving

securities are not sufficient.").[20]  Instead, the alleged misrepresentations related to the size of

Archegos' largest position, the amount of Archegos' available cash, the liquidity of Archegos'

portfolio, whether the positions traded with a particular counterparty were unique to that

counterparty, and the composition of the portfolio.[21]  The CFTC's allegations that the purpose of

---

[20]  *See also Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96 Civ. 2549 (RWS), 1997 WL 97837, at *
5 (Mar. 6, 1997) (dismissing claims "because they do not relate to the fundamental investment attributes of the
securities"); *Citibank N.A. v. K-H Corp.*, No. 89 Civ. 3609 (PKL), 1991 WL 35951 at * 4 (S.D.N.Y. Mar. 14, 1991),
*aff'd*, 968 F.2d 1489 (2d Cir. 1992) (dismissing claim where "there is no allegation that defendants actually made any
representation as to the nature or value of the stock").

[21]  *See* AC ¶¶ 57-59, 77 (alleged representations concerning the size of Archegos' largest position); ¶¶ 57, 79 (alleged
representations concerning the amount of available cash); ¶¶ 62, 65, 80 (alleged representations concerning the
uniqueness of a counterparty's portfolio), ¶¶ 63-64 (alleged representations concerning liquidity), ¶¶ 65, 66 (alleged
representations concerning portfolio composition, generally and at other counterparties).

these discussions was to enable the counterparties to "make credit and risk management decisions about [Archegos'] portfolio, including, but not limited to, the need for short [ETF/Basket Swaps], at their respective institutions" (AC ¶ 55) are insufficient.  Allegations that the counterparties "required" or might have asked Archegos to add more of the ETF/Basket Swaps – with no accompanying allegations that the counterparties were lied to or deceived about the composition, value, or nature of the ETF/Basket Swaps – do not state a CEA claim.

In *Chadbourne & Park*, the Supreme Court considered whether the Securities Litigation Uniform Standards Act ("SLUSA") required the dismissal of the plaintiffs' state law claims. SLUSA bars plaintiffs from bringing large securities class actions based on state law alleging "a misrepresentation or omission of a material fact *in connection with* the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A) (emphasis added).  Analyzing this identical statutory language, the Supreme Court concluded that the plaintiffs' claims were barred.  In doing so, it rejected an interpretation of the "in connection with" requirement that would cover "a lawsuit brought by creditors of a small business that falsely represented it was creditworthy, in part because it owns or intends to own exchange-traded stock."  *Chadbourne & Park*, 571 U.S. at 391.  In other words, misrepresentations concerning creditworthiness – like those alleged here by the CFTC – are not enough to satisfy the "in connection with" requirement where there is, at best, a tenuous relationship to the covered securities at issue.

The Second Circuit's decision in *Chemical Bank* is also instructive.  There, certain banks agreed to provide loans to Frigitemp Corporation and its wholly owned subsidiary, Elsters, Inc. The loan to Elsters was guaranteed by Frigitemp and secured by 100% of Elsters common stock. After Frigitemp filed for bankruptcy, the banks sued Frigitemp's outside auditor under § 17(a) of the Securities Act of 1933 and § 10(b) of the Securities Exchange Act of 1934, alleging that

Frigitemp's financial statements were false and misleading, and had induced the banks to extend loans to Frigitemp and Elsters. *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 933 (2d Cir. 1984).  The Second Circuit explained:

> The purpose of § 10(b) and Rule 10b-5 is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be.

*Id.* at 943; *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (same). The court went on to dismiss the securities law claims because the defendant's misrepresentations concerning Frigitemp were made in connection with obtaining the loans, not the pledge of Elsters stock. *Chemical Bank*, 726 F.2d at 945; *see also Sarafianos v. Shandong Tada Auto-Parking Co.*, No. 13-cv-3895 (SAS), 2014 WL 7238339, at * 4 (S.D.N.Y. Dec. 19, 2014) ("courts in this Circuit routinely reject attempts to transform putative fraud or breach of contract claims into section 10(b) claims.").  Here, the CFTC fails to allege that any supposed misrepresentations regarding the composition of Archegos' portfolio, or the amount of available cash, were "in connection with" transactions involving ETF/Basket Swaps.

In addition, none of the controlling Supreme Court or Second Circuit cases place significance on the timing of the alleged misrepresentations where the misrepresentations do not relate to the value or nature of the securities transactions.  Unable to allege a sufficient nexus between the ETF/Basket Swaps and the alleged misrepresentations, the CFTC seeks to have the Court infer such a nexus exists from its allegations that Archegos traded ETF/Basket Swaps on the days before, during, or shortly after certain calls between Mr. Becker, Mr. Tomita and the counterparties took place.  AC ¶¶ 59 n.3, 62 n.4, 64 n.5, 65 n.6, 66  n.7.  Temporal proximity alone does not make the connection.  The CFTC does not explain the significance of the timing, and it is not at all clear from the Amended Complaint how a trade made on November 10, 2020

(AC ¶ 65 n.6) would relate to a counterparty call the following day, on November 11, 2020 (AC ¶ 65). Even where calls and trades took place on the same day (e.g., AC ¶ 66 & n.7) or where trades were made on the days following counterparty calls (e.g., AC ¶ 64 & n.5), the CFTC alleges nothing from the substance of the calls that suggests Archegos personnel made any statements about the terms of the ETF/Basket Swaps or the consideration to be exchanged. These new allegations are insufficiently particularized under Rule 9(b) and are not enough to allege the necessary connection between the trades and the misrepresentations at issue.

The CFTC's general allegation that one of the purposes of the credit calls was for counterparties to evaluate the "need for [ETF/Basket Swaps]" also does not save its claim. AC ¶ 55. The Second Circuit has made clear that claiming that securities transactions would or would not have occurred absent the alleged misrepresentations does not satisfy the "in connection with" requirement. This precise argument was considered – and rejected –in *Chemical Bank*, where the court held that such "'but for' causation is not enough." *Chemical Bank*, 726 F.2d at 943. Section 10(b) and Rule 10b-5 "impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part." *Id.*; *see also Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (finding that the "purported misrepresentations as to the authority of the [bank] representatives to loan money in excess of the bank's lending requirements . . . do not pertain to the purchase or sale of a security."). Here, the CFTC alleges that Archegos' counterparties offered financing terms (i.e., margin rates) and increased trading capacity based on certain oral representations. These claims, like the claims in

*Chemical Bank*, must fail because they amount to nothing more than allegations that the

supposed misrepresentations related to *credit terms*, not the *securities transactions*.[22]

The CFTC's allegations concerning the week of March 22, 2021 are even further

attenuated from any possible CEA claim.  That week, the CFTC alleges that Archegos

employees made misrepresentations about Archegos' solvency, the reasons why Archegos was

calling back excess margin, and Mr. Becker's access to trade information.  These allegations

have nothing to do with the ETF/Basket Swaps in any respect, and the CFTC makes no

allegations that bridge this gap.[23]

Both before and after the week of March 22, the CFTC does not allege that Archegos

made misrepresentations to counterparties concerning the characteristics of the ETF/Basket

Swaps trades after the counterparties had increased trading capacity or modified margin rates for

Archegos.  As one court explained, "[t]he 'in connection with' requirement mandates that the

alleged fraud concern the fundamental *nature* of the commodity futures contract:  namely, the

characteristics and attributes that would induce an investor to buy or sell the particular

commodity future contract."  *Kearney*, 701 F. Supp. at 424 (emphasis in original).  In *Kearney*,

the court dismissed a CEA claim based on allegations that a broker provided fraudulent tax

---

[22]  The CFTC alleges that some counterparties "required" Archegos to maintain a particular long/short ratio, and that the ETF/Basket Swaps were "typically" placed by Archegos at the "request" of counterparties, but the CFTC does not allege that Archegos was contractually required to use ETF/Basket Swaps – as opposed to any other type of short position – to satisfy these ratios.  AC ¶¶ 37, 42, 44, 46, 68.  Of the over 400 ETF/Basket Swaps trades listed in the Amended Complaint's appendix, the CFTC alleges only two instances where counterparties conditioned Archegos' trading additional long positions on Archegos trading short positions in ETF/Basket Swaps.  AC ¶¶ 48, 49.  But even if Archegos was required to exclusively use ETF/Basket Swaps to satisfy long/short requirements, this alone would not be sufficient to satisfy the "in connection with" element.  To state a claim under the CEA, the misrepresentations must concern the nature of the ETF/Basket Swaps or the consideration received for those trades.  There are no such allegations here.

[23]  *See* AC ¶¶ 78, 79 (alleged representations concerning solvency); ¶ 82 (Mr. Becker's access to trade information).  While there is no basis to claim temporal proximity to the trades at issue is relevant for the reasons stated above, the CFTC has not even alleged that the statements during the week of March 22 were made close in time to any ETF/Basket Swaps trades.

advice concerning the plaintiffs' commodities account.  Relying on *Chemical Bank* and other Second Circuit precedent, the court concluded "[t]hese cases teach that, in order for a misrepresentation to be actionable under the Securities Exchange Act and the Commodity Exchange Act, it must be fundamental to the nature of a particular securities or commodity trading device."  *Id.* at 426; *see also Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) (allowing CEA claim to survive where misrepresentations regarding the risks and highly speculative nature of commodities trading were allegedly made in connection with a discretionary commodities account but affirming dismissal of securities law claims where defendants' alleged misrepresentations caused plaintiff to liquidate securities account in order to open and trade in the discretionary commodities account); *Rinfret*, 661 F. Supp. at 614-615 (dismissing CEA claim based on misrepresentations by defendant that plaintiff would be paid commissions).  The CFTC's amendments have not cured this defect and, accordingly, its claims should be dismissed.

## CONCLUSION

For the reasons set forth above, ACM respectfully requests that the Court enter an order dismissing the Amended Complaint as to ACM in its entirety, with prejudice.

Dated:  New York, New York
        November 1, 2022                              **KING & SPALDING LLP**

                                          By: */s/ Carmen J. Lawrence*
                                               Carmen J. Lawrence
                                               William F. Johnson
                                               Eric A. Hirsch
                                               1185 Avenue of the Americas
                                               New York, NY 10036-4003
                                               Tel: (212) 556-2100
                                               Email: clawrence@kslaw.com

                                               *Attorneys for Defendant*
                                               *Archegos Capital Management, LP*