# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CSX CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> THE CHILDREN'S INVESTMENT FUND MANAGEMENT (UK) LLP, et al., <br><br> Defendants. | 08 Civ. 2764 (LAK) |

**BRIEF OF AMICI CURIAE**
**INTERNATIONAL SWAPS AND DERIVATIVES ASSOCIATION, INC. AND**
**SECURITIES INDUSTRY AND FINANCIAL MARKETS ASSOCIATION**

Katherine Tew Darras
Rosario Chiarenza
INTERNATIONAL SWAPS AND
DERIVATIVES ASSOCIATION, INC.
360 Madison Avenue, 16th Floor
New York, NY 10017
(212) 901-6000 (Tel)

David M. Becker
Edward J. Rosen
Michael D. Dayan
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000 (Tel)
(212) 225-3999 (Fax)

Ira D. Hammerman
Kevin M. Carroll
SECURITIES INDUSTRY AND
FINANCIAL MARKETS ASSOCIATION
1101 New York Avenue, NW
Washington, DC 20005
(202) 962-7382 (Tel)

2000 Pennsylvania Avenue, NW
Washington DC 20006-1801
(202) 974-1500 (Tel)
(202) 974-1999 (Fax)

holdings of disparate parties, as they crossed over and under the five percent (or, in the case of Section 16, ten percent) threshold.

There are many circumstances where one's actions influence another to purchase or sell securities, none of which has ever been thought to make the actor their beneficial owner. The investor who purchases or redeems mutual fund shares foreseeably causes the fund to buy or sell securities, but the investor is not the beneficial owner of those securities. Similarly, a lender who extends unsecured credit to an investor to acquire securities, by withdrawing it, foreseeably causes the disposition of the securities. That foreseeable effect likewise does not make a creditor a beneficial owner.

        B.    <u>Plaintiff mischaracterizes market behavior</u>

Current market practice does not support the claim that cash-settled equity swaps necessarily lead to the swap dealer's acquisition of the referenced shares. Current market practice also does not support any inference that a swap dealer maintains a hedged position in the referenced shares so that they may be available for disposition when and if the dealer's long counterparty terminates an equity swap.

While counterparties generally may hedge equity swaps with referenced shares, it is far from invariably so. <u>See</u> DX 151 (Kennedy Dep. 39:11-21, 22-25) (Head of Citigroup's "Prime Swap" group testifying that a hedge can take many different forms including option combinations, shorts or shares directly, and that there are times when Citigroup chooses not to hedge swap positions entirely, especially in the context of total return swaps); <u>see also</u> Trial Tr. (Amin Test.) 206:12-17; DX 149 (Partnoy ¶¶ 100, 104). In a 2007 PricewaterhouseCoopers LLP survey commissioned by the U.K. Financial Services Authority (in which a number of *amici*'s members and affiliates were surveyed), PwC concluded that "most [market] participants . . . do

*not necessarily* hedge their CFD positions by buying the underlying shares" and "found significant differences in practices depending on the size and type of organisation."[5] Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference, Annex 4 at 3 ("PwC Survey"), available at http://www.fsa.gov.uk/pubs/cp/cp07_20.pdf (emphasis added); see also id. at 16 (Answer to Q20) (while 85% of the respondents said that "they sometimes hedge with the underlying asset," 46% hedged through "[o]ffsetting positions with derivatives" and 15% "in some other way").

Plaintiff's generalizations about market behavior have additional flaws. Even when a swap dealer initially hedges with the referenced shares, once the hedge is established, many dealers manage their equity exposures on a portfolio basis, rather than on a transactional basis, because it is economically efficient to do so, combining positions in shares, swaps, futures, options, structured notes and other listed and unlisted derivatives for these purposes. See generally Robert L. Tortoriello & Paul E. Glotzer, Guide to Bank Underwriting, Dealing and Brokerage Activities II-139--II-147, II-152--II-155 (2007) (summarizing interpretive letters from Office of the Comptroller of the Currency describing hedging practices that include hedging on a portfolio basis). Thus, in managing its equity portfolio, a swap dealer may well dispose of referenced shares before the equity swap is terminated, and without the counterparty's knowledge. For instance:

- Where a swap dealer has wholly or partially offsetting swaps, it may simply dispose of the two hedges initially established (to the extent they set off), in order to reduce transaction costs.

---

[5] A CFD, or "Contract for Differences," is "a derivative product that gives the holder an economic exposure, which can be long or short, to the change in price of a specific share over the life of the contract. . . . The contract does not give the holder either ownership of the referenced shares or any ownership rights, such as voting rights. Nor, since the contract is normally cash-settled, does it usually create any right to take delivery of the shares in place of cash settlement." Financial Services Authority, Consultation Paper, Disclosure of Contracts for Difference 11 (2007), available at http://www.fsa.gov.uk/pubs/cp/cp07_20.pdf. Thus, equity CFDs are in all material respects equivalent to cash-settled equity swaps for purposes of the issues raised here.