# Exhibit  4

Consultation Paper

# 07/20***

Financial Services Authority

# Disclosure of Contracts for Difference

Consultation and draft Handbook text

November 2007



# Survey on Contracts for Difference by PricewaterhouseCoopers LLP for The Financial Services Authority

# Contents

Executive summary                                      3

Purpose of survey                                      3

Survey methodology                                     5

Survey Results                                         6

# Executive summary

*Key findings*

We have found that the selected respondents were not in favour of a new regime being introduced specifically for Contracts for Differences ("CFDs"), and did not agree that it would improve transparency or bring any benefit to the market.

The majority of them also thought that, should such a regime be introduced, it would increase confusion in interpretation of market movements, would lead to double counting, would not solve the initial problem and would increase costs and complexity without clear benefits.

Most participants said that they do not necessarily hedge their CFD positions by buying the underlying shares, but here we found significant differences in practices depending on the size and type of organisation.

All participants categorically stated that they would not vote under the instructions of any client, but reserve the right for themselves to vote in instances where it is in their interest as a bank or a group.

At the same time, most of them declared that parties which are beneficiaries of an interest through a CFD occasionally seek to exert influence over voting rights in the physical holdings in the underlying held by the bank or firm.

All participants except one said they would not enter into pre-arrangements in relation to selling the underlying assets to the CFD holder at the closing of the position.

Most participants enter into CFDs with hedge funds and selected "Leverage" as the key reason for their clients entering into CFDs. Most participants use CFDs with 3-6 months maturity, contracts varied from 648-120,000 per month and monthly average volumes ranged from £150K - £3billion.

# Purpose of survey

We have been engaged by the FSA to conduct focused market research on their behalf on CFDs to demonstrate to the market that proper analysis and consideration has been given to exploring the motivation behind CFD trading and its potential role in influencing voting rights, stake building and impact on price formation.

In addition our research was designed to explore how CFDs work in practice, what participants thought of the current regimes dedicated to market transparency and finally what the selected financial institutions thought of a disclosure regime for economic interest in shares to be introduced.

This survey is one of eight work streams dedicated by the FSA to explore the mechanism and impacts of CFDs on market transparency and its findings will feed into a wider Discussion Paper being prepared by the FSA.

## Survey methodology

*Questionnaire*

There were 38 questions in the survey designed to gather data against the suggested areas highlighted by the FSA in its statement of requirements. The questions were divided into five sections: the Client base, CFD portfolio, Hedging policy, Voting policy and Views on the introduction of disclosure.

*The interviews*

Besides the factual data gathered, we conducted  interviews with the market participants to obtain understanding of the different reasons for trading CFDs, of their CFD related processes in practice and to explore their views and opinions on the status of market transparency in terms of CFDs and possible changes to the disclosure regime. At these interviews in most cases the companies were represented by the heads of their compliance teams, disclosure teams and business heads from the Derivatives/ CFD desks. (Appendix 1)

*Our analysis*

Our analysis was focused on the responses received from the survey, picking up determining themes coming out of the interviews, in search for a majority market view.

*Client base*

# Survey Results

## Q1 The scope of questions apply to which part of the organisation?

☐ Cover whole organisation  ☐ Only specific dept/desks (please expl...



6 answered Cover whole organisation
6 answered Only specific desk
1 answered N/A

**Comment:**

Half of the participants answered that the questions apply to the whole organisation. Those who answered "specific desk" listed the following:

- Equity Finance Desk
- Synthetic Products Group, Global Banking business which includes M&A and Legal
- Institutional equities business
- Prime Services Swaps Desk
- European Cash Trading Desk
- European Equity Brokerage Division
- CFD desk

## Q2 What type of clients do you enter in to CFDs with?

Number of votes

Hedge funds
Pension funds
Investment banks
Other financial institutions (retail ...
Corporates
Private customers
Other (please specify)

0 1 2 3 4 5 6 7

**Comment:**

Most participants enter into CFDs with hedge funds, other financial institutions and corporate. Under others we found:

- 'Intermediate Customers including Expert Private Customers
- 'stockbrokers, futures brokers, spread betters
- Prime brokerage clients

## Q3 Of those listed please rank the top three in order of the volume of transactions they generate?

The participants ranked hedge funds on the top, other financial institutions as second and investment banks as third.

6

*Client base*

| Q4 Do you offer CFDs to only certain clients? | Comment: |
|---|---|
| <br><br>10 answered Yes<br>3 answered No | 77% said Yes<br><br>23% said No |
| **Q5 If yes, please explain in the box below:**<br><ul><li>We do not deal with Private Customers. Clients are subject to appropriate credit checks and limits are placed on their activities.</li><li>Only to Intermediate Customers and Market Counterparties.</li><li>The institutional business does not offer CFDs to private clients.</li><li>Depending on their sophistication and following suitability criteria set out in the Global Suitability Policy.</li><li>We currently do not accept private clients. We only accept intermediate clients, private expert opt ups, or market counterparties.</li><li>Only Professional clients.</li><li>We only deal with institutional investors.</li><li>They must have experience of very active share trading or contingent liability risk</li><li>We enter in CFD contracts pursuant to the negotiation of both an ISDA agreement and a specific CFD agreement.  In addition specific credit checks are undertaken and we will only enter into CFD contracts once the relevant documentation and the appropriate credit checks are in place.</li></ul> | **Comment:**<br><br>Although "easy usage for clients" has been named as one of the key attributes of CFDs some level of sophistication is necessary.<br><br>Based on the interviews:<br><br>The smaller pure brokerage companies seem to have more private clients than the big sophisticated investment banks, whose clientele consists of mainly other big corporates.<br><br>Credit risk and size seem to be the driver behind the selection of clients. The smaller brokerage companies said they prefer many smaller (private) clients rather than fewer big ones, as they can only take limited credit risk in one transaction and with one client due to their own size. |

7

*Client base*

| | |
|---|---|
| **Q6 What reasons do your clients express for entering into a CFD rather than buying the underlying stock directly?** (please select that all that apply)<br><br>Number of votes<br><br> | **Comment:**<br><br>Most participants selected Leverage as the reason for their clients entering into CFDs. Ability to go sort/long came second and avoiding stamp duty came third. Additional reasons have been mentioned as:<br><br>• Ease of Execution<br><br>• CFDs are entered into via  broker, so not normally    expressed<br><br>• We are a brokerage institution and we do not have any responsibility for the discretionary management or advising clients in relation to their portfolios. Therefore there are no formal ongoing discussions whereby clients express their reasons<br><br>• The rationale for entering into a CFD is not always given however we do not enter into cash settled CFD positions if the intention of the client is to stake build as 1) this would put our Exempt Principal Trader status at risk and 2) the instrument only gives economic exposure to the security in question, not the legal right to the underlying security |
| **Q7 What is the primary reason your clients express for entering into CFDs?** (please select main reason)<br><br>5 said They don't ask, are unaware<br>4 said Leverage<br>1 said Operation efficiency<br>1 said Ability to go short/long<br>1 said Avoid stamp duty<br>1 said Stake building? | **Comment:**<br><br>Most participants selected Leverage as the main reason clients enter into CFDs. |
| **Q8 Does the answer to the previous question differ based on the type of client?**<br><br>5 said Yes<br>8 said No | **Comment:**<br><br>Those who said yes explained as follows:<br><br>• Anonymity from other market participants is an important factor for hedge funds.<br><br>• 'The primary reason will vary depending on the clients' use of CFDs<br><br>• 'It depends on the client's strategy and on the significance of the leverage<br><br>• We believe that other financial institutions mainly represent underlying clients who are |

8

*Client base*

| | likely to be most attracted to CFDs for leverage opportunity. The hedge fund community will have more diverse reasons depending on the nature of the fund and its objectives |
|---|---|

*CFD Portfolio*

| **Q9 Do you have a specific trading desk entering into CFDs with the external market?** | **Comment:** |
|---|---|
| <br><br>10 said Yes<br>3 said No | 77% said Yes<br><br>23% said No |
| **Q10 If no please indicate which desks undertake CFD trading?** (XY has been used to hide the company names in the answers)<br><br>• XY Direct<br>• XY Securities<br>• General Brokerage<br>• XY Touch CFDs<br><br>These are all operating divisions within XY Financial<br><br>CFD trading is undertaken by the Equity Distribution European Sales Trading Desk and by the European Cash Desk | **Comment**<br>Those who indicated that they do not have a specific CFD trading desk, mainly use their securities, brokerage or other trading divisions for that activity. |

*CFD Portfolio*



| Q11 Is there a documented policy to capture the controls and procedures around the CFD business? | Comment: |
|---|---|
| | 92% said Yes |
| | 8% said No |
| | All but one participant answered that they have documented policy to capture the controls around CFD trading. |
| 12 said Yes<br>1 said No | |
| Q12 If applicable please describe what subjects are covered by your policy.<br><br>Number of votes | Comments:<br><br>Policies seem to cover most areas listed in our question with most emphasis on "compliance restrictions" and "procedures around corporate actions" based on the answers. |
| Q13 Are there any circumstances in which your policy would prevent you executing a client CFD trade?<br><br>All participants answered Yes. | |

11

*CFD Portfolio*

| Q14 The explanations were as follows: | Comments: |
|---|---|
| • Various reasons, the firms restricted trading list, transaction size, and position size. <br><br> • We may be restricted in trading the security in question for a variety of reasons particularly if we are advising or are connected to M&A activity relation to that security.  Whilst that would not preclude us from entering into a cash settled CFD contract, this product is a delta one hedged product and therefore we would be prohibited from effecting our hedge as we would not be able to trade the underlying stock. <br><br> • Internal restricted list or AML restrictions, sensitive industries, conflicts of interest policy. <br><br> • Non exhaustive examples: Where credit limits are exceeded; For certain illiquid securities; Where restrictions are imposed by Compliance to manage conflicts of interest or to avoid a disclosure threshold breach; If there is a suspicion that the transactions might involve market abuse. <br><br> • Credit constraints, stock concentration, hedging limitations, restricted stocks <br><br> • The most common reason would be an internal restriction on the stock, which could arise for a number of reasons, e.g. us acting as adviser to a hostile takeover bid. <br><br> • There is no formally documented policy specific to CFDs. However, there are other wider range documented policies and procedures applicable to this business such as the Global Grey & Restricted List Procedures, the IB Global Suitability Policy, the Disclosures Regime dictated by the Transparency Directive and the City Code on Takeovers and Mergers etc. This is the approach that has been taken: CFD Positions within our bank are written by the Swaps desk in London.  These positions are hedged as appropriate, although generally on a delta 1 basis.  In-house hedge positions are executed by the relevant sector traders.  These hedge positions are proprietary. | As a summary, the most frequent reasons for a policy preventing the participants executing a CFD trade are: <br><br> • Restricted client, size, type of position, industry <br><br> • Internal conflict of interest with other transactions <br><br> • Credit limits, thresholds <br><br> • Stock restriction, stock concentration, group holding limits <br><br> • Compliance issues <br><br> • Inability to hedge |

*CFD Portfolio*

| | |
|---|---|
| • Clients may be consulted with respect to their economic position under the CFD, but they have no right over the underlying hedge (if any). Our bank itself decides the nature, extent and term of such hedges and, as these are proprietary positions, our bank makes its own decisions on the exercise of associated voting rights.<br><br>• We would be prevented from executing a client CFD trade in case of non compliance with any of the above mentioned policies and procedures.<br><br>• There are several reasons, such as internal conflict, security could be subject to an internal restriction or the size of the transaction would exceed the client's limit.<br><br>• There are a number of instances in which our policies would prohibit us from entering trades. One such example would be if a client wishes to trade in a size above allowable limits.<br><br>• Such limits could relate to our risk exposure or the client's credit limits. Or, for example, we have a requirement that the firm  cannot notionally own more than 10% of any company, and any client cannot own more than 1% of any company (unless we give an exemption in which case a client can own up to 8% of a company; only 3 clients have ever received this exemption).<br><br>• Internal restrictions, Internal Group Holding Policy, Market Limitations<br><br>• Where aggregated  group holdings in terms of the underlying stock prevented hedging of the CFD trade<br><br>• Where there are group restrictions re shorting a stock<br><br>• Where the underlying stock is on a proprietary trading restricted list<br><br>• Where there is inability to hedge due to liquidity of underlying<br><br>• Where client risk limits prevent dealing | |

*CFD Portfolio*

## Q15 Please provide an indication of CFD volumes in an average month?

| Company | Average new contracts per month | Largest contract value in £ in 2006 | Average contract value in £ in 2007 |
|---|---|---|---|
| 1 | 923 | 49,000,000 | 93,451 |
| 2 | 4,819 | 68,600,000 | 127,374 |
| 3 | 1,300 | 10,000,000 | No average could be specified but can range from several thousands to millions |
| 4 | 77,000 | 26,750,000 | 42,001 |
| 5 | 34,000 | 7,455,100 | 30,327 |
| 6 | 45 | 34,800,000 | 946,800 |
| 7 | 22,000 | £25,333,836 | 1,295,675 |
| 8 | 36,000 | 125,000,000 | 150,001 |
| 9 | Proprietary and confidential | Proprietary and confidential | Proprietary and confidential |
| 10 | no response | no response | no response |
| 11 | no response | no response | no response |
| 12 | no response | no response | no response |

**Comment:**

Contracts varied from 45-77,000 per month. The monthly average values ranged from £30k - £1.3m.

Largest contract values ranged from £ 7m – £525m.

## Q16 Do you generally see an increase in CFD trading volumes on a given underlying around the time of corporate events, e.g., earnings announcements/takeovers etc



☐ Yes ☐ No

10 answered Yes
3 answered No

**Comment:**

77% said Yes
23% said No

14

*CFD Portfolio*

15

**Q17** What maturities of CFD do you enter into? (please tick all that apply)

Number of votes



**Comment:**

CFDs with 3-6 months maturity are most widely used and with "Over 12 months" the least.

**Q18**

Of those listed maturities 1-3 and 3-6 months were ranked on the top.

*Hedging Policies*



| Q19 Do you hedge your CFD exposures? | |
|---|---|
| All participants answered Yes | |

| Q20 If yes how are they hedged? | Comment: |
|---|---|
| Number of votes | Some respondents hedged in more than one way. 85% said they sometimes hedge with the underlying asset, 46% with offsetting positions and 15% in some other way. |
| | During the interviews most participants said they apply various, direct holdings in the underlying shares, as well as various other derivative contracts. |

| Q21 Where a CFD is hedged directly using the underlying stock how is this stock held during the term of the hedge? (please select) | Comment: |
|---|---|
| | 69% said in the trading book, 23% said in the stock lending book, 8% chose N/A. |
| 9 answered Trading book<br>3 answered Lending book<br>1 answered N/A | |

16

*Hedging Policies*

| Q22 To what extent are physical holdings in the underlying disclosed to the market during the period? | Comments: |
|---|---|
| <ul><li>Where required under applicable disclosure rules.</li><li>Only when required under the relevant rules</li><li>A hedge position would be disclosed, along with other trading book holdings, if it increased above, or reduced below, a position disclosure threshold as per the country rules applicable to the stock. A holding would also be disclosed, if other rules, such as those relating to takeovers were applicable to the particular stock.</li><li>They are all disclosed as required by regulation</li><li>N/A - only hold via derivatives</li><li>In accordance with POTAM and Transparency Rules</li><li>The firm does not have any physical holdings in the underlying securities</li><li>As required under official reporting</li><li>We report executions in relation to CFD transactions as required under LSE rules, and also make major shareholding disclosures as required since the implementation of the Transparency Directive on 20 January 2007.</li><li>In addition to meeting our trade reporting obligations we would comply with any holding disclosure obligation to which it is subject.</li><li>disclosed in accordance with newly implemented Transparency Directive rules</li><li>As with all holding would disclose the holding where it exceeds a disclosable threshold</li><li>As required by DTR 5</li></ul> | Most participants said, in their disclosures, that they would fully follow any Transparency Rules and disclosure requirements prescribed to them. |

17

*Hedging Policies*



| Q23 Do your standard CFD sale documents contain any provisions with regard to settlement of the contract in the underlying stock if the counterparty or yourself so chooses?<br><br><br><br>13 answered No | Comments:<br>All said No to this question. |
| Q24 Have there been any instances where your standard sale documents have been amended to include provisions with regard to settlement of the contract in the underlying stock or where side agreements have been entered into which include such provisions?<br><br><br><br>10 answered No<br>3 answered Yes | Comments:<br>• Firms indicated as follows:-<br>    ▪ On limited occasions, we have entered into side agreements in relation to voting rights and these contain an option to acquire the underlying hedge<br>    ▪ Extremely rare, but these are classed as physically settled and are disclosable<br>    ▪ Particularly for financing transactions where the underlying is already owned by the counterparty |

18

*Hedging Policies*



| Q25 On average, how often are CFD positions closed out with physical settlement of the underlying stock? | Comments: |
|---|---|
| | 54% said never, 46% said 1-20% of the time |

7 answered Never

6 answered 1-20% of the time

19

*Voting Policies*

| | |
|---|---|
| Q26 Do your standard CFD sale documents contain any provisions with regard to the ability to influence or instruct the exercise of voting rights on any underlying physical holding? | Comment:<br>The sale documents might not contain that provision, but during the interviews firms all categorically said they do not vote and this would be clearly stated in their policies. |



☐ Yes (please describe below) ☐ No

10 answered No

3 answered Yes

- In order for the client to be able to influence or exercise voting rights there would have to be an express right into [our] legal documents. Such right is never present in [our] CFD sale documents.

- Our standard terms of business for CFDs contain the following provision:

  "You acknowledge that we will not transfer voting rights relating to an underlying share or other Instrument to you, or otherwise allow you to influence the exercise of voting rights held by us or by an agent on our behalf".

- No Influence on Voting Rights from Client

*Voting Policies*

| Q27 Have there been any instances where your standard sale documents have been amended to include provisions with regard to control of voting rights on any underlying physical holding or where side agreements have been entered into which include such provisions?<br><br><br><br>☐Yes (please explain below) ☐No<br><br>11 answered No<br><br>2 answered Yes | Comments:<br><br>85% said No, 15% said Yes<br><br>Those who answered yes explained as follows:<br><br>• On limited occasions we have entered into agreements with clients whereby we agree to exercise the voting rights attached to the underlying hedge position in accordance with the clients' instructions. Such agreements are always documented.<br><br>• Mostly in relation to financing of existing positions |

*Voting Policies*

| | |
|---|---|
| **Q28 Once a CFD contract is entered into to what extent do you have non-routine communication with the holders of the CFD?** | Comments: |

**Q28 Once a CFD contract is entered into to what extent do you have non-routine communication with the holders of the CFD?**



☑ Never ☐ Occasionally (please explain below)

Those who answered "Occasionally" explained as below:

- If, for example, trading restrictions are imposed after the CFD has been entered into which might limit the ability of the CFD holder to execute further trades or close out existing positions.

- Mostly relate to requests to vote and actions around tenders or other corporate events

- Corporate actions such as dividends, delisting etc

- Whilst the majority of communications with clients would be routine, on occasions clients will wish to have conversations about voting rights (see answer to question 25), obtaining legal title to the underlying security and corporate actions in relation to the security in question.

- Occasional contact purely of a customer services nature (e.g.. changing customer orders, novation of transactions)

- One occasion from a Legal perspective

- 'There have been occasions where we are contacted by clients or their representatives re voting rights. Our policy is never to discuss voting rights with any third parties.

Comments:

7 answered Occasionally

6 answered Never

54% said Occasionally, 46% said Never

Communication mostly relates to:

- Corporate action, legal matters

- Restrictions

- Logistical issues

- Voting rights

22

*Voting Policies*

| Q29 In situations where you purchase the underlying stock as a hedge for a CFD position how are voting rights utilised during the period they are controlled? | Comments: |
|---|---|
| <ul><li>We will typically vote only in respect of corporate actions.</li><li>We would not exercise the voting rights.</li><li>We have a policy not to vote on hedge positions. On rare occasions there may be a sound business reason to vote but, in these cases, approval would be required from senior Business Management and Legal/Compliance seniors</li><li>The swaps flow desk would determine whether they wanted to vote and, should they wish to do so, they would have to obtain prior approval from the Global Head of Equities.</li><li>n/a - only hedge with derivatives</li><li>so far we have not used our voting rights</li><li>n/a</li><li>Voting rights are not utilised</li><li>It is [our] policy not to allow voting on shares held to hedge CFDs.</li><li>The general policy is for us not to exercise voting rights.  However, at our discretion we may vote in line with the Board's recommendation if it is in our interests to do so.  We will not vote in the direction of our customers and our agreement makes that clear</li><li>We abstain from voting</li><li>Looks at voting rights across its entire inventory, hedges to CFD position are not treated separately.</li><li>It is our policy not to vote as a matter of course.</li></ul> | Most participants said they normally do not exercise their voting rights under their policies, but would do so if it was in their economic interest or related to corporate actions. Where they did vote, Operations or Compliance have to sign off after the desk initiates the proposal. |

23

*Voting Policies*

**Q30 Have parties which are beneficiaries of an interest through a CFD ever sought to exert influence over voting rights in your physical holdings in the underlying?**



□ Yes (please explain below) □ No

Explanations:

- Rarely. In most cases any such overtures are rebuffed.

- Our CFDs confer no beneficial interest. On occasions where a client has requested the voting rights, if we are prepared to agree to the request, a formal agreement is entered into.

- Clients occasionally request us to vote a position but our policy is not to agree to any such requests

- Very Occasionally, we decline to act or discuss

- There have been occasions where we are contacted by clients or their representatives about voting rights. Our policy is never to discuss voting rights with any third parties

- Yes, but at the time it was explained to the customer that they had no control or access to the shares held by us as its hedge.

- Yes, clients have from time to time expressed a desire for us to vote in accordance with their wishes however our policies and agreements are quite clear on this point that whilst we reserve the right to vote, we will only do so if we believe it is in the best economic interests of ours. This happens very rarely.

- No  our clients are aware that [we] own the rights to the underlying hedge and that we may not hold the physical

- Yes, requests are relatively common but normally refused. However, there may be exceptional circumstances where an existing holding of a client is financed by a derivative structure where we may agree to vote along with the management of the underlying company. We have not voted any shares in over a year.

Comments:

69% said Yes, 31% said No.

Explanations coincide with Q29.

9 answered Yes

4 answered No

*Views on the introduction of disclosure*

| | |
|---|---|
| Q31 As an entity involved in the CFD market do you think that a disclosure regime outside the remit covered by the Takeover Panel is necessary? | Comments:<br><br>77% said No, 15% said Yes, 8% said Possibly. |
| <br>☑Yes ☐No ☐Possibly<br><br>10 answered No<br>2 answered Yes<br>1 answered Possibly | |
| Q32 Would increased disclosure of economic interests be beneficial to the wider market? | Comments:<br><br>62% said No, 31% said Yes, 8% said Possibly. |
| <br>☑Yes ☐No ☐Possibly<br><br>8 answered No<br>4 answered Yes<br>1 answered Possibly | |

26

*Views on the introduction of disclosure*

| Q33 Please outline the main reasons for your response in question (32) above. | Comments: |
|---|---|

**Q33 Please outline the main reasons for your response in question (32) above.**

Those who answered **No** explained as follows:

- The current disclosure rules **are sufficient** to guard against anonymous stake building.

- There are often arguments that more disclosure must be beneficial but this needs to **be balanced** against the potentially huge costs of implementing effective monitoring and disclosure systems and procedures.  In this case the **benefits** to the market do **not** seem to be **clear** as the distinction between interests and voting rights (actual or potential) may **not** be **well understood**.  The benefits of additional CFD information on some stocks would be offset by a confusing array of disclosures for many of the larger stocks.

- If the Takeover Panel's approach is followed, the disclosure regime would need to be extended to **all interests** in securities, not just CFDs.  Although we developed monitoring procedures for interests in stocks on the Takeover Panels Disclosure list, extending this to all UK stocks would be a considerable undertaking.

- When the Takeover Panel introduced their new rules, there was some concern that there would be a proliferation of **complex** disclosures that would be difficult to understand and unhelpful to the market.  We appreciate this did not materialise to a great degree but it was largely because few stocks on the disclosure list have been ones with significant trading in complex derivatives.

- Most derivative disclosures related to CFDs and vanilla calls and puts but this should not be considered as representative of the whole UK market.  Extension to all UK stocks would encompass FTSE100 companies, many of which have significant levels of derivative trading, including complex exotic products.  This would be a **considerable monitoring burden** on both the providers of these instruments and the clients utilising them.  In addition, for the larger stocks, the **complexity of disclosures** could be counterproductive in being **confusing** rather than helpful to the market.

- It is unclear what market failure an extended disclosure regime would address. Whilst there may be evidence that certain hedge funds attempt to influence voting rights on hedge positions, we do **not** consider this to be **serious enough to justify the additional costs** of moving to a disclosure regime based on interests.  We are not aware of

**Comments:**

Those who said **Yes** explained as follows:

- There would be a benefit whereby holdings disclosed on the new TR-1 had some form of marker indicating that a position being disclosed was held as a hedge of derivatives contracts, so the market knew that the investment was not proprietary in nature.

- The benefit would come from increased transparency to the market in terms of showing the split between those who hold an economic interest and those who hold a voting interest.

- Transparency for buyers in certain conditions and specific circumstances, e.g. Disclosure for stake building, limited amount of holding or purchase of underlying stock within a period of holding a CFD i.e. 10% in one week etc

- Enhanced market transparency.

Those who said **No** explained their answers in relation to a new regime:

- It would create confusion

- It would be unnecessary as the Takeover Panel rules are already sufficient

- It would cause a significant cost burden

- It would produce multiple counting of same shares

- It would give no added benefit

- The initial enhancement of the Takeover Panel rules may be lost.

27

*Views on the introduction of disclosure*

<table>
<tr>
<td>

- Although some hedge funds had to adapt to the new Takeover Panel disclosures, an expanded FSA regime would have a significant impact on a much wider range of funds.  Panel disclosures have mainly impacted funds with M&A type strategies whereas broadening the regime would impact all funds with holdings in UK stocks.

- The proposed regime is **unnecessary** for the following reasons:

- it would lead to a significant increase in disclosures

- **double counting** of both the CFD and the hedge reported which would lead to a lack of transparency

- In our opinion it would be **confusing** to investors. It would also be **costly** and difficult to define and implement. Would this be worth the marginal increase in transparency?

- Whilst there may be increased swap and other derivative activity around a takeover deal, this is the **natural result** of investors focusing on the potential price movements rather than activist funds wishing to influence the votes.

- The **additional costs** of an expanded regime could lead to managers avoiding the UK market altogether

- Major shareholding disclosures, as updated by the Transparency Directive, looks to voting control as a driver for disclosure, synthetic cash settled products, such as CFDs, as an investment product, only provides the holder with economic exposure to price movements.

- The Takeover Panel's decision to include such products during takeover situations for disclosure purposes was a prudent approach given the ability to create dead stock by the retention of CFD hedges with connected parties, driven by activist, attempting to prevent offers succeeding.  The benefit here is the transparency afforded to the market were CFD holders would otherwise go undetected.  However, **outside this very specific event,** the **benefits** of including such products in holding calculations is **non-existent**.

</td>
<td>

</td>
</tr>
</table>

*Views on the introduction of disclosure*

- In certain instances, the closing of a CFD and the resultant unwinding of a hedge may lead to situations where stocks can be bought by the original CFD holder, but this is no different to an investor buying such stock from the market/current shareholder or through a block trade executed by a broker.

- The FSA should be looking to **provide rules** that restrict CFD/SWAP holders from attempting to exert or exercise control of hedge positions rather than impose additional disclosure obligation and costs on firms.

- There may be **some benefits** overall provided there was clarity and an understanding of the information among investors. However, we believe the **Takeover Panel rules target the situations** where transparency is of most importance – in addition, there are certain disclosure exemptions for Recognised Intermediaries under these rules.

- There is a risk that a requirement generally to disclose economic interests will lead to **confusion** and the increased possibility of "interests" relating to **multiples** of a company's total voting rights. A targeted regime which focused on where perceived abuses were taking place would be preferred.

- Including such products would create confusion for the company and the market as the volume and complexity of disclosures would mask the true controllers of votes.

- Additionally the perceived ownership of a company would be vastly **over inflated** resulting in a reduction of transparency of voting control.

- The implementation of the TD to date has enhanced the transparency of voting control in the UK through, for example, the introduction of netting in borrowing and lending and the exclusion of collateral and short puts.  **These enhancements would, in our opinion be lost** with the inclusion of cash settled product.

29

*Views on the introduction of disclosure*

| | |
|---|---|
| **Q34 In the event that additional disclosure of economic interests was introduced do you think that the threshold for disclosure should be set:**<br><br><br><br>8 answered The same<br><br>5 answered Higher | Comments:<br><br>62% said The same, 38% said Higher. |
| **Q35 Are you required to disclose economic interests in shares through derivatives in any other jurisdiction?**<br><br><br><br>7 answered No<br><br>6 answered Yes | Comments:<br><br>53% said No, 47% said Yes<br><br>Those who answered yes added the following:<br><br><ul><li>Some other jurisdictions require disclosure of potential holdings through physically settled derivatives, i.e. where there are rights to acquire voting rights.  However, we are not aware of other jurisdictions requiring a broad disclosure of interests, whether conferring rights to voting rights or not</li><li>In some jurisdictions outside Europe, and those European jurisdictions which have yet to implement the transparency directive.</li><li>Hong Kong and UK Takeover Panel</li><li>Hong Kong</li><li>The disclosure regimes across EU are many and varied and there are a number of countries where disclosures of derivatives are required. As an example Italy require that a potential interest of over 5% is disclosed.</li><li>Hong Kong (not certain of exact requirements as such disclosures are made by Hong Kong office)</li></ul> |

*Views on the introduction of disclosure*

| Q36 How much time would you estimate your organisation currently spends on monitoring and ensuring compliance with the existing Takeover Panel disclosure rules? | Comments: |
|---|---|
| <ul><li>On average 1-2 hours per day</li><li>Approximately **3 hours per week**</li><li>We have a team of 4 covering Panel disclosures but they also have other disclosure responsibilities. The proportion of time on Panel disclosures will vary according to the number of Panel deals where our group is connected.</li><li>We employ one full time resource dedicated to monitoring and complying with the existing Takeover Panel Disclosures Regime. There is also regularly an additional reliance on control room headcount for support.</li><li>Because we currently enjoy an exemption from the Takeover Panel rules, our time spent would be limited to approximately 1 hour per week. This time is spent corresponding with the Takeover Panel on queries regarding our client's positions.</li><li>Extended man hours globally, 1 hour daily for each country and 1-4 hours daily reporting dependant on volume</li><li>Daily requirement - processing and preparing reports, reviewing report, dealing with queries and issues and ongoing monitoring. 10man  hours a week</li><li>2 compliance staff, 20%</li><li>1 person, about half a day each business day.</li><li>Not taking into account the considerable development time needed to comply with the requirements one person spends all their time complying with the disclosure requirements on a daily basis</li><li>Compliance with the Takeover Panel disclosure rules is a function performed by the Control Room. At a minimum this is a **full time role for 2 people** however depending on deal flow this number can increase.</li><li>Approximately 2-3 hours per day</li></ul> | The time estimated spent on ensuring compliance with the Takeover Panel disclosure rules ranged from 3 - 80 man-hours per week. |

31

*Views on the introduction of disclosure*

| Q37 What would you estimate the approximate cost of the existing Takeover Panel disclosure regime to be for your business? | Comments: |
|---|---|
| • Difficult to quantify.  It is not a significant burden. | Most estimates were around £10,000 to £20,000 per annum, however there were £1 million and £250,000 estimates as well. |
| • Employees and associated costs for a Compliance Executive's 3 hours per week. IT costs will be deemed "sunk costs" as they have already been incurred. | |
| • Difficult to determine as there were resource costs for setting up the procedures as well as technical work in automating some of the processes. | |
| • Approximately one million pounds annually (excluding initial system outlay.) | |
| • Approximately £10,000 per year (three times) | |
| • Cost of two staff as indicated and necessary reporting infrastructure | |
| • We have provided a cost analysis, as we are spending a lot of time focusing on other major projects, such as the implementation of MiFID. We have limited our response to confirming that it would be extensive | |
| • Difficult to take in isolation as cover EMEA region but systems, data processing and storage, and personnel costs probably up to £250,000 per annum. | |
| ▪ Approx £20,000 per annum | |

*Views on the introduction of disclosure*

**Q38 If the existing disclosure rules were expanded to include a requirement to disclose economic interests at the same levels as those currently required by the Takeover Panel rules on voting interests, what would you estimate the incremental cost of this to be for your business?**

- It really depends on how the rules are framed and whether systems can be created/amended to automatically calculate the levels of interest. There will be initial costs of systems redevelopment but the ongoing costs should not be significant subject to the ability to automate the process.

- Minimal

- Difficult to estimate incremental costs as it would not be a matter of just extending the process for the Panel disclosures. To extend to all UK stocks would require significant technology resource to examine data feeds, covering all products and rewrite monitoring systems to ensure positions could be calculated and reported correctly. In addition there would be headcount costs for the additional work in monitoring, verifying disclosable positions and making the relevant disclosures.

- It is impossible to provide a precise estimate. The upfront costs would be in the range of 5 to 10 millions pounds taking into consideration manpower, systems and education costs. There would also be ongoing annual costs associated with ensuring compliance with the expanded rules.

- The workload would more than double

- Additional ongoing costs would be approximately doubled.

- Unlikely to be marginal

- Main cost would be changing system to automate this requirement.

- Systems have been developed re reporting of this information which would need amendments – there would be initial setup costs and additional ongoing monitoring and reporting Additional ongoing costs would be approximately doubled.

- Approx 3 times the current cost £300,000 -

Comments:

The main costs would be systems related. The highest cost estimate was £5 million to £10 million Workload and ongoing costs were mostly estimated to double.

33

*Views on the introduction of disclosure*

£400,000 development costs as front-end booking
systems would need to be enhanced as well as
compliance disclosure systems developed to enable
us to accommodate increased monitoring of
positions.

# pwc.com

© 2007 PricewaterhouseCoopers LLP. All rights reserved. "PricewaterhouseCoopers" refers to PricewaterhouseCoopers or, as the context requires, the PricewaterhouseCoopers global network or other member firms of the network, each of which is a separate and independent legal entity. The firms of the PricewaterhouseCoopers global network (www.pwc.com) provide industry-focused assurance, tax and advisory services to build public trust and enhance value for clients and their stakeholders. More than 140,000 people in 149 countries across our network share their thinking, experience and solutions to develop fresh perspectives and practical advice.

Designed by Design & Production, FS, Assurance (920071)

35