# Exhibit  20

**CREDIT SUISSE**
**PORTFOLIO SWAPS (STANDARD TERMS) ANNEX**

Credit Suisse International ("CS") and Archegos Fund, LP (the "Counterparty") have entered into a 1992 ISDA Master Agreement dated as of ___December 15___ 2020, including the Schedule and any annexes thereto (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Master Agreement"). This Portfolio Swaps (Standard Terms) Annex, including the Schedule attached hereto and made a part hereof (the "Standard Terms"), supplements and forms part of the Master Agreement and is intended to govern the parties' relationship when entering into an equity swap transaction through "Primeview" (or successor system) that the parties agree to be governed by the Standard Terms in relation to a single Share, a basket of Shares treated together (a "Custom Basket") a single Index or a basket of Indices treated together (a "Custom Index Basket") (each, an "Equity Swap Transaction"). Each Equity Swap Transaction shall be deemed a "Transaction" for the purposes of the Master Agreement.

The definitions and provisions contained in the 2006 ISDA Definitions (the "Swap Definitions") and in the 2002 ISDA Equity Derivatives Definitions (the "Equity Definitions," and together with the Swap Definitions, the "Definitions"), in each case as published by the International Swaps and Derivatives Association, Inc., as amended and supplemented from time to time, are incorporated into these Standard Terms. In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern. In the event of any inconsistency between either set of Definitions and the Standard Terms, the Standard Terms shall prevail. The confirmation applicable to each Transaction, which shall constitute a "Confirmation" for the purposes of, and will supplement, form a part of, and be subject to, the Master Agreement, shall consist of the Standard Terms (including the Schedule hereto), as supplemented by the trade details applicable to such Transaction as set forth in the Confirmation for that Transaction.

In order to enter into a Transaction, the Counterparty must notify (by telephone or as otherwise agreed between the parties) CS of its request for an offer, specifying the name of the relevant Shares, Custom Basket, Index or Custom Index Basket, and the proposed Number of Shares or the proposed Number of Units, as applicable, and whether the Counterparty wishes to act as Equity Amount Receiver/Synthetic Buyer or Equity Amount Payer/Synthetic Seller. If CS agrees to provide such offer, it must then notify (by telephone or as otherwise agreed between the parties) the Counterparty of the proposed Initial Price or formula for determining the Initial Price. Should the Counterparty wish to accept this offer, it must immediately notify CS (by telephone or as otherwise agreed between the parties) of its acceptance. This acceptance gives rise to a binding Transaction between the parties. An offer by CS that is not immediately accepted shall be deemed to lapse unless CS specifically states that it shall remain open.

A Confirmation will be prepared and either (i) posted by CS on its client access website or (ii) delivered by CS to the Counterparty by other electronic means, in each case, within one Business Day of the Transaction being entered into between the parties. The Counterparty shall be deemed to have accepted the terms of the Confirmation if it does not dispute its terms within one Business Day of such posting or delivery, as the case may be. Failure to dispute the terms within one Business Day shall constitute the Counterparty's full acceptance of the Transaction upon the terms, absent manifest error, and subject to the conditions, as set out in the Confirmation and within these Standard Terms. In the event of any inconsistency between the

89383415_8

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 002776

provisions of the Standard Terms and any Confirmation, the Confirmation shall prevail. In the event of any inconsistency between the provisions of the Standard Terms and the Master Agreement, the Standard Terms shall prevail for the purposes of the relevant Transaction.

The standard terms applicable to each Transaction to which these Standard Terms relate are as follows (unless otherwise specified in the relevant Confirmation):

## 1.    General Terms

Transaction Type:

For purposes of the Equity Definitions, the relevant Equity Swap Transaction constitutes:

(a)   a "Share Swap Transaction" if the relevant Confirmation specifies a single Share;

(b)   a "Share Basket Swap Transaction" if the relevant Confirmation specifies a Custom Basket;

(c)   an "Index Swap Transaction" if the relevant Confirmation specifies a single Index; and

(d)   an "Index Basket Swap Transaction" if the relevant Confirmation specifies a Custom Index Basket.

Trade Date:

As specified in the Confirmation.

Effective Date:

As specified in the Confirmation.

Termination Date:

Is the earlier of:

(i)  the Swap Termination Date; and

(ii) the Optional Termination Date,

in each case, if such date is not a Scheduled Trading Day, the next following Scheduled Trading Day, subject to the provisions of Section 6.6 of the Equity Definitions.

2

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002777

| | |
|---|---|
| Final Settlement Date: | Is the earlier of: |
| | (i) one Settlement Cycle after the Swap Termination Date; and |
| | (ii) one Settlement Cycle after the Optional Termination Date. |
| Swap Termination Date: | As specified in the Confirmation. |
| Shares: | The shares as specified in the Confirmation (including quantity). |
| Custom Basket: | As specified in the Confirmation. |
| Index: | As specified in the Confirmation. |
| Custom Index Basket: | As specified in the Confirmation. |
| Number (quantity) of Units: | For a Custom Basket, Index or Custom Index Basket, the Equity Notional Amount divided by the Gross Price. |
| Gross Price:[1] | As specified in the Confirmation. |
| Weighting: | For a Custom Basket and in respect of each Share in such Custom Basket, the number of Shares per Unit in the Custom Basket and for a Custom Index Basket and in respect of each Index in such Custom Basket, the number of units of such Index per Unit in the Custom Index Basket, as agreed between the parties at the Trade Date and specified in the Confirmation, and as may be adjusted from time to time by the Calculation Agent as a result of the occurrence of a Potential Adjustment Event, Extraordinary Event or Index Adjustment Event, as the case may be. |
| Equity Notional Amount: | Initially, as specified in the Confirmation, as adjusted pursuant to Section 1.24 of the Equity Definitions. |

---

[1] Note: Swap fees will *either* be separate *or* included in the Initial/Final Price, not both. If swap fees are separate from the Initial Price, then Gross Price equals Initial Price, but if swap fees are included in the Initial Price, then Gross Price equals the Initial Price minus such swap fees. Gross Price is only used to calculate the Number of Units for an Index, Custom Basket or Custom Index Basket.

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002778

Share Notional/ Index Notional for a
Custom Basket or Custom Index Basket:[2]

As of any date, (a) the Share Notional for any Share in a Custom Basket equals the product of (i) the Weighting of such Share and (ii) the Final Price of such Share as of the last Valuation Date or, in respect of the first Valuation Date, the Initial Price and (b) the Index Notional for any Index in a Custom Index Basket equals the product of (x) the Weighting of such Index and (y) the Final Price of such Index as of the last Valuation Date or, in respect of the first Valuation Date, the Initial Price.

Exchange:

Each exchange or quotation system, as specified in the Confirmation, if any, or, in respect of any multi-exchange Index or Custom Index Basket, for each component security of such Index or of any Index in such Custom Index Basket, the principal stock exchange on which such component security is traded, if any; subject to the successor or substitute provisions in Section 1.25 of the Equity Definitions.

Related Exchange:

The principal exchange or exchanges on which futures and options contracts related to the relevant Share, Shares, Index or Indices, as applicable, are traded; *provided* that if CS determines that its Hedge Positions in respect of any Transaction will not include futures or options contracts related to the relevant Share, Shares, Index or Indices, as applicable, then the Related Exchange for such Transaction will be "None;" subject to the successor or substitute provisions in Section 1.26 of the Equity Definitions.

Schedule:

The document substantially in the form attached hereto. The Schedule referred to in the Standard Terms is distinct from all other schedules incorporated into the Master Agreement.

---

[2] Applies only for a Custom Basket or Custom Index Basket and used only if Reinvestment of Dividends is applicable.

4

89383415_8

Confidential Treatment Requested by King & Spalding

| | |
|---|---|
| Exchange Business Day: | Any Scheduled Trading Day on which each Exchange and Related Exchange, if any, are open for trading during their respective regular trading sessions, notwithstanding such Exchange or Related Exchange, if any, closing prior to its Scheduled Closing Time; *provided* that (i) for non-Exchange traded Shares, each day on which price quotations are available to (or provided by) CS in respect of such Shares, (ii) for an Index Swap Transaction or an Index Basket Transaction, it shall also mean each day the Index Sponsor(s) publishes the level of the Index or Indices and (iii) for a Share Basket Swap Transaction or Index Basket Swap Transaction, Exchange Business Day shall be determined on a per Share or per Index, as applicable, basis. |
| Settlement Currency: | As specified in the Confirmation. |
| Calculation Agent: | Notwithstanding any provision of the Master Agreement, CS shall be the sole Calculation Agent. |
| Depository Receipt Election: | Applicable with respect to any of the Shares that are depository shares or receipts, unless otherwise specified in the Confirmation. |
| | In the event that Depository Receipt Election is Applicable, the 2002 Definitions shall be supplemented by the 2007 Partial Lookthrough Depository Receipt Supplement to the Equity Definitions or the 2007 Full Lookthrough Depository Receipt Supplement to the Equity Definitions, as specified in the Confirmation. |

## 2.    Equity Amounts

| | |
|---|---|
| Equity Amount Receiver: | The party specified as the Synthetic Buyer in the Confirmation. |
| Equity Amount Payer: | The party specified as the Synthetic Seller in the Confirmation. |
| Equity Amount Payment Date: | Unless otherwise specified in the Confirmation, in respect of each Valuation |

89383415_8

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 002780

|  | Date, the date that is one Settlement Cycle after the relevant Valuation Date, or if such date is not a Currency Business Day, the next following Currency Business Day. On each Equity Amount Payment Date for a Transaction, an Equity Amount Payment shall be made. |

Valuation Date: Each date specified as such in the Confirmation and the Termination Date, subject to the provisions of Section 6.6 of the Equity Definitions.

Averaging Dates: In respect of each Valuation Date, each date specified or otherwise determined as provided in the Confirmation (or, if such date is not a Scheduled Trading Day, the next following Trading Day); *provided* that the Calculation Agent, in its reasonable discretion, may use a "weighted arithmetic mean" instead of the "arithmetic mean" provided in Section 6.7(b) of the Equity Definitions and the "weighting" for any applicable Share on any Averaging Date will be determined by the Calculation Agent, in its reasonable discretion, with regard to the daily trading volume of such Share on the applicable exchange on such Averaging Date.

Averaging Date Disruption: Modified Postponement.

Equity Amount: As calculated in respect of each Equity Amount Payment Date, (i) for a Share or an Index, an amount equal to $Q \times (P2 - P1)$ and (ii) for a Custom Basket or Custom Index Basket, an amount equal to $\sum (P2_i - P1_i) \times Q_i$, where:

$Q =$ the Number of Shares with respect to a Share or the Number of Units with respect to an Index;

$Q_i =$ the number of Shares of $Share_i$ in a Custom Basket or the number of Units of $Index_i$ in a Custom Index Basket;

$P1$ or $P1_i =$ the Final Price on the Valuation Date relating to the immediately preceding Equity Amount Payment Date or

6

89383415_8

Archegos-CFTC-SEC 002781

in respect of the first Equity Amount Payment Date, the Initial Price; and

P2 or $P2_i =$   the Final Price on the Valuation Date relating to such Equity Amount Payment Date.

Equity Amount Payment:

On the Equity Amount Payment Date, if P2 is greater than P1 (or, for a Custom Basket or Custom Index Basket, if $\sum(P2_i\text{-}P1_i)$ is positive), then the Equity Amount Payer shall pay the Equity Amount to the Equity Amount Receiver; or

If P2 is less than P1 (or, for a Custom Basket or Custom Index Basket, if $\sum(P2_i\text{-}P1_i)$ is negative), then the Equity Amount Receiver shall pay the absolute value of the Equity Amount to the Equity Amount Payer.

Equity Notional Reset:

Applicable/Not Applicable, as specified in the Confirmation.

Type of Return:

Total Return, unless otherwise specified in the Confirmation.

Initial Price:

In respect of a Share, the price per Share specified as such in the Confirmation; in respect of a Custom Basket, the price per Custom Basket specified as such in the Confirmation; in respect of an Index, the level of the relevant Index specified as such in the Confirmation; and in respect of a Custom Index Basket, the level of the Custom Index Basket specified as such in the Confirmation.

Final Price:

The product of (A) {One minus the Final Swap Fee Percentage (as defined in Section 4)}, if Applicable, and

(B): (a) In respect of a Share:

(i)   the price per Share as of the Valuation Time on the Valuation Date (or relevant Averaging Date), as reported in the official real-time price dissemination mechanism for the Exchange or, (ii) if agreed between the parties with respect to a particular Transaction, the volume

7

89383415_8

weighted average price per Share on the Exchange during its regular trading session on the Valuation Date (or relevant Averaging Date), as displayed on Bloomberg Page AQR (or any successor thereto) or, if no such page is available or appropriate for the relevant market, then as determined by the Calculation Agent.

if (A) for any reason no quotation as specified in (i) or (ii) above is available, (B) the Calculation Agent has reasonably concluded that the Final Price determined in accordance with (i) or (ii) above is not a fair reflection of the market value the Shares at the Valuation Time on the Valuation Date (or relevant Averaging Date) or (C) the Shares are specified in the Confirmation to be non-exchange traded Shares, then the "Final Price" shall be the price per Share as reasonably determined by the Calculation Agent as at the Valuation Time on the Valuation Date (or relevant Averaging Date).

(b) In respect of a Custom Basket, $\Sigma$ Final Price$_i$ X Weighting$_i$, where

Final Price$_i$ = the Final Price of Share$_i$ in the Custom Basket (determined in accordance with clause (a) above), as of the Valuation Time on the Valuation Date (or relevant Averaging Date); and

Weighting$_i$ = the Weighting of Share$_i$ in the Custom Basket.

(c) In respect of an Index, the official closing level of the Index as calculated and published by the relevant Index Sponsor on the Valuation Date (or relevant Averaging Date), *provided,* however, that if the Calculation Agent has reasonably concluded that such level is not a fair reflection of market value of the Index on the Valuation Date (or relevant Averaging Date) then the "Final Price" shall be the level of the Index as reasonably determined by the Calculation Agent as at the Scheduled Closing Time on the Valuation Date (or relevant Averaging Date).

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002783

(d)  In respect of a Custom Index Basket, $\Sigma$ Closing Level$_i$ X Weighting$_i$, where

Closing Level$_i$ = the Closing Level of Index$_i$ in the Custom Basket (determined in accordance with clause (c) above), on the Valuation Date (or relevant Averaging Date); and

Weighting$_i$ = the Weighting of Index$_i$ in the Custom Basket.

(e)  If the Number of Shares with respect to any Transaction, together with, at the election of CS, the number of shares of such Issuer under any other equity swap transaction between the parties hereto and for which the "final Valuation Date" occurs on the same day as the Valuation Date or first Averaging Date, as applicable, for such Transaction (the "**Total Number of Shares**"), exceeds the ADTV Limitation (as defined below), the Final Price determination described in paragraph (a) above will apply only with respect to the portion of the Total Number of Shares that the Calculation Agent determines will not exceed such ADTV Limitation.  The Final Price with respect to the remaining portion of the Total Number of Shares shall be determined on as many subsequent days as the Calculation Agent may require to adhere to the ADTV Limitation (each such day, an "**Extended Day**") and shall be determined in accordance with the procedures described in paragraph (a) and this paragraph (e).

The "**ADTV Limitation**" shall mean 20% of the most current 30-day trailing average daily trading volume, to the extent available, determined as of the final Valuation Date (or first Averaging Date, as applicable) as determined by the Calculation Agent acting in good faith and in a commercially reasonable manner.

(f)  Notwithstanding anything herein or in the Definitions to the contrary, if a Market Disruption Event with respect to any applicable Share occurs or exists on any day that, but for the Market Disruption

9

Confidential Treatment Requested by King & Spalding   Archegos-CFTC-SEC 002784

Event, would have been the final Valuation Date or any Extended Day, the Final Price for such Share shall be determined for such day with respect to a number of such Shares, which may be zero, as the Calculation Agent shall determine in its reasonable discretion exercised in good faith and the relevant Valuation Date for the remaining number of such Shares shall be postponed as provided in the Equity Definitions.

Futures Price Valuation:

Not Applicable, unless specified as "Applicable" in the Confirmation for an Index Swap Transaction. If Futures Price Valuation is specified as "Applicable," (i) Section 6.8(d) of the Equity Definitions is amended by replacing "Exchange" with "Related Exchange" and (ii) Section 6.8(b)(ii) of the Equity Definitions is replaced by "Official Settlement Price means the price at which the Exchange-traded Contract on the Relevant Exchange is settled."

Exchange-traded Contract:

If Futures Price Valuation is Applicable, the futures contract, or if there is no such futures contract, the options contract, on the relevant Index traded on the Related Exchange with an expiry date (or the date which would have been the expiry date but for such date being a Disrupted Day or not being a Scheduled Trading Day) that is the same date as the final Valuation Date, unless otherwise specified in the Confirmation, in which case, the futures contract, or if there is no such futures contract, the options contract, on the relevant Index traded on the Related Exchange with an expiry date (or the date which would have been the expiry date but for such date being a Disrupted Day or not being a Scheduled Trading Day) in the month and year as specified in the Confirmation.

Valuation Time:

In respect of a Share Swap Transaction or a Share Basket Swap Transaction, the Scheduled Closing Time; subject to the

10

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002785

provisions of Section 6.1 of the Equity Definitions.

In respect of an Index Swap Transaction or an Index Basket Swap Transaction, Not Applicable.

**3.      Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | The Equity Amount Receiver. |
| Floating Amount Receiver: | The Equity Amount Payer. |
| Calculation Amount: | Equity Notional Amount. |

Floating Amount Payment Dates:

Each date specified in the Schedule and the Final Settlement Date; subject to adjustment in accordance with the Business Day Convention.

| | |
|---|---|
| Business Day Convention: | As specified in the Confirmation. |

Floating Rate Option:

As specified in the Confirmation.

Business Day:

As appropriate, based on the jurisdiction related to the specified Floating Rate Option and the jurisdiction related to the Settlement Currency.

Designated Maturity:

As specified in the Schedule or as otherwise specified in the Confirmation.

Spread:

The percentage specified in the Confirmation as such rate may be adjusted in accordance with the Equity Definitions or the terms hereof following the occurrence of a Potential Adjustment Event or Extraordinary Event (including, for the avoidance of doubt, any Increased Cost of Hedging).

Floating Rate Day Count Fraction:

As specified in Section 6.2(g) of the 2006 Definitions in respect of the relevant Floating Rate Option, unless otherwise specified in the Confirmation.

| | |
|---|---|
| Reset Dates (Interest): | As specified in the Schedule. |
| Compounding: | Not Applicable, unless otherwise specified in the Confirmation. |

Compounding Dates:

If Applicable, each day in the Calculation Period.

11

89383415_8

4.    **Swap Fees:**

(a)  On the first Equity Amount Payment Date only, the Counterparty shall pay an amount equal to the Initial Swap Fee to CS. The Initial Swap Fee is calculated as $Q \times P_0 \times Z$, where:

| | |
|---|---|
| $Q =$ | In respect of a Share Swap Transaction, the Number of Shares; in respect of a Share Basket Swap Transaction, an Index Swap Transaction or an Index Basket Swap Transaction, the Number of Units; |
| $P_0 =$ | the Initial Price; |
| $Z =$ | Initial Swap Fee Percentage; and |
| Initial Swap Fee Percentage = | a percentage, represented in basis points, as agreed between the parties and as specified in the Confirmation. |

(b)  On the Termination Date, the Counterparty shall pay an amount equal to the Final Swap Fee, to CS.  The Final Swap Fee is calculated as $(Q \times P_3 \times Z)$, where:

| | |
|---|---|
| $Q =$ | In respect of a Share Swap Transaction, the Number of Shares; in respect of a Share Basket Swap Transaction, an Index Swap Transaction or an Index Basket Swap Transaction, the Number of Units, or, if such Transaction is terminated in part, then the Number of Shares or Number of Units, as applicable, being terminated; |
| $P_3 =$ | the Final Price; |
| $Z =$ | Final Swap Fee Percentage; and |
| Final Swap Fee Percentage = | a percentage, represented in basis points, as agreed between the parties and as specified in the Confirmation. |

(c)  If the Transaction is terminated, in whole or in part, before the scheduled Termination Date by the Counterparty, and the Breakage Option is Applicable, then CS (on the Termination Date) shall calculate the Breakage Amount, which shall be due from the Counterparty to CS.  The Breakage Amount is an amount equal to the Floating Amount for the Calculation Period beginning on and including the last Reset Date to and excluding the next scheduled Reset Date; *provided* that the Calculation Amount for such calculation is the Equity Notional Amount in respect of the Number of Shares for a Share Swap Transaction or the Number of Units for a Share Basket Swap Transaction, an Index Swap Transaction or an Index Swap Transaction being closed.

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002787

Breakage Option =        Applicable/Not Applicable, as specified in the Confirmation.

## 5.      Payment Netting:

If, on any Equity Amount Payment Date, Floating Amount Payment Date or Dividend Payment Date (each, a "Payment Date"), as the case may be, the same amounts would otherwise be payable by each party to the other (with respect to any Equity Swap Transaction pursuant to the Standard Terms), then on such date, each party's obligation to make such payment shall be netted against each other, and automatically satisfied and discharged. If the aggregate amount otherwise payable by one party exceeds the aggregate amount payable by the other, then the party with the larger aggregate amount shall be obligated to pay the difference on the relevant Payment Date.

## 6.      FX Provisions:

If, with respect to a Transaction, the currency in which any Dividend Amount or Final Price is calculated or determined is different from the Settlement Currency, CS shall determine the value of that amount or price in the Settlement Currency.

## 7.      Dividend Amounts and Additional Amounts:

Dividend Period:                          As specified in the Confirmation.

Dividend Percentage:                     As specified in the Confirmation.

Dividend Option:                         As specified in the Confirmation.

Dividend Amount:                         (A)   In  respect  of  a  Share  Swap Transaction,  (i)  the  Dividend  Option multiplied by (ii) the Number of Shares multiplied by (iii) the Dividend Percentage;

(B)    In respect of a Share Basket Swap Transaction,  the  sum  of  the  following products  for  each  Share  in  the  Custom Basket: (i) the Dividend Option for such Share  multiplied  by  (ii)  the  Dividend Percentage  multiplied  by  (iii)  the Weighting of such Share in the Custom Basket;

(C)    In  respect  of  an  Index  Swap Transaction, the product of (i) the Number of  Units  multiplied  by  (ii)  the  Realized Index  Dividend  Points  (as  defined  in  the Schedule),  on  the  relevant  Ex-Dividend Date; and

(D)    In respect of an Index Basket Swap Transaction,  the  sum  of  the  following products  for  each  Index  in  the  Custom Index  Basket:  (i)  the  Realized  Index Dividend  Points  on  the  relevant  Ex-

13

89383415_8

| | Dividend Date multiplied by (ii) the Weighting of such Index in the Custom Index Basket, expressed as a number of units. |
|---|---|
| Dividend Interest Accrual: | Applicable/Not Applicable, as specified in the Confirmation.  If Dividend Interest Accrual is Applicable, interest will accrue on each Dividend Amount at the Dividend Interest Rate Option from, and including, the day on which the Issuer of the applicable Shares pays the relevant gross cash dividend to holders of record of such Shares to, and excluding, the applicable Dividend Payment Date and such interest will be payable on such Dividend Payment Date. |
| Dividend Interest Rate Option: | As specified in the Confirmation. |
| Dividend Payment Dates: | As specified in the Confirmation. |
| Dividend Recovery: | If (a) the amount actually paid or delivered by an Issuer to holders of record of any applicable Share in respect of any gross cash dividend, or in the case of any Share included in any applicable Index, any Qualifying Dividend (as defined in the Schedule), in each case, declared by the applicable Issuer (a "Declared Dividend") to holders of record of such Share is not equal to such Declared Dividend (a "Dividend Mismatch Event") or (b) such Issuer fails to make any payment or delivery in respect of such Declared Dividend by the third Business Day following the relevant due date, the Calculation Agent shall determine any appropriate correction or repayment to be made by a party to account for such Dividend Mismatch Event or non-payment or non-delivery, as the case may be, and determine the date any such repayment should be made, together with interest on such repayment amount as determined by the Calculation Agent.

The parties expressly acknowledge and agree that these Dividend Recovery provisions shall apply and remain in full force and effect notwithstanding the termination of the relevant Transaction. |

14

89383415_8

Confidential Treatment Requested by King & Spalding

Re-investment of Dividends:

If specified as applicable in the relevant Confirmation (for a Share Basket Swap Transaction or an Index Basket Swap Transaction):

(i)     In respect of a Share Basket Swap Transaction or an Index Basket Swap Transaction, if Dividend Reinvestment Option is specified as Reinvest Specific Shares/Indices in the Schedule, the Calculation Agent shall adjust the Equity Notional Amount as of the Exchange Business Day immediately preceding the ex-dividend date for purposes of each subsequent Equity Amount Payment Date by adding the Dividend Amount to the Share Notional or Index Notional, as applicable, of the relevant Share or Index, as applicable, relating to such Dividend Amount.

(ii)    In respect of a Share Basket Swap Transaction or an Index Basket Swap Transaction, if Dividend Reinvestment Option is specified as Reinvest Equally in the Schedule, the Calculation Agent shall adjust the Equity Notional Amount as of the Exchange Business Day immediately preceding the ex-dividend date for purposes of each subsequent Equity Amount Payment Date by adding to each Share Notional or Index Notional, as applicable, the product of (x) the Dividend Amount and (y) the relative Weighting (expressed as a percentage) of such Share or Index, as applicable, in the Basket.

Notwithstanding anything in the foregoing to the contrary, in the case of each of (i) and (ii) above for a Share Basket Transaction, any adjustment to the Equity Notional Amount or Share Notional following the addition of the relevant Dividend Amount, as the case may be, shall be rounded down to the nearest whole number of Units, and any surplus Dividend Amount shall be paid by the relevant party to the other party on the Dividend Payment Date to which the Dividend Amount relates. In respect of an Index Swap Transaction or an Index Basket Swap Transaction, where the Confirmation specifies the Type of Return as Total Return, certain additional terms related to the Dividend Amount, which are listed and defined in the Schedule, shall apply.

15

89383415_8

Confidential Treatment Requested by King & Spalding

Adjustment to Dividend Percentage:

If CS reasonably determines that there has been, within the term of a Share Swap Transaction or a Share Basket Swap Transaction or the 12 months following the date of a distribution, a change in any applicable law or regulation (or a change in the interpretation or application by any court, governmental or other authority of such law or regulation) that has had the effect of reducing or increasing the amount of the ordinary cash dividend per Share actually due to the holder of the Shares or any Shares in the Custom Basket in the jurisdiction of incorporation of CS or the Counterparty, CS may adjust the Dividend Percentage of such Share Swap Transaction or such Share Basket Swap Transaction, as applicable, with immediate effect by notice in writing to the Counterparty. Further, if any such change is to take effect prior to the date upon which CS gives such notice, CS may make such adjustments to the payment obligations of the parties in respect of any Equity Swap Transaction to which it considers such change applicable. In the case of any Equity Swap Transaction to which "Re-investment of Dividends" is applicable and any Dividend Amount that has been affected by such change has already been re-invested in accordance with the provisions above, CS may make such adjustments to the Equity Notional Amount and/or Share Notional (as applicable) as it deems necessary to account for the economic effect of such change on such Equity Swap Transaction. In the event that such Equity Swap Transaction shall have been previously closed, the Counterparty shall indemnify CS in respect of any such change on a full indemnity basis.

8.    **Index Adjustment Events (in respect of an Index Swap Transaction or an Index Basket Swap Transaction)**

|  |  |
|---|---|
| Index Cancellation: | Cancellation and Payment |
| Index Modification: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |

9.    **Adjustments and Extraordinary Events (in respect of a Share Swap Transaction or a Share Basket Swap Transaction)**

|  |  |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

Consequences of Merger Events:

|  |  |
|---|---|
| Share-for-Share: | Alternative Obligation |
| Share-for-Other: | Cancellation and Payment, in respect of a Share Swap Transaction, and Partial Cancellation and Payment, in respect of a Share Basket Swap Transaction. |
| Share-for-Combined: | Component Adjustment |

89383415_8

Confidential Treatment Requested by King & Spalding    Archegos-CFTC-SEC 002791

| | |
|---|---|
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |
| Tender Offer: | Applicable |
| Consequences of Tender Offer: | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for- Combined: | Modified Calculation Agent Adjustment |
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |
| Composition of Combined Consideration: | Not Applicable |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment |
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |

In a Share Basket Swap Transaction, if any Share is removed from the Custom Basket due to an Adjustment Event, Extraordinary Event or Additional Adjustment Event, then the Calculation Agent will adjust the Weightings of the remaining Shares accordingly; *provided* that, if the parties agree within one Exchange Business Day of such event, the removed Share may be replaced by a substitute Share and the Initial Price of the Custom Basket shall be adjusted as determined by the Calculation Agent.

## 10.    Additional Adjustment Events:

| | |
|---|---|
| Change in Law: | Applicable; *provided* that Section 12.9(a)(ii)(X) of the Equity Definitions is hereby amended by replacing the word "Shares" with the words "Hedge Positions"; *provided, further,* that the parties agree that for purposes of Section 12.9(a)(ii) of the 2002 Definitions, "any applicable law or regulation" includes the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (as may be amended or supplemented from time to time), any rules and regulations promulgated thereunder, any similar law or regulation and any adoption or promulgation of new regulations authorized or mandated by existing statute, and the consequences specified in Section 12.9(b)(i) of the 2002 |

Confidential Treatment Requested by King & Spalding                                                    Archegos-CFTC-SEC 002792

Definitions shall apply to any Change in Law arising from any such act, rule or regulation.

Insolvency Filing:

Applicable

Hedging Disruption:

Applicable; *provided* that (a) Section 12.9(a)(v) of the Equity Definitions is replaced with the following:

"Hedging Disruption" means that the Hedging Party is unable, after using commercially reasonable efforts, to either (i) acquire, establish, re-establish, substitute, maintain, cancel, unwind or dispose of any transaction(s) or asset(s) (including, without limitation, stock loans and other transactions (including pending transactions) that can be used to create a long or short exposure to the Shares or Index, as the case may be) it deems necessary to hedge the market risk (including, but not limited to the equity price risk, dividend risk, settlement risk and currency risk) of entering into and performing its obligations with respect to this Transaction (any such transactions or assets, a "Hedging Party Hedge"), including, for the avoidance of doubt, due to any legal, regulatory or compliance restrictions affecting the Hedging Party or the Hedging Party Hedge or (ii) freely and unconditionally realize, recover, receive, repatriate, remit or transfer the proceeds of the Hedging Party Hedge.

and (b) that Section 12.9(b)(iii) of the Equity Definitions is hereby amended by adding the following phrase after the phrase "to terminate the Transaction," as follows (new language shown in bold and underlined for convenience): "upon at least two Scheduled Trading Days' notice to the Non-Hedging Party **unless a shorter notice period is required given the rules, regulations and practices of a particular jurisdiction, specifying the date of such termination, which may be the same day that notice of termination is effective,** specifying the date of such termination,…"

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002793

| | |
|---|---|
| Increased Cost of Hedging: | Applicable, *provided* that Section 12.9(a)(vi) of the Equity Definitions is replaced with the following: |

"(vi) "Increased Cost of Hedging" means that the Hedging Party would incur a materially increased (as compared with the circumstances that existed on the Trade Date) amount of tax, duty, expense, collateral requirement, fee (other than brokerage commissions) (which amount of tax shall include, without limitation, any amount of tax due to any increase in tax liability, decrease in tax benefit or other adverse effect on its tax position in relation to dividends) (a "Hedging Cost") to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of the Hedging Party Hedge or (B) freely and unconditionally realize, recover or remit the proceeds of the Hedging Party Hedge. However, any such materially increased amount that is (1) incurred solely as a result of the deterioration of the creditworthiness of the Hedging Party or (2) could be avoided by the Hedging Party, acting in a commercially reasonable manner based on prevailing circumstances applicable to the Hedging Party, shall not be an Increased Cost of Hedging."

| | |
|---|---|
| Determining Party: | CS, which shall in all cases act in good faith and in a commercially reasonable manner. |
| Hedging Party: | CS |
| Non-Reliance: | Applicable |
| Agreements and Acknowledgements Regarding Hedging Activities: | Applicable |
| Additional Acknowledgements: | Applicable |
| Index Disclaimer: | Applicable |

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002794

11. **Optional Termination and Maturity**

(i)    Unless otherwise specified in the Confirmation for a particular Transaction, on any Exchange Business Day when CS or the Counterparty wishes to terminate any Transaction (whether in whole or in part), it shall give one (1) Exchange Business Day's notice of that fact to the other party (by telephone or as otherwise agreed between the parties) specifying the proportion of such Transaction it wishes to terminate; subject to Section 10 hereto.

(ii)   In respect of a Share Swap Transaction or a Share Basket Swap Transaction, if the Shares or any Shares included in the Custom Basket are registered pursuant to Section 12 of the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act") or convertible into securities registered pursuant to the Exchange Act and, if at any time the aggregate number of such Shares beneficially owned by CS and its affiliates (the "Transaction Equity") exceeds or could exceed 8% of the number of outstanding, voting Shares of an Issuer at such time (such event, the "Partial Termination Event"), CS may notify the Counterparty of its desire to effect an early settlement with respect to a portion of the Transactions on such Shares or Custom Basket including such Shares, as determined by CS subject to the conditions set forth below, so that, after completion of the unwind related to the Partial Termination Event, the Transaction Equity would not exceed 8% of the number of outstanding Shares of such Issuer.

(iii)  Upon sending or receiving notice on any date as discussed in (i) or (ii) above, CS shall then calculate the Final Price on such date to the extent practicable and commercially reasonable, or the next Exchange Business Day, as determined by CS  (the "Optional Termination Date") and notify the Counterparty of the Final Price (by telephone or as otherwise agreed between the parties), which shall be binding upon the Counterparty.  CS shall then settle the portion of the Transaction to be terminated in accordance with these Standard Terms on the Final Settlement Date with respect to such portion.

(iv)   All payments due on the Final Settlement Date shall be netted against each other, and the balance shall be due on the Final Settlement Date, unless otherwise agreed between the parties.

(v)    If CS or the Counterparty gives notice to terminate only a portion of the Number of Shares in respect of a Share Swap Transaction or the Number of Units in respect of an Index Swap Transaction or an Index Basket Swap Transaction, then the provisions of this Section shall apply only to that portion of the relevant Transaction. In the event that a Transaction is terminated only in part, CS shall make any necessary adjustments to the Number of Shares in respect of a Share Swap Transaction or the Number of Units in respect of a Share Basket Swap Transaction, an Index Swap Transaction or an Index Basket Swap Transaction.  The remainder of the Transaction shall continue to be governed by these Standard Terms.

89383415_8

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 002795

**12.    Calculation and Settlement of Payments**

(i)     All payments made under a Transaction shall be made in accordance with the account details specified in the relevant Confirmation.

(ii)    All payments shall be in the Settlement Currency.

**13.    Additional Representations, Agreements and Transaction Terms**

(a)    Each party represents to the other party:

(1)    that such party is an "eligible contract participant" within the meaning of the CEA;

(2)    that neither these Standard Terms nor any Transaction has been executed or traded on a "trading facility" as such term is defined in the CEA;

(3)    the primary right and obligation of each party and any Transaction is to make or receive the respective payments referred to in the Confirmation; and

(4)    that each Transaction is a "swap agreement" within the meaning of Section 101 (53B) of the U.S. Bankruptcy Code entitled to the protection of Section 560 of the U.S. Bankruptcy Code.

(b)    CS and the Counterparty confirm and agree that it is an express term of each Transaction that:

(1)    neither party acquires any interest in or right to acquire or dispose of any Share or any right to vote or give any consent with respect to any Share by virtue of any Transaction; and

(2)    neither party is obliged to sell, purchase, hold, deliver or receive any Share by virtue of any Transaction.

(c)    The Counterparty represents that it is entering into these Standard Terms and any Confirmation in good faith and not with the intent or as a part of a plan to evade compliance with U.S. federal securities laws including, without limitation, Section 13(d) of and Rule 10b-5 promulgated under the Exchange Act.

(d)    The Counterparty represents that it is not entering into any Transaction with the purpose of changing or influencing control of the Issuer of the related Shares and, if the Counterparty does seek to change or influence control of such Issuer during the terms of the Transaction, it will immediately notify CS.

(e)    The Counterparty represents to CS on the date that the parties enter into a Transaction that the Counterparty is not in possession of any material non-public information regarding any Issuer of Shares, including any Shares included in a Custom Basket, underlying such Transaction.  The Counterparty covenants that it will not seek to terminate, amend or otherwise modify such Transaction if the Counterparty is in possession of any material non-public information regarding the relevant Issuer.

21

89383415_8

(f)     The Counterparty represents to CS on the date that the parties enter into a Transaction that the Counterparty is not an "affiliate" of the Issuer of the Shares, including any Shares included in a Custom Basket, underlying a Transaction within the meaning of any securities law applicable to such Issuer or subject to the reporting requirements of Section 16 of the Exchange Act in respect of such Shares.  The Counterparty covenants that if it attains such status or becomes so subject during the term of the relevant Transaction and, if the Counterparty does attain such status, it will promptly notify CS.

(g)     The Counterparty represents to CS on the date that the parties enter into any Transaction that the Counterparty has made all public filings under the Exchange Act or other applicable law with respect to the related Shares as required by applicable law or regulation and, during the term of any Transaction, it will continue to make all public filings under the Exchange Act or other applicable law with respect to the related Shares.  The Counterparty further represents that if it beneficially owns 5% or more of any class of the Issuer's securities registered under the Exchange Act, it is eligible to file reports on Schedule 13G and it will notify CS immediately following any filing in respect of such securities on Schedule 13D.  The Counterparty represents that the aggregate amount of all such Shares beneficially owned by it for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative position, is less than 20% of the outstanding Shares.

(h)     The Counterparty represents to CS that it will make all disclosures required by law or regulation in respect of its entry into any Transaction.

(i)     The Counterparty further acknowledges and agrees:

(1)     that CS and its affiliates may, at the date of any Transaction or at any time thereafter, be in possession of information in relation to Shares that is or may be material in the context of any Transaction that is not publicly available or known to the Counterparty; and

(2)     that the Master Agreement, these Standard Terms (and all related material, including but not limited to any relevant Schedule, Appendix, and Confirmations) create no obligation whatsoever on the part of CS or its affiliates to disclose to the Counterparty any such information (whether or not confidential).

(j)     For the purpose of facilitating any Transaction, Credit Suisse Securities (USA) LLC ("CSSU"), which is organized in the United States of America (the "Agent"), has acted as agent for CS.  The Agent is not a principal with respect to such Transaction and shall have no responsibility or liability to the parties as a principal with respect to such Transaction.

(k)     Each party agrees that: (i) CSSU is not acting as a principal with respect to these Standard Terms or any Transaction hereunder and (ii) shall have no responsibility or liability (including without limitation, by way of guarantee, endorsement or otherwise) to any party in respect of these Standard Terms or any Transaction hereunder, including without limitation, in respect of the failure of a party to pay or perform under these Standard Terms or any Transaction. The Counterparty hereby agrees that it will not proceed against CSSU in respect of any obligation owed to it under these Standard Terms or any Transaction hereunder.

89383415_8

22

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002797

(l)    Notwithstanding any other method of delivery, the Counterparty agrees to electronic access or delivery via the Internet, either by email or through any website designated for this purpose by CS, of Confirmations and any detailed transaction and account information.

(m)    **Advanced Execution Services (AES) Platform Terms**

A.    Counterparty represents to CS that:

(1)    Each Equity Swap Transaction entered into pursuant to these Standard Terms and executed through the advanced execution services platform of CS or its affiliate (each such Equity Swap Transaction, an "**AES Swap**") is, to the best of its knowledge and belief upon due enquiry, permissible under and complies with all laws or regulations applicable to Counterparty.

(2)    On the date that the parties enter into any AES Swap, it is not subject to the reporting requirements of Section 13 or Section 16 of the Exchange Act with respect to the Shares underlying any AES Swap, and it covenants that it will not become subject to such reporting requirements with respect to Shares during the term of any AES Swap.

B.    CS hereby notifies Counterparty that each of the following criteria (collectively, the "**Criteria**") will apply to any AES Swaps:

(1)    The aggregate AES Swaps on any trading day with respect to any underlying Shares will: (i) not exceed one percent (1%) of the outstanding underlying of such Shares for that Issuer's class of securities and (ii) not exceed fifteen percent (15%) of the average daily trading volume of such Shares based on the lesser of (x) the thirty (30) day trailing average daily trading volume of such Shares and (y) the projected trading volume of such Shares for such trading day and (iii) the resulting swap will have an Equity Notional Amount of less than USD$125,000,000, in each case as determined by CS.

(2)    Certain additional internal limits will apply to each AES Swap as well as the aggregate AES Swaps on all underlying Shares entered into by Counterparty on any trading day; in each case, such limits will be determined by CS.

(3)    The underlying Shares in respect of each AES Swap will (x) be listed on the New York Stock Exchange or the NASDAQ National Stock Market, (y) be a Regulation NMS stock and (z) have an average daily trading volume of at least 10,000 shares, in each of cases (x) through (z) as determined by CS.

Counterparty understands that CS has the right to change the Criteria and will notify (which notice may be oral, electronic or otherwise) Counterparty of any changes in the Criteria.

89383415_8

23

14.     **Costs and Expenses**

Each party shall bear its own costs and expenses in relation to these Standard Terms and to each Transaction thereunder.

15.     **Independent Amount**

As specified in the Confirmation as a percentage of the Equity Notional Amount; *provided* that CS, acting in a commercially reasonable manner, may upon 3 Business Days prior notice to the Counterparty change the Independent Amount with respect to a Transaction to reflect the Independent Amount that CS determines in good faith and in a commercially reasonable manner would be applicable (as determined solely by reference to its internal sources used by it in the regular course of its business) to the Counterparty in respect of such Transaction as of the relevant date of determination if CS and such Counterparty had entered into such Transaction on such date of determination.

16.     **Brazil Indemnification**

In the event that a liability for any tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) imposed by tax authorities of the Federative Republic of Brazil ("Taxes") at any time in respect of any Transaction or in relation to any assets held, purchased, acquired, whether directly or indirectly, actually or synthetically, relating to such Transaction or any connected hedging activity, including any payments made under or in respect of such Transaction or assets, whether or not such Transaction has matured or been terminated and regardless of the date on which such Taxes are imposed, Counterparty agrees that it shall indemnify CS and keep it indemnified against any and all losses, claims, payments and expenses caused by or arising from or in connection with such Taxes suffered or incurred by CS.

The parties agree that the provisions of this sub-clause and the indemnity provided herein shall survive termination of the Transaction until the applicable statute of limitations for recovery of taxes by the relevant tax authorities has run out.

89383415_8

Confidential Treatment Requested by King & Spalding                                    Archegos-CFTC-SEC 002799

**Schedule to Portfolio Swaps (Standard Terms) Annex**:

Dated _December 15_ 2020 which supplements the Master Agreement dated as of
_December 15, 2020_ between

Credit Suisse International
and
The Archegos Fund, LP (the "Counterparty")

| | |
|---|---|
| Dividend Reinvestment Option:<br>(for a Share Basket Swap<br>Transaction or Index Basket<br>Swap Transaction only) | Reinvest Equally<br>Reinvest Specific Shares/Indices |
| Reset Date (Interest): | Monthly |
| Designated Maturity: | One Month |
| Floating Amount Payment Date: | Each Equity Amount Payment Date |

In respect of an Index Swap Transaction or an Index Basket Swap Transaction, where the Confirmation specifies the Type of Return as Total Return, references to Shares for purposes of Article 10 of the Equity Definitions shall be deemed to be references to Shares within the Index and the provisions of Section 7 shall apply and the following terms related to the Dividend Amount shall apply:

Realized Index Dividend Points:   An amount determined by the Calculation Agent in accordance with the following formula:

$$\sum_{t} \sum_{i} \frac{n_{i_t} \times d_{i_t}}{D_t}$$

where:

**t** means each day in a Dividend Period (each, a "Relevant Day$_t$");

**i** means, in respect of each Relevant Day$_t$, each share that is comprised in the Index on that Relevant Day$_t$ (each, a "Share$_i$");

**d$_{it}$** means, in respect of each Share$_i$ and a Relevant Day$_t$:

89383415_8

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 002800

    (a)    if an Ex-Dividend Date in respect of such $Share_i$ falls on such Relevant $Day_t$, an amount equal to the Relevant Dividend in respect of such $Share_i$ and such Relevant $Day_t$; and

    (b)    otherwise, an amount equal to zero;

$n_{it}$ means, in respect of each $Share_i$ and a Relevant $Day_t$, the number of shares of such $Share_i$ then comprised in one Unit of the Index, as calculated and published by the Index Sponsor (or if not published directly, a value implied by the Index Sponsor as determined by the Calculation Agent) on such Relevant $Day_t$, subject to the terms of the Failure to Publish provision set out below;

$D_t$ means, in respect of each Relevant $Day_t$, (a) the divisor, as calculated and published by the Index Sponsor on such Relevant $Day_t$, subject to the terms of the Failure to Publish provision set out below or (b) if the Index Sponsor does not apply any such divisor, a value implied by the Index Sponsor as determined by the Calculation Agent.

Relevant Dividend:                In respect of a $Share_i$, a Relevant $Day_t$ and a Dividend Period, an amount per such share (as determined by the Calculation Agent) equal to:

the product of the Dividend Percentage and the relevant Qualifying Dividend whose Ex-Dividend Date falls on such Relevant $Day_t$ and which would have been received by a holder of record of such $Share_i$ from the Issuer of $Share_i$.

Qualifying Dividend:               In respect of a $Share_i$:

    (a)    any cash dividend declared by the Issuer of such $Share_i$ before any withholding or deduction for or on account of any tax (but excluding any associated tax credit, refund or withholding or deduction on account of any tax on any such associated tax credit or refund), arising under the law of the jurisdiction of the Issuer which would have been made by or on behalf of the Issuer in respect of the Qualifying Dividend, and, provided that such $Share_i$ is priced in a currency other than the base currency of the Index, such amount shall be converted at the foreign exchange rate published by the Index Sponsor at the Valuation Time on the preceding Exchange Business Day or at other such value implied by the Index Sponsor to formulate the number of dividend points for the total return calculation of the Index; or

    (b)    in the case of any non-cash dividend, the cash value declared by the Issuer of such $Share_i$ of any such non-cash dividend (or, if no such cash value is declared by the relevant Issuer, the cash value of such stock dividend as determined by the Calculation Agent); *provided* that, in each case, any cash or non-cash dividend in relation to which the Index Sponsor makes corresponding adjustments to the Index will not be a Qualifying Dividend.  If the Index Sponsor adjusts the Index

89383415_8

Confidential Treatment Requested by King & Spalding        Archegos-CFTC-SEC 002801

DocuSign Envelope ID: AF0E4FE2-1470-42B0-B5B7-E01B8795480D

for part of a dividend, this Qualifying Dividend provision shall apply only to the unadjusted part.

Ex-Dividend Date:

In respect of a Share$_i$ and a Qualifying Dividend, the first day (following the declaration of such Qualifying Dividend) on which such Share$_i$ commences trading ex such Qualifying Dividend on the relevant exchange.

Failure to Publish:

If, for the purposes of determining n$_{it}$ or D$_t$ on any Relevant Day$_t$, the Index Sponsor fails (for whatever reason) to calculate and publish the number of shares in respect of any Share$_i$ or the divisor, respectively, then, subject to the provision under "Corrections" below, the Calculation Agent shall determine the number of shares in respect of such Share$_i$ or the divisor (as the case may be) in respect of such Relevant Day$_t$.

In making any such determination, the Calculation Agent may (but shall not be obliged to) make reference to the formula for and method of calculating the number of shares in respect of such Share$_i$ or the divisor (as the case may be) last in effect prior to the failure by the Index Sponsor to make the relevant calculation publication.

Corrections:

In the event that a number of shares in respect of any Share$_i$ or the divisor (as the case may be) is calculated and published by the Index Sponsor (or determined by the Calculation Agent pursuant to the provisions above (Failure to Publish)) and utilized for any calculation or determination made under the relevant Transaction is subsequently corrected (or, where there has been a Failure to Publish, published by the Index Sponsor) and the correction is published (or, where there has been a Failure to Publish, publication is made) by the Index Sponsor within thirty Scheduled Trading Days after the Dividend Payment Date on which a Dividend Amount has been paid, either party may notify the other party of that correction and the Calculation Agent will adjust the Dividend Amount, as required, to take into account such correction; *provided* that if such correction or subsequent publication occurs after the relevant Dividend Payment Date, the Calculation Agent shall, unless otherwise agreed by the parties determine any appropriate

27

Confidential Treatment Requested by King & Spalding

repayment to be made by a party to account for such correction or subsequent publication, as the case may be, and determine the date any such repayment should be made, together with interest on such repayment amount as determined by the Calculation Agent. The parties expressly acknowledge and agree that the provisions of this paragraph (Corrections) shall apply and remain in full force and effect notwithstanding the fact that the Termination Date has occurred.

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002803

**CREDIT SUISSE INTERNATIONAL**

Name: Steven J Reis

Title: Authorized Signatory

December 16, 2020

Name: Erica Hryniuk

Title: Authorized Signatory

December 16, 2020

Portfolio Swaps (Standard Terms) Annex
Signature Page

89383415_8

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002804

**ARCHEGOS FUND, LP**

Name:  Sung Kook Hwang
Title:   Managing Member of the General Partner

CSI / Archegos Fund, LP
Portfolio Swaps Annex

Confidential Treatment Requested by King & Spalding