# Exhibit  21



Deutsche Bank AG London
Winchester house
1 Great Winchester St, London EC2N 2DB
Telephone: 44 20 7545 8000

c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, NY 10005
Telephone: 212 250 5977

**Tiger Asia Fund L.P.**

## MASTER CONFIRMATION FOR
## EQUITY SWAP TRANSACTIONS

This **MASTER CONFIRMATION FOR EQUITY SWAP TRANSACTIONS** (this "**Master Confirmation**") effective as of **November 20, 2003**, is intended to supplement the terms and provisions of transactions (each, a "**Transaction**") entered into from time to time between **Deutsche Bank AG London** ("**Deutsche**") and **Tiger Asia Fund L.P.** (the "**Fund**" or "**Counterparty**") and Tiger Asset Management, LLC, a corporation organised under the laws of Delaware, acting as Investment Advisor on behalf of the Fund (the "**Agent**") as evidenced by a side letter in the form attached hereto as Annex B (the "**Side Letter**"). This Master Confirmation, taken alone, is neither a commitment by either party to enter into any Transaction nor evidence of a Transaction.

Transactions are also referred to as "**Portfolio Swap Transactions**", the terms of which shall be reflected for each Transaction on a Supplemental Confirmation for Portfolio Swap Transactions, as illustrated in Exhibit A-2 or such other forms as Deutsche may prescribe; a group of Portfolio Swap Transactions sharing common terms is referred to as a "**Portfolio**", and the common terms for a Portfolio are referred to as "**General Portfolio Terms**", which terms shall be reflected on a Supplemental Confirmation for particular Portfolios, as illustrated in Exhibit A-1 or such other forms as Deutsche may prescribe. Each Portfolio Swap Transaction will relate to a single Share or Index and not to a Basket. "**Supplemental Confirmation**" shall refer to the Supplemental Confirmations for the General Portfolio Terms and the Portfolio Swap Transactions in a particular Portfolio. A Supplemental Confirmation confirming General Portfolio Terms, taken alone, is neither a commitment by either party to enter into any Portfolio Swap Transaction nor evidence of a Portfolio Swap Transaction.

This Master Confirmation together with both of the Supplemental Confirmations for a particular Portfolio Swap Transaction shall constitute a "**Confirmation**" as referred to in, and supplement and form a part of and be subject to, the ISDA Master Agreement, including the Credit Support Annex, if any, dated as of          , as amended and supplemented from time to time (the "**Agreement**"), between Deutsche Bank AG and Counterparty. All provisions contained in the Agreement govern this Master Confirmation and each Supplemental Confirmation except as expressly modified below.

**DEUTSCHE BANK AG IS NOT REGISTERED AS A BROKER OR DEALER UNDER THE U.S. SECURITIES EXCHANGE ACT OF 1934. DEUTSCHE BANK SECURITIES INC. ("DBSI") HAS ACTED SOLELY AS AGENT IN CONNECTION WITH THE TRANSACTIONS GOVERNED BY THIS MASTER CONFIRMATION AND HAS NO OBLIGATION, BY WAY OF ISSUANCE, ENDORSEMENT, GUARANTEE OR OTHERWISE WITH RESPECT TO THE PERFORMANCE OF EITHER PARTY**

Chairman of the Supervisory Board: Rolf-E Breuer
Board of Managing Directors: Clemens Borsig, Hermann-Josef Lamberti,
Josef Ackermann, Tessen von Heydebreck

Deutsche Bank AG is regulated by the FSA for the conduct of designated investment business in the UK, is a member of the London Stock Exchange and is a limited liability company incorporated in the Federal Republic of Germany HRB No. 30 000 District Court of Frankfurt am Main; Branch Registration No. in England and Wales BR000005, Registered address: Winchester House, 1 Great Winchester Street, London EC2N 2DB.

Confidential Treatment Requested by King & Spalding

UNDER SUCH TRANSACTIONS.  DEUTSCHE BANK AG, LONDON IS NOT A MEMBER OF THE SECURITIES INVESTOR PROTECTION CORPORATION (SIPC).

The definitions and provisions contained in the 2000 ISDA Definitions (the "**Swap Definitions**"), and in the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**" and, together with the Swap Definitions, the "**Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. are incorporated into this Master Confirmation.  In the event of any inconsistency between the Swap Definitions and the Equity Definitions, the Equity Definitions will govern.   In the event of any inconsistency between either set of Definitions and this Master Confirmation, this Master Confirmation will govern. In the event of any inconsistency between this Master Confirmation and any Supplemental Confirmation, the Supplemental Confirmation will govern for purposes of the relevant Transaction.  In the event of any inconsistency between a Supplemental Confirmation confirming General Portfolio Terms and any Supplemental Confirmation confirming Portfolio Swap Transaction terms thereunder, the Supplemental Confirmation confirming Portfolio Swap Transaction terms will govern for purposes of the relevant Transaction.   References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for purposes of the Swap Definitions.

*"Loss"* payment measure and *"Second Method"* payment method shall apply to all Transactions governed by this Master Confirmation.

Set forth below are the terms and conditions which, together with the terms and conditions set forth in each Supplemental Confirmation in respect of each relevant Transaction, shall govern all Transactions which are Equity Swap Transactions (for which the term "other security", as used in Article 1 of the Equity Definitions, shall be deemed to include bonds and other debt securities ("**Bonds**"), options and over-the-counter derivative transactions).

1.      **Transaction Initiation:**

Counterparty may from time to time request (verbally, electronically or otherwise) Deutsche to enter into a Portfolio Swap Transaction, specifying such information as Deutsche may from time to time require.   Deutsche shall promptly notify Counterparty whether Deutsche, in its sole discretion, accepts such request, in part or in whole. The parties specifically agree that time shall be of the essence in resolving any disputed material Transaction terms.   If Counterparty has not, within 1 Local Business Day following Deutsche's Effective Delivery (as defined below) of a Supplemental Confirmation to Counterparty, in good faith objected in writing to Deutsche with respect to any material term in (or purportedly omitted from) the relevant Supplemental Confirmation, Counterparty shall be deemed to have agreed that the terms set forth in such Supplemental Confirmation accurately evidence the terms agreed by the parties.

"**Effective Delivery**" means where the Supplemental Confirmation is (i) delivered in person by courier, the date it is delivered, (ii) sent by facsimile transmission, the date the transmission is sent by Deutsche to the designated Counterparty-specified Contact Name (or other Counterparty responsible party) via the facsimile number provided by Counterparty, as evidenced by a transmission report generated by sender's facsimile machine, or (iii) sent via the Deutsche Bank Global Equities Web-site, the date such information is posted by Deutsche to Counterparty's designated area of such Web-site.

2.      **General Transaction Terms:**

**a. General Terms:**

| | |
|---|---|
| Business Days for Reset Dates and Payment Dates: | Shall mean a day on which commercial banks and foreign exchange markets settle payments in the jurisdictions selected by the Calculation Agent in good faith. |
| Calculation Agent: | Deutsche |

2

Confidential Treatment Requested by King & Spalding     Archegos-CFTC-SEC 002870

| | |
|---|---|
| Commission Payments: | Counterparty shall pay to Deutsche the Commission Amount for the relevant Transaction on the next succeeding Floating or Fixed Amount Payment Date for such Transaction or as otherwise specified in the relevant Supplemental Confirmation. |
| Commission Amount: | If "Notional" is specified in the relevant Supplemental Confirmation, an amount equal to (i) the Notional Amount for such Transaction *multiplied by* (ii) the Commission Rate specified in the relevant Supplemental Confirmation. |
| | If "Unit" is specified in the relevant Supplemental Confirmation, an amount equal to (i) the Number of Shares or Index Units for such Transaction *multiplied by* (ii) the Commission Rate specified in the relevant Supplemental Confirmation. |
| Equity Notional Amount: | With respect to a Share Swap Transaction, the Number of Shares *multiplied by* the Initial Price of the Shares. With respect to an Index Swap Transaction, the Number of Index Units *multiplied by* the Initial Price of the Index. |
| Exchange: | As specified in the relevant Supplemental Confirmation, or none if "Not Applicable" is specified in the relevant Supplemental Confirmation. |
| Exchange Business Day; Scheduled Trading Day: | The Equity Definitions will apply, except that in the case of Unlisted Shares, Exchange Business Day shall mean each day on which Reference Dealers are open for business and Scheduled Trading Day shall mean each day on which Reference Dealers are scheduled to be open for business. |
| Portfolio Position: | As specified in the Supplemental Confirmation, where "Net Short" means the net position of all of the swaps in the relevant Portfolio at the time of the Transaction is net short, and "Net Long" means the net position of all of the swaps in the relevant Portfolio at the time of the Transaction is net long. |
| Reference Dealers: | With respect to Unlisted Shares, one or more market-makers or dealers in the Shares selected by the Calculation Agent; provided, however, that if Calculation Agent does not deem any market-makers or dealers as appropriate, then the Calculation Agent. |
| Related Exchange(s): | If the relevant Share is an Unlisted Share, none; where Futures Price Valuation applies, each of the primary exchanges on which the shares underlying the relevant Exchange-traded Contract are listed; and in all other cases, All Exchanges. |
| Settlement Currency: | As specified in the relevant General Portfolio Terms, it being understood that payments shall be made in the specified Settlement Currency and that the Settlement Currency may differ for different payment types. Where currency conversion |

3

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002871

is appropriate, the Calculation Agent shall perform such conversion in good faith using commercially reasonable procedures.

Shares:

The term "Shares" shall also be deemed to include "Bonds" if bonds are listed in the relevant Supplemental Confirmation, or "Options" if options are listed in the relevant Supplemental Confirmation or "OTC Transactions" if over-the-counter derivative transactions are listed in the relevant Supplemental Confirmation (in which case the transaction terms for a particular OTC Transaction shall be attached to the Supplemental Confirmation).

Termination Date:

The final (or only) Cash Settlement Payment Date, which is expected to be the date specified in the relevant Supplemental Confirmation.

Trade Action Indicator:

As specified in the Supplemental Confirmation, where "New" means the Supplemental Confirmation evidences a new Transaction and "Cancelled" means the Supplemental Confirmation evidences the cancellation of a previously documented Transaction.

Unlisted Shares:

In the case of a Share Swap Transaction, each Share in respect of which "Not Applicable" is specified opposite the caption "Exchange" in the relevant Supplemental Confirmation.

**b. Equity Amount Terms:**

**(i) Price Terms:**

Final Price:

The Equity Definitions will apply, except:

(a) With respect to any primary U.S. Exchange (other than the NASDAQ Stock Market), or any successor exchange thereto, the closing price as quoted by such Exchange as of the Valuation Time on the relevant Valuation Date; or

(b) with respect to the **NASDAQ Stock Market**, or any successor quotation system thereto, the official NASDAQ closing price per Share as of the Valuation Time on the relevant Valuation Date as reported in the official price determination mechanism for the Exchange; or

(c) with respect to any Transaction where the Exchange is specified as "Not Applicable", the price per Share, including accrued interest, if any (in the case of Bonds) as determined by the Calculation Agent, based on the best available firm commitment "bid price", in the case where Deutsche is the Equity Amount Payer, and "offer price", in the case where Counterparty is the Equity Amount Payer, respecting the full Number of Shares, as provided by the Reference Dealers;

4

Confidential Treatment Requested by King & Spalding

(d)　　any other Exchange, then as specified in the Supplemental Confirmation.

The parties acknowledge that under certain circumstances the Final Price may not be available in respect of the full number of Shares, for example, when the relevant Exchange cannot accommodate execution of all orders designated to be executed at the Final Price for such date.  If the Calculation Agent determines that such an event has occurred with respect to a final Valuation Date where the Final Price is based on the Exchange's closing price, the Final Price shall be the weighted average of such Final Price and the Final Price(s) on the next following Exchange Business Day(s), with such weighting being determined by the Calculation Agent based on the portion of an order designated to be executed at the Final Price on the relevant side of the market that was executed on the relevant day for market participants generally.

|  |  |
|---|---|
| Futures Price Valuation: | If the description of the underlying Share or Index specified in the relevant Supplemental Confirmation refers to a "futures contract" or an "Exchange-traded Contract", then notwithstanding any other provision hereof *Futures Price Valuation* shall be "Applicable" and Section 6.8 of the Equity Definitions shall apply to such Transaction (each such transaction shall be referred to as a "Futures Price Valuation Transaction").  Otherwise, *Futures Price Valuation* shall be "Not Applicable". |

For purposes of this Master Confirmation, each reference in Section 6.8 of the Equity Definitions to an "Index" shall be deemed to refer to a "Share or Index" and each reference to an "Index Transaction" shall be deemed to refer to an "Share Transaction or Index Transaction".  Section 6.8(b)(i)(B) is amended by inserting "or expiration" after "delivery."  Section 6.8(d) of the Equity Definitions is amended by inserting ", 11.2 or Article XII, as applicable" after "11.1" therein and by inserting "or relevant clearing house" after "Exchange" therein. For purposes of Section 6.8(e) only, the Exchange shall be the principal relevant exchange for the relevant Index as determined by the Calculation Agent and the reference to "level of the relevant Index" shall be replaced by "the amount determined by the Calculation Agent by reference to the level of the relevant Index or price of the relevant Shares".  Section 6.8(f) is amended by inserting "or relevant clearing house" after "relevant exchange" therein.

|  |  |
|---|---|
| Valuation Date: | As specified in the Supplemental Confirmation. |
| Valuation Time: | The Equity Definitions will apply, except if the Exchange specified for the relevant Share or Index is: |

(a)　　any primary U.S. Exchange (other than the NASDAQ Stock Market), or any successor exchange thereto, then the

5

Confidential Treatment Requested by King & Spalding　　　　　Archegos-CFTC-SEC 002873

Valuation Time shall mean the Scheduled Closing Time on such Exchange;

(b)     **NASDAQ Stock Market,** or any successor quotation system thereto, then the Valuation Time shall mean 4:00 p.m. (local time) in New York;

(c)     **Not Applicable,** then the Valuation Time shall mean 4:00 p.m. (local time) in the jurisdiction selected by the Calculation Agent in good faith, unless the Shares underlying the Transaction are an OTC Transaction, in which case Valuation Time shall mean the time specified in the transaction terms for such OTC Transaction;

(d)     any other Exchange, then as specified in the Supplemental Confirmation.

**(ii) Ordinary Dividend Terms:**

Subject to the "Dividend Disruption Event" provisions below, the Equity Amount Payer shall pay the relevant Dividend Amount on each Dividend Payment Date pursuant to the following provisions.   The following provisions shall not apply to Futures Price Valuation Transactions, Extraordinary Dividends or OTC Transactions.   As used in the Definitions, "gross cash dividends" shall include, without limitation, in the case of Bonds, all interest payable by the Issuer of the Bond. "**Dividend Receipt Date**" means the date of receipt of a dividend by holders of record.   "**Record Date**" means each relevant date of determination of holder of record status.

**In the case of a Share Swap Transaction where the Record Date for the Shares is after the ex-dividend date (i.e. in a jurisdiction where stock ownership is determined as of settlement date) for such Shares, the following provisions shall apply:**

Dividend Amount:

The Dividend Percentage (as specified in the Supplemental Confirmation) *multiplied by* the Record Amount *multiplied by* Number of Shares.

Dividend Period:

The period commencing on and including the Clearance System Business Day that is one Settlement Cycle following the Trade Date and ending on but excluding the final Cash Settlement Payment Date.

**In the case of a Share Swap Transaction where the Record Date for the Shares is prior to the ex-dividend date (i.e. in a jurisdiction where stock ownership is determined as of trade date rather than settlement date) for such Shares, the following provisions shall apply:**

Dividend Amount:

The Dividend Percentage (as specified in the Supplemental Confirmation) *multiplied by* the Record Amount *multiplied by* Number of Shares.

6

PC Docs 107595

| | |
|---|---|
| Dividend Period: | The period commencing on and including the Trade Date and ending on but excluding the final Valuation Date. |

**In the case of an Index Swap Transaction where the type of return is Total Return, the following provisions shall apply:**

| | |
|---|---|
| Dividend Amount: | In relation to the relevant Index specified in the relevant Supplemental Confirmation, the Number of Index Units *multiplied by* the sum of the amounts calculated on a given day during the Dividend Period for each share underlying the Index (weighted by the number of shares of the relevant issuer in an Index Unit) as follows: the product of (i) the relevant Dividend Percentage (as specified in the relevant Supplemental Confirmation for each jurisdiction where an issuer whose shares are included in the Index is incorporated) and (ii) the Ex Amount. |
| Dividend Period: | The period commencing on but excluding the Trade Date and ending on and including the final Valuation Date. |
| Interest on Dividend Amount: | If (i) Pay on Reset Date or Pay on Termination Date is specified as the Dividend Payment Date and (ii) Interest on Dividend Amount is specified as "Applicable" in the General Portfolio Terms, the Dividend Amount shall accrue interest during the period from and including the Dividend Receipt Date to but excluding the date on which such amount is payable (calculated using the applicable Day Count Fraction) at the applicable Fixed or Floating Rate. |
| Settlement Currency of Dividend Amount: | Dividend Amounts shall be paid in the payment currency of the dividends received by Deutsche, except as otherwise agreed by the parties. |
| Dividend Payment Date: | For Dividend Amounts for which a Dividend Receipt Date takes place during the Dividend Period, as specified in the General Portfolio Terms, where (i) "**Pay on Reset Date**" means the first Reset Date occurring on or after the Dividend Receipt Date; *provided* that if there are no outstanding Portfolio Swap Transactions in the related Portfolio or no other Reset Dates, then the Termination Date, (ii) "**Pay on Termination Date**" means the Termination Date, and (iii) "**Pay on Dividend Receipt Date**" means on the Dividend Receipt Date (or if such day is not a Currency Business Day, the Currency Business Day immediately following such date). |
| | For Dividend Amounts for which a Dividend Receipt Date is scheduled to take place after the Dividend Period, then the relevant Dividend Amount will be payable on the Dividend Receipt Date (or if such day is not a Currency Business Day, the Currency Business Day immediately following such date). |
| Re-investment of Dividends: | Inapplicable |

7

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002875

Share Dividend Elections:

In the event that an actual dividend is payable in either cash or property or a combination thereof at the election of a person who would be a holder of record of such Shares and Deutsche is the Equity Amount Payer, the Dividend Amount shall be determined as if no election were made pursuant to the election default provision as set forth in the documents relating to the payment of dividends on the Shares. If Counterparty is the Equity Amount Payer, the Dividend Amount shall be determined by the Calculation Agent with respect to the Shares. The Calculation Agent shall notify the Counterparty of such determination at least 3 Scheduled Trading Days prior to the last date the election may be made.

### c. Floating Amount Terms:

Floating Rate for the initial Calculation Period:

As specified in the General Portfolio Terms, where (i) **"Historic Rate"** means the Floating Rate as of the most recent Reset Date, (ii) **"New Rate"** means the Floating Rate (without Linear Interpolation) as of the Effective Date, and (iii) **"Daily Rate"** means the Overnight Rate (as specified in the General Portfolio Terms) reset each day during the initial Calculation Period (non-compounded).

### d. Settlement Terms for Share Swap Transactions:

Cash Settlement:          Applicable

### e. Optional Early Termination of Portfolio Swap Transactions:

Optional Early Termination of Portfolio Swap Transactions:

Notwithstanding any other termination provision contained in this Master Confirmation or the Agreement and so long as no Termination Event or Event of Default (as such terms are defined in the Agreement) shall have occurred and then be continuing with respect to the party making the election hereunder, either party may upon three (3) Scheduled Trading Days' prior notice to the other party terminate a Transaction in a Portfolio prior to the relevant Termination Date by designating an earlier Scheduled Trading Day as the **"Optional Early Termination Valuation Date"**, subject to the following: (1) the relevant Optional Early Termination Valuation Date shall be deemed to be the final Valuation Date (subject to Disrupted Day provisions, if applicable), (2) the Optional Early Termination Payment Date (as defined below) shall be deemed to be the final Cash Settlement Payment Date and Floating Amount or Fixed Amount Payment Date, as applicable, (3) the Final Price for the relevant Share or Index shall be based on an objective measure (either the current market price for the applicable number of shares or the closing price) as agreed by the parties (except (i) if the parties are unable to agree or (ii) the shares underlying the Transaction are Unlisted Shares, an objective measure determined by the Calculation Agent), with the Final Price determined by the

8

Confidential Treatment Requested by King & Spalding

Calculation Agent, (4) if Deutsche is unable, after using commercially reasonable efforts, to acquire, establish, re-establish, substitute, maintain, unwind or dispose of any transactions or assets it deems necessary to effect such early termination or realize, recover or remit the proceeds of any such transactions or assets ("Termination Adjustments"), it may, in whole or in part, move the Optional Early Termination Valuation Date forward to the nearest dates as it is able to make such Termination Adjustments, and (5) Counterparty shall be deemed to represent that its election to terminate early will not directly or indirectly result in a violation or breach of any law or other obligation applicable to Counterparty or involve Deutsche in any such violation or breach.

**Method of Determining**
**Optional Early Termination Transactions:**

Unless the parties otherwise agree, if the Share or Index that is covered by an Optional Early Termination is the subject of more than one outstanding Portfolio Swap Transaction in the relevant Portfolio, the relevant Portfolio Swap Transactions shall be terminated (in whole or in part) on one of the following bases.

If "**FIFO**" is specified in the relevant General Portfolio Terms, the relevant Portfolio Swap Transactions shall be terminated on a first-in, first-out basis, determined based on the Trade Date for such Portfolio Swap Transactions.

If "**Weighted Average**" is specified in the relevant General Portfolio Terms, the relevant Portfolio Swap Transactions shall be terminated on a *pro rata* basis, with each Portfolio Swap Transaction weighted according to the outstanding Number of Shares or Index Units underlying such Portfolio Swap Transaction.

**Optional Early Termination Payment**
**Date:**

As specified in the General Portfolio Terms, where (i) "**Pay When Realised**" means the date that is one Settlement Cycle following the Optional Early Termination Valuation Date, or if such date is not a Currency Business Day, the following Currency Business Day (the "**Realised Payment Date**"), and (ii) "**Pay on Reset Date**" means the first Reset Date occurring on or after the Realised Payment Date, or, if there are no more Reset Dates, the Termination Date; *provided* that if there are no outstanding Portfolio Swap Transactions in the Portfolio, then the Realised Payment Date.

**Optional Early Termination Amount:**

The net of the Equity Amount and the Floating Amount (or Fixed Amount, if applicable), plus interest, if applicable, as calculated below.

If the Optional Early Termination Payment Date is the Reset Date or the Termination Date, the Optional Early Termination Amount shall accrue interest (calculated using the applicable Day Count Fraction) during the period from and including the

9

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 002877

Realised Payment Date to but excluding the Reset Date (or if there are no more Reset Dates, the Termination Date) or at one of the following rates: (i) if a Fixed Rate is applicable to the Transaction, the Fixed Rate and (ii) if a Floating Rate is applicable to the Transaction, the then applicable Floating Rate *plus* the Optional Early Termination Spread (as specified in the General Portfolio Terms).

In addition, the Optional Early Termination Amount shall be adjusted (up or down) by funding breakage costs, as determined by Deutsche in a commercially reasonable manner.

Additional Tender Offer Terms:

Deutsche and Counterparty each acknowledges that, if during the term of a Transaction, (i) the relevant Shares are, or become, the subject of a Tender Offer and (ii) either party hereto owns a hedge with respect to such Shares and elects to participate in such Tender Offer, then, notwithstanding anything set forth to the contrary herein or in the Equity Definitions, such Transaction may not be optionally terminated early during the period from and including the Tender Offer Expiration Date (as defined below) up to but excluding the Tender Offer Date. For the purpose hereof, the following term shall have the meaning indicated below:

"**Tender Offer Expiration Date**" shall mean the last business day on which a theoretical holder of the Shares may elect to tender its Shares pursuant to such Tender Offer, as provided in the documents related to such Tender Offer (subject to any extensions as provided pursuant to the documents related to such Tender Offer).

**f.   Netting:**

Without limiting any other netting provided for elsewhere in the Agreement or otherwise, Deutsche and Counterparty agree that all payments in respect of all Portfolio Swap Transactions in a particular Portfolio will be netted.

**g.   Adjustments and Extraordinary Events:**

**(i) The following "Adjustments" and "Extraordinary Events" provisions shall apply only to Share Swap Transactions:**

Method of Adjustment:

Calculation Agent Adjustment.

Section 11.2(c) of the Equity Definitions is amended in the last sentence thereof by replacing "options exchange" with "option or futures exchange" and "options" with "options or futures" each time such terms appear therein.

**Extraordinary Events:**

10

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002878

Consequences of Merger Events:

|  |  |
|---|---|
| (a) Share-for-Share: | Modified Calculation Agent Adjustment |
| (b) Share-for-Other: | Modified Calculation Agent Adjustment |
| (c) Share-for-Combined: | Modified Calculation Agent Adjustment] |
| Determining Party: | Deutsche |
| Tender Offer: | Applicable |

Consequences of Tender Offers:

|  |  |
|---|---|
| (a) Share-for-Share: | Modified Calculation Agent Adjustment. |
| (b) Share-for-Other: | Modified Calculation Agent Adjustment. |
| (c) Share-for-Combined: | Modified Calculation Agent Adjustment. |
| Determining Party: | Deutsche |
| Composition of Combined Consideration: | Inapplicable (for both Merger Events and Tender Offers) |

Bonds and OTC Transactions:

Where the shares underlying a Share Swap Transaction are either Bonds or an OTC Transaction, the Calculation Agent shall have the right to terminate or make necessary adjustments to the Share Swap Transaction upon the occurrence of a Dividend Amount being paid on the Bonds or Shares underlying the OTC Transaction or any event affecting the Bonds or shares underlying the OTC Transaction which is analogous to a Potential Adjustment Event, Merger Event, Tender Offer, Nationalization, Insolvency, Delisting, Additional Disruption Event (each as defined in the transaction terms for such OTC Transaction, or if none are provided, as defined herein) or other similar event.

Nationalisation, Insolvency or Delisting:

Cancellation and Payment. In the case of a Futures Price Valuation Transaction, Delisting shall not apply except if Section 6.8(e) of the Equity Definitions applies and a Delisting occurs with respect to the Exchange for purposes of such provision.

Determining Party:

Deutsche

Section 12.2(e) and 12.3(d) of the Equity Definitions are amended by replacing "options exchange" with "options or futures exchange" and "options" with "options or futures" each time such terms appear therein.

11

PC Docs 107595

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 002879

**(ii) The following "Adjustments" and "Extraordinary Events" provisions shall apply only to Index Transactions:**

**Index Adjustment Events:**

| | |
|---|---|
| Index Modification: | Calculation Agent Adjustment |
| Index Cancellation: | Calculation Agent Adjustment |
| Index Disruption: | Calculation Agent Adjustment |

**(iii) The following "Adjustments" and "Extraordinary Events" provisions shall apply to all Portfolio Swap Transactions:**

Extraordinary Dividend: As determined by the Calculation Agent, (x) any cash dividend or distribution declared on the relevant shares at a time when the issuer has not previously declared or paid dividends or distributions on such shares for the prior four quarterly periods; or (y) any increase in the dividends or distributions paid on the relevant shares; or (z) any other "special" cash or non-cash dividend on, or distribution with respect to, the relevant shares which is, by its terms or declared intent, declared and paid outside the normal operations or normal dividend procedures of the relevant issuer; *provided* that, with respect to Share Swap Transactions, the related Record Date occurs during the Dividend Period, and with respect to Index Swap Transactions where the type of return is Total Return, the dates shares underlying the Index have begun trading ex-dividend occur during the Dividend Period. An Extraordinary Dividend with respect to Index Share Transactions where the type of return is Total Return shall constitute an Index Modification.

**(iv) The following "Additional Disruption Events" provisions shall apply to all Portfolio Swap Transactions:**

**Additional Disruption Events:**

Change in Law: Applicable, except that (1) the parenthetical in section (A) shall be replaced by "(not including any tax law)", (2) "not" shall be inserted at the beginning of the parentheticals in section (B) and subsection (Y) and (3) "without limitation" shall be removed from the parenthetical in subsection (Y).

Dividend Disruption Event: In the event that the Calculation Agent reasonably determines that there has been any Change in Tax Law (as defined in the Agreement) which would have the effect of reducing or increasing the amount of either the cash receivable or tax credit attributable to the Dividend Amount that would be paid by an issuer to a holder of the relevant shares that had either (i) a tax residence in the UK, Germany, or in the jurisdiction of any Lender (where the relevant Transaction is entered into by Deutsche through its office located in the UK); or (ii) a taxable presence in the U.S. or a tax residence in Germany or

12

PC Docs 107595

                    Archegos-CFTC-SEC 002880

in the jurisdiction of any Lender (where the relevant Transaction is entered into by Deutsche through an affiliate as its agent in the U.S.) (a "**Dividend Disruption Event**"), the Calculation Agent may adjust the Dividend Amount with immediate effect by notice in writing to the parties, or, in the event that any such change is expressed to take effect prior to the date upon which Calculation Agent gives such notice, the Calculation Agent may make such adjustments to the payment obligations of the parties in respect of the relevant Transaction, as it deems appropriate. In the event that the relevant Transaction shall have been previously closed (including by reason of a Change in Law Additional Disruption Event), but the amount of any payment previously made or subsequently to be made thereunder is affected by such Change in Tax Law, the relevant party shall indemnify the other in respect of any such change on a full indemnity basis. "**Lender**" means any third party entity resident for tax purposes in the jurisdiction of the issuer of the relevant shares who may be engaged in securities lending transactions with Deutsche in connection with the Transaction involving securities identical or equivalent to (or involving securities of the same issuer in respect of) the relevant shares.

|  |  |
|---|---|
| Insolvency Filing: | Applicable with respect to Share Swap Transactions, Inapplicable with respect to Index Swap Transactions |
| Hedging Disruption: | Applicable |
| Hedging Party: | Deutsche |
| Increased Cost of Hedging: | Applicable |
| Hedging Party: | Deutsche |
| Increased Cost of Stock Borrow: | Applicable, provided, however, that the Hedging Party will make a Price Adjustment without prior notice to the Non-Hedging Party and neither party shall be entitled to terminate the Transaction. For the avoidance of doubt, "Initial Stock Loan Rate" shall be determined by the Calculation Agent and refers to the basis point fee used by stock lenders for the specific Shares underlying the Transaction and does not include the prevailing interest rate. |
| Hedging Party: | Deutsche |
| Determining Party: | Deutsche |

h.   ***Additional Termination Events.*** The occurrence of any of the following events shall constitute an Additional Termination Event:

(i)   Any representation or warranty made or deemed made by the Agent in the Side Letter to Deutsche proves false or misleading in any material respect when made or deemed made or, if the Agent

13

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 002881

fails to comply with or perform any agreement or obligation to be complied with or performed under the Side Letter.

For the purpose of the foregoing Additional Termination Events, the Fund shall be deemed to be the Affected Party and Deutsche shall not be an Affected Party.

**i.     Miscellaneous:**

| | |
|---|---|
| Index Disclaimer: | Applicable |
| Method of Delivery: | Whenever delivery of funds or other assets is required hereunder by or to Counterparty, such delivery shall be effected through DBSI.  In addition, all notices, demands and communications of any kind relating to this Transaction between Deutsche and Counterparty shall be transmitted exclusively through DBSI. |
| Swap Agreement: | Without limiting any other protections under the United States Bankruptcy Code (the "**Bankruptcy Code**"), the parties hereto intend as follows:  (A) each Transaction is a swap agreement, as such term is defined in Section 101(53B) of the Bankruptcy Code, qualifying for protection under Section 560 of the Bankruptcy Code; a swap agreement, as such term is defined in Section 206A of the United States Gramm-Leach-Bliley Act; and a "qualified financial contract" under New York General Obligations Law Section 5-701; (B) any cash, securities or other property provided as performance assurance, credit support or collateral with respect to any Transaction constitute "transfers" as defined in Section 101(54) of the Bankruptcy Code under a "swap agreement;" and (C) all payments for, under or in connection with any Transaction constitute "transfers" as defined in Section 101(54) of the Bankruptcy Code under a "swap agreement." |

**3.     Credit Support Provisions:**

In respect of any Transaction governed by this Master Confirmation and, with respect to Counterparty solely, "**Independent Amount**" shall mean, as of any date, the amount equal to the product of (a) the relevant Independent Amount percentage, if any, as specified in the relevant Supplemental Confirmation and (b) the Equity Notional Amount or Equity Value, as specified in the relevant Supplemental Confirmation, from time to time thereunder; provided, however, that if the related Supplemental Confirmation specifies "**Rules**" as the relevant Independent Amount percentage, then Independent Amount shall mean the amount required in accordance with the Rules of the Road Margin Requirements (which have been separately provided to Counterparty).  "**Equity Value**" means, as determined by the Calculation Agent, (i) with respect to a Share Swap Transaction, the Number of Shares multiplied by the then fair market value of the Shares, and (ii) with respect to an Index Swap Transaction, the Number of Index Units multiplied by the then current level of the Index.  To the extent Counterparty has entered into a Master Netting Agreement with Deutsche and there is a conflict on the definition of Independent Amount, the Master Netting Agreement shall govern.

**4.     Certain Representations, Warranties and Agreements:**

**a.     ISDA Elections**

Non-Reliance:                                        Applicable

14

Confidential Treatment Requested by King & Spalding                                        Archegos-CFTC-SEC 002882

Agreements and Acknowledgments
Regarding Hedging Activities:     Applicable

Additional Acknowledgments:     Applicable

**b. Mutual Representations and Agreements.** Each of Deutsche and Counterparty represents and warrants to and agrees with the other party (which representations, warranties and agreements shall be deemed to be repeated by each party on each date on which the parties enter into a Transaction) that:

(i) the purpose of each Transaction is to gain exposure synthetically to fluctuations in the price of Shares or Indexes and by so doing to attain a profit or avoid a loss;

(ii) neither party acquires any interest (beneficial or otherwise) in or right to acquire any Share or Index by virtue of any Transaction;

(iii) neither party is obliged to sell, purchase, hold, deliver or receive any Share or Index, nor does either party acquire a security interest in any Share, by virtue of any Transaction;

(iv) neither party acquires any voting rights, or other consent or similar rights, with respect to any Share or Index by virtue of any Transaction;

(v) the primary right and obligation of each party under any Transaction is to make or receive the respective payments referred to in the relevant Supplemental Confirmation; and

(vi) notwithstanding anything provided herein or in the Agreement, and notwithstanding any express or implied claims of exclusivity or proprietary rights, the parties (and each of their employees, representatives or other agents) are authorized to disclose to any and all persons, beginning immediately upon commencement of their discussions and without limitation of any kind, the tax treatment and tax structure of any Transaction, and all materials of any kind (including opinions or other tax analyses) that are provided by either party to the other relating to such tax treatment and tax structure.

(vii) **Commodity Exchange Act**. It is an "eligible contract participant" within the meaning of Section 1a(12) of the U.S. Commodity Exchange Act, as amended (the "**CEA**"), each Transaction has been subject to individual negotiation by the parties, and no Transaction has been executed or traded on a "trading facility" as defined in Section 1a(33) of the CEA. It has entered into such Transaction with the expectation and intent that such Transaction shall be performed to its termination date. Each Transaction hereunder that is designated a Swap Transaction or Equity Swap Transaction constitutes a "swap agreement" as defined in Section 206A of the Gramm-Leach-Bliley Act, as amended (the "**GLB Act**").

(viii) **Securities Act**. It is a "qualified institutional buyer" as defined in Rule 144A under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), or an "accredited investor" as defined under the Securities Act.

(ix) **Investment Company Act**. It is a "qualified purchaser" as defined under the Investment Company Act of 1940.

(x) **ERISA**. It is not subject to the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") and the assets used in each Transaction (1) are not assets of any "plan" (as such term is defined in Section 4975 of the Internal Revenue Code (the "**Code**")) subject to Section 4975 of the Code or any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) subject to Title I of ERISA, and (2) do not constitute "plan assets" within the meaning of Department of Labor Regulation 2510.3-101, 29 CFR Sec. 2510-3-101.

PC Docs 107595

Confidential Treatment Requested by King & Spalding        Archegos-CFTC-SEC 002883

c.     **Counterparty Representations, Acknowledgements and Agreements.**     Counterparty represents, warrants, acknowledges and agrees with Deutsche (which representations, warranties, acknowledgements and agreements shall be deemed to be repeated by Counterparty on each date on which the parties enter into a Transaction) that:

(i)      Counterparty is not in possession of any material non-public information regarding any issuer of shares underlying a Transaction. Counterparty will not seek to terminate, amend or otherwise modify a Transaction if Counterparty is in possession of any material non-public information regarding the relevant issuer.

(ii)     Counterparty is not an "affiliate" or "insider" of any relevant issuer of shares underlying a Transaction within the meaning of any securities law applicable to such issuer, and will not attain such status during the term of the relevant Transaction.

(iii)    Counterparty has (and will at all times during the Transaction have) the capacity and authority to invest directly in the shares underlying each Transaction, and has not entered into any Transaction with the intent of avoiding any regulatory filings.

(iv)     Counterparty  (please check the appropriate box below):

☐ (a) is a "U.S. institutional investor" (as defined below);
☒ (b) is a "major U.S. institutional investor" (as defined below);
☐ (c) is a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "1933 Act");
☐ (d) has granted a power-of-attorney with full power and authority on a discretionary basis to enter into Transactions hereunder on its behalf to an adviser that is a "U.S. institutional investor;"
☐ (e) has granted a power-of-attorney with full power and authority on a discretionary basis to enter into Transactions hereunder on its behalf to an adviser that is a "major U.S. institutional investor;" or
☐ (f) has granted a power-of-attorney with full power and authority on a discretionary basis to enter into Transactions hereunder on its behalf to an adviser that owns, controls or has under management on a gross basis in excess of $100 million in "aggregate financial assets" (as defined below).

As used herein,
(A) "U.S. institutional investor" shall mean (1) an investment company registered with the United States Securities and Exchange Commission (the "SEC") under Section 8 of the United States Investment Company Act of 1940, as amended (the "1940 Act"); (2) a bank, savings and loan association, insurance company, business development company, small business investment company, or employee benefit plan defined in Regulation D under the 1933 Act ("Reg. D"); (3) a private business development company defined in Reg. D; (4) an organization described in Section 501(c)3 of the United States Internal Revenue Code, as defined in Reg. D; or (5) a trust defined in Reg. D;

(B) a "major U.S. institutional investor shall mean (1) a U.S. institutional investor that has, or has under management, total assets in excess of $100 million; provided that for purposes of determining the total assets of an investment company, the investment company may include the assets of any family of investment companies of which it is a part or (2) an investment adviser registered with the SEC under Section 203 of the Investment Advisers Act of 1940 that has total assets under management in excess of $100 million; and

(C) "Aggregate financial assets" shall include cash, money-market instruments, securities of unaffiliated issuers, futures, options on futures and other derivative instruments.

(v)      Counterparty is not entering into a Transaction to hedge securities that are subject to resale restrictions under Rule 144 or Rule 145 under the Securities Act or otherwise.

16

PC Docs 107595

(vi)     Counterparty, if it is a non-resident alien individual, foreign corporation, foreign partnership, foreign trust, or foreign estate, by entering into this Transaction represents that it is a foreign person for purposes of Treasury regulation Section 1.6041-4(a)(4).

**d.     Fund and Agent's Representations, Acknowledgements and Agreements.** Fund and Agent each individually represents, warrants, acknowledges and agrees with Deutsche (which representations, warranties, acknowledgements and agreements shall be deemed to be repeated by Fund and Agent on each date on which the parties enter into a Transaction) that:

**5.   Assignment**

Deutsche may assign all of its right and obligations under any Transaction to any of its affiliates if such affiliate has a long-term credit rating equal to or higher than Deutsche as rated by either Moody's or Standard & Poor's.   Any such assignment shall be fully effective upon notice to Counterparty, and Deutsche shall be released from its obligations hereunder.

**6.   Account Details**:

| | |
|---|---|
| Settlement Currency Account Details for **Deutsche**: | *As set forth in the wire transfer notice provided by Deutsche to Counterparty* |
| Settlement Currency Account Details for **Counterparty**: | *As set forth in the wire transfer notice provided by Counterparty to Deutsche* |

**7.      Contact Names for Deutsche**:                    **Contact Names for Counterparty**:

| | | |
|---|---|---|
| Confirmations: | Vernon Catterton | Confirmations: |
| Telephone: | (212) 250-2291 | Telephone: |
| Fax No.: | (212) 797-8874 | Fax No.: |

Domestic Swaps:

| | | |
|---|---|---|
| Payments/Fixings: | Scott Richter | Payments/Fixings: |
| Telephone: | (212) 250-4482 | Telephone: |
| Fax No.: | (212) 797-9377 | Fax No.: |

International Swaps:

| | | |
|---|---|---|
| Payments/Fixings: | Chris Nixon | Payments/Fixings: |
| Telephone: | 44 207 547 6602 | Telephone: |
| Fax No.: | 44 207 545 4923 | Fax No.: |

Each Party has agreed to make payments to the other in accordance with the terms set forth in the Supplemental Confirmation for the relevant Transaction.

Please confirm that the foregoing correctly sets forth the terms of our agreement by promptly executing the copy of this Master Confirmation enclosed for that purpose and returning it to the attention of the contact person named above for Confirmations.

The time of execution of any Transaction under a Supplemental Confirmation will be made available by Deutsche upon written request.

17

PC Docs 107595

Confidential Treatment Requested by King & Spalding                                          Archegos-CFTC-SEC 002885

Deutsche is regulated by the Financial Services Authority.

Agreed and accepted by the parties as of the date of this Master Confirmation.

Regards,

**DEUTSCHE BANK AG LONDON**

By: _____
Name:
Title:

By: _____
Name:
Title:


**DEUTSCHE BANK SECURITIES INC.**
acting solely as Agent in connection with this
Master Confirmation and the Transactions governed hereby

By: _____
Name:
Title:

By: _____
Name:
Title:


Confirmed and Acknowledged as of the date first above written:

**TIGER ASIA FUND, L.P.**

By: _____
Name: Sung Kook Hwang
Title: Managing member of the
General partner

18

Confidential Treatment Requested by King & Spalding

**Annex B**

# TIGER ASIA MANAGEMENT, LLC.

101 Park Avenue,  New York, NY 10178 (212) 984-2500

Deutsche Bank AG London
c/o Deutsche Bank Securities Inc.
60 Wall Street
New York, NY 10005

**Re:**   **Master Confirmation for Equity Swap Transactions between Deutsche Bank AG (collectively with its Affiliates, "Deutsche") and TIGER ASIA FUND, L.P. ("Counterparty") dated as of  December 5, 2003  (the "Agreement")**

We refer to the above Agreement.

Terms defined herein shall bear the same meaning as those in the Agreement.

TIGER ASIA MANAGEMENT, LLC., in its capacity as investment manager (the "[Investment Manager]") to Counterparty hereby represents to or, as the case may be, covenants and agrees with Deutsche as follows:

1.      It will be deemed to repeat to Deutsche on and as of the date hereof and on each date on which a Transaction is entered into and regardless of whether such Transaction or any portion thereof has been finally allocated to Counterparty that:

(a)     *Non-Reliance.*  It is acting for and on behalf of Counterparty and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for Counterparty based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of Deutsche as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered to be investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from Deutsche shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(b)     *Assessment and Understanding.*  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of that

Chairman of the Supervisory Board: Rolf-E Breuer
Board of Managing Directors: Clemens Borsig, Hermann-Josef Lamberti,
Josef Ackermann, Tessen von Heydebreck

Deutsche Bank AG is regulated by the FSA for the conduct of designated investment business in the UK, is a member of the London Stock Exchange and is a limited liability company incorporated in the Federal Republic of Germany HRB No. 30 000 District Court of Frankfurt am Main; Branch Registration No. in England and Wales BR000005, Registered address: Winchester House, 1 Great Winchester Street, London EC2N 2DB.

Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)    *Status of Parties.*  Deutsche is not acting as a fiduciary for or adviser to it in respect of that Transaction.

(d)    *Absence of Litigation.*  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Letter or its ability to perform its obligations as [Investment Manager/Investment Adviser] to Counterparty.

2.    It is an investment adviser registered under the Investment Advisers Act of 1940, as amended, and all similar state laws under which it is required to be registered or is exempt from any such registration, and it maintains the records required by, and complies in all other material respects with, all such laws;

3.    It is a "commodity trading adviser" or a "commodity pool operator" registered under the Commodity Exchange Act, as amended, and all similar state laws under which it is required to be registered or is exempt from any such registration, and it maintains the records required by, and complies in all other material respects with, all such laws;

4.    Pursuant to the Investment Management Agreement, Counterparty authorised it to take all action with respect to Transactions on behalf of Counterparty, including, without limitation, opening accounts with Deutsche on behalf of Counterparty; it has examined all applicable trust instruments, corporate charters, by-laws or authorisations, partnership agreements, trust indentures or other authorising documentation of Counterparty and is satisfied that the person or persons signing the Investment Management Agreement were themselves properly authorised by Counterparty.

5.    (i) it is entering into each Transaction on behalf of Counterparty as investment advisor; (ii) the persons executing this Letter on its behalf have been authorised to do so; (iii) it has the power and the authority to execute and deliver this Letter as investment advisor for Counterparty and to bind Counterparty and to act on its behalf in all matters related to this Letter and the Agreement; and (iv) this Letter is binding upon it and enforceable against it in accordance with its terms and does not and will not violate the terms of any agreement by which it is bound;

6.    It agrees not to take any action during the term of the Agreement or any Transaction thereunder that renders or could render any of the representations and warranties in this Letter or the Agreement (whether given by it or Counterparty) untrue, incorrect, or incomplete, and if any event or condition occurs that renders or could render any such representation untrue, incorrect, or incomplete, it will immediately give written notice thereof to Deutsche;

Confidential Treatment Requested by King & Spalding

7.   It will enter into a Transaction only where the assets in the accounts of Counterparty under its control are sufficient to meet the obligations resulting from such Transaction;

8.   It agrees to indemnify Deutsche to the fullest extent permitted by law from and against any loss, liability, cost, claim, action, demand or expense (including, without limitation, the costs, expenses and disbursements of legal counsel), whether direct, indirect, incidental or consequential, resulting from, arising out of or relating to (i) any claim by Counterparty that any Transaction entered into by [name/the Agent] on Counterparty's behalf was not suitable, (ii) any claim by Counterparty that any Transaction entered into by [name/the Agent] on Counterparty's behalf was without authority and (iii) any breach by [name/the Agent] of any representation, warranty, covenant or agreement contained herein.

This letter shall be governed by and construed in accordance with the laws of New York.

Yours faithfully,

Tiger Asia Management LLC
Sung Kook Hwang
Managing Member