# Exhibit  27

 UBS

# Portfolio Swap Master Confirmation

This Master Confirmation is dated as of February 4, 2020 and is subject to the ISDA Master Agreement between UBS AG (**UBS**) and the Counterparty named below dated as of February 4, 2020 as amended and supplemented from time to time (the **Master Agreement**).

| | |
|---|---|
| *Counterparty* | ARCHEGOS FUND, LP |
| *Address* | c/o Archegos Capital Management, LP |
| | 888 Seventh Avenue, 38th Floor |
| | New York, NY 10019 |
| | |
| *Phone* | 212.271.2012 |
| | |
| *Attention* | Scott V. Becker |

*Execution*

Signed for and on behalf of UBS by:

| | | | |
|---|---|---|---|
| Signature | | Signature | |
| Name | Abigail Clark | Name | Esther Geller |
| Date | Director | Date | Director |
| | 02.11.2020 | | |

Signed for and on behalf of Counterparty by:

| | | | |
|---|---|---|---|
| Signature | | Signature | |
| Name | Sung Kook Hwang | Name | |
| Date | Feb. 5. 2020 | Date | |

SK 99999 1070 8446605 v1

**INTRODUCTION**

**1    DEFINITIONS AND INTERPRETATION**

1.1    **Incorporation by Reference**: This Master Confirmation constitutes a Confirmation under the Master Agreement and incorporates by reference:

(a)    the 2002 ISDA Equity Derivatives Definitions (as supplemented by the 2007 Full Lookthrough Depository Receipt Supplement) (**Equity Definitions**); and

(b)    the 2006 ISDA Definitions (together with the Equity Definitions, the **Definitions**).

1.2    **Sections**: References to "Sections" are to sections in the Equity Definitions.

1.3    **Capitalised Terms**: Capitalised terms not otherwise defined herein are defined in the Definitions.

**2    COVERED TRANSACTIONS**

2.1    **Covered Transactions**: Unless agreed otherwise at the time of trading each Equity Swap Transaction, Index Swap Transaction and Basket Swap Transaction entered into between Counterparty and UBS on or after the date of this Master Confirmation will be a **Covered Transaction** subject to this Master Confirmation.

2.2    **Separate Transactions**: Each Covered Transaction is a separate Transaction for the purposes of the Master Agreement.

**3    AMENDMENTS**

3.1    Without limiting either party's termination and partial termination rights under any Covered Transaction the parties may agree at any time to change the terms of any Covered Transaction, including changing which party is the Equity Amount Payer (as defined in the Equity Derivatives Definitions) and which is the Floating Amount Payer (as defined in the ISDA Definitions).

3.2    Where the parties agree to do so, such amendments will be confirmed in the Activity Report by an entry in respect of the relevant Covered Transaction in which "**Resize**" will be specified as the "**Event Type**".

**4    CONFIRMATION PROCESS**

4.1    **Reports**: We will prepare and send to you the following **Reports** which will be part of and subject to this Master Confirmation:

(a)    **Activity Report**: a daily swap synthetic transaction activity report for all Covered Transactions;

(b)    **Swap Supplement**: a daily swap economics confirmation;

(c)    **Basket Swap Notifications**: in the case of any Basket Swap Transaction, the Basket Swap Notification described in the "Basket Swap" section of this Master Confirmation.

4.2    **Transmission of Reports**: We will send relevant Reports to you electronically within 1 Local Business Day of the relevant Trade Date, Termination Date or amendment date.

(a)    **Discrepancies**: It is your responsibility to review each Report and notify us of any discrepancy.

(b)    **No Signatures**: Signatures are not required from either party.

(c)    **Deemed Consent**: Unless you have notified us of an objection, you will be deemed to have accepted the terms set out in each Report on the earlier of (i) 3 Local Business Days following receipt and (ii) such shorter period as may be required by Applicable Law.

Confidential Treatment Requested by King & Spalding                      Archegos-CFTC-SEC 003517

5   **CALCULATION AGENT**

5.1   Unless otherwise specified, the Calculation Agent will make each determination required hereunder.

6   **PERFORMANCE STANDARD**

6.1   Each party and the Calculation Agent will act at all times in good faith and in a commercially reasonable manner.

7   **DOCUMENTS**

7.1   **Hierarchy of Documents**: If there is any inconsistency between the documents comprising a Covered Transaction:

    (a)   **Activity Report**: An Activity Report will prevail over any Swap Supplement;

    (b)   **Swap Supplement**: A Swap Supplement will prevail over the Master Confirmation;

    (c)   **Master Confirmation**: The Master Confirmation will prevail over the Master Agreement and the Collateral Agreement;

    (d)   **Master Agreement**: The Master Agreement will prevail over the Equity Definitions; and

    (e)   **Equity Definitions**: The Equity Definitions will prevail over the 2006 ISDA Definitions.

Confidential Treatment Requested by King & Spalding               Archegos-CFTC-SEC 003518

## GENERAL TRANSACTION TERMS FOR ALL COVERED TRANSACTIONS

These General Transaction Terms are subject to the Specific Underlier Terms which apply to any Covered Transaction.

### General Transaction Terms

| | |
|---|---|
| Trade Date | As specified in the Activity Report. Time of trading available on request. |
| Effective Date | The "Settle Date" specified in the Activity Report. |
| Termination Date | As specified in the Activity Report, subject to the Early Termination provisions below. |
| Exchange | (a) For each Share, the stock exchange corresponding to the Reuters Instrument Code of that Share listed in the Activity Report under the heading "RIC". |
| | (b) For any security included in an Index, the stock exchange on which that security is principally traded. |
| | For multiple exchange indices as defined in the Multiple Exchange Annex. |
| Related Exchange | All Exchanges. |
| Multiple Exchange | For Covered Transactions where the underlying is a multiple exchange index, the definitions in the ISDA Multiple Exchange Index Annex (**Multiple Exchange Annex**) will apply. |
| Calculation Agent | UBS. |

### Equity Amounts

| | |
|---|---|
| Equity Amount Payer | (a) For a Covered Transaction specified in the Activity Report as "Long": UBS. |
| | (b) For a Covered Transaction specified in the Activity Report as "Short": Counterparty. |
| Type of Return | Total Return. |
| Multiplier | One. |
| Equity Notional Reset | Applies. |
| Valuation Time | Scheduled Closing Time or, in the case of any Hypothetical Reference Price, each of the times at which a Hypothetical Broker Dealer would dispose of the applicable Hedge Positions. |
| Valuation Date(s) | (a) If the specified Reset Frequency in the Swap Supplement is: |
| | (i) **1 Week**, the nth day of each week; |
| | (ii) **1 Month**, the nth day of each month; and |
| | (iii) **1 Year**, the nth day of each year; |
| | where in each case "n" is the Roll Day specified in the Swap Supplement. |
| | (b) If the specified Reset Frequency is **Termination**, one Settlement Cycle before the Termination Date. |
| Initial Price | On the first Valuation Date, the "Booking Price" specified in the Activity Report; on each subsequent Valuation Date, the Final Price for the |

Confidential Treatment Requested by King & Spalding          Archegos-CFTC-SEC 003519

immediately preceding Valuation Date.

| Final Price | (a) | | **For any Valuation Date except the final Valuation Date:** |
|---|---|---|---|
| | | (i) | for each Share, the closing price per Share on the Exchange; |
| | | (ii) | for each Index, the closing level of the Index on that Valuation Date; |
| | (b) | | **For the final Valuation Date:** |
| | | (i) | in respect of VWAP Shares, the VWAP Price; |
| | | (ii) | in respect of any components other than VWAP Shares, the Hypothetical Reference Price; |

in each case converted, where necessary and as appropriate, into the Settlement Currency in accordance with the FX Provisions.

| VWAP Shares | Shares traded on an Exchange in the United States. |
|---|---|

| Hypothetical Reference Price | The price determined by the Calculation Agent as the price at which a Hypothetical Broker Dealer would dispose of applicable Hedge Positions for that Share or securities making up the Index (as applicable), as adjusted to account for any other Costs that would be incurred by the Hypothetical Broker Dealer in connection with the disposal and converted where necessary in accordance with the FX Provisions. |
|---|---|

| Costs | Any costs, commissions, taxes (other than FATCA Withholding Tax (as defined in the Schedule)) or expenses incurred by that party in connection with the execution, maintenance or termination of any transaction. |
|---|---|

| Hypothetical Broker Dealer | A hypothetical broker dealer subject to the same securities laws and regulations as the Hedging Party. |
|---|---|

| Hedge Positions | As defined in Section 13.2(b), as amended by replacing the word "party" with the words "a party or any of its Affiliates hedging in a commercially reasonable manner". Hedge Positions will include any foreign exchange transactions required to convert any positions or contracts into the Settlement Currency. |
|---|---|

| VWAP Price | In respect of any VWAP Share: |
|---|---|

| | (a) | the volume-weighted average price per share (**VWAP**) during regular trading session published by **the Exchange (or, if more than one is published, the VWAP in respect of the latest part of the trading day)**; or |
|---|---|---|
| | (b) | on any day where a VWAP is not reported for any reason, such price as reasonably determined by the Calculation Agent, converted where necessary in accordance with the FX Provisions. |

| VWAP Modifications | Where VWAP Price applies: |
|---|---|

| | (a) | | Section 6.3(a) will be amended by: |
|---|---|---|---|
| | | (i) | deleting "at any time during the one hour period that ends at the relevant Valuation Time, Latest Exercise Time, Knock-in Valuation Time or Knock-out Valuation Time, as the case may be" and replacing it with "at any time during the regular trading session on the Exchange, without regard to after hours or any other trading outside of the regular trading session |

---

5

Archegos-CFTC-SEC 003520

hours"; and

    (ii)    replacing clause 6.3(a)(iii) with: "(iii) an Early Closure that the Calculation Agent determines is material".

(b)    Section 6.3(d) will be amended by deleting the remainder of the provision following the words "prior to its Scheduled Closing Time".

(c)    If the Calculation Agent determines that the final Valuation Date is a Disrupted Day only in part it will:

    (i)    designate the Valuation Date pursuant to Section 6.6(a) for those VWAP Shares which are not affected;

    (ii)    adjust the Number of Shares for which the Disrupted Day is the Valuation Date (based on such factors as it considers relevant); and

    (iii)    determine the Final Price on the basis of such adjustments.

**Dividends**

| | |
|---|---|
| Dividend Period | Second Period. |
| Re-investment of Dividends | Does not apply. |
| Dividend Amount | The percentage of the Ex Amount specified in the Activity Report for that Share or Index under the heading "Entitlement", in each case multiplied by the Number of Shares or Number of Units. |
| | In respect of a convertible bond, any coupon payment, however characterised by the Issuer if paid by the Issuer during the Dividend Period shall be treated as a dividend for the purposes of the Equity Definitions. |
| Ex Amount | The definition of Ex Amount in Section 10.1(b) is amended by replacing the word "declared" with the word "paid". |

**Floating Amounts**

| | |
|---|---|
| Floating Amount Payer | The party that is not the Equity Amount Payer. |
| Notional Amount | Equity Notional Amount. |
| Payment Dates | As specified in the Swap Supplement under the heading "Pay Date". |
| Floating Rate Option | The option designated as such in the Activity Report |
| Spread | As specified in the Activity Report under the heading "Interest Spread". |
| Designated Maturity | As specified in the Activity Report under the heading "Designated Maturity". |
| Floating Rate Day Count Fraction | As defined in Section 6.2(f) of the 2006 ISDA Definitions. |
| Reset Dates | The first day of each Calculation Period. |
| Business Day Convention | As specified in the Swap Supplement. |
| Calculation of short spread | Where Counterparty is the Equity Amount Payer, on each Payment Date the Floating Amount will be reduced by an amount equal to the Borrow Balance Rate specified in the Activity Report, accrued daily on the Share Market Value. |
| Share Market Value | An amount calculated as: |

Confidential Treatment Requested by King & Spalding    Archegos-CFTC-SEC 003521

**Final Price\*Notional Amount/Initial Price**

treating each day in the Calculation Period as a "Valuation Date" for the purposes of determining the Final Price.

**Dates for Payment**

Dates for payment

For the purposes of payment dates specified in the Swap Supplement (under **Interest Pay Method, Cash Interest Pay Method, Fee Pay Method, Realised Gain Pay Method, Reset Gain Pay Method, Dividend Pay Method,** and **Coupon Pay Method**) the following definitions will be used:

(a) **Equity Pay Date:** the first Cash Settlement Payment Date after the Issuer pays the relevant dividend or the date the non-dividend cash flow would ordinarily be due but for this provision;

(b) **Equity Pay Date After Dividend Ex-Date:** the Cash Settlement Payment Date following the first Valuation Date after the Dividend Ex-Date (which means the date on which the Shares have, in respect of that dividend, commenced trading ex-dividend on the Exchange);

(c) **Equity Pay Date After Dividend Pay:** the Cash Settlement Payment Date following the first Valuation Date after the Issuer pays the relevant dividend;

(d) **Interest Pay Date:** the first Floating Amount Payment Date following the date the Issuer pays the relevant dividend or the date the non-dividend cash flow would ordinarily be due but for this provision;

(e) **Interest Pay Date After Dividend Ex-Date:** the first Floating Amount Payment Date falling at least one Settlement Cycle following the first Valuation Date after the date on which the Shares have, in respect of the relevant dividend, commenced trading ex-dividend on the Exchange;

(f) **Interest Pay Date After Dividend Pay:** the first Floating Amount Payment Date falling at least one Settlement Cycle following the first Valuation Date after the date the Issuer pays the relevant dividend;

(g) **Settlement Date:** the date the Issuer pays the relevant dividend or the date the non-dividend cash flow would ordinarily be due but for this provision;

(h) **On Termination:** the Cash Settlement Payment Date following the final Valuation Date;

(i) **Dividend Pay Date:** the date the underlying dividend or coupon is paid;

(j) **On Partial Unwind:** payment of the debit or credit interest attributable to the partial unwind on the relevant Settlement Date of such partial unwind;

(k) **Partial Unwind After Dividend Pay:** the next Equity Pay Date, provided that upon a partial unwind, the Settlement Date of the partial unwind shall apply to that portion of the dividend or coupon equivalent swap cash flow;

(l) **Partial Unwind After Dividend Pay (Interest):** the next Interest Pay Date, provided that upon a partial unwind, the Settlement Date of the partial unwind shall apply to that portion of the dividend or coupon

7

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 003522

equivalent swap cash flow;

(m) **Partial Unwind After Dividend Ex-Date:** the next Equity Pay Date, provided that upon a partial unwind after Dividend Ex-Date, the Settlement Date of the partial unwind shall apply to that portion of the dividend or coupon equivalent swap cash flow;

(n) **Partial Unwind After Dividend Ex-Date (Interest):** the next Interest Pay Date, provided that upon a partial unwind after Dividend Ex-Date, the Settlement Date of the partial unwind shall apply to that portion of the dividend or coupon equivalent swap cash flow; or

(o) **Partial Unwind After Pay Date Or Pay Date Otherwise:** Partial Unwind After Dividend Pay, provided that upon a partial unwind that occurs between Dividend Ex-Date and Dividend Pay Date, the earlier of the Dividend Pay Date or the Equity Pay Date shall apply to that portion of the dividend or coupon equivalent swap cash flow.

| | |
|---|---|
| Interest Accrual | Payments accrue interest at the Interest Accrual Rate to the actual payment date under the Covered Transaction: |

(a) **Dividend Amounts:** from the date that the Issuer pays the relevant distribution on the Share;

(b) **Fee Amount:** for the Fee Amount, from the Effective Date;

(c) **Equity Amounts:** from the Cash Settlement Payment Date following the relevant Valuation Date.

| | |
|---|---|
| Interest Accrual Rate | Where: |

(a) Counterparty owes the relevant amount, a rate equal to the Debit Cash Rate plus the Debit Spread; and

(b) UBS owes the relevant amount, a rate equal to the Credit Cash Rate plus the Credit Spread

as specified in the Swap Supplement (treating a number in brackets as negative).

**Settlement Terms**

| | |
|---|---|
| Settlement Currency | The currency in which the Initial Price is denominated in the Activity Report. |
| | If the performance of a Covered Transaction is realised in a non-deliverable currency the Calculation Agent will convert it to a deliverable currency acceptable to the parties for settlement. |
| Cash Settlement | Applies. |
| Cash Settlement Payment Date | The day that is one Settlement Cycle after the relevant Valuation Date. |

**Fees**

| | |
|---|---|
| Fee | On the Fee Payment Date Counterparty will pay UBS the Fee Amount. |
| Fee Amount | The **Fee** specified in the Activity Report or, if none, the Fee Rate specified in the Swap Supplement multiplied by the Notional Amount or, if none, the Default Fee per Share specified in the Swap Supplement multiplied by the Quantity specified in the Activity Report. |
| Fee Payment Date | As specified in the Activity Report. |

8

    Archegos-CFTC-SEC 003523

**FX Terms**

| | |
|---|---|
| Applicability | The following FX Terms apply where the Local Currency is not the Settlement Currency. |
| Local Currency | The currency in which the Shares are traded on the Exchange. |
| FX Provisions | If the currency of any Dividend Amount or Final Price is different from the Settlement Currency, the Calculation Agent will determine its value in the Settlement Currency using such information as it considers relevant including the exchange rates a Hypothetical Broker Dealer would apply if converting such amounts into the Settlement Currency. |

**Additional Disruption Events**

| | |
|---|---|
| Change in Law | Applies provided that Section 12.9(a)(ii) of the Definitions is amended by replacing the word "Shares" with the words "Hedge Positions" in clause (X) thereof. |
| Failure to Deliver | Does not apply. |
| Insolvency Filing | Does not apply. |
| Hedging Disruption | Applies, provided that: |

    (a)    Section 12.9(a)(v) is replaced by the words:

        "**Hedging Disruption** means that the Hedging Party is unable, after using commercially reasonable efforts, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any Hedge Positions it deems necessary to hedge the market risk (including but not limited to equity price risk, foreign exchange risk and interest rate risk) of entering into and performing its obligations with respect to the relevant Covered Transaction, or (B) realize, recover, convert in the Settlement Currency,  or remit the proceeds of and/or collateral posted with respect to any such Hedge Positions;"

    (b)    Section 12.9(b)(iii) has the following words added at the end:

        "Where reasonably practical, the Hedging Party must elect to terminate only the part of the Covered Transaction with the Number of Shares corresponding to the Hedge Position that the Hedging Disruption relates to, and the Cancellation Amount is then determined over only the terminated part of the Covered Transaction".

| | |
|---|---|
| Increased Cost of Hedging | Applies. Section 12.9(a)(vi) is replaced by the words: |

        "**Increased Cost of Hedging** means that the Hedging Party would incur a materially increased (as compared to the circumstances existing on Trade Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (A) acquire, establish, re-establish, substitute, maintain, unwind, finance or dispose of any Hedge Positions, or (B) realize, recover, convert in the Settlement Currency, or remit the proceeds of any such transaction(s) or collateral posted with respect to any Hedge Positions."

| | |
|---|---|
| Loss of Stock Borrow | Applies. |

**Maximum Stock Loan Rate**: 5% per annum.

9

    

UBS

| | |
|---|---|
| Increased Cost of Stock Borrow | Applies.<br><br>**Initial Stock Loan Rate**: For each Share, a rate equal to the absolute value of the Spread. |
| Hedging Party | UBS or any Affiliates designated by it. |
| Determining Party | UBS. |
| FX Disruption | If an FX Disruption Event occurs the Calculation Agent may postpone, until the first Local Business Day on which the FX Disruption Event ceases, the determination of the relevant spot rate of exchange and each party's obligation to pay any Settlement Currency equivalent of Local Currency amounts, and adjust the then-current Notional Amount to take into account the actual interest that would be received by that party, directly or indirectly, on deposits in the Local Currency. |

| | | |
|---|---|---|
| FX Disruption Event | An event that prevents or delays UBS or its Affiliates from: | |
| | (a) | converting a Local Currency into the Settlement Currency; |
| | (b) | delivering Settlement Currency from accounts within the jurisdiction of the Local Currency to accounts outside the jurisdiction of the Local Currency; |
| | (c) | delivering the Settlement Currency from an account in the jurisdiction of the Local Currency to an account in the jurisdiction of the Local Currency of a person that is a non-resident of the jurisdiction of the Local Currency; or |
| | (d) | delivering the Local Currency between accounts in the jurisdiction of the Local Currency or to a party that is a non-resident of the jurisdiction of the Local Currency; or |
| | (e) | effectively realising the value of its underlying hedge in the Settlement Currency at any time. |

**Other**

| | | |
|---|---|---|
| Tax Reimbursement | In the event that a Hypothetical Investor is liable for any Local Taxes for a Covered Transaction, Counterparty shall, upon demand by UBS, pay UBS an amount equivalent to all Local Taxes (but excluding any amount accounted for under Costs), whether or not occurring after termination of the affected Covered Transaction. | |
| | After the termination of the affected Covered Transaction, UBS may treat the amount of any Local Taxes as: | |
| | (a) | **Liability**: a "Liability" under the Master Prime Brokerage Agreement (if the Covered Transactions are collateralised pursuant to a Master Prime Brokerage Agreement); |
| | (b) | **Exposure**: an "Exposure" under the Credit Support Annex (if the Covered Transactions are subject to a Credit Support Annex); or |
| | (c) | **Obligation**: an Obligation (if the Covered Transactions are subject to a Margin Loan, Securities Loan and Foreign Exchange Agreement). |
| Local Taxes | means taxes (other than FATCA Withholding Tax (as defined in the Schedule)), duties and similar charges (in each case, including interest and penalties thereon) imposed by the taxing authority in any Indemnifiable Jurisdiction, that would be withheld from or paid or otherwise incurred by a | |

Confidential Treatment Requested by King & Spalding Archegos-CFTC-SEC 003525

UBS

Hypothetical Investor in connection with any Applicable Hedge Positions, excluding any corporate income taxes levied on the overall net income of the Hypothetical Investor.

| | |
|---|---|
| Hypothetical Investor | shall mean a hypothetical institutional investor not resident in (a) the applicable Relevant Jurisdiction, Local Jurisdiction and/or the Tax Residence Jurisdiction (in each case, as defined in Consent to Regulatory Disclosure) for the purposes of the tax laws and regulations of the Relevant Jurisdiction, Local Jurisdiction and/or the Tax Residence Jurisdiction, as applicable; or (b) a jurisdiction where any refund, credit or any other benefit, exemption or reduction in relation to any Local Taxes may arise under an applicable tax treaty or any relevant laws or arrangements. |
| Applicable Hedge Positions | means, at any time, Hedge Positions that the Hedging Party determines that a Hypothetical Investor, acting in a commercially reasonable manner, would consider necessary to hedge the relevant Covered Transaction at that time. |
| Indemnifiable Jurisdiction | Those jurisdictions notified to the parties by UBS from time to time. |
| Losses on Hedge Positions | In determining amounts payable in respect of a Covered Transaction the Calculation Agent will include any Costs incurred by Hedging Party as a result of any failure or delay of an Exchange, clearing agency, executing broker or dealer in relation to any Hedge Position. |

**Collateral**

| | |
|---|---|
| Initial Margin | The amount UBS requires as initial margin (however defined under the Collateral Agreement) under any Covered Transaction. |
| | UBS will calculate the Initial Margin and notify it to Counterparty on the next Local Business Day following the Trade Date. |
| | UBS may change the Initial Margin at any time by notice to Counterparty. |
| | Counterparty must pay Initial Margin (as determined hereunder) to UBS under the Collateral Agreement. |
| Collateral Agreement | With respect to any Covered Transaction, the legal contract that governs the taking of collateral. |
| Collateral Interest | Notwithstanding the terms of any Collateral Agreement, the interest rate for cash collateral provided in respect of any Covered Transactions will be the Cash Collateral Interest Rate. |
| Cash Collateral Interest Rate | Where: |

(a) Cash Collateral is provided to UBS, the **Credit Cash Rate** plus the **Credit Spread**, each as specified in the Swap Supplement;

(b) Cash Collateral is provided by UBS the **Debit Cash Rate** plus the **Debit Spread**, each as specified in the Swap Supplement;

In each case as specified in the Swap Supplement, treating a number in brackets as negative.

**Early Termination**

| | |
|---|---|
| Counterparty Optional Early Termination | Counterparty may notify UBS on a Notice Business Day that it wishes to terminate any portion (the **Terminating Portion**) of any Covered |

Confidential Treatment Requested by King & Spalding Archegos-CFTC-SEC 003526

Transaction.

Upon receipt of such notice the Optional Termination Date will be deemed to be the final Valuation Date with respect to the Terminating Portion, Final Price on Early Termination will be used to value the Terminating Portion and, with effect from such date, the Covered Transaction will be reduced by the Terminating Portion.

| | |
|---|---|
| Optional Termination Date | The Notice Business Day on which UBS receives notice of termination provided that if UBS is not reasonably able to unwind any relevant Hedge Position before closing time of the relevant Exchange the Optional Termination Date shall be the next following Exchange Business Day for that Exchange. |
| Notice Business Day | A day which is: |

(a)     a Scheduled Trading Day on the relevant Exchange; and

(b)     a Banking Day in the city where the notice is received.

| | |
|---|---|
| UBS Early Termination | **Early Termination for cause:** If UBS determines that: |

(a)     Shares included in a Covered Transaction cannot be used for share financing trades on commercially reasonable terms;

(b)     for regulatory or reputational reasons UBS does not wish to hold Shares as a Hedge Position for a Covered Transaction; or

(c)     there is an increase in regulatory requirement on UBS to maintain capital in respect of any Covered Transactions since the relevant Trade Date;

then UBS may, on giving 5 Exchange Business Days' notice to Counterparty, terminate a part or all of a Covered Transaction by reducing the Notional Amount by an amount corresponding to those Shares.

**Optional Early Termination:** UBS may terminate any Covered Transaction without reason upon 30 Exchange Business Days' notice. UBS will use Final Price on Early Termination for any UBS Early Termination.

| | |
|---|---|
| Final Price on Early Termination | The price as calculated by UBS and notified to the Counterparty, taking into account objective financial information and, to the extent practicable, the instructions of Counterparty. |

Confidential Treatment Requested by King & Spalding                                    Archegos-CFTC-SEC 003527

## SPECIFIC UNDERLIER TERMS

### Equity Swap Transactions

| | |
|---|---|
| Shares | As specified in the Activity Report under the heading "Instrument Name". "Shares" may include convertible bonds (**Bonds**) and exchange-traded contracts. |
| Equity Notional Amount | For each Valuation Date: |
| | **Number of Shares * Initial Price**, converted where necessary in accordance with the FX Provisions. |
| Number of Shares | The "Quantity" specified in the Activity Report. |

Share Adjustments

(a) **Method of Adjustment**: Calculation Agent Adjustment.

(b) **Consequences of Merger Events**:

    (i)    Share-for-Share: Alternative Obligation.

    (ii)    Share-for-Other: Calculation Agent Adjustment.

    (iii)    Share-for-Combined: Component Adjustment.

(c) **Tender Offer**: Applies.

(d) **Consequences of Tender Offers**: Calculation Agent Adjustment.

(e) **Composition of Combined Consideration**: Applies.

(f) **Nationalisation, Insolvency or Delisting**: Cancellation and Payment.

### Equity Swaps with Bond Underliers

Conversion Right

The Floating Amount Payer may, by giving notice to the Equity Amount Payer, terminate all or part of a Covered Transaction referencing a Bond (the terminated portion being the **Converted Portion**) and replace it with a Covered Transaction referencing the number of shares in the Bond Issuer that a Bondholder would receive if it exercised its conversion right under the Bond Terms with respect to a number of Bonds corresponding to the Converted Portion.

Such conversion right is subject to:

(a) full payment by the Floating Amount Payer of all Conversion Costs; and

(b) the Conversion Proviso.

The final Valuation Date in respect of the Converted Portion will be determined by the Calculation Agent in its sole discretion.

With effect from the final Valuation Date, the Number of Shares under this Covered Transaction shall be reduced by the Converted Portion accordingly.

Put Right

If a Bondholder would be entitled under the Bond Terms to redeem the Bonds early for cash, the Equity Amount Receiver may, by giving notice to the Equity Amount Payer, terminate this Transaction (in whole or in part) (the terminated portion being **Put Shares**), provided that:

(a) the payment date of such cash amount will be deemed to be the final Valuation Date in respect of the Put Shares, and with effect from such date, the Number of Shares under this Covered Transaction shall be reduced by the Put Shares accordingly; and

(b) such right of redemption under the Bonds is subject to the Conversion

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 003528

|  | Proviso. |
|---|---|
| Mandatory Early Termination | If the Bond Issuer exercises its right to redeem the Bonds early by delivery of shares or cash under the Bond Terms then (upon the Equity Amount Payer giving reasonable notice of such exercise and subject to full payment by the Equity Amount Receiver of any Conversion Costs): |
|  | (a) if the Bonds are redeemed by delivery of shares, the Covered Transaction will be terminated in whole and replaced by a Covered Transaction referencing the number of shares which a holder of a Number of Shares in the Bonds would have received under the Bond Terms; and |
|  | (b) if the Bonds are redeemed in cash, the Covered Transaction will be terminated and the payment date of such cash amount will be deemed to be the final Valuation Date. |
|  | Provided that if a Bondholder may elect for cash or physical settlement the Floating Amount Payer will have a corresponding right hereunder, subject to the Conversion Proviso. |
| Conversion Costs | With respect to any Bond, the conversion price, commissions, costs, expenses, duties, tax (other than FATCA Withholding Tax (as defined in the Schedule)), levies, fees or other charges payable by Equity Amount Payer or its nominee in connection with the conversion. |
| Conversion Proviso | Any conversion hereunder is subject to the Equity Amount Payer being able to convert sufficient Bonds into shares of the Issuer under the Bond Terms within a reasonable time and in accordance the rules of any relevant Exchange or clearing system. |
| Bonds | Convertible Bonds referenced by a Covered Transaction. |
| Bond Terms | The terms and conditions of the Bonds. |
| Bond Issuer | The issuer of the Bonds. |
| Bondholder | An actual holder of any Bonds. |

## Equity Swaps with Exchange Traded Underliers

| | |
|---|---|
| Type of Return | Total Return. |
| Futures Price Valuation | Applicable. |
| Final Price | The Official Settlement Price of the relevant Exchange-traded Contract. |
| Valuation Time | The time at which the Final Price is published by the Related Exchange |
| Exchange-traded Contract | The futures or options contract relating to the relevant Index or Share traded on the Related Exchange the expiry date for which is (or would have been, were it not a Disrupted Day or a non-Scheduled Trading Day) the Valuation Date. |
| Non-Commencement or Discontinuance of Exchange Traded Contract | Section 6.8(e) is replaced by the following: "If there is no Official Settlement Price as a result of the fact that trading in the Exchange-traded Contract never commences or is permanently discontinued at any time on or prior to the Valuation Date, such event shall be deemed a Hedging Disruption". |

## Index Underliers

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 003529

| | |
|---|---|
| Index | The index specified in the Activity Report. |
| Equity Notional Amount | **Number of Units \* Initial Price.** |
| Number of Units | The "Quantity" specified in the Activity Report. |
| Index Adjustment Events | **Index Cancellation**: Cancellation and Payment. |
| | **Index Modification**: Cancellation and Payment. |
| | **Index Disruption**: Calculation Agent Adjustment |
| Index Disclaimer | Applies. |
| **Basket Swaps** | |
| Notional Amount | As specified in the Basket Swap Notification or Bloomberg Publication. |
| Basket Creation | Counterparty may request that UBS create a Basket at any time. For each Basket Swap, UBS must either (i) send a Basket Swap Notification to Counterparty and Counterparty must acknowledge the constituents by e-mail prior to trading; or (ii) publish a Bloomberg Publication that is only available to UBS and those parties notified by Counterparty to UBS to have permission to view it. |
| Basket Modification | Counterparty may remove one or more Shares from the Basket at any time, subject to UBS's prior consent, which consent shall not be unreasonably withheld. |
| Basket Swap Notification | An e-mail sent by UBS to Counterparty listing the constituents of the relevant Basket. |
| Bloomberg Publication | A publication on Bloomberg listing the constituents of the relevant Basket. |

Confidential Treatment Requested by King & Spalding        Archegos-CFTC-SEC 003530

**CONTACT DETAILS**

| | |
|---|---|
| Offices | UBS (except where advised differently), in each case to the attention of the Equity Swaps Trading Desk: |

London phone: +44 20 75672890.

London email: ol-gse-trading-EMEA@ubs.com

Stamford phone: +1 203 7197002.

Stamford email: ol-gse-trading-americas@ubs.com

Hong Kong phone: +852 2971 8382.

Hong Kong email: ol-gse-trading-APAC@ubs.com

Counterparty: As separately notified

| | |
|---|---|
| Payment and Delivery Instructions | As separately notified. |

16

Confidential Treatment Requested by King & Spalding    Archegos-CFTC-SEC 003531

## REPRESENTATIONS, UNDERTAKINGS, ACKNOWLEDGEMENTS, OTHER PROVISIONS

### General Representations and Terms

| | |
|---|---|
| Non-Reliance | Applies. |
| Applicable Law | Any applicable laws, regulations, rules or conventions (whether having legal force or not), and the rules, regulations, interpretations, protocols, customs and usages of any applicable Exchange, clearing facility or self-regulatory organisation. |
| Regulatory Authority | Any Exchange and any governmental or other regulatory authority having or claiming jurisdiction over the parties, any Covered Transaction or dealings in any underlier. |
| Consent to Regulatory Disclosure | Without prejudice to the generality of any applicable law, each party ("**X**") expressly consents to the disclosure by the other party ("**Y**") or its affiliates to the relevant authorities in the jurisdiction of the incorporation or organisation of the Issuer (a "**Relevant Jurisdiction**"), the jurisdiction of either of the parties (the "**Local Jurisdiction**") or any jurisdiction of tax residence of the Issuer (a "**Tax Residence Jurisdiction**"), information relating to the Covered Transaction, including the name of X in order for Y or any of its affiliates to comply with laws and regulations of the Relevant Jurisdiction, the Local Jurisdiction or Tax Residence Jurisdiction that are applicable to Y or its affiliate in connection with their dealings in the underlier and to the extent of such disclosure X releases Y from any duty of confidentiality owed to it in relation to such information. |

| | |
|---|---|
| Tax characterisation | Both Parties will: |

    (a)    treat any increase of the notional amount of an existing position on an Activity Report as a separate transaction for all U.S. tax purposes;

    (b)    treat any reduction of the notional amount of an existing position on an Activity Report as a termination of a corresponding portion of that position which will not affect the remaining portion of the position for U.S. tax purposes; and

    (c)    file all U.S. federal, state and local income and franchise tax returns consistent with such treatment.

### Agreements and Acknowledgements

| | |
|---|---|
| Agreements and Acknowledgements Regarding Hedging Activities | Applies. |
| Additional Acknowledgements | Applies. |
| Covered Transactions | Each party is deemed to represent to the other party on the Trade Date of each Covered Transaction that: |

    (a)    it is not aware of any material non-public information or unpublished price sensitive information with respect to any Shares subject to the Covered Transaction that, under any applicable securities laws, it would have to disclose before buying or selling the Shares;

    (b)    it will make all required disclosures regarding any exposure it obtains to

Confidential Treatment Requested by King & Spalding      Archegos-CFTC-SEC 003532

the Shares under the Covered Transaction;

(c)    it has not made, and will not make, any representations or warranties to other parties that it has, by virtue of the Covered Transaction alone, any beneficial interest, voting or other ownership rights to Shares; and

(d)    it understands that the Covered Transaction is a cash-settled instrument, and that it does not by virtue of the Covered Transaction alone obtain any beneficial interest, voting or other ownership rights to Shares.

**Miscellaneous**

Entire Agreement          This Master Confirmation supersedes all prior communications regarding its subject matter.

Termination of this Master Confirmation          Either party may terminate this Master Confirmation on giving notice to the other party at the contact details listed under General Transaction Terms, in which case this Master Confirmation does not apply to Transactions with a Trade Date after the Local Business Day on which the notice is given.

Jurisdictional Representations and Warranties          The parties make the representations set out in the Schedule to this Master Confirmation. Such representations will be deemed to be "Additional Representations" for the purposes of Section 5(a)(iv) of the Master Agreement.

Counterparts          This Master Confirmation (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission, by portable document ("PDF") or other electronic file contained in an email and by electronic messaging system), each of which will be deemed an original.

18

Confidential Treatment Requested by King & Spalding

SCHEDULE: JURISDICTIONAL REPRESENTATIONS AND WARRANTIES

1    **INDIAN TRANSACTIONS**

1.1   If the parties are entering into a Covered Transaction which is or otherwise involves an offshore derivative instrument (**ODI**) (as such term is defined for the purposes of the Securities and Exchange Board of India (Foreign Portfolio Investors) Regulations, 2014, and notifications, circulars, rules and guidelines of the Securities and Exchange Board of India issued from time to time) (collectively referred to as the **FPI Regulations**), the representations and undertakings made by Counterparty in favour of UBS in a letter titled "Notice Regarding Derivative Products Linked to Indian Securities or Indices" (which may be amended/replaced from time to time) (the **ODI Letter**) shall apply to the Covered Transaction and references to ODI in the ODI Letter shall be construed to include the Covered Transaction. If a representation or undertaking in the ODI Letter proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated; or if Counterparty fails to comply with or perform any agreement or obligation undertaken by it in the ODI Letter, it shall be an Additional Termination Event with all Transactions which are or otherwise involve an ODI (as defined in the ODI Letter) being the sole Affected Transactions, and with Counterparty being the sole Affected Party.

2    **TAIWANESE TRANSACTIONS**

2.1   If the parties are entering into a Covered Transaction referencing Taiwanese underliers where the relevant Exchange is in the Republic of China, Counterparty represents to UBS that:

   (a)   it is not entering into the Covered Transaction for the specific benefit or account of:

      (i)    any residents of the People's Republic of China (**PRC**), corporations in the PRC, or corporations outside the PRC that are beneficially owned by residents of the PRC or

      (ii)   any residents of the Republic of China (**ROC** or **Taiwan**), corporations in Taiwan, or corporations outside Taiwan that are beneficially owned by residents of Taiwan.

   (b)   it will not, sell, transfer, assign, novate or otherwise dispose of the Covered Transaction to or for the benefit or account of, or enter into any back-to-back equity derivative transaction with:

      (i)    any residents of the PRC, corporations in the PRC, or corporations outside the PRC which are beneficially owned by residents of the PRC or

      (ii)   any residents of Taiwan, corporations in Taiwan, or corporations outside Taiwan that are beneficially owned by residents of Taiwan.

   (c)   details of the Covered Transaction (including the identity of the parties) may,

      (i)    upon request or order by any competent authority, regulatory or enforcement organisation, governmental or otherwise, including without limitation, the stock exchange on which the underlying shares are listed,

      (ii)   as required by applicable law, rules, regulations, codes or guidelines (whether having the force of law or otherwise), be disclosed in accordance with such request, order, law, rules, regulations, codes or guidelines (whether such disclosure is to be made to third parties or otherwise). By entering into the Covered Transaction, Counterparty agrees to such disclosure and releases UBS (and its subsidiaries and affiliates) from any duty of confidentiality owed to it in relation to such information.

3    **CHINESE TRANSACTIONS**

3.1   If the parties are entering into a Covered Transaction referencing People's Republic of China (**PRC**) underliers where the relevant Exchange is in the PRC, Counterparty represents to UBS that:

Confidential Treatment Requested by King & Spalding                    Archegos-CFTC-SEC 003534

 (a) It is not a Domestic Investor;

 (b) none of its investors are Domestic Investors.

 (c) it will not sell, transfer, assign, novate or otherwise dispose of the Covered Transaction to, or enter into any back-to-back equity derivative transaction with any Domestic Investor;

 (d) details of the Covered Transaction (including identity of the parties) may (a) upon request or order by any competent authority, regulatory or enforcement organisation, governmental or otherwise, including without limitation, the stock exchange on which the underlying shares are listed, (b) as required by applicable law, rules, regulations, codes or guidelines (whether having the force of law or otherwise), be disclosed in accordance with such request, order, law, rules, regulations, codes or guidelines (whether such disclosure is to be made to third parties or otherwise).  By entering into the Covered Transaction, Counterparty agrees to such disclosure and releases UBS (and its subsidiaries and affiliates) from any duty of confidentiality regarding such disclosure.

3.2 **Domestic Investor** means:

 (a) domestic individual as defined in the Administrative Measures on Foreign Exchange Matters for Individuals as issued by the People's Bank of China, and

 (b) legal persons organised under the laws of the PRC (excluding Hong Kong, Macau and Taiwan).

Confidential Treatment Requested by King & Spalding    Archegos-CFTC-SEC 003535