UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                :
COMMODITY FUTURES TRADING      :
COMMISSION,              :
                :
           Plaintiff,     :      No. 22-cv-3401 (JPO)
                :
    - against -         :
                :
ARCHEGOS CAPITAL MANAGEMENT, LP and :
PATRICK HALLIGAN        :
           Defendants.   :
                :
------------------------------------------------------------------ x

**MEMORANDUM OF LAW IN SUPPORT OF
PATRICK HALLIGAN'S MOTION TO
DISMISS THE AMENDED COMPLAINT**

FRIEDMAN KAPLAN SEILER &
 ADELMAN LLP

7 Times Square
New York, NY  10036-6516
(212) 833-1100

November 1, 2022        *Attorneys for Patrick Halligan*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF ALLEGED FACTS ..................................................................................3

    A.    Halligan's Role at Archegos ...............................................................................3

    B.    Archegos's Long-Term Contractual Relationships with its Counterparties ...........4

    C.    The CFTC's Allegations Regarding Statements to ACM's Counterparties ...........5

    D.    The Week of March 22, 2021 ...............................................................................8

ARGUMENT .......................................................................................................................9

I.    THE CFTC LACKS JURISDICTION TO ASSERT A CLAIM AGAINST
    HALLIGAN BASED ON ACM'S TRADING IN ETF AND BASKET SWAPS ...........10

    A.    The CFTC Lacks Jurisdiction Over the ETF and Basket Swaps ...........................10

    B.    The CFTC Fails to Allege that Halligan Engaged in Fraud
        "In Connection With" CFTC-Regulated Swaps ...................................................17

II.    THE CFTC HAS FAILED TO ALLEGE A PRIMARY VIOLATION...........................24

    A.    The CFTC Has Failed to Adequately Plead Halligan's Scienter or
        Negligence ...........................................................................................................24

        1.    The CFTC Has Not Pled Facts Giving Rise to a Strong
            Inference of Scienter ...............................................................................24

            a.    The CFTC's Allegations of Motive and Opportunity
                Are Insufficient ..........................................................................24

            b.    The Allegations of Conscious Misbehavior or
                Recklessness Fail .......................................................................25

    B.    The CFTC's Misrepresentation Claims Fail
        Because Halligan Did Not "Make" Any Alleged Material Misrepresentation ......31

    C.    The Scheme Liability Claims Fail Because the CFTC Has Failed to
        Allege that Halligan Committed Any Deceptive Act ............................................34

III.    THE CFTC HAS FAILED TO ALLEGE A SECONDARY VIOLATION ....................37

    A.    The Complaint Fails to Plead a Primary Violation ...............................................37

    B.    The Complaint Fails to Plead Halligan's Knowledge of a Primary Violation ......38

C.      The Complaint Fails to Plead Halligan's Substantial Assistance .........................39

IV.    The Complaint Should Be Dismissed With Prejudice ........................................................40

CONCLUSION ..............................................................................................................................40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*380544 Can., Inc. v. Aspen Tech., Inc.*,
   544 F. Supp. 2d 199 (S.D.N.Y. 2008)....................................................................24

*Africa v. Jianpu Tech. Inc.*,
   No. 21-cv-1419 (JMF), 2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022) .................35

*Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*,
   No. 96-cv-2549 (RWS), 1997 WL 97837 (S.D.N.Y. Mar. 6, 1997) ......................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................9

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017)...................................................................33

*In re Barrick Gold Corp. Sec. Litig.*,
   341 F. Supp. 3d 358 (S.D.N.Y. 2018)...................................................................40

*In the Matter of Becker*,
   CFTC No. 22-14, 2022 WL 1404267 (Apr. 27, 2022) ..........................................27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...............................................................................................9

*Bissell v. Merrill Lynch & Co., Inc.*,
   937 F. Supp. 237 (S.D.N.Y. 1996)..................................................................19, 23

*CFTC v. Gorman*,
   No. 21-cv-870 (VM), 2022 WL 596261 (S.D.N.Y. Feb. 28, 2022) .........1, 9, 31, 34

*CFTC v. White Pine Tr. Corp.*,
   574 F.3d 1219 (9th Cir. 2009) .............................................................................11

*Chadbourne & Park LLP v. Troice*,
   571 U.S. 377 (2014)...................................................................................19, 21, 23

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018)....................................................................................20

*Chem. Bank v. Arthur Andersen & Co.*,
   726 F.2d 930 (2d Cir. 1984)..............................................................17, 18, 19, 22

*Chill v. Gen. Elec. Co.*,
   101 F.3d 263 (2d Cir. 1996)............................................................................24, 25, 26

*City of Brockton Ret. Sys. v. Avon Prods. Inc.*,
   No. 11-cv-4665 (PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).............................26, 27

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020)........................................................................26, 28

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
   713 F. Supp. 2d 378 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011).........................26

*In re Commodity Exch., Inc.*,
   213 F. Supp. 3d 631 (S.D.N.Y. 2016)...............................................................................17

*Crummere v. Smith Barney, Harris Upham & Co., Inc.*,
   624 F. Supp. 751 (S.D.N.Y. 1985)....................................................................................19

*Cuoco v. Moritsugu*,
   222 F.3d 99 (2d Cir. 2000)..............................................................................................41

*In re Eastman Kodak Co. Sec. Litig.*,
   No. 21-cv-6418, 2022 WL 4473629 (W.D.N.Y. Sept. 27, 2022).......................................35, 36

*ECA v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)............................................................................................24

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
   352 F. Supp. 2d 429 (S.D.N.Y. 2005)...............................................................................37

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
   No. 09-cv-4050 (PKC), 2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010)................................30

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 154 (2d Cir. 2000)..............................................................................................8

*Garcia v. Bill Me Later, Inc.*,
   No. 13-cv-8701 (RJS), 2015 WL 4578613 (S.D.N.Y. July 28, 2015)....................................13

*In re Gentiva Sec. Litig.*,
   971 F. Supp. 2d 305 (E.D.N.Y. 2013) ..............................................................................30

*Gissin v. Endres*,
   739 F. Supp. 2d 488 (S.D.N.Y. 2010)...............................................................................25

*Harris v. Mills*,
   572 F.3d 66 (2d Cir. 2009)................................................................................................9

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
   No. 10-cv-371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) .............................................32

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
   564 U.S. 135 (2011)...............................................................................................*passim*

iv

*Jing v. Sun*,
　No. 21-cv-2350, 2022 WL 1505950 (E.D.N.Y. Jan. 4, 2022)..........................................17, 18

*In re JP Morgan Chase Sec. Litig.*,
　363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................................25

*Kolbeck v. LIT Am., Inc.*,
　923 F. Supp. 557 (S.D.N.Y. 1996)...........................................................................................34

*Landy v. Mitchell Petrol. Tech. Corp.*,
　734 F. Supp. 608 (S.D.N.Y. 1990)...........................................................................................37

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
　724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd,* 430 F. App'x 63 (2d Cir. 2011)......................29

*Loginovskaya v. Batratchenko*,
　764 F.3d 266 (2d Cir. 2014).....................................................................................................18

*Lorenzo v. SEC*,
　139 S. Ct. 1094 (2019) ..........................................................................................3, 10, 36, 37

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
　518 F. Supp. 3d 772 (S.D.N.Y. 2021)................................................................................28, 31

*Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co. Inc.*,
　770 F. Supp. 176 (S.D.N.Y. 1991)...........................................................................................18

*In re Marsh & McLennan Companies, Inc. Sec. Litig.*,
　501 F. Supp. 2d 452 (S.D.N.Y. 2006).....................................................................................27

*Matsumura v. Benihana Nat'l Corp.*,
　542 F. Supp. 2d 245 (S.D.N.Y. 2008).....................................................................................26

*Matusovsky v. Merrill Lynch*,
　186 F. Supp. 2d 397 (S.D.N.Y. 2002).......................................................................................9

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
　No. 19-cv-7536 (NRB), 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) ..................................34

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000).....................................................................................................24

*In re NQ Mobile, Inc. Sec. Litig.*,
　No. 13-cv-7608 (WHP), 2015 WL 1501461 (S.D.N.Y. Mar. 27, 2015) ................................34

*In re Open Joint Stock Co. Vimpel-Commc'ns*,
　No. 04-cv-9742 (NRB), 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006)....................................40

*Paulsen v. Stifel, Nicolaus & Co.*,
　No. 18-cv-09440 (CM), 2019 WL 2415213 (S.D.N.Y. June 4, 2019) ....................................15

*PetEdge, Inc. v. Garg*,
  234 F. Supp. 3d 477 (S.D.N.Y. 2017)................................................................34, 40

*Prodanova v. H.C. Wainwright & Co., LLC*,
  993 F.3d 1097 (9th Cir. 2021) ...........................................................................30, 31

*Puddu v. 6D Glob. Techs., Inc.*,
  No. 15-cv-8061 (AJN), 2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021)....................35

*Pugh v. Trib. Co.*,
  521 F.3d 686 (7th Cir. 2008) .....................................................................................27

*In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*,
  No. 06-cv-643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007), *aff'd sub
  nom. Capital Mgmt Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012) ....................36

*Ring v. AXA Fin., Inc.*,
  483 F.3d 95 (2d Cir. 2007)........................................................................................22

*Romano v. Kazacos*,
  609 F.3d 512 (2d Cir. 2010).......................................................................................21

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009).....................................................................................25, 26

*Schwartz v. Duckett*,
  No. 88-cv-5395 (MBM), 1989 WL 16054 (S.D.N.Y. Feb. 21, 1989), *vacated in
  part on other grounds* (May 26, 1989) .....................................................................18

*SEC v. Apuzzo*,
  689 F.3d 204 (2d Cir. 2012).....................................................................................39

*SEC v. Carrillo Huettel LLP*,
  No. 13-cv-1735 (GBD), 2014 WL 12785242 (S.D.N.Y. June 4, 2014) .................28

*SEC v. Cedric Kushner Promotions, Inc.*,
  417 F. Supp. 2d 326 (S.D.N.Y. 2006)......................................................26, 38, 39

*SEC v. Kelly*,
  817 F.Supp.2d 340 (S.D.N.Y. 2011)..........................................................................36

*SEC v. KPMG LLP*,
  No. 03-cv-671 (DLC), 2003 WL 21998052 (S.D.N.Y. Aug. 22, 2003) .................39

*SEC v. Mudd*,
  885 F.Supp.2d 654 (S.D.N.Y. 2012).......................................................................39

*SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*,
  296 F.R.D. 241 (S.D.N.Y. 2013) ..............................................................................38

vi

*SEC v. Paulsen,*
No. 18-cv-6718 (PGG), 2019 WL 13063380 (S.D.N.Y. Feb. 13, 2019)................................39

*SEC v. Paulsen,*
No. 18-cv-6718 (PGG), 2020 WL 1911208 (S.D.N.Y. Apr. 18, 2020)..................................39

*SEC v. Penn,*
225 F. Supp. 3d 225 (S.D.N.Y. 2016)......................................................................27

*SEC v. Rio Tinto plc,*
No. 17-cv-7994 (AT) (DCF), 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019),
*aff'd,* 41 F.4th 47 (2d Cir. 2022) ....................................................................... *passim*

*SEC v. Sugarman,*
No. 19-cv-5998 (WHP), 2020 WL 5819848, (S.D.N.Y. Sept. 30, 2020)..............................34

*SEC v. Syron,*
934 F. Supp. 2d 609 (S.D.N.Y. 2013).....................................................................25

*SEC v. Wey,*
246 F. Supp. 3d 894 (S.D.N.Y. 2017)................................................................34, 37

*SEC v. Yorkville Advisors, LLC,*
305 F. Supp. 3d 486 (S.D.N.Y. 2018).....................................................................37

*SEC v. Zandford,*
535 U.S. 813 (2002).............................................................................................22

*In re Take-Two Interactive Sec. Litig.,*
551 F. Supp. 2d 247 (S.D.N.Y. 2008)................................................................27, 34

*Taylor v. Westor Cap. Grp.,*
943 F. Supp. 2d 397 (S.D.N.Y. 2013)................................................................20, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007).............................................................................................3

*In re Tether & Bitfinex Crypto Asset Litig.,*
576 F. Supp. 3d 55 (S.D.N.Y. 2021).......................................................................37

*In the Matter of Tomita,*
CFTC No. 22-15, 2022 WL 1404268 (Apr. 27, 2022) ..........................................27

*Touchstone Strategic Trust v. Gen'l Elec. Co.,*
No. 19-cv-1876 (JMF), 2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022) ..................35

*In re Turquoise Hill Res. Ltd. Sec. Litig.,*
No. 20-cv-08585 (LJL), 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ..............35, 36

**Statutes**

7 U.S.C. 1a(47)(B)(i)-(x) ...................................................................................................11

7 U.S.C. § 1a(35) .............................................................................................................16

7 U.S.C. § 1a(47) ......................................................................................................4, 5, 11

7 U.S.C. § 9 ............................................................................................................... *passim*

15 U.S.C. § 78c(a)(68) ..........................................................................................11, 12, 13

15 U.S.C. § 78j(b) .................................................................................................17, 18, 23, 31

15 U.S.C. § 8302(b) ........................................................................................................11

15 U.S.C. § 8302(d)(1) ....................................................................................................11

15 U.S.C. § 8302(d)(4) ....................................................................................................14

**Rules and Regulations**

17 C.F.R. § 180.1 ...............................................................................................10, 17, 31

17 C.F.R. § 240.10b-5 ...............................................................................17, 18, 23, 31

Fed. R. Civ. P. 9(b) .................................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ...............................................................................................9, 11

**Other Authorities**

76 Fed. Reg. 41398-01, *Prohibition on the Employment, or Attempted Employment,*
    *of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*,
    (July 14, 2011) .......................................................................................................17, 18

77 Fed. Reg. 48208, *Further Definition of "Swap," "Security-Based Swap," and*
    *"Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap*
    *Agreement Recordkeeping* (Aug. 13, 2012)...................................................... *passim*

Lydia Beyoud et ano., "Archegos Spurs CFTC Boss's Vow to Scrutinize Family
    Offices," BLOOMBERG (May 9, 2022), *available at* https://bloom.bg/3I2CMnp......................1

"Prohibition Against Fraud, Manipulation, or Deception in Connection with
    Security-Based Swaps; Prohibition Against Undue Influence over Chief
    Compliance Officers; Position Reporting of Large Security-Based Swap
    Positions," SEC Release No. 34-93784, 2021 WL 6755214 (Dec. 15, 2021)...................23, 24

Patrick Halligan respectfully submits this memorandum of law in support of his motion to dismiss the Amended Complaint filed by the Commodity Futures Trading Commission ("**CFTC**") in this action (ECF No. 33, the "**Complaint**" or "**Cpl.**"). Halligan expressly incorporates, as if set forth herein, all arguments made in the motion to dismiss filed by Archegos Capital Management, LP ("**ACM**" or "**Archegos**") in this action (ECF No. 43).

## PRELIMINARY STATEMENT

In the wake of ACM's March 2021 collapse—a stunning, sudden loss of over $30 billion caused by factors outside of ACM's control—CFTC Chair Rostin Behnam proclaimed that his agency had failed.[1] The CFTC's rules *allow* family offices like ACM to build up large, unreported swap positions across multiple counterparties, and to do so with leverage. The CFTC has not alleged that ACM operated outside these rules, and instead through this action defies the limitations of those rules by bringing claims that it lacks jurisdiction to assert, based on conduct that is not actionable. And in doing so, it seeks to cast Halligan—a back-office employee with no role in trading—as somehow responsible for events caused by regulatory inaction, counterparties' voracious appetites for fees and profits, and a perfect storm of market conditions. This effort is factually wrong, and, for the reasons discussed below, it is also defective as a matter of law.

To begin, the Complaint should be dismissed in its entirety, with prejudice, because the conduct it alleges, even if wrongful, is outside of the CFTC's regulatory jurisdiction. The allegations against Halligan arise from alleged misrepresentations that others at ACM allegedly made to ACM's swap counterparties, regarding the commercial relationship between ACM and those counterparties. These statements, even if false, are not actionable under CFTC rules.

While ACM suffered extreme losses in connection with its trading of single-issuer total return swaps ("**TRS**"), those instruments are within the exclusive jurisdiction of the SEC (not the

---

[1] Lydia Beyoud et ano., "Archegos Spurs CFTC Boss's Vow to Scrutinize Family Offices," BLOOMBERG (May 9, 2022), *available at* https://bloom.bg/3I2CMnp.

CFTC), so this case *cannot* be about them, or any statement allegedly "in connection with" their purchase, sale, or offer.[2] Instead, the CFTC asserts jurisdiction based on swaps that ACM typically held as short investments. These swaps tracked the securities of dozens or hundreds of issuers (in contrast to the single-issuer TRSs that ACM typically held as long investments), and the CFTC does not allege that that these short swap positions contributed in any way to the losses that ACM or anyone else allegedly suffered during or after ACM's collapse. The CFTC's reliance on these swaps to assert jurisdiction fails for two reasons.

- The swaps are not regulated by the CFTC. The Dodd-Frank Act and the rules and interpretations that the SEC and the CFTC have promulgated thereunder define which financial instruments are CFTC-regulated "*swaps*," and which are SEC-regulated "*security-based swaps*." Although the CFTC summarily asserts that ACM's short swaps were of the sort that it has authority to regulate, in fact they were not: they bear the objective characteristics (namely, they either reference index-tracking single securities or their composition was subject to change at the discretion of ACM or its counterparties) that make them "security-based swaps" as defined by the applicable rules. Thus, they are regulated by the SEC. *See* Pt. 1.A.

- Even if the CFTC had jurisdiction over these short instruments (it does not), the misstatements alleged in the Complaint did not occur during negotiations over the terms of these swaps; they did not relate to the value or pricing of these swaps; and in fact they had nothing at all to do with any of these swaps. Rather, they related to characteristics of ACM itself, and were provided, as the CFTC's own allegations reveal, in connection with the counterparties' due diligence regarding their contractual and credit relationships with ACM. But statements relating to the contractual and credit relationship between swap counterparties—even if they are flatly false—are too attenuated from any CFTC-regulated swap to be subject to CFTC jurisdiction under 7 U.S.C. § 9(1). *See* Pt. 1.B.

Dismissal is also required because the CFTC has not pled the essential elements of its claims. It has brought a one-count complaint asserting that Halligan is primarily and secondarily liable for violating § 6(c)(1) of the Commodity Exchange Act and Rule 180.1 thereunder

---

[2] On the same day the CFTC filed its original complaint, the U.S. Attorney's Office for the Southern District of New York ("**SDNY**") indicted Halligan and Sung Kook (Bill) Hwang for alleged federal RICO and securities laws violations (*U.S. v. Hwang et ano.*, No. 22-cr-240 (Hellerstein, J.)), and the Securities and Exchange Commission ("**SEC**") filed a civil action against Halligan, ACM, Hwang, Scott Becker, and William Tomita (*SEC v. Hwang et al.*, No. 22-cv-3402 (Oetken, J.)). Halligan and Hwang have pled not guilty in the SDNY action, and intend to seek dismissal of the indictment. Halligan, ACM, and Hwang also moved to dismiss the SEC action; the SEC subsequently filed an amended complaint, which the defendants have moved to dismiss.

("**§ 6(c)(1)**," the "**CEA**," and "**Rule 180.1**," respectively), based on misrepresentations allegedly made by his former colleagues. But the CFTC has failed to allege that *Halligan* was the "maker" of any material misrepresentation, as would be required for misstatement liability after *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). *See* Pt. II.B. Nor has the CFTC sufficiently pled that *Halligan* engaged in deceptive conduct as would be required for scheme liability after *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) and the Second Circuit's recent decision in *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022). *See* Pt. II.C. Moreover, the CFTC has not sufficiently pled under Rule 9(b) that Halligan acted with the requisite scienter—he was a back-office professional with no conceivable motive to deceive trading counterparties, and the CFTC's allegations seeking to impute scienter to him based on the alleged misconduct of his former junior colleagues fail as a matter of law. *See* Pt. II.A.

Finally, the CFTC's aiding and abetting claim amounts to no more than "guilt by association," and fails to adequately allege facts that, if true, would show that Halligan had knowledge of any primary violation or substantially assisted any primary violation. Thus, it fails as a matter of law as well. *See* Pt. III.

## STATEMENT OF ALLEGED FACTS

The allegations of fact in the Complaint are presumed to be true only for the purposes of this motion, and only to the extent they are not contradicted by judicially noticeable material. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

### A.    **Halligan's Role at Archegos**

ACM was established in 2013 as a family office to manage the personal funds of its founder, Sung Kook (Bill) Hwang (referred to in the Complaint as "Founder"). Cpl. ¶¶ 18, 24. The Complaint alleges that Halligan was ACM's chief financial officer ("**CFO**"), but otherwise offers no well-pled facts regarding his responsibilities at ACM. Among other things, it does not allege that Halligan had any role in investment decisions or trading at ACM. *Id.* ¶¶ 17, 57-58. Indeed, it

alleges that Hwang made all investment decisions at ACM. *Id.* ¶¶ 18, 71. Trading at ACM was conducted primarily by head trader William Tomita, who reported to Hwang. *Id.* ¶¶ 19, 71. Halligan is not alleged to have had any role or responsibility in supervising Tomita. *See id.* ¶¶ 17, 19.

The Complaint alleges that Halligan supervised ACM's Director of Risk Management, Scott Becker, and further alleges that during at least the period from March 2020 through March 2021 (defined in the Complaint as the "Relevant Period"), Becker was the "primary contact at Archegos for credit risk-related issues." *Id.* ¶¶ 1, 20, 57. The Complaint does not allege that Halligan had any contact with ACM's counterparties during the Relevant Period.

B.    **Archegos's Long-Term Contractual Relationships with its Counterparties**

ACM's trading counterparties were the world's most sophisticated banks and prime brokers (the "**Counterparties**"). ACM's relationships with its Counterparties were contractual. *Id.* ¶¶ 3 n.1, 29-34, 36, 46, 72, 84-85. The CFTC has not alleged that Halligan made, knew of, or participated in any misrepresentations or omissions to procure Counterparties' agreement to these contracts.[3]

Most of ACM's trading was conducted through TRSs, which are agreements under which the buyer (here, ACM) and the seller (here, the Counterparties) agree to exchange cash flows tied to the price of referenced securities. *Id.* ¶ 3 n.1. TRSs referencing single issuers of the sort traded by ACM are within the exclusive jurisdiction of the SEC and are not subject to regulation by the CFTC. *See* 7 U.S.C. § 1a(47).

---

[3] The CFTC alleges that Halligan signed certain "transaction confirmations" with counterparty MUFG (referred to in the Complaint as "Swap Counterparty ['**SC**'] 9"), which contained the incorrect representation that "the aggregate amount of all Shares beneficially owned by [ACM] for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative positions, is less than 5% of the outstanding shares." Cpl. ¶ 72. However, as discussed further below, the Complaint does not allege that Halligan knew that these representations were not correct or had access to or reviewed information showing that these confirmations were in error. *Id.*

In addition to its long positions in single-name TRSs, ACM also acquired sometimes substantial short positions in "basket" and "index" swaps, which, instead of referencing a single issuer, directly or indirectly reference dozens or hundreds of underlying issuers. Cpl. ¶¶ 3, 37. Some of these swaps referenced exchange-traded funds, or "ETFs," which issue tradeable shares that are correlated to hundreds of underlying securities (the "**ETF Swaps**"), and others referenced custom collections of underlying securities (the "**Basket Swaps**").[4] *Id.* ACM's short Basket and ETF Swaps generally provided protection against downward market movements, because ACM would be entitled to payment under these contracts if the underlying securities declined in value. *Id.* ¶¶ 26, 37. The CFTC does not allege that Halligan had *any* role in negotiation, execution, or investment decisions as to ETF or Basket Swaps.

ACM's contracts with its Counterparties also allowed it to trade using leverage (i.e., on margin)—meaning that it would post an agreed-upon amount of collateral with its Counterparty, and it could buy swaps that exceeded the value of the collateral. *Id.* ¶¶ 31-33. The CFTC does not allege that trading in highly leveraged positions (as ACM did) is wrongful.

## C.   The CFTC's Allegations Regarding Statements to ACM's Counterparties

The Complaint alleges that beginning in March 2020 and continuing through ACM's collapse in March 2021, ACM engaged in a scheme to mislead the Counterparties regarding the amount of risk associated with its investment portfolio. *Id.* ¶¶ 1, 68-71, 90. The CFTC alleges that the purpose of this was to allow ACM to "obtain additional capacity to trade even greater volumes of highly leveraged, concentrated, and illiquid long [TRS] positions, while maintaining favorable margin rates." *Id.* ¶ 5. The Complaint alleges that if ACM had provided accurate information about

---

[4]  The CFTC refers to these instruments as ETF Swaps and Custom Basket Swaps, respectively, and it refers to them together as "Broad-Based Security Index Swaps." Cpl. ¶ 3. The Appendix to the Complaint purports to be a schedule of "Broad-Based Security Index Swaps" that ACM traded with the Counterparties during the Relevant Period. *See id.* ¶ 37 & App. As discussed further below, *see* Pt. I.A, the ETF Swaps and Basket Swaps are "security-based swaps" subject to SEC jurisdiction rather than "swaps" subject to CFTC jurisdiction.

its portfolio, the Counterparties would have extended less capacity to trade long single-name TRSs

(which, as noted, are *not* regulated by the CFTC) and would have required ACM to post more

collateral to finance those long TRSs. *Id.* ¶¶ 5-6, 68. The Complaint does not allege that the

misrepresentations induced Counterparties into extending capacity for short ETF or Basket Swaps

that they otherwise would have withheld—nor would such an allegation make sense, as the

purpose of the ETF or Basket Swaps was to reduce the market risk of the portfolio. *Id.* ¶¶ 6, 26, 37.

The Complaint alleges that Becker and Tomita (never Halligan) made misrepresentations

during *ad hoc* conversations with Counterparties' credit and risk officers. *Id.* ¶¶ 42, 55-67, 71, 77.

These conversations did not relate to the terms of any single-name TRS or ETF or Basket Swap

trades that ACM engaged in with the Counterparties, and instead related to the contractual and

overall commercial relationship between the Counterparties and ACM. *Id.* The Complaint further

alleges that as a result of some of these conversations, Counterparties agreed to capacity increases

and more favorable margin rates for long single-name TRSs. *Id.* ¶ 42. As it relates to the ETF and

Basket Swaps, the Complaint alleges that if the Counterparties had received accurate information

from Becker and Tomita, they might have requested or required ACM to purchase more of these

short instruments to maintain a desired ratio between its short and long investments. *Id.* ¶¶ 6, 55,

69. Then, in turn, the Complaint alleges that *if* the Counterparties had requested or required that

ACM purchase more of these short instruments *and* ACM had failed to so, *then* the Counterparties

*might* have raised ACM's margin rates or restricted its capacity to trade long TRSs. *Id.* ¶¶ 37, 56.

The CFTC alleges that Becker (and in several instances Tomita) made misrepresentations

in three categories:

- ***Portfolio Concentration*** – the Complaint alleges that at various times, Becker told
  Counterparties that ACM's largest single position represented 35% of the net value
  of its assets ("NAV"). *Id.* ¶¶ 58-60, 77. The Complaint alleges that "in or around
  2018" (years before the Relevant Period), Halligan told Becker to provide
  Counterparties with this 35% figure "regardless of the true figure." *Id.* ¶ 58.
  However, the Complaint does not allege that 35% was an inaccurate figure at that

time, and fails to explain when it became inaccurate. Though the CFTC alleges that "Becker received daily reports detailing the size of Archegos Fund's positions," (*id.* ¶ 59), it does not allege that Becker (or Halligan) actually reviewed those reports, let alone what those reports stated. And the Complaint also offers no cogent explanation for why Halligan would have said this to Becker "in or around 2018" (which was years before ACM is even alleged to have begun to run out of capacity at the Counterparties), or why Becker would have relied on the instruction for years.

- *Liquidity* – the Complaint alleges that Becker and Tomita provided Counterparties with inaccurate metrics of how long it would take ACM to liquidate (i.e., sell) some or all of its portfolio. *Id.* ¶¶ 63-64. As with the alleged concentration misstatements, the Complaint only sometimes alleges what a purportedly accurate figure would have been (*see id.*), and does not allege that Halligan actually reviewed, or was even aware of, internal records that would have demonstrated the accurate metrics. *Id.* The Complaint contains only one allegation that Halligan "direct[ed]" Becker to misstate the liquidity profile (and contains no allegations that Halligan directed Tomita), but does so only in conclusory fashion. *Id.* ¶ 64. There are no specific, fact-based allegations about when this direction took place, what was said, or even that Halligan actually knew that the liquidity profile that Becker provided to Counterparties was false. *Id.*

- *Portfolio Composition* – the Complaint alleges that Becker and Tomita provided Counterparties with inaccurate descriptions of the investments that it held, for example understating ACM's holdings or concentration in particular issuers (namely, GSX Techedu Inc. ("**GSX**")), *id.* ¶ 65, or overstating its holdings or concentration in other issuers, *id.* ¶ 61 (alleging that Becker misrepresented that "the fund's largest positions consisted of highly liquid tech stocks"). The Complaint does not allege that Halligan ever discussed these alleged misrepresentations with Becker or Tomita, or even that he was aware of them. *See id.* ¶¶ 61, 65.

As to each of these categories, the Complaint does not allege that ACM was required to maintain any particular metric (e.g., concentration under 35%; a certain liquidity profile; or a particular portfolio composition) as a term of any ETF or Basket Swap transaction.

Finally, the Complaint alleges only one instance of alleged misstatements by Halligan. It alleges that before ACM entered into certain TRS trades with SC 9, Halligan signed "transaction confirmations" that contained false representations about the size of ACM's total positions in relevant equity and TRSs. *Id.* ¶ 72. The Complaint does not allege that Halligan actually knew that these representations were false at the time he signed them; instead, it broadly alleges that Halligan "knew or recklessly disregarded" the falsity of these representations "based on his knowledge of and access to information about Archegos Fund's portfolio," without identifying any particular

7

information or reports that Halligan accessed and reviewed. *Id.* ¶ 72. And while the CFTC does not

provide specifics about the transactions to which these confirmations related, the Complaint

explicitly states that they related to "TRS swap transaction[s]," *id.*, and does not allege that these

confirmations had anything whatsoever to do with any trades in ETF or Basket Swaps.

**D.**     **The Week of March 22, 2021**

ACM suffered extreme losses in the value of its TRS investments during the week of

March 22, 2021. *Id.* ¶¶ 73-75. The losses were triggered by events outside of ACM's control,

including (1) a secondary offering in ViacomCBS Inc. ("**Viacom**," ACM's largest position) that

priced substantially below the market price of the company's stock, *id.* ¶¶ 74-75, setting off

massive declines in that and correlated investments,[5] and (2) an announcement by the SEC that it

was enhancing regulation on China-based companies, which put pressure on many such issuers,

including a number of ACM's largest positions. *Id.* ¶ 75.[6] These losses are not alleged to have been

incurred in connection with the ETF or Basket Swaps.

The Complaint alleges that Becker made several misrepresentations to Counterparties

during that week. Specifically, it alleges that Becker told SC 2 on March 24 that ACM had $9B in

cash on hand and was not facing a "distress situation," at a time when the family office allegedly

had less than $2B in available cash. *Id.* ¶ 79. Halligan is not alleged to have participated in this

conversation, or even known about it. *Id.* Becker also allegedly prepared a set of talking points,

which he allegedly discussed with Halligan and then used during conversations with

Counterparties on March 25, which included supposedly false information about the amount of

real-time information that Becker had access to (specifically, ACM's live trade blotter and the total

---

[5]  Viacom declined 51.4% between March 22 and 26; the correlated Discovery Communications Inc. stocks (Class A and Class C shares) both declined 46% over that same period. *See* Exs. G, H. The Court may take judicial notice of the price of stocks traded on major exchanges. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000).

[6]  Between March 22 and 26, iQIYI, Inc. declined 37.6%; Baidu, Inc. declined 20%; Tencent Music Entertainment Group declined 33%; GSX declined 55%; Vipshop Holdings Ltd. declined 31.1%. *See* Exs. A-F.

amount of margin calls it had received). *Id.* ¶ 81. The Complaint alleges that Halligan, "as

Becker's direct supervisor," knew that the statements in the talking points were false or

misleading, and that through these alleged misrepresentations, Becker "concealed his knowledge

of Archegos Fund's financial state and plans to reduce exposure," and thereby sought to "conceal

the true nature and extent of [ACM's] scheme and attempt[ed] to delay the failure of Archegos

Fund." *Id.* at ¶¶ 81-82.

The Complaint does not allege that these supposed misstatements during the week of

March 22, 2021 related to any transaction involving the ETF or Basket Swaps. *See id.* ¶¶ 76-83.

As the declining value of ACM's long TRS positions led to margin calls that it was unable

to meet, its Counterparties issued notices of default and exercised their early termination rights

pursuant to the terms of their agreements with ACM. *Id.* ¶¶ 84-85. Counterparties allegedly

suffered losses in connection with the unwinding of ACM's long TRS positions, but the CFTC

does not allege that Counterparties suffered any losses in connection with the unwinding of ETF or

Basket Swaps. *Id.* ¶¶ 85-86.

## **ARGUMENT**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the CFTC must push its

claims "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007). While factual allegations are accepted as true, "legal conclusions" and "legal

conclusion[s] couched as [] factual allegation[s]" are not. *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009). Likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (cleaned up), and

allegations "contradicted" by documents referenced in the Complaint "are insufficient."

*Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002). Additionally, because the

CFTC's claims against Halligan are based on fraud, they must satisfy the heightened pleading

requirements of Fed. R. Civ. P. 9(b) and "state with particularity the circumstances constituting" the alleged fraud. *See CFTC v. Gorman*, 587 F. Supp. 3d 24, 38-39 (S.D.N.Y. 2022).

Here, the CFTC alleges that Halligan committed primary and secondary violations of § 6(c)(1) of the CEA and Regulation 180.1(a)(1)-(3). In Section I, we explain that the Complaint is jurisdictionally defective for two separate and independent reasons. First, the ETF and Basket Swaps upon which the CFTC premises its jurisdiction are in fact SEC-regulated products, so even if there were merit to these claims (there is not), the CFTC is the wrong regulator to assert them. *See* Pt. I.A. Second, we explain that, even if the ETF and Basket Swaps were subject to CFTC regulation, the CFTC's claims still fail because the Complaint does not adequately allege that the supposed fraud had a sufficient nexus to *those* swaps (as distinct from the long single-name TRS swaps that ACM traded). *See* Pt. I.B. In Section II.A, we explain that all of the CFTC's primary liability claims against Halligan fail because the Complaint does not allege that he acted with scienter. In Section II.B, we explain that the CFTC's misstatement claims under § 6(c)(1) and Rule 180.1(a)(2) fail because Halligan is not the "maker" of any material misstatement under *Janus*. In Section II.C, we explain that the CFTC's scheme liability claims under § 6(c)(1) and Rule 180.1(a)(1) and (3) fail because the CFTC has not alleged that Halligan engaged in any deceptive act as required under *Lorenzo* and *Rio Tinto plc*. And in Section III, we explain that the aiding and abetting claims fail because the CFTC has not adequately pled that Halligan knew of, and substantially assisted, any primary violation.

## I.
## THE CFTC LACKS JURISDICTION TO ASSERT A CLAIM AGAINST HALLIGAN BASED ON ACM'S TRADING IN ETF AND BASKET SWAPS

### A.     The CFTC Lacks Jurisdiction Over the ETF and Basket Swaps

The CFTC asserts that it has jurisdiction over its claim against Halligan based on ACM's trading in ETF and Basket Swaps, which the CFTC claims are "swaps" within its regulatory jurisdiction. Cpl. ¶ 13. The CFTC is wrong; the ETF and Basket Swaps are in fact "security-based

swaps" that are subject to SEC, *not CFTC*, regulation and jurisdiction. The Complaint must be dismissed because the CFTC lacks jurisdiction to assert any claim against Halligan.[7]

In Title VII of the Dodd-Frank Act,[8] Congress allocated regulatory authority to the CFTC with respect to financial products defined to be "swaps," and regulatory authority to the SEC with respect to financial products defined to be "security-based swaps." *See* 15 U.S.C. § 8302(b). The Dodd-Frank Act generally defined "swaps" and "security-based swaps," *see* 7 U.S.C. 1a(47)(B)(i)-(x), and it also directed the SEC and the CFTC, in consultation with the Federal Reserve, to adopt rules further defining these terms, *see* 15 U.S.C. § 8302(d)(1). Acting pursuant to that direction, the SEC and the CFTC in 2012 adopted final rules further defining the terms "swap" and "security-based swap."[9] As relevant here, Title VII together with the SEC/CFTC Swap Rules provide the following framework:

*First*, the statutory definition of "swap" (regulated by the CFTC) includes agreements under which parties agree to exchange payments based on the value or level of specified securities, and under which the parties transfer "the financial risk associated with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest." 7 U.S.C. § 1a(47)(A). This specifically includes TRSs. *Id.*

*Second*, the statutory definition of "swap" expressly *excludes* any instrument defined to be a "security-based swap," *id.*, which in turn means any "swap" that is based on "a single security or

---

[7]  Whether the CFTC has regulatory jurisdiction over the financial instruments at issue is a question that the Court may consider and resolve on a Rule 12(b)(6) motion. *See CFTC v. White Pine Tr. Corp.*, 574 F.3d 1219, 1222, 1227 (9th Cir. 2009) (remanding with instructions to dismiss case based on CFTC's lack of statutory jurisdiction over certain trading in foreign currency options, and observing that the "argument that the CFTC lacks jurisdiction to bring the case is thus akin to a claim that there is no cause of action provided by the statute, an argument that at the motion to dismiss stage would be brought under Rule 12(b)(6)").

[8]  The Dodd-Frank Wall Street Reform and Consumer Protection Act, 124 Stat. 1376 (2010) (the "**Dodd-Frank Act**") substantially overhauled the regulation of over-the-counter (OTC) derivatives, including swaps.

[9]  *See* 77 Fed. Reg. 48208, *Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping* (Aug. 13, 2012) ("**SEC/CFTC Swap Rules**").

loan, including any interest therein on the value thereof." 15 U.S.C. § 78c(a)(68). Thus, a single-name TRS is a "security-based swap."

*Third*, under the SEC/CFTC Swap Rules, instruments that reference a collection of underlying securities rather than a single security may be either "swaps" or "security-based swaps" depending on their characteristics. As relevant here, a key defining characteristic is whether the instrument gives "one or both of the counterparties, either directly or indirectly (e.g., through an investment adviser or through the third-party index provider), discretionary authority to change the composition of the security portfolio, including, for example, by adding or removing securities in the security portfolio on an 'at-will' basis during the term of the Title VII instrument." 77 Fed. Reg. 48208, at 48285. If either or both of the counterparties have such discretion, then the instrument is a "security-based swap." *Id.*

Applying these definitions to the instruments that ACM traded with its Counterparties demonstrates that all these instruments are "security-based swaps," and none of them is subject to CFTC regulation.

**Single-Name TRSs** – Single-name TRSs (i.e., total return swaps referencing the securities of a single issuer), which are the instruments that constituted the majority of ACM's long investments, *see* Cpl. ¶¶ 3-6, are "security-based swaps" under the statutory definition, and therefore subject to SEC regulation and jurisdiction. *See* 15 U.S.C. § 78c(a)(68) (security-based swaps include swaps based on "a single security or loan, including any interest therein on the value thereof"). The CFTC does not assert otherwise. *See* Cpl. ¶ 13.

**ETF Swaps** – The ETF Swaps that ACM traded are effectively no different than the single-name TRSs for the purposes of applying the statutory definitions. This is because the ETF Swaps do not directly reference the performance or value of the underlying indices, but instead directly reference securities: the shares or units that exchange-traded funds (ETFs) have issued.

For example, the Appendix lists many transactions in an instrument titled "SPDR S&P 500 ETF Trust." *See* App. at 1. This ETF has issued a prospectus, which it has filed with the SEC, explaining that it "was created to provide investors with *the opportunity to purchase a <u>security</u>* representing a proportionate undivided interest in a portfolio of securities consisting of substantially all of the component common stocks, in substantially the same weighting, which comprise the Standard & Poor's 500® Index (the 'S&P 500® Index')." *See* Ex. I at 25 (emphasis added).[10] Similarly, the Appendix lists a number of transactions in an ETF called "iShares MSCI Emerging Markets ETF." *See* App. at 2. That ETF's prospectus explains that "ETFs are funds that *trade like other publicly-traded <u>securities</u>*. The Fund is designed to track an index. . . . An index is a financial calculation, based on a grouping of financial instruments, and *is not an investment product*, while the Fund is an actual investment portfolio." *See* Ex. J at 1 (emphases added). And the "Invesco QQQ Trust," see App. at 1, has issued a prospectus that explains that its shares "are listed for trading on the NASDAQ Global Market tier of NASDAQ[, and they] *are bought and sold in the secondary market <u>like regular shares of stock</u> at any time during the trading day*." *See* Ex. K at 4 (emphasis added).[11]

Neither the statutory definitions nor the SEC/CFTC Rules provide any basis for the CFTC to assert jurisdiction over swaps that reference ETF shares; to the contrary, ETF shares are single-issuer securities for the purposes of these definitions. This is clear from the statutory definitions alone. "Security-based swap" includes *any* swap based on "a single security or loan," without any exception for single-security swaps that themselves reference or replicate an underlying index. 15 U.S.C. § 78c(a)(68). The SEC/CFTC Swap Rules confirm this interpretation: "where

---

[10]  The Court can take judicial notice of materials filed with the SEC. *See Garcia v. Bill Me Later, Inc.*, No. 13-cv-8701 (RJS), 2015 WL 4578613, at *4 (S.D.N.Y. July 28, 2015) ("The Second Circuit has also held it proper for district courts to consider facts contained within SEC filings.").

[11]  Prospectuses for all of the ETFs referenced by the ETF Swaps listed in the Appendix are attached to the Mulligan Decl. as Exhibits I-O. Like the examples discussed above, each prospectus (highlighted for the Court's reference) states that the ETF issued publicly traded securities that tracked a particular index or collection of underlying assets.

a TRS is based on a single security or loan, or a narrow-based security index, the TRS would be a security-based swap." 77 Fed. Reg. 48208, 48264.[12] Because the ETF Swaps reference shares of the ETFs, and not the underlying indices directly, they are "security-based swaps" that the CFTC has no jurisdiction to regulate. Indeed, the SEC agrees: in "Frequently Asked Questions About Security-Based Swaps" that it has posted to its website, a question asks whether a swap referencing shares of an ETF is a swap or a security-based swap, and the SEC responded definitively:

> In the staff's view, **the swap based on the shares of an exchange traded fund (ETF) that tracks a broad-based securities index, such as the S&P 500, is a security-based swap**. . . . Interests, or shares, in an ETF or another similar exchange-traded product, such as a commodity pool or physical trust, are securities under Section 2(a)(1) of the Securities Act of 1933 (Securities Act) and Section 3(a)(10) of the Exchange Act . . . Accordingly, **a swap based on the shares of an ETF or another similar exchange traded product meets the definition of security-based swap because it is based on a single security or loan, including any interest therein or on the value thereof**. This view does not change depending on the holdings of the ETF or other similar exchange-traded product, or the assets or index the ETF or other similar exchange-traded product tracks.

Ex. P at 1-2 (emphases added).

Notably, the Complaint offers no viable explanation for the CFTC's assertion of jurisdiction over the ETF Swaps. In fact, it concedes that the ETFs issue shares that "can be bought or sold on an exchange like a stock," Cpl. ¶ 27, which is one of the characteristics that forecloses the CFTC's jurisdiction. While it goes on to rely on the fact that ETF Swaps ultimately referenced the individual components of the underlying indices, this indirect economic exposure is insufficient to transform these instruments into "swaps" because the direct economic exposure that

---

[12]  Before the enactment of the SEC/CFTC Swap Rules, a commenter sought clarification from the SEC and CFTC regarding "the status of swaps on shares of exchange traded funds that reference broad-based security indices." 77 Fed. Reg. 48208, 48324. The Commissions chose not to enact any rule that would contravene the plain letter of the statute—i.e., that an ETF that issues securities is a single issuer. *See id.* ("market participants can request a clarification through the interpretation process established herein by the Commissions"). And given the absence of explicit rulemaking, the Dodd-Frank Act forbids the CFTC from unilaterally interpreting these definitions in a manner that contradicts the plain statutory language. 15 U.S.C. § 8302(d)(4) & (d)(1).

the ETF Swaps actually provided was to the securities *of the ETFs*. As their prospectuses make clear, each ETF is a single issuer that is distinct from whatever underlying issuers make up its reference index, and, moreover, the prospectuses disclose that the performance of the ETF shares could vary from the performance of the underlying index.[13] Accordingly, there is no basis for the CFTC to ignore the formalities of these instruments and treat them as if they referenced the indices directly, when in fact they do not.

**Basket Swaps** – The SEC/CFTC Swap Rules expressly explain why the Basket Swaps are "security-based swaps" and not CFTC-regulated "swaps." Specifically, under the Basket Swaps, ACM and the Counterparties had "discretionary authority to change the composition or weighting of securities in [the underlying] security portfolio[s]," and thus the swaps referencing those portfolios are therefore "security-based swaps." 77 Fed. Reg. 48208, at 48285.

For example, under the "Portfolio Swap Master Confirmation" between UBS (referred to in the Complaint as "SC 4") and Archegos Fund, both parties "may agree at any time to change the terms of any [transaction]," and with respect to basket swaps specifically, "[Archegos Fund] may remove one or more Shares from the Basket at any time, subject to UBS's prior consent, which consent shall not be unreasonably withheld." Ex. Q, at 2, 15.[14] Similarly, under the "Master Confirmation Agreement for Synthetic Equity Products" between Goldman Sachs (referred to in

---

[13]  *See, e.g.*, Ex. J, at 1 ("The performance of the Fund and the Underlying Index may vary for a number of reasons, including transaction costs, non-U.S. currency valuations, asset valuations, corporate actions (such as mergers and spin-offs), timing variances and differences between the Fund's portfolio and the Underlying Index resulting from the Fund's use of representative sampling or from legal restrictions (such as diversification requirements) that apply to the Fund but not to the Underlying Index.").

[14]  The CFTC enumerates the specific Basket Swap transactions that it relies upon to establish its jurisdiction. Cpl. ¶¶ 13, 26, 28 & App. (referring to each individual Basket Swap by execution date, Counterparty, and notional amount). The Court can consider on this motion the agreements governing the transactions that the CFTC has referenced because the agreements are integral to the Complaint's jurisdictional allegations; the CFTC necessarily relied upon the terms of the agreements to assert (incorrectly) that it has jurisdiction over the Basket Swaps; and because the CFTC possessed these agreements when it prepared the Complaint. *See Paulsen v. Stifel, Nicolaus & Co.*, No. 18-cv-09440 (CM), 2019 WL 2415213, at *3 (S.D.N.Y. June 4, 2019) ("Reliance may occur when the extraneous material is a legal document upon which the plaintiff's complaint stands or falls but which Plaintiff has not attached to the complaint, likely because it would undermine his claim.") (cleaned up).

the Complaint as "SC 1") and Archegos Fund, either party had the right to close out any transaction "in whole or in part," provided that the party was not then in default and certain other conditions were satisfied. Ex. R, at 14. The "Amended and Restated Synthetic Prime Brokerage Master Confirmation" between Nomura (referred to in the Complaint as "SC 5") and Archegos Fund likewise contains no prohibition on the ability of the parties to change the components of the Basket Swaps at their discretion, and, to the contrary, contemplates that the parties may at their discretion unwind "Units" of their swap transactions (as distinct from unwinding any entire transactions), which in the case of Basket Swaps means the "number of Shares of each Issuer included in a single [Basket Swap transaction]." Ex. S, at §§ 3.3, 3.5 & Schedule 3-1.[15]

In sum, the relevant agreements permit the parties to make discretionary changes to the composition of their Basket Swaps. Indeed, the CFTC has not pled that any restrictions on the parties' ability to change the Basket Swaps' composition exist—in fact, the Complaint alleges that the Basket Swaps were often "customized in various ways (for example, to remove certain securities in which Archegos Fund held significant long positions)." Cpl. ¶ 28. Instead, the CFTC's conclusory assertion of jurisdiction over these instruments appears to rely exclusively on the fact that the Basket Swaps "referenced hundreds of securities," and thus their composition did not meet the statutory definition of "narrow-based security index" under 7 U.S.C. § 1a(35). *See id.* But as the SEC/CFTC Swap Rules explain, where the parties have "discretionary authority to change the composition or weighting of securities in a security portfolio, *that security portfolio will be treated as a narrow-based security index*," without making any provision for the number of components in the portfolio. 77 Fed. Reg. 48208, at 48285 (emphasis added).

---

[15] Exhibits T-Y are agreements between ACM and each Counterparty to the Basket Swap identified in the Appendix. Like the examples discussed above, these agreements permit ACM and/or the relevant Counterparty to change the composition of Basket Swaps, provided they remain in compliance with various other contractual terms. Relevant passages are highlighted for the Court's reference and convenience.

3695432.1

Accordingly, the CFTC's bald claim of jurisdiction is wrong as a matter of law. Because the CFTC has no jurisdiction to regulate the TRSs, the ETF Swaps, or the Basket Swaps, its claims against Halligan must be dismissed.

**B.    The CFTC Fails to Allege that Halligan Engaged in Fraud "*In Connection With*" CFTC-Regulated Swaps**

Even if the Court rejects Halligan's argument that the ETF and Basket Swaps are outside the CFTC's jurisdiction, the claims against Halligan must nevertheless be dismissed because the conduct in which he is alleged to have engaged—supposed misstatements to ACM's Counterparties regarding its creditworthiness—did not occur "in connection with" the ETF or Basket Swaps. Indeed, even if it is assumed *arguendo* that the statements at issue were false; were material; were made by Halligan; and were made with scienter, dismissal would be required because the nexus between these statements and the ETF and Basket Swaps is too attenuated to support an action under the CEA. *See Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984).

Section 6(c)(1) reaches only conduct that occurs "in connection with" CFTC-regulated swaps. The CFTC acknowledged in its commentary regarding the implementing rule (Rule 180.1) that the "in connection with" language in the CEA was modeled after, and would be interpreted in conformity with, the parallel provision of the Exchange Act and its implementing rule (Section 10(b) and Rule 10b-5, respectively). *See* 76 Fed. Reg. 41398-01, 41,405-06, *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, (July 14, 2011) (*codified at* 17 C.F.R. § 180.1). While the Exchange Act provisions refer to conduct "in connection with the purchase or sale" of SEC-regulated securities, and the CEA provisions refer to conduct "in connection with" CFTC-regulated swaps, the CFTC and courts have agreed that the implementing rules should be interpreted consistently. *See Jing v. Sun*, No. 21-cv- 2350, 2022 WL 1505950, at *17 (E.D.N.Y. Jan. 4, 2022); *In re Commodity Exch.,*

*Inc.*, 213 F. Supp. 3d 631, 672 (S.D.N.Y. 2016) ("the CFTC has stated that it is 'guided, but not controlled, by the substantial body of judicial precedent applying the comparable language of SEC Rule 10b-5.'") (*quoting* 76 Fed. Reg. 41398-01, 41,399)). Accordingly, courts apply the more well-developed jurisprudence interpreting Section 10(b) and Rule 10b-5 to resolve disputes regarding the scope of the "in connection with" requirement of the CEA. *See Jing*, 2022 WL 1505950, at *17; *Loginovskaya v. Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014).

Turning to that requirement, assessing whether the required "stringent connection" has been established requires "a cautious case-by-case approach," *Chem. Bank*, 726 F.2d at 942 (cleaned up); *Schwartz v. Duckett*, No. 88-cv-5395 (MBM), 1989 WL 16054, at *2 (S.D.N.Y. Feb. 21, 1989), *vacated in part on other grounds* (May 26, 1989). It is not enough for a plaintiff to allege fraudulent conduct between transactional counterparties; the antifraud provisions of neither the Exchange Act nor the CEA govern counterparty relationships generally. *See Alex. Brown & Sons Inc. v. Marine Midland Banks, Inc.*, No. 96-cv-2549 (RWS), 1997 WL 97837, at *6 (S.D.N.Y. Mar. 6, 1997) (dismissing § 10(b) claim brought by securities clearing broker against counterparty bank, where the broker alleged that the bank had misrepresented that funds were available to purchase the securities at issue). Nor is it enough that covered securities or swaps are somehow involved in the transaction in which the fraud is alleged to have occurred. *Chem. Bank*, 726 F.2d at 943 (dismissing claim where securities were pledged as collateral in the transaction in which fraud was alleged to have occurred). Rather, the plaintiff must specifically demonstrate that the alleged fraud was connected to the purchase, sale, or offer of regulated instruments. *Id.*; *Manufacturers Hanover Tr. Co. v. Smith Barney, Harris Upham & Co. Inc.*, 770 F. Supp. 176, 181 (S.D.N.Y. 1991) ("something more than a 'de minimis' relationship between the fraudulent scheme and the purchase or sale of securities is required").

In *Chemical Bank* and subsequent cases, courts have rejected plaintiffs' efforts to package related but individually non-actionable transactions—where some involve covered instruments (but no fraud) while others involve fraud (but no covered instruments)—into a single actionable transaction. *See Crummere v. Smith Barney, Harris Upham & Co.*, 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("[T]he misrepresentation must relate to the securities alleged to satisfy the purchase and sale requirement, and not just to the transaction in its entirety."). For example, in *Bissell v. Merrill Lynch & Co.*, the court dismissed the complaint on this basis where a brokerage customer alleged that a broker fraudulently retained interest on collateral that the customer posted to secure securities trades. 937 F. Supp. 237, 243 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998). The court explained that even though the collateral account undoubtedly facilitated the customer's securities transactions with the broker, the alleged fraud in connection with "the alleged nondisclosure at issue . . . pertains not to the sale of the securities or the value of the securities themselves, ***but to the terms of the relationship between the broker and the customer***." *Id.* at 243-44 (emphasis added, cleaned up). *See also Chadbourne & Park LLP v. Troice*, 571 U.S. 377, 387 (2014) ("a fraudulent misrepresentation or omission is not made in connection with such a purchase or sale of a covered security *unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a covered security*") (emphasis added).

These principles are fatal to the CFTC's claims against Halligan. The CFTC does not allege that he had *any* role in the ETF or Basket Swap transactions between ACM and the Counterparties—he did not make investment decisions (i.e., deciding which ETF or Basket Swaps to buy or sell); did not negotiate the terms of the ETF or Basket Swaps, such as their pricing, duration, or composition; and is not alleged to have engaged in *any* trading with the Counterparties at all. Whatever vague role he is alleged to have had in the supposed fraud, it is not "in connection with" transactions in which he had no part.

Nor does the CFTC allege that Halligan (or anyone else) made any fraudulent or deceptive statement that was relevant to the terms of the ETF or Basket Swap transactions—to the contrary, the Counterparties received exactly what they bargained for in the ETF and Basket Swaps. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018) (affirming dismissal where alleged misrepresentations did not relate to the "value of the securities" or the "consideration [seller] received," and plaintiff "received exactly what it expected" in disputed securities transactions). Likewise, the Complaint does not allege that Halligan (or anyone else at ACM) made any misrepresentation about the value of the ETF or Basket Swaps, or the consideration that ACM would pay in the transactions. *See Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 403 (S.D.N.Y. 2013) ("[C]ourts have drawn a line separating fraud claims that impact the fundamental valuation of the securities at issue, and the operation of securities markets, as distinguished from those that do not."). To the contrary, the alleged misrepresentations related to metrics associated with ACM's overall investment portfolio—but those metrics were not a term or condition of the ETF or Basket Swaps, nor was ACM required to disclose any of them pursuant to the terms of any ETF or Basket Swap. *See supra* at p.7.

The CFTC concedes as much, acknowledging that the alleged misrepresentations occurred during *ad hoc* due diligence calls between Becker or Tomita and the Counterparties. Cpl. ¶¶ 59-64. But these conversations lack any well-pled nexus to any ETF or Basket Swap. For example, the CFTC alleges that in "late 2020 or early 2021, Becker had a telephone call with [SC] 3" in which the Counterparty inquired about ACM's largest holdings, in response to which Becker allegedly misrepresented the size of ACM's largest positions. *Id.* ¶ 59. The CFTC alleges that other misrepresentations took place on calls during which a Counterparty asked about "the aggregate composition of Archegos Fund's holdings," *id.* ¶¶ 4, 56, or about the amount of time it would take to liquidate ACM's portfolio, *id.* ¶¶ 63-64. By the very terms of the Complaint, these

20

conversations were not conducted in connection with ETF or Basket Swap transactions, but rather were conducted in connection with the overall assessment of ACM's credit risk. *Id.* ¶¶ 59-64. And that dooms the Complaint, because as the U.S. Supreme Court held in *Chadbourne & Park LLP*, misrepresentations by an investor that "it was creditworthy" do not satisfy the "in connection with" requirement. 571 U.S. at 391.

The CFTC attempts to overcome this fatal flaw in its pleading by alleging that the ETF or Basket Swap transactions "frequently coincide[d]" with ACM's transactions in "long TRS positions referencing single securities." *See* Cpl. ¶ 44. For instance, the Complaint alleges that ACM agreed to maintain "long/short ratios and sector limits," so that "when Archegos Fund placed additional long single-name TRS positions, it also transacted additional Broad-Based Security Index Swaps contemporaneously," such that it would maintain the desired ratio between its long positions and short positions. *Id.* But these allegations do nothing to fill the critical hole in the pleadings: *none* of these transactions—neither the long nor the short positions, including the ETF and Basket Swaps listed in Appendix A—are alleged to have occurred in connection with the alleged misstatements. The conclusory assertion that certain ETF or Basket Swap trades "coincide[d]" with the alleged misrepresentations, *see* Cpl. ¶¶ 44, 64 n.5, 65 n.6, 66 n.7, does not satisfy the requirement that the trades occurred "in connection with" the alleged misrepresentations. *See Romano v. Kazacos*, 609 F.3d 512, 522 (2d Cir. 2010) (alleged misrepresentation sufficiently "coincides" with a securities transaction where plaintiff's claims "necessarily allege," "necessarily involve," or "rest on" *the purchase or sale of covered securities*).

The CFTC's allegations about alleged misstatements during the week of March 22, 2021 fail for the same reason. The Complaint alleges that Becker and Tomita made misrepresentations to SC 7 on March 23 and 24, but it does not allege that ACM entered into any ETF or Basket Swap transactions with that Counterparty that week. *See id.* ¶¶ 77-78. The Complaint alleges that on

March 24, ACM made misrepresentations to SC 2 when demanding the return of excess margin pursuant to the parties' margin agreement, *id.* ¶ 79, but the transfer of margin pursuant to a contractual margin agreement is not an ETF or Basket Swap transaction. Similarly, the Complaint alleges that ACM's Counterparties began to "unwind Archegos Fund's positions, including the [ETF and Basket Swaps]," after ACM defaulted on its obligations under its agreements with the Counterparties, *id.* ¶ 85, but it does not complain that anyone at ACM made any misrepresentation regarding ACM's compliance with any term that would trigger a contractual default or that any alleged misstatement prevented any Counterparty from timely exercising any contractual rights as to ACM or its portfolio. Nor does it complain that any alleged misrepresentation induced the Counterparties to unwind the ETF or Basket Swaps.

The Complaint fares no better with its allegations that the misrepresentations induced Counterparties to extend more long-TRS capacity or provide more favorable margin rates to ACM, or "resulted in Swap Counterparties taking inadequate risk-reducing measures," which might have included enlarging ACM's short position in ETF or Basket Swaps. *See id.* ¶¶ 6, 69. *First*, the CFTC's "but for" thesis—i.e., that the Counterparties would have required ACM to enter into additional ETF or Basket Swaps "but for" ACM's misrepresentations—is foreclosed by *Chemical Bank*. There, the plaintiff alleged that it would have refrained from engaging in a transaction involving securities but for the defendant's misrepresentations, and the court held that "but-for causation is not enough." 726 F.2d at 943.[16] *Second*, the Counterparties' long, single-name TRS capacity limits and margin arrangements are not transactions in CFTC-regulated swaps. Rather, they are the operational "terms of the relationship between the customer and the broker," and

---

[16] Courts in other circuits have questioned whether *Chemical Bank* remains authoritative after *SEC v. Zandford*, 535 U.S. 813 (2002). The Second Circuit has made clear that it does. *See Ring v. AXA Fin., Inc.*, 483 F.3d 95, 101 (2d Cir. 2007) (rejecting argument that *Chem. Bank* was "archival").

cannot support liability under the securities laws. *See Bissell*, 937 F. Supp. at 243-44; *Taylor*, 943 F. Supp. 2d at 403; *see also Chadbourne & Park*, 571 U.S. at 391.

Similarly flawed are the allegations that Halligan made misstatements by signing transaction confirmations, some of which contained incorrect representations about ACM's exposure to certain, unspecified securities "[b]eginning in mid-2020." Cpl. ¶ 72. The CFTC does not even attempt to allege that these confirmations were "in connection with" CFTC-regulated swaps. Rather, the Complaint concedes that the "transactions" to which the "confirmations" related were all single-issuer TRSs—in other words, **not** CFTC-regulated swaps. *See* above Pt. I.A.

Finally, the conclusion that § 6(c)(1) does not reach alleged misrepresentations made by swap counterparties in the course of negotiating the terms of their relationships (such as margin rates and capacity limits) is confirmed by the SEC's recent rulemaking efforts. As noted above, the scope and meaning of the limiting language "in connection with" found in § 6(c)(1) is largely based on the meaning of the parallel language in Section 10(b) and Rule 10b-5. *See supra*, at pp. 9-10.[17] In a direct response to ACM's collapse and what the SEC apparently perceived as gaps in existing rules, it dusted off a rule proposal that it had first made following the financial crisis over a decade ago but failed to implement, which would expand the reach of the anti-fraud provisions to cover conduct that does not occur in connection with the entry of a swap transaction (i.e., purchase or sale of the swap), but occurs within the context of the transactional relationship more generally. *See* "Prohibition Against Fraud, Manipulation, or Deception in Connection with Security-Based Swaps; Prohibition Against Undue Influence over Chief Compliance Officers; Position Reporting of Large Security-Based Swap Positions," SEC Release No. 34-93784, 2021 WL 6755214 (Dec. 15, 2021). The SEC's proposing release explained plainly that the expanded

---

[17]  As noted *supra* at fn.2, Halligan has moved to dismiss the SEC's complaint against him, which is based on the same events as the CFTC's action. In his motion, he explains that the alleged misrepresentations were not "in connection with" the purchase, sale, or offer of any SEC-regulated long, single-name TRS trades, just as they are not "in connection with" the ETF or Basket Swaps.

rule "*would apply not only to the 'purchase' or 'sale' of security-based swaps*," but would also apply to various other aspects of the trading relationship more generally, as well as to attempted conduct that the existing rules do not reach. *Id.* at *11 (emphasis added). In fact, the alleged misrepresentations at issue in this case are so attenuated from the ETF or Basket Swap transactions that they would not even satisfy this greatly expanded proposed rule (because capacity limits and margin terms, and a counterparty's portfolio composition, are not rights or obligations that arise under the ETF or Basket Swaps, but rather relate only to the parties' general course of dealing), further underscoring that the existing rules do not reach them.

## II.
## THE CFTC HAS FAILED TO ALLEGE A PRIMARY VIOLATION

### A.      The CFTC Has Failed to Adequately Plead Halligan's Scienter or Negligence

#### 1.      The CFTC Has Not Pled Facts Giving Rise to a Strong Inference of Scienter

The CFTC's primary liability claims against Halligan under § 6(c)(1) fail because the Complaint does not allege facts giving rise to a strong inference of Halligan's intent to commit fraud. To meet this burden, the CFTC must show either "(1) motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Moreover, "[a] complaint adequately pleads scienter only if a reasonable person would deem the inference of scienter both 'cogent' and 'at least as likely as any plausible opposing inference.'" *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008) (cleaned up).

#### a.      The CFTC's Allegations of Motive and Opportunity Are Insufficient

To establish a strong inference of "motive and opportunity," the CFTC must allege that the defendant "benefited in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307-8 (2d Cir. 2000). General motives, like "[t]he motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve

benefit to a[n organization], but does not 'entail concrete benefits.'" *Chill v. Gen. Elec. Co.*, 101

F.3d 263, 267 (2d Cir. 1996) (cleaned up).

But the Complaint alleges no discernible motive at all for Halligan to defraud ACM's

Counterparties. Indeed, the CFTC does not even allege a motive for the overall "scheme," other

than "to further [ACM's] trading strategy, maintain existing trade capacity, secure additional

capacity for Archegos Fund to enlarge its swap trading positions, obtain or maintain favorable

margin rates, and dissuade swap counterparties from . . . taking . . . risk-reducing measures that

could adversely impact" ACM—in other words, in order to continue trading TRSs (not ETF or

Basket Swaps) and, as a result, to make money for ACM. Cpl. ¶ 68. Yet Halligan was not a trader,

and the CFTC nowhere alleges that Halligan had any role in trading. *Id.* ¶ 17. The Complaint's

naked assertion that Halligan generally participated in an effort to mislead Counterparties through

misrepresentations, without any plausible explanation for why he would do so, is insufficient.

*Gissin v. Endres*, 739 F. Supp. 2d 488, 513-14 (S.D.N.Y. 2010) ("implausible" and "generalized"

allegations insufficient to establish scienter). Indeed, even if the CFTC had plausibly alleged that

Halligan had a generalized desire that ACM obtain the opportunity to do more business with its

Counterparties, that allegation would fail as a matter of law. *See In re JP Morgan Chase Sec.*

*Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) ("Generalized allegations of intent to maintain

lucrative business relationships and to establish new ones do not set forth a motive for scienter

purposes.") (citing cases).

###### b.    **The Allegations of Conscious Misbehavior or Recklessness Fail**

Having failed to allege a plausible motive, the CFTC bears a heightened burden to allege

facts giving rise to a strong inference of Halligan's conscious misbehavior or recklessness. *SEC v.*

*Syron*, 934 F. Supp. 2d 609, 631-32 (S.D.N.Y. 2013). There, too, it falls short. Recklessness means

"conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a

heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d

Cir. 2009) (cleaned up). "The facts alleged to support recklessness must be strong circumstantial evidence of that recklessness . . . such that it gives rise to a strong inference of fraudulent intent." *Chill*, 101 F.3d at 267 (cleaned up). But the Complaint merely recites rote boilerplate that Halligan "knew or was reckless in not knowing" that statements were false, Cpl. ¶ 58, and generalized allegations that he "intentionally or recklessly directed, encouraged and/or taught" Becker to mislead ACM's Counterparties, *id.* ¶ 67.  Such conclusory contentions are insufficient. *See City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 422 (S.D.N.Y. 2020) (allegation that defendant "made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading" is insufficient); *SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006) (dismissing aiding and abetting claims where the SEC made only "general assertions" that the defendant "must have known of material misstatements" because of his "constant e-mail and telephonic communication with members of the . . . team that prepared, reviewed and filed the [forms]").

The CFTC next attempts to impute scienter to Halligan based on his supervisory relationship to Becker, Cpl. ¶ 58, but this fails as well. *See City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 399 (D. Del. 2010), *aff'd*, 442 F. App'x 672 (3d Cir. 2011) ("Mere allegations that a defendant 'should have known' of fraud because of his supervisory role within a company or because his subordinates were aware of it, are insufficient."). Likewise, the allegation that Halligan knew as Becker's "direct superior" that Becker was speaking with Counterparties, and that those conversations would have sometimes involved discussion of ACM's position sizes, Cpl. ¶ 58, is a deficient effort to assign scienter to Halligan "by virtue of his status" and seniority at ACM. *See Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 255 (S.D.N.Y. 2008) ("[I]t is well-established that a corporate officer or director by virtue of his status cannot, without more, be charged with knowledge of activities within the corporation."); *City of*

*Brockton Ret. Sys. v. Avon Prods. Inc.*, No. 11-cv-4665 (PGG), 2014 WL 4832321, at *19 (S.D.N.Y. Sept. 29, 2014) (courts in the Second Circuit "have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight").

Similarly, the fact that Becker and Tomita entered guilty pleas in criminal cases brought against them does not aid the CFTC's effort to plead *Halligan's* scienter. *See* Cpl. ¶¶ 19-20, 55-56. Becker and Tomita pled and allocuted as to their own conduct, but neither allocution implicated Halligan or addressed his conduct or state of mind at all. *See* Exs. Z & AA (transcripts of Becker and Tomita proceedings, respectively).[18] These pleas therefore offer no support for the CFTC's claims against Halligan. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 305 (S.D.N.Y. 2008) (plaintiff could not adequately plead scienter against supervisor based on guilty plea entered by the supervisor's subordinate, referring to such allegation as "little more than . . . guilt by association"); *see also Pugh v. Trib. Co.*, 521 F.3d 686, 696 (7th Cir. 2008) (plaintiff failed to adequately plead scienter as against individual defendant, despite guilty pleas by nine of his colleagues, including four co-defendants).[19]

Stripped of these generic allegations, the Complaint is left with only four instances in which Halligan is alleged to have engaged with Becker *at all* in connection with Becker's alleged misrepresentations. None of these is well pled.

- *First*, the CFTC alleges that Becker, Tomita, and Halligan "held a conference call in which they developed and conspired to provide false or misleading liquidation

---

[18]  To the extent these guilty pleas and allocutions may be considered at all in assessing whether the CFTC has met its pleading burden, the Court is limited to considering only the facts that the defendants admitted during their plea allocutions. *SEC v. Penn*, 225 F. Supp. 3d 225, 234 (S.D.N.Y. 2016). As discussed above, those allocutions do not implicate Halligan and therefore they do not help the CFTC here. Becker and Tomita have also both consented to the entry of CFTC administrative orders against them. *See* Cpl. ¶¶ 19, 20; *In the Matter of Tomita*, CFTC No. 22-15, 2022 WL 1404268 (Apr. 27, 2022) (consent order as to Tomita); *In the Matter of Becker*, CFTC No. 22-14, 2022 WL 1404267 (Apr. 27, 2022) (consent order as to Becker). While Becker and Tomita have admitted in these administrative orders facts as to their own conduct and states of mind, the orders do not address Halligan's conduct or state of mind at all, and provide the CFTC with no support for its allegations as against Halligan.

[19]  *See also In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 484 (S.D.N.Y. 2006) ("Simply arguing that specific high level employees must have known what was taking place at Marsh because certain subordinate employees were later implicated in the fraud is insufficient to give rise to the strong inference of scienter required to state a claim under Section 10(b).").

statistics" for Becker's call with SC 4 in March 2021. Cpl. ¶ 63. But the Complaint does not allege anything more specific as to Halligan, such as that he *knew* that the liquidity profile was false (far less materially so) or discussed with Becker or Tomita the supposed falsity of the liquidity information. The CFTC only alleges that "Tomita, Becker, and Halligan each received or had access to periodic reports detailing the amount of time required to liquidate Archegos Fund's portfolio," but does not allege whether those reports stated that the numbers provided to SC 4 were actually false, let alone whether Halligan actually reviewed or had any role in "creating, maintaining, or reviewing" any such analyses; allegations of their mere existence cannot support scienter as against Halligan. *See City of Omaha Police & Fire Ret. Sys.*, 450 F. Supp. 3d at 422 (scienter insufficiently pled where plaintiff alleged that company maintained a "second set of books," but did not allege that individual defendants "had any role in creating, maintaining, or reviewing this material"). And the allegation that Halligan participated in a call after which *someone else* made a misrepresentation does not show scienter. *See Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 772, 781 (S.D.N.Y. 2021) ("simply alleging that executive defendants are closely involved in running their business is not enough to show that they had access to contrary information") (cleaned up) (Oetken, J.).

- *Second*, the CFTC alleges that Halligan told Becker to use the 35% concentration figure "in late 2020 or early 2021" in connection with a due diligence call with SC 3. Cpl. ¶ 59. The CFTC makes the conclusory allegation that Halligan instructed Becker when he "knew that Viacom had grown well above 35% of Archegos Fund's NAV," *id.*, but fails to allege *how* Halligan knew that the figure was false at that time. The CFTC alleges only that Halligan "received the same daily position reports as Becker," but not that he ever reviewed these reports, or actually knew that the reports contained contradictory information. *See SEC v. Carrillo Huettel LLP*, 13-cv-1735 (GBD), 2014 WL 12785242, at *3 (S.D.N.Y. June 4, 2014) (regulator must plead facts establishing that defendant "knew the true relevant information," how he "knew the true relevant information, and the circumstances surrounding, and purpose behind, [his] decision to cover it up").

- *Third*, the CFTC alleges that "on or around January 29, 2021," Halligan told Becker to join some of Tomita's calls with Counterparties, and Becker "understood that Halligan wanted to ensure that Becker and Tomita were telling counterparties a consistent story, and that if Tomita was providing misleading information to a [SC], it would be important for Becker to do the same." Cpl. ¶ 67. The CFTC further alleges that when Becker relayed the substance of a January 29 call he had with SC 1 regarding GSX to Halligan, Halligan responded "if they only knew," which "Becker interpreted" as meaning "that Halligan knew that Becker and Tomita were disseminating false and misleading information." *Id.* But these allegations are solely about *Becker's* understanding and state of mind, and nothing that Halligan is purported to have said supports Becker's interpretations. There are no allegations about *Halligan's* knowledge, or whether or how *Halligan* knew that the information Becker and Tomita were providing was false.

- *Fourth*, the CFTC alleges that on March 24, 2021, Halligan and Tomita "proposed" certain "talking points" for conversations with Counterparties, which Becker then

memorialized in a document. *Id.* ¶ 81. Halligan allegedly "reviewed and approved" the document, which contained "false and misleading" statements that Becker "did not have access" to certain data including the "total margin calls" ACM had received, or ACM's "live portfolio." *Id.* But the CFTC does not explain how these statements were false, other than the conclusory allegation that "Halligan, as Becker's direct supervisor, knew that Becker in fact did have access to Archegos Fund's trade blotter, live portfolio, and up-to-date margin calculations." *Id.* As the CFTC has alleged, ACM's long single-name TRS (not ETF or Basket Swap) positions that week "plummeted," causing ACM to face a "cascade of margin calls" over a short series of days, resulting in the "collapse of the firm." *Id.* ¶ 73. Even if Becker might have had access to such information in normal, less frenzied circumstances, in such a hectic, rapidly deteriorating environment, myriad factors could make real-time data unavailable or unreliable, rendering the CFTC's conclusory allegation insufficient. *See Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (scienter allegations are insufficient where they "do not establish what specific contradictory information the Individual Defendants received or when they received it").

Next, the CFTC alleges that "Becker learned to misrepresent the size of Archegos Fund's largest positions from Halligan" by "shadowing Halligan on calls with [SCs]" in *2016 and 2017*, and that "in or around 2018" Halligan instructed Becker "that he should tell all [SCs] that [ACM's] largest position was 35% of NAV, regardless of the true figure." *See* Cpl. ¶¶ 57-58. But these allegations make no sense in the context of the Complaint's other allegations—the CFTC does not allege that the 35% figure was false when Becker and Halligan had this supposed conversation in "around 2018"; the CFTC offers no explanation for why Halligan would have "directed" Becker to use a false number years before the alleged scheme to defraud even began; there is no allegation that ACM's Counterparties imposed any meaningful TRS trading constraints in 2018 (*see id.* ¶ 42, alleging constraints later in the "Relevant Period" that began March 2020); and there is no allegation that Halligan believed that providing the accurate figure (if 35% was inaccurate, which the CFTC does not allege) would have had any impact on anything.

It is not only implausible that Halligan would have given Becker a standing instruction to provide Counterparties with false information in the hypothetical event the 35% figure ever became inaccurate in the future, but the Complaint offers no plausible basis to understand why

Becker—ACM's Director of Risk Management, *id.* ¶¶ 20, 82—would accede to such an instruction. The CFTC asserts that "Becker did not question or dispute Halligan's instruction because he understood this type of deception to be part of Archegos's culture," *id.* ¶ 58, but does not support this broadside with a single factual detail or an allegedly deceptive act by Halligan or Archegos prior to this conversation in "approximately 2018."[20] In sum, the Complaint paints a picture of Halligan misleading the Counterparties for no reason at all, and because this theory is implausible as alleged, the Court need not credit it. *See Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1107 (9th Cir. 2021) (court may dismiss scienter theory that is not "persuasive or plausible," and is "divorced from common experience").

Finally, the Complaint describes a series of "transaction confirmations" that Halligan signed "upon the consummation of each TRS swap transaction," each of which contained a false statement about Archegos's total exposure. Cpl. ¶ 72. While the CFTC makes the bald allegation that Halligan "knew or recklessly disregarded" the falsity of certain of these confirmations, it provides no factual assertions sufficient to demonstrate that Halligan created, reviewed, or used any data that contradicted them. The vague assertion that Halligan should have known that the specific representations in the confirmations were false "based on his knowledge of and access to information about Archegos Fund's portfolio," *id.*, is too non-specific to support the CFTC's desired inference. *See Ollie's Bargain Outlet Holdings*, 518 F. Supp. 3d at 781 (non-specific allegations that defendants "had access to daily sales reports" and "regularly assessed company inventory" do not support claims of misstatements about company's inventory and supply chain).

---

[20]  To the extent this is an oblique reference to matters in which other entities founded by Hwang previously resolved criminal and civil charges related to alleged insider trading in or around 2012, *see* Cpl. ¶¶ 22-23, the Complaint does not allege that Halligan had any connection to those prior, resolved matters. Moreover, the resolution of the matters demonstrates acceptance of responsibility, in stark contrast to any supposed culture of "deception." Such allegations in a pleading against Halligan are only prejudicial and, to the extent the Complaint is not dismissed, should be stricken. *See In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 322 (E.D.N.Y. 2013) (refusing to consider facts from an earlier complaint against defendant to establish any culture of fraud); *Footbridge Ltd. v. Countrywide Home Loans, Inc.*, No. 09-cv-4050 (PKC), 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (granting motion to strike allegations "based on pleadings and settlements in other cases and government investigations").

**B.    The CFTC's Misrepresentation Claims Fail Because Halligan
Did Not "Make" Any Alleged Material Misrepresentation**

The CFTC's misrepresentation claims against Halligan under § 6(c)(1) and Rule

180.1(a)(2) must be dismissed because, under the U.S. Supreme Court's holding in *Janus*, Halligan

is not the "maker" of the misrepresentations alleged in the Complaint.[21] In *Janus*, the Court held

that because SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, prohibits "mak[ing] any untrue statement of

a material fact" in connection with the purchase or sale of securities, an individual may be liable

under the Rule only if he or she "made" the statement at issue. 564 U.S. at 141. For the purposes of

the Rule, "the maker of a statement is the person or entity with ultimate authority over the

statement, including its content and whether and how to communicate it." *Id.* at 142. The Court

and lower courts following *Janus* have explained that establishing "ultimate authority" over a

statement requires two elements—control over its content, and control over whether and how to

communicate the statement (i.e., its delivery). *Id.*; *see also SEC v. Rio Tinto plc*, No. 17-cv-7994

(AT), 2019 WL 1244933, at *13 (S.D.N.Y. Mar. 18, 2019), *aff'd,* 41 F.4th 47 (2d Cir. 2022). The

Supreme Court illustrated this rule by reference to a speechwriter, explaining that even though a

speechwriter drafts a speech, "*the content is entirely within the control of the person who delivers

it,*" and thus the speechwriter is not the "maker" for the purposes of the securities laws. *Janus*, 564

U.S. at 143 (emphasis added).

The Complaint itself forecloses any claim that Halligan can be the "maker" of any of the

statements at issue, because it expressly alleges that Halligan *did not* have "ultimate authority"

over ACM's communications with Counterparties. *See* Cpl. ¶¶ 18, 71 ("Founder" "controlled"

ACM). The Complaint alleges that the purpose of the misstatements was allegedly "[t]o achieve

---

[21]  Although the Court in *Janus* addressed misrepresentations under Section 10(b) and Rule 10b-5, due to the "dearth of law analyzing Section 6(c)(1) and Rule 180.1(a)," courts regularly "analyze the case law regarding Section 10(b) and Rule 10b-5 to evaluate whether the CFTC has plausibly alleged a Section 6(c)(1) and Rule 180.1 claim." *See Gorman*, 587 F. Supp. 3d, at *40 and cases cited *supra* at pp. 17-18.

the Founder's dual goals of increased trade capacity and lower margins," and that "the Founder" "directed" others to achieve these goals. *See id*. ¶ 71. Furthermore, the Complaint alleges that "the Founder" directed both the content and delivery of the alleged statements when he "repeatedly stressed that Archegos representatives should not discuss its positions with anyone outside the firm" (*the content*), and "routinely directed Tomita and others to acquire additional trade capacity" and "to obtain and maintain more favorable margin rates" (*the delivery*). *Id*. ¶¶ 18, 71.[22] These allegations compel dismissal of the CFTC's claims against Halligan. *See Hawaii Ironworkers Annuity Tr. Fund v. Cole*, No. 10-cv-371, 2011 WL 3862206, at \*5 (N.D. Ohio Sept. 1, 2011), *as amended* (Sept. 7, 2011) (allegation that senior management imposed a "directive" on defendants to misstate financial information was effectively a concession that defendants lacked "ultimate authority" over the content of the statements).

The Complaint's non-specific allegation that Halligan at times "directed" Becker in his communications with Counterparties is insufficient. *See* Cpl. ¶ 58. In violation of Rule 9(b), the Complaint provides no particularity as to what this "direction" entailed, and in fact appears to rely for the most part on a supposed conversation that happened *years* before Becker made the alleged misstatements, and *years* before the alleged market manipulation scheme began, at a time when the representation at issue is not even alleged to have been false. *See id*. The Complaint does not allege that Becker attributed a single misstatement to Halligan when speaking with the Counterparties, *see Janus*, 564 U.S. at 147, n.11 ("More may be required to find that a person or entity made a statement indirectly, but attribution is necessary"), and it fails to allege with particularity that Halligan "directed" Becker to have any specific conversations with Counterparties.[23]

---

[22]  Halligan does not suggest or concede that the CFTC sufficiently alleges (1) that *anyone* directed Becker or Tomita to lie or make misrepresentations to achieve these "dual objectives," or (2) why Becker or Tomita would have understood a supposed direction to obtain better credit terms as an instruction to engage in fraudulent conduct.

[23]  *See, e.g.*, Cpl. ¶ 59 (mentioning Becker's conversations with five Counterparties in which Becker "falsely represented" in each conversation that ACM's "largest investment was only 35% of NAV" without alleging that Halligan directed those conversations, for four of the five Counterparties ); ¶ 60 (describing Becker's conversations

The Complaint contains only three examples of Halligan allegedly "directing" Becker, but each of these is conclusory, and relies on the CFTC dropping the word "directed" into the pleading without actual facts or context. The first is an alleged conversation with SC 3 in "late 2020 or early 2021," for which Halligan "directed Becker to continue to falsely represent that [ACM's] largest position was 35% of its NAV," *id.* ¶ 59, but this allegation is insufficiently particular. The CFTC does not describe what Halligan actually "directed," or even allege that Halligan actually knew that the representation was false (as noted above, the CFTC broadly alleges that Halligan had access to contrary data, but not that he reviewed, created, or used that data). The second example is an alleged conversation on March 10, 2021, during which "at the direction of Halligan, Becker again conveyed false or misleading liquidation statistics." *Id.* ¶ 64. But this allegation contains no factual detail whatsoever about what that "direction" actually entailed. *Id*. The final example concerns the "talking points" Becker allegedly prepared on March 24, 2021, which the CFTC claims reflected Halligan's "direction" that "Becker falsely tell Swap Counterparties that Becker did not have access to [ACM's] up-to-date financial information." *Id.* ¶ 81. But none of these examples includes any allegation that Halligan "possessed ultimate authority over the statements at issue." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 640-41 (S.D.N.Y. 2017) (noting high burden Rule 9(b) imposes on "determining who among the many who participated in creating and disseminating a statement had the ultimate authority over what the statement said and whether and how it was communicated."). Each of these conclusory allegations that Halligan "directed" Becker falls far short of the particularity requirements under Rule 9(b).

---

with two Counterparties in February and early March 2021 concerning the "size" of ACM's "largest long positions," without alleging that Halligan directed those conversations); ¶ 61 (describing Becker's conversations with SC 4 concerning the composition of ACM's portfolio without alleging that Halligan directed that conversation); ¶ 62 (describing Becker's conversation with a Counterparty on March 8, 2021 concerning ACM's "top ten positions," without alleging that Halligan directed Becker in that conversation).

Courts routinely reject similarly vague allegations, and that result is appropriate here. *See SEC v. Sugarman*, No. 19-cv-5998 (WHP), 2020 WL 5819848, at *5–6 (S.D.N.Y. Sept. 30, 2020) (disregarding conclusory allegations, unsupported by facts, that scheme participants carried out acts taken with defendant's "knowledge and approval" or "knowledge and consent"); *Kolbeck v. LIT Am., Inc.*, 923 F. Supp. 557, 569 (S.D.N.Y. 1996), *aff'd* 152 F.3d 918 (2d Cir. 1998) (plaintiff cannot satisfy Rule 9(b) with "conclusory assertions that one defendant controlled another, or that some defendants are guilty because of their association with others.").[24]

## C.    The Scheme Liability Claims Fail Because the CFTC Has Failed to Allege that Halligan Committed Any Deceptive Act

The Second Circuit recently clarified the law applicable to scheme liability claims, holding that simply repackaging misstatement claims and calling them a "scheme" is not enough. *Rio Tinto plc*, 41 F.4th at 53. Yet that is all that the CFTC has done here; it has not adequately alleged that Halligan committed a single deceptive act, and instead seeks to establish liability through a theory of "guilt by association." *Take-Two Interactive*, 551 F.Supp.2d at 305.  But these efforts fail as a matter of law. *See SEC v. Wey*, 246 F. Supp. 3d 894, 917 (S.D.N.Y. 2017) ("[c]laims for scheme liability hinge" on the commission of a deceptive act) (cleaned up).

A plaintiff asserting a scheme liability claim must allege with sufficient particularity: that the defendant "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme, (3) with scienter." *Gorman*, 587 F. Supp., at 40. It must "state with particularity what deceptive or manipulative acts were performed, which defendants performed them, [and] when the acts were performed[.]" *Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19-cv-7536 (NRB), 2021 WL 1199035, at *9 (S.D.N.Y. Mar. 30, 2021) (cleaned up).

---

[24]  *See also In re NQ Mobile, Inc. Sec. Litig.*, No. 13-cv-7608 (WHP), 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015) (finding claims that a defendant performed audit services "on the authority of, at the direction of, under the control of, and for the sole benefit of" another defendant to be "conclusory allegations" with "no facts to substantiate" them); *cf. PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 492-93 (S.D.N.Y. 2017) (describing claims that individuals acted "at [defendant's] direction," "as part of [defendant's] scheme to defraud [the plaintiff]," and "with his knowledge and approval" as conclusory and dismissing those unsupported by particularized allegations) (cleaned up).

3695432.1

The alleged "scheme" described in the Complaint was to make material misstatements "in order to further Archegos Fund's trading strategy, maintain existing trade capacity, secure additional capacity for Archegos Fund to enlarge its swap trading positions, obtain or maintain favorable margin rates, and dissuade swap counterparties from liquidating Archegos Fund's positions or taking other risk-reducing measures that could adversely affect Archegos Fund." *See* ¶ 68. Here, Halligan's only alleged role in conduct described in the Complaint is that he supposedly participated in the commission of misrepresentations to Counterparties. *See* ¶¶ 68-69, 76, 79, 81-82. The CFTC does not allege that Halligan was a trader, but clearly alleges that Tomita, as ACM's head trader, was responsible for entering larger TRS positions and obtaining favorable margin rates for the TRS trades. *See, e.g., id.* ¶¶ 42, 47-48, 50, 65, 71. This alone dooms the scheme liability claims against Halligan, because, as the Second Circuit's recent holding in *Rio Tinto plc* makes clear, the law in this Circuit is that scheme liability claims cannot be premised on misstatements alone. 41 F.4th at 53.[25] Although the decision is only a few months old, numerous courts have already applied it to dismiss scheme liability allegations that—like those here—seek to repackage alleged misstatements as purported "schemes to defraud." *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-cv-08585 (LJL), 2022 WL 4085677, at *54-59 (S.D.N.Y. Sept. 2, 2022) (dismissing scheme liability claims where plaintiff failed to sufficiently allege any deceptive conduct beyond the making or dissemination of misstatements, and distinguishing from circumstances where a deceptive act could be sufficiently pled—"i.e., sham agreements, sham transactions, sham companies, or undisclosed payments to doctors who appeared independent"); *Touchstone Strategic Trust v. Gen'l Elec. Co.*, No. 19-cv-1876 (JMF), 2022 WL 4536800, at *6 (S.D.N.Y. Sept. 28, 2022) (dismissing scheme liability claims where the complaint "alleges

---

[25] Before *Rio Tinto plc*, courts disagreed as to whether misrepresentations could constitute a deceptive act sufficient to plead scheme liability under Rule 10b-5(a) or (c). *See Puddu v. 6D Glob. Techs., Inc.*, No. 15-cv-8061 (AJN), 2021 WL 1198566, at *10-11 (S.D.N.Y. Mar. 30, 2021) (noting split among the courts).

misstatements and omissions, not inherently deceptive conduct") (cleaned up); *Africa v. Jianpu Tech. Inc.*, No. 21-cv-1419 (JMF), 2022 WL 4537973, at *13 (S.D.N.Y. Sept. 28, 2022) (same); *In re Eastman Kodak Co. Sec. Litig.*, No. 21-cv-6418, 2022 WL 4473629, at *14 (W.D.N.Y. Sept. 27, 2022) (dismissing scheme liability claims where plaintiff failed to allege that "a deceptive or manipulative act—independent from the alleged misstatements or omissions—occurred").

This defect is fatal, because the Complaint does not plead with particularity any deceptive or fraudulent act of *Halligan*, as opposed to conduct by Becker and/or Tomita. Halligan's general awareness that his former colleagues engaged in "frequent and regular calls with [SCs] regarding credit risk issues," *see* Cpl. ¶ 58, provides no help to the CFTC, because there is nothing "inherently deceptive" about speaking with Counterparties—indeed, the CFTC implicitly concedes that ACM had non-fraudulent communications with the Counterparties for many years preceding the Relevant Period. Cpl. ¶¶ 3-4, 38. *See SEC v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011) ("[s]cheme liability hinges on the performance of an inherently deceptive act") (cleaned up).

Similarly, the CFTC's allegations that Halligan conferred with Becker or Tomita before certain of the misstatements also fall short, because these allegations, too, fail to identify any specific fraudulent or deceptive act *by Halligan. See In re Refco Capital Mkts., Ltd. Brokerage Customer Sec. Litig.*, No. 06-cv-643 (GEL), 2007 WL 2694469, at *7 (S.D.N.Y. Sept. 13, 2007) ("the most basic element of all fraud claims is that the victim must be deceived *by the perpetrator's words or actions*") (emphasis added), *aff'd sub nom. Capital Mgmt Select Fund Ltd. v. Bennett*, 680 F.3d 214 (2d Cir. 2012). This would be true even if, *arguendo*, the CFTC had adequately pled that Halligan had any role in creating the false statements that Becker or Tomita made (it has not). *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *55 ("it seems clear from *Lorenzo* and from *Rio Tinto plc* that the creation of a false statement that is then disseminated by another who is the 'maker' is not sufficient to create scheme liability"). As

discussed above, *all* of the alleged misstatements were made *by Becker and Tomita*, and the bald

assertion that Halligan conferred with colleagues before or after they made the statements at issue

is insufficient under *Rio Tinto plc* and *Lorenzo*.

The CFTC is thus left with nothing but guilt by association, but "guilt by association is not

a sufficient pleading of fraud under Rule 9(b)." *Landy v. Mitchell Petrol. Tech. Corp.*, 734 F.

Supp. 608, 620 (S.D.N.Y. 1990); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F.

Supp. 2d 429, 461 (S.D.N.Y. 2005) (rejecting "essentially a 'guilt by association' argument").

### III.
### THE CFTC HAS FAILED TO ALLEGE A SECONDARY VIOLATION

The CFTC's aiding and abetting claims fare no better. To survive dismissal, the Complaint

must sufficiently plead "the defendant (i) had knowledge of the principal's intent to violate the

CEA; (ii) intended to further that violation; and (iii) committed some act in furtherance of the

principal's objective." *See In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 114

(S.D.N.Y. 2021). The CFTC must still allege facts giving rise to a "strong inference" of fraudulent

intent, *Wey*, 246 F. Supp. 3d at 927-28, and "[m]ere negligence does not suffice." *SEC v. Yorkville

Advisors, LLC*, 305 F. Supp. 3d 486, 511 (S.D.N.Y. 2018). The Complaint fails on each element.

**A.** **The Complaint Fails to Plead a Primary Violation**

The CFTC's aiding and abetting counts against Halligan are premised on Becker's and

Tomita's alleged primary violations. Cpl. ¶ 92. However, because Becker and Tomita did not

commit any fraudulent or deceptive act "in connection with" the ETF or Basket Swaps, *see* Pt. I.A,

their conduct cannot constitute a primary violation of the CEA, and therefore cannot be the

predicate for Halligan's secondary liability either. Whether the conduct at issue in this case

occurred "in connection with" the purchase, sale, or offer of securities is a legal question that must

be independently assessed for the purpose of any alleged secondary violation by Halligan.

**B.**     **The Complaint Fails to Plead Halligan's Knowledge of a Primary Violation**

As this Court has held, the knowledge element of an aiding and abetting claim cannot be met by "[p]iling inference upon inference." *SEC v. One or More Unknown Traders in Secs. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 253 (S.D.N.Y. 2013) (Oetken, J.). Here, inferences are all that the CFTC has alleged, and its failure to sufficiently plead Halligan's knowledge of a primary violation follows for many of the same reasons as its failure to adequately plead Halligan's scienter with respect to the alleged primary violations. *See* Pt. II.A.

The CFTC's ubiquitous allegation that Becker relied for years on a 2018 "direction" from Halligan to provide false information to Counterparties, *see* Cpl. ¶¶ 58-59, 67, is deficient because it hinges on the unpled inference that Halligan *knew* that Becker provided this figure to specific Counterparties, and *knew* that the figure had become false as of these supposed conversations (as noted, there is no allegation that the 35% figure was false in 2018). The Complaint alleges only one instance in which Halligan supposedly knew that Becker was going to provide the 35% concentration metric to a Counterparty, *id.* ¶ 59, but it makes no claim that *Halligan knew* that metric was false at that time, if it was. *See id.*

The Complaint's remaining allegations also fail to plead with sufficient particularity that Halligan was aware of the conversations in which Tomita or Becker allegedly made false statements to Counterparties, *see* Cpl. ¶¶ 59-67, 77-81; that the information that Tomita or Becker were providing to Counterparties was inaccurate, *see id.*; or both. At most, the CFTC alleges that Halligan "received or had access" to certain "reports," *see id.* ¶ 63, but there is no allegation that Halligan created, reviewed, or used these reports. The CFTC makes no well-pled allegation that Halligan *knew* that Becker was making false statements to Counterparties, and on that basis alone it cannot ask the Court to infer that he knew of a primary violation. *See, e.g., Cedric Kushner Promotions*, 417 F. Supp. 2d at 335 (SEC failed to sufficiently plead defendant's knowledge of primary violation where, as here, it relied upon "general assertions . . . that [defendant] must have

known of material misstatements because [of] his duties" and because he "was in constant e-mail and telephonic communication with members of the . . . team that prepared, reviewed and filed the [misstated documents]") (cleaned up).

## C.   The Complaint Fails to Plead Halligan's Substantial Assistance

Even if the Complaint sufficiently alleged Halligan's knowledge of a primary violation, "mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance." *SEC v. Paulsen*, No. 18-cv-6718 (PGG), 2020 WL 1911208, at *5 (S.D.N.Y. Apr. 18, 2020) (cleaned up). The aiding and abetting claims against Halligan fail for the additional reason that the CFTC has not sufficiently alleged that Halligan "consciously assisted the commission of the specific crime in some active way" and that he "sought by his action to make it succeed." *SEC v. Apuzzo*, 689 F.3d 204, 214 & 212, n.8 (2d Cir. 2012) (cleaned up).

Halligan's proximity to Becker is not a proxy for substantial assistance. Aiding and abetting claims may proceed only where a defendant has "associate[d] himself with the venture . . . participate[d] in it as in something that he wishe[d] to bring about, [and] . . . [sought] by his action to make it succeed." *Id.* at 212. Halligan did none of these things. He is not alleged to have even *known of* the market manipulation scheme of which Becker's misrepresentations supposedly were an "integral component," Cpl. ¶ 13, far less "acquiesce[d]" in those trading practices. *See SEC v. KPMG LLP*, No. 03-cv-671 (DLC), 2003 WL 21998052, at *5 (S.D.N.Y. Aug. 22, 2003). Nor did he do any of the other things that courts have found sufficient to establish "substantial assistance," such as lie to cover up alleged wrongdoing, *see SEC v. Paulsen*, 2019 WL 13063380, at *1 (S.D.N.Y. Feb. 13, 2019), or actively reiterate the primary violator's alleged misstatements to investors, *see SEC v. Mudd*, 885 F.Supp.2d 654, 671 (S.D.N.Y. 2012). Moreover, even if Halligan were aware of and failed to stop Becker's violative conduct (which the CFTC has not sufficiently pled), that failure would not amount to substantial assistance. *See Rio Tinto*, 2019 WL 124493, at *18 (defendant's failure to correct alleged misstatement made by another person—even if made

in defendant's presence—does not establish substantial assistance). To hold otherwise would effectively make supervisors the guarantors of subordinates' compliance with the securities laws, which is not the law. *See PetEdge,* 234 F. Supp. at 493 (dismissing claim against CEO that "seem[s] to rest on a belief that [the CEO] is liable because he was a senior officer . . . and, thus, must bear some personal liability for the acts of the company through his subordinates").

## IV.
## THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

The CFTC filed this Complaint with the benefit of time to review defendants' initial motions to dismiss. The CFTC's efforts to rehabilitate its pleading are ineffective, and fairness now requires that Halligan have finality. *See In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 381 (S.D.N.Y. 2018) ("[W]e conclude that leave to amend would be futile here given the fundamental substantive problems in plaintiffs' allegations."); *In re Open Joint Stock Co. Vimpel-Commc'ns*, No. 04-cv-9742 (NRB), 2006 WL 647981, at *9 (S.D.N.Y. Mar. 14, 2006) (same).[26]

Dismissal is also appropriate because amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("The problem with [plaintiff's] causes of action is substantive; better pleading will not cure it. Repleading would thus be futile."). Most critically, the CFTC does not have jurisdiction to regulate the instruments that ACM traded as relevant to the conduct alleged in the Complaint, so even if it had sufficiently pled the other elements of a violation of the CEA (it has not), the Complaint must be dismissed. *See* above Pt. I.A. No amendment could solve the CFTC's problem, which arises as a matter of law. Dismissal with prejudice is therefore required.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[26]   As in this case, the courts in both *In re Barrick Gold* and *In re Open Joint Stock Co.* had not previously ruled on any motions to dismiss.

3695432.1

Dated:   New York, New York
          November 1, 2022

                              Respectfully Submitted,

                              FRIEDMAN KAPLAN SEILER &
                               ADELMAN LLP


                              *s/ Mary E. Mulligan*
                              Mary E. Mulligan (mmulligan@fklaw.com)
                              Bonnie M. Baker (bbaker@fklaw.com)
                              Timothy M. Haggerty (thaggerty@fklaw.com)
                              Anil K. Vassanji (avassanji@fklaw.com)
                              Rupita Chakraborty (rchakraborty@fklaw.com)
                              7 Times Square
                              New York, New York  10036-6516
                              (212) 833-1100

                              *Attorneys for Patrick Halligan*

3695432.1