# Exhibit R

***For the avoidance of doubt, this Master Confirmation Agreement does not govern any transaction that where the Exchange or Related Exchange is located outside of the United States of America or Canada***

**GOLDMAN SACHS MASTER CONFIRMATION AGREEMENT FOR SYNTHETIC EQUITY PRODUCTS**

This agreement ("**Master Confirmation Agreement**" or "**MCA**") is dated as of 25 November, 2020 between each Goldman Entity and **Archegos Fund, LP** ("**Counterparty**"). This Master Confirmation Agreement supplements, forms a part of, and is subject to the relevant ISDA Master Agreement between Counterparty and Goldman Entity, dated as of December 6, 2013, as may be supplemented, amended, or amended and restated from time to time (the "**Master Agreement**").

For the purposes of this MCA, "**Goldman Entity**" means Goldman Sachs & Co. LLC ("**GS&Co.**"), Goldman Sachs International ("**GSI**") and/or Goldman Sachs Bank USA ("**GS Bank**"); *provided* that this MCA shall be effective with respect to a particular Goldman Entity and Counterparty only to the extent both of the following conditions have been satisfied: (i) such Goldman Entity and Counterparty have executed this MCA and at least one PCA (as defined below); and (ii) such Goldman Entity and Counterparty have executed a Master Agreement (as defined below), and such Master Agreement remains in effect. Upon satisfaction of both conditions (whether or not contemporaneously), this MCA shall automatically be effective with respect to such Goldman Entity and Counterparty.

**It is understood and agreed that no Goldman Entity shall have any liability for the obligations of any other Goldman Entity. With respect to each Goldman Entity, (i) only Transactions between such Goldman Entity and Counterparty shall be part of the Master Agreement (as defined below) with such Goldman Entity and Counterparty and (ii) any references in this MCA to the "Agreement" or "Master Agreement" shall be deemed to refer to the Master Agreement between such Goldman Entity and Counterparty. References herein to "GS" shall be deemed to refer to the applicable Goldman Entity.**

The parties wish to facilitate the process of entering into and confirming the transactions and accordingly agree as follows:

1. ISDA Definitions. This MCA, the GT (as defined below), each PCA and each TS hereby incorporate by reference the definitions and provisions of the 2006 ISDA Definitions (the "**2006 Definitions**") and the definitions and provisions of the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**", and together with the 2006 Definitions, the "**Definitions**"), in each case as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"). Any capitalized term not otherwise defined herein, in the MCA, the GT, each PCA and each TS shall have the meaning assigned to such term in the Definitions.

2. Coverage. Unless the parties agree otherwise at the time of trading, if as of the Trade Date a Transaction is a Share Swap Transaction, Share Basket Swap Transaction, Index Swap Transaction or an Index Basket Swap Transaction with an Exchange in a Specified Country (a "Covered Transaction"), then that Covered Transaction is subject to the terms of this Master Confirmation Agreement.

"**Specified Country**" means Canada or the United States of America.

3. Confirmation Process. The parties intend to enter into separate transactions (each a "**Transaction**") set out in a TS substantially in the form specified in Exhibit I to the PCA (each, a "**Transaction Supplement**" or a "**TS**"). The confirmation applicable to each Transaction, which shall constitute a "Confirmation" for the purposes of, and will supplement, form a part of, and be subject to the Master Agreement , shall consist of this MCA and PCA applicable to such Transaction executed by the parties hereto referencing this MCA (the "**Product Customization Agreement**" or "**PCA**" for such Transaction), in each case as supplemented by the trade details applicable to such Transaction as set forth in the TS for that Transaction.

For any Transaction, in the event of inconsistency between the MCA, (including the GT) and the PCA for such Transaction, the PCA shall govern for purposes of such Transaction. For any Transaction, in the event of inconsistency between the MCA (including the GT and the PCA) and the Equity Definitions, the MCA shall govern for purposes of such Transaction, and in the event of inconsistency between the MCA (including the GT and the PCA) or the Equity Definitions, on the one hand, and the TS, on the other hand, the TS shall govern for the purpose of the relevant Transaction. The TS shall set forth, at a minimum, all of the information set out in the form of the TS in Exhibit I to the PCA.

4. Non-Exclusive. The parties acknowledge and agree that the execution of this MCA and any PCA does not require them to document Transactions in accordance with this MCA or PCA, as the case may be.

5. Preparation of TSs. Unless otherwise agreed between the parties, the preparation of a TS shall be the responsibility of GS. Failure by GS to send a TS with respect to a Transaction shall not affect the validity of such Transaction. In respect of all Transactions entered into the TS will (in the absence of manifest or proven error) be conclusive as to the terms of each Transaction referred to therein, notwithstanding that the TS may not be signed by either party.

6. Incorporation of General Terms. The General Terms set forth on Annex I hereto (the "**General Terms**" or "**GT**") are hereby incorporated herein by this reference and made a part of this MCA to the same extent as if the GT were set forth in full herein.

7. Acknowledgement and Agreement Regarding Synthetic Exposure. Each party acknowledges and agrees that each Transaction is a derivative transaction providing synthetic exposure to an underlying asset. Neither party intends that any Transaction will be settled by taking delivery of any shares or other securities, or that a Transaction will confer on either party any right, title, voting rights or interest in any shares or other securities, or entitle or oblige either party to acquire, receive, hold, deliver or dispose of any particular shares or other securities.

8. Undertaking Regarding Disclosure. Counterparty undertakes to GS that it will make or provide any disclosure reasonably required by GS or its Affiliates in connection with its entry into each Transaction pursuant to the applicable securities laws or applicable regulations in the jurisdiction of the relevant Share or the rules of the relevant Exchange, notwithstanding any duty of confidentiality owed by GS. Counterparty acknowledges and agrees that GS may make such disclosure to any legal or regulatory body or authority as GS or its Affiliates shall reasonably consider necessary or appropriate regarding the Transaction .

9. Notice Regarding Tax Treatment of Short Bullet Transactions. The tax treatment of a bullet contracts for differences Transaction or bullet swap Transaction where Counterparty is the Equity Amount Payer (a "**Short Bullet Transaction**") is uncertain. GS does not provide tax advice and has made no representations, express or implied, as to the possible tax consequences of investing in a Short Bullet Transaction. Counterparty should consult its own tax advisor regarding the tax consequences to it of entering into this position, including, if relevant, Counterparty's holding period. For the avoidance of doubt, this notice is not applicable to Transactions other than Short Bullet Transactions.

10. No Material Non-Public Information. In addition to the representations, warranties and covenants in the Master Agreement, Counterparty represents, warrants and covenants to GS (and any Affiliate of GS) that on each date that a Transaction is entered into and on each date that Counterparty elects to close a Transaction, it is not entering into or closing, as applicable, such Transaction "on the basis of" (as such term is defined in Rule 10b5-1 under the Securities Exchange Act of 1934 (the "**Exchange Act**") or other applicable securities law) in respect of any U.S. Component Underlier any material, non-public information concerning the relevant Issuer or the Shares, or in respect of an Index Transaction where the Index is not a Broad-based Index, any Issuer of the shares comprising the relevant Index, which would result in a violation by it of applicable law or regulation, including for these purposes, a violation of applicable law or regulation if Counterparty were to actually purchase or sell the securities of the Issuer or the securities comprising the Index, as the case may be.

"**Broad-based Index**" means an Index that is widely published, broadly based, a wide range of sectors, comprised of 100 or more securities, and with no single underlier comprising more than 10% of the index's weighting.

"**U.S. Component Underlier**" means any Shares or shares comprising a Basket or Index, as the case may be, for which the Exchange (or primary exchange for any Component Underlier in respect of an Index Transaction) is located in the United States.

11. Additional Representation Regarding MOC/MOO Execution. In respect of a Share Transaction or a Share Basket Transaction where (i) the Exchange is located in the United States or Canada, or where the Share is Margin Stock, and (ii) the Initial Price and/or Final Price is determined based on the market-on-close ("**MOC**") or market-on-open price ("**MOO**") (as applicable), Counterparty represents that it will not, directly or indirectly, in connection with entering into, or terminating (at scheduled termination or otherwise), any Transaction, submit to any broker or dealer or electronic execution venue a sell or buy order, as the case may be, for any of the shares underlying (or any of the shares underlying the basket in the case of a Share Basket Transaction), for execution at the market-on-close or market-on-open price (as applicable) on any relevant Trade Date and/or Valuation Date (as applicable).

12. Acknowledgement and Representation Regarding Security-Based Swaps. Each party acknowledges that the offer and sale of each Transaction to it is intended to be exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"), by virtue of Section 4(a)(2) thereof and the provisions of Regulation D thereunder ("**Regulation D**"). Accordingly, each party represents and warrants to the other that (a) it has the financial ability to bear the economic risk of its investment in the Transaction and is able to bear a total loss of its investment, (b) it is an "accredited investor" as that term is defined under Regulation D, (c) it will purchase the Transaction for investment and not with a view to the distribution or resale thereof, and (d) the disposition of the Transaction is restricted under this MCA, the Securities Act and state securities laws.

13. Amendment to Master Agreement. The parties agree that, notwithstanding anything to the contrary in the Master Agreement, no breach by Counterparty of any of the representations, covenants or warranties set forth in Paragraphs 10 and 11 of this Master Confirmation Agreement shall constitute an Event of Default or Potential Event of Default under

the Master Agreement and shall instead be deemed to constitute an Additional Termination Event for which Counterparty is the sole Affected Party and the relevant Transaction(s) are the Affected Transaction(s).

14. Additional Provisions Relating to Goldman Entities.

(a) GS Bank. If Goldman Entity is GS Bank, then in connection with each Transaction on the date each Transaction between Counterparty and GS Bank is entered into, Counterparty represents and warrants to GS Bank that it is a "Qualified Investor" as defined in Section 3(a)(54) of the Exchange Act, and Counterparty covenants and agrees to immediately notify GS Bank should it subsequent to the date hereof cease to be a "Qualified Investor".

(b) GSI. If Goldman Entity is GSI and Counterparty is a "U.S. Entity" (as defined below), then in connection with each Transaction:

(A) Counterparty understands and agrees that, unless otherwise indicated GSI has acted as principal in respect of each Transaction and GS&Co. is acting solely in its capacity as agent for Counterparty and GSI pursuant to instructions from Counterparty and GSI. GS&Co. shall have no responsibility or personal liability to either party arising from any failure by either party to pay or perform any obligation under the Transaction. For the avoidance of doubt, any performance by Counterparty of its obligations (including notice obligations) through or by means of GS&Co.'s agency for GSI shall constitute good performance of Counterparty's obligations hereunder to GSI; however, performance by GSI of its obligations hereunder (including notice obligations) to Counterparty through or by means of GS&Co.'s agency for GSI shall not constitute good performance of GSI's obligations hereunder unless and then only to the extent that GS&Co. performs the obligations on behalf of GSI. Each party agrees to proceed solely against the other to collect or recover any amount owing to it or enforce any of its rights in connection with or as a result of the Transaction.

(B) **GSI is not a member of the Securities Investor Protection Corporation, and the protections of the Securities Investor Protection Act of 1970 (15 U.S.C. 78aaa through 78lll) will not apply to any Transactions or collateral posted by Counterparty to GSI. As a consequence, in the bankruptcy of GSI, Counterparty will be treated as an unsecured creditor of GSI with respect to any obligations of GSI, including GSI's obligation to return collateral posted by it to GSI, unless the parties otherwise agree to segregate such collateral.**

(C) Notwithstanding the above, for purposes of applicable rules of The Financial Conduct Authority ("**FCA**") GSI shall treat GS&Co. alone as its client. As a consequence, most of the client protections available under FCA rules will not be available to Counterparty.

(D) The time and venue of execution of each Transaction is available upon request.

(E) As used herein, "U.S. Entity" means an entity (i) domiciled or incorporated in the United States of America, or (ii) domiciled outside of the United States of America but managed, in whole or in part, from within the United States of America; *provided* that such an entity may be classified as not being a U.S. Entity for particular Transactions after consultation with, and subject to the agreement of, GSI.

15. Execution of PCA. Execution of this MCA by the parties shall constitute valid execution of the PCA attached as Annex II hereto.

16. Miscellaneous.

(a) Entire Agreement. This MCA constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect specifically thereto.

(b) Amendments. An amendment, modification or waiver in respect of this MCA (including the GT, but, for the avoidance of doubt, excluding any PCA annexed hereto) will only be effective if in writing (including a writing evidenced by a facsimile transmission or email) and executed by each of the parties or confirmed by an exchange of electronic messages on an electronic messaging system.

(c) Counterparts. This MCA, each PCA and each TS documented hereunder may be executed in counterparts, each of which will be deemed an original.

(d) Headings. The headings used in this MCA are for convenience of reference only and shall not affect the construction of or be taken into consideration in interpreting this MCA.

(e) Evidence of Calculations. GS will, upon reasonable request by Counterparty, provide evidence within a commercially reasonable time period in support of any calculation or determination made by GS, acting in good faith and in a commercially reasonable manner, under this MCA, whether in its capacity as Calculation Agent or otherwise, without disclosing any proprietary models of GS and/or the Calculation Agent or any information that GS determines, based on the advice of counsel, is subject to a duty, whether arising by contract, regulation or operation of law, of confidentiality GS owes to any third party.

(f) Standard of Care. Notwithstanding any other provision of this MCA, any annexes, supplements, adjustments or amendments thereto, where GS is required to act or exercise judgment in any way (including, without limitation, making a determination, adjustment or otherwise), it will do so in good faith and in a commercially reasonable manner provided that Additional Terms for Designated Transactions or any side letter, as the case may be, shall prevail.

(e) Eligible Contract Participant. Each party represents and warrants to the other that (i) it is an "eligible contract participant" as defined in the U.S. Commodity Exchange Act (as amended) and (ii) it has entered into each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

**IN WITNESS WHEREOF**, the parties have executed this document with effect from the date specified on the first page of this document.

**GOLDMAN SACHS INTERNATIONAL**

By:________________________

Name: Craig Donadio

Title: Vice President

**GOLDMAN SACHS BANK USA**

By:________________________

Name:

Title:

**GOLDMAN SACHS & CO. LLC**

By:________________________

Name:

Title:

**Archegos Fund, LP**

By:________________________

Name: Sung Kook Hwang

Title: Managing Member of the General Partner

Goldman Sachs / Archegos Fund, LP
MCA for Synthetic Equity Products

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 004012
SDNY_P001_0000032499

**ANNEX I**

**General Terms**

The purpose of these General Terms is to set forth certain general terms and conditions of any Share Swap Transaction, Share CFD Transaction, Share Basket Swap Transaction, Share Basket CFD Transaction, Index Swap Transaction, Index CFD Transaction, Index Basket Swap Transaction and Index Basket CFD Transaction entered into between GS and Counterparty under the Master Confirmation Agreement for Synthetic Equity Products that these General Terms are annexed to (the "**MCA**").

A Transaction (including any contracts for differences transactions, each a "**CFD Transaction**") that references a single Share, two or more Shares, a single Index, or two or more Indices will constitute, respectively, a Share Swap Transaction, a Share Basket Swap Transaction, an Index Swap Transaction, and an Index Basket Swap Transaction for the purposes of the Equity Definitions and will be referred to herein, respectively, as a Share Transaction, a Share Basket Transaction, an Index Transaction, or an Index Basket Transaction.

The general terms of each Transaction to which these General Terms relates are as follows, as supplemented by the PCA and the TS relating to such Transaction:

**General Terms:**

| | |
|---|---|
| Trade Date: | As specified in the TS. |
| Effective Date: | As specified in the TS. |
| Shares/Index/Basket: | As specified in the TS. |
| Exchange(s): | As specified in the TS. |
| Related Exchange(s): | As specified in the TS. |
| Termination Date: | The final Cash Settlement Payment Date. |

**Equity Amounts:**

| | |
|---|---|
| Equity Amount Payer: | As specified in the TS. |
| Number of Shares/Units/Baskets: | As specified in the TS. |
| Equity Notional Reset: | Not Applicable if such Transaction has one Valuation Date; Applicable if such Transaction has more than one Valuation Date. |
| Type of Return: | (i) In respect of a Share Transaction and a Share Basket Transaction, Total Return.<br><br>(ii) In respect of an Index Transaction, (a) where the Calculation Agent determines the Index is a total return index, Price Return; otherwise, (b) Total Return. |
| Equity Notional Amount: | (i) In respect of a Share Transaction, the product of the Number of Shares and the Initial Price.<br><br>(ii) In respect of a Share Basket Transaction, the sum of the values for each Share in the Basket as the product of the Initial Price of each Share and the relevant Number of Shares comprised in the Basket, multiplied by the Number of Baskets.<br><br>(iii) In respect of an Index Transaction, the product of the Number of Units and the Initial Price.<br><br>(iv) In respect of an Index Basket Transaction, the sum of the values for each Index in the Basket as the product of the Initial Price of each Index and the relevant Number of Units comprised in the Basket, multiplied by the Number of Baskets. |
| Initial Price: | Except as set forth in the PCA, as specified in the TS. |
| Final Price: | Except as set forth in the PCA, the Final Price or the Relevant Price (in respect of a Share Basket Transaction or an Index Basket Transaction), as the case may be, shall be determined:<br><br>(i) in respect of any interim Valuation Date(s) (if applicable to such Transaction) as provided in Section 5.9 of the Equity Definitions, unless NASDAQ is the Exchange, in which case the NASDAQ Official Closing |

Price (NOCP) as of the Valuation Time on the Valuation Date as reported in the official price dissemination mechanism for the Exchange; and

(ii) in respect of the final Valuation Date, as follows:

(a) In respect of a Share Transaction or a Share Basket Transaction where the Exchange is located in the United States or Canada or where the Share is Margin Stock; the VWAP Price;

(b) In respect of all other Share Transactions or Share Basket Transactions, the Hypothetical Broker Dealer Price;

(c) In respect of an Index Transaction or Index Basket Transaction, the closing level of the relevant Index as published by the Index Sponsor, as determined by the Calculation Agent; and

(d) If Futures Price Valuation is applicable to the Transaction, as specified in Exhibit I.

Valuation Time: In respect of any Transaction whereby the Final Price is determined in accordance with Section 5.9 of the Equity Definitions, as provided in Section 6.1 of the Equity Definitions. In all other cases, the time at which the Final Price is determined.

Margin Stock: "**Margin Stock**" has the meaning specified in Regulation U (as supplemented or amended from time to time), issued by the Board of Governors of the Federal Reserve System, United States 12 C.F.R. Part 221.

VWAP Price: The composite volume weighted average price per Share on the Valuation Date determined by the Calculation Agent on the basis of trades executed on the exchanges on which the Share trades, net of (or where Counterparty is the Equity Amount Payer, plus) any additional commissions or costs actually incurred by GS (determined by GS in good faith and a commercially reasonable manner treating Counterparty comparably to similarly situated swap or contracts customers. Details of any additional costs and commissions will be available upon request.

Hypothetical Broker Dealer Price: (i) In respect of a Share Transaction, the Relevant Share Price, where "**Relevant Share Price**" means, the reasonable price, determined by GS in good faith and a commercially reasonable manner, at which a hypothetical broker dealer would purchase or sell a number of Shares equal to the Number of Shares with respect to the Transaction on the final Valuation Date; or

(ii) In respect of a Share Basket Transaction, an amount for the Basket equal to the sum of the values for the Shares of each Issuer as the product of (A) the Relevant Share Price of such Share and (B) the relevant Number of Shares comprised in the Basket;

And with respect to (i) and (ii), minus (or where Counterparty is the Equity Amount Payer, plus) any additional commissions or costs actually incurred by GS (determined by GS in good faith and a commercially reasonable manner, treating Counterparty comparably to similarly situated swap or contracts customers; *provided* that such hypothetical broker dealer would be subject to the same securities laws or rules or regulations of any securities regulator, exchange or self-regulatory organization as applicable to GS or any of its affiliates. Details of the Final Price and any additional costs and commissions will be available upon request.

Additional Provisions with respect to Final Price: Notwithstanding anything herein to the contrary, the occurrence of any final Valuation Date shall be delayed, in whole or in part, to the extent necessary, as determined by GS in good faith and a commercially reasonable manner, treating Counterparty comparably to similarly situated swap or contracts customers, to allow GS or any of its affiliates to unwind its Hedge Positions in a commercially reasonable manner in light of then-prevailing market conditions. Solely to the extent that such inability to unwind is caused by a lack of market liquidity, such delay of the final Valuation Date shall not be postponed for a number of Exchange Business Days greater than a number of days equal to the quotient of the Number of Shares being terminated under the applicable Transaction

divided by the ADTV Limit (the "**Postponement Period**"); provided, that if any day during the Postponement Period is a Disrupted Day and the eight immediately Scheduled Trading Days following such date are also Disrupted Days, the consequences set forth in Section 6.6 of the Equity Definitions shall prevail with respect to the remaining portion of the Transaction. In the event of such delay of any final Valuation Date, GS will notify Counterparty as soon as practicable under the circumstances, specifying the reason for such delay and providing a reasonable estimate (to the extent practicable) of when such unwind shall be completed.

ADTV Limit: 20% of the average daily composite trading volume reported for the Shares for the regular trading hours of the Exchange for the 30 consecutive calendar days ending on the Exchange Business Day immediately prior to the final Valuation Date, as determined by the Calculation Agent using Bloomberg function "<equity> HP" (or any successor thereto as determined by the Calculation Agent) with respect to the Ticker for the Shares or, if such average daily trading volume is not so reported for any reason or is manifestly erroneous, as determined by the Calculation Agent using other commercially reasonable means.

**Floating Amounts:**

Floating Amount Payer: The party who is not the Equity Amount Payer.

Floating Amount: Except as set forth in the PCA, on each Payment Date, the Floating Amount Payer will pay to the Equity Amount Payer an amount equal to the Floating Amount in respect of the related Calculation Period *plus* any additional amounts specified in the PCA.

If such Transaction has one Valuation Date, the Floating Amount is:

[((Spread + OIS Spread) x Spread Notional Amount) + (Floating Rate x Equity Notional Amount)] x Day Count Fraction

If such Transaction has more than one Valuation Date, the Floating Amount is:

Equity Notional Amount x (Floating Rate + Spread + OIS Spread) x Day Count Fraction

OIS Spread: As specified in the TS (if applicable).

Floating Rate Option: As specified in the TS.

If Designated Maturity is one day ("**1D**"), the Floating Rate Option shall have the meaning as specified on the web site below for the relevant currency in which the Floating Amount is denominated: www.goldmansachs.com/disclosures/floatingrateoption.html[2]

Additional Provisions with respect to Floating Rates: Unless otherwise mutually agreed between the parties and notwithstanding anything to the contrary in the Master Confirmation Agreement or the 2006 Definitions, the Floating Rate in respect of each Reset Date in the Calculation Period (including the Effective Date) shall be the applicable rate on the day that is two (2) Applicable Banking Days preceding the relevant Reset Date or Effective Date (as applicable), in each case subject to adjustment in accordance with the business day convention and/or fallback provisions (if any) relating to the applicable rate not being published on such day (as such terms are described in the relevant Floating Rate Option definition or elsewhere in the Confirmation for such Transaction).

"Applicable Banking Days" means the specified Banking Days or Business Days (as applicable) referenced in the relevant Floating Rate Option definition, or if no such days are specified, the applicable days for the relevant Floating Rate Option as determined by the Calculation Agent.

[2] ***Important Disclaimer***: The information on this web site is provided by Goldman Sachs International, Goldman Sachs & Co. LLC or Goldman Sachs Bank USA to authorized users only and solely for the purposes of documenting transactions.

| | |
|---|---|
| Designated Maturity: | As specified in the TS. |
| Spread: | As specified in the TS and, in respect of any Transaction where Counterparty is specified in the TS as the Equity Amount Payer, as determined by GS from time to time in a commercially reasonable manner based on stock borrow rates available to GS for the applicable securities and amended on a weekly basis as separately agreed between the parties. |
| Day Count Fraction: | As specified in the TS. |
| Spread Notional Amount: | As specified in the PCA (if applicable). |
| Payment Date(s): | As specified in the PCA. |
| Reset Date(s): | As specified in the PCA. |
| Method of Calculation: | Weighted Average. |

**The following terms shall apply where the Designated Maturity is specified on the TS as 1D:**

| | |
|---|---|
| Reset Date(s): | Each Business Day in each Calculation Period. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable. |
| Settlement Currency: | As specified in the TS (all amounts shall be converted to the Settlement Currency by the Calculation Agent). |
| Cash Settlement Payment Date(s): | Except as set forth in the PCA, in respect of any Transaction, a number of Currency Business Days following the relevant Valuation Date based on the standard settlement period for the relevant Share, Shares comprising the Basket or securities comprising the Index, as the case may be (or, if there are multiple Exchanges specified in the TS in respect of an Index or Shares comprising the Basket, as determined by the Calculation Agent. |

**Dividends (applicable where Type of Return is Total Return):**

| | |
|---|---|
| Dividend Period: | Second Period. |
| Dividend Amount: | Ex Amount multiplied by the Number of Shares (or in the case of a Share Basket Transaction or an Index Basket Transaction, the relevant Number of Shares, multiplied by the Number of Baskets); *provided* that Sections 10.1(a) and 10.1(b) of the Equity Definitions shall be amended by replacing the percentage 100% with the relevant Dividend Percentage.<br><br>For the purposes of calculating any Dividend Amount in relation to an Index Transaction or an Index Basket Transaction, references to Shares shall be deemed to be references to Shares within the Index, and "Number of Shares" shall mean a number of shares determined by the Calculation Agent equal to the number of relevant shares in the Index taking into account the applicable weightings of the relevant issuer in the Index, the Number of Units and any other factors the Calculation Agent (in consultation with Counterparty and with reference to any relevant Bloomberg pages) deems relevant excluding any dividends (or portion of such dividends) that the Index Sponsor has taken into account, through a change made by the Index Sponsor to the composition and/or the official index divisor of the Index, such that payment of a cash equivalent of such dividend would have the effect of accounting for such dividend (or portion of such dividend) more than once.<br><br>Any interest on capital distribution by the Issuer shall constitute a "gross cash dividend" for the purposes of Section 10.1 of the Equity Definitions. |
| Dividend Payment Date(s): | As specified in the PCA. |
| Dividend Percentage: | With respect to each Share, the percentage specified in the TS, or as separately agreed between the parties from time to time; *provided* that where GS is the Equity Amount Payer, if such dividend or distribution is specified by the Issuer (or in the case of a depositary receipt, the issuer of the underlying security) as a payment of interest on capital or interest on equity of shareholders, the Dividend Percentage shall be determined by the Calculation Agent, in accordance with the withholding tax legislation |

| | |
|---|---|
| | applied by the Issuer at the time of payment by the Issuer to holders of record of the Shares; and *provided further* that if the rate for withholding or deduction of taxes at the source by or on behalf of any applicable authority having the power to tax in respect of such dividend changes from such rates as applicable on Trade Date, the Calculation Agent shall adjust the foregoing percentage to account for such change. |
| Extraordinary Dividends: | The definition of "gross cash dividend" in Section 10.1 of the Equity Definitions shall be amended so that Extraordinary Dividends which consist solely of cash are included, and any Extraordinary Dividends which consist solely of cash shall not constitute a Potential Adjustment Event under Section 11.2(e) of the Equity Definitions. |
| Dividend Recovery: | If, in respect of any Dividend Amount (a) the gross cash or non-cash dividend declared by the Issuer (a "**Declared Dividend**") to holders of record of the Shares is not equal to the gross amount deemed to be paid by the Issuer (notwithstanding that such payment is made to either any relevant taxing authority or holders of record) in respect of such Dividend Amount (a "**Dividend Mismatch Event**") or (b) the Issuer fails to make any payment or delivery in respect of that Declared Dividend by the third Currency Business Day following the relevant due date, then in either case the Calculation Agent shall determine:<br>(i) any appropriate adjustment or repayment to be made by a party to account for that Dividend Mismatch Event or non-payment or non-delivery, as the case may be;<br>(ii) the date any such repayment should be made and the effective date of such adjustment; and<br>(iii) any interest payable on such repayment amount, if any.<br>The parties expressly acknowledge and agree that this Dividend Recovery provision shall apply and remain in full force and effect (even if the Termination Date has occurred) until one year from Termination Date. The parties further agree that in the event that an Issuer makes a payment or delivery in respect of a dividend that has already been the subject of an adjustment or repayment per this section, the Calculation Agent shall determine any appropriate adjustments or repayments to be made (including interest, if applicable) in respect of the Transaction in order to account for such subsequent payment or delivery by the Issuer. |

**Index Adjustment Events Applicable to Index Transactions and Index Basket Transactions:**

| | |
|---|---|
| Index Cancellation: | Cancellation and Payment |
| Index Modification and Index Disruption: | Calculation Agent Adjustment |

**Share Adjustments Applicable to Share Transactions and Share Basket Transactions:**

| | |
|---|---|
| Method of Adjustment: | Calculation Agent Adjustment |

**Extraordinary Events Applicable to Share Transactions and Share Basket Transactions:**

| | |
|---|---|
| Share-for-Share: | Section 12.1(f) of the Equity Definitions is hereby amended by deleting the parenthetical "(or, at the option of the holder of such Shares, will consist)" from the second line thereof. |

Consequences of Merger Events:

| | |
|---|---|
| Share-for-Share: | Alternative Obligation; *provided* that if necessary, GS will adjust any relevant terms that GS reasonably concludes in good faith and in a commercially reasonable manner are appropriate with respect to any legal regulatory or self-regulatory requirements or related policies and procedures (whether or not such requirements, policies or procedures are imposed by law or have been voluntarily adopted by GS); treating Counterparty comparably to similarly situated swap or contract customers. |
| Share-for-Other: | Cancellation and Payment, or in respect of a Share Basket Transaction, Partial Cancellation and Payment. |

| | |
|---|---|
| Share-for-Combined: | Component Adjustment |
| Tender Offer: | Applicable |
| Consequences of Tender Offers: | |
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |
| Composition of Combined Consideration: | Not Applicable; provided that notwithstanding Sections 12.1(f) and 12.5(b) of the Equity Definitions, to the extent that the composition of the Combined Consideration for the relevant Shares pursuant to a Tender Offer or Merger Event could be determined by a holder of the Shares, the Calculation Agent will, in its sole discretion, determine such composition. |
| Nationalization, Insolvency or Delisting: | Cancellation and Payment in the case of a Share Transaction, Partial Cancellation and Payment in the case of a Share Basket Transaction; *provided* that the definition of "Affected Shares" in Section 12.1(n) of the Equity Definitions is hereby amended by inserting the words "or by a Nationalization, Insolvency or Delisting" after the words "Tender Offer" in the first line thereof; *provided further* that in addition to the provisions of Section 12.6(a)(iii) of the Equity Definitions, it shall also constitute a Delisting if the Exchange is located in the United States and the Shares are not immediately re-listed, re-traded or requoted on any of the New York Stock Exchange, the NYSE MKT, NYSE-Arca, The NASDAQ Global Select Market, or The NASDAQ Global Market (or their respective successor). |

**Extraordinary Events Applicable to all Transactions:**

| | |
|---|---|
| Additional Disruption Events: | For the purposes of Section 12.9 of the Equity Definitions, references to the terms "a party" or a "Hedging Party" will be deemed to include any of its Affiliates for all purposes other than giving or receiving notice. |
| Change in Law: | Applicable; *provided* that Section 12.9(a)(ii) of the Equity Definitions is hereby amended by replacing the word "Shares" with "Hedge Positions", inserting the words "(a "**Hedge Illegality**")" after the word "Transaction" in the seventh line thereof, and inserting the words "(a "**Change in Law Increase**"); *provided* that this Section 12.9(a)(ii) shall not apply to any Hedge Illegality or Change in Law Increase if the Calculation Agent determines that such party could have taken reasonable steps to avoid such Hedge Illegality or Change in Law Increase, as the case may be." after the words "its tax position)"" in the ninth line thereof.<br><br>Upon the occurrence of a Hedge Illegality, the provisions of Section 12.9(b)(i) of the Equity Definitions shall apply.<br><br>Upon the occurrence of a Change in Law Increase, then, in lieu of Section 12.9(b)(i) of the Equity Definitions, the provisions of Section 12.9(b)(vi) of the Equity Definitions shall apply as if such occurrence were an Increased Cost of Hedging. |
| Insolvency Filing: | Applicable |
| Hedging Disruption: | Applicable; *provided* that Section 12.9(a)(v) of the Equity Definitions is replaced with the following: "'**Hedging Disruption**' means that the Hedging Party is unable, after using commercially reasonable efforts, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any Hedge Positions, or (B) realize, recover, remit or transfer the proceeds of any Hedge Positions or a transaction between accounts within the jurisdiction of the Hedge Positions (the "**Affected Jurisdiction**") or from accounts within the Affected Jurisdiction to accounts outside of the Affected Jurisdiction; *provided further* that, any such inability or material restriction that (1) is due solely to the deterioration of the creditworthiness of the Heding Party or (2) could be avoided by the Hedging Party, acting in a |

| | |
|---|---|
| | commercially reasonable manner based on prevailing circumstances applicable to the Hedging Party, shall not be a Hedging Disruption." |
| Increased Cost of Hedging: | Applicable; *provided* that Section 12.9(a)(vi) of the Equity Definitions is replaced with the following: "'**Increased Cost of Hedging**' means that the Hedging Party would incur a materially increased (as compared with circumstances existing on the Trade Date) amount of tax, duty, expense or fee (other than brokerage commissions) to (A) acquire, establish, re-establish, substitute, maintain unwind or dispose of any Hedge Positions, or (B) realize, recover or remit the proceeds of any such Hedge Positions; *provided* that any such materially increased amount that (1) is incurred solely due to the deterioration of the creditworthiness of the Hedging Party or (2) could be avoided by the Hedging Party, acting in a commercially reasonable manner based on prevailing circumstances applicable to the Hedging Party, shall not be deemed an Increased Cost of Hedging." |
| Hedging Party: | GS, acting in good faith and in a commercially reasonable manner. |
| Determining Party: | GS; acting in good faith and a commercially reasonable manner, unless an Event of Default has occurred and is continuing with respect to GS, in which case Counterparty may appoint a Leading Dealer to act as Determining Party for so long as such Event of Default is continuing, unless an Event of Default has also occurred and is continuing with respect to Counterparty, in which case GS is the Determining Party. All calculations and determinations by the Determining Party shall be made in good faith and in a commercially reasonable manner. Further, the Counterparty acknowledges that GS in its role as Determining Party may consider in calculating a Cancellation Amount any loss or cost of GS incurred in connection with its terminating, liquidating or re-establishing any hedge related to such Transaction as provided in Section 12.8 of the Definitions or that a Leading Dealer in its role as Determining Party shall consider in calculating a Cancellation Amount any loss or cost of GS incurred in connection with its terminating, liquidating or re-establishing any hedge related to such Transaction as provided in Section 12.8 of the Definitions and notified to such Leading Dealer by GS. If either party chooses to dispute a determination made by the Determining Party, then it must do so within three (3) Scheduled Trading Days of the day on which the relevant initial determination is communicated and provide the Determining Party with the reasons why it objects to the initial calculation or determination in writing. If Counterparty and GS cannot resolve the dispute, then the dispute resolution procedures applicable to the Calculation Agent shall also apply to the Determining Party and references therein to the Calculation Agent shall be deemed to be references to the Determining Party. |
| Hedge Positions: | Section 13.2(b) of the Equity Definitions shall be amended by (i) inserting the words ", unwind, termination" after the words "entry into" in the first line thereof and (ii) replacing the words "a party" with the words "GS or its Affiliates" in the third line thereof. |

**Other Terms:**

| | |
|---|---|
| Non-Reliance/Agreements and Acknowledgements Regarding Hedging Activities/Additional Acknowledgements: | Applicable |
| Index Disclaimer: | Applicable, and including any additional specific disclaimers that GS may deliver to Counterparty from time to time. |
| Calculation Agent: | GS. If Counterparty chooses to dispute a calculation or determination, (each, an "Initial Calculation or Determination") made by GS in its role as Calculation Agent, then it must do so within one (1) Scheduled Trading Day of the day on which GS communicates the relevant Initial Calculation or Determination to Counterparty and provide GS with the reasons why Counterparty objects to the Initial Calculation or Determination in writing. If Counterparty and GS cannot resolve the dispute within one (1) Scheduled Trading Day following the day on which Counterparty disputed the Initial |

Calculation or Determination, then Counterparty and GS shall agree on three (3) Independent Dealers to act as substitute Calculation Agents in place of Counterparty and GS ("Substitute Calculation Agents") for the purposes of the determination or calculation that is subject to the dispute only. If the parties do not agree on three (3) Substitute Calculation Agents within one (1) Scheduled Trading Day, they shall each appoint a Substitute Calculation Agent (each, a "Proxy Agent") and those two (2) Proxy Agents together shall appoint the third Substitute Calculation Agent within one (1) Scheduled Trading Day so that a total of three (3) Substitute Calculation Agents are appointed. In appointing the third Substitute Calculation Agent, the two Proxy Agents shall be instructed not to disclose the identities of GS and Counterparty to the third Substitute Calculation Agent. If (i) a party cannot appoint any Proxy Agent after contacting three (3) Independent Dealers and such party presents to the other party a copy of written rejection from each of such three dealers or (ii) two Proxy Agents cannot reach agreement as to the third Substitute Calculation Agent within one (1) Scheduled Trading Day, then the provisions in this "Calculation Agent" provision relating to the appointment of and making of determinations by Substitute Calculation Agents shall cease to apply to the relevant dispute. In all cases the appointment of any Substitute Calculation Agent shall be dependent on such Substitute Calculation Agent having agreed to comply with the standards of Section 1.40 of the Equity Definitions and having agreed to act without any additional conditions, unless such conditions are acceptable to each of GS and Counterparty.

Any dispute by the Counterparty shall be made in good faith and shall not postpone any payment owed or delivery to be made by, or any other obligation under the relevant Transaction of, the Counterparty or GS, as applicable. For the avoidance of doubt, any payment or delivery by the Counterparty or GS, as applicable, related to a disputed Initial Calculation or Determination (each, a "Disputed Payment or Delivery"), shall still be made on the date it would have been required absent the dispute. If, following Counterparty's or GS's Disputed Payment or Delivery, as applicable, the parties or the Substitute Calculation Agents revise an Initial Determination or Calculation in accordance with the provisions set forth herein (each, a "Revised Calculation or Determination"), then GS shall promptly apply such Revised Calculation or Determination to re-calculate any payment or delivery originally owed by the Counterparty or by GS, as applicable (each, a "Revised Payment or Delivery"). If the Disputed Payment or Delivery made by the Counterparty exceeds the Revised Payment or Delivery, then GS shall promptly return to Counterparty any amounts paid or securities delivered to GS in excess of the Revised Payment or Delivery, as applicable. If the Disputed Payment or Delivery made by GS is less than the Revised Payment or Delivery, then GS shall promptly pay any additional amounts or deliver any additional securities to Counterparty, as applicable, so that the full Revised Payment or Delivery is received by the Counterparty.

Once the three (3) Substitute Calculation Agents are appointed, each of GS and Counterparty will be entitled to separately submit (where the third Substitute Calculation Agent was appointed by the Proxy Agents, such submission will be done on an anonymous basis without revealing the identity of GS and Counterparty to the third Substitute Calculation Agent) its understanding of the facts and how it reached its own determination or calculation in writing (which may accompany any publicly available information to support such determination or calculation) to the Substitute Calculation Agents which will also be disclosed to the other disputing party. GS and Counterparty shall request the contents of such submission be kept confidential to any other parties and be treated without prejudice to any existing or future positions which the relevant party may have (other than the relevant Transaction) by the Substitute Calculation Agents unless otherwise agreed by GS and Counterparty.

For determinations of prices or rates quoted on publicly available sources, the median price or rate provided by the three (3) Substitute Calculation

Agents shall be deemed to be the price or rate. For all calculations, valuations and any other matters, the consensus determination of at least two (2) of the three (3) Substitute Calculation Agents shall be deemed to be the final determination, and if no consensus is reached by at least two (2) Substitute Calculation Agents within two (2) Scheduled Trading Days, then the provisions in this "Calculation Agent" provision relating to the appointment of and making of determinations by Substitute Calculation Agents shall cease to apply to that determination. Unless there is a clear error, the prices, rates and other determinations of the Substitute Calculation Agents shall be binding and conclusive, but only with respect to the relevant Transaction and such calculation or determination will be without prejudice to any other Transactions between GS and Counterparty. Such determinations of the Substitute Calculation Agents shall also be kept confidential by GS and Counterparty as well as by the Substitute Calculation Agents. Counterparty and GS shall pay equally any costs of the Substitute Calculation Agents. Each of Counterparty and GS waives any claim that it might otherwise have against the Substitute Calculation Agents for errors or omissions made in good faith in making any calculation or determination in connection with a Transaction."

"**Independent Dealer**" means a leading dealer in the relevant market that (i) is not an Affiliate of either of the parties or any other appointed Independent Dealer and (ii) does not have any trades with GS and/or Counterparty, the settlement of which requires or involves the relevant disputed determination or calculation.

| | |
|---|---|
| Payment Instructions: | As separately notified. |
| Credit Provisions: | Any Transaction entered into under this MCA shall be governed by the Credit Support Annex between GS and Counterparty. The "Independent Amount" with respect to the Counterparty for any such Transaction shall be the percentage specified in the related TS *multiplied by* the Equity Notional Amount. |

(a) **Optional Early Closing Right:** Provided that no Event of Default, Potential Event of Default or Termination Event has occurred and is continuing with respect to a party, and subject to the additional terms set forth in the PCA, such party may on any Exchange Business Day ("**Early Unwind Date**") close any Transaction, in whole or in part by giving notice to (i) in the case of Counterparty, at least (1) one Exchange Business Day prior to the Early Unwind Date and (ii) in the case of GS, giving notice to Counterparty at least (5) five Exchange Business Days prior to the Early Unwind Date. Such notice shall specify the Number of Shares, Number of Units, or Number of Baskets (as applicable) to be terminated ("**Early Unwind Amount**"). The final Valuation Date shall, subject to the other terms of this MCA, be deemed to be the Early Unwind Date for that Early Unwind Amount and the Calculation Agent shall determine the amount payable with respect to the termination of such transaction. Any other amounts or obligations that are expressed to survive any closing of such Transaction shall survive the closing of the Transaction. If a party gives notice to close only part of a Transaction, then the above provisions shall apply *mutatis mutandis* and the Equity Notional Amount, Initial Price, the Number of Baskets or the Number of Shares or Number of Units (as applicable) of such Transaction shall be adjusted accordingly. If GS elects to close a Transaction in whole or in part, all amounts payable in respect of such Early Unwind Amount shall be payable the date which is the number of days specified under Valuation Date(s), Cash Settlement Payment Date(s) or Settlement Period (as applicable) after the Early Unwind Date.

(c) **Additional Provisions Regarding Financial Securities:** Notwithstanding anything to the contrary herein, the occurrence of any final Valuation Date of a Transaction (a) where GS is the Equity Amount Payer and (b) the underlier of which is the common stock (or the equivalent thereof) of a "financial institution" or a "financial sector entity" (as such terms are defined below), or an index/basket, or security that contains the common stock (or the equivalent thereof) of a "financial institution" or "financial sector entity", shall be delayed, in whole or in part, to the extent necessary, as determined by GS in good faith and a commercially reasonable manner, treating Counterparty comparably to similarly situated swap or contracts for differences customers, to allow GS (or its Affiliates) to unwind any hedge it may have to a Transaction; *provided* that, (i) such delay is necessary, as determined in GS's reasonable discretion, for appropriately hedging exposure to a "financial institution" or "financial sector entity" in compliance with Basel III capital rules, and (ii) on any scheduled final Valuation Date, GS will use all commercially reasonable efforts to unwind any relevant hedge in light of then-prevailing market conditions. As used herein:

"**Financial institution**" shall have the meaning defined in "Regulatory Capital Rules: Regulatory Capital, Implementation of Basel III, Capital Adequacy, Transition Provisions, Prompt Corrective Action, Standardized Approach for Risk-weighted Assets, Market Discipline and Disclosure Requirements, Advanced Approaches

Risk-Based Capital Rule, and Market Risk Capital Rule; Final Rule" promulgated by the Office of the Comptroller of the Currency, Treasury; and the Board of Governors of the Federal Reserve System in the Federal Register on October 11, 2013.

"**Financial sector entity**" shall have the meaning defined under Article 4(27) of Regulation (EU) No 575/2013 Of The European Parliament And Of The Council of 26 June 2013.

Page **15** of **23**

89308416_1

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 004022
SDNY_P001_0000032509

## EXHIBIT I

### Futures Price Valuation Transactions

If "Futures Price Valuation" is specified in the TS the following provisions will apply. All terms of the MCA, GT and relevant PCA shall apply to each Futures Price Valuation Transaction unless expressly amended below. Terms used but not defined herein shall have the meaning set out in the MCA, GT or relevant PCA.

**Equity Amounts:**

| | |
|---|---|
| Final Price: | The Official Settlement Price of the Exchange-traded Contract as calculated and published by the Related Exchange. |
| Valuation Date: | As specified in the TS; *provided* that, notwithstanding anything to the contrary in Section 6.8(a) of the Equity Definitions, if on the Valuation Date either (i) no Official Settlement Price is published, or (ii) the Hedging Party is unable, after using commercially reasonable efforts, to unwind its Hedge Positions on such date, (a "**Valuation Date Disruption**") then the Valuation Date shall be the first succeeding Business Day on which both (a) an Official Settlement Price is published, and (b) no Valuation Date Disruption is continuing. |
| Valuation Time: | The time at which the Official Settlement Price of the Exchange-traded Contract is published. |
| **Floating Amounts:** | No Floating Amounts shall be payable in respect of any Futures Price Valuation Transaction. |
| **Settlement Terms:** | |
| Cash Settlement Payment Date: | In respect of a Pan Asia Country Transaction or any other Transaction where the Exchange or Related Exchange is located within the Americas, three (3) Exchange Business Days following the Valuation Date (unless such day is not a Currency Business Day, in which case the next following Currency Business Day).<br>For all other Transactions, a number of Exchange Business Days following the relevant Valuation Date based on the standard settlement period for the relevant Exchange-traded Contract (unless such day is not a Currency Business Day, in which case the next following Currency Business Day). |
| **Extraordinary Events:** | Consequences of Merger Events, Consequences of Tender Offers, Composition of Combined Consideration, and Nationalization, Insolvency, and Delisting shall not apply. |
| **Index Adjustment Events:** | Index Cancellation, Index Modification, and Index Disruption shall not apply. |
| Exchange-traded Contract: | Section 6.8(b)(i) of the Equity Definitions shall be replaced in its entirety by the following: ""**Exchange-traded Contract**" in relation to the Index or Share means the options or futures contract on the relevant Index or Share traded on the Related Exchange with an expiry date (or the date which would have been the expiry date but for that day being a Disrupted Day or not being a Scheduled Trading Day) that matches the final Valuation Date and that is most closely equivalent to the terms of the relevant Transaction." |
| Consequences of Exchange-traded Contract Events: | Articles 11 and 12 of the Equity Definitions (excluding Sections 12.7(c), 12.8 and 12.9 therein) shall be disregarded.<br>Section 6.3 of the Equity Definitions shall not be applicable to any Transaction.<br>Section 6.4 of the Equity Definitions shall be deleted in its entirety and replaced with the following: ""Disrupted Day" means any Scheduled Trading Day on which a Valuation Date Disruption has occurred."<br>Section 6.6(a) of the Equity Definitions shall be deleted in its entirety and replaced with the following: "in the case of any Transaction, the Valuation Date shall be the first succeeding Scheduled Trading Day that is not a Disrupted Day." |

Section 6.8(d) of the Equity Definitions shall be replaced in its entirety by the following:

"(d) **Adjustments of the Exchange-traded Contract**: In the event that the terms of the Exchange-traded Contract are changed or modified by the Related Exchange, the Calculation Agent shall, if necessary, adjust one or more of the Initial Price, the Number of Units/Shares, or any other variable relating to the settlement terms of the Transaction to preserve for each party the economic equivalent of any payment or payments (assuming satisfaction of each applicable condition precedent) by the parties in respect of the Transaction that would have been required after the date of such change or modification."

Section 6.8(e) of the Equity Definitions shall be replaced in its entirety by the following:

"(e) **Non-Commencement, Discontinuance, Expiry or Delisting of the Exchange-traded Contract**: Upon the occurrence of a Non-Commencement, Discontinuance, Expiry or a Delisting (which in each case will be deemed to have occurred on the earlier of the Announcement Date or the occurrence of such event), the Transaction will be cancelled and an amount calculated in accordance with Section 12.7(c) of the Equity Definitions will be paid by one party to the other, where:

(i) "**Non-Commencement**" means that the Exchange-Traded Contract never commences prior to the Valuation Date;

(ii) "**Discontinuance**" or "**Expiry**" means respectively the permanent discontinuance or expiry of the Exchange-traded Contract prior to the Valuation Date;

(iii) "**Delisting**" means that the Related Exchange announces that pursuant to the rules of the Related Exchange, the Exchange-traded Contract ceases (or will cease) to be listed, traded or publicly quoted on the Related Exchange for any reason and it is not immediately re-listed, re-traded or re-quoted on an exchange or quotation system located in the same country as the Related Exchange (or, where the Related Exchange is within the European Union, in any member state of the European Union);

(iv) "**Announcement Date**" means the date of the first public announcement by the Related Exchange that a Non-Commencement, Discontinuance, Expiry or Delisting has occurred or will occur in respect of the Exchange-traded Contract; and

(v) The Determining Party is GS; acting in good faith and a commercially reasonable manner, unless an Event of Default has occurred and is continuing with respect to GS, in which case Counterparty may appoint a Leading Dealer to act as Determining Party for so long as such Event of Default is continuing, unless an Event of Default has also occurred and is continuing with respect to Counterparty, in which case GS is the Determining Party. . All calculations and determinations by the Determining Party shall be made in good faith and in a commercially reasonable manner. Further, the Counterparty acknowledges that GS in its role as Determining Party may consider in calculating a Cancellation Amount any loss or cost of GS incurred in connection with its terminating, liquidating or re-establishing any hedge related to such Transaction as provided in Section 12.8 of the Definitions or that a Leading Dealer in its role as Determining Party shall consider in calculating a Cancellation Amount any loss or cost of GS incurred in connection with its terminating, liquidating or re-establishing any hedge related to such Transaction as provided in Section 12.8 of the Definitions and notified to such Leading Dealer by GS. . If either party chooses to dispute a determination made by the Determining Party, then it must do so within three (3) Scheduled Trading Days of the day on which the relevant initial determination is communicated and provide the Determining Party with the reasons why it objects to

the initial calculation or determination in writing. If Counterparty and GS cannot resolve the dispute, then the dispute resolution procedures applicable to the Calculation Agent shall also apply to the Determining Party and references therein to the Calculation Agent shall be deemed to be references to the Determining Party.

| | |
|---|---|
| **Optional Early Closing Right:** | In addition to the terms specified above, if either party elects to close a Transaction in whole or in part, the date which is the number of days specified under Cash Settlement Payment Date above after such Early Unwind Date shall be the final Cash Settlement Payment Date. |

**ANNEX II**

**Product Customization Agreement – Swap Transactions**

The purpose of this Product Customization Agreement, or "PCA", is to set forth product-specific terms and conditions, in addition to the GT, of Share Swap Transactions, Share Basket Swap Transactions, Index Swap Transactions and Index Basket Swap Transactions entered into between GS and Counterparty under the Master Confirmation Agreement for Synthetic Equity Products that this PCA is annexed to (the "**MCA**").

1. Any Transaction that is designated a "Swap Transaction" in the relevant TS shall be governed by, and be subject to, this PCA. All provisions contained in the Master Agreement and the MCA (including the GT) govern each Transaction to which this PCA relates, except as expressly modified below. Terms used but not defined herein shall have the meaning set out in the MCA or the GT.

2. Notwithstanding anything to the contrary in the Master Agreement or the MCA, an agreement (whether oral or in the form of a writing evidenced by a facsimile transmission or email) to amend or modify any term or provision of this PCA will be effective at the time of such agreement, and following such agreement GS shall deliver a written notice of such agreement to Counterparty (a "**PCA Amendment Notice**"), which shall be conclusive as to the scope and terms of such amendment, notwithstanding that the PCA Amendment Notice may not be signed by either party. Failure by GS to send a PCA Amendment Notice shall not affect the validity of such agreement.

3. The general terms of each Transaction to which this PCA relates are as follows, as supplemented by the TS related to such Transaction:

**Equity Amounts:**

| | |
|---|---|
| Valuation Date(s): | The final Valuation Date as specified in the TS. |
| Initial Price: | As specified in the TS, being the Gross Initial Price adjusted by the relevant Commission, converted using the FX Rate. |
| Gross Initial Price: | As specified in the TS. |
| Commission: | As agreed between the parties and as specified in the TS. |
| FX Rate: | As specified in the TS. |
| Final Price | The Gross Final Price adjusted by the relevant Commission, converted using the FX Rate. |
| Gross Final Price: | Final Price as specified in the GT in respect of the relevant Valuation Date. |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount: | Floating Amount will be an amount equal to the sum of (i) the Floating Amount as defined in the GT (the "**Basic Floating Amount**") and (ii) all Compounding Amounts in respect of each Reset Date in the Calculation Period. |
| Spread Notional Amount: | (i) For the initial Spread Notional Reset Date, the Equity Notional Amount; and<br>(ii) For each subsequent Spread Notional Reset Date:<br>(A) In respect of a Share Transaction, the Reset Final Price *multiplied by* the Number of Shares.<br>(B) In respect of a Share Basket Transaction, the sum of the product of the Reset Final Price of each Share and the relevant Number of Shares comprised in the Basket, *multiplied by* the Number of Baskets.<br>(C) In respect of an Index Transaction the Reset Final Price *multiplied by* the Number of Units.<br>(D) In respect of an Index Basket Transaction, the sum of the product of the Reset Final Price of each Index and the relevant Number of Units comprised in the Basket, *multiplied by* the Number of Baskets. |
| Spread Notional Valuation Date(s): | (i) Where Designated Maturity is specified in the TS as "1D", daily from the Effective Date; *provided* that such date shall be treated as a Valuation Date. |

(ii) Where Designated Maturity is specified in the TS as "1W", the Effective Date, the Initial Reset Date (if applicable), and weekly from the Initial Reset Date *provided* that such date shall be treated as a Valuation Date.

(iii) Where Designated Maturity is specified in the TS as "1M", the Effective Date, the Initial Reset Date (if applicable), and monthly from the Initial Reset Date *provided* that such date shall be treated as a Valuation Date.

(iv) Where Designated Maturity is specified in the TS as "3M", the Effective Date, the Initial Reset Date (if applicable), and quarterly from the Initial Reset Date *provided* that such date shall be treated as a Valuation Date.

Spread Notional Reset Date(s): The date that is one Settlement Period following each Spread Notional Valuation Date.

Reset Final Price: For each Spread Notional Reset Date:

(i) In respect of a Share Transaction or Share Basket Transaction, the closing price per Share on the Exchange on the related Spread Notional Valuation Date as determined by the Calculation Agent.

(ii) In respect of an Index Transaction or Index Basket Transaction, the closing level of the relevant Index on the related Spread Notional Valuation Date as determined the Calculation Agent.

Reset Date(s): (i) Where Designated Maturity is specified in the TS as "1D", daily from the Effective Date.

(ii) Where Designated Maturity is specified in the TS as "1W", the Effective Date, the Initial Reset Date (if applicable), and weekly from the Initial Reset Date.

(iii) Where Designated Maturity is specified in the TS as "1M", the Effective Date, the Initial Reset Date (if applicable), and monthly from the Initial Reset Date.

(iv) Where Designated Maturity is specified in the TS as "3M", the Effective Date, the Initial Reset Date (if applicable), and quarterly from the Initial Reset Date.

Initial Reset Date: Not Applicable.

Payment Date(s): The Cash Settlement Payment Date.

Compounding Amounts: As of each Reset Date, the product of:

(i) the sum of (a) the Basic Floating Amount accrued to but excluding such Reset Date and (b) all Compounding Amounts for all previous Reset Dates;

(ii) the Floating Rate; and

(iii) the Compounding Amount Day Count Fraction

For the avoidance of doubt, the Compounding Amount for the first Reset Date shall be zero.

Compounding Amount Day Count Fraction: The Day Count Fraction specified in the TS. For the purposes of determining the Compounding Amount Day Count Fraction relevant to a Reset Date, the relevant "Calculation Period" shall be deemed to be the Compounding Period.

Compounding Period: Each period from, and including one Reset Date to, but excluding the next Reset Date, *provided* that (a) the initial Compounding Period shall

| | |
|---|---|
| | commence on, and include the Effective Date, and (b) the final Compounding Period shall end on, but exclude the Termination Date. |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement Payment Date(s): | One Settlement Period following the final Valuation Date (unless such day is not a Currency Business Day, in which case the next following Currency Business Day). |

**Dividends (applicable where Type of Return is Total Return):**

| | |
|---|---|
| Dividend Payment Dates: | Cash Settlement Payment Date<br><br>"**Cash Settlement Payment Date**" means:<br><br>The Cash Settlement Payment Date immediately following the date on which the Issuer pays the relevant dividend to holders of record of the Shares, unless the relevant dividend is paid to holders of record after the scheduled Termination Date, in which case, the date on which the Issuer pays the relevant dividend to the holders of record. |
| Dividend Floating Amounts: | In addition to any Dividend Amounts payable on the Dividend Payment Date, the sum of (i) the Basic Dividend Amount and (ii) all Compounding Dividend Amounts, each as determined by the Calculation Agent as of each Reset Date with respect to each Dividend Amount and accrued from the date on which the Issuer pays the relevant dividend to holders of record of the Shares. |
| Basic Dividend Amount: | In respect of each Reset Date, an amount equal to;<br><br>Dividend Amount x Floating Rate x Day Count Fraction; *provided*, that the Designated Maturity will be calculated with Linear Interpolation being Applicable, from, and including the date on which the Issuer pays the relevant dividend to holders of record of the Shares to, but excluding the next Reset Date, if necessary. |
| Compounding Dividend Amounts: | In respect of each Reset Date, the product of:<br><br>(i) the sum of (a) the Basic Dividend Amount accrued to but excluding such Reset Date and (b) all Compounding Dividend Amounts for all previous Reset Dates;<br><br>(ii) the Floating Rate; and<br><br>(iii) the Compounding Amount Day Count Fraction |

**Optional Early Closing Right:**

In addition to the terms specified in the MCA, if Counterparty elects to close the Transaction in whole or in part:

The date which is one Settlement Period after such Early Unwind Date shall be the final Cash Settlement Payment Date.

"**Settlement Period**" unless otherwise agreed by the parties means: (i) in respect of a Transaction where any Exchange or Related Exchange is located within the People's Republic of China ("**PRC**"), three (3) Exchange Business Days and (ii) for all other Transactions, a number of Exchange Business Days based on the standard settlement period for the relevant Share, Shares comprising the Basket or securities comprising the Index, as determined by GS in good faith and in a commercially reasonable manner.

**Unwind Methodology:**

In respect of any Share, Basket, or Index (as applicable) where more than one Transaction or a portion thereof exists on the Early Unwind Date, the relevant transaction(s) shall be terminated (in whole or in part) on a "Max Loss" basis.

"**Max Loss**" shall mean that the Early Unwind Amount shall be Transaction or a portion thereof that was agreed between the parties with the highest Initial Price where GS is the Equity Amount Payer or the lowest Initial Price where GS is the Floating Amount Payer.

# EXHIBIT I

## Form of TS

This Transaction Supplement is entered into between [Insert Goldman Entity] and Counterparty on the Trade Date set forth below.

The purpose of this communication is to confirm the terms and conditions of the CFD / Swap Transaction(s) (as applicable) entered into between [Insert Goldman Entity] ("[**Insert Goldman Acronym**]") and [**Insert Full Name of Counterparty**] ("**Counterparty**") on the Trade Date specified below (each, a "**Transaction**"). This Transaction Supplement is entered into under the CFD Annex / Master Confirmation Agreement dated as of [**Insert Date**] between us, as may be amended from time to time, and, together with the General Terms Confirmation and Product Customization Agreement (if applicable), constitutes a "**Confirmation**" as referred to in the Master Agreement between the parties, as amended and supplemented from time to time, in respect of each Transaction hereunder.

For the avoidance of doubt, where displayed below, 'N/A' shall mean that the respective field is not applicable for the relevant Event Type for the related GS Reference Number.

When Spread Change, Dividend Percentage Change or Corporate Action is specified under Event Type, the Effective Date shall refer to the date in which the Spread Change, Dividend Percentage Change or Corporate Action takes effect.

Except as provided herein, all other terms and conditions relating to the above Transaction(s) as set out in the relevant Confirmation(s) / Transaction Supplement (as applicable) between the parties shall remain in full force and effect.

The additional terms of the Transaction(s) to which this communication relates are as follows:

| GS Reference Number | Trade Date | Effective Date | Event Type | Share / Index / Basket (RIC) | No. Of Shares / Units / Baskets | Exchange Code | Equity Amount Payer | Settlement Currency | Gross Initial Price / Gross Final Price | Commission | FX Rate | Initial Price / Final Price | Designated Maturity and Floating Rate Option | Day Count Fraction | Spread (bps) | Dividend Percentage | Valuation Date (final) | Independent Amount % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*OIS Spread = A rate determined for each Reset Date as equal to the Term Rate minus the OIS Swap Rate.
Please see the table below for the Term Rate and OIS Swap Rate for each Transaction covered by this Confirmation for which OIS Spread is specified under Designated Maturity and Floating Rate Option. The OIS Swap Rate specified in the table below shall have the meaning as specified on the web site for the relevant currency in which the Floating Amount is denominated: www.goldmansachs.com/disclosures/floatingrateoption.html***

| GS Reference Number | Term Rate | Term Rate Designated Maturity | OIS Swap Rate | OIS Swap Rate Designated Maturity |
|---|---|---|---|---|
| | | | | |

*** *Important Disclaimer*: The information on this web site is provided by Goldman Sachs International, Goldman Sachs and Co. LLC, Goldman Sachs Financial Markets, L.P. or Goldman Sachs Bank USA to authorized users only and solely for the purposes of documenting transactions.

Key:

The abbreviated terms as defined above, shall have the following meanings:

| Exchange Code | Exchange | Related Exchange |
|---|---|---|
| | | |

This Confirmation has been automatically generated and will not bear a manual or machine imprinted signature. You are not required to execute and return this Confirmation.
**[Insert Goldman Entity]**

| ANNEX | | | |
|---|---|---|---|
| GS Reference Number | USI Prefix/USI Value | Prior USI Prefix/Prior USI Value | UTI Prefix/UTI Value |
| | | | |

**APPENDIX 1[5]**
**Shares/Indices comprised in the Basket**

The Basket is composed of the specified Shares of the Issuers listed below in the relative proportions and numbers set out in relation to each Issuer below. The composition is subject to change from time to time (as a result of a Potential Adjustment Event or an Extraordinary Event or as may be agreed between the parties). Such amended composition will be published on the relevant Bloomberg page (or any successor page, as may be notified to Counterparty by the Calculation Agent). In case the Bloomberg page (or any successor page) is not available, the composition will be as notified by the Calculation Agent. In case of inconsistency between the composition in APPENDIX 1 and the composition published on Bloomberg page or as notified by the Calculation Agent (as the case may be), the composition published on the Bloomberg page or as notified by [Insert Goldman Acronym] will prevail.

The Basket is composed of the specified Shares of the Issuers/Indices listed below in the relative proportions and numbers set out in relation to each Issuer/Index below.

| Basket RIC | Issuer/Index | Ric | Number of Shares/Units | Exchange | Related Exchange |
|---|---|---|---|---|---|
| | | | | | |

[5] Delete for non-Basket Transactions.