# Exhibit U

**CREDIT SUISSE FIRST BOSTON**
**PORTFOLIO SWAPS (STANDARD TERMS) ANNEX**

Credit Suisse First Boston (Europe) Limited ("CSFB") and Tiger Asia Fund, L.P. (the "Counterparty") have entered into 1992 ISDA Master Agreement, with related schedules (the "Master Agreement"). This Annex (the "Standard Terms") supplements and forms part of the Master Agreement and is intended to govern the parties' relationship when entering into Swap Agreements on Securities ("Securities Swaps"). Each Contract shall be deemed a "Transaction" for the purposes of the Master Agreement.

In order to enter into a Securities Swap, the Counterparty must notify (by telephone or as otherwise agreed between the parties) CSFB of its request for an offer, specifying the name of the relevant Security and the proposed quantity, and whether the Counterparty wishes to act as Synthetic Buyer or Synthetic Seller. If CSFB agrees to provide such offer it must then notify (by telephone or as otherwise agreed between the parties) the Counterparty of the proposed Opening Price. Should the Counterparty wish to accept this offer, it must immediately notify CSFB (by telephone or as otherwise agreed between the parties) of its acceptance. This acceptance gives rise to a binding Contract between the parties. An offer by CSFB that is not immediately accepted shall be deemed to lapse unless CSFB specifically states that it shall remain open.

A Confirmation will be prepared and posted by CSFB on its client access website within one Business Day of the Transaction being entered into between the parties. The Counterparty shall be deemed to have accepted the terms of the Confirmation if it does not dispute its terms within 24 hours (one Business Day) of such posting. Failure to dispute the terms within one Business Day shall constitute Counterparty's full acceptance of the Contract upon the terms, and subject to the conditions, as set out in the Confirmation and within these Standard Terms. In the event of any inconsistency between the provisions of the Standard Terms and any Confirmation, the Confirmation shall prevail. In the event of any inconsistency between the provisions of the Standard Terms and the Master Agreement, the Standard Terms shall prevail for the purposes of the relevant Transaction.

1

Confidential Treatment Requested by King & Spalding

## 1. DEFINITIONS

| | | |
|---|---|---|
| 1.1. | **Additional Payments** | is defined in Section 5.1. |
| | **Appendix** | is the document substantially in the form attached hereto. The Appendix referred to in the Standard Terms is distinct from all other schedules incorporated into the Master Agreement. |
| | **Applicable Cycle Date** | is as defined in the Appendix. |
| | **Applicable Interest Rate** | is the rate for the Contract Currency as defined in the Appendix for the Applicable Interest Rate Cycle on the Applicable Cycle Date. |
| | **Applicable Interest Rate Cycle** | is as defined in the Appendix or as otherwise specified in the Confirmation. |
| | **Bond** | is a bond or other debt instrument. |
| | **Bond Pricing Factor** | is as set forth in the Confirmation. |
| | **Breakage Amount** | is as defined in Section 9.4. |
| | **Business Day** | is, for each Contract, a day on which the Security is traded on the relevant Exchange or, for non-Exchange traded Securities, each day quotations are available to CSFB. |
| | **CEA** | means the U.S. Commodity Exchange Act, as amended. |
| | **Close of Business** | is the time of the official close of trading (without regard to any "after hours" trading) on the Exchange on which the Security is traded as specified in the Confirmation or if the Security is not traded on an Exchange as reasonably determined by CSFB. |
| | **Closing Date** | is the earliest of: |

(i)     the Original Closing Date;

(ii)     the date determined in accordance with Section 7, Section 8 or Section 11; and

(iii)     the Business Day on which the Counterparty accepts the Closing Price quoted by CSFB and gives notice that it wishes to

2

Archegos-SDNY-00059874
SDNY_P001_0000115800

|  | close all or part of that Contract in accordance with Section 9.1. |
|---|---|
| **Closing Price** | is the Reference Price on a Closing Date. |
| **Confirmation** | is with respect to a Contract; |
|  | (i)     all written documents exchanged between the parties with respect to such contract, including, but not limited to, electronic messages exchanged between the parties with respect to such Contract; and |
|  | (ii)     other conforming evidence, including information posted by CSFB on such website as may be notified to Counterparty from time to time. |
| **Contract** | forms part of a Securities Swap as evidenced by a Confirmation that incorporates these Standard Terms. |
| **Contract Currency** | is the U.S. dollar, unless otherwise specified in the Confirmation. |
| **Contract Price Difference** | is as defined in Section 9.3. |
| **Contract Quantity** | is the number of shares of a Security to which a Contract relates (as revised from time to time in accordance with the provisions of Section 6 and Section 9.6). |
| **Convertible** | is a Security that is a convertible instrument. |
| **Counterparty** | the party specified in the preamble. |
| **Day Count Fraction** | is the number specified as such in the Appendix for the Contract Currency. |
| **Dividend Percentage** | is the percentage specified as such in the Confirmation. |
| **Effective Date** | is as specified in the Confirmation. |
| **Exchange** | is the exchange or market on which the Security is traded, as specified in the Confirmation. |
| **Hedge Position** | means any purchase, sale, entry into or maintenance of one or more (i) positions or contracts in securities, options, futures, |

3

Archegos-SDNY-00059875
SDNY_P001_0000115801

derivatives or foreign exchange, (ii) stock loan transactions or (iii) other instruments or arrangements (howsoever described) by a party in order to hedge, individually or on a portfolio basis, a Contract.

**Hedging Activities**  means any activities or transactions undertaken in connection with the establishment, maintenance, adjustment or termination of a Hedge Position.

**Interest**  is the amount calculated on a daily basis in accordance with Section 3.4.

**Interest Payment Date**  is each date specified in the Appendix and the Termination Date.

**Market Disruption Event**  means (i) the occurrence or the existence on any Business Day, during the one-half hour period prior to and terminating at the close of the regular trading session on the relevant Exchange, of any suspension of or limitation in trading (by reason of movements in price exceeding limits permitted by the Exchange or otherwise) in the Security (or in listed options on the Security, if any), if, in the reasonable determination of CSFB, such suspension or limitation is material or (ii) for non-Exchange traded securities the occurrence or existence on any Business Day of any disruption in trading in the Securities and, in the reasonable determination of CSFB, the disruption is material.   CSFB in its sole discretion will reasonably determine the value of the affected Security for that Business Day.

**Merger Date**  means, in respect of any Merger Event, the date upon which holders of the necessary number of Securities (other than, in the case of a takeover offer, shares of such Securities owned or controlled by the offeror) have agreed or have irrevocably become obligated to transfer their Securities.

**Merger Event**  means, in respect of the Securities that are the subject of one or more Contracts hereunder, any:

(i)   reclassification or change of such Securities that results in a transfer of or an irrevocable commitment to transfer all of the

4

Archegos-SDNY-00059876
SDNY_P001_0000115802

outstanding shares of such Securities;

(ii)   consolidation, amalgamation or merger of the issuer of the Securities with or into another entity (other than a consolidation, amalgamation or merger in which such issuer is the continuing entity and which does not result in reclassification or change of all of the outstanding Securities); or

(iii)   other takeover offer for the Securities that results in a transfer of or an irrevocable commitment to transfer all of the Securities (other than such Securities owned or controlled by the offeror), in each case if the Merger Date is on or before the Termination Date.

| | |
|---|---|
| **New Shares** | means, in respect to a Merger Event, consideration for the Security consisting of shares that are publicly quoted, traded or listed on an exchange or quotation system located in any country in which CSFB may enter into a Contract. |
| **Opening Security Balance** | shall be an amount determined in accordance with Section 3.1. |
| **Opening Price** | is the price per Security specified as such in the Confirmation. |
| **Original Closing Date** | as specified in the Confirmation |
| **Other Consideration** | means, with respect to a Merger Event, consideration for the Security consisting of cash and/or any securities or assets (whether of the offeror or a third party) other than New Shares. |
| **Payment Date** | is either any Security Payment Date or Interest Payment Date, or as agreed between the parties. |
| **Potential Adjustment Event** | shall mean, for each Contract, any of the following: |

(i)   a subdivision, consolidation or reclassification of a Security, or a free distribution or dividend of additional securities to existing holders of a Security by way of bonus, capitalization or similar issue;

5

Archegos-SDNY-00059877
SDNY_P001_0000115803

(ii)     a distribution or dividend to existing holders of a Security of additional shares of the Security, other share capital or securities granting the right to payment of dividends and/or the proceeds of liquidation of the issuer equally or proportionately with such payments to holders of the Security or other types of securities, rights or warrants or other assets, in any case for payment (cash or other) at less than the prevailing market price as determined by CSFB;

(iii)    a call by the issuer in respect of shares of a Security that are not fully paid;

(iv)     a repurchase by the issuer of a Security, whether out of profits or capital and whether the consideration for such repurchase is cash, securities or otherwise; or

(v)      any other similar event that may have a diluting or concentrative effect on the value of a Security.

**Reference Price**     is in relation to the valuation of any Security on any date:

(i)      shall be either the closing auction price or the last regular way trade on the Exchange for that Security as of the Close of Business (without regard to any "after hours" trading) on the date of such valuation;

(ii)     if the Security is a bond, or if for any reason such quotation is unavailable, or if CSFB has reasonably concluded that such last regular way trade price is not a fair reflection of market value, the price shall be reasonably determined by CSFB as at Close of Business on the date of such valuation taking into account, in the case of Bonds, any accrued interest; or

(iii)    if specified as a non-exchange traded Security then as reasonably determined by CSFB.

(iv)     if for any reason no such quotation is available (or if CSFB reasonably concludes that the last regular way trade price is not a fair reflection of the market value), the price as

6

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00059878
SDNY_P001_0000115804

| | reasonably determined by CSFB at the Close of Business on the date of such valuation. |
|---|---|
| **Related Exchange** | is the principal exchange(s) on which futures or options related to the Security are traded. |
| **Scheduled Closing Date** | is the date (if any) identified as such in the Confirmation in relation to a Contract. |
| **Security** | is the security specified in the Confirmation. In the case of any Security that is a Bond, each Security will represent a nominal amount of such Security equal to the Bond Pricing Factor of such Security specified in the Confirmation. |
| **Security Balance** | shall be an amount determined in accordance with Section 3.1. |
| **Security Cycle Date** | is the settlement period mandated by the relevant Exchange, and specified in the Appendix. |
| **Security Payment** | is a payment required to be made pursuant to Section 3.3. |
| **Security Payment Date** | is each date specified in the Appendix and the Termination Date. |
| **Spread** | is the percentage specified in the Confirmation. |
| **Swap Fee Amount** | is the amount represented in basis points, as agreed between the parties as, specified in the Confirmation. |
| **Swap Fee** | is as defined in Section 3.5. |
| **Synthetic Buyer** | is the party specified as such in the Confirmation. |
| **Synthetic Seller** | is the party specified as such in the Confirmation. |
| **Termination Date** | is the number of Business Days following the Closing Date as specified in the Appendix for the relevant Exchange or as otherwise agreed between parties. |
| **Trade Date** | is, for each Contract, the date specified as such in the Confirmation. |

7

Archegos-SDNY-00059879
SDNY_P001_0000115805

| **Valuation Date** | is, for each Contract, each successive Business Day from but excluding the Trade Date up to and including the Closing Date. |

**2.**     **CONTRACT TERMS**

2.1.     The purpose of each Contract is to allow the Counterparty synthetically to gain exposure to fluctuations in the price of the relevant Security. Accordingly, CSFB and the Counterparty agree that it is an express term of the Contract that:

    (i)     neither party acquires any interest in or right to acquire or dispose of any Security or any right to vote or give any consent with respect to any Security by virtue of any Contract; and

    (ii)     neither party is obliged to sell, purchase, hold, deliver or receive any Security by virtue of any Contract.

**3.**     **SECURITY AND CALCULATION OF INTEREST**

3.1.     For each Contract, the Opening Security Balance adjusted as provided in 3.3 is referred to as the Security Balance. On the Trade Date the Opening Security Balance shall be zero. For the avoidance of doubt a Security Balance may be positive or negative.

3.2.     On each Valuation Date for a Contract, CSFB shall determine the Reference Price.

3.3.     On each Security Payment Date (up to but excluding any Closing Date) for a Contract, a Security Payment shall be made to take into account any change in the Reference Price of the Security. Security Payments shall adjust the Security Balance. The Security Payment shall be an amount equal to $Q \times (P_2 - P_1)$, where:

    $Q =$     the Contract Quantity;

    $P_1 =$     the Reference Price on the immediately prior Security Cycle Date or in respect of the first Security Payment Date, the Opening Price; and

    $P_2 =$     the Reference Price on the most recent Security Cycle Date.

    If $P_2$ is greater than $P_1$, then the Synthetic Seller shall make the Security Payment to the Synthetic Buyer and the Security Balance shall be increased by an equal amount; or

    If $P_2$ is less than $P_1$, then the Synthetic Buyer shall make the Security Payment to the Synthetic Seller and the Security Balance shall be reduced by an equal amount and may be reduced below zero.

3.4.     On each Interest Payment Date for a Contract, the Synthetic Buyer shall pay to the Synthetic Seller an amount equal to the Interest Payment. The Interest Payment shall be the aggregate amount of Interest accrued daily from, and including, the immediately preceding Interest Payment Date (or the Effective Date in the case of the first payment made under this Section 3.4) to, but excluding, the next Interest Payment Date (or Closing Date as the case may be).

8

Archegos-SDNY-00059880
SDNY_P001_0000115806

Each day's Interest shall be calculated as $((Q \times P_0) + N) \times (R + C) \times (1/F)$, where:

$Q =$    the Contract Quantity;

$P_0 =$    the Opening Price;

$N =$    the Security Balance on the previous Interest Payment Date;

$R =$    the Applicable Interest Rate on such day;

$C =$    the Spread, which may be positive or negative, and may depend on whether Counterparty is Synthetic Buyer or Synthetic Seller, as set out in the Appendix; and

$F =$    the Day Count Fraction.

3.5.    On the first Security Payment Date only, the Counterparty shall pay an amount equal to the Swap Fee to CSFB. The Swap Fee is calculated as $Q \times P_0 \times Z$, where:

$Q =$    the Contract Quantity;

$P_0 =$    the Opening Price; and

$Z =$    Swap Fee Amount

**4.**    **PAYMENTS NETTING**

4.1.    If, on any Payment Date the same amounts would otherwise be payable by each party to the other (under any provision of a Security Swap with respect to any Contract), then on such date, each party's obligation to make such payment shall be netted against each other, and automatically satisfied and discharged. If the aggregate amount otherwise payable by one party exceeds the aggregate amount payable by the other, then the party with the larger aggregate amount shall be obligated to pay the difference on the Payment Date.

**5.**    **ADDITIONAL PAYMENTS AND ADJUSTMENTS**

5.1.    additional payments shall be made by the Synthetic Seller if, during the period from but not including the Trade Date to and including the Termination Date, any of the following circumstances shall occur(each being an "Additional Payment"):

(i)    If the issuer of a Security pays a dividend or makes another distribution in respect of such Security, the payment to be made by the Synthetic Seller shall be equal to the gross amount of the cash dividend or distribution per share (excluding for the avoidance of doubt any tax credits), as the case may be, multiplied by the Dividend Percentage, multiplied by the Contract Quantity, and in respect of a Security which is a Bond, an amount equal to the coupon amount payable to persons who would be holders of record of the Security multiplied by the Contract Quantity.

9

Archegos-SDNY-00059881
SDNY_P001_0000115807

(ii)    If the issuer of a Security shall, by way of preferential rights, offer, grant or issue to the holders of such Security generally such additional shares of the Security or any other securities, which by their terms of issue are convertible into or exchangeable for or carry rights to subscribe for or otherwise acquire such additional shares of the Security or any options, warrants or rights to subscribe for or otherwise acquire such additional shares of the Security or any such convertible or exchangeable securities, the payment to be made by the Synthetic Seller shall be equal to the aggregate value of the rights as determined by CSFB in its reasonable discretion on the Business Day on which the rights are first traded.

(iii)   If the issuer of a Security shall distribute to holders of such Security generally any of its assets (including cash or portfolio securities) out of its reserves (but excluding cash dividends payable out of distributable reserves), the payment to be made by the Synthetic Seller shall be equal to the value of the cash or securities obtained by way of distribution as determined by CSFB in its reasonable discretion on the Business Day on which the Security is marked ex the distribution.

5.2    If CSFB reasonably determines that there has been, within the term of a Contract or the 12 months following the date of a distribution, a change in any applicable law or regulation (or a change in the interpretation or application by any court, governmental or other authority of such law or regulation) which would have had the effect of reducing or increasing the amount of the ordinary cash dividend per Security actually due to the holder of the Security in the Counterparty's jurisdiction, CSFB may adjust the Dividend Percentage with immediate effect by notice in writing to the Counterparty. If any such change is to take effect prior to the date upon which CSFB gives such notice, CSFB may make such adjustments to the payment obligations of the parties in respect of any Contract to which it considers such change applicable. In the event that the Contract shall have been previously closed, the Counterparty shall indemnify CSFB in respect of any such change on a full indemnity basis.

All Additional Payments made under this Section shall be payable on the date of the relevant distribution to holders of the relevant Security, or as otherwise reasonably determined by CSFB.

## 6.    POTENTIAL ADJUSTMENT EVENTS

6.1.    In case of a Potential Adjustment Event affecting a Security, CSFB shall determine (in its own discretion) the appropriate adjustment, if any, to be made to the Security's Reference Price (or Opening Price as the case may be) and/or to its Contract Quantity. CSFB shall consider the diluting or concentrating effect of the Potential Adjustment Event, and attempt to preserve the economic equivalent of the rights and obligations of the parties as in effect immediately prior to the Potential Adjustment Event. CSFB shall also determine the date of adjustment.

6.2.    In determining whether an adjustment should be made as a result of a Potential Adjustment Event, CSFB may have regard to, but shall not be bound by, any adjustment to the terms of the relevant options contracts made and announced by a Related Exchange.

10

Archegos-SDNY-00059882
SDNY_P001_0000115808

6.3.   CSFB shall reasonably determine any Additional Payment or adjustment of the Opening Price or Contract Quantity or other relevant provision. Its determination shall be conclusive and binding on the Counterparty, save in the case of manifest error. Notice of any Additional Payments or adjustments pursuant to this Section shall be given to the Counterparty as soon as practicable after the determination of such Additional Payments or adjustments. No events occurring after the Termination Date shall give rise to any adjustments in relation to any Contract.

## 7.   CORPORATE ACTIONS

7.1.   Upon becoming aware of the occurrence of any Merger Event with respect to any issuer of a Security, which is the subject of any Contract hereunder, CSFB shall notify Counterparty of such Merger Event.  Where the consideration for the Security consists:

(i)     (or at the option of the holder of the Security, may consist) of New Shares, then on or after the Merger Event, as to the portion of the Contract consisting of New Shares, the number of New Shares to which a holder of a Security would be entitled upon consummation of the Merger Event shall be deemed to be the Contract Quantity and the New Shares, the Security; or

(ii)    of Other Consideration, then on or after the Merger Event, as to the portion of the Contract consisting of Other Consideration, the occurrence of the Merger Event will constitute an Additional Termination Event under the Master Agreement with the Contract the sole Affected Transaction (as defined in the Master Agreement) and the Counterparty the Affected Party, and irrespective of the payment measure elected in the Master Agreement, CSFB will determine if any payment will be made in respect of the Affected Transaction.

In either of the above instances, CSFB shall determine in its own reasonable discretion the appropriate adjustments to be made to the contract.  Its decision shall be binding on the Counterparty.

7.2.   For the purposes of Sections 5, 6 and 7, CSFB shall determine if any event constitutes a Potential Adjustment, a Merger Event or an event giving rise to an Additional Payment.

## 8.   SUSPENSION AND LIQUIDATION

8.1.   If on any Business Day trading on the Exchange is suspended in the Security which forms the subject of a Contract, or if CSFB determines that a Market Disruption Event has occurred and is continuing, the Reference Price for the Security shall be determined at the Close of Business as the last traded price on the day such suspension or Market Disruption Event occurred. If such day is a Closing Date, then the Closing Date shall be the first succeeding Business Day on which the Security is traded on the Exchange. CSFB shall then in good faith and in a commercially reasonable manner determine the Closing Price for the Security.

8.2.   If at any time trading on the Exchange in the Security is suspended for a period of seven Business Days or more, or the Security is de-listed from the Exchange, then CSFB may terminate the Contract (with notice to the Counterparty). CSFB shall then, in good faith and in a commercially reasonable manner, determine a Termination Date and Closing Price. The provisions of Section 9 shall otherwise apply.

11

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00059883
SDNY_P001_0000115809

8.3.   If at any time prior to the Termination Date, the issuer of a Security shall have entered into insolvency or liquidation proceedings (whether following suspension or otherwise), then the Termination Date shall be deemed to be the date on which the liquidator or official receiver gives notice of the final distribution to the holders of shares in the insolvent issuer. If no such distribution is declared, the Termination Date shall be deemed to be the date of the final declaration of dividends to the unsecured creditors of the insolvent issuer. The Closing Price of the Security for the purposes of Section 9 shall be equal to the amount receivable through the distribution to each such holder of each share held by it or, if none, zero.

## 9.   CONTRACT CLOSING AND MATURITY

9.1.   On any Business Day when CSFB or the Counterparty wishes to close any Contract (whether in whole or in part), it shall give notice of that fact to the other party (by telephone or as otherwise agreed between the parties) specifying the Security and the proportion of such Contract it wishes to close.

9.2.   CSFB shall then calculate and notify the Counterparty of the Closing Price (by telephone or as otherwise agreed between the parties), which shall be binding upon the Counterparty.   CSFB shall then settle the portion of the Contract to be closed in accordance with Section 9.3, and such date shall be deemed the Closing Date.   In the event that a Contract is closed only in part, CSFB shall make any necessary adjustments to the Contract Quantity.

9.3.   On the Closing Date (be it the Termination Date or otherwise), CSFB shall calculate the Contract Price Difference as an amount equal to: $(Q \times (P_3 - P_0))$, where:

$Q =$   the amount of the Contract Quantity to be closed;

$P_0 =$   the Opening Price; and

$P_3 =$   the Closing Price.

If $P_3$ is greater than $P_0$, then the Synthetic Seller shall pay the Synthetic Buyer an amount equal to the Contract Price Difference.

If $P_3$ is less than $P_0$, then the Synthetic Buyer shall pay such amount to the Synthetic Seller an amount equal to the absolute value of the Contract Price Difference.

Additionally, if Security Balance is (i) positive then that amount shall be paid by the Synthetic Buyer to Synthetic Seller; (ii) negative then that amount shall be paid by Synthetic Seller to the Synthetic Buyer.

9.4.   In addition, if the Counterparty has elected to close the Contract, in whole or in part, before the Scheduled Closing Date, then CSFB (on the Closing Date) shall calculate the Breakage Amount, which shall be due from the Counterparty to CSFB.

The Breakage Amount shall be an amount equal to $(Q \times Z \times P_3)$, where:

$Q =$   the amount of the Contract Quantity being closed;

12

$Z =$     the Swap Fee Amount; and

$P_3 =$     the Closing Price.

9.5.     All payments due under 9.3 (Contract Price Difference), 9.4 (Breakage Amount) and the final Interest Payment under 3.4 shall be netted against each other, and the balance shall be due on the Termination Date. However, where agreed between the parties the balance, together with interest calculated at a rate agreed between the parties from time to time, may be paid on the following Security Payment Date according to the Appendix (as if such Contract had not terminated).

9.6.     If CSFB or the Counterparty gives notice to close only a portion of the Contract Quantity, then the provisions of this Section shall apply only to that portion. The remainder of the Contract Quantity shall continue to be governed by these Standard Terms.

## 10.     CALCULATION AND SETTLEMENT OF PAYMENTS

10.1.     All payments made under a Contract shall be made in accordance with the account details specified in the relevant Confirmation.

10.2.     All payments shall be in the Contract Currency.

## 11.     ADJUSTMENT AND TERMINATION

11.1.     Should CSFB wish to borrow, buy, sell or lend a Security and either is at any time unable to do so, or if CSFB's ability to do so becomes, in the reasonable opinion of CSFB, materially impaired or restricted at any time for whatever reason including, without limitation, for reasons of material increase in the cost of borrowing, then CSFB shall notify the Counterparty. On the Counterparty's request, CSFB shall provide reasonable evidence of such circumstances. However, CSFB's determination of impairment shall be conclusive.

11.2.     At any time following a notification under Section 11.1, CSFB may, at its election, close any Contract affected by the operation of Section 11.1, in whole or in part CSFB shall immediately give the Counterparty notice of its action, including the Closing Price and, if relevant, the date of notice shall serve as the Closing Date. Sections 9.3 and 9.4 shall apply. Counterparty shall have the option to avoid the close of any Contract pursuant to this Section due to a material increase in the generally prevailing cost of borrowing by agreeing to adjust the Spread by an amount reflecting the increase in the cost of borrowing as reasonably determined by CSFB.

11.3.     Where a Contract references Convertibles such Contract shall terminate automatically upon the effective date of a conversion (however described in the terms of such Convertible) and such date shall be deemed to be the Termination Date in respect of such Contract.

## 12.     ADDITIONAL REPRESENTATIONS AND AGREEMENTS

12.1.     Each party represents to the other party:

13

Confidential Treatment Requested by King & Spalding

(i)      that it is entering into these Standard Terms (and each Securities Swap thereunder) as principal, and not as agent or in any other capacity, fiduciary or otherwise;

(ii)     that it has sufficient knowledge and experience to be able to evaluate the appropriateness, merits and risks of entering into these Standard Terms and each Securities Swap, and is acting in reliance upon its own judgment or upon professional advice it has obtained independently of the other party as to the appropriateness, merits and risks of so doing, including the correct tax and accounting treatment of Securities Swaps;

(iii)    that it is not relying upon the views or advice of the other party including, without limitation, any marketing materials or model data with respect to these Standard Terms or any Securities Swap; and no communication (written or oral) received from CSFB shall be deemed an assurance or guarantee as to the expected results of any Securities Swap;

(iv)    that it has been given the opportunity to obtain information from the other party concerning the terms and conditions of these Standard Terms necessary in order for it to evaluate the merits and risks of the transaction contemplated herein. Notwithstanding the foregoing, it is not relying on any communication (written or oral) of the other party (or any of its affiliates) as investment advice or as a recommendation to enter into these Standard Terms; it being understood that information and explanations related to the terms and conditions of these Standard Terms are made incidental to the other party's (or any of its affiliates') business and shall not be considered investment advice or a recommendation to enter into these Standard Terms;

(v)     that it acknowledges that, with respect to these Standard Terms and each Securities Swap, the other party is acting solely in the capacity of an arm's length contractual counterparty, and not in the capacity of financial adviser or fiduciary;

(vi)    that each Securities Swap is intended to be exempt from, or otherwise not subject to regulation under the Commodity Exchange Act, and that such party is an "eligible contract participant" within the meaning of the Commodity Exchange Act;

(vii)   that neither these Standard Terms nor any Securities Swap has been executed or traded on a "trading facility" as such term is defined in the Commodity Exchange Act;

(viii)  that each Securities Swap is intended to constitute a "security-based swap agreement" for purposes of Section 3A of the Securities Exchange Act of 1934; and

(ix)    that each Securities Swap is a "swap agreement" within the meaning of Section 101 (53B) of the Bankruptcy Code entitled to the protection of Section 560 of the U.S. Bankruptcy Code.

12.2.   The Counterparty acknowledges and agrees with CSFB that CSFB and its affiliates may:

Confidential Treatment Requested by King & Spalding

Archegos-SDNY-00059886
SDNY_P001_0000115812

(i)    perform similar services for, or otherwise have business relations with, third parties;

(ii)    act for their own accounts in the same or similar instruments underlying Securities Swaps, and take positions or enter into transactions regarding such instruments (including such trading as CSFB and its affiliates deem appropriate in their sole discretion to hedge market risk in any position or transaction) which may or may not be consistent with those taken with respect to Securities Swaps with the Counterparty and which may affect the value of Securities Swaps with the Counterparty; and

(iii)    be a party to other contractual arrangements, which may increase in value as a result of, the transactions contemplated under these Standard Terms.

12.3.    The Counterparty further acknowledges and agrees:

(i)    that CSFB gives no guarantee and makes no assurance or representation as to the expected or projected success, profitability, return, savings, performance, result to be obtained, effect, consequence or benefit (either legal, regulatory, fiscal, financial, accounting or otherwise) of any Securities Swap;

(ii)    that no communication (written or oral) received from CSFB shall be deemed an assurance or guarantee as to the expected results of any Securities Swap;

(iii)    that CSFB and its affiliates may, at the date of any Securities Swap or at any time thereafter, be in possession of information in relation to a Security that is or may be material in the context of any Securities Swap and that may or may not be publicly available or known to the Counterparty; and

(iv)    that the Master Agreement, these Standard Terms (and all related material, including but not limited to any relevant Schedule, Appendix, and Confirmations) create no obligation whatsoever on the part of CSFB or its affiliates to disclose to the Counterparty any such information (whether or not confidential).

12.4.    Each party agrees that if Credit Suisse First Boston LLC ("CSFBLLC") acts as agent in respect of a Contract, (i) CSFBLLC is not acting as a principal with respect to these Standard Terms or any Securities Swap hereunder and (ii) shall have no responsibility or liability (including without limitation, by way of guarantee, endorsement or otherwise) to any party in respect of these Standard Terms or any Securities Swap hereunder, including without limitation, in respect of the failure of a party to pay or perform under these Standard Terms or any Securities Swap. Counterparty hereby agrees that it will not proceed against CSFBLLC in respect of any obligation owed to it under these Standard Terms or any Securities Swap hereunder.

12.5.    Notwithstanding any other method of delivery, Counterparty agrees to electronic access or delivery via the Internet, either by email or through any website designated for this purpose by CSFB, of Confirmations and any detailed account information.

12.6.    Each party acknowledges and agrees that:

15

Archegos-SDNY-00059887
SDNY_P001_0000115813

    (i)             when entering into, or continuing to maintain, a Securities Swap, neither party is relying on:

             (A)      whether, or the manner or method in which, the other party or any of its affiliates establishes, maintains, adjusts or unwinds its Hedge Positions,

             (B)      any communication, whether written or oral, between the parties or any of their respective affiliates with respect to any Hedging Activities of the other party or any of its affiliates; or

             (C)      any representation, warranty or statement being made by such party or any of its affiliates as to whether, when, how or in what manner or method such party or any of its affiliates may engage in any Hedging Activities; and

    (ii)    (A)      each party and its affiliates may, but are not obliged to, hedge any Securities Swap on a dynamic, static or portfolio basis, by holding a corresponding position in the securities or indices referenced by or underlying such Securities Swap or in any other securities or indices or by entering into any Hedge Position;

             (B)      any Hedge Position established by either party or any of its affiliates is a proprietary trading position and activity of such party or such affiliate;

             (C)      each party or such affiliate is not holding the Hedge Positions or engaging in the Hedging Activities on behalf or for the account of or as agent or fiduciary for the other party, and the other party will not have any direct economic, beneficial or other interest in, or ownership of, the Hedge Positions or Hedging Activities, or the price levels at which such transactions are executed; and

             (D)      the decision to engage in Hedging Activities is the sole discretion of each party, and each party and its affiliates may commence or, once commenced, suspend or cease the Hedging Activities at any time as it may solely determine.

## 13.  COSTS AND EXPENSES

13.1.  Each party shall bear its own costs and expenses in relation to these Standard Terms and to each Contract thereunder.

16

Archegos-SDNY-00059888
SDNY_P001_0000115814

**Appendix to Portfolio Swaps (Standard Terms)**
**Dated February 4, 2005 which supplements the Master Agreement**
**dated as of February 4, 2005 between**
**Credit Suisse First Boston (Europe) Limited**
**and**
**Tiger Fund Asia, L.P. ("Counterparty")**

**Spreads:**

| | |
|---|---|
| Counterparty is Synthetic Buyer | As determined in the relevant Confirmation. |
| Counterparty is Synthetic Seller | As determined in the relevant Confirmation. |

**Dividend Percentages:**

| | |
|---|---|
| Counterparty is Synthetic Buyer | As determined in the relevant Confirmation. |
| Counterparty is Synthetic Seller | As determined in the relevant Confirmation. |

**Applicable Interest Rate:** The London Interbank Offered Rate as set forth in the relevant Confirmation and as specified on Reuters pages LIBOR01 and LIBOR02, as applicable.

**Applicable Cycle Date:** [Daily]

**Applicable Interest Rate Cycle:** [1 week]

**Security Payment Date:** Last Business Day in each calendar month

**Interest Payment Date:** each Security Payment Date

**Business Day Convention:** In the event any relevant date falls on a day that is not a Business Day, such date shall be the first following day which is a Business Day unless that day falls in the next calendar month in which that date will be the first preceding day that is a Business Day.

**Day Count Fraction:** Corresponding to the Contract Currency specified as such in the relevant Confirmation as listed below:

| Contract Currency: | GBP | USD | AUD | BRL | CAD | CZK | DKK | EUR | GRD | HKD | ISK | INR | JPY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day Count Fraction: | 365 | 360 | 365 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |

| Contract Currency: | KPW | KRW | MYR | MXN | NZD | PLN | SGD | ZAR | SEK | CHF | TWD | THB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Day Count Fraction: | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 | 360 |

17

Archegos-SDNY-00059889
SDNY_P001_0000115815

| Contract Currency: | TRL | USD |
|---|---|---|
| Day Count Fraction: | 360 | 360 |

**Security Cycle Date:**

Unless specified otherwise in the Confirmation, number of Business Days before the Security Payment Date as specified in the table below for the Exchange as specified in the Confirmation:

| Exchange: | London Stock Exchange | NASDAQ | New York Stock Exchange | Athens Stock Exchange | Amsterdam Stock Exchange | Australian Stock Exchange | Bolsa de Madrid |
|---|---|---|---|---|---|---|---|
| Business Days: | 3 | 3 | 3 | 3 | 3 | 3 | 3 |

| Exchange: | Bombay Stock Exchange | Boursa Italiana S.p.A | Copenhagen Stock Exchange | EASDAQ | Euronext Belgium | Icelandic Stock Exchange | Irish Stock Exchange |
|---|---|---|---|---|---|---|---|
| Business Days: | 5 | 3 | 3 | 3 | 3 | 1 | 3 |

| Exchange: | KOSDAQ | Kuala Lumpur Stock Exchange | Bolsa Mexicana de Valores | New Zealand Stock Exchange | Sao Paulo Stock Exchange | Johannesburg Stock Exchange |
|---|---|---|---|---|---|---|
| Business Days: | 2 | 4 – buy 5 - sell | 3 | 3 | 3 | As specified in the Confirmation |

| Exchange: | Stock Exchange of Hong Kong | Stock Exchange of Singapore | Stock Exchange of Thailand | Stockholmborsen | SWX | Taiwan Stock Exchange |
|---|---|---|---|---|---|---|
| Business Days: | 2 | 3 | 3 | 3 | 3 | 1 |

| Exchange: | Tokyo Stock Exchange | Wiemer Borse AG | Warsaw Stock Exchange | Euronext Paris S.A. | Prague Stock Exchange |
|---|---|---|---|---|---|
| Business Days: | 3 | 3 | 3 | 3 | 5 |

| Exchange: | Xetra | Borsa de Valores de Lisboa e Porto |
|---|---|---|
| Business Days: | 2 | 3 |

18

Archegos-SDNY-00059890
SDNY_P001_0000115816

**CREDIT SUISSE FIRST BOSTON (EUROPE) LIMITED**

_____
Name
Title:

_____
Name
Title:

**TIGER ASIA FUND, L.P.**

Name: Sung kook Hwang
Title: managing member of the General Partner

_____
Name:
Title:

19