# Exhibit W

# Jefferies

### SHARE SWAP AND SHARE BASKET SWAP
### MASTER CONFIRMATION AGREEMENT (BULLET; BULLET)

November 16, 2017

Archegos Fund, L.P.
620 Eighth Avenue, 44th Floor
New York, NY 10018
Attention:    Patrick Halligan, Chief Financial Officer

Dear Sir or Madam:

The purpose of this Share Swap and Share Basket Swap Master Confirmation Agreement (Bullet; Bullet) (this "**Master Confirmation Agreement**") is to confirm certain general terms and conditions of Share Swap and/or Share Basket Swap Transactions (each, a "**Transaction**") to be entered into between **Jefferies Financial Products, LLC** ("**Party A**") and **Archegos Fund, L.P.** ("**Party B**") from time to time and to facilitate the process of entering into and confirming such Transactions. The parties intend that each Transaction shall be a separate Transaction for purposes of the ISDA Master Agreement referred to below. The confirmation applicable to each Transaction, which shall constitute a "Confirmation" for purposes of the ISDA Master Agreement, shall consist of this Master Confirmation Agreement as supplemented by the trade details applicable to such Transaction as set forth in a Transaction Supplement which may be in the form of Annex I (for Share Basket Swaps) or Annex II (for Share Swaps) attached hereto or a different form to which the parties agree, or any amendment to any of the foregoing or any related termination statement (each, a "**Transaction Supplement**"). All provisions contained in this Master Confirmation Agreement govern each Confirmation except as expressly modified in a Transaction Supplement. Notwithstanding the foregoing, the parties acknowledge and agree that the execution of this Master Confirmation Agreement does not require them to document Transactions in accordance with this Master Confirmation Agreement. **Party A is not a member of the Securities Investor Protection Corporation ("SIPC"). Obligations of Party A hereunder are not protected by SIPC or any other organization or authority.**

This Master Confirmation Agreement, together with any Transaction Supplements, supplements, forms a part of, and is subject to, the ISDA Master Agreement dated as of November 16, 2017, as amended and supplemented from time to time (the "**Agreement**"), between Party A and Party B. All provisions contained in the Agreement govern this Master Confirmation Agreement except as expressly modified below.

The definitions and provisions contained in the 2002 ISDA Equity Derivatives Definitions (the "**Equity Definitions**") and the 2006 ISDA Definitions (the "**2006 Definitions**"), each as published by the International Swaps and Derivatives Association, Inc. ("**ISDA**"), are incorporated into this Confirmation. If in relation to any Transaction there is any inconsistency in terms or definitions, the following will prevail for purposes of such Transaction in the order of precedence indicated: (i) the Transaction Supplement; (ii) this Master Confirmation Agreement; (iii) the 2007 Partial Lookthrough Depository Receipt Supplement to the Equity Definitions; (iv) the Equity Definitions; (v) the 2006 Definitions; and (vi) the Agreement.

Unless otherwise agreed by the parties, the preparation of a Transaction Supplement shall be the responsibility of Party A. Party A shall submit such Transaction Supplement to Party B as soon as possible after the parties have agreed to enter into a Transaction. Failure by Party A to send a Transaction Supplement with respect to a Transaction shall not affect the validity of such Transaction. Upon receipt thereof, Party B shall examine the terms of each Transaction Supplement sent by Party A, and unless Party B objects to the terms within one Local Business Day following receipt of that Transaction Supplement, those terms shall be deemed accepted and, absent manifest error, Party B shall be deemed to have agreed that the terms contained in the relevant Transaction Supplements correctly set forth the terms agreed by the parties with respect to the relevant Transaction, in which case that Transaction Supplement will be sufficient to form a binding supplement to the Agreement, and the terms of such

Archegos-CFTC-SEC 002948
SDNY_P001_0000031435

Transaction Supplement shall be binding on both party A and Party B, notwithstanding that the Transaction Supplement may not be signed by either party and notwithstanding Section 9(e)(ii) of the Agreement.  For the avoidance of doubt, if the relevant Transaction Supplement contains any signature block or request for execution, such inclusion shall not negate the foregoing statement.

       1.       The general terms of each Share Swap and Share Basket Swap Transaction to which this Master Confirmation Agreement relates are as follows (unless otherwise specified in the relevant Transaction Supplement), as supplemented by the Transaction Supplement related to such Transaction:

**General Terms:**

| | |
|---|---|
| Reference Number: | As specified in the Transaction Supplement |
| Trade Date: | As specified in the Transaction Supplement |
| Effective Date: | As specified in the Transaction Supplement |
| Termination Date: | The Cash Settlement Payment Date |
| Shares: | In the case of a Share Swap Transaction, as specified in the Transaction Supplement. |
| Basket: | In the case of a Share Basket Swap Transaction, as specified in the Swap Schedule Addendum to the Transaction Supplement. |
| Exchange(s): | In the case of a Share Swap Transaction, as specified in the Transaction Supplement. In the case of a Share Basket Swap Transaction, as specified in the Swap Schedule Addendum to the Transaction Supplement. |
| Related Exchange(s): | None, unless otherwise specified in the Transaction Supplement |

**Equity Amounts:**

| | |
|---|---|
| Equity Amount Payer: | As specified in the Transaction Supplement |
| Number of Shares: | In the case of a Share Swap Transaction, as specified in the Transaction Supplement |
| Number of Baskets: | In the case of a Share Basket Swap Transaction, as specified in the Transaction Supplement |
| Equity Notional Amount: | As specified in the Transaction Supplement |
| Equity Notional Reset: | Not Applicable |
| Type of Return: | Total Return |
| Initial Price: | As specified in the Transaction Supplement. |
| Final Price: | The Hypothetical Broker Dealer Price. |
| Hypothetical Broker Dealer Price: | (i) In the case of a Share Swap Transaction, the volume-weighted average price per Share determined by the Calculation Agent in good faith and a commercially reasonable manner at |

2

which a hypothetical broker dealer could purchase or sell a number of Shares equal to the Number of Shares with respect to the Transaction on the Valuation Date (without regard to the Valuation Time, but taking into account any Averaging Dates or Accelerated Averaging Dates, if applicable), as adjusted by the Fee Adjustment, and converted, if applicable, in accordance with the FX Provisions (the "**Relevant Share Price**"); and

(ii) in the case of a Share Basket Swap Transaction, an amount for the Basket equal to the sum of the values for the Shares of each Issuer as the product of (A) the Relevant Share Price of such Share and (B) the relevant Number of Shares comprised in the Basket;

provided further that if, in the Calculation Agent's reasonable discretion, it would be impracticable or inadvisable for such hypothetical broker dealer to dispose of the Number of Shares on a single day (in respect of a Share Swap Transaction or Share Basket Swap Transaction), taking into account the average daily trading volume of the Shares and such other factors as Calculation Agent deems relevant, then the disposal by the hypothetical broker dealer shall take place over such number of days as the Calculation Agent may determine in good faith and in a commercially reasonable manner, with the last of such days being deemed the Valuation Date.

| | |
|---|---|
| Fee Adjustment: | (i) For each Transaction in respect of which the Shares have an Issuer that is incorporated or otherwise organized in the United States (any such Share, a "**U.S. Share**"), an amount per Share determined by Calculation Agent as of the Valuation Date with respect to each Transaction to compensate a hypothetical broker dealer for entering into such Transaction. |
| | (ii) For each Transaction in respect of which the Shares are not U.S. Shares, an amount per Share determined by the Calculation Agent in good faith and in a commercially reasonable manner as of the Valuation Date with respect to such Transaction to compensate a hypothetical broker dealer for entering into such Transaction and the Hedge Positions and reimburse it for any costs and expenses associated therewith, taking into account any reasonable factors it deems relevant including without limitation the volatility, volume, historical trading patterns and price of the Shares and any Local Taxes. For purposes of this provision, a "hypothetical broker dealer" would be subject to the same securities laws or rules or regulations of any securities regulator, exchange or self-regulatory organization as applicable to Party A or any of its affiliates. |
| ADTV Limitation: | If, as of the Valuation Date, the Number of Shares (or the relevant portion thereof being terminated) in the case of a Share Swap Transaction (or, in the case of a Share Basket Transaction, the Number of Shares of any Issuer in the Basket), together with the Number of Shares (or the relevant portion thereof being terminated) of such Issuer under any other equity share swap or equity basket swap transaction between Party A and Party B or |

3

Archegos-CFTC-SEC 002950
SDNY_P001_0000031437

any of Party B's Affiliates (as defined in the Agreement) for which the Valuation Date or any early termination is occurring on the same day (the "**Total Number of Shares**"), is greater than the ADTV Limit, notwithstanding anything in this Master Confirmation Agreement or the Equity Definitions to the contrary, solely upon Party A's election, the following terms shall apply.

(a)     A number of Averaging Dates shall be deemed specified equal to the quotient of the Total Number of Shares divided by the ADTV Limit; provided that if the number of Averaging Dates for a Transaction has been specified prior to the Valuation Date, the number of Averaging Dates will not be less than the previously specified number of Averaging Dates.

(b)     Any fractional Averaging Dates shall be rounded up to the next whole number.

(c)     The first Averaging Date shall be deemed to occur on the scheduled Valuation Date with the remaining number of Averaging Dates occurring thereafter, one on each succeeding Scheduled Trading Day.  The latest occurring Averaging Date shall be deemed to be the Valuation Date for purposes of the Transaction (or the relevant portion thereof being terminated).

ADTV Limit:     A number of Shares determined by Party A equal to product of (i) 20% and (ii) the most current 30-day trailing average daily trading volume determined as of the Valuation Date, as adjusted by the Calculation Agent to offset the impact of block trades or other events that significantly affect such average daily trading volume.

Valuation Dates:     As specified in the Transaction Supplement

Averaging Date Disruption:     If Averaging Dates are specified in the relevant Transaction Supplement, Averaging shall be applicable and Modified Postponement shall apply.

Notwithstanding anything to the contrary in the Equity Definitions, to the extent that a Market Disruption Event occurs on an Averaging Date, the Calculation Agent shall make adjustments to (i) the number of Shares for which such day shall be the Averaging Date and Modified Postponement shall apply for the remaining Shares and (ii) the Final Price.  Such adjustments will be based on reasonable factors determined by the Calculation Agent, which may include, among other factors, the duration of any Market Disruption Event and the volume, historical trading patterns and price of the Shares.

Relevant Price:     With respect to any Averaging Date, shall be the price determined using the pricing methodology elected to determine the Final Price in respect of the Valuation Date.

**Floating Amounts**

Floating Amount Payer:     As specified in the Transaction Supplement

4

| | |
|---|---|
| Notional Amount: | The Equity Notional Amount; *provided* that, if Averaging is applicable, the Notional Amount shall be reduced on each Exchange Business Day, commencing on the Exchange Business Day that is one Settlement Cycle following the first Averaging Date, by an amount equal to the product of (x) one *divided* by the number of Averaging Dates and (y) the Notional Amount in effect immediately prior to the first of such reductions and accordingly, the Notional Amount for the related Calculation Period will equal the weighted average of the Notional Amounts for such period.  To the extent a Disrupted Day occurs on an Averaging Date, the Calculation Agent will adjust the Notional Amount computation accordingly. |
| Payment Dates: | As specified in the Transaction Supplement |
| Floating Rate Option: | As set forth in Appendix II (Floating Amount Table) in the row for the Floating Rate Option Symbol that is specified in the Transaction Supplement |
| Designated Maturity: | As set forth in Appendix II in the row for the Floating Rate Option Symbol that is specified in the Transaction Supplement |
| Floating Rate Day Count Fraction: | As set forth in Appendix II in the row for the Floating Rate Option Symbol that is specified in the Transaction Supplement |
| Reset Dates: | As set forth in Appendix II in the row for the Floating Rate Option Symbol that is specified in the Transaction Supplement |
| Business Days: | As set forth in Appendix II in the row for the Floating Rate Option Symbol that is specified in the Transaction Supplement |
| Spread: | Initially, as specified in the Transaction Supplement, and thereafter, as determined by Party A in its sole discretion from time to time on thirty (30) calendar days' prior written notice to Party B.  If more than one Spread is established during a particular Calculation Period, then the Spread in respect of such Calculation Period shall be the weighted average of the Spreads in respect of each day during the Calculation Period. |
| Business Day Convention: | Modified Following |
| Method of Averaging: | Weighted Average |

**Settlement Terms:**

| | |
|---|---|
| Cash Settlement: | Applicable |
| Settlement Currency: | As specified in the Transaction Supplement |
| FX Provisions: | The Equity Amount, Floating Amount, Dividend Amount, and all other amounts calculated, determined, or payable in respect of any Transaction shall be denominated in the Settlement Currency for that Transaction (notwithstanding the foregoing, the Independent Amount and all other collateral transfers shall |

5

Archegos-CFTC-SEC 002952
SDNY_P001_0000031439

be denominated in USD as required under the New York law Credit Support Annex). If the Settlement Currency is different than the Local Currency, then where any amount relevant to the calculation or determination thereof is specified in the Local Currency then Calculation Agent shall convert such Local Currency amount into an amount of Settlement Currency at the market currency exchange rate prevailing at the time of the relevant calculation or determination as Calculation Agent shall determine.

Local Currency:
The currency in which the Shares trade on the Exchange

Cash Settlement Payment Date:
One Settlement Cycle following the Valuation Date or, if such date is not a Currency Business Day, the next following Currency Business Day

**Dividends:**

Dividend Period:
Second Period

Dividend Amount:
In respect of the Shares, the related Dividend Period and the related Dividend Payment Date, the product of (i) the Ex Amount, (ii) the Number of Shares (or, in the case of a Share Basket Swap Transaction, the relevant Number of Shares) and (iii) the Dividend Percentage, converted, if applicable, in accordance with the FX Provisions; *provided* that, if Averaging is applicable, the Calculation Agent shall make appropriate adjustments to the Number of Shares if an ex-dividend date occurs on or following the initial Averaging Date.

Dividend Percentage:
As specified in the Transaction Supplement, subject to any adjustments determined by Party A in a commercially reasonable manner to take into account any increase or decrease of Local Taxes. Party A agrees to notify the other party of such adjustments as soon as reasonably practicable after the announcement of the relevant increase or decrease of Local Taxes by the relevant taxing authority.

Dividend Payment Dates:
The Cash Settlement Payment Date relating to the end of the Dividend Period

Re-investment of Dividends:
Not applicable

Dividend Recovery:
In the event that (a) the amount actually paid by an Issuer to holders of record of a Share in respect of any Ex Amount is not equal to such Ex Amount (a "**Dividend Mismatch Event**") or (b) such Issuer fails to make any payment in respect of such Ex Amount by the third Currency Business Day following the relevant due date originally announced by such Issuer (a "**Dividend Omission Event**"), then the Calculation Agent may (but shall not be obliged to) determine the appropriate correction or repayment, if any, to be made to account for such Dividend Mismatch Event or Dividend Omission Event, as the case may be, and in the case of repayment, the relevant party

6

shall make such payment to the other party by the third Currency Business Day following notice from the Calculation Agent.

The parties agree that the provisions of this section shall apply and remain in full force and effect in respect of any Ex Amount as to which a Dividend Mismatch Event or Dividend Omission Event, as the case may be, occurs, notwithstanding the fact that the Cash Settlement Payment Date or Optional Early Termination Date has occurred.

**Adjustments:**

Method of Adjustment:

Calculation Agent Adjustment.  In its determinations of the existence and extent of any diluting or concentrative effect on the theoretical value of the Shares of any Potential Adjustment Event, and any related adjustments to the terms of the Transaction, Party A shall use commercially reasonable efforts to (a) take into account the implication of any Local Taxes in connection with such Potential Adjustment Event and the applicable Dividend Percentage and (b) determine the effective date of such adjustments.

**Extraordinary Events:**

New Shares:

In the definition of New Shares in Section 12.1(i) of the Equity Definitions, the following text shall be added at the end of clause (i), after the parenthetical and before the word "and": "but only if such exchange or quotation system is a major exchange or quotation system with significant liquidity as reasonably determined by the Calculation Agent,"

Consequences of Merger Events:

Share-for-Share:

Modified Calculation Agent Adjustment

Share-for-Other:

Cancellation and Payment, or in respect of a Share Basket Swap Transaction, Partial Cancellation and Payment

Share-for-Combined:

Component Adjustment

Determining Party:

Party A, acting in good faith and a commercially reasonable manner.  The dispute rights applicable to calculations and determinations made by the Calculation Agent shall also apply to determinations made by the Determining Party.

Tender Offer:

Applicable; provided that the definitions of "Tender Offer" and "Tender Offer Date" in Section 12.1 of the Equity Definitions shall be deleted and replaced with the following:

"(d)    'Tender Offer' means the first public announcement by any entity or person of a firm intention to conduct a takeover offer, tender offer, exchange offer, solicitation, proposal or other event that, when and if completed, would result in such

7

Archegos-CFTC-SEC 002954
SDNY_P001_0000031441

entity or person purchasing, or otherwise obtaining or having the right to obtain, by conversion or other means, greater than 10% and less than 100% of the outstanding shares of the Issuer, as determined by the Determining Party."

"(e)   'Tender Offer Date' means, in respect of a Tender Offer, the date of the first public announcement that constitutes such Tender Offer, as determined by the Determining Party."

Consequences of Tender Offers:

| | |
|---|---|
| Share-for-Share: | Modified Calculation Agent Adjustment |
| Share-for-Other: | Modified Calculation Agent Adjustment |
| Share-for-Combined: | Modified Calculation Agent Adjustment |

Determining Party:          Party A, acting in good faith and a commercially reasonable manner.  The dispute rights applicable to calculations and determinations made by the Calculation Agent shall also apply to determinations made by the Determining Party.

Composition of Combined Consideration:          Not Applicable

Nationalization, Insolvency or Delisting:          Cancellation and Payment, or in respect of a Share Basket Swap Transaction, Partial Cancellation and Payment.

The definition of "Delisting" in Section 12.6 of the Equity Definitions shall be deleted and replaced with the following:

"'Delisting' means that the Exchange announces that pursuant to the rules of such Exchange, the Shares cease (or will cease) to be listed, traded or publicly quoted on the Exchange for any reason (other than a Merger Event or Tender Offer) and are not immediately re-listed, re-traded or re-quoted on an exchange or quotation system that is both:  (i) located in the same country as the Exchange (or, where the Exchange is within the European Union, in any member state of the European Union), and (ii) a major exchange or quotation system with significant liquidity as reasonably determined by Party A.  If the Shares are immediately re-listed, re-traded or re-quoted on any such exchange or quotation system, such exchange or quotation system shall be deemed to be the Exchange."

Provided further that in addition to the provisions of Section 12.6(a)(iii) of the Equity Definitions, it shall also constitute a Delisting if the Exchange is located in the United States and the Shares are not immediately re-listed, re-traded or requoted on any of the New York Stock Exchange, the NYSE-AMEX, NYSE-Arca, The NASDAQ Global Select Market, or The NASDAQ Global Market (or their respective successors).

Determining Party:          Party A, acting in good faith and a commercially reasonable manner.  The dispute rights applicable to calculations and

8

determinations made by the Calculation Agent shall also apply to determinations made by the Determining Party.

**Additional Disruption Events:**

Change in Law:

Applicable; *provided that* Section 12.9(a)(ii) of the Equity Definitions is hereby replaced in its entirety by the following: ""Change in Law" means that, on or after the Trade Date of any Transaction (A) due to the adoption of or any change in any applicable law or regulation (including, for the avoidance of doubt and without limitation, (x) any tax law or (y) adoption or promulgation of new regulations authorized or mandated by existing statute), or (B) due to the promulgation of or announcement of any change in the formal interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law or regulation (including any action taken by a taxing authority), a party to such Transaction determines in good faith that (X) it has become, or will become within 30 calendar days following the date of such determination but prior to the Termination Date, illegal to hold, acquire or dispose of Hedge Positions relating to such Transaction in the manner contemplated by the Hedging Party, or (Y) it has incurred, or will incur within 30 calendar days following the date of such determination but prior to the Termination Date, a materially increased cost in performing its obligations under, or holding, acquiring or disposing of any Hedge Positions relating to, such Transaction (including, without limitation, due to any increase in tax liability, decrease in tax benefit or other adverse effect on its tax position)."

Insolvency Filing:

Applicable; provided that Section 12.9(a)(iv) shall be modified so that each reference therein to "the Issuer" shall be deleted and replaced by "the Issuer of the Shares for a Share Transaction or the Issuer of any Shares that comprise the Basket for a Basket Swap Transaction".

Hedging Disruption:

Applicable; provided that Section 12.9(a)(v) of the Equity Definitions is hereby replaced in its entirety by the following: ""Hedging Disruption" means that the Hedging Party is unable, after using commercially reasonable efforts, to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any Hedge Positions, or (B) realize, recover, remit or transfer the proceeds of any Hedge Positions between accounts within the jurisdiction of the Hedge Positions (the "Affected Jurisdiction") or from accounts within the Affected Jurisdiction to accounts outside of the Affected Jurisdiction."

Increased Cost of Hedging:

Applicable; provided that Section 12.9(a)(vi) of the Equity Definitions is hereby replaced in its entirety by the following: ""Increased Cost of Hedging" means that the Hedging Party would incur a materially increased (as compared with circumstances existing on the Trade Date) amount of tax, duty, expense, financing fee, or other fee (other than brokerage commissions) to (A) acquire, establish, re-establish, substitute, maintain, unwind or dispose of any Hedge Positions, or (B) realize, recover or remit the proceeds of any such Hedge

9

Archegos-CFTC-SEC 002956
SDNY_P001_0000031443

|  | Positions, provided that any such materially increased amount that is incurred solely due to the deterioration of the creditworthiness of the Hedging Party shall not be deemed an Increased Cost of Hedging." |
|---|---|
| Loss of Stock Borrow: | Applicable; provided that Sections 12.9(a)(vii) and 12.9(b)(iv) of the Equity Definitions are hereby amended by deleting the words "at a rate equal to or less than the Maximum Stock Loan Rate" and replacing them with "at a rate of return equal to or greater than zero." |
| Increased Cost of Stock Borrow: | Applicable; provided that Section 12.9(a)(viii) of the Equity Definitions is hereby replaced in its entirety by the following: |
|  | ""Increased Cost of Stock Borrow" means that the Hedging Party would incur a rate to borrow Shares with respect to such Transaction that is higher than the rate in effect on the Trade Date (the "Initial Stock Loan Rate"), in each case as determined by the Hedging Party in good faith and in a commercially reasonable manner." |
| Partial Termination for Baskets: | Notwithstanding Section 12.9(b) of the Equity Definitions, if the relevant Transaction is a Share Basket Swap Transaction, the consequence associated with each Additional Disruption Event is hereby amended such that the right to terminate the Transaction is limited to that portion of the Transaction represented by Shares affected by the relevant Additional Disruption Event and, if any such right to partially terminate is exercised, (a) the Cancellation Amount will be calculated with respect solely to the terminated portion, (b) the remainder of the Transaction will continue with the Basket comprising Shares that are not affected by the relevant Additional Disruption Event, and (c) the Calculation Agent will adjust any relevant terms if necessary to preserve as nearly as practicable the economic terms of the Transaction for the remaining Basket. |
| Hedging Party: | Party A or its affiliates. |
| Determining Party: | Party A, acting in good faith and a commercially reasonable manner.  The dispute rights applicable to calculations and determinations made by the Calculation Agent shall also apply to determinations made by the Determining Party. |
| Cancellation Amount: | The following changes shall apply to Sections 12.7 and 12.8 of the Equity Definitions: |
|  | (A) Section 12.7 of the Equity Definitions shall be replaced with the following: |
|  | "Section 12.7. Payment upon Certain Extraordinary Events.   If, in respect of an Extraordinary Event, "Cancellation and Payment" or "Partial Cancellation and Payment" applies or is deemed to apply to the Transaction (or part of it), then the Cancellation Amount shall be paid |

10

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002957
SDNY_P001_0000031444

by one party to the other, determined as provided in Section 12.8. Such payment shall be made not later than three Currency Business Days following the date that notice of the determination by the Determining Party of such Cancellation Amount, and the party by which it is payable, is effective. Such notice shall be provided promptly following the determination."

(B)   Section 12.8 of the Equity Definitions shall be replaced with the following:

"Section 12.8 Cancellation Amount. "Cancellation Amount" means the amount that would be payable by one party to the other, determined by the Determining Party taking into account the Equity Amount, the Floating Amount and the Dividend Amount that would be payable under the Mutual Early Termination Right provisions (regardless whether such provisions are designated as applying to a party) where the Optional Early Termination Date is a date determined by the Determining Party based on the date of the Extraordinary Event and any relevant documentation relating to such event published by the Issuer or a regulatory authority."

Hedge Positions:

The definition of "Hedge Positions" in Section 13.2(b) of the Equity Definitions shall be amended by replacing the words "a party" with the words "Party A or its affiliates" in the third line.

**Agreements and Acknowledgements:**

Non-Reliance:                                  Applicable

Agreements and Acknowledgments
Regarding Hedging Activities:                  Applicable

Additional Acknowledgments:                    Applicable

**Depository Receipts:**

The 2007 Partial Lookthrough Depository Receipt Supplement to the Equity Definitions, as published by ISDA, shall be incorporated by reference with respect to any Transaction under this Master Confirmation Agreement if the Calculation Agent determines that the Shares (or any Share in the case of a Basket Transaction) are American Depositary Receipts ("ADRs") or Global Depositary Receipts ("GDRs").

**ETFs:**

For any Transaction for which the Shares are shares, units or other interests in any exchange traded fund, in addition to the other terms of this Master Confirmation Agreement, the provisions of Section 11.1 ("Adjustment to Indices") of the Equity Definitions shall apply. For such purposes, the word "Index" shall be deemed to be replaced with the word "Fund" throughout Sections 1.28, 6.7(e), 11.1, 12.1 and 13.3 of the Equity Definitions. For the purposes of Section 11.1, amended

11

Archegos-CFTC-SEC 002958
SDNY_P001_0000031445

as per the preceding provisions, the following consequences shall apply:

Fund Modification:  Calculation Agent Adjustment.

Fund Cancellation:  Cancellation and Payment.

Fund Disruption:  Calculation Agent Adjustment.

Fund Disclaimer:  Applicable

**China A-Shares – China Connect:**     For any Transaction for which "China Connect" is specified in the relevant Transaction Supplement, the following provisions shall apply:

Additional Provisions for Shares traded through the China Connect Service: Applicable.

China Connect Share Disqualification: Hedging Party.

China Connect Service Termination: Hedging Party.

Notwithstanding anything to the contrary in this Master Confirmation Agreement, a Hedging Disruption shall be deemed to have occurred with respect to a Transaction if, in circumstances where a shareholding limit under applicable laws is or may be breached or exceeded, SEHK imposes a forced sale of any Hedge Positions.

**China A-Shares – non-China Connect:**     For any Transaction for which "Shanghai Stock Exchange" or "Shenzhen Stock Exchange" is specified as the Exchange but "China Connect" is not specified in the relevant Transaction Supplement, the following provisions shall apply:

Notwithstanding anything to the contrary in this Master Confirmation Agreement, a Hedging Disruption shall be deemed to have occurred with respect to a Transaction if either of the following events occurs (or, in the determination of the Calculation Agent, such event will occur within 30 calendar days following the date of determination but prior to the Termination Date):

(i)     the cessation or suspension for any reason of the foreign qualified investor status of the Hedging Party; or

(ii)     the reduction or restriction of the foreign qualified investor quota of the Hedging Party or the use or application of such quota to such an extent that, as determined by the Calculation Agent, affects or will affect the ability of the Hedging Party to acquire,

12

Archegos-CFTC-SEC 002959
SDNY_P001_0000031446

establish, re-establish, substitute, maintain unwind or dispose of any Hedge Positions,

where, for the purposes of the foregoing, "**foreign qualified investor**" means Qualified Foreign Institutional Investor or Renminbi Qualified Foreign Institutional Investor, as applicable.

2.     **Calculation Agent:**      As specified in the Agreement.

3.     **Credit Support Document; Independent Amount:** The Credit Support Annex executed between Party A and Party B. For these purposes, the "Independent Amount" with respect to Party B in relation to each Transaction shall be an amount equal to the IA Rate, determined by Party A from time to time in a commercially reasonable manner, multiplied by the Equity Notional Amount. The IA Rate shall be, intitially, as set forth in the relevant Transaction Supplement, and thereafter, as notified by Party A and Party B upon one (1) Local Business Day's prior notice to Party B.

4.     **Mutual Early Termination Right:**

(a)      Either party may, with at least one Scheduled Trading Day's notice, elect to early terminate a Transaction in whole or in part (and, for a Share Basket Swap Transaction, any partial early termination shall be for a pro rata portion of the relevant Basket), in its sole discretion, by specifying in such notice a Scheduled Trading Day occurring prior to the scheduled Valuation Date (or, if Averaging is applicable, prior to the initial Averaging Date in respect of the scheduled Valuation Date) as the "**Optional Early Termination Date**" and the number of Shares (or portion of the Basket) in respect of which it is terminating the Transaction early (the "**Terminated Number of Shares/Basket**").

(b)      Subject to (c) and (d) below, the Equity Amount, the Floating Amount and the Dividend Amount shall be determined as provided in accordance with the terms set forth herein but on the basis that references to the "Number of Shares" (or, for a Share Basket Swap Transaction, the relevant pro rata portion of the Basket) are deemed to be references to the Terminated Number of Shares/Basket. If Averaging or ADTV Limitation is not applicable, the Valuation Date with respect to the portion of that Transaction being terminated early shall be accelerated to the Optional Early Termination Date. If Averaging or ADTV Limitation is applicable, the Averaging Dates in respect of the Valuation Date with respect to the portion of that Transaction being terminated early shall be accelerated to consecutive Scheduled Trading Days commencing on the Optional Early Termination Date (each, an "**Accelerated Averaging Date**") and the latest occurring Accelerated Averaging Date shall be deemed to be the Valuation Date for purposes of the portion of the Transaction being terminated early. The Cash Settlement Payment Date and Period End Date for the portion of the Transaction that is terminated early shall be the date that is one Settlement Cycle following such accelerated Valuation Date.

(c)      If the portion of the Transaction being terminated early is less than 100%, the remainder of the Transaction shall continue in accordance with its terms.

(d)      Break Funding Recovery: The Floating Amount shall be adjusted to account for any break funding costs incurred by the Hedging Party in connection with the early termination of any portion of the Transaction, as determined by the Calculation Agent.

5.     **Payment of Unpaid Local Taxes or Excess Local Taxes:**

If the amount of Local Taxes or the basis on which it is to be determined is not confirmed before the relevant day on which a Dividend Amount or the Final Price, as the case may be, is being determined and/or is subject to change in the future, and (i) if any amount of Local Taxes ("**Unpaid Local Taxes**") that should have been taken into account was not taken into account in the determination of the Dividend Amount or the Final Price, as the case may be, the Non-Hedging Party shall pay to the Hedging Party an amount equal to such Unpaid Local Taxes within 10 Currency Business Days following notification from the Hedging Party; or (ii) if any excess amount of Local Taxes ("**Excess Local Taxes**") that should not have been taken into account was taken into account in the determination of

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002960
SDNY_P001_0000031447

the Dividend Amount or the Final Price, as the case may be, the Hedging Party shall pay to the Non-Hedging Party an amount equal to such Excess Local Taxes on the Currency Business Day following notification from the Hedging Party.  The provisions in this paragraph shall apply and remain in full force and effect notwithstanding that the Termination Date may have occurred.

"**Local Taxes**" means taxes, duties and similar charges that would be imposed by any taxing authority other than the United States on the Hedging Party (or any Affiliate(s) designated by it) assuming the Hedge Positions are held by the Hedging Party (or any Affiliate(s) designated by it) in the United Kingdom as determined by the Calculation Agent in good faith and in a commercially reasonable manner (and taking into account any refunds, credits or any other benefit or reduction that may arise under an applicable tax treaty or exemption or any other relevant laws or arrangements, to the extent that the Calculation Agent believes in its reasonable discretion that such refunds, credits, or other tax benefits or reductions would be available).

6.    **Derivatives Financial Transaction Taxes:**

Party B shall indemnify Party A for any Derivatives Financial Transaction Tax Amount in connection with entering into, amending, modifying or terminating a Transaction.  Party B shall pay any such Derivatives Financial Transaction Tax Amount within 10 Currency Business Days of Party A notifying Party B of such Derivatives Financial Transaction Tax Amount being payable and delivering to Party B documentation or other evidence reasonably satisfactory to Party B evidencing such Derivatives Financial Transaction Tax Amount.

"**Derivatives Financial Transaction Tax Amount**" means, in respect of a Transaction, an amount determined by the Calculation Agent in good faith and in a commercially reasonable manner equal to the aggregate of any financial transaction tax on derivative transactions (excluding, for the avoidance of doubt, any financial transaction tax on equity transactions or on any other non-derivative transactions) imposed on the entry into, amendment, modification or termination of such Transaction (including, for the avoidance of doubt, events which are deemed or considered to constitute an amendment or modification for the purposes of the applicable financial transaction tax rules) such as the Italian financial transaction tax arising under paragraph 492 of the Italian 2013 Stability Law (Law No 228 of 24 December 2012), to which:

(i)    Party B is liable, and which Party A is obliged to pay to any relevant governmental revenue authority, in connection with such Transaction; or

(ii)    Party A is liable in connection with such Transaction.

7.    **Additional Provisions for Pan Asia Countries:**

The following provisions will apply to any Transaction where in the case of a Share Swap Transaction or a Share Basket Swap Transaction, the Exchange, the Issuer or any of the Issuers is located in a Pan Asia Country, each a "Pan Asia Country Swap Transaction".

| | |
|---|---|
| Pan Asia Country: | Australia, Hong Kong, India, Indonesia, Japan, Korea, Malaysia, New Zealand, People's Republic of China, Philippines, Singapore, Taiwan, Thailand, Vietnam. |
| FX Conversion: | Notwithstanding anything to the contrary in this Master Confirmation Agreement, to the extent that any amount owed by Party A under a Pan Asia Country Swap Transaction is based on Local Currency amounts actually received by Party A or its Affiliates in connection with the unwind of its Hedge Positions in respect of the relevant Pan Asia Country Swap Transaction,  Party A shall convert such Local Currency amounts into the Settlement Currency payable on the date such amount is due at the Local Currency /Settlement Currency exchange rate determined by the Calculation Agent in good faith and in a commercially reasonable manner. |

If on the date such conversion is to be made, an FX Disruption Event (as defined below) has occurred and is continuing, then the conversion of Local Currency to the Settlement Currency by Party A shall be postponed until the first Currency Business Day on which

14

such FX Disruption Event ceases to exist and such conversion is able to be effected, and Party A's obligation to pay such amount shall be postponed to the Currency Business Day which is the same number of Currency Business Days after such date as the Settlement Cycle.

If an FX Disruption Event has occurred and is continuing on the date such amount is to be paid (including any payment date postponed due to a prior FX Disruption Event), then Party A's obligation to make such payment shall be postponed until the first Currency Business Day on which such FX Disruption Event ceases to exist and the conversion will be made at the rate available on such day. For the avoidance of doubt, if an FX Disruption Event constitutes or coincides with any other market disruption event (however defined), the terms of the relevant Pan Asia Country Swap Transaction will be adjusted pursuant to the above only after such postponements or adjustments have been made as a result of such other market disruption event provisions.

FX Disruption Event:   The occurrence of an event that makes it impossible or commercially impracticable through customary legal channels for Party A or its Affiliates to (i) convert, or obtain a market exchange rate for the conversion of, Local Currency into the Settlement Currency (whether in the Local Jurisdiction or outside such jurisdiction); (ii) freely deliver the Settlement Currency or the Local Currency (as the case may be) from accounts within the Local Jurisdiction to accounts outside such jurisdiction; or (iii) freely deliver the Settlement Currency or the Local Currency (as the case may be) between accounts within the Local Jurisdiction or to a person that is a non-resident of such jurisdiction.

For the purposes of the foregoing:

"Local Jurisdiction" means the jurisdiction in which the Exchange is located.

Limited Recourse:   Party B acknowledges and agrees that Party A's obligation to pay amounts under any Pan Asia Country Swap Transaction and Party B's entitlement to receive amounts under such Transaction are strictly limited to amounts actually obtained and received by Party A under its Hedge Positions and payments to Party B hereunder (if any) shall only be made following such time and to the extent that Party A is in possession and receipt of amounts due under its Hedge Positions in full.

Fees:   Notwithstanding anything to the contrary in this Master Confirmation Agreement, in respect of any Pan Asia Country Swap Transaction, Party B shall upon receipt of written notice from Party A pay to Party A within 10 Currency Business Days the amounts as determined by Party A in good faith and in a commercially reasonable manner equivalent to any taxes, duties, expenses or fees (other than brokerage commissions) including any interest or penalties thereon actually incurred by, imposed on or assessed to Party A or any of its affiliates in respect of Party A or any of its Affiliates acquiring, maintaining or disposing of its Hedge Positions for such Pan Asia Country Swap Transaction (save where such taxes, duties, expenses, or fees arise solely from the gross negligence, fraud or willful misconduct of Party A or any of its Affiliates), net of any refunds to which Party A or any of its Affiliates is entitled in respect of such amounts, and these amounts shall be payable on demand notwithstanding the termination of such Transaction before such Fees are imposed, provided that any such demand by Party A is made no later than six months after the expiry of the applicable statutory limitation period for recovery of Fees by the relevant tax authorities.

8.   **Additional Representations and Undertakings:**

Party B hereby represents and warrants to and for the benefit of, and agrees with, Party A that, in relation to each Transaction:

15

Archegos-CFTC-SEC 002962
SDNY_P001_0000031449

(i)      It is not entering into any Transaction with, and for the duration of any Transaction will not have, intent to influence or change control of the Issuer.

(ii)     It is not on the Trade Date, or on any Optional Early Termination Date that it has elected, in possession of any material, non-public information concerning the business, operations or prospects of the Issuer. "Material" information for these purposes is any information to which an investor would reasonably attach importance in reaching a decision to buy, sell or hold securities of the Issuer.

(iii)    It will make any filings and disclosures relating to such Transaction required to be made by it under applicable laws and regulations and the rules of any Exchange, including without limitation, to the extent applicable, the Financial Services and Markets Act 2000, the rules and regulations made by the UK Financial Services Authority from time to time, the City Code on Takeover and Mergers, Section 13 or Section 16 of the Securities Exchange Act of 1934 of the United States of America, or any other laws, regulations or rules of any country, regulatory body or Exchange that are applicable to such Transaction. Notwithstanding any duty of confidentiality owed by Party A, Party B acknowledges and agrees that Party A may make such disclosure to any legal or regulatory body or authority as Party A shall consider necessary or appropriate regarding the Transaction.

(iv)    The execution, delivery and performance of its obligations under such Transaction (and this Master Confirmation Agreement) will not violate any applicable law or regulation, including but not limited to, any short selling restrictions, applicable to Party B, and Party B is not engaging in the Transactions contemplated hereunder with the intent to impermissibly avoid any such restrictions.

(v)     Party B is not located or organized in Korea and it does not have any office or other presence in Korea.

(vi)    With respect to each Transaction entered into over Shares listed in, or whose Issuer is organized in, or where Party B is located in, any of the countries listed in Appendix I (Additional Representations), Party B further makes each of the additional representations and agreements that are set forth in Appendix I with respect to such country.

9.     **Terms relating to the United States**:

<u>Eligible contract participant</u>.  Each party represents to the other party that it is an "eligible contract participant" as defined in the U.S. Commodity Exchange Act (as amended) and (ii) it has entered into each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

<u>Section 871(m)</u>.  Party A is an adherent to the ISDA 2015 Section 871(m) Protocol published by the International Swaps and Derivatives Association, Inc. on November 2, 2015, as may be amended or modified from time to time (the "**2015 Section 871(m) Protocol**").  In the event that Party B is not an adherent to the 2015 Section 871(m) Protocol, Party A and Party B hereby agree that the Agreement shall be treated as a Covered Master Agreement (as that term is defined in the 2015 Section 871(m) Protocol) and the amendments set forth in the Attachment to the 2015 Section 871(m) Protocol shall be deemed to be made to the Agreement.

<u>U.S. Internal Revenue Code Section 1260</u>.  Party B represents, warrants and covenants to Party A that Party B has reviewed and is familiar with the provisions of Section 1260 of the U.S. Internal Revenue Code of 1986, as amended, and its application to any gains received by Party B under any relevant Transaction.

<u>Representations, Warranties and Covenants Regarding Affiliate Status</u>.  Party B represents, warrants and covenants to Party A on the Trade Date of any Transaction hereunder that Party B has not been at any time since at least three

16

Archegos-CFTC-SEC 002963
SDNY_P001_0000031450

months prior to such Trade Date, and will not become during the term of such Transaction up to and including the Termination Date, an "affiliate" (as such term is defined in Rule 144 under the U.S. Securities Act of 1933, as amended) of the Issuer of any Shares for such Transaction.

<u>Investment Company</u>.  Party B represents, warrants and covenants to Party A on the Trade Date of any Transaction hereunder that Party B is not, and after giving effect to such Transaction will not be, required to register as an "investment company" (within the meaning of the Investment Company Act of 1940, as amended, of the United States of America).

<u>Bankruptcy Code</u>.  Without limiting any other protections under the United States Bankruptcy Code (the "**Bankruptcy Code**"), the parties hereto intend as follows: each Transaction is a "swap agreement," as such term is defined in Section 101(53B) of the Bankruptcy Code, qualifying for protection under Section 560 of the Bankruptcy Code; and a "swap agreement," as such term is defined in Section 206(b) of the United States Gramm-Leach Bliley Act; (ii) any cash, securities or other property provided as performance assurance, credit support or collateral with respect to such Transaction constitute a "transfer" as defined in Section 101(54) of the Bankruptcy Code under a "swap agreement;" and (iii) any payment for, under or in connection with such Transaction constitutes a "transfer" as defined in Section 101(54) of the Bankruptcy Code under a "swap agreement."

10.     **Notice and Account Details:**

     Address for Notices to Party A:

     Notices to Party A in respect of any Transaction hereunder shall be sent by email to SF_CONFIRMS@jefferies.com, provided that all notices under the Agreement, including without limitation Section 5, 6, 11 or 13 thereof, shall be made as set forth in the Agreement.

| | |
|---|---|
| Account for payments to Party A: | The Bank of New York Mellon |
| | ABA# 021000018 |
| | A/C Jefferies Group LLC |
| | A/C 890-067-2064 |
| | FFC Archegos Fund, L.P. |
| Address for Notices to Party B: | As set forth in the Agreement |
| Account for payments to Party B: | To be advised |

11.     **Offices:**

(a)     The Office of Party A for the Transaction is:    Not Applicable; and
(b)     The Office of Party B for the Transaction is:    Not Applicable.

12.     **Other Provisions:**

(a)     <u>**No Interest in Shares**</u>.  For the avoidance of doubt, neither party will have any right (whether contemporaneously or following the termination of any Transaction) to acquire the Shares under any Transaction or pursuant to any other agreement or arrangement between the parties.

(b)     <u>**No Voting Rights**</u>.  For the avoidance of doubt, notwithstanding any provision of the Equity Definitions, neither party shall acquire any right to vote or to give any consent with respect to any Shares by virtue of any Transaction. Without limiting the generality of the foregoing, the Equity Amount Receiver under any Transaction shall not be entitled pursuant to such Transaction, whether directly or indirectly, to vote or direct the voting of, or to give or direct the giving of any consent with respect to, any Shares (including any Shares held by or on behalf of the Equity Amount Payer as a hedge for such Transaction), and the parties agree that the Equity Amount Payer under any Transaction shall not take any such directions or instructions from the other party, or any of its officers, directors, employees, agents or representatives, as to such voting or consent.

17

Archegos-CFTC-SEC 002964
SDNY_P001_0000031451

(c)      **Role of Agent**.  Each party agrees and acknowledges that Jefferies LLC, Jefferies Hong Kong Limited, Jefferies International Limited, Jefferies (Japan) Limited and/or Jefferies Singapore Limited, each an affiliate of Party A, may act or may have acted as Party A's agent ("**Agent**") to solicit, execute or otherwise support Transactions hereunder on behalf of Party A as principal.  Any actions by the Agent with respect to Transactions hereunder are solely as agent and not as principal and Agent has no obligation or liability, by way of guaranty, endorsement or otherwise, in any manner in respect of any Transaction (including, if applicable, in respect of the settlement thereof).  Each party agrees it will look solely to the other party (or any guarantor in respect thereof) for performance of such other party's obligations under each Transaction.

(d)      **Entire Agreement**.   This Master Confirmation Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect specifically thereto.

(e)      **Amendments**.  An amendment, modification or waiver in respect of this Master Confirmation Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of electronic messages on an electronic messaging system, provided that any amendments to Appendix II ("*Floating Amount Table*")  may be made by Party A notifying Party B in writing of the revised form, provided, further, that Party A will make reasonable efforts to notify Party B of any amendment in advance of such revision.

(f)      **Counterparts**.  This Master Confirmation Agreement and each Transaction Supplement documented hereunder may be executed in counterparts, each of which will be deemed an original.

(g)      **Headings**.  The headings used in this Master Confirmation Agreement are for convenience of reference only and shall not affect the construction of or be taken into consideration in interpreting this Master Confirmation Agreement.

(h)      **Governing Law**.  This Master Confirmation Agreement and each covered Transaction will be governed by and construed in accordance with the Governing Law of the Agreement.

(i)      **Termination**.  Either party may terminate this Master Confirmation Agreement on giving notice to the other party at the contact details listed in this Master Confirmation Agreement, in which case this Master Confirmation Agreement does not apply to Transactions with a Trade Date after the Local Business Day on which such notice is given.

[signature page follows]

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002965
SDNY_P001_0000031452

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing a copy of this Master Confirmation Agreement and returning it to us at SF_CONFIRMS@jefferies.com.

JEFFERIES FINANCIAL PRODUCTS, LLC

By:
Name: Bradley Katinas
Title:   Managing Director

ARCHEGOS FUND, L.P.
By:   Archegos Capital Partners, LLC,
      its General Partner

By:
Name:   Sung Kook Hwang
Title:   Managing Member

19

Archegos-CFTC-SEC 002966
SDNY_P001_0000031453

APPENDIX I: ADDITIONAL REPRESENTATIONS

**Australia**

With respect to Transactions entered into over Australian listed Shares, Party B further represents and warrants to and for the benefit of, and agrees with, Party A that, in relation to each such Transaction:

(i)      The entry into and performance by it of and the Transactions contemplated by this Master Confirmation Agreement do not and will not conflict with any Australian law or regulation applicable to a party or such Transaction, including, without limitation, the listing rules (the **"Listing Rules"**) of the Australian Securities Exchange (**"ASX"**); and

(ii)     Party B is not located in Australia.

**Canada**

With respect to Transactions over Shares that are listed, or otherwise traded, on a marketplace in Canada, and regardless of where Party B is located at the time, Party B represents and warrants to and for the benefit of, and agrees with, Party A that in relation to each such Transaction:

(i)      the entry into, and performance by it, of the Transaction does not, and will not, conflict with, or contravene, any law or regulation of Canada, including, without limitation, "Ontario securities law", as that term is defined in subsection 1(1) of the *Securities Act* (Ontario) ("**Ontario securities law**") and the applicable rules of any Canadian marketplace on which the Shares are traded ("**Marketplace Rules**").

**China**

With respect to Transactions the payment/payments under which is/are linked to the performance of one or more PRC Securities:

(a)     Party B makes the following representations to Party A that as at the date of this Agreement (which representations will be deemed to be repeated by Party B to Party A on each date on which a Transaction is entered into):

      (i)     if there is any Share in relation to which "China Connect" is not specified in the relevant Transaction Supplement:

            (A)     it is not (1) a PRC Citizen resident in the PRC (excluding Hong Kong, Macau and Taiwan), (2) a PRC Citizen resident outside the PRC who is not a permanent resident of another country or permanent resident of Hong Kong, Macau or Taiwan, or (3) a Legal Person Registered in the PRC, (each a **"Domestic Investor"**); and

            (B)     to the best of its knowledge and belief after enquiries that it reasonably deems necessary, all amounts paid or to be paid by it under the Transaction did not and will not involve moneys financed by or sourced from any Domestic Investor in contravention of the laws and regulations of the PRC;

      (ii)    if there is any Share in relation to which "China Connect" is specified in the relevant Transaction Supplement, it is not (1) a natural person holding a resident identification card or other equivalent government issued identification of the PRC (excluding Hong Kong, Macau and Taiwan) who is not a permanent resident of another jurisdiction or permanent resident of Hong Kong, Macau or Taiwan or (2) a Legal Person Registered in the PRC, or if it is such a person or legal entity, then its entry into the Transaction does not violate the laws

Confidential Treatment Requested by King & Spalding                  Archegos-CFTC-SEC 002967<br>SDNY_P001_0000031454

and regulations of the PRC including those in relation to foreign exchange control and reporting;

(iii) in the case where the Transaction is entered into by Party B as trustee for a trust, interests in the trust are not majority-owned by, and the management decision over the trust is not controlled by, one or more Domestic Investor(s). For the avoidance of doubt, in the case only where a trust 's investments are being managed on a discretionary basis by an investment manager, such investment manager shall not be deemed to control such entity for the purposes of this representation by reason only of it being able to control the decision-making in relation to the entity's financial, investment and/or operating policies;

(iv) it is entering into this Agreement, including each Transaction, as principal and not as an agent of any person or entity;

(v) it will not transact with Party A in respect of China offshore derivative products linked to the securities of any China listed company while in possession of material, non-public price-sensitive information about such company; and

(b) For so long as Party B has any obligation under the Agreement or under any Credit Support Document to which it is a party:-

(i) Party B acknowledges that Party A and/or any of its affiliates may be required to disclose information relating to, among other things, the details of the Transaction or the identities of any party having a legal or beneficial interest in the Transaction as may be required by any relevant governmental or regulatory authorities (including, without limit, CSRC and SAFE) or as may be required under any law, regulation, orders or other lawful request, and it agrees to all such related disclosure and hereby waives confidentiality with regard thereto; and

(ii) Party B agrees to promptly provide Party A and the relevant governmental or regulatory authorities with such additional information that the relevant governmental or regulatory authorities may require from Party A and/or its affiliates from time to time, with regard to the identity and other details of Party B or the beneficial owners in respect of the Transaction, including but not limited to (i) the category to which Party B belongs (i.e., hedge fund, corporate, individual, pension fund, trust, etc.); and (ii) the source of funding of Party B. It agrees that where such information is maintained by any third party on behalf of Party B and the trust fund, it shall ensure that appropriate procedures are implemented with such third party to enable the prompt disclosure of such information to Party A, its nominated affiliate and/or the relevant governmental or regulatory authorities on request,

(c) In connection with, amongst other things, the entry into this Master Confirmation Agreement the parties agree to execute the PRC Tax Letter Agreement in the form set out herein.

where:

"**CSRC**" means the China Securities Regulatory Commission of the PRC;

"**Legal Person Registered in the PRC**" means an entity incorporated or organized in the PRC (excluding Hong Kong, Macau and Taiwan);

"**PRC**" means the People's Republic of China;

"**PRC Citizen**" means any person holding a resident identification card of the PRC (excluding Hong Kong, Macau and Taiwan);

"**PRC Securities**" means any shares, bonds, warrants or other securities listed on any stock exchange in the PRC (excluding Hong Kong, Macau and Taiwan), securities investment funds quoted in Renminbi or any other financial instruments in which a Qualified Foreign Institutional Investor or a Renminbi Qualified

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002968
SDNY_P001_0000031455

Foreign Institutional Investor may from time to time invest under the laws and regulations of the PRC (excluding Hong Kong, Macau and Taiwan);

"**Qualified Foreign Institutional Investor**" means a Qualified Foreign Institutional Investor (合格境外机构投资者) defined in the Measures on the Administration of Domestic Securities Investments by Qualified Foreign Institutional Investors (合格境外机构投资者境内证券投资管理办法), as may be amended and supplemented from time to time;

"Renminbi Qualified Foreign Institutional Investor" means a Renminbi Qualified Foreign Institutional Investor (人民币合格境外机构投资者) defined in Pilot Measures on the Administration of Domestic Securities Investments by Reminbi Qualified Foreign Institutional Investors (人民币合格境外机构投资者境内证券投资试点办法), as may be amended and supplemented from time to time;

"**SAFE**" means the State Administration of Foreign Exchange of the PRC; and

"**trust**" includes a trust fund or any similar arrangement where the legal title to the trust assets are held by a trustee or legal representative but the beneficial interests in the trust assets are held by beneficiaries; and "**trustee**" shall be construed accordingly.

**Hong Kong**

With respect to Transactions entered into over Hong Kong listed Shares, Party B further represents and warrants to and for the benefit of, and agrees with, Party A that, in relation to each such Transaction:

(i)      The entry into and performance by it of and the Transactions contemplated by this Master Confirmation Agreement do not and will not conflict with any Hong Kong law or regulation applicable to a party to such Transaction, including, without limitation, the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited (the "**Listing Rules**");

(ii)      It will, and will procure that each of its Relevant Individuals will, comply with any other applicable laws or regulations in any jurisdiction in relation to dealing in the Shares, including, without limitation, any insider dealing, market abuse or market manipulation laws or regulations; and

(iii)      Party B is not located in Hong Kong.

**Japan**

With respect to Transactions entered into over Japanese listed Shares and/or where Party B is located within Japan, Party B further represents and warrants to and for the benefit of, and agrees with, Party A that, in relation to each such Transaction:

(i)      The entry into and performance by it of and the Transactions contemplated by this Master Confirmation Agreement do not and will not conflict with any Japanese law or regulation applicable to a party of such Transaction, including, without limitation, the Financial Instruments and Exchange Act of Japan (the "FIEA") and related ordinances and the relevant rules of stock exchanges licensed under the FIEA; and

(ii)      Party B is not and will not be physically present in Japan when it performs all or part of the Transactions.

Appendix I – page 3

Archegos-CFTC-SEC 002969
SDNY_P001_0000031456

**Korea**

With respect to Transactions entered into over Korean listed Shares, Party B further represents and warrants to and for the benefit of, and agrees with, Party A that, in relation to each such Transaction:

(i)      The entry into and performance by it of and the Transactions contemplated by this Master Confirmation Agreement do not and will not conflict with any Korean law or regulation applicable to a party of such Transaction, including, without limitation, the Financial Investment Services and Capital Markets Act of Korea and the rules and regulations promulgated thereunder (the "**FSCMA**"), the Foreign Exchange Transaction Law of Korea and the rules and regulations promulgated thereunder (the "**Foreign Exchange Regulations**") and the relevant listing regulations and disclosure regulations stipulated by the Korea Exchange (collectively, the "**KRX Regulations**");

(ii)      It is a "professional investor" (as defined in the FSCMA) and has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the Transaction, and is able to bear the economic risks of the Transaction;

(iii)      If it ceases at any time to remain a "professional investor", it will immediately advise Party A and acknowledge that dealings for its account may need to cease with immediate effect; and

(iv)      It agrees upon Party A's request to provide copies of such evidence as Party A may require to establish that it is a "professional investor".


**Singapore**

With respect to Transactions entered into over Singapore listed Shares, Party B further represents and warrants to and for the benefit of, and agrees with, Party A that, in relation to each such Transaction:

(i)      The entry into and performance by it of and the Transactions contemplated by this Master Confirmation Agreement do not and will not conflict with any Singaporean law or regulation applicable to a party or such Transaction, including, without limitation, the Companies Act (Cap. 50) of Singapore (the "**Companies Act**"), the Securities and Futures Act (Cap. 289) of Singapore (the "**SFA**") and the Listing manual of the Singapore Exchange Securities Trading Limited (the "**Listing Manual**").


**Taiwan**

With respect to Transactions entered into over Taiwan listed Shares, Party B further represents and warrants to and for the benefit of, and agrees with, Party A that, in relation to each such Transaction:

(i)      It is a fund domiciled outside Taiwan and outside the People's Republic of China (excluding Hong Kong and Macau) ("**PRC**") and investments in Party B utilizing funds sourced from Taiwan or PRC do not represent a material portion of Party B's assets under management.

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002970
SDNY_P001_0000031457

APPENDIX II: FLOATING AMOUNT TABLE

| Floating Rate Option Symbol specified in Transaction Supplement: | Floating Rate Option: | Designated Maturity: | Floating Rate Day Count Fraction: | Reset Dates: | Business Days: |
|---|---|---|---|---|---|
| AUDO/N | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "RBACOR <Index> -Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/365 | Each Business Day | Sydney and London |
| AUD001M | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "BBSW1M <INDEX> - Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 month | Act/365 | The 15th calendar day of each month | Sydney and London |
| BP00O/N | GBP-LIBOR-BBA-Bloomberg | 1 day | Act/365 | Each Business Day | London |
| BP0001W | GBP-LIBOR-BBA-Bloomberg | 1 week | Act/365 | Each Monday of each calendar month | London |
| BP0001M | GBP-LIBOR-BBA-Bloomberg | 1 month | Act/365 | The 15th calendar day of each month | London |
| CADO/N | CAD-BA-CDOR-Bloomberg | 1 day | Act/365 | Each Business Day | Toronto and London |
| CAD001M | CAD-BA-CDOR-Bloomberg | 1 month | Act/365 | The 15th calendar day of each month | Toronto and London |
| CHFO/N | CHF-LIBOR-BBA-Bloomberg | 1 day | Act/365 | Each Business Day | Zurich and London |
| CHF001M | CHF-LIBOR-BBA-Bloomberg | 1 month | Act/365 | The 15th calendar day of each month | Zurich and London |
| CNHO/N | CNH-HIBOR-TMA | 1 day | Act/ 365 | Each Business Day | Hong Kong and London |

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002971
SDNY_P001_0000031458

| Floating Rate Option Symbol specified in Transaction Supplement: | Floating Rate Option: | Designated Maturity: | Floating Rate Day Count Fraction: | Reset Dates: | Business Days: |
|---|---|---|---|---|---|
| DKKO/N | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "DKDR1T-Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/365 | Each Business Day | Copenhagen and London |
| DKK001M | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "CIB001M - Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 month | Act/365 | The 15th calendar day of each month | Copenhagen and London |
| EONIA | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "EONIA <Index>".  If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/360 | Each Business Day | TARGET2 |
| EU0001W | EUR-LIBOR-BBA-Bloomberg | 1 week | Act/360 | Each Monday of each calendar month | TARGET2 |
| EU0001M | EUR-LIBOR-BBA-Bloomberg | 1 month | Act/360 | The 15th calendar day of each month | TARGET2 |
| HIHDO/N | HKD-Hibor-HKAB-Bloomberg | 1 day | Act/365 | Each Business Day | Hong Kong and London |
| HIHD01W | HKD-Hibor-HKAB-Bloomberg | 1 week | Act/365 | Each Monday of each calendar month | Hong Kong and London |
| HIHD01M | HKD-Hibor-HKAB-Bloomberg | 1 month | Act/365 | The 15th calendar day of each month | Hong Kong and London |
| JY00S/N | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "JY00S/N <Index>".  If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/365 | Each Business Day | Tokyo |

Appendix II - page 2

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002972
SDNY_P001_0000031459

| Floating Rate Option Symbol specified in Transaction Supplement: | Floating Rate Option: | Designated Maturity: | Floating Rate Day Count Fraction: | Reset Dates: | Business Days: |
|---|---|---|---|---|---|
| JY0001W | JPY-Libor-BBA-Bloomberg | 1 week | Act/365 | Each Monday of each calendar month | Tokyo and London |
| JY0001M | JPY-Libor-BBA-Bloomberg | 1 month | Act/365 | The 15th calendar day of each month | Tokyo and London |
| NOKO/N | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "NOBRON-Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/365 | Each Business Day | Oslo and London |
| NOK001M | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "NIBOR1M-Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 month | Act/365 | The 15th calendar day of each month | Oslo and London |
| OBFR | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "OBFR <Index>". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/360 | Each Business Day | New York |
| SEKO/N | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "STIB1D- Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/365 | Each Business Day | Stockholm and London |

Appendix II - page 3

Archegos-CFTC-SEC 002973
SDNY_P001_0000031460

| Floating Rate Option Symbol specified in Transaction Supplement: | Floating Rate Option: | Designated Maturity: | Floating Rate Day Count Fraction: | Reset Dates: | Business Days: |
|---|---|---|---|---|---|
| SEK001M | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "STIB1M-Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 month | Act/365 | The 15th calendar day of each month | Stockholm and London |
| SIBCSORA | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "SIBCSORA <Index>". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/365 | Each Business Day | Singapore |
| SIBF1M | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "SIBF1M <Index>". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 month | Act/365 | The 15th calendar day of each month | Singapore and London |
| US0001W | USD-LIBOR-BBA-Bloomberg | 1 week | Act/360 | Each Monday of each calendar month | New York and London |
| US0001M | USD-LIBOR-BBA-Bloomberg | 1 month | Act/360 | The 15th calendar day of each month | New York and London |
| ZARO/N | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "RAONON (ZAR)-Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 day | Act/365 | Each Business Day | Johannesburg and London |

Appendix II - page 4

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002974
SDNY_P001_0000031461

| Floating Rate Option Symbol specified in Transaction Supplement: | Floating Rate Option: | Designated Maturity: | Floating Rate Day Count Fraction: | Reset Dates: | Business Days: |
|---|---|---|---|---|---|
| ZAR001M | In respect of a Reset Date, the rate set forth on Bloomberg for that day under "JIBA1M- Bloomberg". If such rate does not appear on Bloomberg, the rate for that Reset Date will be the rate for the first preceding day for which such rate is set forth on Bloomberg. | 1 month | Act/365 | The 15th calendar day of each month | Johannesburg and London |

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002975
SDNY_P001_0000031462

# Jefferies

Date: November 16, 2017

Dear Sirs,

This notice is directed to the undersigned (hereinafter referred to as "**you**" and the terms "**your**" and "**yourself**" are to be construed accordingly) in connection with and in consideration of all transactions which you may enter into or have entered into, from time to time, with Jefferies Financial Products, LLC ("**Jefferies**") or any of its affiliates (each an "**Issuer**", and together the "**Issuers**") that is linked to the performance of shares, bonds, warrants or other securities traded and listed on a stock exchange in the People's Republic of China (for these purposes, excluding the Hong Kong Special Administrative Region, the Macao Special Administrative Region and the Taiwan area, the "**PRC**"), securities investment funds quoted in Renminbi or any other financial instruments, in each case, eligible for investment under the PRC Qualified Foreign Institutional Investor scheme, the PRC Renminbi Qualified Foreign Institutional Investor scheme or the Shanghai-Hong Kong Stock Connect programme, the Shenzhen-Hong Kong Stock or any other stock connect programme separately notified to you by Jefferies (in each case, "**PRC Securities**"), or indices relating to PRC Securities (each a "**Relevant Transaction**"), whether in the form of:

(i)     over-the-counter derivatives transactions; and/or

(ii)    notes, certificates, warrants or any other structured products or instruments by whatever name they are called.

For the purposes of this notice, the term "Relevant Transaction" refers to any future or currently outstanding Relevant Transaction(s) as of the date of this notice as well as any previous transaction which has been transferred, terminated, matured, redeemed or otherwise unwound prior to the date of this notice.

Notwithstanding any agreements between the Issuer and/or its associates/affiliates and you or any regulatory rules applicable to the Issuer or the Issuer's associates/affiliates or you, in respect of the Relevant Transactions entered into by you, you hereby agree, undertake and acknowledge to each Issuer that:

1.     Investor status

1.1     In relation to each Relevant Transaction linked to the performance of PRC Securities which are eligible for investment under the PRC Qualified Foreign Institutional Investor scheme or the PRC Renminbi Qualified Foreign Institutional Investor scheme:

1.1.1     you are not (1) a person holding a resident identification card of the PRC (a "**PRC Citizen**") resident in the PRC, (2) a PRC Citizen resident outside the PRC who is not a permanent resident of another country or permanent resident of Hong Kong, Macau or Taiwan, or (3) an entity incorporated or organized in the PRC (a "**Legal Person Registered in the PRC**") (each a "**Domestic Investor**"); and

1.1.2     to the best of your knowledge and belief after enquiries that you reasonably deem necessary, all amounts paid or to be paid by you under such Relevant Transaction did not and will not involve moneys financed by or sourced from any Domestic Investor in contravention of the laws and regulations of the PRC.

1.2     In relation to each Relevant Transaction linked to the performance of PRC Securities which are eligible for investment under the Shanghai-Hong Kong Stock Connect programme,  the Shenzhen-Hong Kong Stock or any other stock connect programme separately notified to you by Jefferies, you are not (1) a natural person holding a resident identification card or other equivalent government issued identification of the PRC who is not a permanent resident of another jurisdiction or permanent resident of Hong Kong, Macau or Taiwan or (2) a Legal Person Registered in the PRC, or if you are such a person or legal entity, then your entry into the Transaction does not violate the laws and regulations of the PRC including those in relation to foreign exchange control and reporting.

PRC Tax Side Letter - page 1

Confidential Treatment Requested by King & Spalding     Archegos-CFTC-SEC 002976
SDNY_P001_0000031463

1.3     If a Relevant Transaction is, or will be, entered into by you as trustee for a trust, interests in the trust are not majority-owned by, and the management decision over the trust is not controlled by, one or more Domestic Investor(s). For the avoidance of doubt, in the case only where a trust's investments are being managed on a discretionary basis by an investment manager, such investment manager shall not be deemed to control such entity for the purposes of this representation by reason only of it being able to control the decision-making in relation to the entity's financial, investment and/or operating policies.

1.4     You are, or will be, entering into each Relevant Transaction as principal and not as an agent of any person or entity.

2.     Any of the Issuers, any Issuer's associates/affiliates or any Issuer's hedging party (each a "**Relevant Entity**") may engage or may have engaged in transactions involving the relevant PRC Securities, index futures or options contracts or other instruments in order to hedge its obligations under any Relevant Transaction (each a "**Hedging Activity**") and the costs and expenses relating to any Hedging Activity may include Tax liabilities which may be incurred by, imposed on or assessed to a Relevant Entity in connection therewith by any government or other taxing or revenue authority in the PRC (a "**PRC Tax Authority**").

3.     If at any time any Tax is incurred by, imposed on or assessed to any Relevant Entity in connection with any Relevant Transaction or relevant Hedging Activity (a "**PRC Tax**"), you agree to fully indemnify each Relevant Entity such portion of the PRC Tax as the relevant Issuer determines, in good faith and in a commercially reasonable manner, is attributable to any Relevant Transaction that you have transacted in for the period applicable to such PRC Tax (the "**Applicable PRC Tax**", which includes, without limitation, any Capital Gains Tax and Dividend Tax, each as defined in this notice); provided, however, that the issuer shall use commercially reasonable efforts to cooperate with you to obtain any refunds, credits, or any other benefit or reduction that may arise under an applicable tax treaty or exemption or any other relevant laws or arrangements, to the extent that such Issuer believes in its reasonable discretion that such refunds, credits, or other tax benefits or reductions are available. For the avoidance of doubt, in the event you transfer any Relevant Transaction in the form of notes, certificates or warrants prior to its expiry or maturity (as applicable), the period applicable to such PRC Tax will end at the expiry or maturity (as applicable) of such Relevant Transaction, unless otherwise agreed with the relevant Issuer.

4.     You agree to pay upon demand and delivery to you of documentation or other evidence reasonably satisfactory to you evidencing such PRC Tax (including an explanation of the Issuer's calculation of the Applicable PRC Tax) (in any case no later than 15 calendar days following such demand and delivery) an amount equal to the Applicable PRC Tax converted into the same currency as the currency in which payment under the Relevant Transaction are required to be made (the "**Settlement Currency**") or such other currency as may be mutually agreed.

5.     The Issuer that is a party to a Relevant Transaction may deduct from any amount payable to you in respect of such Relevant Transaction an amount equal to any Applicable PRC Tax payable by you in Settlement Currency or such other currency as may be mutually agreed.

6.     Taxation of capital gains

The relevant Issuer may only be able to determine the PRC Tax in connection with any gains arising on the disposal of any PRC Securities that form part of a Hedging Activity (the "**Capital Gains Tax**") after such Tax is incurred by, imposed on or assessed to a Relevant Entity and/or after a final decision, order or ruling is published or issued, or a change in administrative practice is implemented, by a PRC Tax Authority in relation to the Tax payable in connection with any such gains.

7.     Taxation of dividends

7.1     You acknowledge and agree that an issuer of PRC Securities may deduct or withhold Tax from any dividends payable in respect of any PRC Securities an amount calculated at the prevailing tax rate,

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002977
SDNY_P001_0000031464

which the relevant Issuer determines in good faith and in a commercially reasonable manner is related to such Relevant Transaction (the "**Dividend Tax**"), which we are advised is currently 10% of the amount of the dividend; and

7.2    If an issuer of PRC Securities that form part of a Hedging Activity for a Relevant Transaction does not deduct or withhold from a dividend an amount equal to the Dividend Tax, the relevant Issuer may deduct or withhold from any amount payable to you in respect of such Relevant Transaction an amount equal to the Dividend Tax in the Settlement Currency or such other currency as may be mutually agreed.

8.    For the purpose of determining any amount (including, without limitation, any Capital Gains Tax and Dividend Tax) under the terms of this notice that is denominated in any currency other than Chinese Renminbi, such amount shall be determined by the relevant Issuer, acting in good faith and in a commercially reasonable manner, using such currency exchange rate as it determines appropriate by reference to the rate(s) of exchange at which the relevant Issuer would be able to purchase the relevant amount of such currency.

The term "**Tax**" in this notice means any present or future tax, levy, duty, assessment or other charge of any nature (including, but not limited to, any capital gain tax, withholding tax, tax on dividends, stamp duty, interest or penalties payable or in connection therewith) imposed or levied, directly or indirectly, by a PRC Tax Authority.

This notice shall survive the termination, maturity, redemption, transfer or otherwise unwinding of the Relevant Transactions which are the subject matter of this notice.

Nothing in this notice shall be construed as creating a trust relationship between you and the relevant Issuer. Neither shall any amount received or deducted by the relevant Issuer pursuant to the terms of this notice, be construed in any way as money held for the account and/or on behalf of you or otherwise as money belonging to you in any way.

You shall indemnify Jefferies and the relevant Issuers (the "**Indemnified Parties**") and hold the Indemnified Parties harmless from and against all losses, liabilities, claims, costs, charges and expenses which an Issuer may incur by reason of (and to the extent attributable to) any breach of any representation, warranty or agreement made in this notice by you.

You represent that the terms of this notice constitute and will constitute your legal, valid and binding obligations and do not violate or conflict in any material respect with any law, regulations and rules applicable to you or any provision of your constitutive documents.

The rights and remedies provided in this notice are cumulative and are not exclusive of any rights or remedies provided under the terms of any Relevant Transaction or by law.

In the event of any inconsistency between this notice and the terms of any Relevant Transaction, irrespective of whether any Relevant Transaction was entered into by you before, on or after the date of this notice, this notice shall prevail.

Neither any failure by any Issuer to exercise, nor any delay by any Issuer in exercising, any right or remedy under this notice or by law shall impair or operate as a waiver thereof in whole or in part.

This notice, and any non-contractual obligations arising out of or in connection with it, shall be governed by, and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine which would apply the laws of a jurisdiction other than the State of New York). The parties hereby submit to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City.

This notice and the content hereof is confidential and you shall not disclose or authorize the disclosure of, the fact of this notice and any terms of this notice and all negotiations resulting herein (if any) to any other person, except to the extent that the disclosure is necessary to comply with law.

PRC Tax Side Letter - page 3

In the event you would like further clarification or information on any issue addressed in this notice or if you have any concerns regarding the agreements or undertakings set out herein, please contact the Jefferies sales person who is responsible for the relevant transactions between Jefferies and you.

Please sign below and return to Jefferies to confirm your review and acceptance of the provisions herein.

**Jefferies Financial Products, LLC**

**ACCEPTANCE**

We hereby confirm that we have read, understood, agreed and accepted the terms of the above notice.

**ARCHEGOS FUND, L.P.**
By:  Archegos Capital Partners, LLC,
      its General Partner

By:
Name:  Sung Kook Hwang
Title:  Managing Member
Date:  11/28/17

PRC Tax Side Letter – page 4

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002979
SDNY_P001_0000031466

Annex I – Form of Transaction Supplement for Basket Swaps

**TRANSACTION SUPPLEMENT**

This Transaction Supplement is entered into between **Jefferies Financial Products, LLC** ("**Party A**") and **Archegos Fund, L.P.** ("**Party B**") on the Trade Date set forth below.

The purpose of this communication is to confirm the terms and conditions of the Share Basket Swap Transaction entered into between Party A and Party B on the Trade Date specified below (the "**Transaction**"). This Transaction Supplement supplements, forms part of and is subject to the Share Swap And Share Basket Swap Master Confirmation Agreement (Bullet; Bullet) dated as of November 16, 2017 between us, as may be amended and supplemented from time to time, and constitutes a "Confirmation" as referred to in the ISDA Master Agreement between us, as amended and supplemented from time to time.

The terms of the Share Basket Swap Transaction to which this Transaction Supplement relates are as follows:

| | |
|---|---|
| Reference Number: | [ ] |
| Trade Date: | [ ] |
| Effective Date: | [ ] |
| Scheduled Maturity Date | [ ] |
| Basket: | As specified in the Swap Schedule Addendum |
| Exchange(s): | As specified in the Swap Schedule Addendum |

**Equity Amounts:**

| | |
|---|---|
| Equity Amount Payer: | [Party A] [Party B] |
| Number of Baskets: | [ ] |
| Equity Notional Amount: | [ ] |
| Initial Price: | [ ] |
| Valuation Date: | The day that is one Settlement Cycle prior to the Scheduled Maturity Date. |
| [Averaging Dates: | In relation to the Valuation Date, [ ]][1] |
| Dividend Percentage: | [ ] |

**Floating Amounts:**

| | |
|---|---|
| Floating Amount Payer: | The Equity Amount Receiver |
| Floating Rate Option Symbol: | [ ] |
| Spread: | [ ] |
| Payment Dates: | The Cash Settlement Payment Date. |

**Other Provisions:**

| | |
|---|---|
| Settlement Currency: | [ ] |
| IA Rate: | [ ] |

---

[1] Include if Averaging is applicable to determine Final Price on the final VD

Annex I – page 1

Archegos-CFTC-SEC 002980
SDNY_P001_0000031467

Party B hereby agrees to check this Transaction Supplement carefully and promptly upon receipt so that errors or discrepancies can be promptly identified and rectified.

This Transaction Supplement will not bear a manual or machine imprinted signature.  You are not required to execute and return this Transaction Supplement.

Annex I – page 2

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002981
SDNY_P001_0000031468

**Swap Schedule Addendum**[2]

**Shares comprised in the Basket**

The Basket is composed of the specified Shares of the Issuers listed below in the relative proportions and numbers set out in relation to each Issuer below.

| Issuer | Ticker | Number of Shares in Basket | Exchange |
|---|---|---|---|
| | | | [●][(China Connect)] |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

---

[2] Include for Share Basket Swap Transaction.

Annex I – page 3

Confidential Treatment Requested by King & Spalding

# Jefferies

**Annex II – Form of Transaction Supplement for Share Swaps**

**TRANSACTION SUPPLEMENT**

This Transaction Supplement is entered into between **Jefferies Financial Products, LLC** ("**Party A**") and **Archegos Fund, L.P.** ("**Party B**") on the Trade Date(s) set forth below.

The purpose of this communication is to confirm the terms and conditions of the Share Swap Transaction(s) entered into between Party A and Party B on the Trade Date(s) specified below (the "**Transaction(s)**").  This Transaction Supplement supplements, forms part of and is subject to the Share Swap and Share Basket Swap Master Confirmation Agreement (Bullet; Bullet) dated as of November 16, 2017 between us, as may be amended and supplemented from time to time, and constitutes a "Confirmation" as referred to in the ISDA Master Agreement between us, as amended and supplemented from time to time.

The terms of each Share Swap Transaction to which this Transaction Supplement relates are as follows, as supplemented by the terms in the applicable row of the attached Swap Schedule Addendum:

| | |
|---|---|
| Reference Number: | As specified in the Swap Schedule Addendum |
| Trade Date: | As specified in the Swap Schedule Addendum |
| Effective Date: | As specified in the Swap Schedule Addendum |
| Scheduled Maturity Date: | As specified in the Swap Schedule Addendum |
| Shares: | The common stock, preferred stock or other interest in the Issuer (with specified Ticker and CUSIP/ISIN) specified in the Swap Schedule Addendum |
| Exchange: | As specified in the Swap Schedule Addendum |

**Equity Amounts:**

| | |
|---|---|
| Equity Amount Payer: | As specified in the Swap Schedule Addendum |
| Number of Shares: | As specified in the Swap Schedule Addendum |
| Equity Notional Amount: | An amount equal to the product of the Number of Shares times the Initial Price |
| Initial Price: | As specified in the Swap Schedule Addendum |

Annex II – page 1

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002983
SDNY_P001_0000031470

| | |
|---|---|
| Valuation Date: | The day that is one Settlement Cycle prior to the Scheduled Maturity Date. |
| [Averaging Dates: | In relation to the Valuation Date, [▮▮▮▮▮▮]][3] |
| Dividend Percentage: | As specified in the Swap Schedule Addendum |

**Floating Amounts:**

| | |
|---|---|
| Floating Rate Payer: | The Equity Amount Receiver |
| Floating Rate Option Symbol: | As specified in the Swap Schedule Addendum |
| Spread: | Initially, as specified in the Swap Schedule Addendum, and thereafter, as determined by Party A in its sole discretion from time to time on thirty (30) calendar days' prior written notice to Party B. |
| Payment Dates: | The Cash Settlement Payment Date. |

**Other Provisions:**

| | |
|---|---|
| Settlement Currency: | As specified in the Swap Schedule Addendum |
| IA Rate: | Initially, as set forth in the Swap Schedule Addendum, and thereafter, as notified by Party A to Party B. |

Party B hereby agrees to check this Transaction Supplement carefully and promptly upon receipt so that errors or discrepancies can be promptly identified and rectified.

This Transaction Supplement will not bear a manual or machine imprinted signature. You are not required to execute and return this Transaction Supplement.

---

[3] Include if Averaging is applicable to determine Final Price on the final VD

Annex II – page 2

Confidential Treatment Requested by King & Spalding

## SWAP SCHEDULE ADDENDUM

| Reference Number: | Trade Date: | Effective Date: | Scheduled Maturity Date: | Equity Amount Payer: | Number of Shares: | Ticker: | Initial Price: | Floating Rate Option Symbol: | Spread: | CUSIP or ISIN, as applicable: | Issuer: | Exchange: | Dividend Percen-tage: | IA Rate: | Settlement Currency: |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | [●][(China Connect)] | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |

Annex II – page 3

Confidential Treatment Requested by King & Spalding

Archegos-CFTC-SEC 002985
SDNY_P001_0000031472