# Exhibit  3

[Type text]

**U.S. Department of Justice**

2

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

The motion to intervene and to stay is GRANTED on consent of the appearing defendants and without objection of the plaintiff except that plaintiff may move for entry of default and for default judgment against the non-appearing defendants and without prejudice to a motion by the non-appearing defendants to lift the stay. The Government shall provide a status report every 90 days regarding the status of the criminal case and whether the stay may be lifted. The Clerk of Court is respectfully directed to close Dkt. No. 51.

November 15, 2021

**By ECF**
The Honorable Lewis J. Liman
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     *CFTC v. Baldwin et al.*, 21 Civ. 5707 (LJL)

Dear Judge Liman:

    Earlier today, the Government filed by ECF a motion to intervene and for a complete stay of discovery in the above-captioned civil action due to the pendency of the criminal case, 21 Cr. 428 (ER). (*See* Dkt. No. 51, 52). As is noted in the Government's motion, the only parties to appear and file responsive pleadings in the above-captioned civil action, Ross Baldwin and National Coin Broker Inc., consent to the Government's motion, and the CFTC does not oppose the motion.[1]

    The Government understands that under the existing case management plan and discovery schedule, the parties will need to begin exchanging document discovery in the coming weeks and file responses to interrogatories. In light of the Government's pending motion, and to avoid any potential prejudice to the Government, the Government respectfully requests that the Court hold in abeyance any pending discovery deadlines, including deadlines for document discovery and responding to interrogatories, until the Court has had an opportunity to rule on the Government's pending motion to intervene and for a complete stay of discovery.

                    Respectfully submitted,

                    DAMIAN WILLIAMS
                    United States Attorney

              by:     */s/*
                    Noah Solowiejczyk
                    Assistant United States Attorney
                    (212) 637-2473

cc:     Counsel for defendants Ross Baldwin and National Coin Broker, Inc. (by ECF)
        Counsel for Plaintiff CFTC (by ECF)

---

[1] As is noted in the Government's motion, defendants Robert Jeffrey Johnson, Kathleen Hook, Precious Commodities, Inc. and NCB Wholesale Co. failed to file a timely answer or other responsive pleading by the applicable deadlines.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
SECURITIES AND EXCHANGE COMMISSION,     :
                                        :
                         Plaintiff,     :        19cv6387 (DLC)
              -v-                       :
                                        :             ORDER
DONALD G. BLAKSTAD and MARTHA PATRICIA  :
BUSTOS,                                 :
                                        :
                         Defendants.    :
                                        :
----------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/10/2019

DENISE COTE, District Judge:

On July 10, 2019, Plaintiff U.S. Securities and Exchange
Commission ("SEC") filed this action against defendants Donald
G. Blakstad and Martha Patricia Bustos pursuant to Section 21(d)
of the Securities Exchange Act of 1934 ("Exchange Act") alleging
that the defendants engaged in an insider trading scheme in
violation of Section 10(b) of the Exchange Act and Rule 10b-5
thereunder.  On September 9, 2019, the United States, through
the U.S. Attorney for the Southern District of New York (the
"Government"), moved to intervene in this case pursuant to Rule
24, Fed. R. Civ. P., and to stay this matter in its entirety
pending resolution of a parallel criminal case, United States v.
Donald Blakstad, No. 19cr486(ER).[1]  Both of the defendants

_____

[1] A criminal indictment charging Blakstad with securities fraud,
wire fraud, and conspiracy to commit those offenses was unsealed
on July 10, 2019.

consent to a complete stay of this case.  The SEC does not

oppose the Government's motion.[2]

This case and the parallel criminal case involve the same

insider trading scheme, perpetrated by the same defendants

during the same period of time.  The facts, witnesses, and

issues to be litigated overlap substantially.  A stay of this

case would prevent the circumvention of statutory limitations on

criminal discovery, avoid asymmetrical discovery, promote

judicial economy, and preserve the public interest.  Moreover,

while the SEC has its own enforcement mandate, the Government's

interest in the enforcement of the federal criminal laws is not

adequately protected by the existing parties in this civil

litigation.  Accordingly, it is hereby

ORDERED that the Government's motion to intervene pursuant

to Rule 24, Fed. R. Civ. P., is granted.

IT IS FURTHER ORDERED that this case is stayed in its

entirety pending the completion of trial or other disposition in

the parallel criminal case.

---

[2] The SEC does not oppose the Government's motion, but states in
a responsive filing that it intends to continue its
investigation into uncharged individuals involved in this
matter, as well as into conduct that was not charged in the
complaint.

IT IS FURTHER ORDERED that the Government shall submit a
status letter by **December 13, 2019.**

　　　　SO ORDERED:

Dated:　　New York, New York
　　　　　September 10, 2019

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　DENISE COTE
　　　　　　　　　　　United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SECURITIES AND EXCHANGE            .
COMMISSION,                        .
                                   .
          Plaintiff,               .  Case No. 15-cv-06076
                                   .
vs.                                .  Newark, New Jersey
                                   .  January 29, 2016
DUBOVOY, et al.,                   .
                                   .
          Defendants.              .


TRANSCRIPT OF RECORDED OPINION
BY THE HONORABLE MICHAEL A. HAMMER
UNITED STATES MAGISTRATE JUDGE

This oral opinion has been reviewed and revised in accordance
with L. Civ. R. 52.1




APPEARANCES:

For the Plaintiff:     No one was present



For the Defendants:    No one was present




Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1            (Commencement of proceedings)

2

3            THE COURT:  This is the matter of Securities and

4    Exchange Commission versus Dubovoy, et al., Civil

5    No. 15-6076.  We are on the record for the issuance of an

6    oral opinion addressing three motions before the Court:

7    First is the motion by the United States to intervene in this

8    matter; second is the application by the United States to

9    stay discovery; and then finally, the application by certain

10   of the defendants to sever or bifurcate any claims against

11   them.

12            The Court has considered all of the parties'

13   briefing and the record and held oral argument on this matter

14   on January 21, 2016.  For the reasons that I will state forth

15   herein, the Court will grant the United States' motion to

16   intervene and will grant the United States' motion to stay

17   discovery and deny the motion of certain defendants to sever

18   or bifurcate the claims against them.

19            The facts underlying this case are well known to

20   the parties and have been discussed extensively by Judge

21   Arleo.  Therefore, the Court will touch on them only briefly

22   by way of background.

23            On August 10, 2015, the Securities and Exchange

24   Commission, also known as the SEC, filed the complaint in

25   this matter against the individual defendants as well as

1  various trading entities.  There are also pending federal

2  criminal cases against various of the individual defendants.

3  One is United States v. Turchynov, Criminal Number 15-390.

4  It is against Arkadiy Dubovoy, Igor Dubovoy, Pavel Dubovoy,

5  Ivan Turchynov, and Oleksander Ieremenko.  As well, there is

6  a criminal case pending in the Eastern District of New York,

7  captioned United States v. Vitaly Korchevsky, et al.,

8  Criminal Number 15-381.  That is against Vitaly Korchevsky,

9  Vladislav Khalupsky, Leonid Momotok, and Alexander Garkusha.

10  Both of the criminal cases have indictments returned against

11  the defendants.

12       The New Jersey criminal action or is the subject of

13  an indictment that was returned in August 2015.  It charges

14  the New Jersey criminal defendants for their scheme spanning

15  from in or about February 2010 through August 2015 to steal,

16  through computer hacking, material, nonpublic information in

17  the form of soon-to-be-draft press releases from the computer

18  networks of press release distribution companies, and then

19  executing securities trades based on that material, nonpublic

20  information contained in the stolen releases, before the

21  releases had been distributed to the investing public.

22       The Eastern District of New York case also has a

23  pending indictment that charges the Eastern District of New

24  York criminal defendants for their involvement in the same

25  scheme.

1          We deal first with the motion to intervene before

2    turning to the motion to stay.

3          The United States moves to intervene both as of

4    right under Rule 24(a)(2) and permissibly under

5    Rule 24(b)(1)(B).  No party objects to the intervention

6    application.  Moreover, "it is well established that the

7    United States Attorney may intervene in a federal civil

8    action to seek a stay of discovery when there is a parallel

9    criminal proceeding which is anticipated or already under way

10   that involves common questions of law or fact."  SEC v.

11   Downe, Civil No. 92-4092, 1993, U.S. District Court LEXIS 753

12   at 42 to 43 (S.D.N.Y. January 26, 1993).  Federal courts have

13   actually held that this intervention is as of right.  See

14   *e.g.* SEC v. Chestman, 861 F.2d 49 at 50 (2d Cir. 1998).

15         In this case, however, where no party objects to

16   the intervention, the Court need not reach the issue of

17   whether the government's intervention is as of right or

18   permissibly.  It is clearly proper.  There is no objection to

19   it, and therefore, the Court will grant the application to

20   intervene.

21         In seeking to stay this action, the United States

22   argues that there is a substantial overlap between the civil

23   case and the criminal cases and as well the individual

24   defendants in the civil and the criminal defendants.  The

25   United States argues that the SEC's complaint, much like the

1  criminal indictments, alleges that from as early as

2  February 2010 through mid-2015, Turchynov and Ieremenko

3  hacked into the computer networks of three newswires in order

4  to steal press releases for publicly traded companies before

5  they were issued to the investing public, and that those

6  press releases were passed on to traders, including the other

7  criminal defendants, and that those criminal defendants

8  executed securities trades based on the material, nonpublic

9  information contained in the stolen releases.  Compare, for

10 example, the amended complaint of the SEC in this action at

11 paragraphs 1 through 10, 21 through 23, 24 through 32, and 53

12 through 55 with the District of New Jersey criminal

13 indictment at paragraphs 1 through 6, 14 through 16, 36

14 through 38, and as well, the Eastern District of New York

15 criminal indictment, paragraphs 27 through 53.

16         The United States argues that a stay here is

17 necessary to protect the integrity of the ongoing criminal

18 investigation and prosecution in light of the overlap of

19 factual allegations and the identity of the parties between

20 the criminal cases in New Jersey and the Eastern District of

21 New York, as compared to the allegations in this case.  The

22 United States argues that allowing the civil case to proceed

23 forward, notwithstanding the criminal cases, would pose

24 several risks: one, that the defendants in the civil case

25 could use the rather broad civil discovery process in order

1   to glean information to which they are not entitled in the

2   criminal process.  They note that the Third Circuit in United

3   States v. Mellon Bank NA, 545 F.2d 869 at 873 (3d Cir. 1976)

4   made clear that civil litigants may "exploit civil discovery

5   for the advancement of his criminal case."  Therefore, in

6   Mellon Bank, applying that reasoning, the Third Circuit

7   actually affirmed the District Court's imposition of a stay

8   of discovery.

9        Numerous courts around the country, both in this

10   district and otherwise, have relied on that line of reasoning

11   to stay civil discovery while criminal proceedings are

12   ongoing.  See e.g. SEC v. Ott, Civil No. 06-4195, 2006,

13   U.S. Dist. LEXIS 86541 (D.N.J. November 29, 2006) at pages 3

14   through 10.  See also United States v. GAF Financial

15   Services, 335 F. Supp. 2d 1371 at 1373 (S.D. Fla. 2004).

16        Indeed, courts have held that in evaluating this

17   concern, it is not necessary for the government to show that

18   a party has already improperly exploited the civil discovery

19   process to gain otherwise unauthorized benefit or advantage

20   in the criminal case.  Instead, courts have held that a court

21   evaluating an application by the government to stay a civil

22   case pending an overlapping criminal case may presume that

23   criminal defendants will make use of that opportunity to gain

24   insight and harm the government's case.  See Integrated

25   Generics v. Bowen, 678 F. Supp. 1004 at 1009 (E.D.N.Y. 1988).

1        The government at oral argument also averred that

2   allowing the civil case to go forward may place witnesses,

3   particularly defendants in the civil case, in the untenable

4   position of either having to invoke their right against

5   self-incrimination under the Fifth Amendment or have an

6   adverse inference imposed against them.  Clearly, this is not

7   a significant concern among the defendants, who, for the

8   reasons that I will explain momentarily, vigorously oppose

9   the government's motion to stay.

10       The Amaryan defendants, which, it is important to

11  note, are not defendants in the criminal cases, vigorously

12  oppose the government's motion to stay, arguing that there is

13  no way of knowing at this point when the criminal case will

14  be adjudicated, and therefore, in granting the motion to

15  stay, the Court would be subjecting the defendants to an

16  indefinite and potentially extended stay of the civil case,

17  during which their property would remain frozen, causing them

18  significant financial distress.  The Amaryan defendants argue

19  that there are significant differences between the criminal

20  cases and this civil case and, in fact, that the civil case

21  could be adjudicated based on a series of stipulations

22  regarding the alleged offensive conduct and defenses.  This

23  argument draws on the motion to sever, which was initially

24  instituted by what are commonly known as the foreign trading

25  defendants, Omega 26 and Guibor, Memelland Investments as

 1  well as the Amaryan Group.

 2          Although the proposed stipulations were

 3  predominantly presented in the context of the motion to sever

 4  or bifurcate under Fed. R. Civ. P. 21, they do bear

 5  considerably on the motion to stay, because if the foreign

 6  trader defendants are correct, those stipulations would

 7  considerably shrink, if not eliminate entirely, the need for

 8  discovery in the civil case and therefore resolve the larger

 9  concerns that the government raises in seeking to stay the

10  civil case.  Parenthetically, the Court notes that although

11  Omega 26 and Guibor were movants on the motion to sever and

12  stay, it is the Court's understanding that they no longer

13  join in the motion because of a pending or perhaps by now

14  consummated settlement with the SEC.

15          Nonetheless, at a minimum, the Amaryan Group

16  defendants persist and the Memelland Investments defendant

17  persists in the motion, and therefore it is squarely before

18  the Court.

19          The reasoning or thinking behind the approach that

20  the foreign trader defendants offer in their motion to sever

21  is this:  The foreign trader defendants would stipulate that

22  for the time frame in the SEC's amended complaint, which is

23  2010 to early 2014, the Ieremenko and Turchynov, who are

24  known as the hacker defendants, hacked into Newswire

25  Services 1 and 2's computer systems and stole more than

1  100,000 press releases before those releases were publicly

2  issued.  The foreign trader defendants would stipulate that

3  the hacker defendants used deception to access Newswire 1 and

4  2's computer systems, including using stolen names and

5  password information to pose as authorized users, using

6  malware to delete evidence of computer attacks or intrusions,

7  concealing the identities of the computers used to access the

8  newswires' computers, and using so-called "backdoor access

9  modules."  They would also stipulate that the hackers' theft

10 of the unpublished press releases varied between Newswires 1

11 and 2, depending on which of those newswires could be

12 accessed at the particular time.

13      Armed with those stipulations, the foreign trader

14 defendants argue, the SEC would not need to offer additional

15 proof on a number of paragraphs in its amended complaint,

16 which basically are those paragraphs that allege criminal

17 conduct by the other defendants.  The foreign trader

18 defendants would also stipulate that for the time frame in

19 the amended complaint, they did not receive or trade on the

20 nonpublic press releases that the hacker defendants stole;

21 for the time frame in the amended complaint, that they did

22 not pay the hacker defendants in connection with the purchase

23 or sale of any securities.  So, in other words, the foreign

24 trader defendants would stipulate that their position is that

25 they neither received nor traded on the nonpublic press

1  releases and did not pay hacker defendants in connection with

2  the purchase or sale of any securities, and the SEC would

3  then be left to its proofs.

4        Instead, the foreign trader defendants argue their

5  defense will be based on an explanation or an exposition of

6  their trading decisions.  They would explain their use of

7  algorithms and their specific trading strategy.  They would

8  explain, using at times contemporaneously made spreadsheets

9  from the time of the actual trading, the basis for its

10  trades, and that it did not rely on the hacked press

11  releases.  Therefore, according to the foreign trader

12  defendants, the trial would set up as such.  The SEC would

13  try to prove that the foreign trader defendants' trading

14  patterns were suspicious and show an overlap in trades

15  similar to the criminally charged defendants and would

16  attempt to show links to the hacker defendants.

17        The foreign trader defendants would show that their

18  trades were legitimate by explaining how those defendants

19  identified and analyzed trading opportunities, and therefore,

20  the fact issues for the foreign trader defendants are very

21  different from the other defendants, because for the other

22  defendants, the government would need to prove and the trial

23  will likely require evidence on, one, that Newswires 1 and 2

24  were hacked and nonpublic press releases were stolen, that

25  the hacker defendants, in fact, executed the hacking and

1    shared the hacked press releases with other defendants in

2    exchange for a fee or a percentage of the profits, and that

3    the other defendants used the hacked press releases to trade

4    ahead of the information contained in the hacked press

5    releases.

6           The foreign trader defendants argue that none of

7    that would be an issue as to them in the civil case because

8    of the stipulation.

9           The foreign trader defendants argue, similar to the

10   other defendants opposing the stay, that their assets have

11   been frozen, and with the imposition of a stay, their ability

12   to fight the SEC's claims against them on the merits will be

13   protracted for some indefinite, extended period of time

14   pending completion of the civil case.

15          Whether to stay a case is committed to the sound

16   discretion of the trial court.  Indeed, "the power to stay

17   proceedings is incidental to the power inherent in every

18   court to control the disposition of the causes on its docket

19   with economy of time and effort for itself, for counsel, and

20   for litigants.  How this can best be done, calls for the

21   exercise of judgment, which must weigh competing interests

22   maintain on even balance." Landis v. North American Company,

23   299 U.S. 248 at 250 (1926).

24          When related civil and criminal actions are

25   pending, the criminal actions should ordinarily be tried

1    first to meet the requirements of the Speedy Trial Act,

2    Title 18 U.S.C. § 1361, *et seq,* and to alleviate any Fifth

3    Amendment privilege issues in the civil proceeding.  See *In*

4    *re Residential Doors Antitrust Litigation*, 900 F. Supp. 749

5    at 756 (E.D. Pa. 1995).  "A stay of the civil case where

6    there are pending criminal proceedings is not

7    constitutionally required; however, it may be warranted in

8    certain circumstances."  *Walsh Securities Inc. v. Cristo*

9    *Property Management Limited*, 7 F. Supp. 2d 523 at 526 (D.N.J.

10   1998).

11        The factors to be considered in deciding whether to

12   grant a stay include:  "(1) the extent to which the issues in

13   the criminal and civil cases overlap; (2) the status of the

14   case, including whether the defendants have been indicted;

15   (3) the plaintiff's interests in proceeding expeditiously

16   weighed against the prejudice to plaintiff caused by delay;

17   (4) the private interests of and burden on defendants; (5)

18   the interests of the Court; and (6) public interests."

19   *Walsh*, F. Supp. 2d at 527.

20        Here, after balancing the *Walsh* factors, the Court

21   concludes that a stay is appropriate.  The most important

22   threshold issue in determining whether to grant a stay is the

23   similarity of the issues underlying the civil and criminal

24   actions.  See *Walsh*, 7 F. Supp. 2d at 527 (quoting Milton

25   Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D.

```
 1   201 at 203 (1989)).

 2            In this case, the overlap is substantial.  They may

 3   be fairly grouped into various categories; for example, the

 4   defendants who are believed the so-called "hacker" defendants

 5   versus the "trading" defendants.

 6            Nonetheless, the SEC's complaint and the

 7   indictments in both the District of New Jersey and the

 8   Eastern District of New York demonstrate that the government

 9   is alleging a single scheme to defraud.  There may have been

10   different roles held by various of the actors within that

11   scheme, but it is clear to the Court that the SEC's theory,

12   like the government's theory in the criminal cases, is that

13   each of those various actors alleged to have participated,

14   served the same overarching scheme to defraud.

15            The foreign trader defendants attempt to argue that

16   armed with that stipulation or series of stipulations that

17   they propose, their fact issues that may warrant discovery,

18   if they exist at all are avoided or otherwise minimized.

19   However, this argument fails.

20            The government's theory is that at trial, it will

21   be able to show that the foreign trader defendants

22   specifically had links to and received information from the

23   hacker defendants, such that their -- the foreign trader

24   defendants' so-called "coincidence" defense, in other words,

25   that their trading activity often resembled the criminal
```

1　defendants' trading activity, it was more than mere

2　coincidence.  For example, the SEC avers the foreign trader

3　defendants' trading activity not only oscillated between the

4　newswires, but it did so in a manner that closely resembled

5　the vacillation by the hacker defendants.  And, in fact, the

6　foreign trader defendants' trading, the SEC alleges, dropped

7　off when the hackers lost or didn't have much success.  Not

8　only does the SEC allege a significant overlap between the

9　foreign trader defendants' trading and the trading of other

10　defendants, but that the foreign trader defendants regularly

11　traded in the same direction as the other defendants.

12　Therefore, the Court certainly cannot conclude with any

13　certainty that the proposed stipulation, even if the SEC were

14　inclined to enter into it, would obviate the discovery that

15　likely will need to take place in the civil case as to the

16　activities of the foreign trader defendants and, as well, the

17　SEC's theories about the foreign trader defendants' trading

18　activities.

19　　　　　Certainly, the SEC announced in its briefing and at

20　oral argument, it believes it is entitled to and will seek

21　civil discovery on each defendant's tie to the scheme and

22　their relationship with each other to probe further the issue

23　of whether the overlapping trading and the fact that the

24　foreign trader defendants' trades tracked the other

25　defendants' vacillation between Newswires 1 and 2 were mere

1   coincidence or product of the foreign trader defendants' own

2   analysis and application of algorithms, or because the

3   foreign trader defendants had a much closer relationship to

4   the other defendants.

5        Therefore, the Court finds no assurance in the

6   proposed stipulation offered by the foreign trader defendants

7   that significant discovery in the civil case could be

8   obviated.

9        Given that, as well as the significant overlap

10  between the civil case and the criminal cases, because they

11  involve the same criminal defendants and the same alleged

12  scheme in terms of the hacking and trading, coupled with the

13  likely extensive discovery that will need to take place in

14  the civil case, the Court finds that the criminal and civil

15  matters do, indeed, overlap.

16       Another key factor in determining whether the civil

17  claims and the criminal claims overlap is whether there

18  exists a "danger of self-incrimination." See Tucker v. New

19  York Police Department, Number 08-2156, 2010 WL at *6 (D.N.J.

20  February 23, 2010).

21       Here, although the defendants have not asserted any

22  intention at this time of invoking their Fifth Amendment

23  rights, the distinct possibility that that situation could

24  arise, were civil discovery allowed to go forward in this

25  case, is manifest.  The SEC has already made clear that it

1  intends to move forward with its own discovery that would

2  specifically focus on the links, among other things, between

3  the foreign trader defendants and the other defendants.  It

4  is certainly fair to infer from that, then, that all

5  defendants in the SEC case would be required to respond to

6  interrogatories and perhaps depositions that specifically

7  probe their activities and relationship with each other.  It

8  is hard to imagine a more ripe situation, with the criminal

9  case looming, for the invocation of the Fifth Amendment

10 against self-incrimination, particularly, where, as here, a

11 number of the defendants in the civil case have already been

12 indicted.  See *e.g.* Sterling National Bank v. A-1 Hotels

13 International, 175 F. Supp. 2d 573 at 577 (S.D.N.Y. 2001)

14 (noting that "defendant has been indicted, his situation is

15 particularly dangerous and takes a certain priority for the

16 risk to his liberty, the importance of safeguarding his

17 constitutional rights and even the strain on his resources

18 and attention that makes defending satellite civil litigation

19 particularly difficult, all weigh in favor of his

20 interest.").

21       Indeed, courts are instructed, in the context of an

22 application to stay, to consider the status of the related

23 criminal proceeding, particularly whether the defendant has

24 been indicted.  See *In re* Adelphia Communications Securities

25 Litigation, Number 02-1781, 2003 WL 22358819 at *3 (E.D. Pa.

1  May 13, 2003).  See also State Farm Mutual Auto Insurance

2  Company v. Beckham-Easley, Number 01-5530, 2002 WL, 31111766

3  at *5 through 6 (E.D. Pa. Sept. 18, 2002)(reasoning that the

4  "potential for self-incrimination is gravest at this

5  stage.").

6         If an indictment is returned against a civil

7  defendant, then a court should strongly consider staying the

8  civil proceedings until the related criminal proceedings are

9  solved, because, for example, the indicted defendant risks

10  exposing his or her criminal defense strategy during civil

11  discovery.  Moreover, the burden of delay on the civil

12  litigants is minimal because the Speedy Trial Act requires

13  prompt resolution of the related criminal proceedings.

14  Walsh, 7 F. Supp. 2d at 527.

15         Therefore, the concern about the defendants' Fifth

16  Amendment rights and their ability to defend themselves

17  vigorously in the criminal case is magnified where, as in

18  this case, indictments have already been returned in both the

19  District of New Jersey and the Eastern District of New York.

20         Regarding the second interest, which is the public

21  interest in a stay, the Court finds that clearly it is in the

22  public's interest to stay this litigation, in order to

23  prevent the defendants from utilizing the broad definition of

24  relevance under Fed. R. Civ. P. 26 to obtain discovery that

25  they otherwise would never be able to obtain in criminal

1  discovery.  Having already considered that issue, the Court

2  will dwell on it no longer except it does note that allowing

3  civil discovery presents a number of risks, including but not

4  limited to inquiry into the activities of the grand jury,

5  whether witnesses testified before the grand jury, asking

6  about the substance of witnesses' grand jury testimony, and

7  seeking to reveal the identities of any cooperating

8  witnesses.  Accordingly, that factor, as with the first

9  factor, weighs decisively in favor of a stay.

10      The Court next considers the burden or prejudice to

11  the defendants caused by the stay.  In this instance, the

12  Court is certainly mindful of the defendants' argument that

13  because their assets are frozen, they should be afforded the

14  first, earliest opportunity to litigate the civil case.  The

15  Court certainly appreciates that analysis.

16      However, two things bear noting.  One, as I have

17  already noted and other courts have noted, the Speedy Trial

18  Act ensures that there will be a prompt adjudication of the

19  criminal charges.  Second, there has already been

20  considerable litigation in this civil matter regarding the

21  return of assets to the defendants, and the defendants have

22  been able to take recourse through that process.  Although

23  the Court stays discovery, that does not extend to the

24  defendants' ability to answer, move, or otherwise seek to

25  dismiss the complaint and engage in motion practice under

1    Fed. R. Civ. P. 12, nor does it bar the defendants from

2    seeking a return of funds that they believe have been

3    wrongfully acquired before adjudication of the merits of the

4    civil claims.

5            Therefore, although there is no doubt some

6    prejudice to or burden on the defendants insofar as the civil

7    case will await resolution of the criminal case, the burden

8    does not weigh so heavily as to overcome the other factors

9    that weigh in favor of a stay.  Moreover, the Court would be

10   remiss in considering the burden or prejudice to the

11   defendants if it did not consider, as noted earlier, the risk

12   that the defendants in this case, whether they are also

13   criminal defendants or civil defendants solely, may be in a

14   position where they have to give or are called upon to give

15   deposition testimony and thereby face either answering the

16   questions perhaps to their detriment or invoking the Fifth

17   Amendment privilege against self-incrimination and receiving

18   an adverse inference.

19           Of course, that is not to say that any of the

20   defendants necessarily, by submitting to deposition

21   testimony, particularly the nonindicted defendants, would

22   necessarily have to give or give inculpatory testimony, but

23   the Court would be remiss if it did not at least factor in

24   potential prejudice from answering a civil deposition under

25   oath.

| Recorded Opinion
| 15-cv-06076, January 29, 2016

1    Finally, the interests of the Court favor staying

2    the civil litigation in two ways.  One, as other courts have

3    noted, allowing the criminal proceedings to go first may

4    narrow the civil issues.  See *e.g.*, *In re* Grand Jury

5    Proceedings, 995 F.2d 1013 at 1018 Footnote 11 (11th Cir.

6    1993).  See also Texaco Inc. v. Borda, 383 F.2d 607 at 609

7    (3d Cir. 1967) wherein the Third Circuit affirmed the

8    District Court's decision to stay civil litigation upon

9    finding that "the trial of the criminal case [might] reduce

10   the scope of discovery in the civil action ... and ...

11   perhaps might also simplify the issues."

12   Having weighed all of the factors and considered

13   the record, the parties' briefing and oral argument, the

14   Court grants the government's motion to stay this litigation.

15   Similarly, the Court will deny the motion by the

16   foreign trader defendants to sever or bifurcate this

17   litigation under Fed. R. Civ. P. 21.  The earlier discussion

18   should make clear that the Court does not accept the argument

19   that the proposed stipulation will adequately resolve the

20   need for considerable in-depth discovery in this litigation

21   into what relationship, if any, did the foreign trader

22   defendants have with the other defendants; whether, as the

23   SEC alleges, the foreign trader defendants traded in a way

24   that not only tracked the patterns of the other defendants,

25   but tracked them so much as to vacillate between Newswires 1

1  and 2 in the same manner that the other defendants' trades

2  vacillated between Newswires 1 and 2; and whether, if there

3  was such an identity or overlap in trading, that was a

4  byproduct of a perfectly legitimate trading strategy by the

5  foreign trader defendants, or, as the SEC alleges, was

6  because the foreign trader defendants were more closely

7  connected to the hacker defendants and to the scheme set

8  forth in the complaint.

9          In that regard, this case is distinguishable from

10  SEC v. Pignatiello, 1998 WL 293988 (S.D.N.Y. June 5, 1998)

11  where the court granted severance under Fed. R. Civ. P. 21.

12  In Pignatiello, the court found that there were actually two

13  different schemes alleged, but that Pignatiello developed and

14  implemented both of them.  The first was the Spaceplex scheme

15  between Pignatiello, Fasano, and Manas, which involved an

16  attempt to manipulate markets in advance of a public offers

17  by Spaceplex.  The second scheme was the ACC scheme involving

18  Pignatiello, Marsik and Pierce wherein Pignatiello, after

19  becoming a consultant to ACC, agreed with Marsik, the

20  president of ACC, and Pierce, the secretary and director of

21  ACC, to artificially boost ACC's stock price before a

22  secondary offering and in which Pignatiello had broker

23  dealers become market-makers for ACC stock in exchange for

24  monthly fee and a block of the stock, thereby buying ACC

25  stock through a separate individual and increasing bids for

1    it to drive the price up immediately before the secondary

2    offering.  The District Court in that case noted that the

3    Spaceplex and ACC schemes were quite different and that they

4    involved different codefendants, different securities at

5    issue, and different methods of compensating Pignatiello.

6    The only similarity between the two schemes was that

7    Pignatiello organized them and had assistance from Mazzeo and

8    Constance Pignatiello.

9          Instead, the analysis here follows more closely

10   that of the District Court in SEC v. Nacchio, 2008 WL 4170269

11   (D. Colo. 2008), where the court denied bifurcation.  In

12   Nacchio, the SEC alleged the defendants engaged in a

13   fraudulent scheme to hide the true financial conditions of

14   Qwest Communications such as by falsely reporting one-time

15   sales of IRUs, which was essentially access to Qwest's

16   fiberoptic network, as a recurring revenue.  The SEC in that

17   case did not allege that two particular defendants, Noyes and

18   Kozlowski, were actually involved in the decisions about

19   sales of the IRUs.  Instead, the SEC alleged Noyes and

20   Kozlowski were accountants for Qwest who failed to make sure

21   that Qwest's financial statements properly reported the

22   revenue.  Noyes and Kozlowski sought bifurcation, arguing

23   that the claims against them were much more limited than as

24   to the other defendants and that they could be prejudiced

25   because of jury confusion or spillover from being in the same

 1   trial as the other defendants.  The court denied the

 2   application, finding that, although there was no dispute that

 3   Noyes and Kozlowski were alleged to have focused on a

 4   different set of actions and had a different level of

 5   involvement in the scheme, there was little risk of spillover

 6   of prejudice or confusion and that they were more properly

 7   joined with the other defendants in the single scheme

 8   alleged.

 9          For those reasons, the Court will grant the

10   government's motion to stay, in addition to having already

11   granted the government's motion to intervene, and will deny

12   the foreign trader defendants' motion to sever or bifurcate.

13          That constitutes the opinion of the Court.  An

14   appropriate form of order will issue.

15                    (Conclusion of proceedings)

16

17

18

19

20

21

22

23

24

25

1           Certification

2      I, SARA L. KERN, Transcriptionist, do hereby certify

3 that the 24 pages contained herein constitute a full, true,

4 and accurate transcript from the official electronic

5 recording of the proceedings had in the above-entitled

6 matter; that research was performed on the spelling of proper

7 names and utilizing the information provided, but that in

8 many cases the spellings were educated guesses; that the

9 transcript was prepared by me or under my direction and was

10 done to the best of my skill and ability.

11      I further certify that I am in no way related to any of

12 the parties hereto nor am I in any way interested in the

13 outcome hereof.

14

15

16

17

18 S/ *Sara L. Kern*         2nd of February, 2016

19 Signature of Approved Transcriber       Date

20

21

22 Sara L. Kern, CET**D-338
King Transcription Services
3 South Corporate Drive, Suite 203

23 Riverdale, NJ 07457
(973) 237-6080

24

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

          - against -

EDWARD DURANTE, ABIDA KHAN, LARRY
WERBEL, CHRISTOPHER CERVINO, WALTER
REISSMAN and KENNETH WISE,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ECF Case

No. 15 Civ. 9874 (RJS)


**THE GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**APPLICATION TO INTERVENE AND FOR A LIMITED STAY OF DISCOVERY**


PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States
      of America


DANIEL S. GOLDMAN
ANDREA M. GRISWOLD
Assistant United States Attorneys

    *- Of Counsel -*

# Table of Contents

Table of Authorities ........................................................................................................ ii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL BACKGROUND ............................................................................................ 1

    I.     2001 SECURITIES FRAUD CONVICTION ........................................... 2

    II.    OVERVIEW OF THE CHARGED SCHEME ........................................... 2

        A.    PRIVATE PLACEMENT SECURITIES FRAUD INVOLVING VGTL ................... 3

        B.    MANIPULATION OF THE MARKET FOR SHARES OF VGTL ............................ 4

    III.   THE INDICTMENT AND STATUS OF THE DEFENDANTS ................................. 5

ARGUMENT ..................................................................................................................... 6

    I.     THE GOVERNMENT SHOULD BE GRANTED PERMISSION TO INTERVENE ... 7

    II.    A LIMITED STAY OF DISCOVERY IS APPROPRIATE ................................... 8

        A.    APPLICABLE LAW ............................................................................ 8

        B.    DISCUSSION ..................................................................................... 8

CONCLUSION ................................................................................................................ 15

# Table of Authorities

**Cases**

*Bd. of Governors of the Federal Reserve System* v. *Pharaon*
140 F.R.D. 634 (S.D.N.Y. 1991) ................................................................................. 11

*Kashi* v. *Gratsos*
790 F.2d 1050 (2d Cir. 1986) ....................................................................................... 8

*In re Par Pharm, Inc. Sec. Litig.*
133 F.R.D. 12 (S.D.N.Y. 1990) .................................................................................... 9

*Louis Vuitton Malletier S.A.* v. *LY USA, Inc.*
676 F.3d 83 (2d Cir. 2012) ........................................................................................... 8

*Philip Morris Inc.* v. *Heinrich*
No. 95 Civ. 328 (LMM), 1996 WL 363156 (S.D.N.Y. June 28, 1996) ...................... 11

*Parker* v. *Dawson*
No. 06 Civ. 6191 (JFB), 2007 WL 2462677 (E.D.N.Y. Aug. 27, 2007) ..................... 9

*SEC* v. *Adondakis*
No. 12 Civ. 409 (HB) (Dkt. 57) .................................................................................. 12

*SEC* v. *Beacon Hill Asset Management LLC*
No. 02 Civ. 8855 (LAK), 2003 WL 554618 (S.D.N.Y. Feb. 27, 2003) ..................... 11

*SEC* v. *Chakrapani*
2010 WL 2605819 (S.D.N.Y. June 29, 2010) ............................................................ 11

*SEC* v. *Chestman*
861 F.2d 49 (2d Cir. 1988) ........................................................................................... 7

*SEC* v. *Contorinis*
No 09 Civ. 1043 (RJS), 2012 WL 512626 (S.D.N.Y. Feb. 3, 2012) ......................... 14

*SEC* v. *Credit Bancorp*
297 F.3d 127 (2d Cir. 2002) ......................................................................................... 7

*SEC* v. *Doody*
186 F.Supp.2d 379 (S.D.N.Y. 2002) .......................................................................... 11

*SEC* v. *Gupta*
2011 WL 5977579 (S.D.N.Y. 2011) ........................................................................... 12

ii

*SEC* v. *Nicholas*
569 F. Supp. 2d 1065 (C.D.Cal. 2008) ...................................................................... 10

*SEC* v. *Steinberg*
No. 13 Civ. 2082 (HB) (Dkt. 21) ............................................................................. 12

*SEC* v. *Tuzman*
No. 15 Civ. 7057 (AJN) ................................................................................ 8, 10, 11,13

*Trustees of Plumbers and Pipefitters Nat'l Pension Fund, et al.* v. *Transworld Mechanical, Inc.*
886 F. Supp. 1134 (S.D.N.Y. 1995) .......................................................................... 9

*Twenty First Century Corp.* v. *LaBianca*
801 F. Supp. 1007 (E.D.N.Y. 1992) ...................................................................... 7,14

*United States* v. *One 1964 Cadillac Coupe DeVille*
41 F.R.D. 352 (S.D.N.Y. 1966) ................................................................................ 9

*United States* v. *McCarthy*
292 F. Supp. 937 (2d Cir. 1968) .............................................................................. 10

*United States* v. *Percevault*
490 F.2d 126 (2d Cir. 1974) .................................................................................... 10

*Volmar Distrib., Inc.* v. *New York Post Co., Inc.*
152 F.R.D. 36 (S.D.N.Y. 1993) ............................................................................ 8, 9

## Other Authorities

Federal Rules of Civil Procedure, Rule 24(a)(2) ..................................................... 1, 6

Federal Rules of Civil Procedure, Rule 24(b)(2) ..................................................... 1, 7

Federal Rules of Criminal Procedure, Rule 16 ......................................................... 6, 9

*Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 203 (S.D.N.Y. 1989) ......................... 9

United States Constitution. Amendment V................................................................ passim.

Title 18, United States Code, Section 3500 ............................................................. 10

## Other Cases

*United States* v. *Edward Durante, et al*
15 Cr. 171 (ALC) ......................................................................................................... 1

## PRELIMINARY STATEMENT

The United States of America, by and through the United States Attorney for the Southern District of New York ("the Government"), respectfully submits this memorandum in support of its application (i) to intervene in the above-captioned case, pursuant to Rule 24 of the Federal Rules of Civil Procedure, and (ii) to stay depositions, interrogatories, requests for admission, production of transcripts of testimony before the Securities and Exchange Commission ("SEC"), and notes of interviews with, and any form of discovery that would create statements of, any person whom the Government asserts may be called as a witness in the criminal prosecution, until the conclusion of the parallel criminal case, *United States* v. *Edward Durante, et al.*, 15 Cr. 171 (ALC) (the "Criminal Case").

The Criminal Case arises from the same set of facts and circumstances that underlie this action. Courts in this district frequently stay civil discovery when there is a parallel criminal prosecution. For the reasons set forth below, a stay is especially appropriate where, as here, the Government seeks only a limited stay, with respect to discovery that would effectively be 3500 material in the criminal action.

It is the Government's understanding that defendant Abida Khan ("Khan") intends to oppose and that defendant Christopher Cervino ("Cervino") may oppose the limited stay requested by the Government. The other defendants – Edward Durante ("Durante"), Larry Werbel ("Werbel"), Walter Reissman ("Reissman") and Kenneth Wise ("Wise," collectively, with Khan and Cervino, the "Defendants") – consent to the motion to intervene and for a limited stay of discovery. The SEC does not oppose this motion.

## FACTUAL BACKGROUND

This case, and the parallel Criminal Case, arise out of the same underlying events. The

facts set forth below are detailed in the superseding indictment returned in the Criminal Case against Durante, Khan, Werbel and Cervino on January 5, 2016 by a Grand Jury in the Southern District of New York (the "Indictment"),[1] and are reflected in the SEC's complaint in this civil action (the "SEC Complaint").

## I.    2001 SECURITIES FRAUD CONVICTION

In December 2001, Durante was convicted in the Southern District of New York of conspiracy to commit securities fraud, wire fraud, money laundering, and making false statements in connection with a market manipulation scheme in which the defendant also used the alias "Ed Simmons."   (Indictment ¶ 1.)   As part of the parallel SEC action in that matter, Durante was ordered by a United States District Court to pay disgorgement and prejudgment interest totaling more than $39 million.   (*Id.*)   Durante was also barred from certain activities in connection with the securities industry, including the sale of securities.   Durante was sentenced to 121 months' imprisonment and was released in or about 2009, the year he began the current scheme.   (*Id.*)

## II.    OVERVIEW OF THE CHARGED SCHEME

Between 2009 and March 2015, the Defendants perpetrated a multi-pronged scheme to defraud more than 100 investors of at least $15 million by soliciting funds in public and private shares of various securities, including VGTel, Inc. ("VGTL"), through false and misleading representations and omissions and by failing to invest investors' funds as promised.   (*Id.* ¶ 11.) The Defendants further manipulated the public Over-The-Counter market of VGTL stock by controlling a majority of the public shares, inducing investors to buy stock based on false

---

1     As noted below, Reissman and Wise were each charged by information and have pleaded guilty in the Criminal Case.

representations and omissions, and engaging in trades in which Durante controlled both the accounts that purchased the stock and the accounts that sold the stock in order to artificially inflate the stock price and trading volume.    (*Id.*)

Of the approximately $15 million invested in the fraudulent scheme, more than $9 million was funneled to the Defendants and other co-conspirators.    (*Id.* ¶ 17.)    Durante concealed this illegal diversion of investor funds through the use of wire transfers among multiple accounts in the names of other individuals, including Wise.   (*Id.* ¶¶ 30-32.)

### A.    PRIVATE PLACEMENT SECURITIES FRAUD INVOLVING VGTL

Among other fraudulent and illicit conduct, between 2009 and in or about March 2015, the Defendants fraudulently induced victims to invest in private shares of VGTL by concealing from investors that Durante controlled the entities selling the shares; that Durante was prohibited from any association with the sale of securities; and that Durante was previously convicted of crimes related to a similar scheme to defraud.    (*Id.* ¶¶ 15-16.)    Durante, with the knowledge of Werbel, Reissman and Wise, among others, used numerous aliases in order to conceal his true identity and regulatory bar from investors, compliance personnel, regulators and law enforcement.    (*Id.* ¶ 14.)

Furthermore, some of the Defendants lied to investors by (a) representing that their investments would be used to fund the operations and growth of VGTL in connection with potential reverse mergers, when in reality no reverse merger was ever consummated and the investments were instead used primarily to personally benefit the Defendants; and (b) representing that the investors would receive an eight-percent dividend on their investments until their private shares could be sold at a promised premium on the public market, when, in reality,

no interest payments were ever provided to the investors and many investors never received

VGTL stock certificates or were permitted to sell the stock.   (*Id.* ¶ 17.)

In order to fund his illegal scheme, Durante used a network of brokers, including Werbel

and Khan, investment advisers in Cleveland, Ohio, and Los Angeles, California, respectively, to

induce investors to buy shares of VGTL.   Although Werbel knew Durante's true identity and

that he had been previously convicted of securities fraud, Werbel did not disclose this

information to any of his clients he solicited to invest in VGTL.   (*Id.* ¶ 16.)   Moreover,

Durante provided Werbel with kickbacks of as much as 20 percent of monies invested by

Werbel's clients, which Werbel did not disclose to his clients.   (*Id.* ¶ 20.)   Werbel also failed

to disclose to his clients that the investors were purchasing shares of VGTL from entities

controlled by Durante, not from the issuer itself.   (*Id.* ¶ 16.)   Similarly, Khan also received

kickbacks in return for inducing her clients to invest in private shares of VGTL, which she did

not disclose to her clients.   (*Id.* ¶ 20.)   Khan also did not disclose to her investors that their

private shares of VGTL were purchased from Durante-controlled entities.   (*Id.* ¶ 16.)   In total,

Werbel received more than $300,000 and Khan received more than $100,000 in undisclosed

kickbacks from Durante for inducing clients to invest in private shares of VGTL.   (*Id.* ¶ 32.)

## B.   <u>MANIPULATION OF THE MARKET FOR SHARES OF VGTL</u>

The Defendants further engaged in a scheme to control and manipulate the public stock

of VGTL in order to artificially inflate the stock price and trading volume so as to profit from

their own sales of VGTL stock and to further induce investments in private shares of VGTL.

(*Id.* ¶ 21.)   To that end, through entities he controlled, Durante held a majority of the

publicly-traded stock of VGTL.   (*Id.* ¶ 23.)   Durante recruited Cervino, a broker, to open

brokerage accounts associated with Durante-controlled entities and investors who were clients of

4

Werbel's and Khan's, many of whom did not know they had accounts with Cervino.   (*Id.* ¶ 22.) Werbel and Khan, along with Durante, purchased VGTL stock for their clients through Cervino – sometimes without the clients' knowledge or permission – while Durante and Cervino ensured that many of these purchases were matched with sales of VGTL stock by Durante-controlled accounts.   (*Id.* ¶ 23.)   The result of these transactions was that the Defendants were effectively taking both sides of a single transaction in VGTL stock in order to artificially control VGTL's stock price.   (*Id.* ¶ 24.)

The Defendants' efforts to artificially inflate the market for VGTL increased the stock price from approximately $.25 per share in April 2012 to as much as $1.90, and dramatically inflated the trading volume, which increased the Defendants' abilities to raise private investments in VGTL.   (*Id.* ¶ 7.) To compensate Cervino for his efforts to control and manipulate the market in VGTL, Durante made at least two cash payments to Cervino totaling approximately $35,000.   (*Id.* ¶ 32.)

### III. THE INDICTMENT AND STATUS OF THE DEFENDANTS

Reissman and Wise were each charged by information and have pleaded guilty in the Criminal Case.   On January 4, 2016, Wise pleaded guilty to one count of conspiracy to commit securities fraud, one count of securities fraud, one count of conspiracy to commit wire fraud, one count of wire fraud, one count of conspiracy to commit money laundering, and one count of money laundering.   On January 5, 2016, Reissman pleaded guilty to one count of conspiracy to commit securities fraud, one count of securities fraud, one count of conspiracy to commit wire fraud, one count of wire fraud, and one count of making false statements to federal officers.

The Indictment charges Durante, Khan, Cervino and Werbel each with one count of conspiracy to commit securities fraud (Count One), one count of securities fraud (Count Two), one

count of conspiracy to commit wire fraud (Count Three), and one count of wire fraud (Count Four).   Durante is also charged with one count of conspiracy to commit money laundering (Count Five), one count of money laundering (Count Six) and one count of perjury (Count Nine). Khan and Werbel are each charged separately with one count of investment advisor fraud (Counts Seven and Eight).   Werbel is charged with one count of making false statements (Count Eleven). Cervino was also charged with one count of perjury (Count Ten).

Durante was arrested in Germany in March 2015 and arrived in the United States via extradition on December 17, 2015.   He has been detained since that date.   The remaining three defendants were arrested on January 6, 2016, and have appeared twice before the District Court overseeing the Criminal Case.   The production of Rule 16 discovery is expected to be complete next week.   Judge Carter indicated to the parties that he would set a motions schedule and trial date at the next conference on April 18, 2016.

## **ARGUMENT**

The Government's requests to intervene and for a limited stay of discovery in this civil action should be granted.   If full-fledged civil discovery were to proceed at this time, there would be a risk of significant interference with the Criminal Case.   On the other hand, a stay of (i) depositions, (ii) interrogatories, (iii) requests for admission, and (iv) the production of transcripts of SEC testimony and notes of interviews with, and any form of discovery that would create statements of, any person whom the Government asserts may be called as a witness in the criminal prosecution (the "3500 Material") would prejudice no party to this civil action. Moreover, the requested stay would preserve the Court's resources because many of the issues presented by the civil action will be resolved in the Criminal Case.

## I.    THE GOVERNMENT SHOULD BE GRANTED PERMISSION TO INTERVENE

Under Rule 24(a)(2) of the Federal Rules of Civil Procedure, anyone may intervene as of right in an action when the applicant "claims an interest relating to the property or transaction that is the subject of the action" and the applicant "is so situated that 'disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests. . . .'" Alternatively, Rule 24(b)(2) provides for permissive intervention when the movant "has a claim or defense that shares with the main action a common question of law or fact."   The Government respectfully submits that its application satisfies both of these provisions given the effect this civil proceeding would have on the Criminal Case and the similarity of claims and facts between the parallel proceedings.

As a general rule, courts "have allowed the government to intervene in civil actions, - especially when the Government wishes to do so for the limited purpose of moving to stay discovery." *Twenty First Century Corp.* v. *LaBianca*, 801 F. Supp. 1007, 1009 (E.D.N.Y. 1992); *see also SEC* v. *Credit Bancorp.*, 297 F.3d 127, 130 (2d Cir. 2002).   The Government has a "discernible interest in intervening in order to prevent discovery in a civil case from being used to circumvent the more limited scope of discovery in the criminal matter." *SEC* v. *Chestman*, 861 F.2d 49, 50 (2d Cir. 1988).

A trial in this action in advance of a related criminal trial could impair or impede the Government's ability to protect its unique interests in the enforcement of federal criminal law. This case and the parallel Criminal Case arise from the same alleged investor fraud, market manipulation and money laundering schemes related primarily to VGTL, and will likely involve many common questions of law and fact.   Holding a civil trial before a criminal trial would create the possibility that there will be two trials covering the same transactions underlying the

7

allegations of investor fraud, market manipulation and money laundering.   Given the nature of the

overlap of the facts and issues in dispute in this case and the Criminal Case, the overlap between

witnesses is likely to be considerable.   This raises the probability that numerous witnesses will be

unnecessarily burdened by having to testify twice.   In light of those circumstances, the

Government respectfully submits that its application to intervene should be granted.

## II.   A LIMITED STAY OF DISCOVERY IS APPROPRIATE

### A.   APPLICABLE LAW

This Court has the inherent power to stay discovery in the interests of justice pending the

completion of a parallel criminal trial.   *See Kashi* v. *Gratsos*, 790 F.2d 1050, 1057 (2d Cir.

1986) ("[A] court may decide in its discretion to stay civil proceedings . . . when the interests of

justice seem . . . to require such action.") (internal citations and quotations omitted).   "In

evaluating whether to grant such a stay, courts in this Circuit consider:

> (1) the extent to which the issues in the criminal case overlap with
> those presented in the civil case; (2) the status of the case, including
> whether the defendants have been indicted; (3) the private interests
> of the plaintiffs in proceeding expeditiously weighed against the
> prejudice to plaintiffs caused by the delay; (4) the private interests
> of and burden on the defendants; (5) the interest of the court; and
> (6) the public interest.

*See, e.g.*, *SEC* v. *Tuzman*, No. 15 Civ. 7057 (AJN), at 2 (S.D.N.Y. March 1, 2016) (quoting *Louis*

*Vuitton Malletier S.A.* v. *LY USA, Inc.*, 676 F.3d 83, 99 (2d Cir. 2012).   "Balancing these factors is

a case-by-case determination, with the basic goal being to avoid prejudice."   *Volmar Distrib., Inc.*

v. *New York Post Co., Inc.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993).

### B.   DISCUSSION

Application of these factors here overwhelmingly weighs in favor of the limited stay

sought by the Government.

8

### 1.    <u>THE EXTENT OF OVERLAP</u>

That the criminal and civil cases involve nearly identical facts and issues weighs heavily in favor of a stay. "The most important factor at the threshold is the degree to which the civil issues overlap with the criminal issues." *Volmar Distrib.*, 152 F.R.D. at 39 (citing Judge Milton Pollack, *Parallel Civil and Criminal Proceedings*, 129 F.R.D. 201, 203 (S.D.N.Y. 1989)); *see also Parker* v. *Dawson*, No. 06 Civ. 6191 (JFB), 2007 WL 2462677, at *4 (E.D.N.Y. Aug. 27, 2007) (same); *United States* v. *One 1964 Cadillac Coupe DeVille*, 41 F.R.D. 352, 353 (S.D.N.Y. 1966) ("Where both civil and criminal proceedings arise out of the same or related transactions the government is ordinarily entitled to a stay of all discovery in the civil case until disposition of the criminal matter.").

Here, the SEC and criminal cases describe virtually the same investor fraud, market manipulation and money laundering schemes. Both actions relate primarily to VGTL and involve the same participants, the same manipulative trading, the same victims, and nearly all of the same events. In short, the cases involve virtually identical facts, witnesses and issues. As a result, this factor weighs in favor of a stay.

### 2.    <u>STATUS OF THE CRIMINAL CASE</u>

The return of an Indictment in the criminal case is also a factor that weighs in favor of a stay. *In re Par Pharm, Inc. Sec. Litig.*, 133 F.R.D. 12, 13 (S.D.N.Y. 1990) ("The weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment."); *Trustees of Plumbers and Pipefitters Nat'l Pension Fund, et al.* v. *Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) ("A stay of a civil case is most appropriate when a party to the civil case has already been indicted for the same conduct for two reasons: first, the likelihood that a defendant may make incriminating statements

is greatest after an indictment has issued, and second, the prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved.")   Where, as here, all of the defendants have been arrested and arraigned, and Rule 16 discovery is substantially complete, this factor favors a stay.   *See SEC* v. *Tuzman*, No. 15 Civ. 7057 (AJN), at 3 (noting that an indictment normally weighs heavily in favor of a stay absent particular facts indicating that the criminal case may not be resolved expeditiously).[2]

### 3.      THE PUBLIC INTEREST

Title 18, United States Code, Section 3500 provides that in criminal cases, the statements of Government witnesses shall not be the subject of discovery "until said witness has testified on direct examination in the trial of the case."   This rule "represents a legislative determination that access to a witness's statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial."   *United States* v. *Percevault*, 490 F.2d 126, 129 (2d Cir. 1974); *see United States* v. *McCarthy*, 292 F. Supp. 937, 942 (2d Cir. 1968) ("The claimed need to see such statements in advance in order to prepare to rebut them is little more than open notice of an intention to tailor testimony to fit the statement."); *SEC* v. *Nicholas*, 569 F. Supp. 2d 1065, 1070 (C.D.Cal. 2008) (the criminal rules were "purposefully limited so as to prevent perjury and manufactured evidence, to protect potential witnesses from harassment and intimidation, and to level the playing field between the government and the defendant, who would be shielded from certain discovery by the Fifth Amendment").

In granting a similar request for a limited stay earlier this month, Judge Nathan observed that courts in this Circuit have articulated three primary Government interests justifying a stay of

---

[2]      The Government is optimistic that Judge Carter will schedule a trial date in the fall at the next status conference on April 18, 2016, so that the Criminal Case can conclude in a timely manner.

discovery of civil proceedings while parallel criminal proceedings are pending:

> First, broad disclosure of the essentials of the prosecution's case may lead to perjury and manufactured evidence.   Second, revelation of the identity of prospective witnesses may create the opportunity for intimidation.   Third, criminal defendants may unfairly surprise the prosecution at trial with information developed through discovery, while the self-incrimination privilege would effectively block any attempts by the Government to discover relevant evidence from the defendants.

*SEC* v. *Tuzman*, No. 15 Civ. 7057 (AJN), at 3-4 (internal citations and quotations omitted).

Based on these concerns, judges in this District have frequently granted government requests to limit discovery in a parallel civil action in order to prevent the civil discovery rules from being subverted into a device for improperly obtaining discovery in the criminal proceeding. *See, e.g.*, *SEC* v. *Tuzman*, No. 15 Civ. 7057 (AJN) (granting same limited stay sought here); *SEC* v. *Beacon Hill Asset Management LLC*, No. 02 Civ. 8855 (LAK), 2003 WL 554618, at *1 (S.D.N.Y. Feb. 27, 2003) (granting limited stay); *SEC* v. *Doody*, 186 F.Supp.2d 379, 381-82 (S.D.N.Y. 2002) (same); *Philip Morris Inc.* v. *Heinrich*, No. 95 Civ. 328 (LMM), 1996 WL 363156, at *19 (S.D.N.Y. June 28, 1996) (same); *Bd. of Governors of the Federal Reserve System* v. *Pharaon*, 140 F.R.D. 634, 639 (S.D.N.Y. 1991) (same).

Furthermore, even judges who have not initially granted a stay in a parallel SEC proceeding have subsequently done so once (a) it is clear that a defendant intends to invoke his Fifth Amendment rights and not participate in the very discovery process he seeks to use affirmatively; or (b) the witnesses the defendant seeks to depose could credibly assert their Fifth Amendment rights, testify for the Government in the criminal trial, or both.   *See, e.g.*, *SEC* v. *Tuzman*, No. 15 Civ. 7057 (AJN), at 4-5 (finding the high likelihood that the defendant would "invoke his Fifth Amendment right against self-incrimination during discovery, rendering

11

discovery incomplete and one-sided until the criminal proceedings have ended"); *SEC* v. *Chakrapani*, 2010 WL 2605819, at *11 (S.D.N.Y. June 29, 2010) (inviting the Government to renew its motion to stay discovery pending completion of the criminal trial if the defendant intends to invoke the Fifth Amendment if noticed for deposition); *SEC* v. *Steinberg*, No. 13 Civ. 2082 (HB) (Dkt. 21) (granting limited stay in the first instance and, later, allowing depositions only of witnesses the Government had no intention of calling at trial); *SEC* v. *Adondakis*, No. 12 Civ. 409 (HB) (Dkt. 57) (same); *SEC* v. *Gupta*, 2011 WL 5977579, *1 (S.D.N.Y. 2011) (holding that depositions in the parallel civil actions should only be allowed where the deponents were "persons the Government has indicated it is unlikely to call as witnesses at the forthcoming criminal trial.").

In *Chakrapani,* after initially denying a stay request in part because Chakrapani was not a party to the criminal proceeding, this Court invited the Government to renew its stay motion upon the invocation of the Fifth Amendment by either the defendant in the criminal proceeding, Joseph Contorinis, or a witness: "Of course, if Contorinis or other relevant witnesses invoke their Fifth Amendment privileges not to participate in civil discovery, the Court's analysis regarding the propriety of a discovery stay might well be altered . . . . To the extent that the process is compromised by the legitimate invocation of a constitutional privilege during discovery, the balance of interests could turn in favor of a discovery stay pending completion of Contorinis's criminal trial." 2010 WL 2605819, at *11. Given that the civil and criminal actions in *Chakrapani* concerned substantially overlapping issues, as is the case here, it became apparent that the defendant and certain witnesses would assert the Fifth Amendment. One week after this Court issued its decision in *Chakrapani*, the Court ordered the parties to appear for a status conference regarding a deposition notice served on a cooperating witness likely to invoke the Fifth Amendment and the effect of "[d]efendant's refusal to participate in discovery." (Order dated

July 6, 2010, Dkt. 125.).   Following that conference, this Court endorsed a discovery schedule specifying that "[n]o depositions shall commence until the conclusion of the trial in the criminal case."   (Order dated Aug. 4, 2010, Dkt. 131.)

Both types of Fifth Amendment concerns are present here.   Durante has already indicated to the SEC that he affirmatively seeks a stay in this action in order to preserve his Fifth Amendment rights.   Cervino's attorney in this case also confirmed to the Government that Cervino would invoke his Fifth Amendment rights against self-incrimination if noticed to be deposed.[3]

Moreover, given the significant overlap in issues between this and the criminal action, certain of the Defendants will seek to depose the Government's potential criminal trial witnesses, raising additional Fifth Amendment considerations.   As Judge Nathan recently stated in *SEC* v. *Tuzman*, "denying a stay would render discovery largely one-sided; the SEC would produce scores of documents and witness testimony only to be precluded from gathering reciprocal discovery from the Defendants."   *SEC* v. *Tuzman*, No. 15 Civ. 7057 (AJN), at 4 (citing *Nicholas*, 569 F. Supp. 2d at 1070).

Therefore, both to avoid circumvention of the criminal discovery restrictions and because it is already clear that depositions and non-document discovery will implicate various Fifth Amendment concerns, this factor weighs in favor of the Government's application.

### 4.   <u>PREJUDICE TO THE PARTIES</u>

No prejudice to the parties will result from the limited stay requested by the Government. The Government seeks to stay only depositions, interrogatories, requests for admission, and

---

[3]      Khan's counsel in the Criminal Case informed the Government that she does not know whether she would advise Khan to assert her Fifth Amendment rights against self-incrimination if noticed to be deposed in this case.

production of the above-referenced 3500 Material. In addition, there is currently no trial date in place, so there will be no undue delay in the proceedings as a result of the limited stay.   Finally, the SEC will produce document discovery (other than the 3500 Material), so the defendants will have ample opportunity to evaluate the documentary evidence and prepare their defense while the Criminal Case proceeds.

### 5.   THE INTERESTS OF THE COURT

Finally, considerations of judicial economy also weigh in favor of granting a stay.   Issues common to both cases can be resolved in the criminal proceeding, thereby simplifying the civil action.   *See SEC* v. *Contorinis*, No. 09 Civ. 1043 (RJS), 2012 WL 512626, at *2 (S.D.N.Y. Feb. 3, 2012) ("Courts in this district have consistently found that a defendant convicted of securities fraud in a criminal proceeding is collaterally estopped from relitigating the underlying facts in a subsequent civil proceeding."); *Twenty First Century Corp.* v. *LaBianca*, 801 F. Supp. at 1010-11 (recognizing judicial economy as a factor to be considered).   Because the Criminal Case's outcome will likely directly affect the conduct, scope, and result of the civil proceeding, this factor favors the Government's application.

*          *          *

In sum, and as set forth above: the Government has requested a limited stay of discovery; there is virtually complete overlap between the parallel proceedings; charges have been filed in the criminal case; there is no prejudice to the parties from the requested stay; there is a strong public interest in preventing the civil discovery rules from being used to improperly obtain discovery in the criminal case; and judicial economy recommends the requested relief.   Therefore, the balance of factors overwhelmingly favors the requested discovery stay.

14

## **CONCLUSION**

For these reasons, the Government respectfully requests that its application to intervene and for a limited stay of depositions, interrogatories, requests for admission, and discovery of the 3500 Material described above, be granted in its entirety.

Dated:  New York, New York
        March 11, 2016

                                Respectfully submitted,

                                PREET BHARARA
                                United States Attorney

                    By:     ___/s/_____
                                DANIEL S. GOLDMAN
                                ANDREA M. GRISWOLD
                                Assistant United States Attorneys
                                One Saint Andrew's Plaza
                                New York, New York 10007
                                Telephone: (212) 637-2289/1205
                                Facsimile: (212) 637-2477

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
SECURITIES AND EXCHANGE COMMISSION,    :        20cv5496(DLC)
                                       :
                        Plaintiff,     :          ORDER
             -v-                       :
                                       :
DAVID HU                               :
                                       :
                        Defendant.     :
                                       :
-------------------------------------- X
```

DENISE COTE, District Judge:

On September 17, 2020, the United States Attorney for the Southern District of New York (the "Government") filed a motion to intervene and to stay civil proceedings until the conclusion of the parallel criminal case, United States v. David Hu, 20 Cr. 360 (AKH). The criminal case arises from the same underlying facts as this civil action. The Government represents that defendant Hu consents to, and that the Securities and Exchange Commission ("SEC") takes no position on, these requests. It is hereby

ORDERED that the Government's motion to intervene is granted.

IT IS FURTHER ORDERED that the above-captioned civil action is stayed until the conclusion of the parallel criminal case.

IT IS FURTHER ORDERED that the SEC shall submit a status
report on September 18, 2021.


Dated:     New York, New York
           September 21, 2020


_____
DENISE COTE
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

             Plaintiff,

       v.                 16 Civ. 2779(CS)

                             CONFERENCE

TOWN OF RAMAPO N.Y.; RAMAPO LOCAL
DEVELOPMENT CORPORATION; CHRISTOPHER
P. ST. LAWRENCE; NACHMAN AARON TROODLER;
MICHAEL KLEIN; NATHAN OBERMAN;

             Defendants.

USA, Movant
------------------------------------------x
MELISSA REIMER,

             Plaintiff,

       v.                 14 Civ. 7044(CS)

THE TOWN OF RAMAPO; CHRISTOPHER
ST. LAWRENCE, sued herein individually
as well as in his official capacity;
NATHAN OBERMAN, sued herein individually
as well as in his official capacity;
MICHAEL KLEIN, sued herein individually
as well as in his official capacity;
LINDA CONDON, sued herein individually
as well as in her official capacity;
BETH FINKELSTEIN, sued herein individually
as well as in her official capacity;

             Defendants.

USA, Intervenor
------------------------------------------x
                         United States Courthouse
                         White Plains, N.Y.
                         June 30, 2016

     Before:  THE HONORABLE CATHY SEIBEL, District Judge

          CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
               (914)390-4103

1                     APPEARANCES - 16 Civ. 2779(CS)

2

3     ALEXANDER MIRCEA VASILESCU
      DANIEL LOSS
4           U.S. Securities and Exchange Commission

5     PREET BHARARA
            United States Attorney for the
6           Southern District of New York
      JAMES FRANKLIN McMAHON
7     ANDREW SETH DEMBER

8

9     MORVILLO, LLP
            Attorneys for Defendant Town of Ramapo N.Y.
      GREGORY ROBERT MORVILLO
10

11    JOHN JAMES PHELAN, III
            Attorneys for Defendants Town of Ramapo,
12                                  Ramapo Local Development Corp.

13

14    BURKE, MIELE & GOLDEN, LLP
            Attorneys for Defendants Christopher P. St. Lawrence,
                                    Nathan Oberman
15    PATRICK BURKE

16

17    LAW OFFICES OF LAWRENCE H. SHOENBACH
            Attorneys for Defendant Michael Klein
      LAWRENCE H. SHOENBACH
18

19    GOTTLIEB & GORDON, LLP
            Attorneys for Defendant Michael Klein
20    DERRELLE MARCEL JANEY

21

22    BLANK ROME, LLP
            Attorneys for Defendant Nachman Aaron Troodler
      MICHELLE COURTNEY
23

24

25

APPEARANCES - 14 Civ. 7044(CS)


FRED B. LICHTMACHER (via telephone)
      Attorney for Plaintiff Michelle Reimer


SOKOLOFF STERN, LLP
      Attorneys for Defendants Town of Ramapo, Michael Klein,
                              Linda Condon, Beth Finkelstein,
                              Christopher St. Lawrence
STEVEN CHARLES STERN


McCABE & MACK, LLP
      Attorneys for Defendant Nathan Oberman
DAVID LEWIS POSNER


PREET BHARARA
      United States Attorney for the
      Southern District of New York
JAMES FRANKLIN McMAHON
ANDREW SETH DEMBER

20166ureimd

```
 1              (Case called)
 2              THE COURT:  I guess the first thing to do is make
 3    clear for the record that we are here on two matters jointly,
 4    SEC v. Town of Ramapo, et al., which is 16 CV 2779, and
 5    Reimer v. Town of Ramapo, 14 CV 7044.
 6              In both cases what I'm going to call the government --
 7    I recognize the SEC is also the government, but when I say the
 8    government, I mean the U.S. Attorney's Office, which is
 9    prosecuting Mr. St. Lawrence and Mr. Troodler and has moved for
10    stays in both cases.  Mr. St. Lawrence is a defendant in both
11    cases.  Mr. Troodler is a defendant only in the SEC case.
12              The issue in the Reimer case is a little --
13              MR. BURKE:  Your Honor, I think Mr. Troodler is a
14    defendant in both cases.
15              THE COURT:  I don't think he's a defendant in the
16    Reimer case.  Is he?
17              MR. BURKE:  Oh, no.  I beg your pardon.
18              THE COURT:  He's a defendant in the criminal case and
19    the SEC case, but not the Reimer case.  Okay.
20              MR. BURKE:  Yes.
21              THE COURT:  The issue, I think, in the Reimer case is
22    narrower because the parties aren't as far apart.  So I'm going
23    to start with some questions which relate more to the SEC case,
24    but everybody should listen because the issues do overlap.
25              Mr. Lichtmacker, I don't know where your -- I know
```

```
 1    you're driving, and I don't want you to crash, but I don't know
 2    where your phone is, but it's making kind of a noise.  Is it
 3    knocking around or something?
 4              MR. LICHTMACKER:  I'll move it.  Okay.  I was moving
 5    it around.  Is that better?
 6              THE COURT:  Yes.  That's good.  Okay.
 7              I guess, first of all, let me just make sure -- I
 8    think I know, Mr. McMahon and Mr. Dember, what you're asking
 9    for.  It wasn't crystal clear from the initial briefing,
10    although I think it is now from the reply, but let me just make
11    sure.  You are not asking, in the SEC case, to halt all
12    interrogatories, requests for admissions, depositions and
13    turnover of witness statements given to the SEC.  You just want
14    to halt those things as they relate to potential witnesses in
15    your criminal case.
16              MR. McMAHON:  That's right.  Anything that would
17    contain a statement of a potential witness in the criminal
18    case.
19              THE COURT:  And I don't know if you can answer this,
20    but are there witnesses in the SEC case that are not witnesses
21    that you think you're going to use in the criminal case?
22              MR. McMAHON:  I would -- really -- I guess I really
23    can't answer.  The cases so overlap that there's an awful lot
24    of overlap of witnesses, but they may be calling additional
25    witnesses that I'm not aware of.
```

1          THE COURT:  And can you answer this question.  Do any

2     of the witnesses -- and if you can't, just tell me.  Do any of

3     the witnesses that you intend to call in the criminal case

4     include any defendants in the SEC case?

5          MR. McMAHON:  Yes.

6          THE COURT:  So that's a complication.

7          And Mr. Vasilescu or Mr. Loss, do you know if your

8     witnesses in your case, apart possibly from the defendants,

9     include anybody who isn't also a potential witness in the

10    government's criminal case?

11         MR. VASILESCU:  Your Honor, for the SEC, Alex

12    Vasilescu.

13         I guess we can't answer that question because we're

14    not privy to how the criminal case will be tried by the United

15    States Attorney's Office.  That information we don't possess

16    right now.

17         THE COURT:  Okay.

18         MR. VASILESCU:  I mean, we do think that, just

19    generally, a lot of the claims overlap and that it's

20    potentially possible that a lot of the witnesses that we would

21    use could also be theoretically witnesses in the criminal case.

22         THE COURT:  Just trying to figure out if what the

23    government's asking for is essentially a complete stay of

24    discovery.  Sounds like it's possible.

25         This is also a question for the government.

1          The defendants said in their papers that you have

2     already turned over, in the criminal case, some statements that

3     were given to the SEC.  Am I correct in assuming that was

4     pursuant to Brady?

5          MR. McMAHON:  Yes.  So there were portions -- the SEC,

6     as part of its investigation, took depositions, and we would

7     ask that the production of those be stayed to the extent

8     they're depositions of our potential witnesses.  However, I

9     have gone through all of those and picked out excerpts that are

10    arguably Brady.  I was pretty broad on my reading of Brady.

11    And those were disclosed.

12         THE COURT:  Mr. Lichtmacher, you're now making a whole

13    a lot of noise.

14         MR. LICHTMACHER:  I just picked up the phone, I turned

15    off the car, and I pulled over, so I should be quieter.

16         THE COURT:  Okay.  Good.

17         Just so I understand, the excerpts that you've turned

18    over which arguably are Brady are statements of people, some of

19    whom are going to be government witnesses notwithstanding the

20    fact that some of the things they have to say are arguably

21    Brady.

22         MR. McMAHON:  That's right, yes.

23         THE COURT:  And are some of them also people who are

24    not going to be government witnesses?

25         MR. McMAHON:  Yes, I would say that's likely, but the

1    majority of them would be witnesses.

2              THE COURT:  Okay.

3              So let me ask you this, Mr. McMahon.

4              I understand why the government doesn't want Mr. St.

5    Lawrence and Mr. Troodler to have the already existing

6    statements of potential government witnesses or to be able to

7    create any new statements in the course of the civil

8    litigation.  I understand your reasoning for that.  But I don't

9    understand, or at least not as clearly, why the government is

10   seeking to halt interrogatories and requests for admissions and

11   such.  If the defendants were to propound interrogatories to

12   the SEC or requests for admissions, how does that create 3500

13   material for your witnesses?

14             MR. McMAHON:  If it doesn't create 3500 -- it depends

15   on what the interrogatory is and what the answer is.  If it

16   doesn't create 3500 material for a potential witness in our

17   criminal case, I'm not moving to stay those interrogatories or

18   requests for admissions.  It's only those interrogatories, for

19   example, or any other discovery device that would lead to a

20   statement of a particular witness.  So, for example --

21             THE COURT:  So if the defendants ask the SEC if it's

22   the SEC's position that X happened, that's okay.

23             MR. McMAHON:  That would be okay.

24             THE COURT:  The only thing that would bother you would

25   be did witness so and so say X, Y or Z.

20166ureimd

1      MR. McMAHON:  Exactly.

2      THE COURT:  Okay.  And turning it around, the SEC

3  propounding interrogatories to the defendants in the civil case

4  only troubles you if that defendant is a potential witness in

5  your case.

6      MR. McMAHON:  That's right, yes.

7      THE COURT:  Okay.  Now let me ask you about

8  retaliation, because that's one of the bases on which you think

9  I should order a stay.

10      Ms. Reimer obviously has alleged that she was

11  retaliated against.  That's still percolating.  And the other

12  thing you point to -- so there's been no finding one way or the

13  other.  The other thing you point to is that this Mr. Friedman,

14  who opposed Mr. St. Lawrence publicly, then found himself

15  facing a primary or an opponent and losing his political

16  position.  You want me to consider that to be some improper

17  form of retaliation?  I mean, to me, that sounds like

18  democracy.

19      MR. McMAHON:  Well, I think it goes beyond democracy,

20  Judge, in that, you know --

21      THE COURT:  If I get up and I say the incumbent's a

22  crook, vote for me, the incumbent will try to get everyone he

23  knows to vote against me.  I mean, that's what happens.

24      MR. McMAHON:  Well, they weren't running against each

25  other.  They were both running for separate seats.

CHRISTINA M. ARENDS-DIECK, RPR, RMR, CRR
(914)390-4103

```
 1          THE COURT:  Okay.  So if I stand up and I say the town
 2    supervisor is a crook, the town supervisor's going to recruit
 3    somebody to run against me.  That's what happens.
 4          MR. McMAHON:  Well, that is what happened.  But it
 5    shows that Mr. St. Lawrence can play a little rough at times.
 6    And when you combine that with the Reimer conduct, I think it
 7    gives you a sense of potential for retaliation.
 8          THE COURT:  I don't know.  I think it would be a very
 9    dangerous proposition to regard running a candidate who the
10    public is free to vote for or not, depending on how they see
11    fit, you know, as some sort of improper retaliation.  I mean, I
12    get lawsuits occasionally where some political person brings a
13    lawsuit saying my First Amendment rights were violated because
14    I spoke out on an issue and then the defendants organized a
15    campaign against me and I got voted out of office and almost --
16    I think I want to say invariably those cases -- the bottom line
17    of those cases is, yeah, you took a position, your political
18    opponents had a different position, you slugged it out in the
19    court of public opinion, and you lost.  That's politics.
20    That's not First Amendment retaliation.
21          MR. McMAHON:  Well, I'll tell you why I'm particularly
22    concerned about it, Judge.  Several of our witnesses are
23    current town employees.  They essentially work for Mr. St.
24    Lawrence.  And he has access to them eight hours or more a day,
25    and he has authority and power over them.
```

20166ureimd

1         THE COURT: Well --

2         MR. McMAHON: And I think if you just focus in on the

3 Reimer conduct, you get a sense of what could happen, and

4 that's my concern.

5         THE COURT: Well, you know, the Reimer allegations, if

6 they are true, I don't know if they amount to compensable

7 injury, that's one of the things we're talking about, but they

8 certainly seem retaliatory. But, at this point, I have an

9 allegation and a denial. I understand it must be a profoundly

10 weird place to work in the Town of Ramapo right now, and I

11 understand that there's a possibility that Mr. St. Lawrence, if

12 he were a fool, could make life miserable for people in his

13 office, but, at this point, since everything's kind of out in

14 the open, he really would have to be a fool to try to retaliate

15 because it would be pretty transparent.

16         But let me ask a more practical question. If the

17 government gets its way and I enter the stay that you would

18 like, you are going to give everybody a list of the potential

19 witnesses so that everybody knows who's to be hands off. Isn't

20 that just as likely to open the door for whatever retaliation

21 anybody might want to undertake? I mean, do they have to know

22 specifically what the witness is going to say?

23         MR. McMAHON: I think that's it, really, that they

24 won't know what the witness is going to say. I mean, to some

25 degree --

1        THE COURT:  Well, that's I think a much stronger

2    argument you have.  They're not entitled to know what the

3    witness is going to say.  But if you really want me to worry

4    about retaliation, just giving the names is going to prompt

5    retaliation.

6        MR. McMAHON:  Well, I could have moved for a complete

7    stay, but I didn't want to do that.  I guess I'm trying to

8    split the baby, and it's not a perfect solution, but it's the

9    best one I could come up with.

10        THE COURT:  Yes.  I mean, I think your real concern --

11    let me put it this way.  The concern that I find more

12    legitimate is you don't want your witnesses' statements

13    available to the criminal defendants in advance of the time

14    they would otherwise get them because that's an advantage that

15    they wouldn't otherwise have in the criminal case.  But isn't

16    that possibility a result of the decision of the government and

17    the SEC to bring the cases in coordination?

18        MR. McMAHON:  Well, Judge, we didn't have much of a

19    choice.  I mean, both agencies, the DOJ, my office, and the

20    SEC, have their individual responsibilities to bring these

21    cases and we had a duty -- both offices had a duty to bring

22    them.  Whether we brought them on the same day or around the

23    same time period really doesn't matter.  We would still be in

24    the same boat here.

25        THE COURT:  I'm not suggesting there's anything wrong

| | |
|---|---|
| 1 | with doing it together, but the defendants have made the |
| 2 | argument, fine, do it together, but then you have to live with |
| 3 | the consequences, one of which is discovery might go forward in |
| 4 | the civil case. |
| 5 | MR. McMAHON:  Right, but if the SEC had waited, the |
| 6 | statute of limitations would have started to run on them, |
| 7 | because ours is longer than theirs.  So we didn't really have a |
| 8 | choice to get the full gamut of remedies that the government |
| 9 | seeks and is entitled to here.  We had to bring them both at |
| 10 | the same time. |
| 11 | THE COURT:  If your concern is that you don't want St. |
| 12 | Lawrence and Troodler to get a leg up in the criminal case that |
| 13 | they otherwise wouldn't be entitled to, what about Mr. Klein's |
| 14 | idea?  I think it was that, essentially, St. Lawrence and |
| 15 | Troodler be severed from the civil case and it goes ahead |
| 16 | against everyone else. |
| 17 | MR. McMAHON:  Well, the problem is we would still be |
| 18 | creating statements.  Under that remedy, we -- we could try to |
| 19 | enter a protective order.  I'm not really sure how well that |
| 20 | would be honored.  And, also, it would be a point where the SEC |
| 21 | and you would have to try this case three times because you |
| 22 | would try it against Mr. Klein and the others -- |
| 23 | THE COURT:  That doesn't sound right. |
| 24 | MR. McMAHON:  -- then Mr. Troodler and Mr. St. |
| 25 | Lawrence and then also the criminal case, and it just places a |

1    burden on the parties and the Court that shouldn't be there.

2    THE COURT:  Let me ask a question of the defendants in

3    the SEC case.  I guess you don't have to answer it, but sooner

4    or later you're going to have to answer it.

5    Some or all of you are going to take the Fifth, I

6    assume.

7    For instance, let me ask you, Mr. Burke.  Is there any

8    possibility that your client, who's a criminal defendant, is

9    going to sit down for a deposition in the civil case?

10    MR. BURKE:  I think the government already knows.  He

11    has asserted his Fifth before the SEC, his rights under the

12    Fifth Amendment, already.

13    THE COURT:  So he's not going to be giving any

14    discovery.

15    MR. BURKE:  No, not until the criminal case is over.

16    THE COURT:  All right.  So essentially what he wants,

17    if I understand your position, is he wants to be able to pick

18    the government's brain and not let them pick back.

19    MR. BURKE:  Correct.  I couldn't say it any better,

20    Judge.  It is what it is.

21    THE COURT:  Mr. Burke doesn't mess around.

22    And is the same true for Mr. Troodler, Ms. Courtney?

23    MS. COURTNEY:  Your Honor, Mr. Troodler has already

24    sat for an SEC deposition and he's also already sat for an FBI

25    interview, and so the concern about asserting his Fifth

1  Amendment privilege is completely different than some of the

2  other defendants.

3         THE COURT:  Well, I guess there's an argument that

4  he's waived.  There's also an argument that, if he speaks a

5  third time, he might contradict what he said the first two

6  times and, therefore, he wants to keep his mouth shut.

7         If the SEC or any of the co-defendants wanted to

8  depose him, as I said, you don't have to answer, maybe you

9  don't have to even decide, but if you know he would take the

10  Fifth, I would be interested in knowing.

11         MS. COURTNEY:  I don't know definitively, but what I

12  can say is that he sat for a very long and intensive SEC

13  deposition, and his very long interview with the FBI has been

14  memorialized in a 302, and to say that there are questions out

15  there that perhaps he could assert the Fifth Amendment on, I

16  suppose it's imaginable, but he's in a very different situation

17  in terms of whether he's --

18         THE COURT:  No, I understand he's in a very different

19  situation.  On the one hand, the government might argue he's

20  waived whatever privilege he has.  On the other hand, if he

21  didn't tell the whole truth on those occasions, then he might

22  well have exposure again.  I don't know.

23         What did you want to say, Mr. Vasilescu?

24         MR. VASILESCU:  Yes, I would just make it clear, from

25  the SEC's position, this proposal by Mr. Klein to have multiple

1  litigations going on separate tracks regarding this case where

2  we divide up the defendants in the SEC case and have some go

3  forward with the trial and the other ones stayed is problematic

4  not only because it would be highly inefficient to try a case

5  twice against multiple defendants, but, also, let's say we did

6  go forth against some of the defendants who are not criminally

7  tried.  We, the SEC, in a civil case have a different burden of

8  proof than in the criminal case and there's other litigation

9  techniques and laws that we can use such as inferences from

10  taking the Fifth.  And then we have a problem of let's say we

11  do go to trial and we would want Mr. St. Lawrence to be a

12  witness in that trial, but he's still waiting for the criminal

13  case.  It complicates and creates an issue for how we try the

14  case against the others.

15       Ultimately we would like to try this case civilly in

16  one trial regarding whatever defendants are still litigating

17  with us in one trial because there are overlapping facts,

18  overlapping witnesses, and it would be highly efficient to do

19  it that way.

20       THE COURT:  Mr. Lichtmacher, I don't know what's going

21  on there, but the court reporter is losing her mind because

22  something --

23       (Pause)

24       MR. LICHTMACHER:  I just dropped a bag on the floor.

25  I was trying to charge the phone in case I cut out.  I'm sorry.

```
 1              MR. SCHOENBACH:  Put the phone on mute.

 2              THE COURT:  Yes, why don't you put your end of the

 3    phone on mute.

 4              MR. LICHTMACHER:  Oh.  I don't know how to do that,

 5    but I'll try to figure it out.

 6              THE COURT:  Do you have an i-Phone?

 7              MR. LICHTMACHER:  I don't, no, your Honor.  I have a

 8    brand new Android that I don't know how to operate.

 9              Can I chip in one little thing that might help your

10    Honor?

11              THE COURT:  Sure.

12              MR. LICHTMACHER:  We would want Mr. Troodler to

13    testify in Ms. Reimer's case.  That's something -- he would be

14    called.  We would want to depose Mr. Troodler in Ms. Reimer's

15    case if it goes forward.

16              THE COURT:  Well, as I understood the state of play in

17    the Reimer case is everyone was okay with a pause on discovery.

18    The dispute is whether the summary judgment briefing should

19    continue on the narrow issue that's pending, and I will get to

20    that in a moment.

21              Did you want to say something, Mr. Morvillo?

22              Oh, Ms. Courtney, you want to say something?

23              MS. COURTNEY:  I just wanted to add one thing.

24              Just to be clear, because I'm afraid that it may have

25    been little bit buried in our briefing, that, as an
```

 1   alternative, if the Court were to impose a stay or a partial
 2   stay, we would ask that, at a minimum, the SEC transcripts and
 3   the exhibits be produced to us.  The argument of the fact that
 4   200,000 documents are going to be produced, which is going to
 5   be a million and a half pages, is going to completely overload
 6   the burden in our defense.  And to even just see the exhibits
 7   that were used at the SEC's deposition, it would be -- you
 8   know, if we could get initial disclosures pursuant to SEC
 9   discovery --
10          THE COURT:  Mr. Lichtmacher, you've got to find that
11   mute button.  We just heard like the Hell's Angels go by.
12          MR. LICHTMACHER:  I'm trying not to laugh, your Honor.
13   I think I found it.  Here we go.
14          THE COURT:  When you say you want the transcripts, you
15   mean the deposition transcripts?
16          MS. COURTNEY:  Correct.
17          THE COURT:  So you want documents that will be 3500 in
18   the criminal case.
19          MS. COURTNEY:  I don't know if they're going to be
20   3500 in the criminal case.
21          THE COURT:  Well, everybody's okay with you getting
22   the ones that aren't, so if there are any, that's what you
23   want.
24          MR. McMAHON:  That's exactly what they're seeking, and
25   the reason they're giving for it is it would be very convenient

1    for us to have it, which, of course, every criminal defense

2    attorney could make that argument.

3         MS. COURTNEY:  I'm not going to repeat what your Honor

4    said about bringing the cases concurrently, but even if you

5    were to say that the transcripts were 3500 material, the

6    exhibits to the transcripts would still be extremely useful in

7    obtaining those exhibits in a way that they were entered into

8    the transcript rather than getting a data dump of 200,000

9    documents.

10        THE COURT:  Well, I agree that getting a data dump of

11   200,000 documents is not that helpful, which is why usually, in

12   a criminal case, I twist the government's arm, and they almost

13   always don't need their arm twisted.  I ask them to informally

14   let the defense know what the government thinks are the hot

15   documents, and I don't think they've ever said no, or what the

16   hot recordings are or what they think the smoking guns are.  So

17   maybe this request needs to come at our next conference in the

18   criminal case.

19        What is it you wanted to say, Mr. Morvillo?

20        MR. MORVILLO:  I just wanted to respond to the SEC's

21   point of three trials.

22        The first point I would like to make is that the U.S.

23   Attorney's Office has said there's going to be no second trial

24   anyway because they're going to beat the criminal defendant, so

25   if that happens, that solves that concern.  But we can also

1   solve that concern by scheduling the criminal trial and the SEC

2   trial back-to-back.  So if the criminal trial, for example,

3   were to go in January of 2017, then I don't see why the SEC

4   trial couldn't go in February of 2017.  Allow the civil

5   defendants to take their discovery and proceed.  And if the

6   criminal defendants are successful in their criminal case, they

7   will have more information than anybody about what the

8   witnesses are going to say, and if they lose, then they won't

9   be a part of the trial anyway.  So you really are only looking

10  at two trials, and two trials are happening anyway.

11          THE COURT:  Well, so what you're proposing is -- what

12  you said is -- let's say we have the criminal trial in January

13  and then have the SEC trial in February.  So what you're

14  proposing means that all the discovery in the civil case has to

15  take place now.  So all you're saying is you don't want a stay.

16          MR. MORVILLO:  Correct.

17          THE COURT:  Correct.  Okay.

18          MR. MORVILLO:  My point, Judge, is that it solves --

19          THE COURT:  I think you're right that it's unlikely

20  that we'll have three trials if Mr. St. Lawrence and

21  Mr. Troodler are convicted, but, from where I sit, that's not a

22  foregone conclusion.

23          MR. MORVILLO:  Nor is it from where I sit, Judge.  And

24  I'm certainly not trying to cast any aspersions on our

25  co-defendants here.

20166ureimd

1           My point is only that if the United States Attorney's

2    Office is concerned about the statements that will be created,

3    then that can be taken care of very easily by a protective

4    order.  And I and I saw my co-counsel take great offense at the

5    notion that we would not abide by a protective order that

6    the --

7           THE COURT:  You represent the Town of Ramapo?

8           MR. MORVILLO:  Correct.

9           THE COURT:  Mr. St. Lawrence is the supervisor of the

10   Town of Ramapo.  He's your client.

11          MR. MORVILLO:  He's not my client, Judge.

12          THE COURT:  Well, he is the supervisor of your client.

13          MR. MORVILLO:  He is the supervisor, yes.

14          THE COURT:  So whatever you get you're going to

15   promise not to share with your client?

16          MR. MORVILLO:  I do not represent Mr. St. Lawrence.

17   We have an understanding.  But, yes, I would not share that

18   with Mr. St. Lawrence.  That's the understanding between the

19   Town and Mr. St. Lawrence.  They have different representation.

20   And if there is a protective order entered saying I can't share

21   the information with Mr. St. Lawrence, then I can't share the

22   information with Mr. St. Lawrence.  And I am telling you right

23   here, on the record, I will abide by that, as will the people I

24   represent.

25          THE COURT:  Well, I don't doubt that the lawyers will

```
 1 │ abide by it.  I hope that's not what Mr. McMahon was implying.
 2 │         So let me just think out loud and follow this thought.
 3 │         Why wouldn't a protective order that said essentially
 4 │ the discovery in the SEC case goes forward in the normal
 5 │ course, but nothing that happens can come to the attention of
 6 │ Mr. Troodler or Mr. St. Lawrence or their lawyers in the
 7 │ criminal case.
 8 │         Well, I guess I see one question.  Mr. Burke is in
 9 │ both.  But that could be remedied.
10 │         What's wrong with that, Mr. McMahon?
11 │         MR. McMAHON:  Judge, I think it still gets to a point
12 │ where we're still having, you know, this person being deposed
13 │ and then that person being deposed.  It becomes very confusing
14 │ and it adds an extra burden.
15 │         THE COURT:  Well, the extra burden it creates is your
16 │ witnesses will be making more statements than they would
17 │ ordinarily make, but they won't come to the attention of the
18 │ defendants in advance of when they would ordinarily come to
19 │ their attention.
20 │         MR. McMAHON:  But, Judge, I just don't see where this
21 │ is going to lead.  I mean, if they take these depositions
22 │ between now and the time of the criminal trial, they first got
23 │ to go through all of the documents and get ready for them.  And
24 │ I think this is really just an attempt to rush to depositions
25 │ as quickly as they can to get the statements as quickly as they
```

1     can.

2              THE COURT:  Well, it does raise a practical question,

3     which I was going to ask the defendants.

4              You know, this notion that you propose, Mr. Morvillo,

5     of going to trial in February, this would be like the

6     land-speed record for a civil case of any sort, let alone a

7     complex and unusual securities case.  So isn't it, as a

8     practical matter -- you know, I sit here every day and, as hard

9     as I try to kick the -- as hard as I try to get the lawyers to

10    move along, I can't get the simplest employment discrimination

11    to trial in six months.

12             MR. MORVILLO:  To be clear, Judge --

13             THE COURT:  So there's no way this trial is ready.

14             MR. MORVILLO:  I'm not suggesting the trial is ready,

15    nor was I suggesting, by the way, that the criminal case should

16    go in January and the civil case should go in February.

17             THE COURT:  It was just a for instance.

18             MR. MORVILLO:  I was saying that one could follow the

19    other.

20             THE COURT:  But, as a practical matter, that just

21    never happens.  The civil cases take years.  Look at all of

22    you.  Just scheduling a deposition, to find a day when you can

23    all be there, like we're talking about years before you're

24    getting to depositions anyway.

25             MR. MORVILLO:  But I'm not sure --

1            THE COURT:  So what's the harm in a stay for what is

2    going to be a limited period?  I don't know what the defendants

3    are going to be asking for for a criminal trial.  They

4    certainly wanted a leisurely schedule so far in the criminal

5    case.

6            MR. MORVILLO:  Well, that's the point, Judge.  We

7    don't know when the criminal trial is going to go.  If the

8    criminal trial is going in October or November, then, fine,

9    from the Town's perspective, stay the discovery until then.  We

10    can live with a couple of months of looking at the 200,000

11    documents, that's for sure.  But if it's going to go on until

12    next July, now, I could certainly get through the 200,000

13    documents before then and I will be ready to take discovery,

14    take depositions, before next July, before the criminal trial,

15    and the Town's prejudiced by not --

16            THE COURT:  Right.  The delay we would be talking

17    about would not be as long as that because -- I'm making this

18    up, but let's say the criminal trial goes in January or March

19    or July and you're ready to take depositions in February.

20    Okay.  February to March.  February to July.  It's not the end

21    of the world.

22            MR. MORVILLO:  Well, February to March is not, but

23    February to July damages the Town.  The longer this hangs over

24    them, the worse it is for the Town.

25            There is real prejudice here, Judge.  And the U.S.

1     Attorney's Office may not see it and they may pooh-pooh it in

2     their documents, but there's real prejudice to the Town.  These

3     are real people with real problems and it is a town that needs

4     to move on from this and/or defend itself, which is what we

5     want the opportunity to do, to defend the Town.

6          THE COURT:  You don't think you would have the same

7     problem if the SEC had never brought its case?  You don't think

8     you would have the same problem from the criminal indictment?

9          MR. MORVILLO:  We might have the same problem, but the

10    problem is exacerbated by the fact that the Town has been

11    charged with a fraud.  The Town's been charged with a knowing

12    fraud, and we have to have an opportunity to --

13         THE COURT:  Right, which can only be executed through

14    its people --

15         MR. MORVILLO:  I understand that.

16         THE COURT:  -- some of whom are indicted.

17         MR. MORVILLO:  That is true.  And those people will

18    answer for their conduct.  But the Town itself needs to be able

19    to prove that it was not complicit in this.  It wants its day

20    in court.  And it would not like to sit around for a year and

21    have people berating the Town Council because they participated

22    in this when they didn't or having questions asked about

23    whether or not they could put together a budget based on this

24    problem.

25         The bond rating is a problem.  The budget is a

1    problem.  There are many, many problems that come with just

2    being charged, and a stay exacerbates them by the enth degree.

3           So if you're asking us to wait for a year, we don't

4    want to wait for a year.  We want to move.  And I understand

5    that it takes a long time for us to get to the point where we

6    have a trial, but if we have to wait a year to start that

7    process, that's a year that's wasted.

8           THE COURT:  Well, it wouldn't be a year to start the

9    process.  It would only be cabining the potential government

10   witnesses.  At this point, none of us really knows which of the

11   civil defendants that is and how many other witnesses there

12   are.

13          What did you want to say, Mr. Vasilescu?

14          MR. VASILESCU:  Well, I'm trying to understand

15   Mr. Morvillo's proposal, but it sounds like what he's saying is

16   there would be one track of the civil suit for Mr. St. Lawrence

17   and Mr. Troodler which will not go forward and then the other

18   track for the other defendants would go forward.  This is

19   problematic because, in pushing forward our case, you know,

20   it's efficient for us to depose Mr. St. Lawrence and

21   Mr. Troodler.  In a civil case, they take the Fifth.  We get

22   inferences in their case.  So going forth with only part of the

23   case going forth would be problematic.

24          Now, to the extent they were still in the case, I

25   don't know how it would be workable to have the sequestrant of

```
1     the information that Mr. Morvillo gets to not get to Mr. St.
2     Lawrence's attorney because if we did go forward and Mr. St.
3     Lawrence would be part of our case and there were depositions,
4     he would have a right to be there, hear the questions that
5     Mr. Morvillo is asking, and the questions Mr. Morvillo is
6     asking could give away information that Mr. St. Lawrence's
7     attorney isn't supposed to get.  So it's highly -- I've never
8     seen a civil SEC case tried like that, and I think it would be
9     very problematic for any civil case.
10            I mean, as to his point regarding an entity like the
11    Town being in the position where there's a parallel criminal
12    case, well, there's been scores of parallel criminal and SEC
13    cases where there's uncharged entities, many of them prominent
14    public companies, which had to wait until the case against the
15    individuals was tried, and so I don't see what other difference
16    there is here other than this entity is a town.  And we
17    understand that there's a lot of these criminal dockets that
18    can move quickly, and so we don't think that that should be the
19    basis to carve out this case into two different cases on two
20    different tracks.
21            THE COURT:  Mr. Janey.
22            MR. JANEY:  Your Honor, I'm a little bit confused.  I
23    thought the record before your Honor indicated that the SEC
24    took no position on the government's application.  I understand
25    that counsel may be somewhat elucidating answers to your
```

1    Honor's questions, but it sounds a little bit just to me, in my

2    small brain, your Honor, that perhaps the SEC is taking an

3    advocacy position on the government's application.

4              THE COURT:  I think they are advocating against your

5    counterproposal.  They're neutral on the government's proposal.

6              MR. JANEY:  What I would also say, more substantively,

7    your Honor, we certainly appreciate from Mr. Klein that your

8    Honor is trying to very artfully tease out the practical

9    questions to figure out a practical solution to this issue, but

10   what I -- and recognizing that this application is

11   discretionary, it's a motion to stay, it's in your Honor's

12   discretion as to whether to grant it and how it might be

13   fashioned, but we would be remiss on behalf of Mr. Klein if we

14   did not point out that this is an application premised on law,

15   and the question before your Honor, in part, albeit a

16   discretionary application, is whether the government has met

17   its burden.

18             There's a lot of discussion in this courtroom on

19   behalf of the government as to the burdens that might occur if,

20   for example, there were multitrack trials, but, your Honor,

21   when you look at the law that undergirds the application, and

22   I'm specifically referring to the Louis Vuitton factors as an

23   example, the only factor that's relevant that we would submit

24   to your Honor is the public interest consideration, and, there,

25   the government, in their papers, your Honor, have talked at

1    length about issues related to retaliation.  They have hinted

2    at witness tampering.  And, your Honor, what we would submit,

3    unless the government can talk in ways that are more than

4    theoretical, unless the government can talk to a real threat to

5    its 3500 material, it has not met its burden, and particularly

6    here, your Honor, where the key witnesses have spoken.  And

7    we're not just talking about witnesses generally.  We're

8    talking about the key witnesses that would advance the ball in

9    the civil trial, where the key witnesses have spoken.  The

10   government cannot and they have not today and they have not in

11   their papers talked in a real meaningful way about the real

12   danger to the 3500 material.

13          THE COURT:  Well, I gather, and they'll correct me if

14   I'm wrong, that it's just a -- I'm putting aside their

15   retaliation argument, but it's just the general, you know,

16   rules of the game that the criminal defendants don't get the

17   statements of the government's witnesses until 3500 says they

18   do or the government, in its beneficence, perhaps with a little

19   help from the Court, bestows it and that if the civil process

20   going forward were to result in the criminal defendants getting

21   an advantage that Congress says they're not entitled to, that

22   that hurts the public interest.

23          MR. JANEY:  But we would submit, your Honor, that it's

24   not a given that what's generated here is 3500 material.  And

25   part of our concern on behalf of Mr. Klein is that there's a

1    real concern.  There's a real policy precedent that this would
2    then create.  It cannot be the case --

3           THE COURT:  Well, I think if it's not 3500, then it's
4    not going to be stayed if they get their way.  It's only if
5    it's 3500 that they're asking for anything.  What I can't
6    really get my arms around, I don't know, is is that shutting
7    down 99 percent of the civil discovery or 20 percent.  I can't
8    tell.

9           Mr. Phelan.

10          MR. PHELAN:  John Phelan, your Honor.

11          Just to deal with what you just asked, it seems to me
12   that, at some point -- the government doesn't know now, they've
13   said they don't know, but at some point they should know -- be
14   able to tell us who the witnesses are that they're not going to
15   call so at least we can get started on discovery on that.

16          THE COURT:  Well, if I give them what they're asking
17   for, they're going to be telling you very soon who they are
18   going to call, and then you can get started on everyone else.

19          MR. PHELAN:  Either way.

20          THE COURT:  What I can't tell is is the list they're
21   going to give you going to be a list of everyone who you would
22   be thinking of.  I just don't know.  Probably not, but I don't
23   know.

24          MR. PHELAN:  Your Honor, the other thing I wanted to
25   say, and your Honor dealt with this a few minutes ago, this is

1    all a creature of the government's creation.  Okay?  This

2    problem was created by the SEC and the government working

3    together in the investigation stage throughout, bringing both

4    their cases on the same day, having a joint press conference,

5    issuing press releases the same day.  They set this up and then

6    they said, well, we'll just go to the Judge and ask her for a

7    stay.  They're setting the Court up, your Honor, is what

8    they're really doing.

9             THE COURT:  Well, I understand that argument, and

10   there's some facial appeal to it, but isn't it also true that,

11   you know, the Executive Branch has legal responsibilities, and

12   one of them is to prosecute people who they think have

13   committed crimes and one is to sue people who they think

14   violate the securities laws?  And what are they supposed to do,

15   pull their punches because then they're going to have to move

16   to stay?  I mean, I don't think that we really want our public

17   officials saying, oh, you know what?  I think I can prove

18   beyond a reasonable doubt that A and B did something really

19   bad, but I'm going to just step aside and let the SEC handle it

20   civilly, nor do we want the SEC to say, oh, you know what?  We

21   wanted to sue six people, but it's going to cause a

22   complication, so we'll just not.  You know?  I mean, that's the

23   counterargument.

24            So I understand that, in a sense, the government's

25   brought it on itself by bringing these two cases at the same

1    time.  On the other hand, you know, that's what they're

2    supposed to do.  They're not supposed to shirk their

3    responsibilities just because it might then entail an

4    application for a stay which they may or may not get.

5            Mr. Morvillo.

6            MR. MORVILLO:  Judge, if I may, it occurred to me

7    while we were sitting here that we may be putting the cart

8    before the horse.  If we had 200,000 documents that we have to

9    go through, that's one-point-whatever million pages.

10           THE COURT:  That sounds horrible.

11           MR. MORVILLO:  It does sound horrible.  And your point

12   is that we would not be ready for depositions by, say, the

13   middle of July, which is obvious.  It seems to me that the U.S.

14   Attorney's Office stay is premature because we haven't gotten

15   the documents, and if it's going to take us three months, four

16   months, six months to go through them, perhaps we should be

17   having this conversation six months from now and not now.

18           There's no reason to stay these depositions at this

19   point because what the government is really trying to do,

20   Judge, is they don't want their witnesses on the record more

21   than once.  That's what this is.  It's nothing more than that.

22   So it's all dressed up as all of these other things, but they

23   just don't want these people speaking two or three times if

24   they don't have to.  I understand why.  Were I in their shoes,

25   I'm sure I would be doing the same thing.

1            THE COURT:  I think you've hit the nail on the head.

2            MR. MORVILLO:  By the way, I don't think that's the

3    standard.

4            THE COURT:  I don't think they're really hiding from

5    that.

6            MR. MORVILLO:  No.  I still don't think it's the

7    standard, Judge.

8            THE COURT:  I know they threw in this retaliation

9    thing, but they've all but said they don't want you getting any

10   more -- the criminal defendants getting any more 3500 than they

11   would in the absence of the civil case.  That's what they want.

12           MR. MORVILLO:  Right.  But since we don't know when

13   the criminal trial is going to be, perhaps this issue should be

14   raised after they know when the criminal trial is going to be,

15   because if it goes quickly, we may not be done reviewing the

16   documents before the trial, and if they decide to take two

17   years for a trial, then we would be back here saying, Judge,

18   it's unfair.  So either the criminal trial needs to be

19   scheduled first --

20           THE COURT:  Well, I guess the flip side is no harm in

21   entering a stay and you can come back to me and say it's gone

22   on too long.  But this is what I was getting at before.  I

23   mean, the defendants in the SEC case haven't even answered.  We

24   haven't even had our first discovery conference.  So I feel

25   like it's entirely possible that these two ships are going to

1    pass in the night and we may not have a problem.

2              MR. MORVILLO:  In which case we would suggest, Judge,

3    that you err on the side of not entering a stay so that we

4    don't have to come back and try to get it lifted.  If it's

5    premature, then they haven't met their burden.  They don't need

6    a stay now.  They just want one, but they don't need one,

7    because we're not ready to go ahead and take depositions.  So

8    just because they want it doesn't mean they get it.  I mean, I

9    keep telling my kids that.  I know they argue against it as

10    well.  But that's where we are, Judge.  We want a stay, so

11    there should be a stay.  They're not ready for it.  It's

12    premature.  They haven't met their burden.  And so this should

13    be put off.  The Court should deny this motion, and we

14    should -- with leave to reply at some point in the future,

15    after we set up the schedule.

16              THE COURT:  What's wrong with that, Mr. McMahon?

17              MR. McMAHON:  Well, a couple of issues.  It could

18    work.  What if we said that we entered the stay that we request

19    now of depositions and the rest without prejudice to their

20    coming back later if they want to come back later so there

21    would be no prejudice.

22              THE COURT:  Opposite sides of the same coin.

23              MR. McMAHON:  The only other issue is that the SEC

24    does have to go ahead with this Rule 26 discovery now, and that

25    would include the deposition transcripts, and I would ask that

1   that be stayed because that's extra 3500 material.

2          MS. COURTNEY:  Your Honor, can I just address the 3500

3   material and the fact that Mr. Troodler and Mr. St. Lawrence

4   are being looped together as co-defendants, as they are, but

5   they are two separate individuals, and the concern about

6   Mr. St. Lawrence perhaps taking the Fifth, retaliating, doing

7   whatever he's going to do --

8          THE COURT:  That's not moving me.

9          MS. COURTNEY:  But, your Honor, with all due respect,

10  and I understand that's not moving you, Mr. Troodler has

11  already testified.  He's already submitted to an FBI interview.

12  The idea that -- I mean, he's a young man with four kids.  The

13  idea that he could intimidate someone, he's not in charge of

14  anyone, he's not --

15         THE COURT:  I haven't seen a shred of evidence that he

16  would intimidate anyone.

17         All right.  Here's what I think.  And this is only for

18  the SEC.  We're going to get to the other thing in a moment.

19         First of all, there was no opposition to the

20  government intervening, and I'm granting them permission to

21  intervene under Rule 24(b)(2).  I don't have to reach

22  intervention as of right because I think, under these

23  circumstances, permissive intervention is warranted.

24         The Louis Vuitton case, which is 676 F.3d 83,

25  discusses the factors I'm supposed to consider.

1            First is the extent of the overlap between the two
2    cases.  From what I can tell, it's close to if not a hundred
3    percent, which weighs in favor of a stay.

4            The second is the status, including whether the
5    defendants have been indicted.  Here, some of the civil
6    defendants have been indicted.  We're not speculating as to
7    whether a criminal case is coming down the pike.  We know there
8    is one.  The criminal case, even if it's on a slower track than
9    some other criminal cases, will I think certainly be resolved
10   before the civil case is ready for trial.  At least one or more
11   of the defendants in the civil case will take the Fifth.  And
12   that factor, two, weighs in favor of a stay.

13           The third factor is the private interests of or
14   prejudice to the plaintiff.  The plaintiff is not objecting to
15   a stay, so that factor is neutral.

16           Private interests and burden on the defendants is the
17   next factor, and, here, the big one is the possible delay and
18   the resolution of the civil case and having it hanging over the
19   heads of the civil defendants, including the Town.  And to the
20   extent the civil case is going to come out favorably for any
21   defendant, having the case hanging over his head or its head
22   for longer than it otherwise would be would be a burden.  It's
23   not clear how much of one because it's not clear that the stay
24   the government's asking for is really going to result in any
25   substantial delay given that there will still be plenty for the

1    civil parties to do in the meantime and that the criminal case

2    is going to be trial ready before the civil case.  So I think

3    delay is a factor that weighs against a stay as a general

4    proposition, but, in this case, how much of a delay there would

5    be is speculative, and if it turned out to be substantial, we

6    can always revisit.  So, at this point, I think that factor

7    weighs against a stay, but not heavily.

8         The fifth factor is the interests of the Court.  My

9    interests are really not relevant here.  On the one hand, I

10   want to have efficient resolution and avoid piecemeal

11   litigation.  On the other hand -- and I want to move cases as

12   speedily as possible.  On the other hand, fairness to all

13   parties trumps efficiency.  I just don't see the Court's

14   interests weighing all that much except maybe to the extent

15   that some of the proposed alternatives would be rather

16   inefficient.

17        And the last factor is the public interest.  If it has

18   not been clear already, I find the government's retaliation

19   rationale weak.  There may have been retaliation against

20   Ms. Reimer, we just don't know, but I think the thing with

21   Mr. Friedman, to me, that's just politics.  I don't think that

22   that's improper retaliation.  In any criminal case,

23   retaliation, I suppose, is always a theoretical possibility,

24   but, A, as I said a moment ago, I haven't seen a shred of

25   evidence that Mr. Troodler is inclined that way and the

1   accusations that have been made against Mr. St. Lawrence

2   suggest he might be, but, A, they're not proven and, B, he

3   would have to be an idiot at this time to do something so

4   obvious as to retaliate against a potential witness.  And

5   frankly, to the extent that the revelation of witness

6   statements might prompt retaliation, the revelation of

7   somebody's name as a government witness would do just about the

8   same thing.

9        However, I think there is a public interest at work

10  besides avoiding retaliation here.  There's a public interest

11  in criminal defendants not gaining discovery via a civil case

12  that they wouldn't otherwise have because of the obvious risk

13  that evidence or testimony could be tailored.  And that's not

14  something that I'm saying is particular to either of the

15  criminal defendants here, but Congress passed the Jenks Act and

16  it passed Section 3500 because it was concerned generally about

17  that problem in every case.  And the rationale behind the Jenks

18  Act would be undermined if criminal defendants could use the

19  civil process to gain information to which they would not

20  otherwise be entitled.  And I think it's a legitimate thing for

21  the government to argue.  I recognize that only two of the

22  civil defendants are in the criminal case, but the problem

23  exists regardless of how many of the civil defendants are also

24  criminal defendants.

25        There's a case called SEC v. Doody, 186 F.Supp.2d 379

1   from this district in 2002, where the son, Doody, IV, was named

2   in a criminal case, but his father, Doody, Sr., was named only

3   in a civil case and he wanted to go forward with discovery and

4   the government wanted a stay, and Judge Kaplan said he would

5   have to be "unimaginably naive" not to suppose that the father

6   was going to be a stalking-horse for the son and that discovery

7   would afford the son information he would not otherwise have,

8   and he found there was little prejudice to the father from the

9   stay and it would outweigh the government's interests.

10          Now, that was a different situation because, there,

11  the stay was only for about six weeks whereas, here, we don't

12  really know how long the delay will be as a practical matter.

13  But, on the other hand, in this case, the government sought a

14  blanket stay whereas, here, it doesn't.

15          I also recognize, here, there's no family

16  relationship, but I would have to be naive not to realize that

17  Mr. St. Lawrence is the Supervisor of the Town of Ramapo and

18  the President of the Ramapo Local Development Corporation and

19  that Mr. Troodler was formerly Executive Director of that

20  entity and that Mr. St. Lawrence, as the Supervisor of the Town

21  of Ramapo, is the boss of Troodler, Klein and Oberman, who are

22  or were all Town of Ramapo employees, so the possibility that

23  their loyalty to or control by Mr. St. Lawrence would result in

24  the discovery helping Mr. St. Lawrence in the criminal case is

25  not remote.

1           And a protective order is a possibility, I'll

2   certainly consider it down the road, but right now it doesn't

3   seem practical given that, for example, Mr. St. Lawrence has

4   the same lawyer in his criminal and SEC cases.  But if the

5   problem persists, maybe he'll want to make a change.

6           The alternatives that the defendants have suggested I

7   don't think are practical.  Mr. St. Lawrence proposes that we

8   put off discovery of witnesses who take the Fifth, that the

9   government move for protective orders if a potential witness is

10  noticed, and that the government attend and participate in

11  depositions.  I'm not really sure how that would work.  But the

12  second and third prongs of that proposal, as the government

13  suggests, I think would lead to endless litigation.  Maybe if

14  the stay really drags on, that's something we could consider,

15  but, at this point, it seems to invite a lot of litigation

16  without a significant counter-balancing advantage.

17          Mr. Klein proposes essentially severing Mr. St.

18  Lawrence and Troodler from the civil case and walling them off

19  from the discovery, which, again, doesn't seem practical.

20  First of all, the SEC may want them as witnesses.  And the

21  proposal would mean at least a risk that discovery would have

22  to be done twice.  So if we wall off St. Lawrence and Troodler

23  and the remaining defendants take a deposition of a third party

24  and then St. Lawrence or Troodler is acquitted and they're

25  going to want to go back and take that same deposition, it's

1   just going to be a lot of duplication, which doesn't seem

2   practical, and the possibility of duplicative trials.  But even

3   if it's just duplicative discovery on two tracks, that's still

4   a burden on the witnesses, and that does not seem like a

5   reasonable price to pay when the stay that's being sought may

6   well not even significantly delay resolution of the civil case.

7          In addition, I think the public not only has an

8   interest in the criminal defendants being subject to the ground

9   rules of the Jenks Act in not getting an advantage that they

10  would not otherwise get, but it also has an interest in the

11  discovery in the civil case not being unbalanced in the sense

12  that the SEC case will be an open book absent the stay, but the

13  individual defendants, at least some them, will, in all

14  likelihood, take the Fifth.

15         As we've discussed, I recognize that the problem is,

16  in a sense, of the government's own making because it brought

17  the cases together.  There's nothing improper about that.

18  There is some appeal to the argument that the government should

19  have to live with the consequences of that.  On the other hand,

20  as we've talked about, I think the public has an interest in

21  the civil enforcement of the securities laws and the SEC

22  shouldn't have to stay its hand in bringing its case just

23  because a subset of those who it thinks have civil liability

24  also have criminal liability.

25         So considering the Louis Vuitton factors, I think they

1    weigh pretty decisively in favor of the limited stay sought

2    here.  If it does drag on too long, however, if the civil case

3    does grind to a halt with no prospect of the criminal trial in

4    sight, I will revisit.

5         I recognize I could do what Mr. Morvillo suggested and

6    punt this decision, but I think punting the decision and

7    letting the government move later or making the decision and

8    letting the defendants move later are opposite sides of the

9    same coin and, at this point, the Louis Vuitton factors I think

10   still favor a stay.

11        So I'm going to grant the government's motion in

12   connection with the SEC's case.

13        And let me ask you, Mr. McMahon or Mr. Dember, to

14   resubmit your proposed order making it crystal clear that

15   you're not asking to stay depositions, interrogatories,

16   requests to admit or the disclosure of transcripts except to

17   the extent that it would reveal statements of potential

18   government witnesses and also putting in a date by which you

19   will let everybody in the civil case know who those witnesses

20   are.  And if you could get me that -- I mean, we have a long

21   weekend coming up, so I don't want to hold your feet to the

22   fire.  Is a week okay?

23             MR. McMAHON:  Yes, that's fine, your Honor.

24             THE COURT:  Okay.  So that would be July 7th.  And

25   hopefully run it by your adversaries first and you'll all be

1    able to agree.

2           Now, the Reimer issue is more narrow, as I understand

3    it.  I guess I just want to make sure I understand the state of

4    play, but, as I read the papers, nobody was objecting to a stay

5    of discovery for the moment, but the defendants want to finish

6    briefing and have me rule on the pending summary judgment

7    motion, which is limited to the issue of whether Ms. Reimer's

8    speech was or was not part of her job responsibilities and was

9    or was not First Amendment protected.  And Mr. Posner has a

10   motion to dismiss pending.

11          MR. POSNER:  Yes.

12          MR. LICHTMACHER:  I'm sorry.  Fred Lichtmacher, your

13   Honor.

14          Mr. Posner filed a motion to dismiss?

15          THE COURT:  That's what he's saying.

16          MR. LICHTMACHER:  Well, I did not receive it.  Okay.

17   May I ask what the return date is.  I don't want to hear that

18   it's tomorrow.

19          THE COURT:  Well, I put a halt on the briefing

20   schedule, but let me -- I happen to have the docket right here.

21          MR. LICHTMACHER:  Yes.  I didn't get a bounce on it.

22          THE COURT:  Well, he probably hasn't filed it yet

23   because it's probably bundled.

24          MR. POSNER:  Right, it's bundled, your Honor.  But

25   there was a letter to the Court, which is docketed, indicating

 1    my intention to make the motion, and, of course, I did serve

 2    hard copies, but I will be happy to send another copy to

 3    Mr. Lichtmacher if he didn't get it.

 4            MR. LICHTMACHER:  Thank you.

 5            THE COURT:  All right.

 6            And, Mr. Lichtmacher, your position is you're okay

 7    with a stay of discovery and of that motion or do you want to

 8    go forward with the motion?

 9            MR. LICHTMACHER:  Oh, we do not want to go forward

10    with the motion.  We agree with the government that it would

11    interfere somewhat with their case and it would make

12    Ms. Reimer's exercise of her First Amendment rights kind of

13    futile.

14            THE COURT:  So she prefers that everything be stayed

15    and the motion not go forward at this time.

16            MR. LICHTMACHER:  Correct.

17            THE COURT:  Something about her First Amendment

18    rights?

19            MR. LICHTMACHER:  Well, the point was it seems like

20    the exercise of her First Amendment rights would be somewhat

21    futile if, in fact, it helped the defendants and hurt the

22    government in its criminal case.

23            THE COURT:  Well, obviously, for you, if the

24    government gets a conviction of Mr. St. Lawrence, that only

25    helps you in the civil case.  But what is it about finishing

```
 1    the briefing on the summary judgment motion that you think
 2    would be harmful to your client?
 3              MR. LICHTMACHER:  I brought this to your attention
 4    before, your Honor.  I thought that the scope of the questions
 5    in a Rule 56.1 were overly broad.  And I think the government
 6    agrees with us.  We thought that it was way outside the bounds
 7    of just what her job responsibilities were.
 8              THE COURT:  Didn't I not agree with you?
 9              MR. LICHTMACHER:  You did not agree with me, your
10    Honor, but I would hope that you would revisit it in light of
11    Mr. McMahon's application, which I thought was much more
12    comprehensive than mine and perhaps would put a new light on
13    things.
14              THE COURT:  Oh, now, don't sell yourself short,
15    Mr. Lichtmacher.
16              But let me ask you, Mr. McMahon, all that's going to
17    happen now if the summary judgment briefing goes forward is
18    that Mr. Lichtmacher's going to respond to the -- well, he's
19    going to respond to the motion to dismiss, which is addressed
20    to the face of the complaint and isn't going to create new
21    statements of Ms. Reimer.
22              MR. LICHTMACHER:  May I correct you, your Honor?  If
23    you're talking about Ramapo's, it's a summary judgment motion
24    and it's a 56.1, which is the crucial thing.  Maybe I didn't
25    hear you correctly.  But it does create new statements by
```

1    Ms. Reimer.

2            THE COURT:  Well, what I was talking about is the

3    motion to dismiss by Mr. Oberman --

4            MR. LICHTMACHER:  Oh, okay.

5            THE COURT:  -- which would be addressed to the face of

6    the complaint, and it would create lawyers' arguments, but I

7    don't look at affidavits or anything like that on a motion to

8    dismiss.  But on the motion for summary judgment, yes, the

9    plaintiff is going to have to respond to the 56.1 statement on

10   the limited issue of the plaintiff's job responsibilities.  But

11   I'm just trying to figure out how answers like that could give

12   the criminal defendants any meaningful discovery.  I mean,

13   right now, there's a very limited issue which may be

14   dispositive of the civil case, which is why I sort of

15   bifurcated that issue and we went ahead with discovery on it

16   without going through full-blown discovery, which is what were

17   her job responsibilities.

18           I mean, that's not going to be a controversial issue

19   in the criminal case, is it?

20           MR. McMAHON:  No, it's not.

21           I don't object to the motion for summary judgment

22   going ahead.  I don't object to the extent that there would be

23   statements about what Ms. Reimer's job responsibilities were.

24   I don't object to that because that's just not going to really

25   make a difference to me at the end of the day as a practical

1    matter.  But in my reply brief, I identify from the defendants'

2    proposed Rule 56.1 motion some statements here that they are

3    asking Ms. Reimer either to agree to or disagree with and

4    explain why she disagrees with it and propose an alternative

5    that seemed to go beyond what her job responsibilities were and

6    get into things that are just at issue in the criminal case.

7    And, also, I mean, there are things here about the town's

8    accounting policies.  There are things about statements that

9    she made to others or things that she did that are relevant to

10   the criminal case that go beyond her job responsibilities.

11            THE COURT:  But the defendants' basis for those

12   answers in the 56.1 statements are her deposition and her 50H

13   transcript, which is the same as a deposition.  You're nodding

14   like you know what that is.  That puts you ahead of me.  I had

15   no idea what a 50H was when I was an assistant.

16            MR. McMAHON:  I am just acknowledging that I hear you,

17   but I have absolutely no idea.

18            MR. LICHTMACHER:  Your Honor, that's not issue.  If I

19   may, I think --

20            THE COURT:  Hold on, hold on, hold on,

21   Mr. Lichtmacher.

22            Just so you know, and it took me a while to figure

23   this out, 50H is like this New York municipal law section that

24   says, before you can sue a municipality, you have to file a

25   notice of claim, and the municipality's essentially allowed to

Case 7:16-cv-03471-PCS Document 593 Filed 11/04/16 Page 98 of 120
20166ureimd

1    take your deposition before you can file the lawsuit.  So it's

2    a pre-suit deposition.

3              And so they already have that.  And they already have

4    her regular old deposition on this issue.  And all these

5    statements in the Defendants' 56.1 are basically taken, whether

6    they're taken misleadingly or not, I don't know, from her

7    already created statements.  And Mr. Stern's not one to usually

8    mislead, so I doubt that they're going to be controversial.

9    But I looked at all of them, and I'm just trying to figure out,

10   you know, putting back on my old prosecutor's hat, which I

11   haven't worn in a long time, and I know I only know, you know,

12   one millionth about what you know about your case, but I was

13   trying to figure out how any of this is going to hurt you in

14   the criminal case, and I couldn't really figure it out.  You

15   know, you say in your papers that some of this relates directly

16   to matters that would be at issue in the criminal case.  I just

17   didn't see it.

18             MR. McMAHON:  Oh, a lot of these relate directly to

19   the criminal case.  How they would hurt us?

20             THE COURT:  Yes.

21             MR. McMAHON:  I guess it depends what --

22             THE COURT:  I mean, maybe they relate, but are they

23   going to be controversial?

24             MR. McMAHON:  Some things may be.  Again, I don't know

25   what the answer is going to be to all of these.  Obviously,

1    I've spoken with Ms. Reimer and I know what she has to say on a

2    lot of these, but I don't know everything that she has to say.

3    But I think, for example, if you look on page 5, to pick one

4    just right off the top of my head here, number 120, as part of

5    her job, plaintiff personally executed transfers between the

6    ambulance fund and the general fund.  Well, I don't know if she

7    did that personally or if she directed somebody else to do it

8    or if somebody else did it.

9         THE COURT:  Well, but you could tell because you could

10   look at the 56.1 and it has in parentheses at the end of that

11   statement a reference by exhibit and page number to where in

12   her 50H or her deposition she said she did that.

13        MR. McMAHON:  Right.  I wasn't privy.  I don't have

14   those materials.

15        THE COURT:  Well, it's public -- it will be publicly

16   filed.  You're right.  You don't have it yet.  Because of my

17   bundling rule, it's not publicly filed yet.  Not a rule.

18   Bundling suggestion.

19        MR. McMAHON:  It struck me, your Honor, that this can

20   create statements of a witness.  And obviously now everyone

21   knows Ms. Reimer is going to be a witness.  That surprises

22   everybody.

23        THE COURT:  But the summary judgment --

24        Uh-oh.  We have to call him back since this is his

25   thing.

1          For the record, we have lost Mr. Lichtmacher.  Silence

2     has descended.

3          MR. McMAHON:  It is much quieter.

4          (Pause)

5          THE COURT:  So a summary judgment motion is the

6     defendant saying here's what the record is and, on the

7     undisputed record, we win and it's the plaintiff saying, no,

8     no, no, there's things in the record that go the other way, but

9     it's essentially an examination of what's already been created.

10    So I just am having a hard time seeing how finishing the

11    briefing and deciding that issue is really going to be a

12    problem for the government.

13         Let's say, looking at 120, so what if she did or did

14    not personally execute transfers between the ambulance fund and

15    the general fund.  I mean, I assume she's either going to say

16    that she didn't do that or, if she did it, it's because one of

17    the defendants told her to do so.  I assume the one thing she's

18    not going to say is I did this improper thing on my own.

19         MR. McMAHON:  Right.  That's unlikely.

20         I guess, your Honor, I was just wondering -- I know

21    your Honor wants to go ahead with the motion and, obviously, we

22    don't object to that.  I'm just wondering if there's a way to

23    do it -- well, I just want to avoid new statements being

24    created, obviously.

25         THE COURT:  Well, I don't want to make a commitment,

1   but -- I know one concern you have is you don't want her, when

2   she's testifying in the criminal case, to have one of the

3   defendants cross-examine her with her opposition 56.1 statement

4   and say isn't it true -- let's say she testified I executed a

5   transfer between the ambulance fund and the general fund on the

6   stand, but her lawyer had disputed that as part of the 56.1.  I

7   can see that you would have a worry that that could be used to

8   impeach her, but I'm not at all sure that I would allow that.

9   It seems to me if she disputed it in in her 56.1, A, it would

10   be her lawyer disputing it, and I understand he's her agent,

11   but it would be on a legal basis, and, B, he would have to

12   point to evidence in the record to give a basis to dispute it,

13   and if there weren't any such evidence, then he couldn't do it.

14   But if he said, for example, well, that's misleading because

15   she was told by St. Lawrence to do it and that's consistent

16   with her testimony, then you're fine.

17         So I'm not at all sure that a 56.1 statement is

18   something that would end up as proper impeachment in a civil

19   case, at least to the extent that the statements are legal

20   argument by a lawyer.  I think all you do in a 56.1 statement

21   is you either say undisputed or disputed and here's the

22   document or the transcript that I think is my basis for

23   disputing it.

24         MR. LICHTMACHER:  Your Honor?

25         THE COURT:  Yes.

1          MR. LICHTMACHER:  If it's basically a new topic, you

2     produce a declaration or an affidavit, or if it's phrased very

3     badly and misread from what's in the original transcript, you

4     produce a declaration or an affidavit.

5          THE COURT:  Well, that's true, that's true.

6          MR. LICHTMACHER:  Unfortunately, if I may, the details

7     here, there seems to be a large intent by the defendants to

8     elicit those type of statements, and that's the problem with

9     this extremely bulky, overreaching 56.1.

10         THE COURT:  Well, I really think what's going to

11    happen here --

12         MR. STERN:  Your Honor?

13         THE COURT:  -- is, you know, unless Mr. Stern has gone

14    off the wall, most of these are going to be admitted because it

15    looks to me -- and again, I don't have the underlying

16    documents, but I have in Mr. Stern's June 13th letter -- I know

17    what the exhibits to which he points are, and they're mostly

18    things that she's already said.

19         Now, certainly if she misspoke or if something didn't

20    come out right or she needs to clarify something and she puts

21    in a declaration, that will create a new statement, but it

22    would be one that she can take her time and word as carefully

23    as she wants and talk to her lawyer about.  You know, it's not

24    like a deposition where she's going to be put on the spot.

25         So I think, as to the very limited area of controversy

1
that we have here, which is -- I think everybody's fine with

the briefing going forward.  The only thing the government

doesn't want is new statements of Ms. Reimer being created.

That, I think, is not fair to Ms. Reimer.  I think if the

briefing is going on, she has to be free, if she needs to, if

it's advisable, to put in an affidavit.  But I think that we

should go forward with the briefing.  I'll grant the

application in all other respects, but I think to the extent

the 56.1 requires a response from her, A, the statements

generally rely, in whole or in part, on statements she's

already given; two, they strike me as largely noncontroversial

and benign because they essentially just discuss her job

functions or claims she's already made, which may be related to

the government's case, but not really to the meat of it.  It

seems to me, in the criminal case, what's going to be in

dispute is what she saw and what she heard and what she did,

but not whether something was or was not within her job

description.  And in most cases she's going to either be saying

undisputed or she's going to be disputing it and pointing to

evidence already in the record --

MR. LICHTMACHER:  Your Honor?

THE COURT:  -- that may be limited respects in which

she has to put in an affidavit.

Yes, Mr. Lichtmacher.

MR. LICHTMACHER:  Unfortunately, it's not a limited

1    respect in which she has to put in other statements.  And

2    because it was so overreaching -- you know, I wish I had it in

3    front of me, at least what we propose and we're probably going

4    to submit, you know, but it's overwhelming.  She has to put in

5    a lot.  There's a lot of -- it's amazing.  Ms. Reimer's

6    testified three times, I believe, at the disciplinary hearing,

7    several times at the 50H and at the deposition and, still,

8    there were things there that didn't apply to any of those,

9    where the statements weren't there, where she will have to

10   offer whole new statements.

11            THE COURT:  Well, if the defendant says in a 56.1, you

12   know, says X and cites to a transcript and it's not there, then

13   all you have to say is it's disputed, it's not there.  That

14   can't be used to impeach her.

15            And please bear my page limits in mind.  You're not

16   going to be able to write a novel anyway.

17            MR. LICHTMACHER:  I don't want to write a novel.

18            THE COURT:  To the extent you need to put in an

19   affidavit, you should have the right to do that, but an

20   affidavit is not like a deposition where she has to answer on

21   the spot.  You can take your time and you can word it

22   carefully.  And, yes, it's going to create a statement, but

23   it's going to create a statement that I think is pretty far

24   removed from what the controversy is going to be at the

25   criminal trial.  Unlike the SEC case, this case is already long

1  delayed in part because of prior stays, and I just don't think

2  it's going to give the criminal defendants the kind of

3  ammunition that the cases are concerned about.

4        So my ruling on intervention is the same.  I'm

5  permitting the government to intervene.

6        I'm going to grant the stay on discovery on consent,

7  but I'm not going to stay the summary judgment or motion to

8  dismiss briefing.

9        Looking at the Vuitton factors, which I am considering

10 not with respect to the whole case, but, here, just with

11 respect to the pending motions, I find there's much less

12 overlap between the subject matter of the motion, which is very

13 limited, and the criminal case, which is totally different, so

14 that disfavors a stay.

15        The defendants are indicted and the case is going to

16 move faster than this one, so that favors a stay in a sense.

17        And the private interests of the plaintiff versus the

18 prejudice to the plaintiff by delay favors a stay because the

19 plaintiff is in favor of the stay.

20        The burden on the defendants disfavors a stay because

21 of the delay in resolution of a matter that they hope will get

22 rid of the whole case.

23        The Court's interest, again, not very important.

24        It's an old case, so that disfavors a stay, but not

25 strongly.

```
 1          And the public interest here, for the reasons I've
 2   described, I don't see any real benefit to the government from
 3   a stay or any real harm from not staying.  I think that
 4   whatever new statements of the plaintiff in the briefing would
 5   entail are so limited and so unlikely to be in controversy in
 6   the criminal case that a stay just doesn't make sense.  The
 7   briefing will largely involve statements that have already been
 8   made and which Mr. St. Lawrence already has, and to the extent
 9   they don't, I don't think it's really going to overlap
10   significantly with the matters in controversy in the criminal
11   case.
12          And with respect to retaliation, which the government
13   raises here, I don't think finishing the briefing is going to
14   raise any significant risk of retaliation that isn't already
15   present or which isn't going to be presented by the government
16   giving the list of witnesses that it's willing to give.
17          So let me ask you to, Mr. McMahon, whip me up a
18   proposed order on that one, too.
19          And once I decide that motion -- I don't even think
20   it's -- it's not fully submitted yet because Mr. Lichtmacher's
21   opposition was put on hold pending this argument.  So it's
22   going to be a while.  And then the stay of the remainder will
23   be in place, but if that drags on too long, anybody aggrieved
24   can come back to me.
25          So, Mr. Lichtmacher, you were probably in the middle
```

1     of working on your brief.  Now you've learned that you've got

2     two motions you're going to have to oppose.

3              MR. LICHTMACHER:  Yes, yes.  Thank you, your Honor.

4              THE COURT:  You don't know what Mr. Posner's motion

5     consists of, but you will soon.  He will send it to you again.

6     So what do you want?  And without ruining any vacation plans

7     you have, what do you want for your opposition to the motion to

8     dismiss and the motion to --

9              MR. LICHTMACHER:  I gave up on vacations, your Honor,

10    but, anyway, probably a month would be fine.

11             MR. STERN:  Your Honor, if I may be heard on this.

12             THE COURT:  Yes.  Talk into the microphone so that

13    Mr. Lichtmacher can hear you.

14             MR. STERN:  Mr. Lichtmacher's briefing was due right

15    around the same time that the stay application came in from the

16    government.  Mr. Lichtmacher had indicated to me that he had

17    completed his opposition, but was holding off on submitting it

18    because of the government's application.  So I fail to see why

19    he would need another month at this point, when, apparently, he

20    had already completed his response to our motion at least.  I

21    can't speak to Mr. Posner's motion.

22             MR. LICHTMACHER:  Actually, it was almost completed at

23    that point in time when the application came in for the stay.

24    So it needs a little more tweaking.  Unfortunately, I have to

25    be out of town on two shootings next week for about a week or a

```
 1    week and a half.  And Jessica's father died yesterday, so I'm

 2    kind of alone there.  There will be no one there next week.  So

 3    I need a little bit of time.

 4            THE COURT:  Sorry to hear that.

 5            Did you say you were out of town on a shooting?

 6            MR. LICHTMACHER:  On two shootings, yes.  I'm very

 7    popular for victims of shootings, your Honor.  I know Jay's got

 8    some good jokes there.  I don't want to hear them right now.

 9            THE COURT:  Oh.  I thought you meant shooting a movie.

10            MR. LICHTMACHER:  No.  (INAUDIBLE) able to appear

11    (INAUDIBLE).  They don't need me, your Honor.

12            THE COURT:  Okay.  August 1 for your opposition to

13    both motions.

14            MR. LICHTMACHER:  That's fine.

15            THE COURT:  And then, without ruining defense

16    counsel's vacation plans, what do you folks want for a reply?

17            MR. STERN:  I'm on vacation that week, actually, your

18    Honor.  If I could have until the end of August, I would

19    appreciate it.

20            THE COURT:  The Friday before Labor Day?  September

21    2nd?

22            MR. STERN:  That's great, your Honor.  Thank you.

23            THE COURT:  All right.

24            And I'll get to it when I get to it.

25            Anything else we should do this afternoon?
```

1          MR. McMAHON:  Not from us, your Honor.

2          THE COURT:  All right.  I'll look for those motions

3    and those orders, which hopefully everyone will agree on, and

4    we'll take it from there.

5          Thank you all.

6

7                              - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 Neutral

As of: November 4, 2022 4:56 PM Z

# *SEC v. Tuzman*

United States District Court for the Southern District of New York

March 1, 2016, Decided; March 1, 2016, Filed

15-CV-7057 (AJN)

**Reporter**

2016 U.S. Dist. LEXIS 193710 *

Securities and Exchange Commission, Plaintiff, -v- Kaleil Isaza Tuzman and Robin Smyth, Defendants.

**Subsequent History:** Motion denied by *SEC v. Isaza Tuzman, 2017 U.S. Dist. LEXIS 162843 (S.D.N.Y., Sept. 29, 2017)*

**Prior History:** *United States v. Tuzman, 2015 U.S. Dist. LEXIS 173780 (S.D.N.Y., Dec. 30, 2015)*

## Core Terms

discovery, argues, criminal proceeding, civil case, indictment, criminal case, depositions, weighs, intimidation, intervene, courts

**Counsel:** **[*1]** For Securities and Exchange Commission, Plaintiff: Richard G Primoff, LEAD ATTORNEY, U.S. Securities & Exchange Commission, New York, NY; Adam Seth. Grace, Alexander Javad Janghorbani, U.S. Securities and Exchange Commission (3 World Financial), New York, NY; Kristine Mary Zaleskas, Andrew Matthew Calamari, Securities & Exchange Commission (3 WFC), New York, NY.

For Kaleil Isaza Tuzman, Defendant: Avi Weitzman, Reed Michael Brodsky, LEAD ATTORNEYS, Gibson, Dunn & Crutcher, LLP (NY), New York, NY; Damian Raphael Cavaleri, Ilene B. Jaroslaw, LEAD ATTORNEYS, Hoguet Newman Regal & Kenney, LLP, New York, NY; Paul W. Ryan, Silvia L. Serpe, LEAD ATTORNEYS, Serpe Ryan LLC, New York, NY; Amer Shahid Ahmed, Gibson, Dunn & Crutcher, LLP (NY), New York, NY; David Francis Crowley-Buck, Gibson, Dunn & Crutcher, LLP (NY), New York, NY; David Philip Salant, Gibson, Dunn & Crutcher LLP, New York, NY; Jennifer Barrie Schoch, Hoguet Newman Regal & Kenney, LLP, New York, NY; Joshua Donovan Liston, Beys, Stein & Mobargha LLP (LEXINGTON), New York, NY; Justine Marie Goeke, Gibson, Dunn & Crutcher, New York, NY; Marcellus Antonio McRae, Gibson, PRO HAC VICE, Dunn & Crutcher LLP (Los Angeles), Los Angeles, **[*2]** CA; Michael Petros Beys, Beys, Stein & Mobargha, LLP, New York, NY.

For Robin Smyth, Defendant: Michael Fred Bachner, LEAD ATTORNEY, Bachner & Associates, P.C., New York, NY; Scott James Splittgerber, Bachner & Associates, P.C., New York, NY.

For Jones Day, Miscellaneous: Harold Keith Gordon, LEAD ATTORNEY, Jones Day (NYC), New York, NY.

For Alvarez & Marsal Holdings LLC, Miscellaneous: John G. Moon, LEAD ATTORNEY, Miller & Wrubel P.C., New York, NY.

For Preet Bharara, Intervenor: Andrea Michelle Griswold, United States Attorney's Office, SDNY, New York, NY.

**Judges:** ALISON J. NATHAN, United States District Judge.

**Opinion by:** ALISON J. NATHAN

## Opinion

MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge:

The Securities and Exchange Commission ("SEC") initiated this action against Kaleil Isaza Tuzman ("Tuzman") and Robin Smyth ("Smyth") alleging civil violations of the *Securities Act of 1933* ("Securities Act") and the *Securities Exchange Act of 1934* ("Exchange Act"). Dkt. No. 1. Tuzman and Smyth were subsequently indicted on related criminal charges by the U.S. Attorney's Office for the Southern District of New York. *See* Dkt. No. 26. Currently before the Court is the Government's motion to intervene and implement a limited **[*3]** stay of discovery pending resolution of the criminal charges. Dkt. No. 28. While Smyth consents to the requested stay, Tuzman has filed an opposition. Dkt. No. 36. For the reasons articulated below, the

2016 U.S. Dist. LEXIS 193710, *3

Government's motion is granted.

## I. MOTION TO INTERVENE

Under *Federal Rule of Civil Procedure 24(a)*, the court must allow a party to intervene if it "claims an interest relating to the . . . transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest. . . ." *Fed. R. Civ. P. 24(a)(2)*. Tuzman does not articulate any objection to this portion of the Government's request, *see* Opp. Br., and the Government's motion to intervene is granted. *See S.E.C. v. Chestman, 861 F.2d 49, 50 (2d Cir. 1988)* ("The government had a discernible interest in intervening . . . to prevent discovery in the civil case from being used to circumvent the more limited scope of discovery in the criminal matter.").

## II. MOTION TO STAY DISCOVERY

The Government requests a partial stay of discovery delaying depositions, interrogatories, requests for admission, and disclosure of 3500 material until parallel criminal proceedings have concluded. Br. at 1. In evaluating whether to grant such a stay, courts in this circuit **[*4]** consider:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 99 (2d Cir. 2012)* (quoting *Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc., 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995)* (Chin, J.)).

In support of its request, the Government primarily argues that "asymmetrical discovery" would allow Tuzman to "tailor his defenses" to the criminal charges and create a risk of witness intimidation. Tuzman responds that his criminal case is meaningfully different that the civil case, that the criminal case will not be resolved quickly, and that any delay in his ability to take depositions and preserve witness testimony will prejudice his defense of the civil suit. The Court will

evaluate these arguments in light of the factors articulated above.

### A. Overlap Between Parallel Proceedings

Tuzman first argues that the Government's stay request must be denied because the indictment against him does not include allegations in paragraphs **[*5]** 15 through 59 of the SEC's complaint. Opp. Br. at 18-19. On this point, Tuzman argues that he should not be precluded from seeking discovery regarding "allegations that the government must concede it has no interest in pursuing criminally." *Id.* at 19. In response, the Government argues that this conduct is intertwined with the charged conduct and that it will seek to introduce it "as direct evidence and/or prior act evidence in the criminal trial." Reply Br. at 10. Although the SEC's complaint and the indictment do not contain identical allegations, because the "civil and criminal proceedings arise out of the same or related transactions," the court finds that the substantial overlap between the civil and criminal proceedings weighs in favor of a stay. *United States v. One 1964 Cadillac Coupe De Ville, 41 F.R.D. 352, 353 (S.D.N.Y. 1966)*.

### B. Status of the Case

Courts in this district have generally held that "stays will generally not be granted before an indictment is issued." *Trs. of Plumbers & Pipefitters Nat'l Pension Fund, 886 F. Supp. at 1139 (Chin, J.)*. This rule is in place partially because "the prejudice to the plaintiffs in the civil case is reduced" once an indictment has been filed because "the criminal case will likely be quickly resolved due to *Speedy Trial Act* considerations." *Id.* While an indictment has been filed here, it is not clear that **[*6]** the case "will [] be quickly resolved" due to Tuzman's pending extradition proceedings in Colombia. *See id.*; Opp. Br. at 16. As a result, the Court cannot conclude that this factor weighs as heavily in favor of a stay as it normally does. *See In re Par Pharm, Inc. Sec. Litig., 133 F.R.D. 12, 13 (S.D.N.Y. 1990)* ("The weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment.").

### C. The Government's Interest in the Requested Stay

Courts have articulated three primary government interests justifying a stay of discovery of civil

proceedings while parallel criminal proceedings are pending. First, "broad disclosure of the essentials of the prosecution's case may lead to perjury and manufactured evidence." *S.E.C. v. Cioffi, No. 08-CV-2457 (FB), 2008 U.S. Dist. LEXIS 86088, 2008 WL 4693320, at *2 (E.D.N.Y. Oct. 23, 2008)* (quoting *Nakash v. United States Dep't of Justice, 708 F. Supp. 1354, 1366 (S.D.N.Y. 1988))*. Second, "revelation of the identity of prospective witnesses may create the opportunity for intimidation." *Id.* Third, "criminal defendants may unfairly surprise the prosecution at trial with information developed through discovery, while the self[-]incrimination privilege would effectively block any attempts by the Government to discover relevant evidence from the defendants." *Id.* The Government argues that these factors weigh heavily in favor of the requested **[*7]** stay.

First, the Government discusses the "asymmetrical discovery" that would result without the requested stay. Reply Br. at 3. Due to the pending criminal matter, the Government argues that Tuzman will likely invoke his *Fifth Amendment* privilege against self-incrimination in the civil case. *Id.* For this reason, as one court put it, denying a stay "would render civil discovery largely one-sided; the SEC would produce scores of documents and witness testimony only to be precluded from gathering reciprocal discovery from the Defendants." *S.E.C. v. Nicholas, 569 F. Supp. 2d 1065, 1070 (C.D. Cal. 2008)*. In such a circumstance, discovery could not be completed and the civil case could not be resolved until after the criminal case has ended. For this reason, the Government expresses concern that the real value for Tuzman in obtaining discovery at this early stage is to allow Tuzman to "tailor his defenses" in preparation for the criminal trial. Reply Br. at 3.

The possibility of "asymmetrical discovery" is apparent from Tuzman's surreply, which asks the Court to deny the Government's motion to stay, but to stay Tuzman's deposition. *See* Surreply at 5-6. In the alternative, Tuzman argues that he is "fully prepared to proceed with discovery and risk the entry of an adverse inference **[*8]** should he choose to assert his *Fifth Amendment* rights." *Id.* at 5. Based on Tuzman's filings, the Court finds it highly likely that Tuzman would invoke his *Fifth Amendment* right against self-incrimination during discovery, rendering discovery incomplete and one-sided until the criminal proceedings have ended. This asymmetry would prevent meaningful progress from being made to complete discovery to resolve this lawsuit and would permit Tuzman to use witness testimony to shape his defense to the criminal charges.

Tuzman's acceptance of the possibility of an adverse inference does not rectify the situation. In fact, his willingness to risk an adverse inference in order to obtain discovery in this civil suit reinforces the Government's argument that the real value of civil discovery is not to defend the civil suit, but to allow Tuzman to "tailor his defenses" in preparation for the criminal trial. Reply Br. at 3. As a result, the Court finds that this factor weighs in favor of the requested stay.

The Government also argues that disclosing the substance of statements and conducting depositions of its prospective witnesses during discovery puts those witnesses at risk of intimidation by Tuzman. In support of this contention, the **[*9]** Government cites two emails and numerous interviews where potential witnesses in the criminal case have reported "fears of violence and intimidation from Tuzman," including at least two reports of threatened physical violence in the past. Reply Br. at 9. Tuzman points out that the evidence proffered by the Government is hearsay and argues that the Court "should not credit or rely on the government's say-so." Surreply at 7. Tuzman does not point to any authority indicating that it is improper for the Government to rely such evidence at the motion to stay stage. *See United States v. Approximately $104,770 in U.S. Currency, No. C 11-0249 (MMC), 2011 U.S. Dist. LEXIS 60884, 2011 WL 2224624, at *1 (N.D. Cal. June 8, 2011)*. Based on these emails and the other representations of the Government, the Court finds that the risk of witness intimidation weighs strongly in favor of the requested stay.

## D. The Prejudice to Tuzman by the Requested Stay

Unlike other defendants opposing similar stay requests from the Government, Tuzman does not argue that he has a "compelling need to proceed expeditiously in [his] civil case" to bring it to a resolution. *See, e.g., S.E.C. v. Doody, 186 F. Supp. 2d 379, 381 (S.D.N.Y. 2002)*. As noted above, Tuzman's right against self-incrimination in the face of parallel criminal proceedings make it almost impossible resolve this civil matter until after the criminal **[*10]** matter is complete. Instead, Tuzman argues that staying depositions will inhibit his ability to preserve testimony before "memories fade," noting that some of the conduct alleged in the SEC's complaint dates back to 2008. Opp. Br. at 12-13. Although memories may fade as time passes, *see United States v. Blaustein, 325 F. Supp. 233, 238 (S.D.N.Y. 1971)*, the parallel criminal proceedings here actually mitigate this concern. For example, witnesses' statements are likely

2016 U.S. Dist. LEXIS 193710, *10

preserved in interview notes and will further be memorialized in the form of trial testimony to which Tuzman will have access after the conclusion of the criminal proceedings. Furthermore, the Government has indicated that at least some witness testimony has already been preserved in the form of transcripts of testimony before the SEC with respect to this civil matter.[1] Br. at 1. Even without such preserved statements, Tuzman "has failed to demonstrate" that any possible prejudice to him in his civil case from fading memory "outweighs the government's interest in obtaining a stay." *Doody, 186 F. Supp. 2d at 382*.

## III. CONCLUSION

For the foregoing reasons, the Government's motion is granted. The following discovery is hereby stayed:

(1) *Rule 26(a)(i)(A)* discovery;
(2) Depositions, interrogatories, and requests for admission; and

(3) production **[*11]** of transcripts of SEC testimony and notes of interviews of any person whom the United States Attorney's office certifies may be called as a witness in the criminal case.

*See Doody, 186 F. Supp. 2d at 382*. Tuzman may move to lift the stay if the parallel criminal matter does not proceed expeditiously.

This resolves Dkt. No. 28.

SO ORDERED.

Dated: March 1, 2016

New York, New York

/s/ Alison J. Nathan

ALISON J. NATHAN

United States District Judge

---

**End of Document**

---

[1] It is also worth noting that a stay eliminates the possibility of any adverse inference against Tuzman for invoking his *Fifth Amendment* rights, a factor mitigating potential prejudice even further.

Damien Clark

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-11-16

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 8, 2016

BY ECF

The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan
    United States Courthouse
500 Pearl Street, Chambers 1020
New York, New York 10007

*The letter of March 8 (Doc 86) is denied a motion for a stay of all discovery. As such it is granted on a provisional basis. The conference remains scheduled for April 29.*

*So Ordered*
*[signature]*
*USDS*
*3-11-16*

Re:     SEC v. Wey et al.,
        15 Civ. 7116 (PKC)

Dear Judge Castel:

The Government writes to respectfully request permission to move to intervene and for a limited stay of this action. Specifically, the Government intends to move to stay depositions, interrogatories, requests for admission, and production of transcripts of testimony before the U.S. Securities and Exchange Commission ("SEC") and notes of interviews with, and any form of discovery that would create statements of, any person whom the Government asserts may be called as a witness in the criminal prosecution of Benjamin Wey and Seref Dogan Erbek, United States v. Wey & Erbek, 15 Cr. 611 (AJN) (the "criminal action"), until the conclusion of the criminal action. Trial in the criminal action is currently scheduled for March 6, 2017.

If full-fledged civil discovery were to proceed at this time, there would be a risk of significant interference with the criminal action. On the other hand, a stay of (1) depositions, (2) interrogatories, (3) requests for admission, and (4) production of transcripts of SEC testimony and notes of interviews with, and any form of discovery that would create statements of, any person whom the Government asserts may be called as a witness in the criminal action (the "3500 Material") would prejudice none of the parties to this civil action. Moreover, the requested stay would preserve the Court's resources because many of the issues presented by the civil action will be resolved in the criminal action.

This case, and the parallel criminal action, arise out of the same underlying events, which are detailed in Indictment 15 Cr. 611 (AJN) (the "Indictment"), and also are reflected in the SEC's Amended Complaint in this civil action (the "SEC Complaint").

Hon. P. Kevin Castel
Mar. 8, 2016
Page 2 of 6

A.    Intervention

Under Federal Rule of Civil Procedure Rule 24(a)(2), anyone may intervene as of right in an action "who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interests. . . ." Alternatively, Rule 24(b)(2) provides for permissive intervention when the movant "has a claim or defense that shares with the main action a common question of law or fact." The Government's motion would satisfy both of these provisions given the effect this civil proceeding would have on the criminal action and the identity of claims and facts between the actions.

Courts "have allowed the government to intervene in civil actions—especially when the government wishes to do so for the limited purpose of moving to stay discovery." Twenty First Century Corp. v. LaBianca, 801 F. Supp. 1007, 1009 (E.D.N.Y. 1992); see also SEC v. Credit Bancorp., 297 F.3d 127, 130 (2d Cir. 2002). The Government has a "discernible interest in intervening in order to prevent discovery in a civil case from being used to circumvent the more limited scope of discovery in the criminal matter." SEC v. Chestman, 861 F.2d 49, 50 (2d Cir. 1988). Accordingly, the Government should be permitted to intervene here.

B.    Motion for a Limited Stay

The Court has the inherent power to stay discovery in the interests of justice pending the completion of a parallel criminal trial. See, e.g., Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 96-97 (2d Cir. 2012); Kashi v. Gratsos, 790 F.2d 1050, 1057 (2d Cir. 1986) ("[A] court may decide in its discretion to stay civil proceedings when the interests of justice seem to require such action." (ellipses and quotation marks omitted)).

When considering whether to grant a stay, courts balance the following factors:

> 1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

Louis Vuitton, 676 F.3d at 99 (quotation marks omitted). "Balancing these factors is a case-by-case determination, with the basic goal being to avoid prejudice." Volmar Distrib., Inc. v. N.Y. Post Co., 152 F.R.D. 36, 39 (S.D.N.Y. 1993). But the factors "can do no more than act as a rough guide for the district court as it exercises its discretion" and do not replace the Court's "studied judgment as to whether the civil action should be stayed based on the particular facts before it and the extent to which such a stay would work a hardship, inequity, or injustice to a party, the public or the court," Louis Vuitton, 676 F.3d at 99. The Court's "decision ultimately requires and

Hon. P. Kevin Castel
Mar. 8, 2016
Page 3 of 6

must rest upon a particularized inquiry into the circumstances of, and the competing interests in, the case." Id. (quotation marks omitted).

    Here, the circumstances weigh in favor of the limited stay sought by the Government.

    1.    The Extent of Overlap

    "'The most important factor at the threshold is the first factor: the degree to which the civil issues overlap with the criminal issues.'" In re 650 Fifth Ave., No. 08 Civ. 10934 (RJH), 2011 WL 3586169, at *3 (S.D.N.Y. 2011) (quoting Volmar Distrib., 152 F.R.D. at 39) (quotation marks omitted).

> As a general rule, when both civil and criminal proceedings arise out of the same or related transactions, the government is entitled to a stay of all discovery in the civil action until disposition of the criminal matter. This principle applies "whether or not the litigant is actually a defendant in the parallel criminal case."

City of New York v. Gutlove & Shirvint, Inc., No. 08 Civ. 1372 (CBA) (JMA), 2008 WL 4862697, at *2 (E.D.N.Y. Nov. 10, 2008) (citations omitted) (quoting FDIC v. Chuang, No. 85 Civ. 7468 (SWK), 1986 WL 3518, at *1 (S.D.N.Y. Mar. 17, 2986)); see also United States v. One 1964 Cadillac Coupe DeVille, 41 F.R.D. 352, 353 (S.D.N.Y. 1966) ("The parties apparently agree that where both civil and criminal proceedings arise out of the same or related transactions the government is ordinarily entitled to a stay of all discovery in the civil action until disposition of the criminal matter.").

    A comparison of the Indictment and SEC Complaint makes plain—and Wey agrees (Wey Mem. Law Support Mtn. Stay at 3-5)—that the facts and issues underlying this proceeding and the criminal action are thoroughly related. This factor therefore weighs heavily in favor of a stay.

    2.    Status of the Criminal Case

    The return of the Indictment in the criminal action is also a factor that weighs in favor of a stay. "The weight of authority in this Circuit indicates that courts will stay a civil proceeding when the criminal investigation has ripened into an indictment." In re Par Pharm., Inc. Sec. Regulation, 133 F.R.D. 12, 13 (S.D.N.Y. 1990). This factor "speaks to whether a prosecution is likely and imminent as opposed to a remote or purely hypothetical possibility." Louis Vuitton, 676 F.3d at 100 n.14. As mentioned above, trial against Wey is scheduled for March 2017, and therefore this factor also weighs in favor of a stay.

    3.    Prejudice to the Parties

    Minimal prejudice to the parties will result from the very limited stay requested by the Government. The Government seeks to stay only depositions, interrogatories, requests for admission, and the above-referenced 3500 Material. No other discovery will be impacted.

Hon. P. Kevin Castel
Mar. 8, 2016
Page 4 of 6

In addition, there is currently no trial date in place in this matter, so there will be no undue delay in the proceedings as a result of the limited stay. Therefore, as no significant prejudice to the plaintiffs is likely, this factor is at worst neutral, and at best counsels in favor of a stay.

4.    The Public Interest

> [T]he public interest in the criminal case is entitled to precedence over the civil litigant: "a trial judge should give substantial weight to the public interest in law enforcement in balancing the policy against the right of a civil litigant to a reasonably prompt determination of his civil claims or liabilities."

In re Ivan F. Boesky Sec. Litig., 128 F.R.D. 47, 49 (S.D.N.Y. 1989) (alteration omitted) (quoting Campbell v. Eastland, 307 F.2d 478, 487 (5th Cir. 1963)).

The Government and the public have an important interest in ensuring that civil discovery is not used to circumvent the restrictions that pertain to criminal discovery. Federal Rule of Criminal Procedure 16 and 18 U.S.C. § 3500 provide that in criminal cases, the statements of Government witnesses shall not be the subject of discovery "until said witness has testified on direct examination" at trial. 18 U.S.C. § 3500(a). Thus, in the criminal action, Wey and Erbek would not be entitled to the balance of discovery that the Government would move to stay until (or shortly before) trial.

Courts repeatedly have recognized that a civil litigant should not be allowed to use civil discovery to avoid the restrictions that would otherwise pertain in criminal discovery to a criminal defendant. E.g., SEC v. Beacon Hill Asset Mgmt. LLC, No. 02 Civ. 8855 (LAK), 2003 WL 554618, at *1 (S.D.N.Y. Feb. 27, 2003) (granting stay and noting, "The principal concern with respect to prejudicing the government's criminal investigation is that its targets might abuse civil discovery to circumvent limitations on discovery in criminal cases."); Phillip Morris Inc. v. Heinrich, No. 95 Civ. 328 (LMM), 1996 WL 363156, at *19 (S.D.N.Y. June 28, 1996) (granting stay because of government's justification that if "civil discovery is not stayed, the criminal investigation will be prejudiced, as the Defendants may have an opportunity to gain evidence to which they are not entitled under criminal discovery rules"); Bd. of Governors v. Pharaon, 140 F.R.D. 634, 639 (S.D.N.Y. 1991) ("'A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal trial.'" (quoting Campbell v. Eastland, 307 F.2d 478, 487 (5th Cir. 1952))).

If Wey and Erbek are able to use civil discovery to end-run criminal discovery restrictions, it would allow them to inappropriately and unfairly tailor their defense to the Government's proof. See Louis Vuitton, 676 F.3d at 97 n.11 ("[A] district court may issue one [i.e., a stay] in a civil proceeding in deference to a parallel criminal proceeding in order to prevent either party from taking advantage of broader civil discovery rights or to prevent the exposure of the criminal defense strategy to the prosecution." (quotation marks omitted)).

Hon. P. Kevin Castel
Mar. 8, 2016
Page 5 of 6

Wey and Erbek, "having received broader and earlier discovery in the civil case," would be "in a position to tailor a defense to unreasonably take advantage of that opportunity," such as "illegitimately rais[ing] issues and questions about the nature of the testimony where they would not have the ability and the advantage of doing that, had they received discovery simply in the criminal case," Tr. of Apr. 10, 2014 Conference at 41, SEC v. Martin-Artajo & Grout, 13 Civ. 5677 (GBD) (Court's remarks). The Government has an interest in not giving

> the defendant in a criminal prosecution such an advantage, particularly if there is a possibility that that advantage might be an illegitimate advantage under which the defendant might make the government's case and witnesses now appear to be less credible, reliable, and accurate, because they've had an early opportunity to cross-examine and/or discover prior statements of the witness where they would not have that advantage if there had not been a civil case.

Id. at 41-42; cf. id. at 61 ("But I also understand the interest that the government has equally to not disclose [at] an early stage or prior to even engaging in activity in the criminal case information that is the essence of the criminal case against the defendants in . . . a civil action.").

Therefore, in order to avoid circumvention of the criminal discovery restrictions, this factor weighs in favor of a stay.

5.    The Interests of the Court

Considerations of judicial economy also weigh in favor of granting a stay. Certain issues common to both cases can be resolved in the criminal proceeding, thereby likely significantly simplifying the civil action. See In re Worldcom, Inc. Sec. Litig., Nos. 02 Civ. 3288 (DLC), 02 Civ. 4816 (DLC), 2002 WL 31729501, at *8 (S.D.N.Y. Dec. 5, 2002) ("The conviction of a civil defendant as a result of the entry of a plea or following a trial can contribute significantly to the narrowing of issues in dispute in the overlapping civil cases and promote settlement of civil litigation not only by that defendant but also by co-defendants who do not face criminal charges."); United States v. Mellon Bank, N.A., 545 F.2d 869, 873 (3d Cir. 1976) ("[R]esolution of the criminal case may moot, clarify, or otherwise affect various contentions in the civil case."); Brock v. Tolkow, 109 F.R.D. 116, 120 (E.D.N.Y. 1985) ("[R]esolution of the criminal case might reduce the scope of discovery in the civil case and otherwise simplify the issues.").

In addition, "the stay in this action may streamline later civil discovery since transcripts from the criminal case will be available to the civil parties." Twenty First Century Corp., 801 F. Supp. at 1011. And a conviction in the criminal action could increase the likelihood of a settlement here. See Trustees of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc., 886 F. Supp. 1134, 1140 (S.D.N.Y. 1995).

Because the criminal case's outcome could directly affect the conduct, scope, and result of the civil proceeding, this factor also supports a stay.

Hon. P. Kevin Castel
Mar. 8, 2016
Page 6 of 6

      For all of the foregoing reasons, the Government respectfully requests permission to move to intervene and for a limited stay of this action.

                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney

               By:    /s/ Michael Ferrara
                       Sarah Eddy McCallum
                       Ian McGinley
                       Michael Ferrara
                       Assistant U.S. Attorneys
                       212-637-1033 /-2257 / -2526

Cc:    Derek S. Bentsen, Esq.
       David Siegal, Esq.
       Roland G. Riopelle, Esq.
       Daniel C. Zinman, Esq.
       Marc Litt, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

                              Plaintiff,                    15-cv-7116 (PKC)

           -against-                                        ORDER

BENJAMIN WEY, et al.,

                              Defendants.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

          At a Pretrial Conference in the above-captioned case today, the Court GRANTED

the Motion to Stay, (Dkt. 82), DENIED the Motion to Intervene, (Dkt. 38, 47), and set a schedule

for the filing of motions to dismiss, (Dkt. 81, 94). (See June 8, 2016 Transcript).

          SO ORDERED.

                                                          P. Kevin Castel
                                                    United States District Judge

Dated: New York, New York
       June 8, 2016

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6-9-16