UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | Case No. 22-CV-3401 |
| v. | Hon. J. Paul Oetken |
| ARCHEGOS CAPITAL MANAGEMENT, LP and PATRICK HALLIGAN, | |
| Defendants. | |

---

## PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Benjamin J. Rankin
Alejandra de Urioste
Steven I. Ringer
John C. Murphy
Jacob Mermelstein

COMMODITY FUTURES
  TRADING COMMISSION
Division of Enforcement
290 Broadway, Suite 600
New York, NY 10007
(646) 746-9794
brankin@cftc.gov

January 6, 2023

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

SUMMARY OF ALLEGATIONS .................................................................................... 4

LEGAL STANDARD ....................................................................................................... 12

ARGUMENT .................................................................................................................... 13

   I.   Defendants Improperly Rely on Facts and Documents Outside the FAC ........................ 13

      A.   The Swap Agreements Are Not Integral to the FAC ...................................................... 14

      B.   The Prospectuses May Not Be Considered for Their Truth and are Not Integral to the FAC ................................................................................................................................................ 15

   II.   Broad-Based Security Index Swaps are "Swaps" Within the CFTC's Regulatory Jurisdiction ............................................................................................................................... 16

      A.   Custom Basket Swaps are "Swaps" Within the CFTC's Regulatory Jurisdiction ......... 18

      B.   ETF Swaps are "Swaps" Within the CFTC's Regulatory Jurisdiction ......................... 20

   III.   Defendants Committed Fraud "in Connection with" Swaps .......................................... 23

      A.   Defendants' Fraud Need Only "Coincide" with a Swap, Such That the Fraud and the Swap Are Not "Independent Events" ................................................................................... 24

      B.   Defendants' Fraud Need Not Be in Connection with a "Purchase or Sale" ................. 26

      C.   Defendants' Fraudulent Scheme Was "in Connection with" the Broad-Based Security Index Swaps ........................................................................................................................... 27

   IV.   The FAC Sufficiently Pleads Violations of Section 6(c)(1) and Rule 180.1 ................ 32

      A.   The FAC Sufficiently Alleges Halligan's Scienter ....................................................... 33

      B.   The FAC Sufficiently Alleges that Halligan "Made" Misstatements ........................... 40

      C.   The FAC Sufficiently Alleges that Halligan Used or Employed a Scheme to Defraud 45

   V.   The FAC Sufficiently Alleges Halligan's Aiding and Abetting Liability ....................... 49

CONCLUSION .................................................................................................................. 52

# TABLE OF AUTHORITIES

## Cases

*A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir. 1967) .............................................................. 24

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 12

*Bank of Am. Corp. Sec., Derivative, and Employee Ret. Income Security Act Litig.*, 09 MD 2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) .................................................................. 35

*Bergesen v. Manhattanville Coll.*, No. 20 Civ. 3689, 2021 WL 3115170 (S.D.N.Y. July 20, 2021) ............................................................................................................................... 15

*Bosco v. Serhant*, 836 F.2d 271 (7th Cir. 1987) ......................................................................... 50

*CFTC v. Atkinson,* No. 18-23992-CIV, 2018 WL 9362257 (S.D. Fla. Nov. 16, 2018) ......... 43, 44

*CFTC v. Byrnes*, No. 13-CV-1174, 2019 WL 4515209 (S.D.N.Y. Sept. 19, 2019) .................... 49

*CFTC v. Equity Financial Grp. LLC*, 572 F.3d 150 (3d Cir. 2009) ............................................ 35

*CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022) ............................................................. 46

*CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018) .......................................... 25, 33, 34

*CFTC v. R.J. Fitzgerald*, 310 F.3d 1321 (11th Cir. 2002) .......................................................... 33

*CFTC v. Rolando*, 589 F. Supp. 2d 159 (D. Conn. 2008) ........................................................... 43

*CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) ............................................................................. 30

*Chadbourne & Park LLP v. Troice,* 571 U.S. 377 (2014) ........................................................... 32

*Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68 (2d Cir. 2018) .................................. 31

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984) ....................... 29, 30, 32

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020) .................................................................................................................. 36

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359 (S.D.N.Y. 2012) .................................................................................................................. 41

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395 (S.D.N.Y. 2011) .................................................................................................................................. 41

*Cognex Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408 (S.D.N.Y. 2013) ............................ 13

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ......................................... 14

*Dabit v. Merrill Lynch, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005), *overruled on other grounds*, 547 U.S. 71 (2006) ............................................................................................... 25

*Damato v. Hermanson*, 153 F.3d 464 (7th Cir. 1998) ................................................................. 50

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349 (S.D.N.Y. 2007) . 52

*Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) .................................. 45

*Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150 (2d Cir. 2006) ...................... 14, 16

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*, No. 3:10-CV-371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) ................................................................................................................ 42

*Hishon v. King & Spalding*, 467 U.S. 69 (1984) ........................................................... 12

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424 (S.D.N.Y. 2000) .......... 38

*In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170 (2d Cir. 2013) ......................... 49, 50

*In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 (S.D.N.Y. 2017) ........................... 44

*In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157 (S.D.N.Y. 2014) ....................... 50

*In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188 (S.D.N.Y. 2020) ..................................... 46

*In re NQ Mobile, Inc. Sec. Litig.*, No. 13 Civ 7608, 2015 WL 1501461 (S.D.N.Y. Mar. 27, 2015) ................................................................................................................................... 45

*In re Richardson Securities, Inc.*, CFTC No. 78-10, 1981 WL 26081 (Jan. 27, 1981) ............... 50

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001) .................................................... 43

*In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-cv-08585, 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ............................................................................................................................... 49

*Int'l Code Council, Inc. v. UpCodes, Inc.*, 43 F.4th 46 (2d Cir. 2022) ........................................ 12

*Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) ............ 40, 41, 43, 44

*KCG Americas LLC v. BrazilMed LLC*, 15 Civ. 4600, 2016 WL 900396 (S.D.N.Y. Feb. 26, 2016) ................................................................................................................................... 13

*Kopec v. Coughlin*, 922 F.2d 152 (2d Cir. 1991) ........................................................................ 13

*Loginovskaya v. Batratchenko*, 764 F.3d 266 (2d Cir. 2014) ..................................................... 23

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019) ................................................................................ 42, 43

*Lorenzo v. SEC*, 872 F.3d 578 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. 1094 (2019) ......................... 43

*Lynch v. City of N.Y.*, 952 F.3d 67 (2d Cir. 2020) ................................................................. 14, 16

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772 (S.D.N.Y. 2021) .... 38, 39

*Nicholas v. Saul Stone & Co*. LLC, 224 F.3d 179 (3d Cir. 2000) ............................................... 50

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ....................................................... 35, 37, 39, 40

*Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152 (2d Cir. 2016) ............ 20

*Orlander v. Staples, Inc.*, 802 F.3d 289 (2d Cir. 2015) .............................................................. 20

*Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019) ................................................................ 14

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602 (S.D.N.Y. 2015) ............................................................................................................................... 35, 36

*Pollock v. Ridge*, 310 F. Supp. 2d 519 (W.D.N.Y. 2004) ........................................................... 15

*Prousalis v. Moore*, 751 F.3d 272 (4th Cir. 2014) ...................................................................... 41

*Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010) ...................................................................... 25

iv

*Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) ....................................................................... 15, 16

*Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986) .............................................................. 30

*SEC v. Carrillo Huettel LLP*, No. 13 CIV. 1735, 2014 WL 12785242 (S.D.N.Y. June 4, 2014) 35

*SEC v. Carter*, No. 10-C-6145, 2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ...................... 44, 45

*SEC v. Cedric Kushner Promotions, Inc.*, 417 F. Supp. 2d 326 (S.D.N.Y. 2006) ...................... 39

*SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477 (S.D.N.Y. 2007) ......................... 13, 43, 47

*SEC v. Czarnik*, No. 10-cv-745, 2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) ......................... 30

*SEC v. Das*, 723 F.3d 943 (8th Cir. 2013) ................................................................................. 38

*SEC v. Drysdale*, 785 F.2d 38 (2d Cir. 1986) ....................................................................... 30, 32

*SEC v. E-Smart Technologies, Inc.*, 74 F. Supp. 3d 306 (D.D.C. 2014) ..................................... 45

*SEC v. Greenstone Holdings, Inc.*, 10-cv-1302, 2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012).. 45

*SEC v. Im*, No. 17-CV-3613 (JPO), 2020 WL 4937465 (S.D.N.Y. Aug. 24, 2020) ............. 33, 40

*SEC v. Jean-Pierre*, No. 12 Civ. 8886, 2015 WL 1054905 (S.D.N.Y. Mar. 9, 2015) ................ 45

*SEC v. MiMedx Grp., Inc.*, No. 19 CIV. 10927, 2022 WL 902784 (S.D.N.Y. Mar. 28, 2022)... 39, 46

*SEC v. Pirate Investor LLC*, 580 F.3d 233 (4th Cir. 2009) ........................................................ 25

*SEC v. Ramoil Mgmt., Ltd.*, No. 01-cv-9057, 2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007) ....... 25

*SEC v. Rana Research, Inc.*, 8 F.3d 1358 (9th Cir. 1993)) ........................................................ 25

*SEC v. Rio Tinto*, 41 F.4th 47 (2d Cir. 2022) ...................................................................... 3, 46

*SEC v. Sason*, 433 F. Supp. 3d 496 (S.D.N.Y. 2020) ................................................................ 48

*SEC v. Sugarman*, No. 19 Civ. 5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ................ 45

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................................. 40, 46

*SEC v. Zandford*, 535 U.S. 813 (2002) ............................................................... 2, 24, 25, 27

*Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363 (S.D.N.Y. 2004) .................. 24, 25, 27

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ........................ 34

*Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6 (1971) ...................................... 24

*Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397 (S.D.N.Y. 2013) .......................................... 31

*United States v. Naftalin*, 441 U.S. 768 (1979) ....................................................................... 30

*United States v. Nouri*, 711 F.3d 129 (2d Cir. 2013) ................................................................ 23

*United States v. Peoni*, 100 F.2d 401 (2d Cir. 1938) ................................................................ 50

*United States v. Svoboda*, 347 F.3d 471 (2d Cir. 2003) ............................................................ 50

*Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, No. 19-cv-7204, 2014 WL 3900565 (S.D.N.Y. Aug. 8, 2014) ......................................................................................................... 24

## Statutes

15 U.S.C. § 78c(a)(68) ............................................................................... 17, 18, 21, 22

15 U.S.C. § 78t(e) ..................................................................................................... 50

17 U.S.C. § 78j(b) ..................................................................................................... 26

18 U.S.C. § 2 ............................................................................................................ 50

7 U.S.C. § 13c(a) ................................................................................................ 49, 50

7 U.S.C. § 1a(35) ................................................................................................. 5, 17

7 U.S.C. § 1a(42) ..................................................................................................... 17

7 U.S.C. § 1a(47) ......................................................................................... 17, 18, 22

7 U.S.C. § 9(1) .................................................................................................. *passim*

## Rules

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 12

Fed. R. Civ. P. 9(b) ................................................................................................... 13

## Regulations

17 C.F.R. § 180.1 ............................................................................................. *passim*

17 C.F.R. § 240.10b-5 ........................................................................................ 23, 26

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48207 (Aug. 13, 2012) ............................................................................................... 17, 18, 22

Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41,398 (July 14, 2011) .... 23, 25, 26, 31

Plaintiff Commodity Futures Trading Commission ("CFTC") respectfully submits this memorandum of law in opposition to motions to dismiss the CFTC's First Amended Complaint ("FAC") filed by Defendants Archegos Capital Management, LP ("Archegos") and Patrick Halligan ("Halligan," and collectively, "Defendants").  For the following reasons, the motions should be denied.

## PRELIMINARY STATEMENT

Over the course of a year, Defendants engaged in a fraudulent scheme to mislead swap counterparties ("Swap Counterparties") of Archegos Fund, LP ("Archegos Fund") regarding the risk of Archegos Fund's portfolio.  The goal of the scheme was to convince the Swap Counterparties to repeatedly allow Archegos Fund to expand its highly leveraged swap positions in a concentrated handful of illiquid securities.  To accomplish this goal, Archegos made a series of misrepresentations to its Swap Counterparties regarding the size and concentration of its largest long positions, amount of unencumbered cash, and liquidity.  And, in order to induce the Swap Counterparties to continue to allow Archegos' expansion, it purchased large volumes of Broad-Based Security Index Swaps.  During the week of March 22, 2021, Defendants' scheme collapsed.  The value of several of Archegos Fund's core long positions declined, triggering $13 billion in margin calls that Archegos Fund did not have sufficient capital to meet.  As a result, Swap Counterparties lost over $10 billion.

Defendants do not contest these basic allegations of Archegos's fraud.  Instead, Archegos argues only that the CFTC lacks the authority to prosecute it.  And Halligan, the Chief Financial Officer of Archegos who the CFTC alleges orchestrated key aspects of the fraud, argues that he cannot be held responsible for it.  Defendants are wrong, and their motions should be denied.

The CFTC has authority to prosecute fraud in connection with any "swap," including swaps that are based on broad-based security indexes. A broad-based security index is a group of ten or more securities that are not disproportionately weighted—like, for example, the S&P 500. The CFTC alleges that Archegos Fund, in connection with the fraud, entered into two kinds of broad-based security index swaps: (1) ETF swaps based on existing broad-based security indexes, like the S&P 500 ("ETF Swap"), and (2) swaps based on custom portfolios (or "baskets") of hundreds of different securities ("Custom Basket Swaps," and together with the ETF Swaps, the "Broad-Based Security Index Swaps").

Both Defendants *conceded* in their motions to dismiss the CFTC's original complaint that the Broad-Based Security Index Swaps are subject to the CFTC's antifraud rules. Now, relying improperly on documents and purported facts outside the scope of the FAC, Defendants walk back their concession. Defendants, however, were right the first time. The CFTC has plausibly alleged that both the ETF Swaps and Custom Basket Swaps are based on broad-based security indexes and thus within the CFTC's regulatory purview. The documents relied on by Defendants cannot be appropriately considered for decision on a motion to dismiss, and even if they are, they do not refute the CFTC's authority to prosecute Defendants' conduct.

The CFTC has also alleged that Defendants engaged in fraud "in connection with" the Broad-Based Security Index Swaps. Defendants argue that for this standard to be met, the fraud must relate to the "value" of the swap, but this argument was expressly rejected by the Supreme Court. *SEC v. Zandford*, 535 U.S. 813 (2002). Instead, the fraud and swap need only "coincide," such that they "were not independent events." *Id.* at 820. This may occur where the misconduct and the swap are part of the same fraudulent scheme. The FAC alleges that the Broad-Based Security Index Swaps were essential to Defendants' scheme because Swap

Counterparties required those swaps as a condition to allowing Archegos to continue to increase its long positions.  Archegos thus placed large volumes of these swaps to induce Swap Counterparties to enable this continued growth, which was the object of Defendants' fraud.  The Broad-Based Security Index Swaps therefore were an essential part of the scheme.

Halligan's arguments similarly fail.  First, Halligan argues that the CFTC has not alleged that Halligan—a purported "back-office" CFO—acted with scienter.  But the FAC alleges multiple particularized instances in which Halligan directed Becker to make material misstatements to Swap Counterparties, either knowing the information was false or with reckless disregard for the truth.  The FAC also pleads instances in which Halligan directly misrepresented to Swap Counterparties the amount of Archegos's combined exposure, largest positions, or available cash.  Finally, it alleges that Halligan admitted his knowing participation in the scheme by commenting to Becker, about Archegos's deceived counterparties, "if they only knew."

Second, Halligan argues that the CFTC has not alleged that he was the "maker" of any material misrepresentations.  To the contrary, the FAC alleges several particularized examples in which Halligan had "ultimate authority," consistent with U.S. Supreme Court precedent, over statements that he directed Becker to make, including:  proposing false and misleading talking points for Becker to use; directing Becker to cite specific false numerical data; and directing Becker to make specific misrepresentations to specific Swap Counterparties.  Aside from his directions to Becker, the FAC also alleges material misstatements that Halligan made on his own to Swap Counterparties.

Third, Halligan argues that the CFTC has not alleged that he engaged in a deceptive "scheme."  Under the recent Second Circuit decision *SEC v. Rio Tinto*, 41 F.4th 47 (2d Cir. 2022), an actionable scheme liability claim under the securities laws requires "something *beyond*

misstatements and omissions, such as dissemination." (emphasis in original).  The FAC contains multiple examples of Halligan's deceptive conduct meeting this standard.  For example, Halligan trained and instructed Becker to carry out their scheme by routinely deceiving counterparties regarding Archegos Fund's holdings.  On specific occasions, Halligan conspired with Becker and Tomita to provide false or misleading information regarding Archegos's positions, liquidity, and solvency to Swap Counterparties, and other times conspired to conceal such material information from them.  Further, at the direction of Halligan, Becker disseminated such false and misleading information to Swap Counterparties.

Finally, Halligan argues that the CFTC's aiding and abetting claim against him rests upon mere "guilt by association."  But for the reasons already discussed, and described in further detail below, the FAC alleges much more:  that Halligan knew of and willfully took concrete steps to further Archegos's fraud.

For these reasons, Defendants' motions to dismiss should be denied in their entirety.

## SUMMARY OF ALLEGATIONS

### I.   Background

Archegos was an investment firm founded by Bill Hwang as a family office.  FAC ¶ 18. Halligan was Archegos's Chief Financial Officer.  Nonparties William Tomita and Scott Becker served as its Head Trader and Director of Risk Management respectively.  Both Tomita and Becker have admitted to knowingly participating in the scheme charged in the FAC in consent orders issued by the CFTC and have pled guilty in parallel criminal cases.  *Id.* ¶¶ 17, 19-20. Halligan was Becker's direct supervisor for the entirety of Becker's tenure at Archegos.  *Id.* ¶ 20.

### II.   Archegos's Investments and Swap Counterparty Relationships

Beginning around March 2020, Archegos, as investment manager for Archegos Fund,[1] embarked on a new long/short trading strategy that was materiality different, and materially riskier, than its historical practice.  The portfolio for this new trading strategy was composed, in large part, of long total return swaps ("TRS") referencing securities of individual companies, which were partially hedged through short TRS positions—typically, the Broad-Based Security Index Swaps–that provided exposure to broad liquid sections of the market.  *Id.* ¶ 3.

The long portion of Archegos's portfolio was heavily concentrated in just a handful of China-based issuers and U.S. media and technology companies.  Archegos's positions in these companies were so large that they could not be easily liquidated.  *Id.* ¶ 40.  Archegos's short positions were primarily in the form of Broad-Based Security Index Swaps—the ETF Swaps and Custom Basket Swaps.  *Id.* ¶¶ 3, 6, 26.  The indexes underlying the Broad-Based Security Index Swaps were based on ten or more securities and did not meet the weighting or trading volume criteria of a narrow-based security index set forth in 7 U.S.C. § 1a(35).  *Id.* ¶¶ 27, 28.

Archegos's short and long positions grew quickly over time.  At the beginning of March 2020, Archegos held $1.5 billion in assets, and its portfolio (amplified with leverage) consisted of approximately $13 billion in long TRS positions referencing single securities, and approximately $6 billion in aggregate short exposure.  By March 2021, Archegos's assets— effectively, Hwang's personal wealth—had grown to $35 billion, and its portfolio consisted of approximately $86 billion in long TRS positions referencing single securities and $46 billion in short Broad-Based Security Index Swaps.  *Id.* ¶ 39.  Archegos entered into TRS positions,

---

[1] For simplicity, and because Defendants do not contend that the distinction between Archegos and Archegos Fund is significant to the motions to dismiss, this memorandum hereafter refers collectively to Archegos and Archegos Fund as "Archegos."

including the Broad-Based Security Index Swaps, with at least eight Swap Counterparties, which extended credit to allow Archegos to transact on a leveraged basis.  *Id.* ¶¶ 3, 26.

### III.    Swap Counterparties' Credit and Risk Frameworks

Swap Counterparties generally entered into TRS to profit from Archegos's payment of the agreed-upon interest rate.  *Id.* ¶¶ 3 n.1, 8, 29.  For that reason, upon entering into TRS transactions, Swap Counterparties typically hedged their market risk by establishing cash positions in the underlying asset.  *Id.*  For example, if Archegos established a long swap position referencing $100 million of GSX Techedu Inc. ("GSX"), the Swap Counterparty to the transaction would typically purchase $100 million of GSX stock.  The Swap Counterparty would then, in theory, profit from Archegos's interest payments irrespective of whether GSX stock rose or fell because any gain (or loss) in the Swap Counterparty's cash position would directly offset any amounts that the Swap Counterparty was required to pay to (or was owed from) Archegos. *Id.*

Even after hedging their market risk, however, Archegos's Swap Counterparties remained exposed to Archegos's *credit* risk, *i.e.* the risk that Archegos would not or could not pay what it owed under the terms of the swap agreements in the event of market movements adverse to Archegos.  *Id.* ¶ 30.  This risk was magnified because of the concentrated, leveraged and illiquid nature of Archegos's portfolio.  In an attempt to manage Archegos's credit risk, each Swap Counterparty imposed credit- and risk-related limitations on Archegos's ability to transact, including requiring that Archegos maintain a specified minimum level of collateral at the particular Swap Counterparty ("maintenance margin") at all times.  *Id.* ¶¶ 30-31.

Margin plays a key role in protecting a Swap Counterparty against loss:  if the value of the collateral in Archegos's account dropped below the required maintenance margin due to

adverse market movements, Swap Counterparties were entitled issue a margin call requiring that

Archegos post additional collateral; and if Archegos failed to do so, Swap Counterparties could

unwind the swaps, liquidate the collateral they held, and use the proceeds to satisfy Archegos's

obligations under the swap agreements.  *Id.* ¶¶ 8, 30-35.  Although margin frameworks varied by

firm, to determine the appropriate amount of margin, Swap Counterparties generally considered,

among other variables, the size, composition, directional bias, volatility, and liquidity of

Archegos's positions, both with respect Archegos's positions at the particular the Swap

Counterparty and (to the extent possible) for Archegos's aggregate portfolio across all other

financial institutions.  *Id.* ¶ 35-36.   Swap Counterparties also paid particular attention to

Archegos's available unencumbered cash that could be used to satisfy any margin deficits.  *Id.* ¶

35.

   To further mitigate Archegos's credit risk, Swap Counterparties imposed certain credit-

and risk-related limitations on Archegos's ability to transact, such as setting maximum

thresholds on the total notional value of Archegos's portfolio or exposure to particular issuers

with a Swap Counterparty ("capacity limits"), and/or requiring that Archegos maintain a certain

ratio of long and short positions in its portfolio at that Swap Counterparty ("long/short ratio").

*Id.* ¶¶ 36-37.  If these thresholds were breached, a Swap Counterparty might either limit further

trading entirely, or require Archegos to post additional margin.  *Id.*

   The Broad-Based Security Index Swaps were essential for Archegos to meet the required

long/short ratio on the short side and were thus essential to increasing Archegos's long TRS

positions and essential to Defendant's fraudulent scheme .  *Id.* ¶¶ 6, 36, 37.  The short Broad-

Based Security Index Swaps were intended to serve as a general market hedge to reduce the risks

associated with Archegos's long TRS positions, because those short swaps would not necessarily

be subject to the same losses suffered by the long TRS positions in the event of a widespread market decline. *Id.* ¶ 37. For that reason, Swap Counterparties frequently asked or required that Archegos place new short Broad-Based Security Index Swaps concurrently with, and as a condition to, allowing Archegos to add to its long single-name positions, and Archegos did so. *Id.* ¶¶ 37, 44-51, 69. Archegos's substantial short swap positions, consisting overwhelmingly of the Broad-Based Security Index Swaps with Swap Counterparties 1-8, were essential and critical to inducing Swap Counterparties to provide additional capacity for Archegos to trade ever greater volumes of highly-leveraged, concentrated and illiquid long positions at favorable margin rates. *Id.* ¶¶ 37, 44.

Absent true information about Archegos's aggregate portfolio and accurate information regarding its unencumbered cash, Swap Counterparties could not assess the appropriate level of short Broad-Based Security Index Swaps or evaluate whether other risk control measures—such as restricting Archegos's trade capacity or forcibly unwinding Archegos's positions—were needed to mitigate the risk of Archegos's overall portfolio. *Id.* ¶¶ 7, 56.

**IV.    Archegos, Halligan, and their Accomplices' Misrepresentations About the Risk of Archegos's Portfolio Prior to March 22, 2021**

Each Swap Counterparty saw only a fraction of Archegos's total exposure. *Id.* ¶¶ 4, 53. Swap Counterparties therefore routinely sought information from Archegos's representatives to try to understand the composition of, and to gauge the risk associated with, Archegos's whole portfolio. In particular, Swap Counterparties routinely asked about, among other things, the concentration and liquidity of Archegos's portfolio, the amount of free cash held by Archegos, and the extent to which Archegos's portfolio with a specific Swap Counterparty was materially different from Archegos's portfolio overall—facts that were material to Swap Counterparties' credit- and risk-related analyses. *Id.* ¶¶ 55-56. In response, Defendants and their accomplices,

Tomita and Becker, repeatedly provided false and misleading information that caused the Swap Counterparties to believe that Archegos's total portfolio was far less risky than it actually was, and that Archegos's overall positions were sufficiently hedged to justify adding long exposures. *Id.* ¶¶ 53, 56.  These deceptions were intended to further Archegos's trading strategy, secure additional trade capacity for Archegos to enlarge its swap positions, obtain or maintain favorable margin rates, and dissuade Swap Counterparties from liquidating Archegos's positions or taking other risk-reducing measures. *Id.* ¶¶ 55, 68.

Defendants' deception began as early as 2016 and 2017, when Halligan served as the Swap Counterparties' primary point of contact for credit-risk related issues.  *Id.* ¶ 57.  In response to common questions from Swap Counterparties, like the size of Archegos's largest positions, Halligan purposely understated the true figures.  *Id.*  Halligan also routinely misrepresented the amount of Archegos's available unencumbered cash.  *Id.*  In or about 2018, when Becker took responsibility for speaking with Swap Counterparties about credit risk-related issues, Halligan similarly directed Becker to say that Archegos's largest aggregate position was 35% of its net asset value ("NAV"), regardless of the true figure.  *Id.* ¶ 58.  Consistent with Halligan's directions, Becker repeatedly made this misrepresentation to Swap Counterparties, despite knowing that its largest position was significantly larger.  *Id.* ¶¶ 58-59.  Becker and Tomita made similar misrepresentations to Swap Counterparties on several other occasions between March 2020 and March 2021.  *Id.* ¶ 59, 60, 62, 65, 66.

Halligan also directed Becker to misrepresent to Swap Counterparties that Archegos' total portfolio was more liquid than it was.  In March 2021, during an internal conference call, Halligan, Becker, and Tomita conspired and agreed that in response to a request by Swap Counterparty 4 for information about the liquidity of Archegos's portfolio, Archegos would

provide false and misleading statistics. *Id.* ¶ 63.  Halligan, Becker, and Tomita each knew this information was false or misleading based on contemporaneous internal reports, which they received or had access to, that detailed the amount of time required to liquidate Archegos's portfolio. *Id.*  Following that internal call, at Halligan's direction, Becker intentionally and falsely conveyed the false liquidation statistics to Swap Counterparty 4. *Id.* ¶ 64.

Halligan also sought to ensure that Becker's and Tomita's lies were consistent.  For example, in advance of a January 29, 2021 call with Swap Counterparty 1, Halligan told Becker to participate in all calls that Tomita was having with Swap Counterparties so that Becker would know what Tomita was saying. *Id.* ¶¶ 66-67.  Becker understood that Halligan wanted to ensure that Becker and Tomita were telling counterparties consistent stories, and that if Tomita was providing misleading information to a Swap Counterparty, it would be important for Becker to do the same. *Id.*  On the January 29, 2021 call, Tomita (with Becker present) made materially misleading statements to conceal from Swap Counterparty 1 the true size of and risk of Archegos's aggregate multi-billion dollar position in GSX. *Id.*  After the call, Becker told Halligan that he had adhered to Tomita's talking points regarding GSX, to which Halligan responded, in substance, "if they only knew."  Such statements were common from Halligan, and showed that Halligan knew that Becker and Tomita were disseminating false and misleading information and/or concealing material information from Swap Counterparties, and that Swap Counterparties would have taken protective countermeasures if they knew the truth. *Id.* ¶ 67.

Additionally, beginning in mid-2020, Halligan signed transaction confirmations that falsely certified that "the aggregate amount of all Shares beneficially owned by [Archegos] for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative positions, is less than 5% of the outstanding shares." *Id.* ¶

72.  These transaction confirmations were disseminated to Swap Counterparty 9.  Based upon his knowledge of and access to information about Archegos's portfolio, Halligan knew or recklessly disregarded that certain of those confirmations were false because Archegos's combined exposure, including underlying long derivative TRS positions, exceeded 5% of the outstanding shares of multiple issuers.  *Id.*

## V.  Misrepresentations and Concealment of the Scheme During the Week of March 22, 2021

During the week of March 22, 2021, the prices of securities underlying Archegos's concentrated long TRS positions sharply declined, triggering a cascade of margin calls that bankrupted the firm.  During that week, Halligan, Tomita, and Becker continued to knowingly or recklessly mislead Swap Counterparties in a desperate attempt to delay the failure of the firm and conceal the true nature and extent of their scheme.  *Id.* ¶¶ 73-76.  To induce a Swap Counterparty to return excess margin, for instance, Becker represented on March 24 that Archegos was not in a "distress situation" and that Archegos still had $9 billion in cash, both statements he knew were materially false.  *Id.* ¶ 79.  Tomita similarly misrepresented to a Swap Counterparty that Archegos merely had a liquidity problem but not a solvency problem, despite knowing that Archegos would soon fail.  *Id.* ¶ 78.

On March 24, 2021, Halligan directed Becker to falsely tell Swap Counterparties that Becker lacked access to Archegos's up-to-date financial information.  Becker then drafted and sent to Halligan proposed points to be used in discussions with Swap Counterparties, which falsely represented that Becker lacked access to Archegos's trade blotter, excess cash balances, live portfolio, and the extent of margin calls Archegos had received from other Counterparties. *Id.* ¶ 81.  Although Halligan, as Becker's direct supervisor, knew that Becker did have access to all of that information, Halligan reviewed and approved the document.  *Id.* ¶¶ 81-82.

On the evening of March 25, 2021, Swap Counterparties began to issue notices of default to Archegos and/or exercise early termination rights, and they proceeded to unwind Archegos's positions, including the Broad-Based Security Index Swaps.  This involved selling the securities that Swap Counterparties had bought to hedge Archegos's TRS positions—*e.g.*, GSX stock that was designed to hedge market risk associated with a TRS transaction referencing GSX.  *Id.* ¶ 85.  Because Archegos held many of the same swap positions in illiquid securities at multiple Swap Counterparties, this meant that multiple Swap Counterparties sold the same underlying securities into the market at the same time, which caused the prices of those securities to decline even further, resulting in significant losses.  In total, Swap Counterparties lost over $10 billion due to Archegos's fraud.  *Id.* ¶ 86.

## LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Int'l Code Council, Inc. v. UpCodes, Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  The Court must "accept all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor."  *Id.* (internal citations and alterations omitted).  Thus, "fact-specific questions cannot be resolved on the pleadings."  *Id.* (internal citations and alterations omitted).  Stated differently, "a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

Rule 9(b) provides that in alleging fraud, "a party must state with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of mind

of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).  Under this Rule, the complaint must "set forth the who, what, when, where and how of the alleged fraud." *Cognex Corp. v. Microscan Sys., Inc.*, 990 F. Supp. 2d 408, 418 (S.D.N.Y. 2013) (internal citations and alteration omitted).  While Rule 9(b) "demands specificity, [] it does not demand that a plaintiff plead every fact that forms the alleged violations," *SEC v. Collins & Aikman Corp*., 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007), and "does not require that a complaint plead fraud with the detail of a desk calendar or a street map," *KCG Americas LLC v. BrazilMed LLC*, 15 Civ. 4600, 2016 WL 900396, *3 (S.D.N.Y. Feb. 26, 2016) (internal citation omitted).

## ARGUMENT

The FAC alleges that Defendants made material misstatements and engaged in a fraudulent scheme in connection with swaps, and sufficiently pleads the circumstances constituting fraud and aiding and abetting.  As such, Defendants' motions should be denied.

## I.     Defendants Improperly Rely on Facts and Documents Outside the FAC

In support of their motions, Defendants attach:  (1) purported agreements between Archegos and the Swap Counterparties ("Swap Agreements"), and (2) purported prospectuses ("Prospectuses") for the ETFs underlying the ETF Swaps.  These documents are not integral to the complaint and may not be considered for their truth at the pleading stage.  The Court should disregard them.  Consideration of matters outside the pleadings would require converting Defendants' motions to dismiss under Rule 12(b)(6) to motions for summary judgment under Rule 56 and affording all parties the opportunity to provide supporting evidentiary material.  *See Kopec v. Coughlin*, 922 F.2d 152, 154 (2d Cir. 1991).  If this Court were inclined to consider and rely on such extraneous documents, the Commission requests the opportunity to conduct discovery to properly respond to Defendants' motions.

13

### A. The Swap Agreements Are Not Integral to the FAC

On a motion to dismiss, a court may consider an extraneous document "upon which the plaintiff solely relies and which is integral to the complaint." *Lynch v. City of N.Y.*, 952 F.3d 67, 79 (2d Cir. 2020) (internal quotations omitted). "A matter is deemed integral to the complaint when the complaint relies heavily upon its terms and effect." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019) (internal citation omitted). Furthermore, a plaintiff must "rely on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006) (internal citation and alterations omitted). Most commonly, courts apply this rule to consider contracts or other legal documents containing obligations upon which the plaintiff's complaint stands or falls. *Id*. at 157. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991), cited by Defendants, illustrates the standard application of this rule. There, the court held that a stock purchase agreement was integral to a securities fraud complaint, where the agreement contained representations that plaintiff alleged were false, and plaintiffs also sought rescission of the agreement. Neither circumstances is present here.

Although the Broad-Based Security Index Swaps were an essential and critical part of Defendants' fraudulent scheme, it does not follow that the Swap Agreements underlying those swaps are "integral" to the complaint. The Swap Agreements are not synonymous with the Broad-Based Security Index Swaps—the former are broad contracts governing the parties' relationships, whereas the latter are the numerous individual transactions executed pursuant to (and subsequent to) those Agreements, referenced in Appendix A of the FAC.

The FAC makes only occasional reference to certain Swap Agreements, and the CFTC's claims do not rise or fall depending on the terms and conditions of those Agreements. There is

no dispute that Archegos and its Swap Counterparties entered into the Swap Agreements; the alleged fraud is not dependent on the terms or conditions of those Agreements; and there is no allegation that the Swap Agreements contained any misrepresentations.  Rather, the conduct charged in the FAC is based on Defendants' fraudulent acts and misrepresentations in written and oral communications with Swap Counterparties.  The FAC quotes a Swap Agreement only once (FAC ¶ 72), for the purpose of providing context for a subsequent misrepresentation.[2]  All references to the Swap Agreements could be stripped from the FAC without impairing the core allegations of fraud.  Accordingly, the Swap Agreements are not "integral" to the FAC.  *See Pollock v. Ridge*, 310 F. Supp. 2d 519, 524 (W.D.N.Y. 2004) (declining to consider contracts submitted by defendant in opposition to motion to dismiss, where "plaintiff's complaint is not replete with references or quotations" to the contract); *Bergesen v. Manhattanville Coll.*, No. 20 Civ. 3689, 2021 WL 3115170, at *3 (S.D.N.Y. July 20, 2021) (holding that document was not integral to the complaint where references to it "form[ed] only a very small portion of the complaint," and "Plaintiff base[d] his claim on Defendant's actions" rather than on the document).

## B.  The Prospectuses May Not Be Considered for Their Truth and are Not Integral to the FAC

Under certain circumstances, and for certain purposes, courts may take judicial notice of documents publicly filed with the SEC.  *See, e.g.*, *Roth v. Jennings*, 489 F.3d 499, 509–10 (2d Cir. 2007).  But, Defendants fail to mention an important restriction:  they may be considered "only to determine *what* the documents stated, and *not to prove the truth of their contents*."  *Id.*

---

[2] Paragraph 72 alleges that Archegos Fund's ISDA Master Agreement with Swap Counterparty 9 required Archegos to sign transaction confirmations upon each transaction, in which Archegos would make certain representations regarding its aggregate positions.  FAC ¶ 72.  As such, Paragraph 72 alleges that misrepresentations were contained in the subsequent confirms, not in the ISDA Master Agreement itself.

at 509 (quotations omitted) (emphasis in original).  Defendants cite to the Prospectuses for the

truth of their contents—*i.e.*, to establish purported *facts* regarding the structure and performance

of the ETFs.[3]  Such arguments are not proper in the context of a motion to dismiss and should be

disregarded.  *See id.* at 510 (holding that representations in loan agreement incorporated in SEC

filings could not properly be considered for the truth of their contents on a motion to dismiss).

Moreover, and equally important, the FAC does not even mention the Prospectuses, let along

rely on them; the Prospectuses are therefore not "integral" to the FAC.  *See Lynch*, 952 F.3d at

79; *Global Network Commc'ns*, 458 F.3d at 156.

## II.     Broad-Based Security Index Swaps are "Swaps" Within the CFTC's Regulatory Jurisdiction

In its memorandum of law for dismissal of the CFTC's original Complaint, Archegos

conceded that "[t]he CFTC has the authority to regulate investments in broad-based index

securities like the Index Basket Swaps…."  ECF No. 24 at 1.  Halligan likewise conceded that

the Broad-Based Security Index Swaps "are subject to the CFTC's jurisdiction and antifraud

rules."  ECF No. 27 at 4.  Now, in response to the FAC, Defendants attempt to argue otherwise.

These arguments fail.

The CEA and CFTC Regulations prohibit fraud in connection with any "swap."  7 U.S.C.

§ 9(1); 17 C.F.R. § 180.1(a).  The CEA's definition of "swap" is broad, encompassing numerous

contract types while carving out some exclusions.  Three product categories are pertinent here:

(1) "swaps," which are within the purview of the CFTC, (2) "security-based swaps," which are

---

[3] *See, e.g.*, Arch. Mem. L. 13 ("[A]s the prospectuses for the ETFs disclose, the ETF shares do not perfectly track the performance of the underlying portfolio of securities purchased by the fund or the associated index."); Halligan Mem. L. 15 ("As their prospectuses make clear, each ETF is a single issuer that is distinct from whatever underlying issuers make up its reference index . . . .").

generally within the purview of the SEC, and (3) "mixed swaps," which incorporate attributes of both swaps and security-based swaps and are jointly regulated by the CFTC and SEC.

The CEA's definition of a "swap" includes "total return swaps" like the Custom Basket Swaps and ETF Swaps. 7 U.S.C. § 1a(47)(A)(iii)(IX); FAC ¶ 3 (alleging that the Custom Basket Swaps and ETF Swaps were "total return swaps"). The "swap" definition *excludes* most "security-based swaps," a term that includes swaps that are "based on" either a single security or a "narrow-based security index." 7 U.S.C. § 1a(42); 15 U.S.C. § 78c(a)(68). The term "index" refers to any "index or group of securities, including any interest therein or based on the value thereof." 15 U.S.C. § 78c(a)(68)(E). A narrow-based security index is either (1) an index that contains nine or fewer securities, or (2) an index in which the weighting or trading volume is skewed heavily towards one or more of the component securities of the index, based on specific quantitative metrics. 7 U.S.C. § 1a(35). A security index that is not narrow-based is called a "broad-based security index." Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48207, 48271 (Aug. 13, 2012) ("Joint Rules Release"). Thus, generally speaking, a broad-based security index contains ten or more securities that are not disproportionally weighted. Security-based swaps (including those based on a narrow-based security index) are regulated by the SEC, while swaps based on broad-based security indexes are regulated by the CFTC. *Id.*

Although most security-based swaps are excluded from the definition of a "swap," there is one important exception to this exclusion: a swap that is *both* (1) based on a single security or narrow-based security index and (2) *also* based on another financial or economic interest within the CFTC's purview, such as a broad-based security index, falls *within* the definition of a "swap"

17

and is referred to as a "mixed swap."  7 U.S.C. § 1a(47)(D).[4]  Mixed swaps are jointly regulated

by the SEC and CFTC.  *See* Joint Rules Release, 77 Fed. Reg. at 48210; *id.* at 48,291 ("A mixed

swap . . . is both a security-based swap and a swap.").

### A.  Custom Basket Swaps are "Swaps" Within the CFTC's Regulatory Jurisdiction

The FAC alleges that the Custom Basket Swaps are based on broad-based security

indexes that do not meet the weighting or trading volume criteria of a "narrow-based security

index" and are therefore "swaps" within the CFTC's regulatory jurisdiction.  FAC ¶¶ 13, 27, 28.

Citing to the Joint Rules Release, Defendants argue that the Custom Basket Swaps are outside

the CFTC's regulatory jurisdiction because the Swap Agreements "give one or both of the

counterparties . . . discretionary authority to change the composition of the security portfolio."

Arch. Mem. L. 15-16.  There are at least two problems with this argument.  First, as discussed in

Part I.A, the Swap Agreements may not be considered at this stage.  And second, they do not in

any event establish that any Swap Counterparty had "discretionary authority" to modify the

composition of any security portfolio.

Defendants do not point to any provision of any Swap Agreement that grants any party

"discretionary authority to change the composition of the security portfolio" or, more simply, the

right to add or remove securities from the portfolio "at will," or anything remotely similar.  Joint

Rules Release, 77 Fed. Reg. at 48285.  Rather, Defendants rely on dissimilar provisions in Swap

---

[4] 7 U.S.C. § 1a(47)(D) states:

**(D) Mixed Swap**

The term "security-based swap" includes any agreement, contract, or transaction that is as described
in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(68)(A)) and also
is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of
indebtedness, indices, quantitative measures, other financial or economic interest or property of any
kind (other than a single **security** or a **narrow-based security index**), or the occurrence, non-
occurrence, or the extent of the occurrence of an event or contingency associated with a potential
financial, economic, or commercial consequence . . . .

Agreements with three counterparties:  UBS, Nomura, and Goldman.  None of these provisions grant discretionary authority over the composition of the securities in a basket:

- Archegos's Swap Agreement with UBS stated that "[Archegos] may remove one or more Shares from the Basket at any time, *subject to UBS's prior consent*, which consent shall not be unreasonably withheld."  Hirsch Decl. Ex. 27 at 15 (emphasis added).  According to this provision, Archegos *did not* have "discretionary authority" to add or remove securities from any basket (let alone authority to do so "at will") because any changes required UBS's prior consent.

- Archegos's Swap Agreement with Nomura stated that "[Archegos] may *request* . . . that Nomura . . . effect an SPB Transaction Unwind…."  Hirsch Decl. Ex. 25 § 3.1(a) (emphasis added).  The right to "request" an unwind, however, falls well short of "discretionary authority" to unwind.  Indeed, other provisions on the same page—which Defendants do not acknowledge—make clear that Archegos's "request" merely "constitute[d] an offer" that "Nomura *may* accept." *Id.* § 3.1(b), (c) (emphasis added).

- Archegos's Swap Agreement with Goldman stated that either party could "close any Transaction, in whole or in part."  Halligan Ex. R. at 14.  But the agreement does not define, let alone explain, what it means to close a transaction "in part"; for example, it could refer to closing $10 million of a $20 million transaction, while leaving the composition of the portfolio unchanged.  Closing a transaction "in part" is not equivalent to "discretionary authority" to add or remove securities from a basket, and Defendants provide no support for this conclusion.

Although Archegos Fund entered into additional Swap Agreements with at least three other Swap Counterparties[5]—Credit Suisse, Deutsche Bank, and Morgan Stanley, *see* Hirsch Decl. Exs. 19, 20, 21, 24—Defendants tellingly do not mention these other Swap Agreements in their briefs.  The reason is clear:  these agreements, like the others, do not give any party "discretionary authority" to modify the composition of a basket:

- Archegos's Swap Agreements with Credit Suisse, similar to Goldman, granted only a right to close or terminate a transaction "in whole or in part," which is not synonymous with discretionary authority to modify a basket.  Hirsch Decl. Ex. 19 § 9.1; Hirsch Decl. Ex. 20 § 11(i).

- Archegos's Swap Agreement with Deutsche Bank stated that either party may "terminate a Transaction in a Portfolio."  Hirsch Decl. Ex. 21 at 8.  This

---

[5] Defendants also submit Swap Agreements between Archegos and Jefferies.  The CFTC does not allege that Jefferies entered into Custom Basket Swaps with Jefferies.

termination provision does not on its face appear to grant any party discretionary authority over the composition of a basket.

- Archegos's Swap Agreement with Morgan Stanley, similar to Nomura, stated that Archegos could "*request*" an "ATS Transaction Unwind," which Morgan Stanley "shall not be obliged to accept." Hirsch Decl. Ex. 24 §§ 1(b), 4(a), 5(a) (emphasis added). Again, a right to "request" a change to a portfolio is not the same as "discretionary authority." And, it is not apparent that an "ATS Transaction Unwind" refers to removing individual securities from a basket (as opposed to, for example, reducing the total volume of a specific Custom Basket Swap).

When interpreting contracts, "words and phrases should be given their plain meaning." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016) (internal citation omitted). The Swap Agreements unambiguously *do not* provide for any party's "discretionary authority" over the composition of the baskets of securities underlying the Custom Basket Swaps, and Defendants' strained interpretations depart from the plain meaning of the provisions they cite. At best, the meaning of each of the terms cited by Defendants may be ambiguous, which precludes dismissal on this ground. *See Orlander v. Staples, Inc.*, 802 F.3d 289, 295 (2d Cir. 2015) ("[I]f a contract is ambiguous as applied to [the facts that furnish the basis of the suit], a court has insufficient data to dismiss a complaint for failure to state a claim.") (internal citation omitted).

## B. ETF Swaps are "Swaps" Within the CFTC's Regulatory Jurisdiction

Defendants argue that the ETF Swaps are outside the CFTC's regulatory jurisdiction because ETFs are single securities, and therefore the ETF Swaps are "security-based swaps" that are regulated exclusively by the SEC. This argument is flawed for at least three reasons: (1) there is no material economic difference between a swap based on a broad-based index of securities—over which the CFTC's jurisdiction is undisputed—and an ETF Swap based on this very same index; (2) it ignores the concept of a "mixed swap"; and (3) it improperly relies on the extraneous ETF Prospectuses.

Defendants do not (and cannot) dispute that a swap that is directly based on a broad-based security index, like a swap that is based on the S&P 500, is a "swap" within the regulatory jurisdiction of the CFTC. There is no legal or factual basis to treat the ETF Swaps—*i.e.* a swap that is based upon an ETF, which in turn is based upon a broad-based security index—any differently.

Defendants focus on supposed differences between a swap that is based on the S&P 500 (for example) and a swap that is based on an ETF (e.g., the SPDR S&P 500 ETF, "SPY") that holds all, or substantially all, of the securities in the S&P 500, but this misses the point. Because the term "index" includes *any* "index or group of securities, *including any interest therein or based on the value thereof*," 15 U.S.C. § 78c(a)(68)(E), the portfolio of securities comprising an ETF like SPY is an "index" irrespective of whether the components and performance of that ETF are identical, or even similar, to the S&P 500 or any other particular preexisting published benchmark. The key point is that the ETF Swaps, like a swap based on the S&P 500, are "based on hundreds of individual component securities" that do not meet the "weighting or trading volume criteria of a narrow-based security index," as the CFTC has alleged. FAC ¶ 27.

Even if this Court were to find that the ETF Swaps are based on single securities, such swaps would still be within the CFTC's jurisdiction because they are mixed swaps. Mixed swaps are swaps that are *both* (1) based on a single security, *and* (2) based on a financial or economic interest within the CFTC's purview, like a broad-based security index. *See supra* Part II. The CFTC has alleged the second element, FAC ¶ 27, and Defendants claim that the first element is met. Defendants argue, in essence, that the ETF Swaps are not "based on" broad-based security indexes because they are not *directly* based on those indexes. *See, e.g.*, Halligan Mem. L. 12 ("[T]he ETF Swaps do not *directly* reference the performance or value of the

underlying indices, but instead *directly* reference securities . . . .") (emphasis added).  But, this direct/indirect distinction does not appear anywhere in the swap definition (7 U.S.C. § 1a(47)) or Joint Rules Release, and the CEA's definitions of "swap" and "mixed swap" is not so limited.  In any event, the ETF swaps *are* directly based upon an index.  Because the ETFs themselves are "based on the value" of the hundreds of securities that comprise the ETF, each such ETF is an "index" as defined in 15 U.S.C. § 78c(a)(68)(E).

The SEC FAQ cited by Defendants, which represents the view of staff from one division of the SEC, does not change this analysis.  The FAQ expressly has no precedential value:

> [The responses] are not a rule, regulation, or statement of the Commission.  The Commission has neither approved nor disapproved the content.  These responses, like all staff statements, *have no legal force or effect*:  they do not alter or amend applicable law, and they create no new or additional obligations for any person.

Hirsch Decl. Ex. 11 at 1 (emphasis added).  Moreover, Defendants' reliance on the FAQ underscores their fundamental misunderstanding of "mixed swaps":  under both the CEA and the Securities Exchange Act, the term "security-based swap" *includes* mixed swaps, which are jointly regulated by the SEC and CFTC.  7 U.S.C. § 1a(47)(D); 15 U.S.C. § 78c(a)(68)(D).  As such, even taking Defendants' argument at face value, the SEC FAQ would not preclude the CFTC's jurisdiction over these products as mixed swaps.

Ultimately, the proper classification of the ETF Swaps is a fact-intensive inquiry.  "The determination of whether a[n] . . . instrument is either a swap or a security-based swap should be made based on the facts and circumstances relating to the . . . instrument prior to execution . . . ." Joint Rules Release, 77 Fed. Reg. at 48,262.  As demonstrated by the numerous documents submitted in connection with their motions, Defendants' arguments challenge the factual accuracy of the CFTC's allegations, not their legal sufficiency.  Defendants will have the

opportunity to make such arguments at a later date, after completing discovery regarding the

"facts and circumstances" of the ETF Swaps.

## III.    Defendants Committed Fraud "in Connection with" Swaps

Under the CEA and Rule 180.1, it is unlawful for any person to commit fraud "in

connection with any swap." 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a).  These provisions are similar

(but not identical) to the SEC's antifraud provisions, and "courts have looked to the securities

laws when called upon to interpret similar provisions of the CEA." *Loginovskaya v.*

*Batratchenko*, 764 F.3d 266, 272 (2d Cir. 2014) (citation omitted); *see also* Prohibition on the

Employment, or Attempted Employment, of Manipulative and Deceptive Devices and

Prohibition on Price Manipulation, 76 Fed. Reg. 41,398, 41,399 (July 14, 2011) ("Rule 180.1

Release") ("Given the similarities between CEA section 6(c)(1) and Exchange Act section 10(b),

the Commission deems it appropriate and in the public interest to model final Rule 180.1 on SEC

Rule 10b-5."); *id.* ("To account for the differences between the securities markets and the

derivatives markets, the Commission will be guided, but not controlled, by the substantial body

of judicial precedent applying the comparable language of SEC Rule 10b-5.").

"The Supreme Court has repeatedly held that [the "in connection with"] requirement . . .

is easily satisfied." *United States v. Nouri*, 711 F.3d 129, 143 (2d Cir. 2013) (construing SEC

Rule 10b-5).  In arguing that the FAC does not plead this element, Defendants rely on outdated

case law and misstate and misapply the controlling legal standards.  Contrary to Defendants'

suggestion, the fraud need not relate to the "value" of a swap—in fact, the Supreme Court has

expressly rejected this view.  And, while case law applying SEC Rule 10b-5 is relevant, there are

important differences between that rule and the CEA's antifraud provisions.  Of particular

importance, under 7 U.S.C. § 9(1) and Rule 180.1, there is no requirement that a fraud be in

connection with a "purchase or sale" of a swap.  Applying the correct legal standards, the CFTC "easily satisfie[s]" the "in connection with" element.  *Nouri*, 711 F.3d at 143.  Even under Defendants' overly restrictive interpretation, moreover, the CFTC's allegations suffice.

### A.  Defendants' Fraud Need Only "Coincide" with a Swap, Such That the Fraud and the Swap Are Not "Independent Events"

Defendants argue that the CFTC's claims are not "in connection with" a swap because Defendants' misrepresentations do not relate to the value of a swap.  Arch. Mem. L. 2, 18, 20; Halligan Mem. L. 19, 20.  The Supreme Court, however, expressly rejected this narrow view in *SEC v. Zandford*, 535 U.S. 813 (2002)—a decision that neither Defendant addresses in any meaningful way.  Interpreting SEC Rule 10b-5, the *Zandford* court stated, "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act."  *Id.* at 820; *accord A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 396–97 (2d Cir. 1967); *see also Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 373 (S.D.N.Y. 2004) ("While it is true that, in general, the 'in connection with' element is met when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value, it is not a requirement.") (internal citation omitted); *Uni-World Capital L.P. v. Preferred Fragrance, Inc.*, No. 19-cv-7204, 2014 WL 3900565, at *9 (S.D.N.Y. Aug. 8, 2014) ("[J]udges in this District have repeatedly rejected the contention that the alleged fraud or misrepresentations must relate to the value of the securities purchased or sold.").

As a general matter, the CEA's antifraud provisions should be "construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes."  *Zandford*, 535 U.S. at 819 (internal citation omitted).  These provisions encompass not just "garden variety" types of fraud, but also "unique form[s] of deception" involving "[n]ovel or atypical methods."  *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 11 n.7 (1971) (quoting *A.T. Brod*, 375 F.2d at

397) (internal quotations and alterations omitted).  For these reasons, "[t]he 'in connection with' requirement of Section 6(c)(1) of the Act [7 U.S.C. § 9(1)] and Regulation 180.1(a) is construed broadly."  *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 722 (E.D.N.Y. 2018).  Following *Zandford*, for a fraud to be "in connection with" a swap, the fraud and swap need only "coincide," such that the swap and the misconduct "were not independent events."  535 U.S. at 820; *see also* Rule 180.1 Release, 76 Fed. Reg. at 41,406 n.99 ("The holding of *Zandford* is consistent with judicial interpretations of the phrase 'in or in connection with' in the anti-fraud provisions of the CEA . . . .").

The "coincide" standard is "broad in scope" and can be met under many different circumstances.  *Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010).  It is met when "plaintiff's claims 'necessarily allege,' 'necessarily involve,' or 'rest on'" a swap.  *Id.* (quoting *Dabit v. Merrill Lynch, Fenner & Smith, Inc.,* 395 F.3d 25, 48, 50 (2d Cir. 2005), *overruled on other grounds*, 547 U.S. 71 (2006)); *see also SEC v. Ramoil Mgmt., Ltd.,* No. 01-cv-9057, 2007 WL 3146943, at *8 (S.D.N.Y. Oct. 25, 2007) ("The Commission need only establish that [Defendant's] statement 'somehow touches upon' or has 'some nexus' with 'any securities transaction.'") (quoting *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993)).  It is met when a fraud induced a purchase or sale of a swap—although the inducement standard is "more exacting," than the "coincide" requirement, and inducement is not required.  *Romano*, 609 F.3d at 522.  And, it is met when the misconduct and the swap are part of the same fraudulent scheme.  *Id.* at 524 (holding that the "in connection test" was satisfied because "this was a string of events that were all intertwined") (citing *SEC v. Pirate Investor LLC,* 580 F.3d 233, 245 (4th Cir. 2009) ("The 'in connection with' test is satisfied when the proscribed conduct and the sale are part of the same fraudulent scheme.")); *Seippel*, 341 F. Supp. 2d at 374 (holding that fraud

was in connection with purchase of sale of securities where a stock transaction was "integrally related to the fraudulent scheme"). As discussed in Part III.C, Defendants' fraud was all these things and more.

### B. Defendants' Fraud Need Not Be in Connection with a "Purchase or Sale"

Defendants make a second legal error in suggesting that the CFTC must plead a fraud in connection with a "purchase or sale" of a swap. It is true that courts often look to case law applying Section 10(b) of the Exchange Act and SEC Rule 10b-5 when construing 7 U.S.C. § 9(1) and CFTC Rule 180.1. But these provisions are not identical. Of particular importance here, Section 10(b) Rule 10b-5, by their express terms, prohibit fraud only in connection with the "purchase or sale" of a security. 17 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Section 9(1) and Rule 180.1, in contrast, are not limited to purchases or sales; rather, both provisions broadly prohibit fraud "*in connection with any swap*." 7 U.S.C. § 9(1); 17 C.F.R. § 180.1(a).

This distinction was intentional and meaningful. *See* Rule 180.1 Release, 76 Fed. Reg. at 41,399 n.6 (noting the absence of a "purchase or sale" requirement as a key difference between Exchange Act Section 10(b) and CEA Section 6(c)(1), 7 U.S.C. § 9(1)). In issuing Rule 180.1, the CFTC stated that both 7 U.S.C. § 9(1) and Rule 180.1 were designed to reach far beyond the mere purchase and sale of swaps:

> Section 6(c)(1) [7 U.S.C. § 9(1)] and final Rule 180.1 reach all manipulative or deceptive conduct in connection with the ***purchase, sale, solicitation, execution, pendency, or termination of any swap***, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity. Accordingly, final Rule 180.1 covers conduct ***including, but not limited to, all of the payment and other obligations arising under a swap***.

*Id.* at 41,405 (emphasis added).

The precise language of 7 U.S.C. § 9(1) and Rule 180.1 is particularly important because swaps, unlike securities, often involve a long-term contractual relationship with ongoing rights

and obligations.  Thus, a fraud that lacks a nexus to a "purchase or sale" will still state a claim under the CEA if the fraud was in connection with the solicitation, execution, pendency, or termination of a swap or any payment or other obligation arising under a swap.

### C. Defendants' Fraudulent Scheme Was "in Connection with" the Broad-Based Security Index Swaps

The FAC establishes that the Defendants' fraudulent scheme was "in connection with" the Broad-Based Security Index Swaps.  To begin, although it is not required, Defendants' fraudulent scheme was in connection with the purchase or sale of those swaps.  Under *Zandford*, a fraud need not relate to the value of the Broad-Based Security Index Swaps for the "in connection with" element to be met; rather, it is enough that the fraud "coincide" with the purchase of those swaps, such that they are not "independent events."  *Zandford*, 535 U.S. at 822.

*Seippel*, 341 F. Supp. 2d 363, illustrates the broad scope of the "coincide" and "independent event" tests.  There, the plaintiff intended to exercise certain stock options and sell the resulting stock.  Defendants, aware of the planned exercise and sale, solicited plaintiff's participation in a tax shelter designed to generate capital losses to offset the capital gains, which involved creating certain shell companies and executing various foreign currency option transactions.  *Id.* at 368–69.  During the course of the solicitation, defendants made several misrepresentations relating to the propriety of the shelters.  *Id.* at 369.  Applying *Zandford*, the court held that the fraud was "in connection with" the exercise of the stock options and sale of the stock; even though defendants did not misrepresent the value of the options or stock, the stock transactions were "integrally related" to the scheme and the stock sale and defendants' fraud were "not independent events."  *Id.* at 373–74.

*Zandford*'s "coincide" standard is met here.  In addition to alleging that the Broad-Based Security Index Swaps coincided temporally with Defendants' fraudulent scheme (FAC n.3-7 & Appendix A), the FAC alleges that "Archegos Fund's trading in Broad-Based Security Index Swaps was an integral and critical part in inducing its Swap Counterparties to allow Archegos to continue to build its highly leveraged, concentrated, and illiquid long positions," which were the object of Defendants' fraudulent scheme.  FAC ¶ 44.  To achieve this goal, Defendants made numerous fraudulent statements regarding the size, composition, and liquidity of Archegos's entire portfolio, among other things.  *See, e.g.*, *id*. ¶ 5.  And, as part of the same scheme, Archegos placed short Broad-Based Security Index Swaps with Swap Counterparties 1-8, which were a required condition to adding additional long exposure.  *Id*. ¶¶ 37, 42, 44–51.  Archegos' Broad-Based Security Index Swaps were essential to this fraudulent scheme because they enabled Archegos to build its large TRS long positions—without the Broad-Based Security Index Swaps, Archegos' large positions would have been far smaller.  Defendants' fraud and the Broad-Based Security Index Swaps were not independent events—they were part of the same fraudulent scheme to "obtain additional capacity to trade even greater volumes of highly leveraged, concentrated, and illiquid long positions, while maintaining favorable margin rates." *Id*. ¶ 5; *see also id.* ¶ 37.

Indeed, Defendants' misrepresentations not only induced the Swap Counterparties to enter into the long TRS positions, but they also in turn induced the Swap Counterparties to enter into the short Broad-Based Security Index Swaps as a means to hedge the market risk associated with Archegos's long positions.  *Id*. ¶ 6, 37.  However, since Archegos repeatedly mispresented the size, composition, and liquidity of its portfolio to its Counterparties, the Swap Counterparties were not only tricked into entering into additional long TRS positions and short Broad-Based

Security Index Swaps, they also were prevented from accurately assessing the true risk posed by Archegos's aggregate long positions and therefore could not accurately calibrate their appropriate level of risk controls through the short Broad-Based Security Index Swaps. *See id*. ¶¶ 6, 56, 59. Accordingly, had the Swap Counterparties known the truth about Archegos' positions, they would have limited, restricted, or reduced Archegos's trade capacity, which would have impacted both their long and short TRS positions.

Separately, the FAC satisfies the "in connection with" element even under the pre-*Zandford* test cited by Defendants, exemplified by *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984). Defendants argue that the fraud must relate to the "value of securities traded or consideration received in connection with those trades." Arch. Mem. L. 2; *see also* Halligan Mem. L. 20. Here, Defendants' fraud did relate to the consideration received by the Swap Counterparties. With respect to the Broad-Based Security Index Swaps, the central agreement between Archegos and the Swap Counterparties was that (1) the Swap Counterparties would pay to Archegos an amount equal to any losses on the swaps, and (2) in consideration, Archegos would pay to the Swap Counterparties an amount equal to any gains, plus a fixed fee. *See* FAC n.1, ¶ 26. Defendants' misrepresentations relating to Archegos's positions, unencumbered cash, and liquidity related to Archegos's credit risk and the likelihood that Archegos would be able to fulfill its end of this bilateral bargain—*i.e.*, the likelihood that Swap Counterparties would receive the consideration they were owed. *See id*. ¶¶ 30, 34–37.

Based on Defendants' misrepresentations, the Swap Counterparties thought they were receiving consideration in the form of a promise to pay made by a creditworthy entity; in truth, Archegos was vastly overextended, and the Broad-Based Security Index Swaps were far riskier from the Swap Counterparties' perspective—and thus far less valuable—than the Swap

Counterparties were led to believe.  *See id*. ¶ 2 (alleging that Archegos represented that its portfolio "was far less risky than it actually was"); *see also id.* ¶ 5 (alleging that Archegos "conceal[ed] the true risk of [its] portfolio").

This is not mere "but for" causation, and the FAC alleges much more than "a proscribed act in a transaction of which [a swap] is a part."  Arch. Mem. L. 23 (citing *Chemical Bank*, 726 F.2d at 943).  Rather, Defendants' misrepresentations directly and foreseeably impacted the consideration received by Swap Counterparties and directly and foreseeably impacted Swap Counterparties' risk management decisions, including decisions regarding the purchase and sale of Broad-Based Security Index Swaps.  Defendants' representations regarding Archegos's financial condition and the degree of risk associated with the swaps were central to the bargain and were "in connection with" the Broad-Based Security Index Swaps.  *See Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110–11 (2d Cir. 1986) (holding that misrepresentations relating to the "degree of risk" of an investment were made "in connection with" commodity futures contracts, under an analogous section of the CEA, 7 U.S.C. § 6(b)); *CFTC v. Vartuli*, 228 F.3d 94, 101–02 (2d Cir. 2000) (same)[6]; *SEC v. Drysdale*, 785 F.2d 38, 41 (2d Cir. 1986) (misrepresentation relating to financial health of defendant's firm satisfied § 10(b) "in connection with" requirement); *United States v. Naftalin*, 441 U.S. 768, 772–73 (1979) (misrepresentation relating to defendant's ownership of stock sufficient to cover short sale orders satisfied similar provision in § 17(a) of the Securities Act); *SEC v. Czarnik*, No. 10-cv-745, 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010) (false representations to a transfer agent concerning prospective purchaser's status as an accredited investor satisfied § 10(b) and § 17(a)).

---

[6] Like 7 U.S.C. § 9(1), section 4b of the Act prohibits fraud "in connection with" certain swaps.  7 U.S.C. § 6(b).

Furthermore, as discussed in Part III.B, *supra*, Defendants' fraud need not be in connection with a purchase or sale of a swap because 7 U.S.C. § 9(1) and Rule 180.1 contain no "purchase or sale" requirement.  The CFTC may alternatively state a claim based on allegations that Defendants' fraud was in connection with the "pendency" of swaps or "payment and other obligations arising under" swaps.  Rule 180.1 Release, 76 Fed. Reg. at 41,405.  The FAC meets this standard as well because it relates to the relationship established by the parties for the purpose of managing Archegos's total swap exposure.  Specifically, during and in connection with the pendency of the Broad-Based Security Index Swaps, Archegos maintained regular and frequent communications with Swap Counterparties to discuss credit and risk issues.  FAC ¶¶ 55, 58.  From the Swap Counterparties' perspective, the purpose of these calls was to gather information about Archegos's *entire portfolio*—both the long TRS and the Broad-Based Security Index Swaps—in order to assess the parties' rights and obligations relating to the swaps and make appropriate credit and risk management decisions, "including, but not limited to, the need for short Broad-Based Security Index Swaps."  *Id*.

Defendants' cited cases do not compel a different result.  Most of their cases—including their leading case, *Chemical Bank*—were decided prior to *Zandford* and based on the faulty premise, rejected by *Zandford*, that the "in connection with" standard is only met if a fraud relates to the value of a swap.[7]  *Chemical Bank* is also distinguishable on its facts.  That decision

---

[7] Defendants also cite *Taylor v. Westor Cap. Grp.*, 943 F. Supp. 2d 397, 403 (S.D.N.Y. 2013), which post-dates *Zandford*, for the proposition that "courts have drawn a line separating fraud claims that impact the fundamental valuation of the securities at issue, and the operation of securities markets, as distinguished from those that do not." As discussed, *Zandford* held categorically that a fraud need not relate to the value of a security for the "in connection with" standard to be met.  *Taylor* must be rejected to the extent it is inconsistent with governing Supreme Court precedent.  In any case, Defendant's conduct meets the standard set forth in *Taylor* because it related to the purchase, sale, solicitation, pendency, or termination of swaps and obligations arising thereunder—and thus necessarily related to the operation of the swap markets.  Defendants also cite to *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018), which held that the alleged fraud was not "in connection with" a purchase or sale of a security because plaintiff "received exactly what it expected."  Here, as discussed above, the

hinged on the fact that the direct result of the misrepresentations was not the purchase or sale of securities, but rather a loan (which was not a security), which incidentally was secured in part by stock. *Chemical Bank*, 726 F.2d at 944; *see also Drysdale*, 785 F.2d at 43 ("[I]in the instant case, securities were transferred *as a direct result* of a misrepresentation, whereas in *Chemical Bank* the *direct result* of the misrepresentations was a loan and not a securities transfer.") (emphasis added). Here, in contrast, the FAC alleges that the Defendants' misrepresentations directly impacted the Swap Counterparties' decisions regarding the appropriate amount of Broad-Based Security Index Swaps, which are "swaps" within the meaning of 7 U.S.C. § 9(1) and Rule 180.1. *See* FAC ¶ 6.[8]

Accordingly, the FAC sufficiently alleges Defendants' fraud in connection with swaps.

## IV.   The FAC Sufficiently Pleads Violations of Section 6(c)(1) and Rule 180.1

Halligan asserts that the FAC fails to sufficiently allege his violations of 7 U.S.C. § 9(1) and Rule 180.1. In light of the FAC's detailed allegations of Halligan's scienter, misrepresentations, and deceptive conduct, this Court should reject these arguments.

Rule 180.1(a)(1)-(3) makes it unlawful for any individual, in connection with any swap, to intentionally or recklessly "[u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud," "[m]ake, or attempt to make, any untrue or misleading

---

Swap Counterparties *did not* receive what they expected out of the bargain—*i.e.*, a creditworthy counterparty. *See* FAC ¶ 1.

[8] Defendants also cite *Chadbourne & Park LLP v. Troice,* 571 U.S. 377, 387 (2014) in support. However, that decision interpreted the scope of a phrase in the Securities Litigation Uniform Standards Act of 1998 ("SLUSA") that does not apply to the present case. Specifically, the Court held that a fraudulent misrepresentation or omission is not made "in connection with" the "purchase or sale of a covered security" under SLUSA "unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" The Court's holding, that plaintiffs did not plead fraud "in connection with the purchase or sale of a covered security" because their claims rested on the purchase of *uncovered* securities (certificates of deposit), is inapposite here. *Id.* at 395–96. Regardless, in this case, as discussed, Defendants' fraud was in fact material to the Swap Counterparties' decisions to enter into the Broad-Based Security Index Swaps. FAC ¶ 6.

statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading," or "[e]ngage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. 180.1(a)(1)-(3). "To prove a violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a), 17 C.F.R. § 180.1(a) . . . the Commission must show that Defendants engaged in prohibited conduct (*i.e.*, employed a fraudulent scheme; made a material misrepresentation, misleading statement or deceptive omission; or engaged in a business practice that operated as a fraud); with scienter . . . ." *McDonnell*, 332 F. Supp. 3d at 717. Defendants' conduct may be shown to be intentional or reckless where a defendant "intended to defraud, manipulate, or deceive, or if [d]efendant's conduct represents an extreme departure from the standards of ordinary care. *CFTC v. R.J. Fitzgerald*, 310 F.3d 1321, 1328 (11th Cir. 2002); *see also McDonnell*, 332 F. Supp. 3d at 721 (recklessness may be established where the conduct "departs so far from the standards of ordinary care that it is very difficult to believe the [actor] was not aware of what he was doing") (citing *R.J. Fitzgerald*, 310 F.3d at 1328); *cf. SEC v. Im*, No. 17-CV-3613 (JPO), 2020 WL 4937465, at *3 (S.D.N.Y. Aug. 24, 2020) (Rule 10b-5 requires a showing that defendant's misrepresentations "were made with the intent to deceive, manipulate, or defraud or were made with reckless disregard for the truth and constituted conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care.") (internal citations omitted).

### A.  The FAC Sufficiently Alleges Halligan's Scienter

The FAC alleges several specific instances in which Halligan directed Becker to make material misstatements to Swap Counterparties, either knowing that the information was false or

with reckless disregard to the truth.[9]  First, the FAC alleges that beginning in or around 2016 and 2017, Halligan purposely understated the size of Archegos's largest positions and misrepresented the amount of Archegos's available cash to Swap Counterparties.  *Id.* ¶¶ 57–58; *see also McDonnell*, 332 F. Supp. 3d at 722 (finding scienter where Defendants intentionally, or with reckless disregard to their truth, made representations concerning company's size, location, and number of employees that were false).  In or around 2018, when Becker took responsibility for dealing with Swap Counterparties on credit risk-related issues, Halligan instructed Becker that he should tell all Swap Counterparties that Archegos's largest position was 35% of NAV, regardless of whether that was true.  *Id.* ¶ 58.

The FAC alleges that this deception continued through late 2020 and early 2021.  Around this time, Becker asked Halligan for guidance in handling an upcoming call with Swap Counterparty 3.  *Id.* ¶ 59.  By this point, both Halligan and Becker received daily position reports showing that Archegos's largest long single-name TRS position, ViacomCBS, had grown significantly larger than 35% of Archegos Fund's NAV, and Becker was concerned that he would receive questions about the position.  *Id.*  Despite clear evidence that this figure was inaccurate, Halligan again directed Becker to falsely represent that the fund's largest position was approximately 35% of its NAV, and Becker did so.  *Id.*  Following Halligan's direction, Becker repeated the same misrepresentation to multiple other counterparties.  *Id.*  These are not generalized allegations; the FAC cites seven separate calls, with dates, between Becker and four

---

[9] Although Archegos incorporates by reference Halligan's arguments about his own scienter, Archegos does not otherwise challenge the complaint's well-pleaded allegations of scienter, including as to Archegos employees Becker and Tomita.  *See, e.g.*, FAC ¶¶ 55–71.  Archegos also does not dispute that it is liable for the violations of its officers, employees, or agents pursuant to 7 U.S.C. § 2(a)(1)(B).  *See also Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 105 (2d Cir. 2001) (holding that complaint adequately pleaded fraud against corporate defendants where it alleged that employee was acting as an agent and on behalf of those defendants when disseminating false report).

different Swap Counterparties in which he made this misrepresentation, despite the fact that Archegos's largest position was over 60% of its NAV on each date.  *Id.*  The FAC also alleges that Halligan had access to contrary financial information, and therefore knew that he was directing Becker to provide false information to Archegos's counterparties.[10]  Such allegations are sufficient to plead scienter.  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements."); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617–18 (S.D.N.Y. 2015) (finding scienter where CFO either knew or had access to information contrary to her public statements, including from reports that were sent to her); *Bank of Am. Corp. Sec., Derivative, and Employee Ret. Income Security Act Litig.*, 09 MD 2058, 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011) ("Examples of recklessness include plausible allegations that the defendants knew or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor.") (internal quotations omitted); *CFTC v. Equity Financial Grp. LLC*, 572 F.3d 150, 160 (3d Cir. 2009) (finding scienter where defendants knew or recklessly disregarded obvious risk that company's accounting reports were false, based in part on knowledge of earlier false report and knowledge that accountant did not have access to information underlying representation).[11]

As another example of Halligan's scienter, the FAC alleges that in or around March 8, 2021, Halligan, Tomita, and Becker held a conference call in which they conspired to provide

---

[10] In his guilty plea allocution, Becker admitted knowing these statements were untrue.  FAC ¶ 56.

[11] *SEC v. Carrillo Huettel LLP*, No. 13 CIV. 1735, 2014 WL 12785242, at *3 (S.D.N.Y. June 4, 2014), which held that the SEC "must plead sufficient facts to establish" scienter, poses no higher burden for showing scienter in government enforcement actions, and is otherwise distinguishable on its facts.  *See id.* ("GGSI's routine business practice of assisting its clients with maintaining nominee accounts cannot alone sustain an inference of securities fraud under Section 10(b) and Rule 10b-5(b).").

false or misleading liquidation statistics for Becker to report back to Swap Counterparty 4; that all three received or had access to periodic reports detailing the amount of time required to liquidate Archegos's portfolio; and that each therefore knew the statistics were false or misleading.  FAC ¶ 63.  Becker then conveyed those false statistics to Swap Counterparty 4 at the direction of Halligan, misrepresenting that Archegos could liquidate its portfolio at a rate that would not significantly impact market prices.  *Id*. ¶ 64.  In fact, as Halligan and Becker knew (or recklessly or consciously disregarded) based on Archegos's liquidation reports, Archegos's portfolio could not be unwound at the stated rate and time period without significantly impacting the market price, based on market conditions and the positions to be liquidated.  *Id*.  Becker made similar misrepresentations to two other Swap Counterparties around the same time period. *Id*.; *see also Orthofix*, 89 F. Supp. 3d at 618 (finding that plaintiff was not required to specifically allege that CFO read reports containing contrary information in order to establish scienter).[12]

The FAC also alleges Halligan acted with scienter during the critical week of March 22, 2021, when Archegos's Swap Counterparties issued rapidly escalating margin calls.  The FAC alleges that Halligan directed that Becker falsely tell Swap Counterparties that Becker did not have access to Archegos's up-to-date financial information, and that Becker memorialized

---

[12] Halligan argues that under *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 422 (S.D.N.Y. 2020), the CFTC must allege that Halligan actually reviewed or had a role in "creating, maintaining, or reviewing" contrary information.  However, that decision explicitly stated that it was "[i]n line with" prior Second Circuit decisions including *Novak*, which, as noted above, held that recklessness may be established based on *access* to information contradicting one's public statements.  *Id*. at 421–22.  Further, *City of Omaha* is distinguishable on its facts; the complaint alleged that one unit of a company, of which the two individual Defendants were the CEO and CFO, maintained a second set of books to keep track of its actual revenues, but the complaint did not allege that the two individuals "had any role in creating, maintaining, or reviewing this material." *Id*. at 422.  The court explained that the complaint "boils down to" the argument that company accounting violations alone were a sufficient basis for the scienter of its executives, which the court rejected.  *Id*.  In contrast, the FAC includes numerous allegations in which Halligan made or directed material misstatements with knowing, or recklessly disregarding, contrary position reports, liquidation reports, and other financial data.  Any factual disputes regarding Halligan's fraudulent intent are simply are not appropriate for resolution at this stage.

Halligan's instruction in a set of talking points for calls with Swap Counterparties.  FAC ¶ 81.
Later, Halligan reviewed and approved those talking points, despite knowing, as Becker's direct
supervisor and Archegos's CFO, that Becker had access to Archegos's trade blotter, live
portfolio, and up-to-date margin calculations; Halligan therefore knew, was reckless in not
knowing, or consciously avoided knowing that several representations in the talking points were
false or misleading.  *Id.*; *see Novak*, 216 F.3d at 308 (recklessness may be found where
"defendants knew or, more importantly, should have known that they were misrepresenting
material facts related to the corporation … [or] failed to review or check information that they
had a duty to monitor, or ignored obvious signs of fraud.").  The next day, Halligan again
directed Becker to falsely tell counterparties that Becker did not have insight into Archegos's
plan to reduce Archegos's exposure, despite knowing that Becker had access to all of this
information.  Acting at the direction of Halligan, his immediate supervisor, Becker followed
through on these instructions.  *Id.* ¶ 82.  These allegations establish that Halligan acted
intentionally, or at a minimum recklessly, in directing Becker's repeated material misstatements
to counterparties.

  As to all these examples, it bears repeating that Halligan was not a mere back-office or
low-level employee; he was Archegos's Chief Financial Officer.  In this role, he was directly
responsible for overseeing Archegos's financial records and the dissemination of financial
information to outsiders, including through his supervision of Becker, and as such played a
significant and active role in ensuring the success of this fraudulent scheme.  The sheer volume
of misrepresentations that Becker, Halligan's direct report, made to Archegos's Swap
Counterparties, coupled with instances in which Halligan failed to correct misrepresentations
disseminated by Becker, *id.* ¶ 67, only further establishes Halligan's scienter.  *See SEC v. Das*,

723 F.3d 943, 952 (8th Cir. 2013) (affirming trial court's rejection of a reliance-on-officers jury instruction because "[a]s chief financial officer, [his] very job" was to "manage its financial department and ensure its records and documents were accurately and fairly maintained . . . .") (quotations omitted); *In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (finding that company's radically inflated revenues over period of two years was circumstantial evidence of recklessness against CFO and Comptroller, who were "uniquely situated" to control accounting procedures).

The FAC, therefore, provides several, particularized examples where Halligan instructed Becker to materially misrepresent financial information to Archegos's Swap Counterparties with the intent to deceive or, at least, recklessness as to the truth of those representations.  This is far from a generalized allegation that Halligan was so "closely involved" in running Archegos that he "must have known" contrary information.  *Maloney v. Ollie's Bargain Outlet Holdings, Inc*., 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (Oetken, J.).

Apart from Halligan's directions to Becker, the FAC alleges several instances in which Halligan himself intentionally or recklessly made material misstatements directly to Archegos's Swap Counterparties.  For instance, beginning in mid-2020, Halligan signed TRS swap transaction confirmations for Swap Counterparty 9 that represented that "the aggregate amount of all Shares beneficially owned by [Archegos] for purposes of Section 13(d) of the Exchange Act, when combined with the notional amount of Shares underlying any long derivative positions, is less than 5% of the outstanding shares."  *Id*. ¶ 72.  At the time he signed certain of these confirmations, Halligan knew (based on his knowledge of and access to portfolio information, including daily position reports and communications with Becker) or recklessly or consciously disregarded that that representation was false.  In fact, Archegos's combined

exposure, including underlying long derivative TRS positions, exceeded 5% of the outstanding shares of multiple issuers. *Id*.[13]  In addition, the FAC also alleges that in or around 2016 or 2017, in calls with counterparties, Halligan purposely understated the size of Archegos's largest positions and misrepresented the amount of Archegos's available cash. *Id*. ¶ 57.

Halligan also criticizes the relevance of his remark to Becker, "if they only knew," after Becker and Tomita spoke with Swap Counterparty 1 regarding Archegos's position in GSX. FAC ¶ 67.  The phrase speaks for itself:  it shows that Halligan knew that Archegos's Swap Counterparties had been deceived as to Archegos's positions, which was a natural consequence of his various directions to Becker to misrepresent financial information.  In short, it shows scienter.  *See SEC v. MiMedx Grp., Inc.*, No. 19 CIV. 10927, 2022 WL 902784, at *8 (S.D.N.Y. Mar. 28, 2022) (finding support for scienter where defendant was aware that account was being handled in a different way than was being presented).  Contrary to Halligan's argument, the FAC does not "attempt to impute scienter" to Halligan based on his relationship with Becker, or allege that Halligan is responsible for Becker's misrepresentations "by virtue of his status . . . without more."  Halligan Mem. L. 26.  The FAC also does not rely on general assertions of Halligan's knowledge based simply on the frequency of his emails and telephone calls with Becker.  *Cf. SEC v. Cedric Kushner Promotions, Inc*., 417 F. Supp. 2d 326, 335 (S.D.N.Y. 2006).  Rather, the FAC alleges that Halligan directed Becker to lie, or lied himself, on specific dates and time

---

[13] Halligan argues that this aspect of the FAC is insufficient under this Court's decision in *Ollie's Bargain Outlet Holdings*, in which plaintiffs alleged that recklessness could be inferred from the fact that the three individual defendants "had access to daily sales reports" and "regularly assessed company inventory."  518 F. Supp. 3d at 781. This Court found that the complaint failed to specify the purported contrary information or how it contradicted defendants' statements about the company's sales and inventory, and also found that allegations that executives "regularly assessed company inventory" were too vague.  *Id*.  In contrast, the FAC properly alleges that Halligan knew that Archegos's combined exposure exceeded 5% of the outstanding shares based on his knowledge of and access to daily position reports and other portfolio information, or reckless disregard of such information.  FAC ¶¶ 59, 70.  Such allegations satisfy this Court's holding in *Ollie's*.  *See id.* at 780 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.") (quoting *Novak*, 216 F.3d at 309).

periods to specific counterparties.  These allegations go well beyond the requirements of Rule 9(b).

Because the FAC sufficiently alleges intent to deceive, or reckless disregard for the truth, nothing more is required.  *Im*, 2020 WL 4937465 at *3.  Nevertheless, the FAC also sufficiently alleges Halligan's opportunity to commit fraud—through material misrepresentations that he directed Becker to make or made himself—and motive—to conceal the true risk of Archegos's portfolio so that Archegos could obtain additional capacity to trade even greater volumes of highly leveraged, concentrated, and illiquid long positions, while maintaining favorable margin rates.  FAC ¶ 5; *see SEC v. Wey*, 246 F. Supp. 3d 894, 912 (S.D.N.Y. 2017) (quoting *Novak*, 216 F.3d at 306) (noting that scienter may be established "by alleging facts to show that defendants had both motive and opportunity to commit fraud.").  Even if the Court finds these motives inadequate, under the standard posed by Halligan, the Court would only have to find strong circumstantial evidence of conscious misbehavior or recklessness.  *See* Halligan Mem. L. 24. The FAC plainly meets this prong for the reasons stated.

### B.  The FAC Sufficiently Alleges that Halligan "Made" Misstatements

Halligan argues that under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), he is not the "maker" of any misrepresentations alleged in the FAC.  In *Janus*, the Supreme Court found, in a securities fraud action brought by a private plaintiff, that an investment adviser could not be held liable under SEC Rule 10b-5 for false statements included in its client's prospectuses because it was not the "maker" of those statements. *Id.* at 147–48. The Court held that the "maker" of a statement is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* at 142.  Notably, there was nothing on the face of the prospectuses that indicated the statements

came from the investment adviser, nor any allegation that the investment advisor was the filer of the prospectuses.  *Id.* at 147.[14]

No court has extended *Janus* to apply to the CEA, and this Court should decline to be the first to do so.  The *Janus* decision rested on a canonical principle—narrowly construing implied private rights of action—that does not apply to the CEA.  The Supreme Court was explicit that its narrow interpretation of SEC Rule 10b-5 was premised on the fact that neither that rule nor section 10(b) of the Exchange Act expressly created a private right of action.  *See, e.g.*, 564 U.S. at 142 ("[W]e are mindful that we must give narrow dimensions . . . to a right of action Congress did not authorize when it first enacted the statute and did not expand when it revisited the law.") (internal citation omitted); *id*. at 144 ("Our holding also accords with the narrow scope that we must give the implied private right of action.").

Unlike the Exchange Act, the CEA *does* contain an express private right of action for claims brought under 7 U.S.C. § 9(1) and Rule 180.1.  7 U.S.C. § 25(a)(1)(D).  Thus, the *Janus* Court's animating concern about expanding implied rights of action simply does not apply to the CEA.  Given this distinction, there is no basis to extend *Janus*'s narrow construction of the term "to make" to the CEA, and this Court should reject Defendants' invitation do so.  *See Prousalis v. Moore*, 751 F.3d 272, 279 (4th Cir. 2014) (refusing to apply *Janus* to a criminal securities fraud case because "to broaden *Janus*'s holding beyond the domain of implied rights would represent a stark assertion of judicial will, the very thing against which *Janus* itself inveighed.").

Even if this court were to apply *Janus* to Plaintiff's CEA claims, the FAC meets *Janus*'s requirements.  Citing *Janus*, Halligan falsely claims that the FAC "expressly alleges" that

---

[14] Subsequent decisions have clarified that there can be more than one "maker" of a statement.  *See City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 n.9 (S.D.N.Y. 2011); *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012).

Halligan did not have ultimate authority over Archegos's communications because Hwang "controlled" Archegos. Halligan Mem. L. 31. This is plainly wrong: the fact that Hwang legally owned and controlled Archegos cannot possibly mean that Hwang had ultimate authority over every communication by every Archegos officer and employee for purposes of *Janus*.

Halligan also cites a non-controlling decision in *Hawaii Ironworkers Annuity Tr. Fund v. Cole*, No. 3:10-CV-371, 2011 WL 3862206, at *5 (N.D. Ohio Sept. 1, 2011), *as amended* (Sept. 7, 2011) for the principle that a management "directive" to misstate information absolves subordinate employees of any "ultimate authority" over their statements in response. In that case, after company executives and the Board of Directors imposed a directive on management to meet an unattainable 6% profit margin, defendant employees falsified their unit's accounting records to meet those targets; subsequently, other officials relied on that falsified information to make overly optimistic public statements. *Id.* at *1, *4. Critically, the defendants—who were the subordinate, non-executive employees—never "spoke directly to the investing public," nor did they direct anyone to make any such statements. *Id.* at *1. Following *Janus*, the court reached the logical conclusion that those defendants, who were merely alleged to have manipulated earnings, could not be held liable for "making" any material misstatement. *Id*. at *2. By contrast here, Halligan was a C-level executive alleged to have ordered his direct report to lie to counterparties, and he made several material misstatements directly to counterparties himself. Neither *Janus* nor *Hawaii Ironworkers* poses any obstacle to holding Halligan liable as the "maker" of those misrepresentations.

A more apt comparison for the present case is *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019). Francis Lorenzo, a director of investment banking at a brokerage firm, sent emails to prospective investors that contained false statements about the assets of the company, including $10 million

in "confirmed assets," while failing to reveal that the company had publicly stated that its assets were worth less than $400,000. *Id.* at 1099. At trial, Lorenzo testified that he sent the e-mails at the direction of his boss, who supplied the content and "approved" the messages. *Id.* The Court of Appeals for the District of Columbia Circuit found that Lorenzo's boss was the "maker" of the statements, and the Supreme Court took the case "on the assumption that Lorenzo was not a 'maker' under subsection (b) of Rule 10b–5." *See id.* at 1100 ("[B]ecause his boss "asked Lorenzo to send the emails, supplied the central content, and approved the messages for distribution," [] it was the boss that had "ultimate authority" over the content of the statement "and whether and how to communicate it" under *Janus*); *Lorenzo v. SEC*, 872 F.3d 578, 587–88 (D.C. Cir. 2017), *aff'd*, 139 S. Ct. 1094 (2019) (finding that Lorenzo transmitted statements devised by his boss at his boss's direction). Thus, *Lorenzo* stands for the proposition that where, like here, a subordinate employee disseminates false information at the direction of his supervisor, the supervisor is the "maker" of those statements. Here, because Halligan directed Becker to send messages containing false information (*e.g.*, FAC ¶ 59), supplied the central content (including, in some cases, even telling Becker which numerical figures to cite) (*e.g.*, *id.*), and approved false messages for distribution (*e.g.*, *id.* ¶ 81) to specific counterparties (*e.g.*, *id.* ¶¶ 59, 64), Halligan is the "maker" of those statements under *Janus* and *Lorenzo*.[15]

---

[15] If *Janus* does not apply, Halligan is liable, for the reasons stated, because he created or was significantly involved in preparing the referenced misstatements. *See CFTC v. Atkinson*, No. 18-23992-CIV, 2018 WL 9362257, at *4, *8 (S.D. Fla. Nov. 16, 2018) (granting injunction based in part on allegation that defendant, or others at his direction, sent fraudulent email solicitations); *CFTC v. Rolando*, 589 F. Supp. 2d 159, 168–69 (D. Conn. 2008) (finding that defendant made material misstatements under Section 4b of the CEA); *Collins & Aikman Corp.*, 524 F. Supp. 2d at 489 (noting Second Circuit case law holding that an individual can be liable under Section 10(b) of the Exchange Act where he is "sufficiently responsible" for an entity's speech); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (holding corporate officer had primary liability under Section 10(b) based on his drafting, producing, reviewing and/or disseminating of company's false and misleading statements).

Apart from *Janus*, Halligan next incorrectly argues that the FAC's allegations that Halligan "directed" Becker in his communications with Swap Counterparties are not particularized and thus insufficient.  Halligan Mem. L. 32.[16]  Halligan also faults the FAC for failing to allege that Becker attributed any misstatements to Halligan, and failing to allege with particularity that Halligan "directed" Becker to have any specific conversations with Swap Counterparties.  *Id*.  This portion of Halligan's brief rehashes several of the particularity arguments already addressed.  As analyzed in Part IV.A, the FAC alleges several material misstatements that Halligan made directly to Swap Counterparties, which do not implicate *Janus*, including signing transaction confirmations containing material misrepresentations that were disseminated to Swap Counterparty 9.  FAC ¶ 72.  As Archegos's CFO, Halligan unquestionably is the "maker" of misstatements in documents he signed relating to Archegos's financial holdings.  *See Janus*, 564 U.S. at 142–43 ("attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it was attributed."); *Atkinson*, 2018 WL 9362257 at *4, *8 (finding that CFTC made a showing of a reasonable likelihood of success on the merits that defendants violated Rule 180.1 and other provisions, including by signing and sending deceptive emails containing false statements); *SEC v. Carter*, No. 10-C-6145, 2011 WL 5980966, at *3 (N.D. Ill. Nov. 28, 2011) (finding that defendant signed an SEC form "as [a] highranking corporate officer" and thus "made" the statements therein).  In addition, the FAC alleges Halligan made other

---

[16] Halligan points to *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 640–41 (S.D.N.Y. 2017), a private suit under the PSLRA, for the proposition that Rule 9(b) imposes a "high burden" in determining ultimate authority where there are multiple people involved in creating and disseminating a statement.  In fact, this portion of *Banco Bradesco* addressed "whether the group-pleading doctrine . . . survives the Supreme Court's 2011 decision in *Janus*."  *Id*. at 637.  Because Plaintiff in this case is not relying on the group-pleading doctrine, but instead asserting that Halligan and not Becker had "ultimate authority" over the relevant misstatements, *Banco Bradesco* has no bearing.

misrepresentations directly to Swap Counterparties regarding the size of Archegos's positions and amount of available cash.  ¶ 57.

Separately, the FAC alleges several examples in which Halligan instructed Becker to make specific misrepresentations to Archegos's Swap Counterparties.  *See, e.g.*, FAC ¶¶ 58–59, 64, 81–82.  To pick one example, on March 24-25, 2021, Halligan proposed false and misleading talking points for Becker to use with calls with counterparties, specifically directed Becker to falsely deny that he had access to up-to-date financial information, and then reviewed and approved the document memorializing his instructions.  *Id*. ¶ 81.  These particularized allegations satisfy both Rule 9(b) and *Janus*.[17]  The cases cited by Halligan regarding conclusory allegations of one individual acting at the direction of another, with "no facts to substantiate" them, *In re NQ Mobile, Inc. Sec. Litig*., No. 13 Civ 7608, 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015), are of no moment.

### C. The FAC Sufficiently Alleges that Halligan Used or Employed a Scheme to Defraud

Rule 180.1(a)(1) and (3) prohibit what courts call "scheme liability" for "those who, with scienter, engage in deceitful conduct."  *See SEC v. Sugarman*, No. 19 Civ. 5998, 2020 WL 5819848, at *5 (S.D.N.Y. Sept. 30, 2020) (quoting *SEC v. Jean-Pierre*, No. 12 Civ. 8886, 2015 WL 1054905, at *8 (S.D.N.Y. Mar. 9, 2015)) (analyzing Rule 10b-5(a) and (c)).  A "scheme liability claim is aimed at inherently deceptive conduct and does not require a misleading statement or omission."  *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y.

---

[17] *See also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015) (finding that CEO "made" statement that he drafted but another executive read to the media); *SEC v. E-Smart Technologies, Inc.*, 74 F. Supp. 3d 306, 319–20 (D.D.C. 2014) (holding CEO liable for misstatements contained in press release that she endorsed and approved); *SEC v. Greenstone Holdings, Inc.,* 10-cv-1302, 2012 WL 1038570, at *7–8 (S.D.N.Y. Mar. 28, 2012) (holding that the "maker" of the statements within company press releases was CEO or COO who drafted them); *Carter*, 2011 WL 5980966 at *2 (finding that allegation that company's CEO approved press releases was sufficient to make him the "speaker.").

2020) (analyzing Rule 10b-5(a) and (c) (internal quotation omitted)); *Wey*, 246 F. Supp. 3d. at 918 (finding that deceptive act can support scheme liability under Rule 10b-5 even if it is not inherently unlawful).  To plead scheme liability under Rule 180.1(a)(1) and (3), the CFTC must allege that Halligan:  (i) committed a manipulative or deceptive act; (ii) in furtherance of the alleged scheme; (iii) with scienter.  *CFTC v. Gorman*, 587 F. Supp. 3d 24, 40 (S.D.N.Y. 2022).  *See also Wey*, 246 F. Supp. 3d at 916 (finding that complaint need not allege that a defendant "participated in each and every aspect of the fraudulent scheme," but only that defendant's actions "contributed to the larger fraudulent scheme").

In *SEC v. Rio Tinto*, 41 F.4th 47 (2d Cir. 2022), the Second Circuit held that an actionable scheme liability claim under Rule 10b-5(a) and (c) "requires something *beyond* misstatements and omissions, such as dissemination." (emphasis in original).  Because there was no allegation that the defendants disseminated false statements, but only that the defendants failed to prevent misleading statements from being disseminated by others, the court affirmed dismissal of the scheme liability claims.  Importantly, the court explained that dissemination is only "one example of something extra that makes a violation a scheme," but declined to rule whether other misconduct, such as concealing information from auditors, would suffice.  *Id.* at 54.[18]  Nevertheless, prior decisions in the Second Circuit and elsewhere have held that concealing truthful information may support scheme liability.  *See, e.g.*, *MiMedx Grp.,* 2022 WL 902784 at *11 (finding that SEC sufficiently pleaded scheme liability where defendant concealed material facts from audit committee and auditors); *Wey*, 246 F. Supp. 3d at 916–17 (holding that

---

[18] The Second Circuit also reiterated some of the Supreme Court's concerns in *Janus* about expanding implied causes of action and weakening pleading requirements for private plaintiffs bringing Rule 10b-5 claims.  41 F.4th at 54–55.  For similar reasons as discussed in Part IV.B, if *Janus* does not apply to enforcement actions under the CEA like this one, it would also call into question whether *Rio Tinto*'s holding extends to Rule 180.1(a)(1) and (3).  Nevertheless, the discussion below assumes for purposes of this brief that *Rio Tinto* applies to this action.

SEC adequately pleaded fraudulent scheme where defendant lied to and concealed information from national stock exchange); *Collins & Aikman Corp.*, 524 F. Supp. 2d at 494 (finding well-pled scheme liability based, in part, on allegations that defendant made false statements to conceal transactions from audit committee investigation, supervised employees who negotiated transactions, and participated in meetings in which they were discussed).

Halligan incorrectly argues that the FAC does not allege "something extra" beyond the purported misstatements, as required by *Rio Tinto*.  He also argues that alleging that he "conferred" with Becker or Tomita before they made misstatements is mere "guilt by association."  Halligan Mem. L. 36–37.

Apart from the various misrepresentations made by Halligan, the FAC alleges various ways in which he engaged in deceptive conduct in furtherance of the fraudulent scheme. Halligan was one of the chief architects of Archegos's systematic deception of Swap Counterparties.  FAC ¶ 54.  As discussed at length above, Halligan implemented these principles by training and instructing Becker to routinely deceive counterparties as to Archegos's true position sizes, which Becker carried out.  *Id.* ¶¶ 57–59; *see Collins & Aikman Corp.*, 524 F. Supp. 2d at 495 ("[K]nowingly supervising employees who are carrying out a fraudulent scheme is itself the employment of a deceptive device.").  Halligan, Becker, and Tomita developed and conspired to provide false or misleading liquidation statistics for Becker to report back to Swap Counterparty 4, which Becker repeated in substance to two other counterparties.  *Id.* ¶¶ 63–64. Similarly, during the critical week of March 22, 2021, Halligan counseled Becker to keep Archegos's Swap Counterparties in the dark by falsely claiming he did not have access to the Fund's current financial information; subsequently, Halligan approved the talking points that Becker delivered to various Swap Counterparties throughout the day, *id.* ¶ 81.  These allegations

show quintessential culpable participation in a fraudulent scheme:  in response to pending or expected questions from Swap Counterparties, Halligan, Tomita, and Becker joined together to craft false statements for Becker to deliver, which were designed to conceal material information from the counterparties and further perpetuate the scheme.  *See SEC v. Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020) (finding sufficient allegations of deceptive conduct where defendants condoned the creation of falsified documents and used them to facilitate fraudulent scheme); *SEC v. Kearns*, 691 F. Supp. 2d 601, 604–07, 618 (D.N.J. 2010) (upholding scheme liability claim where, *inter alia*, CFO gave false assurances to auditors, allowed employee to give them false documents, and failed to correct misleading statements on investor calls).  Based on this allegation alone, Halligan is primarily liable under Rule 180.1(a) and (c).

Indeed, in all Becker's material misrepresentations to Swap Counterparties, Becker was following Halligan's example, which he learned as early as 2016 or 2017 by witnessing Halligan purposely misrepresent the size of Archegos's largest positions and available cash.  FAC ¶¶ 57–58.  Perhaps no comment is more revealing of Halligan's knowing participation in the fraudulent scheme than his remark to Becker, "if they only knew."  *Id*. ¶ 67.  The FAC details that just before making this statement, Halligan had told Becker, essentially, that Becker and Tomita needed to keep their stories straight in their calls with Swap Counterparties.  *Id*.  After a January 29, 2021 call with Swap Counterparty 1, Becker reported back to Halligan, in substance, that he had adhered to Tomita's talking points (which were false) regarding Archegos's position in GSX.  *Id*. ¶¶ 66–67.  Halligan's winking response "if they only knew" in fact endorsed Becker's

deception and confirmed Halligan's knowing engagement in the ongoing scheme, further establishing his liability under Rule 180.1.[19]

## V.     The FAC Sufficiently Alleges Halligan's Aiding and Abetting Liability

Finally, Halligan moves to dismiss the claim that he aided and abetted Archegos's violations of 7 U.S.C § 9(1) and Rule 180.1(a)(1)-(3).  The aiding and abetting claim does not rest upon mere "guilt by association," nor does it require "piling inference upon inference." Halligan Mem. L. 3, 38.  Instead, the FAC amply alleges that Halligan knew of and willfully took concrete steps to further Archegos's fraud, which is all that is required.

Section 13 of the CEA establishes liability for any individual who "willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of" the CEA or Regulations, or who "acts in combination or concert with any other person in any such violation," or "willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation."  7 U.S.C. § 13c(a).  The Second Circuit, drawing on the criminal aiding and abetting standard, has interpreted Section 13 as requiring the defendant to "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, [and] that he seek by his action to make it succeed."  *In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 182 (2d Cir. 2013) (internal citation omitted); *accord CFTC v. Byrnes*, No. 13-CV-1174, 2019 WL 4515209, at *12 (S.D.N.Y. Sept. 19, 2019).  Put differently, to state a claim for aiding and abetting, the complaint must allege that defendant:  (1) had knowledge of the principal's intent to commit a violation; (2) had the intent

---

[19] Halligan cites twice to the recent, post-*Rio Tinto* decision *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-cv-08585, 2022 WL 4085677, at *55 (S.D.N.Y. Sept. 2, 2022), which found, *inter alia*, "that the creation of a false statement that is then disseminated by another who is the 'maker' is not sufficient to create scheme liability." Because, for reasons already stated, Halligan had ultimate authority and was the "maker" of several misrepresentations disseminated by Becker, *Turquoise Hill* is of no help to Halligan in this case.

to further that violation; and (3) committed some act in furtherance of the principal's objective. *Nicholas v. Saul Stone & Co. LLC*, 224 F.3d 179, 189 (3d Cir. 2000); *Damato v. Hermanson*, 153 F.3d 464, 471, 473 (7th Cir. 1998).[20]  A defendant who is willfully blind also meets the knowledge requirement.  *See United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) ("[K]nowledge consciously avoided is the legal equivalent of knowledge actually possessed.").

Halligan first asserts that the FAC's aiding and abetting claim should be dismissed because the Commission fails to adequately plead a primary violation, an argument that rests solely on his contention that the primary violations by Becker, Tomita, and Archegos were not "in connection with" swaps.  This argument fails because, as discussed above, the primary violations are "in connection with" the Broad-Based Security Index Swaps, which are within the CFTC's anti-fraud jurisdiction.  Second, Halligan argues that the FAC fails adequately to plead that Halligan knew of and knowingly participated in the underlying violation.[21]  These arguments are also without merit.

The rhetoric in Halligan's motion is badly out of step with the facts in the FAC, as previously discussed in the context of Halligan's primary liability.  The FAC does not plead

---

[20] The legal standard for aiding and abetting liability under § 13c(a) was modelled on, and has been interpreted consistently with, the federal criminal aiding and abetting statute, 18 U.S.C. § 2.  *See, e.g.*, *In re Richardson Securities, Inc.*, CFTC No. 78-10, 1981 WL 26081, at *8 (Jan. 27, 1981); *see also Bosco v. Serhant*, 836 F.2d 271, 279 (7th Cir. 1987).  The Second Circuit has instructed that the "classic formulation" of criminal aiding and abetting liability in *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) is the applicable standard for CEA aiding and abetting liability in this circuit, while observing that the three-part test employed by the Seventh and Third Circuits in *Damato* and *Nicholas* does "not differ, in substance" from the Second Circuit's formulation.  *Amaranth*, 730 F.3d at 182.

[21] Halligan refers to a "substantial assistance" requirement for an aiding and abetting claim.  The phrase "substantial assistance" appears in Section 20(e) of the Securities Exchange Act of 1934 (as amended), 15 U.S.C. § 78t(e), as a component of the aiding and abetting liability standard in SEC actions.  That phrase does not appear in Section 13 of the CEA, 7 U.S.C. § 13c(a), nor does any requirement exist under the CEA that an aider and abettor's participation be "substantial."  *See In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 177 (S.D.N.Y. 2014) (Section 13 requires that a defendant commit "some act"—*i.e.* at least one overt act—in furtherance of the principal's objective).  As discussed *supra*, Halligan not only met the standard for aiding and abetting through numerous overt acts, but he also actively and substantially participated in the fraudulent scheme with Tomita, Becker and Archegos.

Halligan's scienter merely based upon his supervisory relationship to Becker, or generic assertions that Halligan "should have known" of misrepresentations by others.  Halligan Mem. L. 30, 38.  Instead, the FAC contains detailed allegations describing how Halligan joined in the fraudulent venture, knowingly and actively participated in it, and sought to make it succeed, in concert with Tomita and Becker.  Among other things, the FAC alleges that Halligan personally lied to Swap Counterparties on a routine basis; trained and directed Becker to do the same; conspired with Becker and Tomita to provide additional false or misleading information to Swap Counterparties; sought to ensure that false or misleading information provided to Swap Counterparties by Becker and Tomita was consistent; and signed transaction confirmations containing false or misleading information.  *See supra* Part IV.A.

Halligan tries to brush off the CFTC's allegations by mischaracterizing or ignoring the facts alleged in the FAC.  For example, the FAC describes how, in late 2020 or early 2021, Becker became concerned that a counterparty might question the repeated misrepresentation that Archegos's largest position was approximately 35% of NAV and sought direction from Halligan; in response, Halligan directed Becker to continue to make that false representation.  FAC ¶ 59. Halligan argues that the FAC "makes no claim that Halligan knew that metric was false at the time, if it was," Halligan Mem. L. 38, but the FAC expressly alleges Halligan knew the figure was materially false based on daily reports that Halligan received.  FAC ¶ 59.  Similarly, Halligan argues that Becker could not plausibly have acceded to a directive from Halligan (Becker's direct supervisor) to mislead Swap Counterparties because the FAC supposedly fails to provide "a single factual detail or an allegedly deceptive act by Halligan" prior to that directive. Halligan Mem. L. 30.  But the FAC provides several examples of Halligan's deceptive conduct,

including Becker's prior observation of Halligan's routine and systematic lies to Swap

Counterparties over multiple years.  FAC ¶¶ 57–58.[22]

In sum, the FAC adequately alleges that Halligan aided and abetted Archegos's violations

of Section 6(c)(1) of the Act and Rule 180.1(a)(1)-(3).

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' motions in their entirety.

In the event that the Court grants Defendants' motions, the CFTC respectfully requests the

opportunity to replead.

Dated:  January 6, 2023

Respectfully submitted,

/s/ Benjamin J. Rankin
Benjamin J. Rankin
Alejandra de Urioste
Steven I. Ringer
John C. Murphy
Jacob Mermelstein

COMMODITY FUTURES
  TRADING COMMISSION
Division of Enforcement
290 Broadway, Suite 600
New York, NY 10007
(646) 746-9794
brankin@cftc.gov

---

[22] Although the FAC alleges that Halligan had actual knowledge, even assuming that he did not, he was at a minimum willfully blind to the fact that Tomita and Becker routinely misled Swap Counterparties about Archegos's portfolio.  Given his role as CFO, his awareness that Archegos's portfolio concentration was of concern to Swap Counterparties, his prior instruction for Becker to quote a 35% concentration metric "regardless of the true figure," *id.* ¶ 58, his receipt of daily reports detailing the size of Archegos's concentrated positions, the staggering size of Archegos's concentrated long TRS positions, and his repeated "if they only knew" remark with reference to Swap Counterparties, the FAC supports a strong inference that Halligan at a minimum consciously chose to remain ignorant. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (observing that no reason exists to "spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers").