UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> ARCHEGOS CAPITAL MANAGEMENT, LP and PATRICK HALLIGAN, <br><br> Defendants. | **No. 1:22-cv-3401 (JPO)** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT
ARCHEGOS CAPITAL MANAGEMENT, LP'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

Carmen J. Lawrence
William F. Johnson
Eric A. Hirsch
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
Tel: (212) 556-2100

*Attorneys for Defendant
Archegos Capital Management, LP*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

ARGUMENT ........................................................................................................ 2

I.     The CFTC Does Not Have Jurisdiction Over the ETF/Basket Swaps.............................. 2

      A.     The Court Can Consider the Swap Agreements and ETF Prospectuses................ 3

      B.     Under the Plain Language of the Joint Rules Release, the Custom Basket
            Swaps Are Security-Based Swaps .......................................................... 7

      C.     There is No Basis to Support a Finding That the ETF Swaps Are Anything
            Other Than Security-Based Swaps ........................................................ 10

II.    The CFTC Can Only Bring Fraud Claims Involving Conduct "In Connection
     With" Swaps ................................................................................................. 13

      A.     The "In Connection With" Element Cannot Be Met By Alleging a
            Transaction "Coincided" with a Misrepresentation ................................ 14

      B.     ACM's Motion Is Not Based On the Failure to Allege a Connection to a
            "Purchase or Sale" ............................................................................ 19

CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................3, 6, 16

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................................16

*Bergesen v. Manhattanville Coll.,*
    2021 WL 3115170 (S.D.N.Y. July 20, 2021) ........................................................5

*CFTC v. Byrnes,*
    2019 WL 4515209 (S.D.N.Y. Sept. 19, 2019)........................................................8

*CFTC v. McDonnell,*
    332 F. Supp. 3d 641 (E.D.N.Y. 2018) ..................................................................22

*CFTC v. Vartuli,*
    228 F.3d 94 (2d Cir. 2000).............................................................................. 18-19

*Chadbourne & Parke LLP v. Troice,*
    571 U.S. 377 (2014)...................................................................................14, 15, 17

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002).....................................................................................4

*Charles Schwab Corp. v. Bank of Am. Corp.,*
    883 F.3d 68 (2d Cir. 2018).......................................................................14, 17, 18

*Chemical Bank v. Arthur Andersen & Co.,*
    726 F.2d 930 (2d Cir. 1984)...................................................................................17

*Christopher v. SmithKline Beecham Corp.,*
    567 U.S. 142 (2012)..........................................................................................8, 11

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42 (2d Cir. 1991)...............................................................................4, 5, 7

*Furman v. Cirrito,*
    828 F.2d 898 (2d Cir. 1987).....................................................................................4

*Gallop v. Cheney,*
    642 F.3d 364 (2d Cir. 2011)...................................................................................21

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F. Supp. 3d 366 (S.D.N.Y. 2020)*, aff'd* 847 Fed. App'x. 35 (2d Cir. 2021) ....................6

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir. 1991)...........................................................................................5

*Kearney v. Prudential-Bache Secs. Inc.*,
    701 F. Supp. 416 (S.D.N.Y. 1988) ...............................................................................19

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014) ......................................................................................6, 22

*Nasdaq, Inc. v. Exch. Traded Managers Grp. LLC*,
    2018 WL 3996932 (S.D.N.Y. Aug. 21, 2018) ....................................................... 10-11

*Nat. Res. Def. Council v. EPA*,
    808 F.3d 556 (2d Cir. 2015)..........................................................................................11

*In re NYSE Specialists Secs. Litig.*,
    503 F.3d 89 (2d Cir. 2007)............................................................................................21

*Pettaway v. Nat'l Recovery Sols., LLC*,
    955 F.3d 299 (2d Cir. 2020)............................................................................................2

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.*,
    2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ................................................................12

*Romano v. Kazacos*,
    609 F.3d 512 (2d Cir. 2010).................................................................................... 17-18

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007)............................................................................................6

*Saxe v. E.F. Hutton & Co.*,
    789 F.2d 105 (2d Cir. 1986)...........................................................................18, 19, 22

*SEC v. Zandford*,
    535 U.S. 813 (2002)................................................................................................14, 15

*Seippel v. Jenkins & Gilchrist, P.C.*,
    341 F. Supp. 2d 363 (S.D.N.Y. 2004)...........................................................................16

*Taylor v. Westor Capital Grp.*,
    943 F. Supp. 2d 397 (S.D.N.Y. 2013)...........................................................................18

*Williams v. GMAC Mortg., Inc.*,
    2014 WL 2560605 (S.D.N.Y. June 6, 2014) ..................................................................5

*Wu v. Bitfloor*,
   460 F. Supp. 3d 418 (S.D.N.Y. 2020) .................................................................16

**Statutes**

7 U.S.C. § 1(a)(47)(D) ..................................................................................... 12-13

7 U.S.C. § 9(1) ....................................................................................................22

15 U.S.C. § 78c(a)(68)(A) ....................................................................................12

15 U.S.C. § 78c(a)(68)(E) .....................................................................................11

**Other Authorities**

Fed. R. Civ. P. 9(b) ..............................................................................................16

17 C.F.R. § 180.1 ..................................................................................................19

17 C.F.R. § 240.10b-5 ...........................................................................................19

Prohibition on the Employment, or Attempted Employment, of Manipulative and
   Deceptive Devices and Prohibition on Price Manipulation,
   76 Fed. Reg. 41398-01 (July 14, 2011) ................................................... 15, 20-22

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
   Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
   77 Fed. Reg. 48207 (Aug. 13, 2012) ................................................................ *passim*

## PRELIMINARY STATEMENT

Archegos Capital Management, LP's opening brief ("ACM Br."), demonstrated that the swaps over which the CFTC claims jurisdiction – the Custom Basket Swaps and the ETF Swaps (together, the "ETF/Basket Swaps") – are under the exclusive jurisdiction of the SEC.  It further demonstrated that the Amended Complaint fails to allege facts supporting the claim that any alleged misrepresentations were made "in connection with" the ETF/Basket Swaps, a necessary predicate for any Commodity Exchange Act ("CEA") claim.

In its Opposition ("Opp."), the CFTC first asks this Court to ignore documents that define the very swap transactions on which the Amended Complaint is based.  Those documents, which are proper for the Court to consider on this motion, establish that the CFTC has no jurisdiction to bring these claims.  The CFTC next argues that the Custom Basket Swaps are within its purview by disregarding the plain language of the SEC's and CFTC's Joint Rules Release setting forth which agency has jurisdiction over which types of swaps, as well as the plain language of Archegos' swap agreements with its counterparties (the "Swap Agreements").  The Swap Agreements are clear, however, that Archegos and/or its counterparties had the discretionary authority to modify the Custom Basket Swaps, and therefore pursuant to the Joint Rules Release the CFTC has no jurisdiction to make claims concerning those Custom Basket Swaps.

The CFTC's assertion of jurisdiction over the ETF Swaps also lacks legal support.  First, the CFTC argues that because there is "no material economic difference" between the ETF Swaps and swaps over which it does have jurisdiction, the Court should allow its claims.  There is no authority, however, in the Joint Rules Release or the CEA for such a "no material economic difference" test.  Second, the CFTC claims that the ETF Swaps are "mixed swaps," subject to the joint jurisdiction of the CFTC and SEC.  However, the Amended Complaint contains no such

allegation or facts to support it, and here again, the Joint Rules Release forecloses that conclusion.

Finally, the CFTC has no adequate response to ACM's argument that alleged misrepresentations about the characteristics of Archegos' portfolio, purportedly made to obtain additional trading capacity and more favorable margin rates, were not "in connection with" the ETF/Basket Swaps (positions Archegos primarily entered into for hedging purposes). In its Opposition, the CFTC continues to rely on stale law, and alternatively contends its allegations are sufficient because the broader jurisdictional language of the CEA only requires the CFTC to allege facts that show a fraud was "in connection with any swap" rather than in connection with a purchase or sale of a swap. This does not cure the CFTC's pleading problem, however, because the misrepresentations alleged here have no relationship to the ETF/Basket Swaps, even under a broad reading of the applicable standard. Accordingly, all of the CFTC's claims should be dismissed, with prejudice.

## ARGUMENT[1]

### I.     The CFTC Does Not Have Jurisdiction Over the ETF/Basket Swaps

ACM's moving brief explained that Archegos' Custom Basket Swaps (swaps that reference a custom portfolio of hundreds of different securities) and ETF Swaps (swaps that referenced shares of exchange-traded funds) are "security-based swaps," and therefore outside of the CFTC's jurisdiction.[2] In its Opposition, the CFTC argues that the Court should not take

---

[1] ACM incorporates by reference all arguments made in Mr. Halligan's reply brief in further support of his motion to dismiss. Citations and quotations are omitted in case quotations throughout.

[2] Although ACM did not raise this argument in its original motion to dismiss, there is no procedural barrier to the Court's consideration of it. Upon the CFTC's filing of the Amended Complaint, both the original complaint and ACM's motion to dismiss that pleading were rendered moot. *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 303-04 (2d Cir. 2020) (when an amended complaint is filed, it "ordinarily supersedes the original and renders it of

judicial notice of the documents that govern the swaps between the parties or define their terms

(the Swap Agreements and ETF Prospectuses).  It also argues that the Swap Agreements do not

support the conclusion that the Custom Basket Swaps are security-based swaps, and that there is

no material difference between the ETF Swaps and other swaps over which it does have

jurisdiction.  Finally, the CFTC asserts that the ETF Swaps are "mixed swaps" over which the

CFTC has joint jurisdiction with the SEC.  These arguments are contrary to settled law, the

judicially noticeable documents, the Joint Rules Release, and the allegations in the Amended

Complaint.[3]

### A.    The Court Can Consider the Swap Agreements and ETF Prospectuses

Recognizing that the Swap Agreements and the ETF Prospectuses illustrate its lack of

jurisdiction to bring this action, the CFTC asks the Court to accept its conclusory allegations of

jurisdiction, and ignore the contractual provisions and public disclosures that define the swaps at

the heart of its claims.  Only factual allegations are entitled to be taken as true on a motion to

dismiss, however.  *Iqbal*, 556 U.S. at 678 (holding "the tenet that a court must accept as true all

of the allegations contained in a complaint is inapplicable to legal conclusions.").  Here, the

Amended Complaint provides a single conclusory paragraph asserting jurisdiction (AC ¶ 13),

supported by no alleged facts.  Other brief references to the nature of the swaps at issue likewise

provide no support for the CFTC's legal conclusion.  The Court therefore can, and should,

consider the documents that define the terms of the relevant swaps, which confirm that the CFTC

lacks jurisdiction to pursue these claims.

---

no legal effect."); Judge Oetken, Individual Rules & Practices in Civil Cases 3(D)(ii).  The CFTC elected to amend its complaint, and bears the risk that ACM would continue to develop its arguments.

[3]  The CFTC misstates the applicable standard for a motion to dismiss.  The "no-set-of-facts" standard (Opp. at 12) was replaced by the plausibility standard in *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009) ("only a complaint that states a plausible claim for relief survives a motion to dismiss.").

First, on a motion to dismiss, a court can consider documents that are integral to a plaintiff's claims. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) (offering memoranda and stock purchase agreement can be considered on a motion to dismiss "because there was undisputed notice to plaintiffs of their contents and they were integral to plaintiffs' claim."). A document is "integral" to a complaint where the complaint "relies heavily on its terms and effect." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (considering parties' contracts not attached to complaint on a motion to dismiss); *Furman v. Cirrito*, 828 F.2d 898, 900 (2d Cir. 1987) (same, considering partnership agreement and contract).

The CFTC argues that "[a]lthough the [ETF/Basket Swaps] were an essential and critical part" of the alleged scheme in this case, the documents that define those swaps are not integral to the CFTC's claims because they do not "rise or fall depending on the terms and conditions of" those documents. Opp. at 14. The CFTC does not explain how that is the case – the ETF/Basket Swaps only exist by virtue of the documents that define their terms. Because, as the CEA provides, the nature of the security drives the question of jurisdiction, the issue can only be resolved by reference to the terms of the Swap Agreements and the disclosures in the ETF Prospectuses. The Second Circuit has held that courts can properly consider partnership agreements for similar reasons. *See Furman*, 828 F.2d at 900 (finding partnership agreement, "which spells out the rights and obligations of the parties" integral to the complaint, and dismissing plaintiff's RICO claim where defendants' conduct was within authority provided by partnership agreement). The CFTC cites no legal, regulatory, or other source that is determinative of its jurisdiction in this matter, and there is none.

4

The CFTC next argues that the Court should not consider the Swap Agreements and ETF Prospectuses because the CFTC makes only "occasional reference" to certain Swap Agreements and does not reference the ETF Prospectuses at all.  Opp. at 14, 16.  A court is permitted to take judicial notice of documents "incorporated by reference" into a complaint, but that is a separate doctrine.  *See I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (finding that because prospectus was integral to complaint, "[w]e therefore decline to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because the plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference."); *Williams v. GMAC Mortg., Inc.*, 2014 WL 2560605, at *1 (S.D.N.Y. Jun. 6, 2014) (Oetken, J.).  The CFTC's own authority recognizes that courts "may properly consider even documents not quoted, incorporated by reference, or attached to the complaint when adjudicating a motion to dismiss *if they are integral to the complaint*."  *Bergesen v. Manhattanville Coll.*, 2021 WL 3115170, at *2-3 (S.D.N.Y. July 20, 2021) (Opp. at 15) (emphasis added); *see also Cortec*, 949 F.2d at 49-50 (affirming dismissal of claim where stock warrant integral to complaint established defendant was not a statutory "seller" of securities under § 12 of the Securities Act).  Here, the Swap Agreements and ETF Prospectuses are the only source of factual matters about the swaps in question that could inform proper pleading of jurisdiction (or lack thereof).  This makes them integral to a complaint whose core allegations rise and fall on the nature of those swaps.

Although the CFTC concedes that the Court can take judicial notice of SEC filings like the ETF Prospectuses (Opp. at 15), the CFTC argues that ACM is inappropriately asking the court to accept the truth of their contents.  ACM is not asking the Court to take judicial notice of facts that contradict well-pled allegations.  However, because the CFTC's jurisdictional

allegation (AC ¶ 13) is not supported by facts, it is therefore nothing more than a legal conclusion that is not entitled to the presumption of truth.  *Iqbal*, 556 U.S. at 681 (allegations that "amount to nothing more than a 'formulaic recitation of the elements'" are "conclusory and not entitled to be assumed true.").  When the CFTC's conclusory jurisdictional allegation is compared to what the integral documents say about the nature of the swaps here, it is plain that the CFTC does not have jurisdiction.  This is not a novel analysis – the Second Circuit has upheld the dismissal of a CEA claim where its jurisdictional basis was belied by judicially noticed documents.  *See Loginovskaya v. Batratchenko*, 764 F.3d 266, 274 & n.8 (2d Cir. 2014) (Opp. at 23) (affirming dismissal of motion to dismiss CEA claim based on judicially noticed Investment Memoranda); *see also Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382 (S.D.N.Y. 2020)*, aff'd* 847 Fed. App'x. 35 (2d Cir. 2021) (judicially noticing proxy statement, holding judicial notice can be taken "of a fact that is 'not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'") (quoting Fed. R. Evid. 201).

The circumstances here are thus entirely unlike those in *Roth v. Jennings*, 489 F.3d 499 (2d Cir. 2007) (Opp. at 15), where the defendants attempted to use disclaimers in their own SEC filings to resolve the ultimate issue of their liability on a motion to dismiss.  In *Roth*, the plaintiff alleged that the defendants did not disclose they acted as a "group" when they purchased the securities of a public company.  The defendants asked the court to dismiss the complaint by judicially noticing the statements in their SEC filings disclaiming group status.  The Second Circuit held that the district court erred by weighing the complaint's allegations against the defendants' SEC filings and concluding that the self-serving statements in the filings resolved the ultimate issue of liability.  *Id.* at 511.  Here, unlike the defendants in *Roth*, ACM is not

offering the ETF Prospectuses to resolve the ultimate liability issue, which is whether material misrepresentations were made to ACM's counterparties in connection with the ETF/Basket Swaps.  ACM is offering the ETF Prospectuses to show that the CFTC has not pled, and cannot plead, critical facts about the swaps that establish jurisdiction.[4]

### B.   Under the Plain Language of the Joint Rules Release, the Custom Basket Swaps Are Security-Based Swaps

In its moving brief, ACM explained that the Custom Basket Swaps are SEC-regulated security-based swaps because they fall into an exception outlined in the Joint Rules Release for swaps that referenced large portfolios of securities, but "give one or both of the counterparties … discretionary authority to change the composition of the security portfolio …."  Joint Rules Release, 77 Fed. Reg. 48207, at 48285 (Aug. 13, 2012).  In its Opposition, the CFTC ignores both the plain meaning of this language and the relevant provisions of the Swap Agreements.

First, the CFTC argues that unless the Swap Agreement provides that any party could modify the Custom Basket Swaps "at will," the agreement does not confer "discretionary authority" to modify the Custom Basket Swap.  Opp. at 18.  This ignores that the Joint Rules Release states that where a swap agreement gives "*one* or both *of the counterparties* … discretionary authority to change the composition of the security portfolio, including, *for example*, by adding or removing securities in the security portfolio on an 'at-will' basis," the instrument is a security-based swap.  Joint Rules Release, 77 Fed. Reg. at 48285 (emphasis added).  Thus, even where the bank counterparty's consent was required for a modification, the

---

[4]  Under the circumstances, the Court should not grant the CFTC's fallback request for discovery on the jurisdictional issue (Opp. at 13).  *See Cortec*, 949 F.2d at 44 ("Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim – and that they apparently most wanted to avoid – may not serve as a means of forestalling the district court's decision on the motion.").  Unlike a private plaintiff, the CFTC has already received millions of pages of pre-suit investigatory discovery from ACM and other parties on these very issues.  Further discovery will not remedy the jurisdictional defects with the CFTC's claims.

agreements give the bank counterparty discretion to agree to Archegos' request, which provides one party "discretionary authority" to modify the portfolio.

The Joint Rules Release is clear – as long as "one … of the counterparties" had the discretionary authority to modify, the instrument is an SEC-regulated security-based swap.  Joint Rules Release 77 Fed. Reg. at 48285.  The CFTC's reading assumes a party must have *unilateral* authority to modify the Custom Basket Swap for the exception to apply, which is not what the Joint Rules Release says.  The exception captures any discretionary change in composition approved by one or both parties.  What the exception does not cover are circumstances where swaps are "reconstituted and rebalanced" based on a "published methodology" or modified based on "predetermined criteria" or "predetermined self-executing formulas."  *Id.*  Those swaps – unlike the Custom Basket Swaps here – are outside of the exception, and considered CFTC-regulated swaps.  The focus of the exception is whether one or both parties have discretionary authority to make changes in composition, in contrast to circumstances where only formulaic changes in composition are permitted.  The applicability of the exception does not turn on which of the two parties to the swap agreement has the ultimate authority to approve a change in composition.  *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012) (deference to agency interpretation of its regulation "is undoubtedly inappropriate, for example, when the agency's interpretation is plainly erroneous or inconsistent with the regulation … or when it appears that the interpretation is nothing more than a convenient litigating position."); *CFTC v. Byrnes*, 2019 WL 4515209, at *6 (S.D.N.Y. Sept. 19, 2019) (rejecting CFTC's interpretation of regulation based on *Christopher*).

Second, the CFTC argues – without any basis – that those Swap Agreements that do not specifically refer to modifying baskets of swaps, but instead refer to either partially terminating a

transaction or terminating a transaction in a portfolio (as in the case of Goldman Sachs, Credit Suisse, and Deutsche Bank), do not provide discretionary authority to modify a Custom Basket Swap.  Opp. at 19-20.  The CFTC is wrong.  Partially terminating a Custom Basket Swap transaction to remove one or more securities from that transaction changes its composition, and the exception in the Joint Rules Release applies if either party has the discretionary authority to "change the composition … in a security portfolio…."

The CFTC's position – that where the agreements use broad terms stating that the parties can modify a "Transaction," "Portfolio," or "Contract," the agreements cannot be read to include the change of composition of a Custom Basket Swap – is untenable based on any reasonable reading of Archegos' agreements with its counterparties.

- With respect to Goldman Sachs, the terms of a "Transaction" that can be closed "in whole or in part" are described in the Transaction Supplements. The agreement includes a Form of Transaction Supplement that calls for the counterparties to identify the transaction's reference security as one of the following: "Share/Index/Basket".  Hirsch Decl. Ex. 22 at pp. 14, 22.

- There is nothing in the 2005 Credit Suisse Swap Agreement that excludes Custom Basket Swaps from the definition of the term "Contract" or limits the term "Contract" to single-name swaps.  Hirsch Decl. Ex. 19 § 1. Section 9.1 of the 2005 Credit Suisse Swap Agreement is also clear that Credit Suisse or Archegos could "close any Contract (whether in whole or in part)" upon notice to the other party "specifying the Security and the proportion of the Contract it wishes to close."  Hirsch Decl. Ex. 19 § 9.1.

- Section 11(v) of the 2020 Credit Suisse Swap Agreement (which supersedes the 2005 Credit Suisse Swap Agreement) expressly states that either party can give notice to "terminate only a portion of …. an Index Basket Swap Transaction…." Hirsch Decl. Ex. 20 § 11(v).

- The Deutsche Bank Swap Agreement permits either party to terminate a transaction within a portfolio of swaps transactions.  It defines "a group of Portfolio Swap Transactions sharing common terms" as a "Portfolio" (Hirsch Decl. Ex. 21 at p. 1) and states that "either party may …. terminate a Transaction in a Portfolio …." Hirsch Decl. Ex. 21 § 2(e).

- Although the CFTC questions whether an "ATS Transaction Unwind" in the Morgan Stanley Swap Agreement refers to removing individual securities from a basket (Opp. at 20), that question is resolved by reading

> the language in the agreement:  "Acceptance by [Morgan Stanley] of an
> ATS Unwind Request shall constitute an agreement between the parties to
> adjust the relevant ATS Transaction(s) by reducing the Number of Shares
> by the number specified by [Archegos] in such request …."  Hirsch Decl.
> Ex. 24 § 5(h).

These provisions allow for multiple forms of modification, whether it comes in the form of a

reduction in total notional value of a single-name swap or the change in composition of a Custom

Basket Swap through the termination of shares in the basket.  The CFTC cites nothing within the

Swap Agreements (or anywhere else) that supports a contrary reading.

### C.   There is No Basis to Support a Finding That the ETF Swaps Are Anything Other Than Security-Based Swaps

In its moving brief, ACM explained that, consistent with the views of the Staff of the

SEC's Division of Trading & Markets, a swap that references a share of an ETF is a "security-

based swap" under the SEC's exclusive jurisdiction.  Other than asking the Court not to look at

the ETF Prospectuses, the CFTC advances two arguments as to why it has jurisdiction over the

ETF Swaps.  Opp. at 20.  First, the CFTC argues that because there is no "material economic

difference" between a swap that references an ETF share and a swap that references the broad-

based index of securities that the ETF share's value is based upon, the ETF Swaps should be

considered "swaps," and therefore within CFTC jurisdiction.  *Id.*  This position mischaracterizes

the nature of the ETF Swaps, and has no basis in the Joint Rules Release.  Alternatively, the

CFTC argues that the ETF Swaps should be considered "mixed swaps," and therefore subject to

the joint jurisdiction of the SEC and CFTC.  This argument fails as well.  The Amended

Complaint does not allege that the ETF Swaps are mixed swaps, and the CEA and Joint Rules

Release do not support that after-the-fact legal conclusion.

As disclosed by the ETF Prospectuses, the ETF Swaps reference a single security – the

shares of the ETF.  *See* Hirsch Decl. Exs. 12-18; *see also Nasdaq, Inc. v. Exch. Traded*

10

*Managers Grp. LLC*, 2018 WL 3996932, at *1 (S.D.N.Y. Aug. 21, 2018) ("[a]n ETF is a security that tracks an index, a commodity, bonds or a collection of assets."). The CFTC argues, however, that "[t]here is no legal or factual basis to treat the ETF Swaps … any differently" from a swap "directly based on a broad-based security index." Opp. at 21. There is a legal basis to do so, however – the Joint Rules Release. Joint Rules Release, 77 Fed. Reg. at 48264 ("where a TRS [total return swap] is based on a single security or loan … the TRS would be a security-based swap"). Nor does the Joint Rules Release provide for consideration of whether there is a "material economic difference" between different types of financial instruments in evaluating whether they are security-based swaps. Furthermore, even if the Joint Rules Release allowed such a consideration, the ETF Prospectuses warn investors that there can be a material economic difference between the value of the ETF shares and the indexes they attempt to track. *See* ACM Br. at 13-14. The CFTC ignores this point in their Opposition. The treatment of total return swaps based on a single security or loan is clear from the plain language of the Joint Rules Release, and that text does not include consideration of a "material economic difference". *See Christopher*, 567 U.S. at 155; *Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 579 & n.17 (2d Cir. 2015) (rejecting EPA interpretation inconsistent with regulation).

Next, the CFTC points to the Exchange Act provision defining an "index" for the purposes of a security-based swap and claims it brings the swaps at issue here within its jurisdiction. That provision is of no help. It states that "the term 'index' means an index or group of securities, including any interest therein or based on the value thereof." 15 U.S.C. § 78c(a)(68)(E). The CFTC focuses on the phrase "including any interest therein or based on the value thereof" (Opp at 21), but the value of the ETF Swaps is not based on the value of an index, it is based on the value of the ETF shares. These are two different things. As ACM explained in

its opening brief, the value of the ETF shares can – and sometimes does – diverge from the value of the relevant index.  ACM Br. at 14.  Furthermore, while the public guidance of the Staff of the SEC's Division of Trading & Markets is only persuasive authority, the Staff does not typically issue public guidance that is contrary to the express language of the Exchange Act.  *See* Frequently Asked Questions Regarding Security-Based Swaps (Hirsch Decl. Ex. 11) ("In the staff's view, the swap based on the shares of an exchange traded fund (ETF) that tracks a broad-based securities index, such as the S&P 500, is a security-based swap.")

Finally, the CFTC argues that the ETF Swaps are "mixed swaps," subject to the joint jurisdiction of the CFTC and SEC.  There is no support for that conclusion in the Amended Complaint.  The Amended Complaint alleges (in conclusory fashion) that the Custom Basket Swaps are swaps – it does not allege that they are mixed swaps.  AC ¶ 13.  The CFTC cannot add new allegations through arguments in its opposition brief.  *See River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at *6 n.1 (S.D.N.Y. Mar. 8, 2019) ("It is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss….").

Further, the Amended Complaint alleges no facts to support the legal conclusion that the ETF Swaps are mixed swaps.  The CEA defines mixed swaps as:

> [A]ny agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(68)(A)) and also is based on the value of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness, indices, quantitative measures, other financial or economic interest or property of any kind ….

7 U.S.C. §1(a)(47)(D).  In other words, a mixed swap is a contract that has two underlying references.  First, it is a security-based swap as defined by 15 U.S.C. § 78c(a)(68)(A), and therefore its value is based on a single-name security or a narrow-based security index.  Second, its value is also based on some other instrument, such as one or more broad-based indexes.  The

Joint Rules Release likewise describes mixed swaps as swaps with multiple underlying references, such as a swap "in which the underlying references are the value of an oil corporation stock and the price of oil" or "a portfolio of both securities … and commodities."  Joint Rules Release, 77 Fed. Reg. at 48291.  Unlike these examples, the ETF Swaps reference a single security – a share of an ETF – and therefore do not meet the criteria for a "mixed swap" under the CEA.  The CFTC does not cite any example from the Joint Rules Release that supports its position that the ETF Swaps are mixed swaps.[5]

## II.   The CFTC Can Only Bring Fraud Claims Involving Conduct "In Connection With" Swaps

Even if the ETF/Basket Swaps were within the CFTC's jurisdiction, the CFTC has failed to allege the necessary nexus between those swaps and the misrepresentations alleged in the Amended Complaint.  ACM. Br. at 19-25.  ACM is not, as the CFTC claims, arguing that misrepresentations must relate solely to the value of the ETF/Basket Swaps to be actionable.  Opp. at 24.  They must, however, relate to the ETF/Basket Swaps.

In both the Amended Complaint and its Opposition, the CFTC leverages allegations describing Archegos' trading in concentrated long positions in single-name swaps (over which the CFTC does not claim it has jurisdiction) (AC ¶ 4) and allegations that Archegos made misrepresentations to its counterparties that purportedly concealed the "true risk" of its portfolio so that it could "obtain additional capacity to trade" (AC ¶ 5) in those same single-name swap positions.  These allegations do not relate to the terms of the ETF/Basket Swaps, the payment obligations of the ETF/Basket Swaps, or the consideration received on the ETF/Basket Swap

---

[5]  The CFTC attempts to explain away the SEC FAQ by suggesting that the Staff's position that swaps on ETFs are security-based swaps is consistent with them being mixed swaps.  It is not.  A swap does not become "mixed" because both agencies claim they have jurisdiction over it.  The SEC FAQ is quite clear that swaps based on ETFs are security-based swaps.  Hirsch Decl. Ex. 11 ("a swap based on the shares of an ETF … meets the definition of security-based swap because it is based on a single security or loan ….").

trades.  The CFTC argues in its Opposition that Archegos' alleged misrepresentations deceived counterparties about its creditworthiness, but that does not save its claims – there are no allegations in the Amended Complaint that any ACM employee intentionally misrepresented Archegos' ability to pay amounts due on any ETF/Basket Swap at any time.

Controlling case law requires that the misrepresentations relate to either a swap's value or the consideration received.  Here, the Amended Complaint does not allege such nexus between the ETF/Basket Swaps and any alleged misrepresentations.  *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 96 (2d Cir. 2018).

### A.  The "In Connection With" Element Cannot Be Met By Alleging a Transaction "Coincided" with a Misrepresentation

To state a claim under the CEA, the CFTC must do more than merely allege that a swap transaction "coincides" with a misrepresentation such that they are not "independent events." Opp. at 27.  Indeed, *Zandford* – the Supreme Court decision upon which the CFTC primarily relies – cautions that the "in connection with" language "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b)." *SEC v. Zandford,* 535 U.S. 813, 819-20 (2002); *see also Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 392 (2014) (quoting same).  Yet that is precisely what the CFTC is attempting to do, as it misinterprets *Zandford's* holding and ignores subsequent controlling authority that provides additional guidance on the "in connection with" criteria.

*Zandford*'s statement, that "[i]t is enough that the scheme to defraud and the sale of securities coincide," must be read in the context of the facts of that case.  535 U.S. at 822.  In *Zandford* the defendant misappropriated the proceeds of his customers' securities account and used them to trade for his own benefit.  The defendant argued that his trades were not fraudulent,

and were separate from the fraudulent misappropriation of the proceeds of his customers'
account.  The Supreme Court disagreed, holding that the defendant's scheme to enrich himself
by selling his customers' securities without authorization and then misappropriating the proceeds
was necessarily connected to the purchase or sale of securities.  *Zandford*, 535 U.S. at 822
(customers "were injured as investors through respondent's deceptions, which deprived them of
any compensation for the sale of their valuable securities.").  In *Zandford*, unlike here, the
defendant's deception directly related to the consideration his customers received for their
investments.

The Supreme Court most recently interpreted the "in connection with" language in
*Chadbourne & Parke*.  ACM Br. at 21.  In that case, the Supreme Court looked to its prior
interpretations of the same language in, among other cases, *Zandford*.  The Supreme Court did
not read *Zandford* as setting forth any "coincide" or "independent event" test.  Opp. at 27; *see
also* 571 U.S. at 389 (summarizing *Zandford* as a case where fraudster told customers he would
invest their money in the stock market but sold their securities and "pocketed the proceeds").
The Supreme Court went on to hold that "a fraudulent misrepresentation or omission is not made
in connection with such a purchase or sale of a covered security unless it is material to a decision
by one or more individuals (other than the fraudster) to buy or sell a covered security."  571 U.S.
at 387.  The scope of the "in connection with" requirement is therefore much narrower than the
question of whether a misrepresentation simply "coincided" with a swap.

Although the CFTC's analysis begins and ends with *Zandford*, the final rules release
promulgating Rule 180.1 (the "Rule 180.1 Release") explicitly states that the CFTC "intends to
be guided by [*Zandford*] *and other precedent interpreting the words 'in connection with' in the
securities context*."  Rule 180.1 Release, 76 Fed. Reg. 41398-01 at 41406 (July 14, 2011)

15

(emphasis added).  Confronted with such other precedent – *Chadbourne & Parke* – the CFTC argues that the alleged fraud here was material to Archegos' counterparties' decisions to enter into the ETF/Basket Swaps.  Opp. at 32 n.8.  The paragraph of the Amended Complaint that the CFTC cites, however, is replete with legal conclusions (counterparties "relied on material false information and in turn could not accurately assess the risk") and speculation (had they known the full scope of Archegos' positions, the counterparties "would have taken risk control measures").  AC ¶ 6.  These allegations are not sufficiently particularized to support a fraud claim under Fed. R. Civ. P. 9(b).  *See Wu v. Bitfloor*, 460 F. Supp. 3d 418, 423 (S.D.N.Y. 2020) (holding that where "plaintiffs' allegations suggest fraudulent conduct on defendants' part, the CEA claims are subject to the heightened pleading requirements of Rule 9(b)").  Furthermore, even if the pleading requirements of Rule 9(b) did not apply, these allegations are still insufficient to support the conclusion that any representations were considered to be material by the counterparties with respect to the ETF/Basket Swaps, or allege how the counterparties factored those representations into their decisions to manage risk using ETF/Basket Swaps as opposed to any other risk-reducing measure.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[f]actual allegations must be enough to raise a right to relief above the speculative level"); *Iqbal*, 556 U.S. at 678-79 (a court should not accept as true any "legal conclusion couched as a factual allegation" on a motion to dismiss).  These speculative and conclusory allegations are insufficient to allege a jurisdictional nexus under *Chadbourne & Parke*.[6]

---

[6] *Seippel v. Jenkins & Gilchrist, P.C.*, 341 F. Supp. 2d 363 (S.D.N.Y. 2004) (Opp. at 27), like many of the CFTC's cited cases, did not have the benefit of the Supreme Court's subsequent holding in *Chadbourne & Parke* or the Second Circuit's subsequent holding in *Charles Schwab*.  The alleged fraud in *Seippel* did not merely "coincide" with a securities transaction, however.  There, the plaintiffs were sold a fraudulent tax shelter scheme that was initiated by the plaintiffs selling stock and realizing a large gain.  The defendants allegedly deceived the plaintiffs about the consideration they would receive from that securities transaction – their ability to protect the gains through a tax shelter.  *Seippel*, 341 F. Supp. 2d at 369.

The Second Circuit's approach – both before and after *Chadbourne & Parke* – has been to interpret the "in connection with" jurisdictional requirement far more narrowly than what the CFTC advocates here.  In *Charles Schwab*, the Second Circuit held that a "claim fails where the plaintiff does not allege that a defendant misled him concerning the value of the securities he sold or the consideration he received in return."  883 F.3d at 96; *see also Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) ("it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.").  The CFTC argues that its alleged misrepresentations relate to consideration because the counterparties received promises to pay the amounts due on the ETF/Basket Swaps from an entity that was less creditworthy than they were told.  Opp. at 29.  But there is no allegation that Archegos was unable to make any required swap payments when due at any time before its collapse.  Moreover, as ACM explained in its moving brief (ACM Br. at 21), the CFTC's premise was rejected in *Chadbourne & Parke*, which held that misrepresentations concerning creditworthiness are not enough to satisfy the "in connection with" requirement.  *See Chadbourne & Parke*, 571 U.S. at 391 (holding the "in connection with" requirement would not be satisfied in "a lawsuit brought by creditors of a small business that falsely represented it was creditworthy, in part because it owns or intends to own exchange-traded stock.").  The CFTC offers no response to this point.

The CFTC cites an earlier decision, *Romano v. Kazacos*, 609 F.3d 512 (2d Cir. 2010) (Opp. at 25), in which the Second Circuit observed that the standard as articulated in *Zandford* was "broad in scope."  609 F.3d at 521.  *Romano* pre-dates both the Supreme Court's decision in *Chadbourne & Parke* and the Second Circuit's decision in *Charles Schwab*, both of which confirmed that the "in connection with" standard demands more than that a misrepresentation

17

"coincide" with a securities transaction.  Furthermore, the nexus in *Romano* between the defendants' alleged false statements and the plaintiffs' securities transactions was clear, as the defendants allegedly made misrepresentations to the plaintiffs about "future returns on their retirement assets …"  *Romano*, 609 F.3d at 523.  The misrepresentations in *Romano* were therefore related to the consideration the plaintiffs expected to receive on their post-retirement investments, and thus the result in *Romano* is consistent with the Second Circuit's most recent articulation of the standard in *Charles Schwab*, which focused on consideration or value.[7]

The CFTC argues that alleged misrepresentations about financial condition and "degree of risk associated with swaps" are sufficient to establish jurisdiction, directing the Court to *CFTC v. Vartuli*, 228 F.3d 94 (2d Cir. 2000) and *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105 (2d Cir. 1986).  First, neither case has anything to do with representations about financial condition.  Second, the CFTC has not alleged that any ACM employee made a misrepresentation about the "degree of risk" associated with ETF/Basket Swaps.  The CFTC's allegations relate to the credit risk of Archegos, not the risk associated with any of the ETF/Basket Swaps themselves.

The misrepresentations at issue in *Vartuli* and *Saxe* are nothing like the misrepresentations alleged here.  In *Vartuli*, the defendants were alleged to have sold a software system that they claimed had the ability to analyze market transactions and provide real-time investment advice that "would enable … users to trade futures contracts profitably."  *Vartuli*, 228 F.3d at 98-99.  The court upheld the CEA claim, finding that "[m]isrepresentations about [the

---

[7]  The CFTC argues that *Taylor v. Westor Capital Grp.*, 943 F. Supp. 2d 397 (S.D.N.Y. 2013) disregards *Zandford* and is "inconsistent with governing Supreme Court precedent."  Opp. at 31 n.7.  The decision in *Taylor* relied on *Chemical Bank*, which as the Second Circuit noted in *Charles Schwab*, remains binding precedent.  *See Charles Schwab*, 883 F.3d at 96.  *Taylor* is also consistent with a more restrained – and accurate – reading of *Zandford* that acknowledges the holding involved the unauthorized use of the proceeds of securities transactions, as well as *Zandford*'s cautionary language that not every common law fraud can be converted into a securities law violation.

software], the way it functioned, the risks involved in using it, and the results it would produce were necessarily misrepresentations about all the trades directed by the [software]." *Id.* at 101. In *Saxe*, the defendant told the plaintiff that his account would be traded by "an experienced commodities trading advisor" using "a sophisticated computerized trading program," but the account was allegedly traded "by inexperienced personnel without reference to any personally tailored computerized program." *Saxe*, 789 F.2d at 110.  The misrepresentations in *Vartuli* and *Saxe* were thus related to trading the commodities in those cases, and not – as here – misrepresentations related to the credit risk associated with one of the counterparties who happened to trade in security-based swaps.  *See Kearney v. Prudential-Bache Secs. Inc.*, 701 F. Supp. 416, 424 (S.D.N.Y. 1988) ("[t]he 'in connection with' requirement mandates that the alleged fraud concern the fundamental *nature* of the commodity futures contract:  namely, the characteristics and attributes that would induce an investor to buy or sell the particular commodity futures contract.") (emphasis in original) (citing *Saxe*).

> **B.   ACM's Motion Is Not Based On the Failure
> to Allege a Connection to a "Purchase or Sale"**

In its opening brief, ACM explained that Rule 180.1 was modeled on Rule 10b-5, and that courts often look to decisions interpreting the "in connection with" provision in the Exchange Act when interpreting Rule 180.1  ACM. Br. at 18.  The CFTC does not disagree. Opp. at 26.  Instead, it argues that its claims should survive because the two rules are not identical, pointing out that Rule 10b-5 proscribes fraud "in connection with the purchase or sale of any security" (17 C.F.R. § 240.10b-5), and Rule 180.1 proscribes fraud "in connection with any swap" (17 C.F.R. § 180.1).  ACM is not contending that the CFTC has failed to allege a connection to a "purchase or sale."  The CFTC's allegations fail because none of the alleged misrepresentations relate to the ETF/Basket Swaps.

19

Citing the Rule 180.1 Release, the CFTC argues that the CEA reaches "all manipulative or deceptive conduct in connection with the purchase, sale, solicitation, execution, pendency, or termination of any swap … including, but not limited to, all of the payment and other obligations arising under a swap."  Opp. at 26 (quoting Rule 180.1 Release, 76 Fed. Reg. at 41405).  The Amended Complaint does not allege, however, that Archegos made any misrepresentations specific to the ETF/Basket Swaps' solicitation, terms (payment or otherwise), pendency, execution, or termination.  The alleged misrepresentations relate not to the ETF/Basket Swaps, but rather to Archegos itself:  its available cash, the composition and liquidity of the long positions in Archegos' portfolio, and whether the positions traded were unique to a particular counterparty.  ACM Br. at 20.

The CFTC strains to articulate how these subjects relate to the ETF/Basket Swaps.  The CFTC alleges that because of their "risk reducing properties," Archegos' trading in ETF/Basket Swaps "was instrumental and essential to Archegos's ability to obtain additional capacity and favorable margin rates," (AC ¶ 37), and argues that, "without the Broad-Based Security Index Swaps, Archegos' large positions would have been far smaller" (Opp. at 28) and that had the counterparties "known the truth," they "would have limited, restricted, or reduced Archegos's trade capacity, which would have impacted both their long and short TRS positions." (Opp. at 29).  The CFTC's responses confuse the issue – the question is whether any misrepresentations were material to the ETF/Basket Swaps themselves, not whether the misrepresentations were essential to obtaining capacity and favorable margin rates.  And as ACM explained in its moving brief, arguing that "but for" the alleged misrepresentations, swaps transactions would not have occurred fails to satisfy the "in connection with" requirement under the Second Circuit's holding in *Chemical Bank*.  ACM Br. at 23.

20

Here, the CFTC alleges no facts supporting the conclusion that Archegos' representations about its portfolio were material to the ETF/Basket Swaps themselves.  *See Gallop v. Cheney*, 642 F.3d 364, 368-69 (2d Cir. 2011) (complaints based on "speculation and conjecture," "cannot withstand a motion to dismiss"); *In re NYSE Specialists Secs. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (on a motion to dismiss, a court "need not accord legal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness") (citations and quotations omitted).  The CFTC suggests that counterparties would have wanted Archegos to hedge with more of the ETF/Basket Swaps (or perhaps some other product), but does not allege that the counterparties were deceived about the nature or value of the ETF/Basket Swaps.  What is missing from the Amended Complaint are fact-based allegations that Archegos' representations about its portfolio caused a counterparty to adjust the terms of the ETF/Basket Swaps they traded with Archegos, or caused the counterparty to request or require trading in an ETF/Basket Swap where another product would have been more appropriate.

The CFTC urges this Court to confer upon it an extremely broad jurisdictional scope, arguing that the Amended Complaint should survive because "it relates to the relationship established by the parties for the purpose of managing Archegos' total swap exposure."  Opp. at 31.  There is nothing in the Rule 180.1 Release that supports such a broad interpretation.  *See* Rule 180.1 Release, 76 Fed. Reg. at 41405 ("While broad, the elasticity of the 'in connection with' language is not limitless.").  Indeed, the Release specifically forecloses an interpretation that would base jurisdiction on claims solely relating to the "relationship established by the parties."  Opp. at 31.  The Rule 180.1 Release provides the following example of what is not covered by the rule:  "If … a broker embezzles cash from a client's account or takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction, then the

fraud would not include the requisite connection to a purchase or sale of securities." Rule 180.1 Release at 41406 (alteration in original, quoting *Zandford*, 535 U.S. at 825 n.4).

More fundamentally, however, the CFTC cites no case law that applies a broader interpretation of the "in connection with" language in Rule 180.1 than what has been applied to the same language in the Exchange Act. *See Loginovskaya*, 764 F.3d at 272 (Opp. at 23) ("courts have looked to the securities laws when called upon to interpret similar provisions of the CEA."); *Saxe*, 789 F.2d at 109 (Opp. at 30) (same).[8]  Accordingly, putting aside that the CFTC has failed to allege that the ETF/Basket Swaps are within its jurisdiction, its claims should be dismissed based on its failure to plead adequately the "in connection with" requirement of § 9(1) and Rule 180.1

## CONCLUSION

For the reasons set forth above, ACM respectfully requests that the Court enter an order dismissing the Amended Complaint as to ACM in its entirety, with prejudice.[9]

Dated: New York, New York
February 6, 2023

**KING & SPALDING LLP**

By:  _/s/ Carmen J. Lawrence_
Carmen J. Lawrence
William F. Johnson
Eric A. Hirsch
1185 Avenue of the Americas
New York, NY 10036-4003
Tel: (212) 556-2100
Email: clawrence@kslaw.com

*Attorneys for Defendant*
*Archegos Capital Management, LP*

---

[8]  *CFTC v. McDonnell*, 332 F. Supp. 3d 641 (E.D.N.Y. 2018) does not help the CFTC.  In that case, the court found the CFTC stated a claim where the defendants "solicited customers to provide funds for virtual currency trading on the customers' behalf."  *Id.* at 722-23.  In *McDonnell*, there was a direct connection between the alleged misrepresentations and the commodity sales at issue.

[9] The CFTC offers no reason why it should be permitted (and has not requested) another opportunity to amend.