UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                                        :

COMMODITY FUTURES TRADING COMMISSION,  :

                                    :

                       Plaintiff,          :

                                    :      No. 22-CV-3401 (JPO)

              - against -           :

                                    :

ARCHEGOS CAPITAL MANAGEMENT, LP and     :
PATRICK HALLIGAN,                     :

                                    :

                       Defendants.     :

                                    :

                                    :
-------------------------------------------------------------------x

## PATRICK HALLIGAN'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT

FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP

7 Times Square
New York, NY  10036-6516
(212) 833-1100

February 6, 2023                  *Attorneys for Patrick Halligan*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT ...........................................................................................................................3

I.   THE CFTC LACKS JURSIDCTION TO ASSERT A CLAIM AGAINST
     HALLIGAN BASED ON ACM'S TRADING IN ETF AND BASKET SWAPS ............3

     A.   The Court May Consider the ETF Prospectuses and Swap Agreements
          Because They Are Integral to the Complaint ...........................................................3

     B.   The Court May Take Judicial Notice of the ETF Prospectuses ...............................6

     C.   The CFTC Lacks Jurisdiction Over the ETF Swaps .................................................6

     D.   The CFTC Lacks Jurisdiction Over the Basket Swaps ............................................8

II.  THE CFTC FAILS TO ALLEGE THAT HALLIGAN ENGAGED IN FRAUD
     "IN CONNECTION WITH" THE ETF SWAPS OR BASKET SWAPS ........................9

     A.   The CFTC's Interpretation of the "In Connection With"  Requirement
          Defies Recent Supreme Court and Second Circuit Authority ...............................10

     B.   Halligan's Alleged Fraud Lacks *Any* Sufficient Nexus to the ETF Swaps
          or the Basket Swaps ................................................................................................15

III. THE CFTC FAILS TO ALLEGE A PRIMARY VIOLATION ....................................17

     A.   The CFTC Fails Adequately to Plead Halligan's Scienter or Negligence ............17

          1.   Allegations about Halligan's Access to Internal Reports Are
               Insufficient .....................................................................................................17

          2.   Allegations about Halligan's Position Are Insufficient .............................21

          3.   Allegations about the Events of the Week of March 22 Are
               Insufficient .....................................................................................................21

          4.   Allegations about Becker's State of Mind Are Insufficient ......................22

          5.   Allegations about Halligan's Motive or Opportunity Are
               Insufficient .....................................................................................................24

3709153.1

B.     Halligan Did Not "Make" Any Alleged Material Misrepresentation ...................24

    1.    *Janus* Applies to Claims Under the CEA .................................25

    2.    The CFTC's Misrepresentation Claim Fails Under *Janus*.......................26

C.     The Scheme Liability Claim Fails Because the CFTC Has Failed to Allege that Halligan Committed Any Deceptive Act .......................................28

    1.    Misstatements Alone Cannot Support a Scheme Liability Claim ............28

    2.    The CFTC's Scheme Liability Claim Rests on Misstatements Alone............................................................................30

IV.    THE CFTC FAILS TO ALLEGE A SECONDARY VIOLATION ................................32

A.     The CFTC Fails to Adequately Plead Halligan's Knowledge of a Primary Violation ...........................................................................33

B.     The CFTC Fails to Adequately Plead that Halligan Assisted a Primary Violation ...........................................................................34

CONCLUSION................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aegon N.V. Sec. Litig.*,
  No. 03-cv-0603, 2004 WL 1415973 (S.D.N.Y. 2004) ...........................................................21

*In re Amaranth Nat. Gas Commodities Litig.*,
  730 F.3d 170 (2d Cir. 2013)...................................................................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................................................17

*In Re Bank Note Holographics, Inc. Sec. Litig.*,
  93 F. Supp. 2d 424 (S.D.N.Y. 2000)......................................................................................18

*In re Bank of Am. Corp. Sec., Derivative, And Emp. Ret. Income Sec. Act Litig.*,
  No. 09-md-2058, 2011 WL 3211472 (S.D.N.Y. July 29, 2011) ............................................18

*Bergesen v. Manhattanville Coll.*,
  No. 20-cv-3689, 2021 WL 3115170 (S.D.N.Y. July 20, 2021)................................................4

*Bissell v. Merrill Lynch & Co., Inc.*,
  937 F. Supp. 237 (S.D.N.Y. 1996) .........................................................................................10

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass*,
  754 F.2d 57 (2d Cir. 1985).....................................................................................................32

*CFTC v. Equity Fin. Grp. LLC*,
  572 F.3d 160 (3d Cir. 2009)...................................................................................................19

*CFTC v. McDonnell*,
  332 F. Supp. 3d 641 (E.D.N.Y. 2018) ...................................................................................19

*Chadbourne & Parke LLP v. Troice*,
  571 U.S. 377 (2014)................................................................................................................13

*Charles Schwab Corp. v. Bank of Am. Corp.*,
  883 F.3d 68 (2d Cir. 2018)............................................................................................ *passim*

*Chem. Bank v. Arthur Anderson & Co.*,
  726 F.2d 930 (2d Cir. 1984)............................................................................................10, 14

*City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v.
Ryanair Holdings plc,*
No. 18-CV-10330, 2022 WL 4377898 (S.D.N.Y. Sept. 22, 2022).........................................19

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.,*
875 F. Supp. 2d 359 (S.D.N.Y. 2012).....................................................................................27

*City of Roseville Ret. Sys. v. EnergySolutions, Inc.,*
814 F. Supp. 2d 395 (S.D.N.Y. 2011).....................................................................................27

*Clopay Plastic Prod. Co. v. Excelsior Packaging Grp., Inc.,*
No. 12-cv-5262, 2013 WL 6388444 (S.D.N.Y. Dec. 6, 2013) ..................................................3

*Cornwell v. Credit Suisse Grp.,*
689 F. Supp. 2d 629 (S.D.N.Y. 2010).....................................................................................20

*DiFolco v. MSNBC Cable L.L.C.,*
622 F.3d 104 (2d Cir. 2010).......................................................................................................3

*In re Eastman Kodak Co. Sec. Litig.,*
No. 21-cv-6418, 2022 WL 4473629 (W.D.N.Y. Sept. 27, 2022)............................................31

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,*
479 F. Supp. 2d 349 (S.D.N.Y. 2007).....................................................................................34

*Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese,*
No. 18-cv-8460, 2020 WL 611506 (S.D.N.Y. Feb. 7, 2020) ..................................................31

*Glickenhaus & Co. v. Household Int'l, Inc.,*
787 F.3d 408 (7th Cir. 2015) .............................................................................................27, 28

*Global Network Commc'ns Inc. v. New York,*
458 F.3d 150 (2d Cir. 2006).......................................................................................................5

*Goplen v. 51job, Inc.,*
453 F. Supp. 2d 759 (S.D.N.Y. 2006)................................................................................21, 22

*Gray v. Wesco Aircraft Holdings, Inc.,*
454 F. Supp. 3d 366 (S.D.N.Y. 2020).......................................................................................6

*Hawaii Ironworkers Annuity Tr. Fund v. Cole,*
No. 10-cv-371, 2011 WL 3862206 (N.D. Ohio Sept. 1, 2011) ..............................................26

*Janus Capital Group, Inc. v. First Derivative Traders,*
564 U.S. 135 (2011).......................................................................................................... *passim*

*Kramer v. Time Warner Inc.,*
937 F.2d 767 (2d Cir. 1991).......................................................................................................6

iv

*Levitin v. PaineWebber, Inc.*,
    933 F. Supp. 325 (S.D.N.Y. 1996) ..................................................................11

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010).............................................................22

*Lorenzo v. SEC*,
    139 S. Ct. 1094 (2019)............................................................................26, 27

*Lorenzo v. SEC*,
    872 F.3d 578 (D.C. Cir. 2017) ......................................................................27

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d 772 (S.D.N.Y. 2021).......................................................19, 24

*Mangiafico v. Blumenthal*,
    471 F.3d 391 (2d Cir. 2006)............................................................................3

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71 (2006)........................................................................................16

*Nat'l Com. Bank v. Morgan Stanley Asset Mgmt. Inc.*,
    No. 94-cv-3167, 1997 WL 634292 (S.D.N.Y. Oct. 15, 1997)...............................12

*In re Nine W. LBO Sec. Litig.*,
    482 F. Supp. 3d 187 (S.D.N.Y. 2020)...........................................................4, 5

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................18

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015).............................................................17

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
    89 F Supp. 3d 602 (S.D.N.Y. 2015)................................................................19

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imp. Bank of Com.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010).............................................................19

*Pollock v. Ridge*,
    310 F. Supp. 2d 519 (W.D.N.Y. 2004) .............................................................5

*Prousalis v. Moore*,
    751 F.3d 272 (4th Cir. 2014) ........................................................................25

*River Birch Cap., LLC v. Jack Cooper Holdings Corp.*,
    No. 17-cv-9193, 2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019)...............................7

*SEC v. Apuzzo,*
    689 F.3d 204 (2d Cir. 2012).................................................................................32

*SEC v. Carter,*
    No. 10-cv-6145, 2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ...........................28

*SEC v. Das,*
    723 F.3d 943 (8th Cir. 2013) ..............................................................................21

*SEC v. E-Smart Techs., Inc.,*
    74 F. Supp. 3d. 306 (D.D.C. 2014) .....................................................................28

*SEC v. Greenstone Holdings, Inc.,*
    10-cv-1302, 2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012)..................................28

*SEC v. Kearns,*
    691 F. Supp. 2d 601 (D.N.J. 2010) ................................................................29, 30

*SEC v. Knight,*
    694 F. App'x 853 (2d Cir. 2017), *as amended* (June 7, 2017) ...............................25

*SEC v. Lee,*
    720 F. Supp. 2d 305 (S.D.N.Y. 2010)..................................................................17

*SEC v. MiMedx Grp., Inc.,*
    No. 19-cv-10927, 2022 WL 902784 (S.D.N.Y. Mar. 28, 2022)......................18, 19

*SEC v. Monterosso,*
    756 F.3d 1326 (11th Cir. 2014) ...........................................................................25

*SEC v. Pentagon Cap. Mgmt. PLC,*
    725 F.3d 279 (2d Cir. 2013)................................................................................25

*SEC v. Rio Tinto plc,*
    41 F.4th 47 (2d Cir. 2022) ............................................................... *passim*

*SEC v. Sason,*
    433 F. Supp. 3d 496 (S.D.N.Y. 2020)..................................................................29

*SEC v. Sugarman,*
    No. 19-cv-5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ...........................29

*SEC v. Zandford,*
    535 U.S. 813 (2002)..........................................................................10, 11, 12, 16

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.,*
    346 F. Supp. 3d 473 (S.D.N.Y. 2018)..................................................................32

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) ............................................................................19, 20

*In re Sotheby's Holdings, Inc.*,
    No. 00-cv-1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) .............................................21

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    No. 20-cv-08585, 2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ...........................................29

*U.S. v. Bercoon*,
    No. 15-cr-22, 2018 WL 11252065 (N.D. Ga. Jan. 10, 2018) ................................................25

*U.S. v. Blankenship*,
    No. 14-cr-00244, 2015 WL 1565761 (S.D.W. Va. Apr. 8, 2015) .........................................25

*U.S. v. O'Hagan*,
    521 U.S. 642 (1997) ..............................................................................................................11

*U.S. v. Peoni*,
    100 F.2d 401 (2d Cir. 1938) .................................................................................................32

*Williams v. GMAC Mortg., Inc.*,
    No. 13-cv-4315, 2014 WL 2560605 (S.D.N.Y. June 6, 2014) ................................................4

**Statutes**

7 U.S.C. § 1a(47)(D) ........................................................................................................................7

7 U.S.C. § 9(1) .........................................................................................................10, 15, 16, 24

15 U.S.C. § 77q(1) ...................................................................................................................26, 27

15 U.S.C. § 77t(b) ..........................................................................................................................25

15 U.S.C. § 78j(b) ................................................................................................................ *passim*

15 U.S.C. § 78u(d) .........................................................................................................................25

**Rules and Regulations**

17 C.F.R. § 180.1 ................................................................................................................. *passim*

17 C.F.R. § 240.10b-5 .......................................................................................................... *passim*

FED. R. CIV. P. 12 .......................................................................................................................3, 5

**Other Authorities**

76 Fed. Reg. 41398, *Prohibition on the Employment, or Attempted Employment,*
   *of Manipulative and Deceptive Devices and Prohibition on Price*
   *Manipulation,* (July 14, 2011) ...............................................................................16

77 Fed. Reg. 48208, *Further Definition of "Swap," "Security-Based Swap," and*
   *"Security-Based Swap Agreement"*; *Mixed Swaps*; *Security-Based Swap*
   *Agreement Recordkeeping*, (Aug. 13, 2012).................................................. *passim*

Merriam-Webster.com Dictionary, Merriam-Webster, *available at*
   https://www.merriam-webster.com/dictionary/ ......................................................11

## PRELIMINARY STATEMENT[1]

Patrick Halligan's opening brief showed that the Complaint asserts legally defective claims that the CFTC has no jurisdiction to bring. The CFTC's opposition brief ("**Opp.**") offers no credible response:

First, the CFTC cannot dispute that its assertion of regulatory jurisdiction rests entirely on the terms of the ETF Swaps and Basket Swaps, so it pleads for the Court to ignore the documents that define those terms. That entreaty fails, because the documents are "integral" to the Complaint and properly before the Court on this Motion. *See* Pt. I.A.

Next, seeking to expand its jurisdiction on the fly, the CFTC advances an unprecedented, self-serving, and facially incorrect interpretation of the rules that define "swaps" (which are subject to CFTC regulation), "security-based swaps" (which are subject to SEC regulation), and "mixed swaps" (which are subject to dual SEC/CFTC jurisdiction). Those rules make clear that the ETF Swaps and Basket Swaps are "security-based swaps" that the CFTC has no authority to regulate.

- In the case of the ETF Swaps, the CFTC argues that even though the instruments actually reference single ETF shares (which makes them "security-based swaps"), the court should treat them for jurisdictional purposes as if they instead reference broad security indices (which could make them "swaps" or, in circumstances not present here, "mixed swaps"). It does not offer an iota of legal support for its effort to disregard the true structure of these instruments or to depart from a straightforward application of clear definitional rules. *See* Pt. I.C.

- In the case of the Basket Swaps, the CFTC cannot contest that the instruments are "security-based swaps" if the parties had "discretionary authority" to modify the baskets' composition. Since the Swap Agreements that govern these instruments allow that discretion, and since a straightforward application of the rules forecloses the CFTC's jurisdiction, the CFTC asks the Court to

---

[1] Capitalized terms not defined herein are used as defined in Halligan's opening brief (ECF No. 47, "**Halligan Br.**"). Unless otherwise noted, case citations throughout this brief omit internal citations and quotation marks. Halligan incorporates by reference all arguments set forth in ACM's reply brief in further support of its motion to dismiss.

adopt a constrained, artificial, and incorrect definition of "discretionary authority" that exists nowhere but in its opposition brief. *See* Pt. I.D.

Even if the ETF Swaps and Basket Swaps were within the CFTC's jurisdiction, it has failed to allege a sufficient nexus between those instruments and the alleged fraud. Indeed, the CFTC's opposition brief confirms that the only connection between the alleged fraud and the ETF and Basket Swaps was that ACM and its counterparties were, respectively, the perpetrator and victims of the alleged scheme that centered on ACM's trading in single-name TRSs (total return swaps). That is not enough, and the CFTC's effort to link the ETF and Basket Swaps with the alleged fraud defies recent Supreme Court and Second Circuit precedent that inform the proper, narrow meaning of the "in connection with" requirement. *See* Pt. II.

Next, the CFTC seeks to overcome the rules of *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), and *SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022), by arguing that they do not apply to enforcement actions brought under the CEA. No court has ever so held, and this Court should not be the first. On the substance, the CFTC fails to overcome those rules as well. Its "maker" claim fails under *Janus* because Halligan lacked ultimate control over the content and delivery of the alleged misrepresentations. *See* Pt. III.B. And its "scheme" claim fails under *Rio Tinto plc* because Halligan's deceptive conduct consists only of his alleged participation in misrepresentations. *See* Pt. III.C.

Finally, the CFTC does not resuscitate its legally deficient scienter and secondary liability allegations. It relies on *Becker's* state of mind as if it can plead *Halligan's* scienter by proxy; it demands legally improper inferences based on Halligan's access to documents that he is not alleged to have reviewed, nor had any duty to review; it makes sweeping generalizations about Halligan's "role" as ACM's CFO and his supposed "motive" to commit fraud, but its generic contentions lack any basis in the Complaint or the law. *See* Pts. III.A & IV.

## ARGUMENT

### I.

### THE CFTC LACKS JURSIDCTION TO ASSERT A CLAIM AGAINST HALLIGAN BASED ON ACM'S TRADING IN ETF AND BASKET SWAPS

In his opening brief, Halligan showed that the Complaint should be dismissed because the CFTC lacks jurisdiction over the ETF and Basket Swaps. In response, the CFTC first asks the Court to ignore the documents that conclusively foreclose the CFTC's jurisdiction. But these documents – Prospectuses in the case of the ETF Swaps and Swap Agreements in the case of the Basket Swaps – are integral to the Complaint, and the Court may consider them on this Motion. Next, the CFTC advances a series of fanciful arguments that defy the clear definitions in the CEA and SEC/CFTC Swap Rules that exclude the ETF Swaps and Basket Swaps (together, the "**Swaps**") from CFTC jurisdiction. It offers no support for these arguments – indeed, they also defy the allegations of the Complaint – and the Court should reject them.

### A.    The Court May Consider the ETF Prospectuses and Swap Agreements Because They Are Integral to the Complaint

It is well established that on a 12(b)(6) motion, a court can consider the factual allegations in the complaint, any exhibits attached to it, any documents incorporated by reference, and any documents integral to it. *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A document is "integral" to the complaint "where the complaint relies heavily upon its terms and effect." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006); *Clopay Plastic Prod. Co. v. Excelsior Packaging Grp., Inc.,* No. 12-cv-5262, 2013 WL 6388444, at *5 (S.D.N.Y. Dec. 6, 2013) (Oetken, J.) ("the plaintiff necessarily had actual notice" of documents that are "integral" to the complaint).

As this Court has recognized, "allowing the court to consider documents integral to the complaint "prevents plaintiffs from surviving Rule 12(b)(6) motions because of clever

drafting alone, where the [extrinsic] material is a legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Williams v. GMAC Mortg., Inc.*, No. 13-cv-4315, 2014 WL 2560605, at *1 (S.D.N.Y. June 6, 2014) (Oetken, J.); *see also In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 196 (S.D.N.Y. 2020) (contract is integral to complaint where "plaintiffs clearly relied on the [contract] – even if only to get around it – while drafting the Complaint."). Thus, the determination of whether a document is "integral" does not turn on how many times it is referenced, but rather whether the complaint (either explicitly or implicitly) relies on the terms and effect of the document. *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d at 196 (extrinsic contract is "integral" even though it was referenced only once, where the complaint asserted legal conclusions that the Court could test by reference to the extrinsic contract).[2]

Under these principles, the CFTC finds no basis to shield the Prospectuses and Swap Agreements from the Court's consideration. Indeed, the CFTC's opposition brief demonstrates just how integral these documents are to the Complaint: it argues that the Swap Agreements governed both the Swaps – supposedly "an essential and critical part" of the alleged fraudulent scheme – and ACM's relationship with its counterparties. Opp. at 14. Thus, by the CFTC's own characterization, there would be no Swaps – and no Complaint – if not for the Swap Agreements. Having asserted claims that rise or fall on the terms of the Swaps (and, specifically, the terms that define the Swaps as either "security-based swaps" or "swaps" for

---

[2] As the CFTC's own authorities confirm, a document that is "integral" to the complaint need not be incorporated by reference in order to be considered on a motion to dismiss. *See Bergesen v. Manhattanville Coll.*, No. 20-cv-3689, 2021 WL 3115170, at *2 (S.D.N.Y. July 20, 2021) (cited in Opp. at 15) (recognizing that courts "may properly consider even documents not quoted, incorporated by reference, or attached to the complaint when adjudicating a motion to dismiss *if those documents are integral to the complaint*.") (emphasis added).

jurisdictional purposes), the CFTC cannot now demand that the Court decline to examine the agreements that define those terms.[3]

The CFTC does not dispute that the terms of the Swap Agreements and Prospectuses are relevant to, or even dispositive of, the narrow legal question presented by this Motion – i.e., whether the Swaps are subject to CFTC jurisdiction. Instead, it argues that jurisdiction is sufficiently pled for the purposes of Rule 12, and the Court cannot consider the Swap Agreements and Prospectuses at this juncture. Opp. at 13-16. But the CFTC's allegation that it has regulatory jurisdiction over the Swaps, Cpl. ¶ 13, is a bald legal conclusion that "is not entitled to the assumption of truth." *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d at 196. Because the CFTC's jurisdictional allegation necessarily rests on the interpretation of the terms of the Swap Agreements and the Prospectuses, the Court may properly consider those documents on this Motion. *See id.* The CFTC does not cite a single case in which a court declined to consider extrinsic documents that bore upon a jurisdictional allegation.[4]

---

[3] The CFTC argues that the Court may not consider these documents because the Complaint makes only "occasional reference to certain Swap Agreements" and does not reference the Prospectuses, Opp. at 14, 16, but this understates its own allegations and defies the relevant law. Contrary to the CFTC's characterization, the Complaint repeatedly relies upon terms of the Swap Agreements as it seeks to establish how the ETF Swaps and Basket Swaps relate to the claims against Halligan. *See, e.g.*, Cpl. ¶ 29 (payment terms of the Swaps are governed by Swap Agreements); *id.* ¶ 30 (ACM's credit risk is "the risk that Archegos Fund would not or could not pay what it owed *under the terms of the swap agreements*"); *id.* ¶ 72 (ISDA Master Agreement with a swap counterparty requires signed transaction confirmations, which the CFTC alleges Halligan signed and were false); *id.* ¶ 84 ("When Archegos Fund was unable to meet the full amount of its margin calls . . . Archegos's Swap Counterparties began exercising their rights *under their respective swap agreements*.") (all emphases added). With respect to the ETF Swaps, the Complaint's 10-page, single-spaced Appendix identifies the issuer of every Prospectus as part of the CFTC's effort to demonstrate that ACM traded instruments subject to CFTC jurisdiction. Cpl. ¶ 37 & Appendix. Even if the CFTC were correct that the references were only "occasional," the law is clear that these documents are integral to the complaint and can be considered by the court. *See In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d at 196.

[4] In *Global Network Commc'ns Inc. v. New York*, 458 F.3d 150, 156-57 (2d Cir. 2006) (cited in Opp. at 14), the court held that testimony of plaintiff s president in an unrelated criminal proceeding was not integral to complaint, and in *Pollock v. Ridge*, 310 F. Supp. 2d 519, 523 (W.D.N.Y. 2004) (cited in Opp. at 15), the court refused to consider a letter and disputed contract because neither was quoted in the complaint, and their authenticity was in question.

**B.    The Court May Take Judicial Notice of the ETF Prospectuses**

The CFTC offers no viable objection to the Court taking judicial notice of the ETF Prospectuses, which is an additional and alternative basis upon which the Court can consider those documents on this Motion. *See* Halligan Br. at 13, n.10. The CFTC does not dispute that the Court may take judicial notice of documents filed with the SEC; nor does it dispute that the Prospectuses were filed with the SEC. Opp. at 15. Its only objection is that the Court may not consider these documents for their truth, even while it does not even *hint* at any doubt as to their accuracy or authenticity. *Id.* at 15-16. But the CFTC's entreaty for the Court to turn a blind eye to facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned" is contrary to the law of this Circuit. *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 382 (S.D.N.Y. 2020), *aff'd* 847 Fed. Appx. 35 (2d Cir. 2021); *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (affirming that on 12(b)(6) motion, district court could rely on Offer to Purchase and Joint Proxy Statement, filed with SEC, in dismissing the complaint).[5] Accordingly, the Court may take judicial notice of the ETF Prospectuses on this Motion.

**C.    The CFTC Lacks Jurisdiction Over the ETF Swaps**

As Halligan showed in his opening brief, the ETF Swaps are "security-based swaps" because they reference ETF shares, not the individual components of the ETFs or the underlying indices. Halligan Br. at 12-15. The CFTC attempts to assert jurisdiction over the ETF Swaps by asking the Court to (1) ignore the ETF Prospectuses, which as discussed above, is unwarranted because the Prospectuses are integral to the Complaint and the appropriate subject

---

[5]  The CFTC requests that the Court permit discovery if the Prospectuses and Swap Agreements are considered on the Motion. Opp. at 13. But it offers no reason that discovery is needed. The CFTC does not claim to lack access to the Swap Agreements and Prospectuses, nor does it claim is any basis to question the documents' authenticity, nor does it identify any other records that would bear on the jurisdictional analysis.

of judicial notice; (2) recharacterize the ETF Swaps as "mixed swaps," violating the rules that define that term; and (3) disregard the formalities of these instruments to treat them as if they reference the underlying ETF components or indices directly, when they do not. Opp. at 20-23.

The CFTC did not reference "mixed swaps" in the Complaint, and for good reason: the ETF Swaps are not mixed swaps. A mixed swap is an instrument that is *both* a security based swap "***and also*** is based on the value of" another underlying instrument. 7 U.S.C. § 1a(47)(D) (emphasis added); SEC/CFTC Swap Rules, at 48291 (providing example that an "instrument in which the underlying reference is a portfolio of *both securities* (assuming the portfolio is not an index or, if it is an index, that the index is narrow-based) *and commodities* would be a mixed swap.") (emphasis added).[6] This definition plainly does not fit the ETF Swaps at issue here, which reference *only* shares of ETFs and no other instrument. Thus, while the Court should decline to consider the CFTC's newly minted theory because it was raised for the first time its opposition brief, *River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, No. 17-cv-9193, 2019 WL 1099943, at *6 n.1 (S.D.N.Y. Mar. 8, 2019), the argument fails on its merits as well.

The CFTC's only other argument is that the ETF Swaps should be treated for jurisdictional purposes as if they reference broad-based indices of securities (which they do not) rather than single ETF shares (which they do). Opp. at 21-22. This approach is not based on any provision of the CEA or the SEC/CFTC Swap Rules, but instead on the untenable assertion that an instrument referencing an ETF share and an instrument referencing an index of securities may

---

[6] As the SEC/CFTC Swap Rules make clear, "the Commissions believe that the scope of mixed swaps is, and is intended to be, narrow." SEC/CFTC Swap Rules, at 48291. Accordingly, "the Commissions believe the category of mixed swap was designed so that there would be no gaps in the regulation of swaps and security-based swaps. . . . the Commissions believe the category of mixed swap covers only a small subset of Title VII instruments." *Id.* The CFTC's interpretation does not close a regulatory gap since the ETF Swaps referencing single securities (ETF shares) are already properly characterized as "security-based swaps" subject to SEC regulation.

be approximately economically equivalent. *Id.* at 20. But as Halligan showed in his opening

brief, that thesis is not accurate because the ETF shares' Prospectuses disclose that their

performance may deviate from the referenced indices. Halligan Br. at 14-15. Even more

fundamentally, the CFTC's make-it-up-as-you-go-along approach to its jurisdiction runs

roughshod over carefully crafted statutory and regulatory regimes that define the relevant

instruments, establish regulatory jurisdiction, and provide certainty to market participants.

D.     **The CFTC Lacks Jurisdiction Over the Basket Swaps**

Halligan showed in his opening brief that the Basket Swaps are security-based

swaps outside of the CFTC's jurisdiction because ACM and/or its counterparties have

discretionary authority to change the composition of the baskets of securities that the instruments

reference. Halligan Br. at 15-17. The CFTC attempts to overcome that showing with a cramped

and incorrect definition of "discretionary authority" that finds no support in the CEA or the

SEC/CFTC Swap Rules. Opp. at 18-20.

Specifically, neither the statute, the rules, nor any case cited by the CFTC

supports its argument that "discretionary authority" means that one party to the swap agreement

has unilateral, sole, and unfettered discretion. *See id*. Indeed, the CFTC's restrictive

interpretation is incompatible with the SEC/CFTC Swap Rules, which provide that an instrument

is a security-based swap where a swap agreement gives "one or both of the counterparties …

discretionary authority to change the composition of the security portfolio, including, for

example, by adding or removing securities in the security portfolio on an 'at-will' basis."

SEC/CFTC Swap Rules, at 48285. By pointing to provisions of the Swap Agreements that

confirm that ACM's counterparties had discretion to authorize or deny modification to the

Basket Swaps' Composition, Opp. at 19-20, the CFTC only proves Halligan's point.

Finally, while the CFTC fails to identify any restrictions on the parties' ability to change the Basket Swaps' composition, and the Complaint pleads no such limitation, the CFTC seeks to obscure ACM's and the counterparties' discretionary authority by suggesting that terms of the Swap Agreements "may be ambiguous." Opp. at 20. But they are not: ACM's agreements with all of the counterparties allow for ACM and/or the counterparty to modify the composition or weighting of the referenced security portfolio. *See* Halligan Br. at 15-16; Mulligan Decl. Exs. Q-Y.[7] In fact, insofar as the supposed "ambiguity" arises from the fact that the Swap Agreements allow ACM and its counterparties to modify the components and weighing of the referenced securities in multiple ways, in whole or "in part," far from evidencing a lack of discretion, this only demonstrates flexibility in how the parties could exercise their discretion.

## II.
## THE CFTC FAILS TO ALLEGE THAT HALLIGAN ENGAGED IN FRAUD "IN CONNECTION WITH" THE ETF SWAPS OR BASKET SWAPS

Even if the CFTC has jurisdiction over the ETF and Basket Swaps, all of its claims against Halligan fail because it has not alleged any fraud "in connection with" those instruments. The CFTC's effort to overcome this deficiency is premised on misstatements of law and mischaracterizations of Halligan's arguments. And like the CFTC's misguided effort to regulate ETF and Basket Swaps, it is also premised on an untenably capacious view of the CFTC's regulatory reach.

---

[7] Exhibits Q-Y to the Mulligan Decl., (ECF No. 48-17 to No. 48-25), are agreements between ACM and each counterparty to the Basket Swaps identified in the Complaint's Appendix, highlighted for the Court's reference and convenience.

**A.**  **The CFTC's Interpretation of the "In Connection With"**
      **Requirement Defies Recent Supreme Court and Second Circuit Authority**

The phrase "in connection with" has a very specific and carefully circumscribed

meaning when used in this context.[8] As Halligan explained in his opening brief, and the Second

Circuit recently confirmed, the "in connection with" requirement demands that

misrepresentations "concern[] the value of the securities . . .  sold or the consideration . . .

received in return." Halligan Br. at 20 (quoting *Charles Schwab Corp. v. Bank of Am. Corp.*, 883

F.3d 68, 95 (2d Cir. 2018)). This requirement is not met merely by alleging that a transaction in a

CFTC-regulated instrument would not have occurred "but for" earlier misrepresentations, *Chem.*

*Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 944 (2d Cir. 1984), or that it pertains to "the

terms of the relationship between the broker and the customer." *Bissell v. Merrill Lynch & Co.,*

*Inc.*, 937 F. Supp. 237, 243 (S.D.N.Y. 1996), *aff'd*, 157 F.3d 138 (2d Cir. 1998). Halligan's

opening brief showed that the conduct alleged in the Complaint is too attenuated from the ETF

and Basket Swaps to satisfy the "in connection with" requirement of CEA § 6(c)(1) [7 U.S.C. §

9(1)] and Rule 180.1 [17 C.F.R. § 180.1]. Halligan Br. at 17-24. The CFTC in its opposition

brief would reduce the "in connection with" requirement to a nullity.

The CFTC places primary reliance on the Supreme Court's decision in *SEC v.*

*Zandford*, where the Court found that the "in connection with" requirement was satisfied where a

stockbroker sold his customer's securities for his own benefit, without the customer's knowledge

or consent. 535 U.S. 813 (2002) (cited in Opp. at 24-25). The CFTC latches on to the Supreme

Court's statement that the stockbroker's fraud and the securities transactions "coincided," 535

U.S. at 820, but that phrase is no help to the CFTC when read in appropriate context. In

---

[8]  The CFTC concedes that the interpretation of the term "in connection with" as used in CEA § 6(c)(1) and Rule 180.1 is appropriately guided by authorities interpreting the same term under the Securities Exchange Act of 1934 ("**Exchange Act**"). Opp. at 23.

*Zandford*, the stock sales were themselves deceptive because they were conducted without the customer's knowledge or consent. Thus, the fraud and the securities transaction were one and the same, i.e., they "coincided."[9] Here, in contrast, the alleged fraud relates to misrepresentations that allegedly induced counterparties to extend capacity or margin terms – but these are not CFTC-regulated instruments. The CFTC alleges that trading in ETF and Basket Swaps *followed* the misrepresentations, sometimes in close temporal succession, Opp. at 28, but that is not what "coincide" means under *Zandford* or even under a basic dictionary definition of the term.[10]

The CFTC's overbroad reliance on *Zandford* defies more recent decisions of the Supreme Court and the Second Circuit that are fatal to its claims against Halligan. In *Charles Schwab Corp.*, plaintiff-investors sued the banks that sold them debt securities, arguing that the banks had made material misrepresentations regarding the banks' borrowing rates (which in turn affected the return on certain debt securities). 883 F.3d at 95. In affirming the dismissal of certain of the plaintiffs' claims, the Second Circuit explained that to state a § 10(b) claim, a misrepresentation must "concern[] the value of the securities . . .  sold or the consideration . . . received in return." *Id.* at 96. Put simply, and fatal to the CFTC's overreaching position here, not every alleged misrepresentation by a party to a securities transaction (or, here, a transaction in CFTC-regulated instruments) satisfies the "in connection with" requirement. *See also Levitin v. PaineWebber, Inc.*, 933 F. Supp. 325, 329 (S.D.N.Y. 1996), *aff'd*, 159 F.3d 698 (2d Cir. 1998)

---

[9]  *U.S. v. O'Hagan* demonstrates the same point. There, the Supreme Court stated that the "in connection with" requirement is satisfied where the securities transaction and the fraudulent conduct "coincide," 521 U.S. 642, 655-56 (1997), and the alleged fraud at issue was a lawyer's use of confidential information to purchase or sell securities. The Supreme Court explained that the fraud occurred *not* when the lawyer obtained the confidential information, but at the moment he *used* the confidential information – without disclosure to his law firm or his client – to buy or sell securities. Thus, the fraud and securities transactions were exactly coincident and inextricably bound together. *Id.* at 656.

[10]  *See* "Coincide." Merriam-Webster.com Dictionary, Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/coincide (last accessed Feb. 4, 2023) ("to occupy the same place in space or time").

(defendant-broker's nondisclosure does not meet "in connection with" requirement of Exchange Act even though it "may have affected the customer's decision to open an account" with the broker); *Nat'l Com. Bank v. Morgan Stanley Asset Mgmt. Inc.*, No. 94-cv-3167, 1997 WL 634292, at \*5 (S.D.N.Y. Oct. 15, 1997) ("in connection with" requirement not met where plaintiff failed to show that alleged misrepresentations were "integral to anything but the 'trust relationship'" between the parties).

The CFTC makes two arguments seeking to escape the rule that the Second Circuit set forth in *Charles Schwab*. First, it misstates Halligan's argument, claiming that he had argued that misrepresentations can satisfy the "in connection with requirement" only if they "relate to the value of a swap," which, the CFTC further contends, contradicts the Supreme Court's statement in *Zandford* that "neither the SEC nor this Court has ever held that there must be a misrepresentation about the value of a particular security in order to run afoul of the Act." Opp. at 24 (quoting *Zandford*, 535 U.S. at 820). In fact, Halligan accurately quoted *Charles Schwab*'s holding that the fraud must relate to *either* the "value of the securities" ***or*** the "consideration [seller] received." Halligan Br. at 20 (quoting *Charles Schwab*, 883 F.3d at 96). Moreover, the *Charles Schwab* test is wholly consistent with *Zandford* (appropriately so, as *Charles Schwab* post-dates *Zandford*), because in *Zandford*, the stockbroker's fraudulent sales of his customer's securities deprived his customers of the proceeds to which they were entitled "for the sale of their valuable securities." *Zandford,* 535 U.S. at 822. Thus, the fraud in *Zandford* meets the *Charles Schwab* test because the deceptive conduct (the unauthorized sales) related to the consideration the customers received for their securities.

The CFTC's second attack on *Charles Schwab* seeks to distinguish the case on its facts, but this effort runs headlong into recent Supreme Court precedent. Opp. at 31-32 & n.7. In *Charles Schwab*, the Second Circuit observed that the plaintiff had "received exactly what it

12

expected" in the securities transaction (thus illustrating the absence of a sufficient connection between the transaction and the alleged fraud). 883 F.3d at 96. The CFTC argues that this case is different from *Charles Schwab* because ACM's counterparties did not receive "what they expected out of the bargain [with ACM]—*i.e.*, a creditworthy counterparty." Opp. at 31-32 n.7. For one thing, the Complaint does not allege that any counterparty made ACM's creditworthiness a term of any ETF or Basket Swap, or even *considered* ACM's creditworthiness during the negotiation of any ETF or Basket Swap. Indeed, ACM's creditworthiness is a characteristic of one party to contractual financial instruments (ETF and Basket Swaps), not a characteristic or term of the financial instruments themselves.

Equally fatal, the CFTC's argument that ACM misrepresented its creditworthiness is exactly the type of argument that the Supreme Court rejected in *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 386 (2014), as insufficient to meet the "in connection with" requirement. In *Chadbourne & Parke LLP*, which is the Supreme Court's most recent decision interpreting the term "in connection with," the Court held that "[a] fraudulent misrepresentation or omission is not made in connection with such a purchase or sale of a covered security unless it is material to a decision by one or more individuals (other than the fraudster) to buy or sell a covered security." *Id.* at 387. To illustrate its holding, the Court offered an example of the type of conduct that is not "in connection with" a securities transaction: "a lawsuit brought by creditors of a small business that falsely represented it was creditworthy, in part because it owns or intends to own exchange-traded stock." *Id.* at 391. Yet this is precisely the sort of attenuated conduct that the CFTC wrongly suggests can salvage the Complaint, when it argues that as a result of the alleged misrepresentations, ACM's counterparties "were prevented from accurately assessing the true risk posed by Archegos's aggregate long positions and therefore could not accurately calibrate

their appropriate level of risk controls through the short Broad-Based Security Index Swaps." *See*

Opp. at 28-29.

Finally, the CFTC's effort to overcome the Second Circuit's landmark decision in

*Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984), is just as unavailing

as its effort to overcome *Charles Schwab*. In *Chem. Bank*, the Second Circuit squarely held that

"but-for" causation – i.e., that the transaction in the relevant instrument would not have occurred

"but for" the defendant's alleged fraud – "is not enough." 726 F.2d at 943. This principle is fatal

to every claim against Halligan, because as explained in detail in Halligan's opening brief, "but

for" causation is the *only* way that the CFTC can even try to link the ETF and Basket Swaps to

Halligan's alleged fraud. *See* Halligan Br. at 22. While the CFTC summarily claims that it is not

relying on "but for" causation, Opp. at 30, its own description of its theory belies that claim:

> Defendants' misrepresentations not only induced the Swap
> Counterparties to enter into the long TRS positions, but *they also*
> *in turn* induced the Swap Counterparties to enter into the short
> Broad-Based Security Index Swaps **as a means to hedge the**
> **market risk associated with Archegos's long positions**. . . . had the
> Swap Counterparties known the truth about Archegos' positions,
> they would have limited, restricted, or reduced Archegos's trade
> capacity, which would have impacted both their long and short
> TRS positions.

*Id.* at 28-29 (emphases added). This is "but for" causation at the second derivative level: the

misrepresentations allegedly induced transactions in TRSs (over which the CFTC does not even

claim to have jurisdiction), and those transactions "in turn" led to hedging transactions to reduce

the risk associated with the ETF and Basket Swaps. Under *Chem. Bank*, this is "not enough."[11]

---

[11]  The relationship between the alleged fraud and the ETF and Basket Swaps is even more attenuated
than the CFTC's description suggests. The Complaint alleges that the misrepresentations were made
during "due diligence" conversations about the capacity limits and margin rates that its counterparties
imposed, not during negotiations regarding the purchase or sale of TRSs. *See* Cpl. ¶¶ 5, 37, 56; Halligan
Br. at 5-7, 22. Halligan has moved to dismiss the SEC's parallel complaint because the alleged
misrepresentations are too attenuated from the purchase, sale, or offer of any TRS, as required by § 10(b)
and Rule 10b-5 of the Exchange Act. *See* ECF Nos. 59-61, 90 in Case No. 22-cv-3402.

**B.      Halligan's Alleged Fraud Lacks *Any* Sufficient**
         **Nexus to the ETF Swaps or the Basket Swaps**

   The CFTC makes the further argument that because CEA § 6(c)(1) and

Rule 180.1 use the phrase "in connection with any swap" rather than "in connection with the

purchase or sale of any security" (as in Exchange Act §10(b)), it can assert claims where there is

no "nexus to a 'purchase or sale.'" Opp. at 26-27. This argument is a red herring: the CFTC's

claims fail not only because the alleged fraud was too attenuated from any "purchase or sale" of

the ETF or Basket Swaps, but because it was so far removed from those instruments altogether.

   Indeed, the Complaint also fails under the CFTC's self-proclaimed standard. The

CFTC argues that Rule 180.1 reaches fraudulent conduct "in connection with ***the purchase, sale,***

***solicitation, execution, pendency, or termination of any swap***," as well as "***all of the payment***

***and other obligations arising under a swap***." Opp. at 26 (citing Rule 180.1 Release, 76 Fed.

Reg. at 41,405) (emphasis original), but the alleged conduct was no more related to the

"solicitation, execution, pendency, or termination" or payment or other obligations of the ETF

and Basket Swaps than it was to their "purchases" or "sales." As discussed above and at length in

Halligan's opening brief, the alleged misrepresentations had *nothing* to do with the ETF or

Basket Swaps other than that they were made by one swap counterparty (ACM) to another. The

CFTC's highly speculative argument that the misrepresentations made the Swaps "far riskier

from the Swap Counterparties' perspective—and thus far less valuable—than the Swap

Counterparties were led to believe," Opp. at 29-30, falls short under the CFTC's own standard,

because even if the counterparties were deceived about ACM's creditworthiness or its portfolio,

those issues relate to the counterparty relationship generally, and not to any term of the Swaps.

Thus, even if the CFTC's assertion about the differences between the CEA and the Exchange Act

were meritorious, it would be of no moment here.

The CFTC's effort to expand the reach of Rule 180.1 is not only futile; it is also wrong. The CFTC does not cite a single case that has interpreted the parallel provisions of the CEA and Exchange Act differently. In fact, it concedes – as it must – that courts interpreting CEA § 6(c)(1) and Rule 180.1 routinely take guidance from decisions interpreting Exchange Act § 10(b). Opp. at 26; *see also Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation,* 76 Fed. Reg. 41398, 41399 (July 14, 2011) (codified at 17 C.F.R. § 180.1) ("Given the similarities between CEA section 6(c)(1) and Exchange Act section 10(b), the [CFTC] deems it appropriate and in the public interest to model final Rule 180.1 on SEC Rule 10b-5."). In that regard, the *Charles Schwab* test – which the CFTC flunks because the alleged misrepresentations did not concern the value of the ETF or Basket Swaps or the consideration th10(at the counterparties received for them – does not turn on the "purchase or sale" language of the Exchange Act, but rather on the quality of the nexus between the alleged misrepresentation and the relevant instrument, and there is no reason that it should not apply to claims under the CEA with the same force it applies to Exchange Act claims.

Moreover, the CFTC relies heavily on its final rules release regarding Rule 180.1, but declines to quote the passage explaining that the CFTC "intend[ed] to be guided by [*Zandford*] and other precedent interpreting the words 'in connection with' in the securities context," and specifically citing the Supreme Court's holding in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, "that the 'in connection with' language of SEC Rule 10b-5 *requires a nexus between fraudulent conduct and a securities transaction*." 76 FR 41398 at 41406 n.100 (citing *Dabit*, 547 U.S. 71, 85 (2006)) (emphasis added). The CFTC's position in this case, if accepted, would not only contravene "precedent interpreting the words 'in connection with' in the securities context," but would eliminate the "nexus" requirement altogether.

16

**III.**
**THE CFTC FAILS TO ALLEGE A PRIMARY VIOLATION**

**A.     The CFTC Fails Adequately to Plead Halligan's Scienter or Negligence**

Halligan's opening brief showed that the Complaint fails sufficiently to allege facts giving rise to a strong inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *SEC v. Lee*, 720 F. Supp. 2d 305, 334-35 (S.D.N.Y. 2010). In response, the CFTC reaches for inapposite case law and invites the Court to find scienter based on allegations of Halligan's access to "reports" he is not alleged to have reviewed (nor had any duty to report), based on generic allegations about his title, role, and supposed motive to commit fraud, and based on *Becker's* state of mind rather than his own. Its allegations are insufficient as a matter of law.

The CFTC also argues, wrongly, that Halligan's motion calls upon the Court to resolve factual disputes as to Halligan's intent. Opp. at 36, n.12. It does not. The CFTC's claims against Halligan fail because the Complaint's well-pled allegations of fact, taken as true, are insufficient. Moreover, while the Court must accept well-pled allegations of fact as true, it "is not required to credit mere conclusory statements," *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 353 (S.D.N.Y. 2015), *aff'd sub nom. Klein v. PetroChina Co.*, 644 Fed. Appx. 13 (2d Cir. 2016) (summary order), or legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The *legal* deficiencies as to each of the CFTC's arguments are addressed below.

**1.     Allegations about Halligan's Access to Internal Reports Are Insufficient**

Throughout its opposition brief, the CFTC repeatedly urges the Court to infer Halligan's scienter based on his alleged access to daily reports on ACM's position sizes and to periodic reports detailing the amount of time required to liquidate ACM's portfolio. Opp. at 36;

Cpl. ¶¶ 59, 63.[12] The CFTC relies on these reports to support an inference that Halligan knew that certain TRS confirmations (unrelated to ETF or Basket Swaps) that he signed were false, Opp. at 38; that statements that Becker made to counterparties about ACM's portfolio were false, *id.* at 36; and that a statement that Becker made to one counterparty about ACM's liquidity profile was false, *id.* at 37. Applicable law does not support the CFTC's effort to impute scienter to Halligan based on his alleged access to these reports.

The CFTC's own authorities stand for the proposition that scienter may be inferred where a defendant failed to check information **he had a duty to monitor**. *See Novak*, 216 F.3d at 308 (recklessness may be established where "defendants failed to review or check information *that they had a duty to monitor*") (emphasis added) (cited in Opp. at 35); *In re Bank of Am. Corp. Sec., Derivative, And Emp. Ret. Income Sec. Act Litig.*, No. 09-md-2058, 2011 WL 3211472, at *4 (S.D.N.Y. July 29, 2011) (finding scienter where bank's CFO had duty to review reports that he received and discussed with codefendants, concerning bank's losses) (cited in Opp. at 35); *In Re Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 444, 446 (S.D.N.Y. 2000) (finding scienter where complaint alleged that CFO, who was also the Chief Accounting Officer, was specifically responsible for company's financial reporting and that he had the authority and responsibility to enforce the company's revenue recognition policies, and company had inflated revenues over two years) (cited in Opp. at 38); *SEC v. MiMedx Grp., Inc.*, No. 19-cv-10927, 2022 WL 902784, at *7-8 (S.D.N.Y. Mar. 28, 2022) (finding scienter where

---

[12]  The CFTC also points to "daily capacity notes" that Becker prepared, which the Complaint alleges detailed ACM's capacity limitations at each counterparty. Cpl. ¶ 70 (cited in Opp. at 39 n. 13). But there is no allegation that Halligan or any other ACM employee misrepresented ACM's available capacity, so these capacity notes are irrelevant to the analysis of whether the Complaint sufficiently alleges that Halligan reviewed specific facts or information that were contrary to his statements to the counterparties. *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

the CFO of a publicly traded company had duty to monitor accounting treatment of distributor's accounts) (cited in Opp. at 39).

Likewise, none of the cases that the CFTC cites found scienter solely on the basis of bald allegations of mere "access" to contradictory information.[13] *See also City of Birmingham Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 18-cv-10330, 2022 WL 4377898, at *3-4 (S.D.N.Y. Sept. 22, 2022) (Oetken, J.) (allegation that problem of pilot shortage was "flagged" for CEO; that he "received detailed correspondence" concerning shortage; and that an employee provided him with "reports" on "critical operational issues such as pilot numbers" insufficient to raise an inference about CEO's "knowledge about the facts alleged to contradict" his public statements); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 299 (S.D.N.Y. 2010) ("perfunctor[y allegation]" in a securities fraud action "that Defendants received information contradicting their public statements" insufficient to establish knowledge or recklessness); *Sjunde AP-Fonden v.*

---

[13] In *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.* (cited in Opp. at 35,36), the court did not rest its conclusion on the allegation that the defendant had merely received reports containing information that contradicted the company's public statements, but credited the further allegation that the defendant had discussed the subject of those reports with another senior executive. 89 F Supp. 3d 602, 618 (S.D.N.Y. 2015).

In *CFTC v. McDonnell* (cited in Opp. at 34), the court found that scienter had been proven at trial based on evidence that the defendant made misrepresentations about the size, location and number of employees of a company that the defendant "himself owned and controlled [] . . . from his home basement in Staten Island." 332 F. Supp. 3d 641, 722 (E.D.N.Y. 2018). Similarly inapposite is *CFTC v. Equity Financial Grp. LLC*, (cited in Opp. at 35), where the trial court found that a company's lawyer's scienter had been proven where the evidence at trial showed, among other things, that the lawyer had *invented* the method used to falsify the company's rate-of-return reporting. 572 F.3d 150, 160 (3d Cir. 2009).

The CFTC attempts to distinguish this Court's decision in *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, yet this case is instructive. *See* Opp. at 39 n.13. There, the Court found that recklessness was not sufficiently pled where the complaint alleged that "Ollie's executives had access to the Daily Sales Flash Report, which tracked store sales; that Ollie's executives assessed inventory on a weekly basis; and that the company had technology in place to provide real-time information to its senior executive team regarding its inventory," 518 F. Supp. 3d 772, 780 (S.D.N.Y. 2021) (Oetken, J.). The "daily reports detailing the size of [ACM's] positions" that the CFTC relies upon here, Cpl. ¶ 59, are at least as insufficient as the "Daily Sales Flash Reports" that this Court found inadequate in *Maloney*.

*Gen. Elec. Co.*, 417 F. Supp. 3d 379, 403 (S.D.N.Y. 2019) ("Without specific identification of the reports or statements containing this information, Plaintiff's theory boils down to little more than Defendants "must have known" based on their roles"); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637 (S.D.N.Y. 2010) (plaintiff sufficiently alleged defendants' knowledge or reckless disregard of information contradicting their public statements based on, among other things, a specific allegation that the defendants "*reviewed* specific reports that should have alerted them to" the falsity of their public statements ) (emphasis added); *see also* Halligan Br. at 28 (citing cases).

Under these principles, the CFTC's naked reliance on Halligan's *access* to allegedly contradictory reports fails. The CFTC argues that Becker made statements to counterparties that contradicted the position and liquidation reports, Opp. at 34-37, but cannot point to any allegation that Halligan actually reviewed – or had any role in creating, maintaining, or reviewing – those reports. Nor can it point to any allegation that Halligan had any *duty* to review those reports. *See* Cpl. ¶¶ 59, 63, 70, 72. Thus, these reports do not support *Halligan's* scienter as to statements that *Becker* made. Nor do they support the CFTC's allegations that Halligan acted with scienter when he signed transaction confirmations that contained a false statement regarding ACM's exposure to certain single-name TRSs (not ETF or Basket Swaps). Opp. at 38-39 (citing Cpl. ¶ 72). Here again, bald allegations of access to contradictory information that Halligan had no alleged duty to monitor are not sufficient. Moreover, the Complaint describes the reports as relating to ACM's *trading* – they allegedly reported the sizes of ACM's positions and the time it would take to liquidate the portfolio – and thus they are outside the operational (*not trading*) role the Complaint ascribes to Halligan. *See* Halligan Br. at 3-4; Cpl. ¶¶ 17-19; 57-58, 71 (investing and trading decisions were the responsibility of Hwang

and Tomita). This is another reason that the CFTC's requested inference is implausible and unsupported by well-pled facts.

### 2.    Allegations about Halligan's Position Are Insufficient

The CFTC argues that Halligan's scienter can be inferred from his position and role at ACM as "a senior manager and Chief Financial Officer," *see* Opp. at 37, but this is simply wrong. Courts routinely reject broad and conclusory arguments, like the CFTC makes here, that defendants "who are in senior positions . . . are presumed to be knowledgeable about significant practices at their company." *In re Sotheby's Holdings, Inc.*, No. 00-cv-1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) (dismissing securities fraud complaint and stating, "It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."); *In re Aegon N.V. Sec. Litig.*, No. 03-cv-0603, 2004 WL 1415973, *17 (S.D.N.Y. 2004) (dismissing securities fraud complaint based on allegations that "defendants had access to adverse undisclosed information because of their senior positions with the company"); *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 773 (S.D.N.Y. 2006) (allegations that "defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports" insufficient); *see also* Halligan Br. at 26-27 (citing cases).[14]

### 3.    Allegations about the Events of the Week of March 22 Are Insufficient

The CFTC also argues that Halligan's scienter has been sufficiently alleged with respect to misrepresentations that Becker made to counterparties during the week of March 22,

---

[14] The CFTC cites the out-of-circuit case *SEC v. Das*, where the court explained that the duties of the CFO of a publicly traded company included "manag[ing] its financial department and ensur[ing] its records and accounts were accurately and fairly maintained." 723 F.3d 943, 952 (8th Cir. 2013) (quoted in Opp. at 37-38). But ACM was not a publicly traded company; it was a family office. Cpl. ¶ 24. The CFTC's one-size-fits-all conception of the role of a "CFO" should be rejected.

21

2021, as ACM was experiencing a dramatic decline in the value of its single-name TRS positions (notably, not ETF Swaps or Basket Swaps). Opp. at 36-37; Cpl. ¶¶ 73, 81-82, 85. The CFTC makes the conclusory allegation that Halligan "knew" that Becker misled counterparties by telling them he did not have access to ACM's trade blotter, live portfolio, and updated margin calculations, Cpl. ¶ 81, but this bald assertion is insufficient, given the Complaint's vivid allegations about the rapidly deteriorating and fluid status of the portfolio over that week. As set forth in Halligan's moving brief at 29, the CFTC's failure to allege facts sufficient to support an inference that Halligan knew that the data at issue was accurate and reliable – *on a real-time basis in the dynamic and challenging environment described by the Complaint* – is fatal. *See Goplen*, 453 F. Supp. 2d at 773-74 (rejecting inference of scienter based on the short time period between certain of defendants' positive statements and the revelation of adverse facts because "this inference is most compelling for problems of the type and magnitude that likely develop over time, and do not become apparent to management all at once."); *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011) (scienter allegations are insufficient where they "do not establish what specific contradictory information the Individual Defendants received or when they received it").

### 4.   <u>Allegations about Becker's State of Mind Are Insufficient</u>

Finally, without sufficient factual allegations of *Halligan's* scienter, the Opposition seeks to rely on *Becker's* inferences, interpretations, and state of mind. Becker's state of mind cannot sustain the CFTC's claims against Halligan.

*First*, the CFTC relies on Becker's interpretation of Halligan's alleged instruction to join Tomita's calls with counterparties "so that Becker would know what Tomita was saying to the Swap Counterparties"; the Complaint alleges that *Becker* interpreted this to mean that if

Tomita misled counterparties, Becker should, too. Cpl. ¶ 67; Opp. at 10. The Complaint does not allege that Becker shared this interpretation with Halligan, and the facts that the Complaint *does* allege amount to, at most, an instruction that two colleagues should coordinate regarding their communications with counterparties. This is not only innocuous, but it is objectively sensible, and thus fails to support any inference of Halligan's wrongful state of mind.

*Second*, the CFTC relies on Becker's interpretation of Halligan's alleged statement "if they only knew" in response to Becker's account of a call he had with a counterparty regarding ACM's positions in a certain single-name TRS (not an ETF Swap or Basket Swap); the Complaint alleges that *Becker* interpreted this to mean that Halligan knew that Becker and Tomita had made misrepresentations. Cpl. ¶ 67; Opp. at 10. Here again, the CFTC fails to allege any facts beyond Becker's interpretation of Halligan's alleged statement – it does not allege that Becker asked Halligan what this supposed statement meant, or that Halligan told him what it was intended to mean. The CFTC's glib suggestion that this "phrase speaks for itself" reveals its circular logic: its sinister interpretation only follows if it is assumed that Halligan knew that Becker and Tomita were making misrepresentations. *See* Opp. at 39. But in the absence of that assumption – which is unwarranted here, as the CFTC has not alleged facts to support it – the more plausible inference to draw from the statement "if they only knew" is that Halligan believed that Becker and Tomita were providing the counterparties with only the information to which they were entitled – and, critically, the Complaint does not allege that any counterparty was entitled to information about ACM's holdings at *other* counterparties (which is the information that Becker claims to have misstated). *See* Cpl. ¶ 67.

*Third*, the CFTC relies on *Becker's* admission through his guilty plea that he knew his own statements to counterparties were untrue, Opp. at 35 n.10, but again, the CFTC offers no legal authority that permits it to bootstrap Becker's admission into proof of Halligan's

3709153.1

scienter. As explained in Halligan's opening brief at 27, neither Becker's guilty plea nor his allocution implicated Halligan, and thus they cannot support an inference of Halligan's scienter.

### 5. Allegations about Halligan's Motive or Opportunity Are Insufficient

The CFTC makes only a cursory effort to overcome the absence of any well-pled allegation supporting an inference that Halligan had a motive and opportunity to commit fraud. *See* Opp. at 40. All that it cites is the allegation that the fraud was designed to enable ACM to obtain greater capacity so it could trade more "long positions" (not ETF or Basket Swaps) at "favorable margin rates" – in other words, so that the family office could maintain or grow its success or profits. Opp. at 40 (citing Cpl. ¶ 5). This is inadequate as a matter of law. Indeed, this Court has recognized that the desire to keep a business profitable or successful is insufficient to show that defendant "benefitted in some concrete and personal way from the purported fraud." *Maloney* 518 F. Supp. 3d at 778. Thus, in *Maloney*, this Court rejected the alleged motive that "Ollie's did not want to end its winning streak," because such a desire to maintain a winning streak "is no different from 'the desire for the corporation to appear profitable' — which courts have repeatedly held to be insufficient." *Id.* at 779.

## B. Halligan Did Not "Make" Any Alleged Material Misrepresentation

In *Janus Capital Group Inc. v. First Derivative Traders*, the Supreme Court narrowly defined what it means to "make" a statement for the purposes of § 10(b) and Exchange Act Rule 10b-5, and held that primary liability under Rule 10b-5(b) lies only against the "makers" of misrepresentations. 564 U.S. 135, 142 (2011). Since *Janus*, "maker" is a term of art under § 10(b), meaning the person who has "ultimate authority over the statement, including its content and whether and how to communicate it." *Id.* Halligan's opening brief explains that, as a matter of law, Halligan cannot be liable for a violation of § 6(c)(1) or Rule 180.1(a)(2) – which tracks the language of Rule 10b-5(b) almost verbatim – because the CFTC has not alleged that he

24

was the "maker" of any alleged misrepresentation. Halligan Br. at 31-34. In response, the CFTC

argues that *Janus* does not apply to the CEA, and that even if *Janus* applies, the Complaint is

nonetheless sufficiently pled. Opp. at 40-45. It is wrong on both scores.

1.    ***Janus* Applies to Claims Under the CEA**

The CFTC acknowledges that no Court has addressed the application of *Janus* to

the CEA, Opp. at 41, but fails to confront the fact that courts routinely apply *Janus* in the context

of SEC misrepresentation claims. *See, e.g., SEC v. Knight*, 694 F. App'x 853, 856 (2d Cir. 2017),

*as amended* (June 7, 2017) (in SEC enforcement action, applying *Janus* to Rule 10b-5(b) claim);

*SEC v. Pentagon Cap. Mgmt. PLC*, 725 F.3d 279, 286–87 (2d Cir. 2013) (in SEC enforcement

action, finding defendants were "makers" under *Janus*); *SEC v. Monterosso*, 756 F.3d 1326,

1334 (11th Cir. 2014). This alone should be dispositive of the CFTC's argument that the CEA's

express private right of action renders *Janus* inapplicable. Opp. at 41. Like the CEA, the

Exchange Act provides an express private right of action for the SEC to pursue alleged violations

of the securities laws.[15] The CFTC offers no explanation, and there is none, as to why SEC

enforcement actions would be subject to *Janus* but CFTC actions are not.[16]

---

[15]  *See* Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

[16]  The CFTC's lone citation is to a wrongly decided case from the Fourth Circuit that declined to apply *Janus* to a criminal securities fraud prosecution. Opp. at 41 (citing *Prousalis v. Moore*, 751 F.3d 272, 279 (4th Cir. 2014)). Indeed, at least one district judge within the Fourth Circuit has suggested (without expressly so stating) that *Prousalis* was wrongly decided. *U.S. v. Blankenship*, No. 14-cr-00244, 2015 WL 1565761, at *4 (S.D.W. Va. Apr. 8, 2015) (noting significance of concurring view (in *Prousalis*) that "'make' has the same meaning in the criminal context as it does in the context of a private right of action."). And at least one district judge in the Eleventh Circuit has applied *Janus* in the criminal context without equivocation. *U.S. v. Bercoon*, No. 15-cr-22, 2018 WL 11252065, at *2 (N.D. Ga. Jan. 10, 2018). Rightly so, because *Janus* turned on the meaning of the word "make"; nothing in *Janus* even hints at the notion that the Court's interpretation of the term "make" was idiosyncratic to cases involving implied, rather than express, rights of action, and the fact that *Janus* arose in the context of a private 10b-5 action is of no moment to the definitional issue.

2.      **The CFTC's Misrepresentation Claim Fails Under *Janus***

Having failed to show that it is immune from the rule of *Janus*, the CFTC fails to

show how the Complaint survives that rule. As shown in Halligan's opening brief, by the

Complaint's own allegations, ultimate authority over the content and communication of the

alleged misstatements rested with others. Halligan Br. at 31-34. Now, the CFTC seeks to walk

back the Complaint's extensive allegations about ACM's "Founder's" (*not* Halligan's)

ownership, direction, and control of ACM, which he allegedly exercised at various times by

instructing employees how to communicate with counterparties, "direct[ing]" or "demand[ing]"

Tomita and others to obtain increased trade capacity and/or lower margins, and providing

direction with respect to certain alleged misrepresentations. Cpl. ¶¶ 18, 54, 65, 71. The CFTC

summarily asserts in its opposition brief that these allegations "cannot possibly mean that [the

Founder] had ultimate authority" over the alleged misstatements, Opp. at 42, but it is bereft of

*any* authority to support what amounts to a belated attempt to edit its own allegations.[17]

Moreover, the CFTC's claims are against Halligan, not the Founder, so the relevant question is

whether the Complaint's allegations defeat the CFTC's claim that *Halligan* had ultimate

authority over both the content and communication of the alleged misstatements.

The CFTC's effort to analogize this case to *Lorenzo v. SEC*, is particularly inapt.

Opp. at 42-43 (citing 139 S. Ct. 1094 (2019)). First, it distorts the holding of *Lorenzo*, which

addressed only scheme liability under Exchange Act Rule 10b-5(a) and (c) and Securities Act

---

[17]  The CFTC attempts to distinguish *Hawaii Ironworkers Annuity Tr. Fund v. Cole*, on the factual ground
that the defendants there did not "speak with the investing public" or direct anyone to make false
statements. Opp. at 42 (citing No. 10-cv-371, 2011 WL 3862206, at *1 (N.D. Ohio Sept. 1, 2011)). But it
ignores that the court's conclusion that the defendants there were not "makers" under *Janus* was based on
the complaint's own allegation that the defendants were following their more senior supervisors'
"directive." *Id.* at *5. So, too, here, for the reasons discussed above and in Halligan's opening brief at 31-
34. The CFTC's argument that Halligan was a "C-level executive," Opp. at 42, does not change the fact –
alleged in the Complaint – that he was still an employee and subordinate of the Founder. Cpl. ¶¶ 17, 71.

§ 17(a)(1) for a defendant (Lorenzo) who intentionally disseminated false statements, and did not address whether Lorenzo was a "maker" of the statements. In fact, the Court expressly stated that it was *not* revisiting the question of whether Lorenzo had "made" the statements, but was merely assuming that Lorenzo was not a "maker" under Rule 10b-5(b) as the appellate court had concluded. 139 S. Ct. at 1100. And notably, in its opinion, the appellate court explained that the emails Lorenzo had disseminated to prospective investors, and which contained the false information, began with an express statement that Lorenzo was sending them at his boss's request. *Lorenzo v. SEC*, 872 F.3d 578, 588 (D.C. Cir. 2017). That *attribution* was critical to the outcome in *Lorenzo*, and it is consistent with *Janus*'s statement that "in the ordinary case, *attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed.*" 564 U.S. at 142-43 (emphasis added). It also renders *Lorenzo* inapposite to the facts here, where there is no allegation that Becker attributed any of his false statements to Halligan.[18] And, the three statements that the Complaint vaguely alleges Halligan "directed" Becker to make, Cpl. ¶¶ 59, 64, 81, are pled in only the most conclusory fashion and without any facts that would support an inference that Halligan had "ultimate authority" to make them.[19] *See* Halligan Br. at 33.

---

[18]  Similarly inapposite are the cases the CFTC cites in support of the proposition that a statement can have more than one "maker," Opp. at 41, n.14, as they concern corporate securities filings with multiple signatories and press releases, not the single speaker situation in *Janus* and here. *See City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc*., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (alleged misstatements in SEC registration statement signed by multiple officers and directors); *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012) (in the context of determining whether the group pleading doctrine retained viability post-*Janus*, noting that "[i]t is not inconsistent with *Janus* to presume that multiple people in a single corporation have the joint authority to 'make' an SEC filing, such that a misstatement has more than one 'maker'"). Given the CFTC's acknowledgement that it is not relying on the group pleading doctrine, Opp. at 44 n.16, *City of Pontiac* is particularly inapt.

[19]  These allegations also fall short under the authorities the CFTC cites. The CFTC argues that Halligan can be liable because he "reviewed and approved" talking points that Becker drafted and later used in his communications with counterparties. Cpl. ¶ 81; Opp. at 37. But this is at odds with the Seventh Circuit's conclusion in *Glickenhaus & Co. v. Household Int'l, Inc*., Opp. at 45, n.17, that a jury instruction "plainly

**C.    The Scheme Liability Claim Fails Because the CFTC Has
Failed to Allege that Halligan Committed Any Deceptive Act**

Halligan demonstrated in Pt. II.C of his moving brief that the scheme liability

claim asserted against him under Rule 180.1(a)(1) and (3) – which relates to his alleged

involvement in making misrepresentations to ACM's counterparties – is foreclosed by *SEC v.

Rio Tinto plc*, 41 F.4th at 53-54, in which the Second Circuit recently held that misstatements

and omissions alone cannot form the basis for scheme liability. The CFTC disputes the

significance of this landmark decision and seeks to rehabilitate its claim by relying on pre-*Rio

Tinto plc* authorities, Opp. at 45-49, but it is wrong on the law. It is equally wrong in its

contention that the Complaint passes muster under *Rio Tinto plc*; it does not, because the

Complaint fails to allege deceptive conduct separate and apart from Halligan's alleged role in

misrepresentations. *Id.* at 47-48.

**1.    Misstatements Alone Cannot Support a Scheme Liability Claim**

In *Rio Tinto plc*, the Second Circuit squarely held that "a collection of

misrepresentations" cannot form the basis for a scheme liability claim, even if the defendant

participated in the preparation of the false statements. 41 F.4th at 52-53. As reflected in

Halligan's opening brief, in the few months since *Rio Tinto plc* was decided, multiple courts

---

misstated the law" by providing that "the plaintiffs could prevail on their Rule 10b–5 claim if they proved that the defendant "made, *approved, or furnished information* to be included in a false statement'"). 787 F.3d 408, 425 (7th Cir. 2015) (emphasis in original). Simply reviewing and approving a statement that another person makes is not enough under *Janus*.

The CFTC's other cases are not to the contrary. *See* Opp. at 45 n.17. In *SEC v. E-Smart Techs., Inc.*, 74 F. Supp. 3d 306, 319-20 (D.D.C. 2014), a company's CEO did not merely "review" a press release, but edited multiple drafts, coordinated revisions from others, and directed when the release would be issued. In *SEC v. Greenstone Holdings, Inc.*, 10-cv-1302, 2012 WL 1038570, at *8 (S.D.N.Y. Mar. 28, 2012), the defendant did not deny that he was responsible for "*everything*" at company or that he drafted the press releases in question. In *SEC v. Carter*, No. 10-cv-6145, 2011 WL 5980966, at *1 (N.D. Ill. Nov. 28, 2011), a company's President/CEO "made" statement where the press releases at issue identified him as the company's contact person, quoted him, and/or were filed with the SEC as an exhibit to a Form 8-K that he signed.

have applied its holding to dismiss claims – like the CFTC's claims against Halligan here – that

seek to repackage misrepresentations into actionable schemes. Halligan Br. at 35-36 (citing

cases). Inexplicably, the CFTC acknowledges only one of these authorities in its response,[20] and

*every case* it relies upon predates *Rio Tinto plc*.[21]

Even the pre-*Rio Tinto plc* cases that the CFTC cites in its opposition brief

involve allegations that the defendants personally engaged in inherently deceptive conduct

separate from alleged misrepresentations, and that their deceptive conduct was knowingly

intended to further the alleged fraudulent scheme. *See SEC v. Sugarman*, No. 19-cv-5998, 2020

WL 5819848, at *2 (S.D.N.Y. Sept. 30, 2020) (cited in Opp. at 45) (defendant personally

engaged in deceptive conduct to convince board of directors to consummate a transaction

engineered to facilitate broader scheme; defendant also directed his assistant to create a sham

account and conducted a series of fraudulent transactions to disguise the flow of funds); *SEC v.*

*Sason*, 433 F. Supp. 3d 496, 509 (S.D.N.Y. 2020) (cited in Opp. at 48) (defendants used falsified

documents to sell shares through "bogus [SEC] registration exemptions"); *SEC v. Kearns*, 691 F.

---

[20]  The CFTC seeks to distinguish *In re Turquoise Hill Res. Ltd. Sec. Litig.*, No. 20-cv-08585, 2022 WL 4085677, at *55 (S.D.N.Y. Sept. 2, 2022) on the wholly conclusory assertion that – unlike the defendant there – Halligan was supposedly the "maker" of misrepresentations. Opp. at 49 n.19. For one thing, the CFTC has not sufficiently pled that Halligan was a "maker" under *Janus*. More fundamentally, the CFTC cannot circumvent the burden imposed by *Rio Tinto plc* (which addresses the limitations on scheme liability) by arguing that it has overcome the burden imposed by *Janus* (which addresses the limitations on misstatement liability). As the court explained *Turquoise Hill*, where the only fraudulent conduct is the "making of a false statement," the defendant "is either liable as a maker under Rule 10b-5(b) ***or is not liable" at all***. 2022 WL 4085677, at *55 (emphasis added).

[21]  The CFTC makes the equivocal contention that if *Janus* does not apply to CEA enforcement actions, "it calls into question" whether *Rio Tinto* should extend to enforcement actions under the CEA," and its uncertainty betrays the weakness of its position. Opp. at 46 n. 18. First, as discussed above, *Janus **does*** apply in CEA enforcement actions. Second, *Rio Tinto plc* involved a scheme liability claim asserted by the SEC, not by a private plaintiff, so the CFTC's suggestion that the decision should be limited to civil actions brought by private plaintiffs is unsound. Indeed, just as in *Janus*, the decision in *Rio Tinto plc* turned on the interpretation of the operative language of Rule 10b-5 (subsection (b) in *Janus* and subsections (a) and (c) in *Rio Tinto plc*), and the Second Circuit found that there was "*no credible basis* for [the SEC's] argument" – now advanced here by the CFTC – that the rule announced in *Rio Tinto plc* should apply "only in cases brought by private litigants." 41 F.4th at 54 (emphasis added).

Supp. 2d 601, 605–06, 618 (D.N.J. 2010) (cited in Opp. at 48) (defendant CFO ignored employee reports of billing irregularities and concealed from auditors information regarding improper billing practices, lack of internal controls over billing practices, and complaints by customers and employees over billing fraud). None of these cases contemplates what the CFTC seeks here against Halligan – use of a scheme theory to reach a defendant whose *only* conduct consists of participation in alleged misrepresentations.

### 2.    The CFTC's Scheme Liability Claim Rests on Misstatements Alone

The CFTC argues that the Complaint alleges that Halligan engaged in deceptive conduct that went beyond misrepresentations and omissions. Opp. at 47-49. In fact, the Complaint includes no such allegations. The CFTC points to the following instances of Halligan's alleged deceptive conduct: (1) in early 2021, Halligan reported to ACM's executive chairman that "Becker was intentionally vague in response to Swap Counterparties' questions" about ACM's positions (Cpl. ¶ 54); (2) training and instructing Becker to "routinely" deceive counterparties as to ACM's true position sizes (*id.* ¶¶ 57-59); (3) conspiring, with Tomita and Becker, to provide false or misleading liquidation statistics which Becker reported to three counterparties (*id.* ¶¶ 63-64); (4) reviewing and approving talking points, drafted by Becker, which falsely claimed that Becker lacked access to ACM's trade blotter, live portfolio, and up-to-date margin calculations (*id.* ¶ 81); and (5) responding "if they only knew" after Becker recounted a conversation with a counterparty in which he allegedly made a misrepresentation (*id.* ¶ 67). Opp. at 47-48. Because each of these instances is merely a repackaging of alleged misrepresentations, *and does not involve any **deceptive conduct by Halligan** apart from participating in the preparation of alleged misrepresentations* (which he did not make), they fail to make out a viable claim for scheme liability under *Rio Tinto plc*. The Court should not allow the CFTC to make an end run around the Second Circuit's holding that merely "participat[ing] in

the preparation" of misstatements that others "make" is *not* sufficient to state a scheme liability claim. 41 F.4th at 52, 54.[22]

Nor can the CFTC salvage its scheme liability claim by arguing that the misrepresentations advanced some broader "fraudulent scheme." Opp. at 47. In one of several post-*Rio Tinto plc* decisions that Halligan cited and the CFTC ignored, the court in *In re Eastman Kodak Co. Sec. Litig.*, No. 21-cv-6418, 2022 WL 4473629, at *14 (W.D.N.Y. Sept. 27, 2022) (cited in Halligan Br. at 36), applied *Rio Tinto plc* to dismiss a scheme liability claim brought against Kodak and its officers and directors where the plaintiffs – like the CFTC here – had not alleged any deceptive conduct apart from the defendants' alleged role in misrepresentations. Notably, the plaintiffs' scheme liability claim failed despite their allegation that the misrepresentations facilitated a broader scheme to grant stock options to certain defendants in alleged violation of company policies. *See also Geoffrey A. Orley Revocable Tr. U/A/D 1/26/2000 v. Genovese*, No. 18-cv-8460, 2020 WL 611506, at *7 (S.D.N.Y. Feb. 7, 2020) (dismissing scheme liability claim asserted against a lawyer who assisted in the preparation of certain misleading documents that his client used to solicit investments from plaintiffs; rejecting the plaintiffs' argument that the defendant's "participation [in the preparation of the allegedly misleading documents] was one part of a larger scheme to defraud [plaintiffs]" sufficient to support scheme liability). The same result follows here, regardless of whether the CFTC argues

---

[22]  Likewise, while the CFTC repeatedly argues that Becker learned from Halligan how to make misrepresentations to counterparties in 2016 or 2017, Opp. at 9, 34, 39, 48; Cpl. ¶ 57, it never attempts to address the illogic and implausibility of this allegation, explained at length in Halligan's opening brief at 29. Specifically, the CFTC offers no explanation for why Halligan would have "directed" Becker to use a false number years before the alleged scheme to defraud even began, particularly in the absence of any allegation that ACM's Counterparties imposed any meaningful TRS trading constraints in 2018 (*see* Cpl. ¶ 42, alleging constraints later in the "Relevant Period" that began March 2020) or any allegation that Halligan believed that providing the accurate figure (if 35% was inaccurate in 2016/2017, which the CFTC does not actually allege) would have had any impact on anything.

that the purpose of the alleged misrepresentations was to obtain trading capacity and margin terms or to trade in TRSs, ETF Swaps, or Basket Swaps. Opp. at 1, Cpl. ¶ 56.

## IV.
## THE CFTC FAILS TO ALLEGE A SECONDARY VIOLATION

Halligan's opening brief explained in detail why the Complaint fails sufficiently to plead *any* of the elements of Halligan's alleged secondary violations. Halligan Br. at Pt. III. In analyzing the sufficiency of the CFTC's aiding and abetting claim, the Court must evaluate the Complaint's allegations of Halligan's knowledge of a primary violation;[23] unlawful intent to assist with it; and affirmative, or substantial, assistance.[24] *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 181–83 (2d Cir. 2013). The Complaint fails on each score, and nothing in the Opposition remedies its defects.

---

[23]  The CFTC does not contest the hornbook rule that without a primary violation, its secondary claim against Halligan fails. *See* Opp. at 50.

[24]  The CFTC argues that "substantial assistance" is not the applicable requirement, and that its secondary liability claim is instead guided by criminal aiding and abetting standards, Opp. at 50, n.21, but this is only a semantic distinction. In *SEC v. Apuzzo*, the Second Circuit noted "substantial assistance," as applicable to secondary liability claims under the Exchange Act, is equivalent to Judge Learned Hand's formulation of this element of criminal aiding and abetting liability "that [defendant] in some sort associate[d] himself with the venture, that [the defendant] participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed." 689 F.3d 204, 212 (2d Cir. 2012) (citing *U.S. v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

It is unsurprising that the CFTC seeks to eschew the authorities that have applied the "substantial assistance" requirement under the Exchange Act, because those authorities spell out why its aiding and abetting claim fails. As this Court has recognized, "embedded into the substantial assistance element is a proximate cause analysis, which requires a showing that a defendant's participation was the proximate cause of plaintiff's injury." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018) (Oetken, J.). Allegations of a "but for" causal relationship do not suffice. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 63 (2d Cir. 1985). Here, the Complaint alleges that in 2016-2018, as long as four years before the Relevant Period began, Becker observed Halligan make statements to counterparties that *Becker* believed to be untruthful, Cpl. ¶¶ 57-58, without any allegation that *Halligan* believed them to be untruthful. The CFTC provides no credible basis for the inferential leap that Becker's observation of Halligan's 2016-2018 statements proximately caused Becker's own misrepresentations to counterparties during the Relevant Period years later. Opp. at 51-52.

A.      **The CFTC Fails to Adequately Plead**
        **Halligan's Knowledge of a Primary Violation**

As shown above at Pt. III.A, while the Complaint is replete with references to *Becker's* knowledge, inferences, assumptions, and admissions, *e.g.* Cpl. ¶¶ 56, 67-68, the CFTC's aiding and abetting claim requires well-pled allegations of *Halligan's* knowledge. There, the Complaint falls short, and the CFTC's charged-up rhetoric – claiming that Halligan's argument "is badly out of step" with the allegations of the Complaint, Opp. at 50 – cannot make up for its deficient pleading.

First, the CFTC's contention that Halligan "lied to Swap Counterparties on a routine basis [and] trained and directed Becker to do the same," Opp. at 51, is not a fair characterization of the Complaint. In fact, the only alleged communications between Halligan and a counterparty during the "Relevant Period" are transaction confirmations that he allegedly signed and sent to one counterparty (CP 9), and the supposed "training" occurred years before the "Relevant Period" began. Cpl. ¶¶ 57-58, 72. As discussed above and in detail in Halligan's opening brief, the allegations about Halligan's conduct before the "Relevant Period" are illogical, implausible, and inconsistent with the other allegations of the Complaint. *See* Pt. II.C.2; Halligan Br. at 29-30. Moreover, having failed to allege that Halligan knew the position size he provided to counterparties in 2016-17 was incorrect, *see* Cpl. ¶ 57, or that he knew that the 35% figure that he "directed" Becker to provide to counterparties in 2018 was incorrect, *id.* ¶ 58, these allegations are insufficient to support Halligan's knowledge of Becker's later misstatements.

The CFTC's other arguments in support of its aiding and abetting claim are largely recycled versions of the arguments it relied upon in support of the primary claim, and they are just as deficient here. Specifically, the  CFTC asserts that Halligan "was at a minimum willfully blind to the fact that Tomita and Becker routinely misled" counterparties, given his role as CFO and receipt of daily reports, and Halligan's "repeated 'if they only knew' remark." Opp.

at 52 n. 22. First, the Opposition implies that Halligan had a duty to monitor ACM's positions

and portfolio concentration, *id.*, but there is no allegation in the Complaint that Halligan had any

role in, responsibility for, or insight into ACM's trading, which was, as the Complaint concedes,

Tomita's domain as Head Trader, Cpl. ¶ 19. As discussed above at Pt. III.A.1 & 2, mere

allegations of Halligan's title and that he received reports, without any allegation that he had a

duty to review them, are insufficient to establish scienter under a primary or secondary theory of

liability.[25] Likewise, Halligan's "if they only knew" remark is "repeated" only in the CFTC's

opposition brief; it appears just once in the Complaint. *Compare* Opp. at 3, 10, 39, 48, 52, n.22

with Cpl. ¶ 67. As set forth above at Pt. III.A.4 and in Halligan's moving brief at 28, this

allegation solely concerns *Becker's* understanding and state of mind; nothing that Halligan is

purported to have said supports Becker's interpretation, and thus it does not support Halligan's

knowledge for the purpose of the aiding and abetting claim either.

## B.   The CFTC Fails to Adequately Plead
## that Halligan Assisted a Primary Violation

In its opposition brief, the CFTC does not address a single authority that Halligan

cited concerning the Complaint's failure to sufficiently allege that Halligan assisted a primary

violation as necessary to plead its aiding and abetting claim. *See* Halligan Br. at 39-40. Apart

from the same allegations that it relies upon to support Halligan's knowledge of the primary

violation (which were addressed in the preceding discussion), the CFTC appears to argue that

---

[25]  The CFTC argues that scienter has also been sufficiently alleged because Halligan "consciously
avoided" knowledge of Becker's misrepresentations, Opp. at 50; 52 n. 22, but the Complaint alleges no
facts sufficient to invoke the "conscious avoidance" doctrine. *See Fraternity Fund Ltd. v. Beacon Hill
Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (cited in Opp. at 52 n. 22) (scienter based
on conscious avoidance may be pled where defendant "suspected a fact and realized its probability, but
refrained from confirming it in order later to be able to deny knowledge"). As discussed above at Pt.
III.A.1 and in Halligan's moving brief at Pt. II.A, Halligan is not alleged to have had a duty to monitor or
review ACM's position information. Nor does the Complaint allege facts sufficient to support a plausible
inference that Halligan suspected but refrained from confirming that Becker was making
misrepresentations.

Halligan's affirmative assistance is established based on "Becker's prior observation" of Halligan's alleged lies to ACM's counterparties over a number of years prior to the "Relevant Period." Opp. at 52, citing Cpl. ¶¶ 57-58. But Halligan's alleged statements years before the "Relevant Period" – and years before any primary violation was allegedly committed – cannot be a "concrete step[] to further Archegos's fraud," (Opp. at 49), because the CFTC has failed to allege that Halligan knew these statements were false at the time he made them (and Becker observed them). *See* Cpl. ¶¶ 57-58; *see also* Halligan Br. at 29-30. The CFTC does not identify a single case where a court found the assistance element of an aiding and abetting claim could be established based on conduct that the defendant was not alleged to have known was wrongful.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in Halligan's opening brief, the Complaint should be dismissed with prejudice.[26]

Dated:   New York, New York
         February 6, 2023

Respectfully Submitted,

FRIEDMAN KAPLAN SEILER
 ADELMAN & ROBBINS LLP

s/ Mary E. Mulligan
Mary E. Mulligan (mmulligan@fklaw.com)
Timothy M. Haggerty (thaggerty@fklaw.com)
Bonnie M. Baker (bbaker@fklaw.com)
Anil Vassanji (avassanji@fklaw.com)
Rupita Chakraborty (rchakraborty@fklaw.com)
7 Times Square
New York, New York  10036-6516
(212) 833-1100

*Attorneys for Defendant Patrick Halligan*

---

[26] The CFTC does not respond to Halligan's argument that the Complaint should be dismissed with prejudice, given that the CFTC has already had an opportunity to amend based on the defendants' initial motions and further amendment would be futile. Halligan Br. at 40.

3709153.1