UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION

                    Plaintiff,

        v.                                           No. 22-cv-3401-JPO

ARCHEGOS CAPITAL MANAGEMENT,
LP and PATRICK HALLIGAN,

                    Defendants.

**BRIEF OF AMICUS CURIAE
SECURITIES AND EXCHANGE COMMISSION
ON DEFENDANTS' MOTIONS TO DISMISS THE
COMMODITY FUTURES TRADING COMMISSION'S
AMENDED COMPLAINT**

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

DAVID D. LISITZA
Senior Appellate Counsel

EZEKIEL L. HILL
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202-551-7724 (Hill)
hillez@sec.gov

# TABLE OF CONTENTS

STATEMENT OF INTEREST .................................................................... 1

INTRODUCTION ................................................................................1

BACKGROUND .................................................................................3

    A.     Regulation of Swaps................................................................. 3

    B.     The CFTC and SEC Enforcement Actions Against Archegos
           Defendants................................................................. 8

           1.     The CFTC Action....................................................... 8

           2.     The SEC Action .................................................. 10

           3.     Oral Argument ........................................................ 10

ARGUMENT .................................................................................11

I.    A swap based on a custom basket of securities is a security-based swap
    subject to the SEC's exclusive regulatory jurisdiction if at least one
    counterparty has discretionary authority to change its composition or
    weighting during the life of the instrument. .................................................. 11

    A.     The Joint Release establishes the SEC's exclusive regulatory
           jurisdiction over swaps based on a custom basket of securities that
           a counterparty has discretion to tailor. ............................................... 11

    B.     Classifying swaps on discretionary custom baskets of securities
           as security-based swaps protects against securities fraud,
            manipulation, and abuse in the underlying securities. ...................... 13

    C.     Whether the custom basket swaps at issue here provide discretion
           depends on the facts and circumstances............................................. 14

II.     A swap based on the shares of an ETF is a security-based swap subject
        to the SEC's exclusive regulatory jurisdiction. ........................................... 15

        A.     A swap based on an ETF's shares is a swap on a single security
               and thus a security-based swap............................................................15

        B.     Classifying swaps on ETFs as security-based swaps minimizes the
               likelihood of fraud, manipulation, and abuse concerning ETF
               shares. ..................................................................................................17

        C.     There is no merit to the counterarguments that a swap on shares of
               an ETF is not a security-based swap, or constitutes a mixed
               swap. .....................................................................................................19

        D.     This brief confirms that the SEC itself views a swap based on an
               ETF's shares as a security-based swap as a matter of law. .................. 22

        CONCLUSION .........................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Bruh v. Bessemer Venture Partners III L.P.*,
    464 F.3d 202 (2d Cir. 2006) ................................................................................24

*Coeur Alaska, Inc. v. Se. Alaska Conserv. Council*,
    557 U.S. 261 (2009) .............................................................................................11

*Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*,
    298 F.3d 136 (2d Cir. 2002) ...............................................................................24

*Heckler v. Chaney*,
    470 U.S. 821 (1985).............................................................................................10

*In re ProShares Tr. Sec. Litig.*,
    728 F.3d 96 (2d Cir. 2013) .................................................................................20

*Nat'l Treasury Emps. Union v. MSPB*,
    743 F.2d 895 (D.C. Cir. 1984) ...........................................................................11

*N.Y. City Emps.' Ret. Sys. v. SEC*,
    45 F.3d 7 (2d Cir. 1995) .....................................................................................23

*SEC v. Capital Gains Rsch. Bureau, Inc.*,
    375 U.S. 180 (1963) ...........................................................................................19

*SEC v. Citigroup Glob. Mkts., Inc.*,
    752 F.3d 285 (2d Cir. 2014) ...............................................................................10

*SEC v. Hwang*,
    No. 22-cv-3402-JPO (S.D.N.Y.) ........................................................................10

*SEC v. Jorgenson*,
    No. 13-cv-2275-JLR (W.D. Wash.) ....................................................................18

*United States v. Hwang*,
    No. 22-cr-240-AKH (S.D.N.Y.) .........................................................................11

**Statutes and Rules**

Commodity Exchange Act, 7 U.S.C. 1, *et seq.*

    Section 1a(42), 7 U.S.C. 1a(42) ...........................................................................7

    Section 1a(47), 7 U.S.C. 1a(47) ......................................................................7, 8

    Section 2(a)(1)(H), 7 U.S.C. 2(a)(1)(H) ...............................................................7

Securities Act of 1933, 15 U.S.C. 77a, *et seq.*

    Section 2(a)(1), 15 U.S.C. 77b(a)(1) ...................................................................7

    Section 2(a)(17), 15 U.S.C. 77b(a)(17) ...............................................................7

    Section 20(b), 15 U.S.C. 77t(b) .......................................................................... 10

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

    Section 2, 15 U.S.C. 78b ..................................................................................... 17

    Section 3(a)(10), 15 U.S.C. 78c(a)(10) .........................................................7, 18

    Section 3(a)(55), 15 U.S.C. 78c(a)(55)..................................................................7

    Section 3(a)(68)(A), 15 U.S.C. 78c(a)(68)(A) .............................................*passim*

    Section 3(a)(68)(D), 15 U.S.C. 78c(a)(68)(D) ................................................8, 21

    Section 3(a)(68)(E), 15 U.S.C. 78c(a)(68)(E) ...............................................20, 21

    Section 3(a)(69), 15 U.S.C. 78c(a)(69)..................................................................7

    Section 9, 15 U.S.C. 78i .......................................................................................18

    Section 21(d), 15 U.S.C. 78u(d) ..........................................................................10

Investment Company Act of 1940, 15 U.S.C. 80a-1, *et seq.*

Section 2(a)(22), 15 U.S.C. 80a-2(a)(22) ..........................................................17

Section 3(a)(1), 15 U.S.C. 80a-3(a)(1) ........................................................16, 17

Rule 6c-11(a)(1), 17 C.F.R. 270.6c-11(a)(1) ...................................................17

15 U.S.C. 8302 ....................................................................................6, 8, 11

15 U.S.C. 8321 ..............................................................................................8

15 U.S.C. 8341 ..............................................................................................8

Commodity Futures Modernization Act of 2000,
Pub. L. 106-554, 114 Stat. 2763 (2000) .............................................4

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. 111-203, 124 Stat. 1376 (2010) .............................................1

Futures Trading Act of 1982,
Pub. L. 97-444, 96 Stat. 2294 (1982) .................................................4

Securities Act Amendments of 1982,
Pub. L. 97-303, 96 Stat. 1409 (1982) .................................................4

**Administrative Materials**

69 Fed. Reg. 64614 (Nov. 5, 2004).........................................................20

77 Fed. Reg. 48208 (Aug. 13, 2012)................................................*passim*

84 Fed. Reg. 57162 (Oct, 24, 2019)................................................*passim*

85 Fed. Reg. 19984 (Apr. 9, 2020) .........................................................18

85 Fed. Reg. 77297 (Dec. 1, 2020) ..................................................20, 23

88 Fed. Reg. 13872 (Mar. 6, 2023).........................................................19

SEC Release No. 10801, 2020 WL 3961977 (July 13, 2020) ................................23

SEC Release No. 96572, 2022 WL 18107643 (Dec. 22, 2022) ............................ 18

**Other Authorities**

156 Cong. Rec. S5920 (daily ed. July 15, 2010) ..................................................... 6

156 Cong. Rec. H5256 (daily ed. June 30, 2010) ................................................... 6

*A Joint Report of the SEC and the CFTC on Harmonization of Regulation*
    (Oct. 16, 2009) .................................................................................................3-4

*CFTC and SEC: Issues Related to the Shad-Johnson Jurisdictional Accord*,
    GAO Report No. 00-89 (Apr. 6, 2000).......................................................... 4, 5

*Over-the-Counter Derivatives: Modernizing Oversight to Increase
    Transparency and Reduce Risks*, S. Hrg. 111-248 (2009) ............................... 13

Report of the Senate Committee on Banking, Housing, and Urban Affairs,
    *The Restoring American Financial Stability Act of 2010*,
    S. Rep. No. 111-176 (2010).............................................................................. 5

SEC Division of Trading and Markets, *Frequently Asked Questions Regarding
    Security-Based Swaps* (July 11, 2022)............................................................ 23

## STATEMENT OF INTEREST

The Securities and Exchange Commission ("SEC"), the agency responsible for administering and enforcing the federal securities laws by regulating securities as well as securities markets and their participants, submits this brief as amicus curiae to address important issues regarding its regulatory authority.  Under the framework for over-the-counter derivative instruments established by Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), the Commodity Futures Trading Commission ("CFTC") regulates "swaps," the SEC regulates "security-based swaps," and the two agencies jointly regulate "mixed swaps" (collectively, "Title VII instruments").  The SEC therefore has a substantial interest in the proper classification of the Title VII instruments at issue in this CFTC enforcement action ("CFTC Action").

## INTRODUCTION

The CFTC alleges regulatory jurisdiction here based on the trading of Title VII instruments.  In moving to dismiss the CFTC's claims, the defendants argue that the CFTC lacks jurisdiction because the instruments at issue are subject to SEC, not CFTC, regulation.  Whether Title VII instruments are subject to CFTC regulation, SEC regulation, or both depends on whether they are classified as

"swaps," "security-based swaps," or "mixed swaps."  This brief addresses the classification of the Title VII instruments at issue in the CFTC Action.

The framework established by the Dodd-Frank Act provides for regulation of swaps exclusively by the CFTC, regulation of security-based swaps exclusively by the SEC, and regulation of mixed swaps by the CFTC and SEC jointly. Security-based swaps include, among other things, swaps based on "a single security or loan, including any interest therein or on the value thereof."  15 U.S.C. 78c(a)(68)(A).  The Dodd-Frank Act assigns regulatory authority over security-based swaps to the SEC because they can be used to commit securities fraud or manipulate the prices of the underlying securities, and because of the historical SEC/CFTC jurisdictional division.

The first category of Title VII instrument at issue in the CFTC Action is a swap based on a basket of hundreds of securities.  As the CFTC and the SEC jointly established, if "one or both" of the parties to such an instrument has "discretionary authority to change the composition or weighting" of the underlying securities in the basket, the swap is a security-based swap subject to SEC, and not CFTC, regulation.  77 Fed. Reg. 48208, 48285-86 (Aug. 13, 2012) ("*Further Definition of 'Swap,' 'Security-Based Swap,' and 'Security-Based Swap Agreement'; Mixed Swaps; Security-Based Swap Agreement Recordkeeping*") ("Joint Release").  In contrast, such a change is non-discretionary if made

according to "predetermined criteria" or "predetermined self-executing formulas." *Id.* Whether the composition and weighting of the securities in the custom baskets on which swaps at issue in the CFTC Action are based is discretionary or predetermined hinges on those swaps' contractual terms and is thus a fact-based inquiry.

The second category of Title VII instrument at issue in the CFTC Action is a swap based on the shares of an exchange-traded fund ("ETF"). ETF shares are single securities traded on national securities exchanges. An ETF share represents an interest in the ETF, not an interest in the securities or the index of securities that the ETF is intended to track. Accordingly, a swap based on an ETF's shares—including the swaps on ETF shares at issue in the CFTC Action—is based on a single security, and is thus a security-based swap subject to SEC regulation, and not CFTC regulation, as a matter of law. Moreover, a swap based on the shares of an ETF is not a mixed swap—for example, a swap based on a security as well as on a commodity—because it is based solely on a security: the shares of an ETF.

## BACKGROUND

### A. Regulation of Swaps

"Since the 1930s, securities and futures have been subject to separate regulatory regimes." *A Joint Report of the SEC and the CFTC on Harmonization of Regulation*, at 1 (Oct. 16, 2009), *available at* https://www.sec.gov/

news/press/2009/cftcjointreport101609.pdf.  "When Congress originally

established the CFTC in 1974, its jurisdiction and the SEC's jurisdiction could be

delineated with relative clarity to refer to distinct markets . . . .  [But t]he

emergence of financial instruments such as swaps, stock-index futures, and other

derivative instruments, some of which were traded off-exchange, began to

introduce challenges to defining precisely which regime should oversee the new

products."  *Id.* at 15.[1]  Those challenges led SEC Chair John Shad and CFTC Chair

Philip Johnson to reach an agreement (the Shad-Johnson Jurisdictional Accord),

which, as codified by Congress in 1982, provided the CFTC with jurisdiction over

futures on broad-based stock indices, provided the SEC with jurisdiction over

options on securities (including stock indices), and prohibited futures on individual

securities and narrow-based security indices.  Futures Trading Act of 1982, Pub. L.

97-444, 96 Stat. 2294 (1982); Securities Act Amendments of 1982, Pub. L. 97-303,

96 Stat. 1409 (1982); *see also CFTC and SEC: Issues Related to the Shad-Johnson

Jurisdictional Accord*, GAO Report No. 00-89, at 5-6 (Apr. 6, 2000) ("GAO

Report"), *available at* https://www.gao.gov/assets/ggd-00-89.pdf.

The Commodity Futures Modernization Act of 2000, Pub. L. 106-554, 114

Stat. 2763 (2000) ("CFMA"), then permitted futures on individual securities and

---

[1]  Over-the-counter derivative instruments are privately negotiated between
counterparties and are not cleared through regulated central clearinghouses or
traded on exchanges.

narrow-based security indices and provided the CFTC and the SEC with joint jurisdiction by classifying them as both securities and futures.  The CFMA also addressed swaps, derivatives in which two counterparties contractually agree to exchange or "swap" the cash flows or liabilities from different financial instruments.  *See* GAO Report at 2 n. 6.  Specifically, the CFMA prohibited the CFTC and the SEC from regulating the over-the-counter swaps markets, though it provided the SEC with antifraud authority over swaps that are based on the price, yield, value, or volatility of a security, multiple securities, or a security index.

Thereafter, Congress passed Title VII of the Dodd-Frank Act in response to over-the-counter derivatives being cited as a significant contributor to the 2008 financial crisis.  *See, e.g.*, Report of the Senate Committee on Banking, Housing, and Urban Affairs, *The Restoring American Financial Stability Act of 2010*, S. Rep. No. 111-176 at 29 (2010).  Congress enacted Title VII "to reduce risk, increase transparency, and promote market integrity within the financial system"

by "establish[ing] a comprehensive new regulatory framework for swaps and security-based swaps."  Joint Release at 48209.[2]

Under Title VII's statutory jurisdictional divide, which governs today, the CFTC regulates "swaps" and the SEC regulates "security-based swaps."  15 U.S.C. 8302; *see also* Joint Release at 48210.  This was "designed to maintain the existing Shad Johnson jurisdictional lines between the CFTC and the SEC," providing that the CFTC has jurisdiction over commodity-based instruments as well as futures on broad-based security indices and now swaps, while the SEC has jurisdiction over security-based instruments—both single name and narrow-based security indices—and now security-based swaps.  156 Cong. Rec. S5920 (daily ed. July 15, 2010) (statement of Sen. Lincoln); *see also* 156 Cong. Rec. H5256 (daily ed. June 30, 2010) ("[n]othing in . . . any . . . provision of Title VII . . . alters the existing jurisdictional divide between the CFTC and SEC established by the Johnson-Shad Accord") (statement of Rep. Peterson).  Title VII also established joint CFTC and SEC regulatory authority over "mixed swaps."  15 U.S.C. 8302(a)(8).

---

[2]  Title VII's framework includes "(i) [p]roviding for the registration and comprehensive regulation of swap dealers, security-based swap dealers, major swap participants, and major security-based swap participants; (ii) imposing clearing and trade execution requirements on swaps and security-based swaps, subject to certain exceptions; (iii) creating rigorous recordkeeping and real-time reporting regimes; and (iv) enhancing the rulemaking and enforcement authorities of the [CFTC and the SEC] with respect to, among others, all registered entities and intermediaries subject to the [CFTC's and the SEC's] oversight."  Joint Release at 48209.

Title VII defines "swap" to include a wide variety of agreements, contracts, and transactions but excludes security-based swaps. *See* 7 U.S.C. 1a(47); *see also* 15 U.S.C. 77b(a)(17); 15 U.S.C. 78c(a)(69).  Title VII defines "security-based swap" as a swap that "is based on . . . (I) an index that is a narrow-based security index, including any interest therein or on the value thereof; (II) a single security or loan, including any interest therein or on the value thereof; or (III) the occurrence, nonoccurrence, or extent of the occurrence of an event relating to a single issuer of a security or the issuers of securities in a narrow-based security index, provided that such event directly affects the financial statements, financial condition, or financial obligations of the issuer." 15 U.S.C. 78c(a)(68)(A); *see also* 7 U.S.C. 1a(42); 15 U.S.C. 77b(a)(17).[3]  Title VII also amended the definition of "security" in both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Securities Exchange Act") to include security-based swaps.  15 U.S.C. 77b(a)(1); 15 U.S.C. 78c(a)(10).[4]  And Title VII defines "mixed swap" as a

---

[3] An index of securities is "narrow-based" if it has nine or fewer component securities or meets certain weighting requirements.  15 U.S.C. 78c(a)(55)(B), (C).

[4] Title VII does not apply to securities other than security-based swaps, ensuring that its broad definition of swap does not render any securities subject to CFTC regulation.  7 U.S.C. 2(a)(1)(H) ("Notwithstanding any other provision of law, [Title VII] shall not apply to, and the Commodity Futures Trading Commission shall have no jurisdiction under such Act (or any amendments to this chapter made by such Act) with respect to, any security other than a security-based swap.").

security-based swap that is "also . . . based on the value" of certain specified
financial instruments.  7 U.S.C. 1a(47)(D); 15 U.S.C. 78c(a)(68)(D).

The CFTC and SEC issued the Joint Release in response to the Dodd-Frank
Act's directive that the two agencies jointly "further define" certain terms,
including "swap" and "security-based swap."  15 U.S.C. 8302(d)(1); *see also* 15
U.S.C. 8321, 8341.  The CFTC and SEC concluded "that extensive further
definition of the terms by rule [was] not necessary" because "[t]he statutory
definitions of the terms 'swap' and 'security-based swap' are detailed and
comprehensive."  Joint Release at 48211.  But the Joint Release did "further
defin[e] the terms 'swap' and 'security-based swap' to clarify whether particular
agreements, contracts, or transactions are swaps or security-based swaps based on
[their] characteristics," and "provid[e] interpretations related to the definitions."
*Id.* at 48211-12, 48262.

B.    **The CFTC and SEC Enforcement Actions Against Archegos
      Defendants**

1.    **The CFTC Action**

This CFTC civil enforcement action alleges that Archegos Capital
Management, LP ("Archegos") and Patrick Halligan committed commodities fraud
in violation of the Commodity Exchange Act.  *See* ECF No. 33 (CFTC's amended
complaint).  Archegos pursued a trading strategy that used Title VII instruments to
pursue both long positions and short positions (to hedge against the long positions'

risk).  *Id.* ¶ 3.  The CFTC does not claim regulatory jurisdiction over Archegos's long swaps, which referenced single securities and are undisputedly security-based swaps.  *Id.* ¶¶ 3, 13, 26.  Rather, the CFTC claims regulatory jurisdiction over Archegos's short swaps, which referenced either (1) custom baskets of securities or (2) the shares of an ETF.  *Id.* ¶¶ 3, 13, 26-28.  For each swap referencing a custom basket of securities, the custom basket included hundreds of securities that largely tracked a broad-based stock index but was customized, such as by removing certain individual securities in which Archegos held long positions.  *Id.* ¶ 28.[5]  And for each swap referencing the shares of an ETF, the ETF was intended to track a broad-based stock index.  *Id.* ¶ 27.[6]

The CFTC alleges that it has regulatory jurisdiction over the ETF swaps and the custom basket swaps under Title VII.  *Id*. ¶ 13.  In moving to dismiss the CFTC's claims, the defendants argue that the CFTC lacks regulatory jurisdiction because the ETF swaps and the custom basket swaps are subject to SEC, not CFTC, regulation.  *See* ECF No. 43 at 11-17; ECF No. 47 at 10-17; ECF No. 69 at 7-13; ECF No. 70 at 6-9.

---

[5]  These baskets contained hundreds of securities at execution, and continued to contain hundreds of securities even after individual securities were subtracted.

[6]  A broad-based stock index is a stock index that based on its number of securities and weighting is not narrow-based.  *See supra* at 7 n. 3.

### 2.    The SEC Action

The SEC brought a civil enforcement action ("SEC Action") alleging that Archegos, Halligan, Sung Kook (Bill) Hwang, and other persons committed securities fraud and manipulation in violation of the Securities Act and the Securities Exchange Act.  *See SEC v. Hwang*, No. 22-cv-3402-JPO (S.D.N.Y.), ECF No. 47 (SEC's amended complaint).  In the SEC Action, the SEC alleges that it has regulatory jurisdiction over these defendants' violations related to equity securities issued by individual public reporting companies, as well as long swaps that referenced single securities (which are undisputedly security-based swaps).  *See* 15 U.S.C. 77t(b), 78u(d).  The pending motions to dismiss the SEC Action do not challenge the SEC's regulatory jurisdiction.  *See* SEC Action ECF No. 55, 58, 61.  Moreover, because the SEC's regulatory jurisdiction in the SEC Action is based on those securities, the classification of the ETF swaps and the custom basket swaps at issue in the CFTC Action does not affect the SEC's regulatory jurisdiction in the SEC Action.[7]

### 3.    Oral Argument

This Court granted Halligan's request for simultaneous oral argument on the motions to dismiss in both the CFTC Action and the SEC Action and set the

---

[7]  *See SEC v. Citigroup Glob. Mkts., Inc.*, 752 F.3d 285, 297 (2d Cir. 2014) ("The exclusive right to choose which charges to levy against a defendant rests with the SEC.") (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

argument for Thursday, May 4, 2023.  ECF Nos. 67, 68.  This amicus brief is

intended to help the Court address "questions regarding the CFTC's jurisdiction."

ECF No. 67 (Halligan's request).[8]

## ARGUMENT

I.   **A swap based on a custom basket of securities is a security-based swap subject to the SEC's exclusive regulatory jurisdiction if at least one counterparty has discretionary authority to change its composition or weighting during the life of the instrument.**

A.   **The Joint Release establishes the SEC's exclusive regulatory jurisdiction over swaps based on a custom basket of securities that a counterparty has discretion to tailor.**

In addressing swaps based on an underlying basket of custom securities, the

CFTC's and SEC's Joint Release identifies the circumstances "in which changes to

the composition of a security index (including a portfolio of securities) underlying

a Title VII instrument would affect the characterization of such Title VII

instrument."  Joint Release at 48285.[9]  A swap on a custom basket of securities

---

[8]  The Department of Justice brought a parallel criminal enforcement action against Halligan and Hwang, alleging securities fraud, market manipulation, wire fraud, and racketeering conspiracy.  *See United States v. Hwang*, No. 22-cr-240 (S.D.N.Y.) (Hellerstein, J.), ECF Nos. 1, 1-1.  Halligan and Hwang unsuccessfully moved to dismiss their indictments on grounds unrelated to the classification of Title VII instruments.  *See id.* at ECF No. 66.

[9]  The deference that courts afford regulations that agencies jointly promulgated is especially appropriate where Congress mandated the joint rulemaking.  *See Coeur Alaska, Inc. v. Se. Alaska Conserv. Council*, 557 U.S. 261, 277 (2009); *Nat'l Treasury Emps. Union v. MSPB*, 743 F.2d 895, 916-17 (D.C. Cir. 1984); *see also* 15 U.S.C. 8302(d)(1).

constituting a broad-based security index is generally subject to the CFTC's exclusive regulatory jurisdiction. *See supra* at 7. If, however, one or both of the counterparties has "discretion to change" the composition and/or weighting of the custom basket, the custom basket is treated as a narrow-based security index and the swap is a security-based swap subject to the SEC's exclusive regulatory jurisdiction. Joint Release at 48285-86. Specifically, if "the Title VII instrument . . . give[s] one or both of the counterparties, either directly or indirectly (*e.g.*, through an investment adviser or through the third-party index provider) discretionary authority" "to change the composition or weighting of securities in a security portfolio," "including, for example, by adding or removing securities in the security portfolio on an 'at-will' basis during the term of the Title VII instrument," "that security portfolio will be treated as a narrow-based security index, and therefore a Title VII instrument on that security portfolio is a security-based swap." *Id.* at 48285.

The Joint Release further defines a "discretionary" modification to such a custom basket of securities by contrasting it with a change made pursuant to "predetermined" criteria or formulas. *Id.* at 48285-86. "Predetermined criteria" change the composition or weighting of the custom basket's securities as the result of the occurrence of "certain events specified in the Title VII instrument." *Id.* at 48285. A "predetermined self-executing formula" may be used to change "the

composition or weighting" of the custom basket's securities.  *Id.*  "In either of these situations," the custom basket is treated as broad-based because its composition can be changed only "without the Title VII instrument counterparties" having "any direct or indirect discretionary authority."  *Id.* at 48285-86.

### B. Classifying swaps on discretionary custom baskets of securities as security-based swaps protects against securities fraud, manipulation, and abuse in the underlying securities.

"Because market participants can readily use securities-related OTC derivatives to serve as synthetic substitutes for securities, the markets for these OTC derivatives directly and powerfully implicate the policy objectives for capital markets that Congress has set forth in the Federal securities laws," including "investor protection, the maintenance of fair and orderly markets, and the facilitation of capital formation."  *Over-the-Counter Derivatives: Modernizing Oversight to Increase Transparency and Reduce Risks*, S. Hrg. 111-248, at 47 (2009) (statement of SEC Chair Mary Schapiro).  Accordingly, it is crucial to treat a discretionary custom basket of securities as a narrow-based security index for purposes of classifying a Title VII instrument based thereupon to minimize the likelihood that such a swap could be used as a surrogate or substitute for the underlying securities to circumvent application of the federal securities laws,

including to engage in fraud, manipulate the market for such securities, and misuse material non-public information.  *See* Joint Release at 48344.

Where the underlying reference of a Title VII instrument is a broad base of securities, those individual securities are generally less susceptible to manipulation via the Title VII instrument and the CFTC properly exercises regulatory jurisdiction over that derivative.  But where one counterparty has discretion to add or remove particular securities from the custom basket, the Title VII instrument can more readily be used to manipulate the market for those individual securities, thus implicating the concerns warranting the SEC's regulatory jurisdiction over that derivative.  Where such discretion is present, the Title VII instrument is best understood not as a swap on a basket of securities in which the underlying securities are a broad-based *whole*, but as an "aggregate[ion]" of swaps on *individual* securities—the narrowest basis for a swap on securities—and thus properly subject to the SEC's regulatory jurisdiction.  *Id.* at 48285 nn. 880, 886.

### C.   Whether the custom basket swaps at issue here provide discretion depends on the facts and circumstances.

The contractual terms that establish whether a custom basket's composition and weighting is discretionary instead of predetermined "must be set forth in the Title VII instrument at execution" and "must not be subject to change or modification through the life of the Title VII instrument."  Joint Release at 48286. Accordingly, the "determination of whether a Title VII instrument is either a swap

14

or a security-based swap should be made based on the facts and circumstances relating to the Title VII instrument prior to execution, but no later than when the parties offer to enter into the Title VII instrument." *Id.* at 48262 & n. 625.

Because the determination here is based on a fact-intensive examination of the terms of each Title VII instrument, the SEC takes no position in this amicus brief whether any particular instrument in the CFTC Action that referenced a custom basket of securities is a swap or a security-based swap. However, if any particular custom basket swaps at issue here do provide discretion, the Court should find that, as set forth in the Joint Release, those particular swaps are security-based swaps subject to the SEC's exclusive regulatory jurisdiction.

## II.   A swap based on the shares of an ETF is a security-based swap subject to the SEC's exclusive regulatory jurisdiction.

### A.   A swap based on an ETF's shares is a swap on a single security and thus a security-based swap.

A swap that is based on the shares of an ETF is a swap on a single security and thus a security-based swap subject to the SEC's exclusive regulatory jurisdiction, irrespective of whether the ETF is intended to track the performance of a broad-based securities index. That is because under the Dodd-Frank Act, a swap that "is based on . . . a *single security* or loan, including any interest therein or on the value thereof" is a "security-based swap." 15 U.S.C. 78c(a)(68)(A)

(emphasis added); *see also* Joint Release at 48264 (a swap based on a "single security" is a "security-based swap").

A share of an ETF is a single security. ETFs are exchange-traded investment companies registered with the SEC under the Investment Company Act of 1940 ("Investment Company Act"). Like other investment companies, such as mutual funds, ETFs pool assets from multiple investors and invest them primarily in securities, including equity securities or assets intended to track the performance of a securities index. *See* 15 U.S.C. 80a-3(a)(1); 84 Fed. Reg. 57162, 57164 & n. 16 (Oct. 24, 2019) ("ETF Release").[10] Other types of exchange-traded products are pooled investment vehicles with shares that trade on a securities exchange, but they are not investment companies required to register under the Investment Company Act because they invest primarily in non-securities such as physical commodities. ETF Release at 57164 n. 16. All exchange-traded products, including ETFs, register offerings of their shares under the Securities Act and list their shares for trading on a national securities exchange under the Securities Exchange Act. *Id.* at 57165 n. 30.

Just like other stocks, shares of an ETF can be bought and sold in the secondary market on a national securities exchange at market-determined prices.

---

[10]  For example, the swaps at issue here were based on the shares of ETFs that are intended to track the performance of broad-based securities indices such as the S&P 500 Index or the MSCI Emerging Markets Index. ECF No. 33 ¶ 27.

*Id.* at 57164.[11]  An ETF is registered as an investment company under the Investment Company Act because it is an "issuer" of a "security," namely, ETF shares.  15 U.S.C. 80a-2(a)(22); 15 U.S.C. 80a-3(a)(1).  And an ETF share is a share in the ETF itself, not a share in the ETF's underlying assets.  *See, e.g.*, 17 C.F.R. 270.6c-11(a)(1) ("*Exchange-traded fund share* means a share of stock issued by an exchange-traded fund.").

### B. Classifying swaps on ETFs as security-based swaps minimizes the likelihood of fraud, manipulation, and abuse concerning ETF shares.

It is important to treat a share of an ETF as a "single security" for purposes of classifying swaps based on ETFs to help protect ETF shares from fraud and manipulation, as well as to prevent ETF-related abuses by securities industry participants.  ETF shares trade on national securities exchanges, and Congress found that the Securities Exchange Act imposes "requirements necessary" to make prices of securities on exchanges less "susceptible to manipulation," 15 U.S.C. 78b.  Specifically, application of the federal securities laws helps safeguard against

---

[11]  Unlike a mutual fund, retail investors do not purchase or redeem a share in the ETF directly from the ETF; they buy or sell individual ETF shares in the secondary market.  But certain large market participants are "authorized participants" who purchase and redeem ETF shares directly from the issuer in large blocks called "creation units."  When the secondary market price of the ETF begins to deviate from the value of the ETF's underlying assets, these authorized participants can engage in arbitrage by purchasing or redeeming creation units.  *See* ETF Release at 57164-65.

a person's use of swaps based on an ETF's shares to "manipulate the market" for the ETF's shares.  Joint Release at 48344.  The SEC ensures, for example, that there are protections in place on ETFs to "help prevent manipulation of the price" of ETF shares, 85 Fed. Reg. 19984, 19992 (Apr. 9, 2020), and brings enforcement actions for insider trading in ETF shares, *see, e.g.*, *SEC v. Jorgenson*, No. 13-cv-2275-JLR (W.D. Wash.), ECF No. 1 (alleging that defendants bought options on shares of a technology-focused ETF to profit from material nonpublic information about one particular technology company's stock).

Indeed, market participants have a settled expectation that ETF swaps are security-based swaps,[12] putting them within the reach of the anti-fraud and anti-manipulation provisions of the federal securities laws, including the Dodd-Frank Act's expansion of Securities Exchange Act provisions to encompass security-based swaps.  15 U.S.C. 78i; *see also* ETF Release at 57168 n. 64.  Existing federal securities laws also address "special concerns" and opportunities for "abuses" that ETFs present in the securities industry—including for investment companies, investment advisers, securities brokers, and securities dealers—involving potential conflicts of interest, unethical behavior, and misuse of material non-public

---

[12]   *See, e.g.*, SEC Release No. 96572, 2022 WL 18107643, at *2 (Dec. 22, 2022) ("[t]he Exchange believes" that "an Exchange-Traded Fund Share is a 'security'" as that term is defined in reference to Securities Exchange Act Section 3(a)(10), 15 U.S.C. 78c(a)(10)).

information.  *See* ETF Release at 57168-69 & n. 64 (collecting provisions); *SEC v. Capital Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 186-87 (1963) (Congress enacted the securities laws to ensure that "the highest ethical standards prevail in every facet of the securities industry.").  But if swaps on ETFs' shares were classified as swaps subject to the CFTC's sole regulatory jurisdiction, these important protections on the multi-trillion dollar ETF market would be unavailable.[13]

### C. There is no merit to the counterarguments that a swap on shares of an ETF is not a security-based swap, or constitutes a mixed swap.

A swap based on a single security is a security-based swap and, contrary to the CFTC's position in this case, there is no exception for a swap based on a single security "which *in turn* is based upon a broad-based security index."  ECF No. 62 at 21 (CFTC's opposition to motions to dismiss) (emphasis added).  As Title VII and the Joint Release indicate, a swap on a single security is unequivocally a security-based swap.  It is generally not appropriate to look through the shares of an ETF that seeks to track a broad-based index of securities to assess whether there is a "material economic difference" between a swap on that ETF's shares, versus a

---

[13]  By the end of 2021, the ETF market in the U.S. included 2,690 funds with combined assets of $7.2 trillion.  88 Fed. Reg. 13872, 13923 (Mar. 6, 2023).

swap on the underlying index.  *Id.* at 20.[14]  For example, the shares of an

exchange-traded product whose holdings consist of a physical commodity, such as

gold, are still securities.  *See, e.g.,* 69 Fed. Reg. 64614, 64619 (Nov. 5, 2004).

Furthermore, ETF shares trade at the market-determined share price, not at the

value of the ETF's underlying assets, and not at the price of the securities or index

of securities that the ETF is intended to track.  *See* ETF Release at 57165; *supra* at

17 n. 11; *see, e.g.*, *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102-08 (2d Cir.

2013).[15]

For this same reason, a swap based on an ETF's shares is a swap based on a

"single security," 15 U.S.C. 78c(a)(68)(A), not a swap on a broad-based "index,"

78c(a)(68)(E).  *See* ECF No. 62 at 21.  "The term 'index' means an index or group

---

[14]  *See* 85 Fed. Reg. 77297, 77298, 77301 (Dec. 1, 2020) ("*Order Granting Conditional Exemptive Relief, Pursuant to Section 36 of the Securities Exchange Act of 1934 With Respect to Futures Contracts on the SPIKES Index*") (concluding that an ETF tracking a broad-based index is "a single security" and that "[a]lthough the stated investment objective of the [ETF] is to provide investment returns that, before expenses, correspond generally to the price and yield performance of the S&P 500 Index, we generally do not believe it appropriate to 'look through' to an issuer's holdings."), *petition for review on different grounds filed, Cboe Futures Exchange, LLC v. SEC*, No. 21-1038 (D.C. Cir.).

[15]  For example, if an ETF's shares are "trading at a premium" relative to its reference assets that are intended to track the performance of a particular securities index, a person may sell ETF shares short and buy those assets, wait for the trading prices to move toward parity, and then close out both positions to realize a profit. *See* ETF Release at 57165.  Similarly, if an ETF's shares are "trading at a discount" to those reference assets, a person could profit by buying ETF shares and selling those assets short.  *Id.*

of securities, including any interest therein or based on the value thereof."  15

U.S.C. 78c(a)(68)(E).  Again, the purchaser of an ETF share does not obtain an

"interest" in an "index or group of securities" (*id.*), but rather obtains an interest in

the ETF.  And an ETF's share price is determined by the secondary market price,

not the value of an index or group of securities.

Finally, there is no merit to the alternative argument that even if the ETF

swaps are based on single securities, they are mixed swaps subject to joint SEC

and CFTC regulatory jurisdiction.  ECF No. 62 at 21-22.  A "mixed swap" is a

"security-based swap" that "also" is based on:

> the value of 1 or more interest or other rates, currencies, commodities,
> instruments of indebtedness, indices, quantitative measures, other
> financial or economic interest or property of any kind (other than a
> single security or a narrow-based security index), or the occurrence,
> non-occurrence, or the extent of the occurrence of an event or
> contingency associated with a potential financial, economic, or
> commercial consequence (other than an event described in
> subparagraph (A)(ii)(III) [of Section 3(a)(68) of the Exchange Act])."

15 U.S.C. 78c(a)(68)(D).  A mixed swap, therefore, is both a security-based swap

and a swap.  Joint Release at 48291.  For example, "a Title VII instrument in which

the underlying references are the value of an oil corporation stock and the price of

oil would be a mixed swap."  *Id.*  By contrast, the swaps on the ETF shares at issue

in the CFTC Action are based on a single instrument—the ETF shares—and,

therefore are security-based swaps.  Although intended to track the performance of

specified broad-based indices, *supra* at 16 n. 10, these security-based swaps are not

based on the value of those indices or any other instruments or indices or events or contingencies that would bring them within the definition of mixed swap. Accordingly, these security-based swaps are subject to the exclusive jurisdiction of the SEC.

Moreover, as the CFTC and the SEC have explained, "the scope of mixed swaps is, and is intended to be, narrow" because "the category of mixed swap was designed so that there would be no gaps in the regulation of swaps and security-based swaps." Joint Release at 48291. Because the ETF swaps are security-based swaps and thus subject to SEC regulation, there is no regulatory gap that necessitates classifying them as mixed swaps.

### D. This brief confirms that the SEC itself views a swap based on an ETF's shares as a security-based swap as a matter of law.

This brief reconfirms the SEC's previously expressed view that a swap based on the shares of an ETF is a security-based swap. The plain language of the Dodd-Frank Act establishes that because shares of an ETF are a "single security," a swap based on an ETF's shares (even one that is intended to track the performance of a broad-based security index) is a "security-based swap" subject to the SEC's sole regulatory jurisdiction as a matter of law. 15 U.S.C. 78c(a)(68)(A).

Nothing in the Joint Release alters that result. In response to a commenter's inquiry about "the status of swaps on shares of exchange traded funds that reference broad-based security indices," the two agencies jointly responded that

"market participants can request a clarification through the interpretation process established herein."  Joint Release at 48324.  Since the Joint Release's issuance, no such request for clarification has been received via that interpretation process.

Moreover, before the CFTC Action was filed, an order by the SEC confirmed that, consistent with the Dodd-Frank Act, swaps on an ETF's shares are "security-based swaps because they were based on the value of a single security," namely, "an ETF share."  SEC Release No. 10801, 2020 WL 3961977, at *8 (July 13, 2020); *see also* 85 Fed. Reg. at 77301 (SEC order concluding that an ETF tracking a broad-based index is "a single security").

Consistent with that understanding, after the CFTC Action was initially filed the SEC's staff released responses to questions regarding the definition of security-based swaps, explaining that "a swap based on the shares of an ETF . . . meets the definition of security-based swap because it is based on a single security or loan, including any interest therein or on the value thereof.  This view does not change depending on the holdings of the ETF [or] the assets or index the ETF . . . tracks." SEC Division of Trading and Markets, *Frequently Asked Questions Regarding Security-Based Swaps* (July 11, 2022), *available at* https://www.sec.gov/files/faqs-security-based-swaps.pdf.  The SEC staff expressly noted that its response, "like all staff statements," has "no legal force or effect."  *Id*.; *see* ECF No. 62 at 22; *see generally N.Y. City Emps.' Ret. Sys. v. SEC*, 45 F.3d 7, 12, 14 (2d Cir. 1995).  But

that response is consistent with the SEC's view as reconfirmed in this amicus brief. *See, e.g.*, *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 207 n. 7 (2d Cir. 2006) ("The views expressed in the Commission's *amicus* brief are the views of the Commission itself and not merely of the staff."); *accord Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 145 (2d Cir. 2002).

## CONCLUSION

In deciding the defendants' pending motions to dismiss, this Court should interpret the Dodd-Frank Act, the Joint Release, and related regulations as set forth in this brief.

Respectfully submitted,

MEGAN BARBERO
General Counsel

MICHAEL A. CONLEY
Solicitor

DAVID D. LISITZA
Senior Appellate Counsel

*/s/ Ezekiel L. Hill*
EZEKIEL L. HILL
Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
202-551-7724 (Hill)
hillez@sec.gov

April 14, 2023