UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>ARCHEGOS CAPITAL MANAGEMENT, LP and PATRICK HALLIGAN,<br><br>Defendants. | Case No. 22-CV-3401<br><br>Hon. J. Paul Oetken |

## PLAINTIFF COMMODITY FUTURES TRADING COMMISSION'S RESPONSE TO AMICUS BRIEF BY SECURITIES AND EXCHANGE COMMISSION

Manal M. Sultan
  *Deputy Director*
Lenel Hickson
  *Deputy Regional Counsel*
Alejandra de Urioste
Steven I. Ringer
John C. Murphy
Jacob Mermelstein
Benjamin J. Rankin

COMMODITY FUTURES
  TRADING COMMISSION
Division of Enforcement
290 Broadway, Suite 600
New York, NY 10007
(646) 746-9881
adeurioste@cftc.gov

Robert A. Schwartz
  *General Counsel*
Anne Stukes
  *Deputy General Counsel*
Mark Fajfar
  *Senior Assistant General Counsel*
Martin B. White
  *Senior Assistant General Counsel*

COMMODITY FUTURES
  TRADING COMMISSION
Office of General Counsel
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581

April 28, 2023

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

PROCEDURAL HISTORY ................................................................................................ 6

ARGUMENT ...................................................................................................................... 7

    A.    Broad-Based Custom Basket Swaps Are Generally Subject to CFTC Jurisdiction ......... 7

        i.    The CEA and Applicable Regulations Establish the CFTC's Jurisdiction Over Swaps Based on Broad-Based Security Indexes, Including Custom Basket Swaps ....................................................................................................... 7

        ii.    The Commissions Have Not Established a Binary Jurisdictional Test Based Only on Predetermined Criteria or Discretionary Authority ............................... 11

        iii.    Determining Whether Custom Basket Swaps Are Discretionary Depends on the Facts and Circumstances ................................................................................ 12

    B.    The CFTC Has Jurisdiction Over the ETF Swaps Because they are Based on Broad-Based Security Indexes ........................................................................................ 14

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*CFTC v. Gresham,*
  No. 09 Civ. 75, 2012 WL 1606037 (N.D. Ga. May 7, 2012) .................................................. 22

*Doe v. Columbia Univ.,*
  831 F.3d 46 (2d Cir. 2016)........................................................................................ 14

*In re: JPMorgan Chase Bank, N.A.,*
  2013 WL 6057042, at *8 (Oct. 16, 2013) .................................................................. 4

*In re: Otkritie Capital Int'l, Ltd.,*
  2016 WL 192257 (Jan. 13, 2016) ............................................................................. 5

*In re: Scott Becker,*
  2022 WL 1404267 (Apr. 27, 2022) ........................................................................... 6

*In re: William Tomita,*
  2022 WL 1404268 (Apr. 27, 2022) ........................................................................... 6

*Int'l Code Council, Inc. v. UpCodes, Inc.,*
  43 F.4th 46 (2d Cir. 2022) ....................................................................................... 12

*Schindler Elevator Corp. v. U.S. ex rel. Kirk,*
  563, U.S. 401 (2011)................................................................................................ 15

*SEC v. Merch. Capital, LLC,*
  483 F.3d 747, (11th Cir. 2007) ................................................................................. 18

*SEC v. Rorech,*
  720 F. Supp. 2d 367 (S.D.N.Y. 2010)................................................................. 20, 21

*SEC. v. Unique Fin. Concepts, Inc.,*
  196 F.3d 1195 (11th Cir. 1999) ................................................................................ 22

*Tcherepnin v. Knight,*
  389 U.S. 332, 336 (1967)......................................................................................... 18

**Statutes**

15 U.S.C. § 78c(a)(68).................................................................................... 8, 15, 16

15 U.S.C. § 8302(a)(4)........................................................................................ 24

15 U.S.C. § 8302(a)(8)........................................................................................ 21

15 U.S.C. § 8302(d)(1) ......................................................................................... 8

15 U.S.C. § 8302(d)(4) .................................................................................... 8, 24

7 U.S.C § 9(1) .................................................................................................... 21

7 U.S.C. § 1a(42) .................................................................................................. 8

7 U.S.C. § 1a(47) ......................................................................................... 6, 8, 21

7 U.S.C. 5(b) ........................................................................................................ 4

Administrative Procedure Act, 5 U.S.C. 553(c) ................................................... 3

Commodities Futures Modernization Act of 2000 .......................................... 4, 20

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. 111-203, 124 Stat. 1376 (2010)............................................... 4, 7, 20

Futures Trading Act of 1982, Pub. L. 97-444, 96 Stat. 2294 (1982)................... 3

Securities Act Amendments of 1982, Pub. L. 97-303, 96 Stat. 1409 (1982) ....... 3

**Regulations**

17 C.F.R. § 180.1 ................................................................................................ 21

84 Fed. Reg. 57162 ............................................................................................ 20

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap
    Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
    77 Fed. Reg. 48207 (Aug. 13, 2012)........................................................ passim

Joint Order to Exclude Indexes Composed of Certain Index Options from the Definition
    of Narrow-Based Security Index Pursuant to Section 1a(25)(B)(vi) of the CEA Commodity
    Exchange Act and Section 3(a)(55)(C)(vi) of the Securities Exchange Act of 1934 ,
    74 Fed. Reg. 61116 (Nov. 23, 2009)............................................................... 3

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ............................................................................ 13

CFTC and SEC Issues Related to the Shad-Johnson Jurisdictional Accord,
   GAO/GGD 00-89 (Apr. 2000) .................................................................................... 3

Division of Trading and Markets No-Action Letter,
   CFTCLTR No. 02-22, 2001 WL 1891472 (July 11, 2001) ........................................ 5

National Futures Association, "SFP – Frequently Asked Questions," .......................... 3

New Oxford American Dictionary (3rd ed. 2010) ........................................................ 15

Division of Clearing and Intermediary Oversight Letter, *Option For Institutional
   Customers From Broker-Dealers*, CFTCLTR No. 06-20, 2006 WL 2727938 (Sep. 7, 2006)... 5

Request for No-Action Letter, CFTCLTR No. 21-25,
   2021 WL 5862143 (Nov. 23, 2021) ............................................................................ 5

Request for No-Action Relief, CFTCLTR No. 17-43,
   2017 WL 4118881 at *5 n.11 (Sep. 13, 2017) ........................................................... 5

SEC Office of Investor Education and Advocacy, *Mutual Funds and ETFs: A Guide For
   Investors* .................................................................................................................. 19

**INTRODUCTION**

Plaintiff Commodity Futures Trading Commission ("CFTC") submits this brief in response to the amicus brief filed ("Amicus Brief") (ECF No. 75-1) in this action by non-party Securities and Exchange Commission ("SEC").

The issue before this Court is whether, under Federal Rule of Procedure 12(b)(6), the CFTC's First Amended Complaint (ECF No. 33) against Defendants in this action states a claim on which relief can be granted.  The Amicus Brief was ostensibly filed in order to provide this Court with the SEC's interpretation on how to classify certain swaps that are relevant to the Defendants' Motions to Dismiss (ECF Nos. 42-48).  *See* ECF No. 75 (requesting leave to file an "amicus curiae brief on the defendants' motions to dismiss the amended complaint.").  The Amicus Brief argues, among other things, that the SEC may have jurisdiction over the Custom Basket Swaps, if one or both parties has discretionary authority to change the composition of the security portfolio, and that the SEC has exclusive jurisdiction over the ETF Swaps in this action as a matter of law.

The SEC's (largely conclusory) arguments are, however, incorrect.  Under the law as it stands today, and the allegations in the Amended Complaint, both ETF and Custom Basket Swaps are in fact subject to CFTC jurisdiction (either on a sole basis, or at a minimum, jointly with the SEC) because the Custom Basket Swaps are not discretionary and the ETF Swaps are based on broad-based indexes.  Moreover, the SEC's (and Defendants') arguments with respect to the jurisdictional classification of the ETF Swaps and Custom Basket Swaps invite a fact-

1

intensive inquiry that is not appropriate for resolution at this stage.  The Amicus Brief thus provides no basis to grant Defendants' Motions to Dismiss.[1]

Below, the CFTC sets forth the legal principles omitted from the SEC's brief, and explains that the SEC's assertions are contrary to both the Securities Exchange Act and the Commodity Exchange Act, and they are inconsistent with the joint rulemaking and interpretations adopted by both agencies to define the terms "swap," "security-based swap," and "mixed swap."  Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48207(Aug. 13, 2012) ("Joint Release").

Although there is ample support for a finding of CFTC jurisdiction over all of the ETF Swaps and Custom Basket Swaps at issue, in deciding the pending Motions to Dismiss, this Court need not address every argument posed by the Amicus Brief or similar claims made by Defendants.  Rather, if the Court finds that the CFTC has adequately pled jurisdiction over *either* the Custom Basket Swaps or the ETF Swaps, regardless of whether that jurisdiction is joint or exclusive, or if the Court finds that fact discovery is needed on these very issues, this Court should reject the Defendants' jurisdictional arguments and deny the Motions to Dismiss on those grounds.

For the reasons described below, and previously raised in the CFTC's Memorandum of Law in Opposition to Defendants' Motions to Dismiss (ECF No. 62) ("Opposition Brief"), this Court should deny Defendants' motions.

---

[1] Although the CFTC filed its original Complaint on April 27, 2022, Defendants filed their original motions to dismiss on July 1, 2022, briefing on the motions to dismiss the amended complaint was completed on February 6, 2023, and oral argument was granted on February 1, 2023 and scheduled to take place on May 4, 2023, the SEC only filed its Amicus Brief on April 14, 2023.

## BACKGROUND

The CFTC has long had jurisdiction over derivatives based on broad-based security indexes like those at issue in this case.  Although not defined in the Commodity Exchange Act (the "Act" or "CEA"), the CFTC and SEC agree that a broad-based security index generally refers to any security index that would not be classified as a "narrow-based security index" under the definitions or exclusions set forth in the CEA and the Securities Exchange Act of 1934, or that meet certain criteria specified in joint CFTC and SEC rulemakings.  *See, e.g.*, Joint Release, 77 Fed. Reg. at 48272 (a security index that is not narrow-based is called a "broad-based" security index).[2]

The CFTC has regulated futures on broad-based security indexes since the 1982 Shad-Johnson Jurisdictional Accord, an agreement between the CFTC and SEC that clarified each agency's jurisdiction over securities-based derivatives, which was codified in the Futures Trading Act of 1982, Pub. L. 97-444, 96 Stat. 2294 (1983) and the Securities Act Amendments of 1982, Pub. L. 97-303, 96 Stat. 1409 (1982).  *See also* CFTC and SEC: Issues Related to the Shad-Johnson Jurisdictional Accord, GAO/GGD 00-89 (Apr. 2000) at 5–6, *available at:* https://www.gao.gov/assets/ggd-00-89.pdf.  Since they were first traded in 1982, broad-based index futures have been under the exclusive jurisdiction of the CFTC, and they may be sold only by CFTC registrants.  *See* Joint Order to Exclude Indexes Composed of Certain Index Options from the Definition of Narrow-Based Security Index, 74 Fed. Reg. 61116 (Nov. 23, 2009) (futures contracts on broad-based security indexes are under the exclusive jurisdiction of the

---

[2] The Joint Release is the CFTC's and the SEC's (the "Commissions") joint "statement of basis and purpose" of the rules defining those terms, as required by the Administrative Procedure Act, 5 U.S.C. 553(c).  In the Joint Release, the Commissions also determined to set out certain "interpretations" of the statutes defining those terms.  *See* Joint Release at 48208 ("ACTION: Joint final rule; interpretations").  The Commissions' statements discussed below are part of the Commissions' interpretations.  *See, e.g., id.* at 48262 ("The Commissions are restating the interpretation set out in the Proposing Release with certain modifications to the interpretation regarding TRS.").

CFTC); National Futures Association, "SFP – Frequently Asked Questions," *available at* https://www.nfa.futures.org/sfp/sfpu/faq.asp.

The CFTC retained its exclusive authority over broad-based security derivatives through the Commodity Futures Modernization Act of 2000, Pub. L. 106-554, 114 Stat. 2763 (2000) ("CFMA"), which gave the SEC authority as a joint regulator with the CFTC over single-stock futures but not over futures on "broad-based" security indexes, and in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), which also granted the CFTC authority over *swaps* based on broad-based security indexes. As the Amicus Brief recites, the Dodd-Frank Act was intended to preserve the existing jurisdictional lines under Shad-Johnson, including affirming the CFTC's jurisdiction over "futures on broad-based security indices and now swaps." Amicus Brief at 6. To this end, the Dodd-Frank Act incorporated the term "narrow-based security index" in order to "distinguish[] swaps (on security indexes that are not narrow-based, also known as 'broad-based') and security based swaps (on narrow-based security indexes)." Joint Release, 77 Fed. Reg. at 48272; *see also id.* ("The Commissions have determined that their prior guidance with respect to what constitutes a narrow-based security index in the context of volatility indexes and debt security indexes applies in determining whether a Title VII instrument is a swap or a security-based swap.").

Under the CEA, the CFTC's mission includes "protect[ing] all market participants from fraudulent or other abusive sales practices and misuses of customer assets" and "deter[ring] and prevent[ing] price manipulation." 7 U.S.C. 5(b). The CFTC's authority extends to derivatives on broad-based indexes and, where appropriate, the Enforcement Division has brought cases implicating these products. For example, in 2013, in an exercise of its expanded jurisdiction under the Dodd-Frank Act, the CFTC settled an enforcement action against JPMorgan Chase

Bank, N.A. for employing a manipulative device in connection with credit default swaps that referenced broad-based credit indices. *In re JPMorgan Chase Bank, N.A.*, CFTC No. 14-01, 2013 WL 6057042, at *8 (Oct. 16, 2013) (consent order) ("Because the instruments at issue in this Order involve swaps based on a broad-based index of issuers of corporate debt, they are not security-based swaps, and this matter falls within the Commission's jurisdiction."). And in 2016, the CFTC settled an enforcement action against Otkritie Capital International, Ltd. for permitting two of its U.S. customers to trade futures and options in foreign markets without registering as a Futures Commission Merchant. *In re Otkritie Capital Int'l, Ltd.*, CFTC No. 16-06, 2016 WL 192257 (Jan. 13, 2016) (consent order). The order found that OCI facilitated both customers' trading of "broad-based foreign securities index futures on foreign markets, including markets awaiting approval for trading by the Commission." *Id*. at *2. Over the last several decades, Divisions of the CFTC have also taken no-action positions regarding the rules relating to derivatives based on broad-based indices.[3]

Nevertheless, the Amicus Brief suggests that if the SEC does not have enforcement authority over broad-based security index swaps, the SEC would not be able to effectively regulate the underlying securities markets. *See* Amicus Brief at 19 ("But if swaps on ETFs' shares were classified as swaps subject to the CFTC's sole regulatory jurisdiction, these important protections on the multi-trillion dollar ETF market would be unavailable."). This

---

[3] *See, e.g.*, CFTC Division of Trading and Markets No-Action Letter, CFTCLTR No. 02-22, 2001 WL 1891472 (July 11, 2001) (no-action position as to securities broker-dealers registering with the Commission for purpose of trading broad-based-index futures contracts); Option For Institutional Customers From Broker-Dealers, CFTCLTR No. 06-20, 2006 WL 2727938 (Sep. 7, 2006) (no-action position as to broker-dealers that sought to allow institutional customers to execute futures contracts on broad-based indices of stocks, bonds, currencies and other financial instruments through either a futures account or a securities account); Request for No-Action Relief, CFTCLTR No. 17-43, 2017 WL 4118881, *5 n.11 (Sep. 13, 2017) (noting commodity interest exposure through broad-based equity index swaps); Request for No-Action Letter, CFTCLTR No. 21-25, 2021 WL 5862143 (Nov. 23, 2021) (no-action position on foreign board of trade's offer or sale of futures contract on a broad-based security index).

assertion is incorrect, and it overlooks a more immediate concern:  in the Amended Complaint, the CFTC has alleged a fraudulent scheme in the *swaps* markets that resulted in billions of losses.  The SEC did not bring any claims in its Archegos action relating to fraud in connection with the Custom Basket and ETF Swaps; only the CFTC did.  Moreover, the CFTC has settled two enforcement actions with former Archegos employees based on fraud in connection with the Custom Basket and ETF Swaps, without any concern raised by the SEC.  *See In re William Tomita*, CFTC No. 22-15, 2022 WL 1404268 (Apr. 27, 2022) (consent order); *In re Scott Becker*, CFTC No. 22-14, 2022 WL 1404267 (Apr. 27, 2022) (consent order).  Indeed, nothing in the CFTC's action prevents the SEC from exercising its existing anti-fraud and anti-manipulation authority in securities markets.  As stated, the CFTC has long had robust enforcement and regulatory authority over broad-based security index derivatives like those utilized by the Defendants in this alleged fraudulent scheme.  This case itself demonstrates the ability of the CFTC to effectively prosecute fraud in connection with such products.

## PROCEDURAL HISTORY

On September 2, 2022, Plaintiff filed a First Amended Complaint ("FAC") in this action against Defendants Archegos Capital Management, LP and Patrick Halligan.[4]  The CFTC alleges that Archegos Fund, in connection with a fraudulent scheme, entered into two kinds of broad-based security index swaps:  (1) ETF swaps based on existing broad-based security indexes, like the S&P 500 ("ETF Swap"), and (2) swaps based on custom portfolios (or "baskets") of hundreds of different securities ("Custom Basket Swaps," and together with the ETF Swaps, the "Broad-Based Security Index Swaps").  The FAC alleges that both types of Broad-Based Security Index Swaps are "swaps" within the definition set forth in Section 1a(47)(A) and (B) of

---

[4] Plaintiff filed its original Complaint against these same Defendants on April 27, 2022.

the CEA, 7 U.S.C. § 1a(47)(A) and (B), and are thus subject to the CFTC's jurisdiction.  FAC ¶ 13.  On November 1, 2022, each Defendant filed motions to dismiss the FAC on various grounds.  On January 6, 2023, Plaintiff filed its Opposition Brief to the motions to dismiss, and Defendants filed reply briefs on February 6, 2023.[5]

On August 26, 2022, non-party Securities and Exchange Commission ("SEC") filed an Amended Complaint in its own action against Archegos Capital Management, LP, Patrick Halligan, and other Defendants.  *See* 22-cv-3402 (ECF No. 47).

On April 14, 2023, the SEC moved for leave to file an amicus curiae brief in this action, and simultaneously filed its proposed Amicus Brief.  The Amicus Brief presents two main arguments relating to the CFTC's jurisdiction in the CFTC's action.  First, the Amicus Brief argues that swaps based on a custom basket of securities may qualify as security-based swaps under SEC jurisdiction in certain circumstances, requiring a fact-intensive examination.  Second, the Amicus Brief argues that, as a matter of law, swaps based on the shares of an ETF are security-based swaps subject to SEC jurisdiction in all instances.

On April 18, 2023, the CFTC asked this Court for permission to submit a brief in response to the arguments raised in the Amicus Brief, and the Court granted the CFTC's motion on April 19, 2023.

---

[5] For additional background on the facts alleged in the First Amended Complaint, we respectfully refer the Court to the Summary of Allegations in Plaintiff's Opposition Brief.

**ARGUMENT**

A. Broad-Based Custom Basket Swaps Are Generally Subject to CFTC Jurisdiction

    i. The CEA and Applicable Regulations Establish the CFTC's Jurisdiction Over Swaps Based on Broad-Based Security Indexes, Including Custom Basket Swaps

Title VII of the Dodd-Frank Act established a framework for the regulation of swap markets. Title VII grants the CFTC jurisdiction over "swaps," which are broadly defined by the CEA to include various agreements, contracts, and transactions, including total return swaps among other enumerated examples. 7 U.S.C. § 1a(47)(A). Included within the "swaps" definition are swaps on a "broad-based" security index or portfolio of securities; this category would include where the counterparties agree to a swap on a customized basket of securities selected by the counterparties, so long as it meets specified threshold size and weighting requirements (discussed below). On the other hand, the "swap" definition excludes most "security-based swaps," a term that includes swaps that are "based on" either a single security or a "narrow-based security index." 7 U.S.C. § 1a(35), (42); 15 U.S.C. § 78c(a)(68). A "narrow-based security index" is either: (1) an index that contains nine or fewer securities; or (2) an index in which the weighting or trading volume is skewed heavily towards one or more of the component securities of the index, based on specific quantitative metrics. 7 U.S.C. § 1a(35).[6]

In the Dodd-Frank Act, Congress directed the CFTC and the SEC, in consultation with the Board of Governors of the Federal Reserve, to further define certain terms, including "swap" and "security-based swap." 15 U.S.C. § 8302(d)(1) (codifying Dodd-Frank Section 712(d)(1)). In response to this mandate, on August 13, 2012, the CFTC and the SEC jointly issued new rules

---

[6] The term "index" refers to any "index or group of securities, including any interest therein or based on the value thereof." 15 U.S.C. § 78c(a)(68)(E). As noted above, the term "broad-based" security index refers to a security index that is not "narrow-based." Joint Release, 77 Fed. Reg. at 48272.

and interpretations regarding the terms "swap," "security-based swaps," "mixed swaps," and

other subjects.  Joint Release, 77 Fed. Reg. at 48207.  Among other things, the Commissions

interpreted the term "narrow-based security index" in Title VII in a manner that excluded certain

otherwise broad-based security index swaps from the CFTC's jurisdiction.  The Commissions

state that if the "Title VII instrument [gives] one or both of the counterparties, either directly or

indirectly … discretionary authority to change the composition of the security portfolio,

*including, for example,* by adding or removing securities in the security portfolio on an 'at will'

basis," then that security portfolio will be treated as a narrow-based security index and a swap on

that portfolio will be a security-based swap.[7]  *Id. at* 48285 (emphasis added).  The Commissions

then provide, as an example of a security-based swap, an instrument that gives one or both

parties discretionary authority to change the composition of the security portfolio on an "at will

basis."  *Id*.  The Commissions do not provide an exhaustive list of scenarios establishing

"discretionary authority."[8]

Lest the discretionary authority provision be read too broadly, the Commissions next

provide an important disclaimer: "not all changes that occur to the composition or weighting of a

security index underlying a Title VII instrument will always result in that security index being

treated as a narrow-based security index."  *Id*.  In other words, if a swap provides for some

---

[7] The Commissions defined "Title VII instrument" to refer to "any agreement, contract, or transaction that is included in either the definition of the term 'swap' or the definition of the term 'security-based swap.'"  Joint Release, 77 Fed. Reg. at 48262.

[8] The Commissions further provide that the classification of a Title VII product must be determined prior to its execution, and the product will retain its initial characterization throughout its life, and regulated by the same agency, until its expiration.  Thus, "if two counterparties enter into a swap based on a broad-based security index, and three months into the life of the swap the security index underlying that Title VII instrument migrates from being broad-based to being narrow-based, the Title VII instrument will remain a swap for the duration of its life and will not be recharacterized as a security-based swap."  Joint Release, 77 Fed. Reg. at 48286.

mechanism by which the underlying index may change (e.g., one that is not "at will"), that does not necessarily mean that it will be characterized as a security-based swap.

By way of example, the Commissions provide two instances where a swap on broad-based baskets containing criteria for changing the composition of the underlying security index would qualify as a CFTC product and not an SEC product.  First, the Commissions observe that swap counterparties "frequently agree to use as the underlying reference [] a security index based on predetermined criteria where the security index composition or weighting may change" as a result of the occurrence of specified events; similarly, swap counterparties "also may use a predetermined self-executing formula to make other changes to the composition or weighting of a security index underlying" the swap.  *Id*.  The Commissions state that "[i]n general," where there are "predetermined criteria or a predetermined self-executing formula for adjusting the security index that are not subject to change or modification" through the life of the swap, a swap on that underlying index will be based on a broad-based security index if it otherwise meets the applicable composition and weighting requirements.  *Id*. at 48285–86.  Second, the Commissions provide that where a swap is based on "a security index that is constructed and maintained by an index provider pursuant to a published methodology," changes to the index pursuant to that methodology would not be sufficient to render it a security-based swap.  *Id*. at 48286.

Critically, the Commissions do not purport to describe all instances in which a swap on a security index that allows for changes to the composition of the index will be characterized as a CFTC swap.  Rather, the Commissions merely provide two examples where, "in general," a swap on a security index will be considered a CFTC swap.

In essence, this section of the Commissions' interpretation considers a spectrum with two poles: at one pole, there is a swap granting the parties discretionary authority to change the

composition of the underlying portfolio, for example through an "at-will" provision ("Swap A");
at the other pole, there is a swap with predetermined criteria for adjusting the underlying security
index ("Swap B").  According to the Commissions, Swap A would be an SEC product, and, in
general, Swap B would be a CFTC product.  Of course, there are many different examples of
swaps falling between these poles left unaddressed by the Commissions.  The Commissions
acknowledge that determining whether a particular swap constitutes a CFTC swap or an SEC
security-based swap is a fact-intensive inquiry.  *See id*. at 48262 ("The determination of whether
a Title VII instrument is either a swap or a security-based swap should be made based on the
facts and circumstances relating to the Title VII instrument prior to execution, but no later than
when the parties offer to enter into the Title VII instrument.").

   ii. The Commissions Have Not Established a Binary Jurisdictional Test
     Based Only on Predetermined Criteria or Discretionary Authority

  With respect to the Custom Basket Swaps described in the FAC, one issue raised by
Defendants and the SEC is whether those swaps are based on a narrow-based security index, and
thus are security-based swaps under SEC jurisdiction.  The FAC alleges that the Custom Basket
Swaps are based on broad-based security indexes that do not meet the weighting or trading
volume criteria of a "narrow-based security index" and are therefore "swaps" within the CFTC's
jurisdiction.  FAC ¶¶ 13, 28.

  In the Joint Release, the Commissions did not interpret the statutory definitions of "swap"
and "security-based swap" to mean that the only custom basket swaps under CFTC jurisdiction
are those with predetermined criteria for adjusting the underlying index (i.e. the "Swap B" swaps
described above).  As a matter of law, therefore, the Court should not interpret the Joint Release
in that way.  The Amicus Brief could be read to suggest that "whether a custom basket's
composition and weighting is discretionary instead of predetermined" is the only relevant factor

in determining whether the swap on that basket is a CFTC or SEC swap.  Amicus Brief at 14.

But that binary statement of the law is too narrow.  As described above, the Commissions

provide only two examples of custom basket swaps that otherwise qualify as CFTC "swaps."

The Commissions did not take a view on the wide range of possible agreements that contain

neither "discretionary authority" nor "predetermined criteria."

> iii.  Determining Whether Custom Basket Swaps Are Discretionary Depends
>        on the Facts and Circumstances

Determining where specific swaps fall on the spectrum, including whether they contain at

will "discretionary authority" or "predetermined criteria," is an inherently fact-based inquiry, one

that need not be resolved on the pleadings.  *See* Joint Release, 77 Fed Reg. at 48262; *Int'l Code*

*Council, Inc. v. UpCodes, Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (the Court must "accept all well-

pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's

favor.")  (internal citations and alterations omitted).  Thus, "fact-specific questions cannot be

resolved on the pleadings."  *Id.* (internal citations and alterations omitted).  This assessment

necessarily requires close analysis of the individual governing agreements and issues of

contractual interpretation.  *See, e.g.*, Joint Release, 77 Fed Reg. at 48262 (assessment must be

"based on characteristics including the specific terms and conditions of the instrument and the

nature of, among other things, the prices, rates, securities, indexes, or commodities upon which

the instrument is based."); *id.* at 48286 (any "predetermined criteria" must be set forth in the

Title VII instrument at execution).  On that basis alone, this Court should reject any jurisdictional

arguments over the Custom Basket Swaps and allow this action to proceed.[9]  On this point, the

---

[9] Discovery also may be required to confirm the operative agreements and terms as to each Swap Counterparty.

Amicus Brief agrees.  *See* Amicus Brief at 15 ("the determination here is based on a fact-intensive examination of the terms of each Title VII instrument").[10]

Nevertheless, even if the Court were to consider the language in the Swap Agreements between Archegos and its counterparties, there would be no grounds to hold that the CFTC lacks jurisdiction in this case.  First, none of the Agreements grant either party "discretionary authority" to modify the composition of any security portfolio.  *See* Opposition Brief at 18-20.  Rather, at most, Archegos's ability to modify the composition of baskets was contingent on approval from its counterparties, a scenario that does not qualify as "discretionary authority" under the plain meaning of that phrase.  *See* Black's Law Dictionary (11th ed. 2019) (defining "discretion" as conduct "exercised without constraint").  Second, in response to the suggestion that "predetermined criteria" are required, we note that some of the Swap Agreements may satisfy this test as well.  As one example, the Credit Suisse Swap Agreement provides that weighting of Custom Baskets, including the number of shares or Index per unit, "may be adjusted from time to time by the Calculation Agent as a result of the occurrence of a Potential Adjustment Event, Extraordinary Event or Index Adjustment Event, as the case may be."  Hirsch Decl. Ex. 20 (Dec. 15, 2020 Credit Suisse Portfolio Swaps (Standard Terms) Annex between Credit Suisse International and Archegos Fund, LP) (ECF No. 44-20), at 3.  This provision appears to directly track the Commissions' interpretation, which states, "counterparties to a Title VII instrument frequently agree to use as the underlying reference of a Title VII instrument a security index based on predetermined criteria where the security index composition or weighting may change as a result of the occurrence of certain events specified in the Title VII

---

[10] For this reason, the Amicus Brief "takes no position" whether any particular Custom Basket Swap alleged in this action is a CFTC or SEC swap.  Amicus Brief at 15.  On the other hand, Defendants have argued that the Swap Agreements actually do give one or both counterparties "discretionary authority" and, as a result, the Custom Basket Swaps fall under SEC jurisdiction.  Archegos Mem. L. (ECF No. 43) at 16; Halligan Mem. L. (ECF No. 47) at 15.

instrument at execution, such as 'succession events.'''  Joint Release, 77 Fed. Reg. at 48285.

According to the Commissions, where the underlying portfolio is "broad-based," a swap on that

portfolio containing "predetermined criteria" will generally be considered a CFTC "swap."  *Id.* at

48 286.  ("in general … a Title VII instrument on such underlying security index is based on a

broad-based or narrow-based security index, depending on the composition and weighting of the

underlying security index.").  In effect, so long as Archegos had swaps with Credit Suisse based

on broad-based security portfolios (as alleged in the FAC), a finding of "predetermined criteria"

in the Swap Agreement would conclusively establish the CFTC's jurisdiction over this "swap."

At a minimum, if there is any ambiguity regarding the terms in the Swap Agreements, discovery

should be allowed to proceed to determine whether these terms qualify as "predetermined

criteria" or as "discretionary authority" as described by the Commissions in the Joint Release.

*See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) (on motion to dismiss, court must

accept the facts alleged and construe ambiguities in the light most favorable to upholding the

plaintiff's claim).  Indeed, this sort of fact-intensive inquiry is just another reason why

Defendants' motions to dismiss should fail.

      In sum, for the reasons stated herein and previously raised in the Opposition Brief, this

Court should hold that the FAC adequately alleges the CFTC's jurisdiction over the Custom

Basket Swaps in this case.

          **B.  The CFTC Has Jurisdiction Over the ETF Swaps Because they are Based on Broad-Based Security Indexes**

As set forth in the CFTC's Opposition Brief, the ETF Swaps at issue here are subject to

CFTC jurisdiction because they are based on broad-based security indexes.  As explained below,

at a minimum they are "mixed swaps" subject to both CFTC and SEC jurisdiction. The SEC

agrees with the general principle that the CFTC may regulate swaps that are based on broad-

based security indexes.  *See* Amicus Brief at 7, 11-12 ("A swap on a custom basket of securities constituting a broad-based security index is generally subject to the CFTC's exclusive regulatory jurisdiction.").  The agencies diverge, however, in how to apply this concept to swaps on ETFs that track broad-based portfolios of securities ("Index-Based ETFs").  The crux of the dispute is the proper interpretation of an "index" and what it means for a swap to be "based on" an index. Under both the Securities Exchange Act and the plain text of the CEA, applied consistently with the Commissions' interpretation in the Joint Release, an Index-Based ETF is *itself* a broad-based security "index," so swaps based on Index-Based ETFs are "based on" the underlying indexes within the meaning of these statutes.  The statutory definition reflects the economic reality that, regardless of the ETF wrapper, a swap based on an Index-Based ETF closely, tracks the market value of the underlying index of securities or commodities on which the ETF is based.

The CEA does not define the meaning of the phrase "based on," so the ordinary meaning applies.  *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563, U.S. 401, 407 (2011).  The term "based on" therefore means to "have as the foundation for something," or to connote "a main or important element or ingredient to which other things are added," or a "conceptual structure . . . on which something draws or depends."  *New Oxford American Dictionary*, at 136 (3rd ed. 2010).  The facts, circumstances, substance, and underlying factors of swaps on Index-Based ETFs confirm that such swaps are "based on" broad-based security indexes.  This is so for two reasons.  First, the Securities Exchange Act defines "index" to include these ETFs.  And second, the individual indexes that the ETFs incorporate are the foundation and key element or ingredient upon which the entire instrument depends.

An "index" refers to any "index or group of securities, including any interest therein or based on the value thereof."  15 U.S.C. § 78c(a)(68)(E).  The Index-Based ETFs underlying the

swaps in the FAC meet that definition, and they are broad-based.  Three different categories of

broad-based security indexes are relevant to this analysis:  (1) the established market indexes that

the ETFs are designed to track, (2) the portfolio of securities held by the ETFs, and (3) the ETF

shares themselves.

*First*, there is no dispute that the established market indexes relevant to this litigation, the

S&P 500, MSCI Emerging Markets Index, and NASDAQ-100 Index (collectively, "Market

Indexes")—which the SPY, EEM, and QQQ ETFs, respectively, provide exposure to and are

designed to track—are broad-based security indexes.

*Second*, to track the performance of the Market Indexes, the SPY, EEM, and QQQ ETFs

hold portfolios of securities that are designed to, and do, closely match the securities in the

Market Indexes.  *See* SPY Prospectus, Halligan Ex. I at 2 (ECF 48-9) ("The Trust seeks to

achieve its investment objective by holding a portfolio of the common stocks that are included in

the [S&P 500] Index (the 'Portfolio'), with the weight of each stock in the Portfolio substantially

corresponding to the weight of such stock in the Index. . . .  At any time, the Portfolio will

consist of as many of the [S&P 500] Index Securities as is practicable."); EEM Prospectus,

Halligan Ex. J at S-3 (ECF 48-10) ("The Fund generally invests at least 90% of its assets in the

securities of its Underlying [MSCI Emerging Market] Index and in depositary receipts

representing securities in its Underlying [MSCI Emerging Market] Index."); QQQ Prospectus,

Halligan Ex. K at 9 (ECF 48-11) ("Invesco QQQ Trust, Series 1 . . . holds all of the stocks in the

NASDAQ-100 Index.").  The portfolios held by SPY, EEM, and QQQ are "indexes" because

they are "group[s] of securities," 15 U.S.C. § 78c(a)(68)(E); and they are "broad-based" because,

like the Market Indexes, they do not meet the weighting or trading volume criteria of a narrow-

based security index, 7 U.S.C. § 1a(35).  Accordingly, just like the Market Indexes on which

they are modeled, the portfolios of securities held by the SPY, EEM, and QQQ ETFs are broad-based security indexes.

*Third*, because the definition of an "index" includes not just a group of securities, but also "*any interest therein or based on the value thereof*," 15 U.S.C. § 78c(a)(68)(E) (emphasis added), shares of the SPY, EEM, and QQQ ETFs are *also* broad-based "indexes" because they are "interests in" and "based on the value" of the broad-based portfolios of securities held by those ETFs. Indeed, the prospectuses themselves confirm that the ETF shares represent "interests in" the underlying portfolios and therefore meet the definition of an index. *See* SPY Prospectus, Halligan Ex. I at 25 ("The Trust was created to provide investors with the opportunity to purchase a security representing a proportionate undivided *interest in a portfolio of securities* . . . ." (emphasis added)); EEM Prospectus, Halligan Ex. J at 1 ("[E]ach share of the Fund represents an *ownership interest in an underlying portfolio of securities* . . . ." (emphasis added)); QQQ Prospectus, Halligan Ex. K at 3 ("Invesco QQQ Shares represent fractional undivided *ownership interests in the portfolio of stocks* held by the Trust.") (emphasis added). Therefore, Archegos's ETF Swaps, which referenced shares of SPY, EEM, and QQQ, were directly "based on" broad-based security indexes and accordingly are subject to CFTC jurisdiction.

The Amicus Brief disputes the notion that ETF Swaps are "based on" broad-based security indexes. In the SEC's view, because ETF shares are single securities, swaps based on an ETF's shares are security-based swaps within the SEC's exclusive jurisdiction. Amicus Brief at 20 (citing 15 U.S.C. § 78c(a)(68)(A)). The SEC asserts in conclusory fashion that "[i]t is generally not appropriate to look through the shares of an ETF" for the purpose of assessing the CFTC's jurisdiction. It cites no statute, regulation, or case in support of that position, and there

is none.[11]  To the contrary, to determine what a swap is "based on," by the plain meaning of that

term, it is necessary to examine the foundation for the instrument and its key ingredients and

concepts.

That is the approach the two Commissions took in the Joint Release, where they

repeatedly rejected the "form over substance" approach the SEC now presses in its Amicus

Brief.  77 Fed. Reg. at 48260 & n.604 (citing cases including *SEC v. Merch. Capital, LLC*, 483

F.3d 747, 755 (11th Cir. 2007) ("The Supreme Court has repeatedly emphasized that economic

reality is to govern over form and that the definitions of various types of securities should not

hinge on exact and literal tests.")).  The Commissions emphasized that "the form of a transaction

is not dispositive in determining its nature."  *Id.* at 48260 n.604; *cf. Tcherepnin v. Knight*, 389

U.S. 332, 336 (1967) ("[I]n searching for the meaning and scope of the word 'security' in the

[Securities Exchange] Act, form should be disregarded for substance and the emphasis should be

on economic reality.").

Accordingly, the Commissions' interpretation states that a "facts and circumstances"

approach is required to categorize swaps as based on either broad-based or narrow-based security

indexes.  Joint Release, 77 Fed. Reg. at 48262.  Discussing Total Return Swaps like those at

issue here, the two Commissions state "the character of a Title VII instrument as either a swap or

a security-based swap should follow the underlying factors which are incorporated into the cash

flows of the instrument—a security, yield, loan, or other trigger for SEC jurisdiction or as a

commodity triggering CFTC jurisdiction (or both for joint jurisdiction)."  Joint Release, *Id*. at

48265 n.655.  Here, the economic underpinnings are overwhelmingly if not exclusively "based

on" the broad-based indexes.  If the SEC wishes to revisit this approach so that labels like "ETF"

---

[11] Instead, the SEC cites to a single order issued by the SEC itself, and that order does not relate to (and does not even mention) swaps that reference ETF shares.  Amicus Brief at 20 n.14.

predominate over economic reality, the two agencies must act jointly, not via a third-party amicus brief.

Although the price of an Index-Based ETF share may be set by a secondary trading market, the trading price is designed to and does follow the price and concentration of the broad-based indexes of securities held by the ETF.  For example, the SPY Prospectus describes a close overlap between the performance of SPY and the performance of the S&P 500:



SPY Prospectus, Halligan Ex. I at 2 (chart showing growth of $10,000 investment since inception of SPY).

ETFs also permit "Authorized Participants" – typically large financial institutions – to purchase and redeem ETF shares "in kind" by contributing or receiving a basket of securities that generally mirrors the individual holdings in the ETF's portfolio.  This mechanism helps ensure that the market price of an Index-Based ETF's shares remains closely linked to the value of the component securities in the broad-based index that the ETF is intended to track.  SEC Office of Investor Education and Advocacy, *Mutual Funds and ETFs: A Guide For Investors, available at* https://www.sec.gov/investor/pubs/sec-guide-to-mutual-funds.pdf.  The Market Indexes are the "foundation" of the Index-Based ETFs, and tracking the Market Indexes is the entire purpose of SPY, EEM, and QQQ.  *See* EEM Prospectus, Halligan Ex. J at S-1 ("The iShares MSCI

Emerging Markets ETF . . . seeks to track the investment results of an index composed of large- and mid-capitalization emerging  market equities."); SPY Prospectus, Halligan Ex. I at 1 ("The Trust seeks to provide investment results that, before expenses, correspond generally to the price and yield performance of the S&P 500."); QQQ Prospectus, Halligan Ex. K at 9 (QQQ is "designed to seek to track the investment results, before fees and expenses, of the NASDAQ-100 Index").

The Amicus Brief acknowledges that Index-Based ETFs are "intended to track the performance of specified broad-based indices."  Amicus Brief at 22.  Thus, while other factors may impact the price of ETF shares at the margins, in practice investors buy Index-Based ETF shares (and enter into ETF Swaps) based on the exposure they provide to the price movements of the underlying broad-based security indexes.  *See* 84 Fed. Reg. 57162 at 57165 (Oct. 24, 2019) ("ETF Release") ("Investors also have come to expect that an ETF's market price will maintain a close tie to the ETF's NAV per share.").  The Index-Based ETF shares track and serve a very similar if not the same investment purpose as the indexes themselves:  a broad-based exposure to a specific market or sector.  *See* Joint Release, 77 Fed. Reg. at 48285 ("A security index in most cases is designed to reflect the performance of a market or sector by reference to representative securities or interests in securities.").

The Amicus Brief's position – that the term "based on" is satisfied only when a swap expressly and directly references a broad-based index – is contrary to the SEC's own prior positions regarding the virtually identical phrasing in the pre-Dodd-Frank statutory definition of "security-based swap agreement." [12]  In *SEC v. Rorech,* 720 F. Supp. 2d 367 (S.D.N.Y. 2010),

---

[12] Prior to the Dodd-Frank Act, the SEC had anti-fraud authority over a category of swaps that were then termed "Security-Based Swap Agreements," defined to mean, "a swap agreement . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities, or any interest therein."

for example, the SEC charged a bond salesperson with engaging in insider trading the credit default swaps ("CDS") of a company, alleging that the defendant was aware of material non-public information about an anticipated bond offering that was expected to increase the price of the CDS.  The SEC's claims were premised on a theory that the CDS were security-based swap agreements (as defined in the CFMA) because the price of the CDS were "based on" the price, yield, value or volatility of the bonds.  The defendant argued that the CDS were not security-based swaps agreements because (1) they did not "make actual reference to the price or value" of the bonds, and (2) they did not have "a direct, or exclusive dependence" on the bonds that was "spelled out in the text of CDS contract." *Id.* at 405, 407.  Agreeing with the SEC, Judge Koeltl held that "the plain meaning of 'based on' [] does not imply an exclusive relationship," but rather "means to use as the fundamental part or ingredient of, or principal component of something." *Id.* at 405.  Notwithstanding the lack of any express reference to bond prices in the CDS contracts, and the lack of any direct mathematical relationship between the bond and CDS prices, the court concluded that the CDS were security-based swaps agreements because the price, yield, and value of bonds was a "fundamental part" of, and "critical to" the value of the CDS. *Id.* at 407.

The Amicus Brief also argues that treating ETF Swaps as security-based swaps will protect against fraud and manipulation with respect to the underlying ETF shares.  Amicus Brief at 17.  As noted above, however, the CFTC has broad authority to prosecute fraud and manipulation in the *swaps* markets and a robust enforcement program that routinely exercises that authority.  *See* 7 U.S.C § 9(1); 17 C.F.R. § 180.1 (prohibiting fraud and manipulation "in connection with any swap").  *See also supra* at pp. 4-6 (citing cases).

---

CFMA § 301(a), 114 Stat. at 2763A-451 (codified at 15 U.S.C. § 78c note (2006)), *repealed by* Dodd-Frank Act, Pub. L. No. 111-203, § 762(a), 124 Stat. at 1376, 1759 (2010).

This is not a binary choice between regulators. The CEA defines an entire category of swaps—"mixed swaps"—that are based on *both* a single security *and another financial interest* within the CFTC's purview, and which are subject to concurrent regulation by both agencies. 7 U.S.C. § 1a(47)(D)[13]; 15 U.S.C. § 8302(a)(8) (CFTC and SEC "shall jointly prescribe" regulations regarding mixed swaps). Thus, even if the ETF wrappers for these broad-based index interests are sufficient to trigger SEC jurisdiction over the ETF swaps, those swaps are nevertheless subject to the CFTC's regulatory and anti-fraud authority because Index-Based ETFs are themselves "based on" the underlying indexes. *Id.* Nothing in the Dodd-Frank Act, the Securities Exchange Act, the CEA, or any other statute justifies simply ignoring the economic underpinnings of these instruments as the SEC suggests.

If the Court finds that swaps on Index-Based ETFs are mixed swaps, then *both* the SEC and CFTC would have authority to prosecute misconduct involving those products. Thus, even if the SEC's policing of markets for Index-Based ETF securities would sometimes be facilitated by SEC actions involving associated swaps, nothing in the Dodd-Frank Act or its implementing regulations requires the CFTC to abandon *its* statutory responsibility to police the market for swaps based on broad-based security indexes. Although the SEC and CFTC typically operate in separate spheres, some financial products and transactions fall under the authority of both agencies, and there is an established history of concurrent regulation. *See SEC. v. Unique Fin.*

---

[13] 7 U.S.C. § 1a(47)(D) provides:
    (D) Mixed swap
    The term "security-based swap" includes any agreement, contract, or transaction that is as described in section 3(a)(68)(A) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(68)(A)) [e.g., a swap based on a single security] *and also is based on the value of 1 or more* interest or other rates, currencies, commodities, instruments of indebtedness, *indices*, quantitative measures, other financial or economic interest or property of any kind (other than a single security or a narrow-based security index), or the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence (other than an event described in subparagraph (A)(iii)).
(emphasis added).

*Concepts, Inc.*, 196 F.3d 1195, 1203 (11th Cir. 1999) ("Commodity pools . . . are within the concurrent jurisdiction of the CFTC and the SEC."); *CFTC v. Gresham*, No. 09 Civ. 75, 2012 WL 1606037, at *2 (N.D. Ga. May 7, 2012) ("Simply because the SEC may also have jurisdiction does not mean that the CFTC cannot have concurrent jurisdiction."); 7 U.S.C. § 2(a)(1)(C), (D) (describing concurrent SEC and CFTC regulation of security futures).

The Amicus Brief's contention that "market participants have a settled expectation that ETF swaps are security-based swaps" (at 18) lacks merit. As an initial matter, the "settled expectation" of market participants is clearly a question of fact that is not amenable to resolution on a motion to dismiss. In any event, the SEC's purported evidence for this proposition is dubious at best. In support, the SEC cites a single notice filed by one SEC self-regulatory organization, which notes in passing that "an Exchange-Traded Fund Share is a 'security.'" Amicus Brief at 18 n.12 (citing SEC Release No. 96572, 2022 WL 18107643, at *2 (Dec. 22, 2022)). This is sleight of hand. The question here is not whether ETFs are securities, but whether a narrow category of *swaps* (i.e. swaps whose underlyings are Index-Based ETFs based on broad-based security indexes) are swaps, mixed swaps, or security-based swaps. The market's expectations about ETFs in general are uncontroversial, but this says nothing of the market's view of the Index-Based ETF *swaps* that are germane to this matter. Regardless, the CFTC's authority over the ETF Swaps in question must be determined by reference to binding statutes and rules, which in turn provide the basis for the settled expectations of the market.

Far from being a settled matter, the Commissions purposefully declined to impose a bright-line test for the classification of Index-Based ETF swaps in 2012. As the Commissions stated:

> A commenter argued that legal uncertainty would present a burden to market participants absent the Commissions clarifying the status of swaps on shares of

exchange traded funds that reference broad-based security indices. However, market participants can request a clarification through the interpretation process established herein by the Commissions.

Joint Release, 77 Fed. Reg. at 48324. Since then, there has been no subsequent joint rulemaking by the SEC and CFTC regarding the regulatory status of ETF Swaps. Nor has the SEC, prior to its Amicus Brief, asserted that it is the *sole* regulator of such swaps.[14]

To be sure, the CFTC and SEC share responsibility for financial market regulation. There are areas of overlap, and unsurprisingly points of disagreement. Indeed, the Dodd-Frank Act itself provides a mechanism for the sister agencies to resolve differing views. Dodd-Frank Section 712(d)(4) provides that any interpretation or guidance by either Commission regarding a provision of Title VII of the Dodd-Frank Act that requires joint Commission rulemaking to implement—including further definition of "swaps"—shall be effective only if issued jointly by both Commissions after consulting with the Federal Reserve Board. 15 U.S.C. § 8302(d)(4).

Absent further joint rulemaking to the contrary, the CFTC has rightfully exercised its enforcement authority under 7 U.S.C § 9(1) and 17 C.F.R. § 180.1 to prosecute Defendants' fraud in connection with any "swap." *See* 15 U.S.C. § 8302(a)(4). While the SEC's Amicus Brief may represent a statement of the SEC's current view of how to classify certain swaps, this statement is not the result of joint rulemaking, is not being used to exercise its enforcement authority, does not carry the force of law and is inconsistent with the SEC's interpretation in the Joint Release. Accordingly, this Court should reject it.

In sum, for the reasons discussed above, the Court should find that the ETF Swaps are based on broad-based securities indexes subject to the CFTC's jurisdiction.

---

[14] The SEC staff's July 11, 2022 FAQ does not reflect the position of the SEC itself, and merely opines that such swaps are "security-based swaps." The SEC staff makes no claim that the SEC is the only agency with authority to regulate them, and the SEC itself has never formally stated its position on this issue.

## CONCLUSION

For the reasons stated herein, and also in Plaintiff's previously-submitted Opposition Brief, the CFTC has jurisdiction over the Broad-Based Security Index Swaps and this Court should therefore deny Defendants' Motions to Dismiss.

Dated:  April 28, 2023

Respectfully submitted,

/s/ *Alejandra de Urioste*
Alejandra de Urioste                                    Rob Schwartz
Manal M. Sultan                                          Mark Fajfar
Lenel Hickson                                            Anne Stukes
Steven I. Ringer                                         Martin B. White
John C. Murphy
Jacob Mermelstein
Benjamin J. Rankin

COMMODITY FUTURES                        COMMODITY FUTURES
   TRADING COMMISSION                        TRADING COMMISSION
Division of Enforcement                         Office of General Counsel
290 Broadway, Suite 600                        Three Lafayette Centre
New York, NY 10007                             1155 21st Street, NW
(646) 746-9881                                    Washington, DC 20581
adeurioste@cftc.gov