N54KCFTO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

COMMODITY FUTURES TRADING
COMMISSION,

             Plaintiff,

        v.                     22 CV 3401 (JPO)

ARCHEGOS CAPITAL MANAGEMENT
LP, et al.,

                          Oral Argument

             Defendants.

------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

             Plaintiff,

        v.                     22 CV 3402 (JPO)

SUNG KOOK HWANG, et al.,

             Defendants.

------------------------------x

                          New York, N.Y.
                          May 4, 2023
                          11:00 a.m.

Before:

              HON. J. PAUL OETKEN,

                          District Judge

N54KCFTO

1

                               APPEARANCES

2

U.S. COMMODITY FUTURES TRADING COMMISSION
3    BY:  JOHN CULLEN MURPHY
          ALEJANDRA de URIOSTE
4         BENJAMIN JOHN RANKIN
          JACOB WALTER MERMELSTEIN

5

KING & SPALDING LLP
6         Attorneys for Defendant Archegos Capital Management LP
     BY:  CARMEN J. LAWRENCE
7         WILLIAM FARHAM JOHNSON

8    FRIEDMAN KAPLAN SEILER & ADELMAN LLP
          Attorneys for Defendant Patrick Halligan
9    BY:  TIMOTHY MICHAEL HAGGERTY
          MARY ELIZABETH MULLIGAN

10

U.S. SECURITIES AND EXCHANGE COMMISSION (Amicus)
11   BY:  DAVID DARREN LISITZA
          JACK KAUFMAN
12        JACOB DAVID ZETLIN-JONES

13   GIBBONS P.C.
          Attorneys for Defendant Sung Kook (Bill) Hwang
14   BY:  THOMAS R. VALEN
          LAWRENCE S. LUSTBERG

15

DAMIAN WILLIAMS
16        United States Attorney for the
          Southern District of New York
17   ANDREW M. THOMAS
     MATTHEW D. PODOLSKY
18        Assistant United States Attorneys

19   ALSO PRESENT:

20   ROBERT SCHWARTZ, CFTC

21

22

23

24

25

N54KCFTO

| 1 | (Case called)

| 2 | MR. MURPHY:  Good afternoon, your Honor.  John Murphy,

| 3 | on behalf of the Commodity Futures Trading Commission.

| 4 | THE COURT:  Good morning.

| 5 | MR. MURPHY:  I'm joined by Alejandra de Urioste,

| 6 | Benjamin Rankin, and Jacob Mermelstein.  I also would like to

| 7 | note that our general counsel, Robert Schwartz, is in

| 8 | attendance as well.  He is not admitted in the S.D.N.Y., but is

| 9 | available to answer questions if the Court desires.

| 10 | THE COURT:  Good morning.

| 11 | COUNSEL:  Good morning.

| 12 | THE DEPUTY CLERK:  For Defendant Archegos Capital

| 13 | Management LP.

| 14 | MS. LAWRENCE:  Good morning, your Honor.  Carmen

| 15 | Lawrence, King & Spalding, on behalf of Archegos.  And with me

| 16 | today is William Johnson, also of King & Spalding.

| 17 | MR. JOHNSON:  Good morning, your Honor.

| 18 | THE COURT:  Good morning.

| 19 | THE DEPUTY CLERK:  And for Defendant Patrick Halligan?

| 20 | MR. HAGGERTY:  Good morning, your Honor.  Tim

| 21 | Haggerty, from Friedman Kaplan Seiler Adelman & Robbins, for

| 22 | Mr. Halligan.  I'm here with my partner, Mary Mulligan.

| 23 | THE COURT:  Good morning.

| 24 | MR. HAGGERTY:  I also wanted to let the Court know

| 25 | that our colleagues, Bonnie Baker and Anil Vassanji and Rupita

N54KCFTO

Chakraborty, are in the courtroom today, as is Mr. Halligan.

THE COURT:  Good morning.

THE DEPUTY CLERK:  For the SEC?

MR. ZETLIN-JONES:  Good morning, your Honor.  David Zetlin-Jones, from the Division of Enforcement.  With me is Jack Kaufman, and also with me is David Lisitza, from our general counsel's office, who is available to answer any questions on the amicus brief filed in the CFTC matter.

THE COURT:  Good morning.

THE DEPUTY CLERK:  For Defendant Sung Hwang?

MR. LUSTBERG:  Good morning, your Honor.  Lawrence S. Lustberg, from Gibbons PC, on behalf of Mr. Hwang.  With me is my partner, Thomas R. Valen, and many others who are seated in the audience and need not be introduced at this point.

THE COURT:  Good morning.

I think that's it.  Is there anyone else who wants to be identified?

All right.  Good morning, everyone.  I'm Judge Oetken, and there was a request for oral argument on the motions in this case.  I know there was a request for guidance as to how to structure this.  Unfortunately, I didn't really get into the briefing until the last few days because I was on trial, and I wasn't in a position earlier than the last couple of days to give guidance on that.

What I think would be most helpful for me is to break

N54KCFTO

1   it down into, I think, three issues, and then hear from whoever

2   wants to speak about those three issues:  First, the market

3   manipulation claims; second, misrepresentations to

4   counterparties; and then, third, issues relating to the CFTC

5   complaint and specific issues relating to CFTC jurisdiction

6   versus SEC jurisdiction, and how that impacts the motion to

7   dismiss the CFTC's complaint.

8           I think we have about an hour, so I'd like to -- I

9   don't want you to go on and on.  And I will say that I did read

10  the transcript of the oral argument before Judge Hellerstein in

11  the criminal case and, obviously, saw his order denying the

12  motion to dismiss the indictment in that case.

13          But let's start with the issue of market manipulation.

14  I don't know who wants to start, either Mr. Lustberg or

15  Ms. Lawrence.

16          MR. LUSTBERG:  I think I'll start, if it's okay, your

17  Honor.

18          THE COURT:  Sure.

19          MR. LUSTBERG:  Your clerk kindly told us we can be

20  seated, but I'm old-fashioned, so I like to stand, if that's

21  okay.

22          THE COURT:  That's okay as long as we can hear you.

23  These mics are actually made for sitting, but that's fine, as

24  long as we can hear you.

25          MR. LUSTBERG:  Thank you.

N54KCFTO

1          Your Honor, I will assume, as I speak today, that you

2     have read everything, and I'm certainly not going to reiterate

3     it, but there are just a few points I'd like to make.

4          Let me start by saying that you noted that you had

5     read the transcript of the proceedings before

6     Judge Hellerstein, as well as his decision.  Obviously, we'll

7     talk about this a little more, I think, as the day goes along —

8     and we've written to the Court — but we don't believe that that

9     binds the Court, it's a very different standard, and if you

10    read the transcript, you know that Judge Hellerstein treated it

11    as a very different standard than the one that's before your

12    Honor on this motion to dismiss the civil case.

13         THE COURT:  On that topic, let me just ask you at a

14    high-level.  It's obviously common, when there are parallel

15    criminal cases and SEC or CFTC cases, to stay the latter

16    because it's a different ultimate proof standard, even though

17    the motion to dismiss standard may be different and criminal

18    cases don't have *Twombly* and *Iqbal*, they don't have Rule 9,

19    et cetera, but if there's a conviction, wouldn't that have

20    preclusive effect?  Because, for example, if the jury found

21    beyond a reasonable doubt that there was market manipulation on

22    the part of your client, wouldn't that be preclusive in a case

23    where the standard is preponderance?

24         MR. LUSTBERG:  Right.  Well, there's no question that

25    criminal convictions have collateral estoppel type effects

N54KCFTO

|      |                                                                          |
|------|--------------------------------------------------------------------------|
| 1    | under certain circumstances assuming that all of the same                |
| 2    | issues were presented, all the same elements were met, and so            |
| 3    | forth, which appears to be the case here.                                |
| 4    |         That is one reason why cases are stayed.  As I note,              |
| 5    | your Honor is aware, the other reason cases are stayed have to           |
| 6    | do with Fifth Amendment rights, and, of course, our position is          |
| 7    | that those are not yet implicated; that is, we're at the point           |
| 8    | of arguing legal questions, at the point at which either we              |
| 9    | would be seeking to potentially depose government witnesses,             |
| 10   | presumably, and I don't think they have moved to stay, and they          |
| 11   | would have an argument.  To the extent that they were seeking            |
| 12   | facts from us, we would have Fifth Amendment concerns, and we            |
| 13   | might have an application for a stay.  But for purposes of this          |
| 14   | motion practice, for sure, there are inefficiencies in kind of           |
| 15   | doing it twice.  But because there is this other enforcement             |
| 16   | proceeding out there, because it's the kind of thing that we're          |
| 17   | all focused on, because the legal issues deserve the kind of             |
| 18   | airing that they can get under an *Iqbal* and *Twombly* standard,        |
| 19   | even if not under the more lenient standard of a motion to               |
| 20   | dismiss a criminal case, we think it's appropriate for your              |
| 21   | Honor to address them now.                                               |
| 22   |         THE COURT:  Understood.  I do think the U.S.                      |
| 23   | Attorney's Office has moved to stay these cases --                       |
| 24   |         MR. LUSTBERG:  Yes.                                               |
| 25   |         THE COURT:  -- at least with respect to discovery; is            |

N54KCFTO

1    that right?

2                MR. LUSTBERG:  Yes.

3                And our position has been that motion for a stay is

4    premature at this stage, that when we get to the point at which

5    there will be discovery, at that point the Court should

6    entertain that application.  We'll set forth our position at

7    that time.  But right now, we're at a point where we're just

8    looking at the legal sufficiency of the allegations.

9                THE COURT:  Okay.  Fair enough.

10               I didn't even give you a chance to start, really.

11               MR. LUSTBERG:  I'm more than happy to have this made

12   more of a conversation.

13               THE COURT:  Right.  So I want to direct you to the

14   bigger questions I have.

15               On the market manipulation claims, I'm just going to

16   give you my thoughts and let you respond, and my questions.

17               You cited some of the cases that talk about the

18   principle that intent to create an artificial price, manipulate

19   the market, is not enough, you need some additional deceptive

20   conduct, et cetera, but when you look at the most recent Second

21   Circuit cases, particularly *SET Capital* and *Vali Management*, as

22   well as some of the district court cases like Judge Cote's

23   decision — I think it was *Lek Securities* — they seem to say, at

24   least in many circumstances, intent is enough, intent to

25   manipulate the price, and we can argue about what that means,

N54KCFTO

1   but, basically, it means intent to manipulate the price where

2   there's no economic reason to manipulate the price, but you're

3   doing it for some other reason; it's not the supply and demand

4   that the cases talk about.

5          If it's true that the most recent cases indicate that

6   intent is enough, you basically have a set of circumstantial

7   evidence, and a lot of the defendants briefing here is sort of

8   questioning the basis for the inference that there's that

9   intent.

10          So how do you respond to that set of issues?

11          MR. LUSTBERG:  Let me unpack that into the two

12   different questions that you asked.

13          The first has to do with the state of the law in the

14   Second Circuit.  Let me go right to precisely the cases that

15   you mentioned.

16          So *SET Capital*, which the SEC -- and let me be clear

17   for Mr. Hwang, we're only in the SEC case, not the CFTC case.

18   So when I say the SEC, I'm not meaning to exclude my friends.

19          The SEC certainly quotes *SET Capital* for the

20   proposition that open market transactions that are not

21   inherently manipulative, they constitute manipulative activity

22   when accompanied by manipulative intent, that is, intent alone

23   is enough.

24          But, your Honor, we would urge you, as you read each

25   of these cases, to think about at least three things, and I'm

N54KCFTO

1     going to go through them for each of these cases.  The first is

2     to look at the case as a whole; the second -- what I mean is

3     what other things the Court says in those cases; the second is

4     to look at the facts of those cases; and the third is to ask

5     whether a definition of manipulative intent, which is what they

6     say has to be shown, has been really provided so that it's a

7     workable standard.

8            Let me take each of those with respect to just the

9     cases you mentioned.

10           With regard to *SET Capital*, in addition to the quote

11    that I just read you, *SET Capital* says this, and I quote:

12    While a defendant may manipulate the market with open market

13    transactions -- I should say that is something we do not

14    dispute.  And let me just parenthetically say, one of the

15    things that the SEC points to throughout is an argument that a

16    sort of strawman they try to set up and then knock down, which

17    is somehow that we're arguing that open market transactions can

18    never be the subject of manipulation.  That is not our

19    position, just to be clear.  We're not saying that open market

20    transactions can never be the subject of a manipulation claim.

21    We're saying that there has to be the something more that your

22    Honor referred to.

23           But anyway, back to the quote, it says, "While a

24    defendant may manipulate the market through open market

25    transactions, some misrepresentation or nondisclosure is

N54KCFTO

1    required."  That's in *SET Capital*.

2          *SET Capital* also says, and I quote:  "Deception is the

3    gravamen of a claim for market manipulation."

4          The court in *SET Capital* does not actually define what

5    the manipulative intent that would be alone enough to bring a

6    claim would be, but it seems that what is meant is exactly what

7    the court says, which is, an intention to deceive, an intention

8    to send a false signal to the marketplace, and so forth.

9          I should also note that *SET Capital* itself was a case

10   about deception.  It was a case about deceptive offering

11   documents.  So you didn't really ever need to reach the

12   question, and so it's dictum that matters as to whether or not

13   manipulative intent was enough.

14         I know that the court said that, but the court said

15   other things as well, and the problem that your Honor has, and

16   the reason why your decision is such an important one, is with

17   regard to each of these cases, you're going to have to

18   reconcile the different things that the court said and then

19   come up with a definition of manipulative intent.  And our

20   suggestion, respectfully, for what that definition is, or

21   should be, is an intent to deceive by sending a false signal to

22   the marketplace.

23         THE COURT:  But why isn't that met by the

24   circumstances where, as alleged, assuming the truth of the

25   allegations in the complaint, there was an intent to deceive as

N54KCFTO

to the real market value of the securities by pumping them up

artificially?  Why isn't that enough, that level of generality?

MR. LUSTBERG:  So there would have to be an intent to

deceive and to send false signals to the marketplace, and what

you're asking me now is whether the actions that are alleged in

this complaint are enough.  And you described them as pumping

up the price of the security, but that's not actually, your

Honor, what's alleged in this complaint.  What's alleged in

this complaint, and what makes this case so special, is that

the various -- each of the various sets of facts upon which the

SEC relies have to do with legal activity.

So, they say that you pumped up the stock by trading

in swaps, and the market didn't know that you were in them

because you don't have to disclose your identity in swaps.  But

that's completely lawful.  The notion that swaps limit the

visibility of market participants into the extent of Archegos'

aggregate holdings, which is the precise allegation of the

complaint, is one that, in essence, says, you know, the

regulatory regime is wrong, swaps should be regulated in a way

that they currently aren't.  But, of course, that's not for

this Court, and I should note — and we point out in our brief —

that there is regulatory action now that would accomplish that,

but it has not yet been finalized.

But, really, if you take the complaint as a whole and

say this is all an effort to pump up stock, I get what you're

N54KCFTO

1   saying.  But that's really not what it is.  And what we say is

2   that you have to break down each of the components of what's

3   alleged.

4          So the first is the use of swaps, which do not require

5   disclosure.

6          The second is that it was a highly concentrated

7   portfolio.  Again, nothing unlawful about that.  It would be

8   radical, indeed, and it is radical, their position, that

9   somehow trading in large quantities in a highly concentrated

10  portfolio is unlawful.  It isn't.

11         They talk about time trades, premarket, you know, at

12  the close of the trading day.  Those things, as we've pointed

13  out and we cited authority for your Honor, are also entirely

14  lawful.

15         THE COURT:  Right, but you go through all of the

16  particulars of what they show was pumping up the stock, and

17  say, that's not illegal, that's not illegal, that's not

18  illegal, but the question is, under the circuit's law, whether

19  there was this bad intent.  When you put them all together,

20  that's different than all those cases that say each one of

21  those isn't enough.

22         MR. LUSTBERG:  Respectfully, your Honor, what a

23  dangerous way of looking at it.  So you take legal act, upon

24  legal act, upon legal act, and that somehow is rendered illegal

25  based upon intent, which is undefined, it's manipulative

N54KCFTO

1    intent.  So they would have to show -- and they claim they

2    don't have to show this.  That's the key to this complaint.

3    Their argument is that if you show that Mr. Hwang's intent was

4    simply to affect the price, one way or the other, then that

5    would be sufficient.  That is the part of their argument --

6          THE COURT:  To artificially affect the price.

7          MR. LUSTBERG:  Well, artificially means that there

8    would have to be an artificial signal to the marketplace, and

9    that's not alleged in this complaint.  It's just not.  Except

10   to the extent that that artificiality is based upon lawful

11   conduct.

12         So their argument is that there's artificiality

13   because the market doesn't know that Mr. Hwang is trading in

14   swaps, that he's behind the counterparties' transactions, and

15   we can talk about whether that's a perfect one-to-one, but that

16   may be more of a matter of fact.  But the point I'm making is

17   that the artificiality that they assign to the actions all is

18   as a result of a hundred percent lawful activity.

19         I think your Honor is correct, and I think the SEC is

20   correct — we are saying that each of the things that they

21   allege is lawful.  And their conclusion is when you take all

22   those things together, which you have to do, and then layer in

23   intent, which they don't define, and call it manipulative

24   intent, but layer in an intent, which is to affect the price,

25   that that's enough for a manipulation case, and, respectfully,

N54KCFTO

```
1   we think that's not what the cases say.  We think it's not what
2   SET Capital says.  I'll address one other case that you
3   mentioned, which is Vali, and in Vali Capital, again, they
4   quote that same language that we talked about earlier, and they
5   say that, in some cases, scienter is the only factor that
6   distinguishes legitimate trading from improper manipulation.
7   They do correctly quote the case for that.  But what they don't
8   quote is other aspects of the case, which is where the court
9   upholds the jury verdict in that case because, "The charge
10  clearly instructed that to find defendants liable for
11  manipulative acts under the Exchange Act, the defendants must
12  have engaged in an act that sends a false pricing signal to the
13  market or creates a false impression of supply and demand," and
14  defines scienter as the intent to deceive, manipulate, or
15  defraud.
16          THE COURT:  Well, that is exactly what the SEC
17  alleged.
18          MR. LUSTBERG:  No, it isn't, your Honor.  No, it
19  isn't.  They claim that we do not have to show an intent to
20  deceive, manipulate, or defraud.  Their argument is that a mere
21  intent to affect the price is enough to -- when you layer that
22  on top of each of the otherwise lawful actions that Mr. Hwang
23  engaged in.  That is the essence of their argument.
24          There's the deception -- they may say that we think
25  there's deception, but if you look at what the deception is,
```

N54KCFTO

| | |
|---|---|
| 1 | the deception that they see is inherent in the acts that have |
| 2 | been deemed to be lawful or unregulated.  Again, I'll just go |
| 3 | back to the swaps.  The argument is that somehow Mr. Hwang |
| 4 | created a misimpression in the marketplace that there were |
| 5 | numerous participants when it was all just him.  And that's the |
| 6 | way he pumped up, to use your phrase, the stock.  But that was |
| 7 | lawful.  If it was swaps, he didn't have to.  And, by the way, |
| 8 | the signal to the marketplace was the trading that was done by |
| 9 | his counterparties, the banks. |
| 10 | And there's nothing inaccurate about that.  The market |
| 11 | didn't know that, and the market never knows when |
| 12 | counterparties like that trade, what their intention is.  Here, |
| 13 | they say, well, they were just hedging on his trades, but who |
| 14 | knows what their reasons were for any given trade.  We don't |
| 15 | know. |
| 16 | And that's in a way, your Honor, what this case is all |
| 17 | about.  What this case is all about is the idea that if the SEC |
| 18 | is right, then any trade, that anybody ever does, could be |
| 19 | deemed unlawful, even though each aspect of it is lawful, just |
| 20 | because one's intent was somehow to do something other than |
| 21 | whatever the regulators think it is. |
| 22 | Let me be really clear about that, because you said it |
| 23 | well.  The question in a way is whether there was -- the trades |
| 24 | had an economic rationale.  Well, as Judge Posner says in the |
| 25 | case that you cited, the so -- |

N54KCFTO

```
1          THE COURT:  The "so what" case.

2          MR. LUSTBERG:  So what, yes.

3          THE COURT:  Right, he says so what.  But that's not

4    the law in the Second Circuit.  That might have been the law in

5    the '90s, when Judge Posner was around.  I think there's a "so

6    what" answer here, which is in SET Capital, which is that

7    perfectly lawful stuff can become unlawful based on intent

8    alone.  And it's intent to manipulate the price artificially.

9    I agree that's a really hard question and might be a

10   problematic precedent, and who knows what it means, but they

11   did say it.

12         MR. LUSTBERG:  And through deception and not --

13   through artificial price and deception.  What SET Capital

14   stands for, what Vali stands for, is there has to be a false

15   pricing signal to the market, create a false impression of

16   supply and demand, and the scienter is the intent to deceive,

17   manipulate, or defraud.  That's a high standard.  And if the

18   SEC wants to concede that that's the standard they have to

19   meet, then we may be arguing past each other, but the way I

20   read the SEC's papers, that is not their position.

21         THE COURT:  Well, we have the SEC right here.  Let's

22   ask them.

23         MR. LUSTBERG:  You'll get a chance to ask them.

24         THE COURT:  I want you to wrap up because we don't

25   have a ton of time.  I want to give everyone a chance to speak.
```

N54KCFTO

1   But I get your argument, it's well made, it's certainly well

2   made in your papers as well, as all the papers were.

3           Is there any final point or points you wanted to make?

4           MR. LUSTBERG:  No, your Honor.  If I may, can we have

5   just a moment after they speak to talk about any point they

6   might make?

7           THE COURT:  Sure.

8           I'd like to give the SEC a chance to respond first on

9   this market manipulation set of arguments.

10          MR. ZETLIN-JONES:  Your Honor --

11          THE COURT:  Mr. Zetlin-Jones, right?

12          MR. ZETLIN-JONES:  David Zetlin-Jones, from the SEC.

13          -- I would just respond that I think your Honor framed

14  up the issue well and framed the state of the law in the Second

15  Circuit well; that is, open market trades that might be

16  legitimate in other contexts can become actual manipulation

17  when they are undertaken with manipulative intent.

18          THE COURT:  Now, before I forget, I want to get your

19  view on what Mr. Lustberg said, which is that the SEC's

20  position is any intent to affect price is manipulation.

21          MR. ZETLIN-JONES:  When transactions are undertaken

22  for the purpose with the specific intent to move the price with

23  price movement, price manipulation is the dominant purpose of

24  the trade, yes, that constitutes illegal manipulation.

25          But one more point I want to emphasize, your Honor,

N54KCFTO

| | |
|---|---|
| 1 | which is that this manipulative scheme had two essential and |
| 2 | complementary components.  One was the manipulative trading |
| 3 | strategy — the high volume, timed buying, these total return |
| 4 | swaps.  But the other piece of it was the deception of |
| 5 | Archegos' trading partners into selling the swaps that |
| 6 | Archegos –– the volume of swaps that Archegos needed to achieve |
| 7 | its manipulative effects, that is, to move the price. |
| 8 | THE COURT:  So those are the two types of deception or |
| 9 | manipulation? |
| 10 | MR. ZETLIN-JONES:  To frame it up, I think the law is, |
| 11 | under the circuit, under the cases you cited, intent alone can |
| 12 | distinguish legitimate open market trade from illegal |
| 13 | manipulation.  There is no other act of deception needed.  But |
| 14 | even if there were, that deception is supplied by the |
| 15 | succession of lies that Archegos, through Mr. Hwang and through |
| 16 | Mr. Halligan, told to Archegos' counterparties to induce their |
| 17 | trading in the securities. |
| 18 | In other words, your Honor, the market hedges that the |
| 19 | counterparties made in the argument, that was not natural |
| 20 | demand; that was artificial.  It was a byproduct of the lies |
| 21 | that Mr. Hwang and Mr. Halligan directed be told to the |
| 22 | counterparties to induce their selling. |
| 23 | THE COURT:  What's your response to Mr. Lustberg's |
| 24 | argument that this just sweeps in so much kind of innocuous |
| 25 | conduct, anytime the purpose of a trade is to affect the price |

N54KCFTO

1   is perhaps broader than what we normally think of as market

2   manipulation in the sense of kind of a noneconomic purpose?

3           MR. ZETLIN-JONES:  I think the law of the circuit on

4   this point is fairly clear.  And while there could potentially,

5   I could imagine, be some circumstances that create close calls,

6   this just isn't one of them.  We have a raft of circumstantial

7   evidence proving up, shoring up, our allegations of

8   manipulative intent, coupled with the admission of Archegos'

9   head trader in the parallel criminal proceeding during its

10  guilty plea where he acknowledged as much.  And I think, in

11  this case, the facts, as alleged, amply establish, for purposes

12  of this motion, the intent that would be required.

13          THE COURT:  Okay.  Thank you.

14          MR. LUSTBERG:  May I quickly?

15          THE COURT:  Yes.

16          MR. LUSTBERG:  Just three very quick points, and thank

17  you.

18          THE COURT:  Yes.

19          MR. LUSTBERG:  First, I appreciate -- oh, were you not

20  done?

21          MR. ZETLIN-JONES:  No, no.

22          MR. LUSTBERG:  Okay.  I didn't mean to interrupt.

23          MR. ZETLIN-JONES:  It's an awkward setup.

24          MR. LUSTBERG:  Yes.

25          I think this has been a useful argument because what

N54KCFTO

1    you've heard the SEC say is that there doesn't have to be

2    artificiality, that there doesn't have to be deception, all

3    there has to be is an intent to move the price.  And if intent

4    to move the price is enough, then is it enough to have

5    knowledge that the price will move?  Because I can tell you, if

6    I go to the corner store and buy a carton of milk, in some

7    minuscule way, that's affecting the price of milk.  Any trade

8    affects price.

9           THE COURT:  Right.  But he said the dominant purpose

10   has to be the moving of the price.

11          MR. LUSTBERG:  Okay.

12          So even that, though, doesn't fold in any of the

13   standards that -- I read to you from the same cases that

14   they're citing that have to do with deception and

15   artificiality, and I ask your Honor, as you review the

16   allegations of the complaint, taking all of them as true, as

17   you must, and leaving aside issues of plausibility, which my

18   colleague will address, the question really becomes:  Is any of

19   the false signal -- is there a false signal, what's false about

20   it, what false signal was sent to the market?  And there's none

21   that's specified.  What deception was created?  And I will come

22   back to that really quickly in a second.  But if the answer to

23   those is embedded in lawful mechanisms, like swaps, like

24   trades -- I mean, what they are saying is, yes, there has to be

25   intent.  But how you can tell that there's intent is the very

N54KCFTO

1    lawful conduct at issue.

2            So, just takes swaps.  Yes, the market might be much

3    more knowledgeable if the market participants understood who

4    was investing in swaps — that's true — but it's not required.

5    And if that's the basis for the argument that there's deception

6    or a false signal being sent, then that can't be a complaint

7    that can stand, and we've cited cases that say that, so I'll

8    stop.

9            One last point:  The deception that the SEC talks

10   about, and the only deception that they've mentioned today, is

11   false statements that are alleged to have been made with two

12   counterparties.  Those allegations, too, must be taken as true.

13   There's jurisdictional arguments that have been raised about

14   whether they're in connection with securities, but leave that

15   aside for the moment.

16           Those statements to counterparties are not false

17   signals to the market.  If true, they're false statements to

18   counterparties.  And that's really the essence of our argument.

19   I'm not sure we made it as crisply as we should have, so I want

20   to be clear now.  Our argument is, with regard to those, those

21   have nothing to do with deception of the marketplace, with

22   natural forces of supply and demand.  Those have to do with

23   false statements to counterparties.  We can fight about whether

24   that's securities fraud, but the issue here is whether those

25   are false statements to the marketplace, false signals.  And,

N54KCFTO

1    respectfully, for the reasons we've set forth in the papers, we

2    think --

3            THE COURT:  Right.  But on that point, just to push

4    back a little bit, that seems a little cute or naive in the

5    sense that, as alleged, assuming the truth of the allegations

6    in the complaint, everyone knows that the counterparties are

7    hedging -- are not hedging, but that they're purchasing the

8    securities that are the swap reference, and, indeed, the

9    purpose, as alleged, is to buy up these swaps that are long

10   positions knowing that the counterparties will actually buy the

11   stocks, thus pushing the price.

12           So it's not very attenuated to say that they're

13   actually knowingly and intentionally affecting the buying of

14   the security.

15           MR. LUSTBERG:  Yes, this may tread a little on

16   Ms. Lawrence's plausibility point, but, in essence, our

17   argument is that nobody really knows why trades are made by the

18   counterparties.  In reality, counterparties hedge sometimes,

19   they don't hedge other times, sometimes they hedge in part, and

20   overall what they do — but now we're getting into factual

21   stuff — overall what they do is they hedge their whole

22   portfolio and not hedge trade by trade.

23           That allegation, I think, fails the plausibility test,

24   but I'll let Ms. Lawrence get to that because that's what she

25   wanted to address.

N54KCFTO

1          THE COURT:  Okay.

2          MR. LUSTBERG:  Really, the allegation that every

3    single swap purchase is accompanied by a corresponding hedge is

4    without basis.

5          THE COURT:  Right, but I have to assume it's true.

6          MR. LUSTBERG:  I understand.  I understand the

7    standard, but what *Iqbal* and *Twombly* say is you have to assess

8    the plausibility of that.

9          THE COURT:  Okay.

10         Ms. Lawrence.

11         MS. LAWRENCE:  Thank you, your Honor.  I will try not

12   to cover the same material that Mr. Lustberg has covered for

13   efficiency.  But to start off, we do agree with Mr. Lustberg

14   that the statute is a necessary element to establish a market

15   manipulation claim.

16         But assuming for purposes of the argument that the SEC

17   is correct in the law, and we believe that it is not, the SEC

18   still must allege factual allegations that establish that there

19   was artificial price or a false signal sent to the market.

20   That is the definition of manipulation.

21         We believe that the SEC's factual allegations are

22   still insufficient to state a market manipulation claim because

23   they do not establish at all that there was artificial price or

24   a false signal to the marketplace or that either of those was

25   caused by Archegos.

N54KCFTO

1      I just want to start first with the point that the

2  SEC, not all of its allegations are entitled to an assumption

3  of truth.  As the Court knows under *Twombly* and *Iqbal*,

4  conclusory and labels and formulaic presentations of the

5  elements of a cause of action dressed up as factual allegations

6  don't warrant and don't deserve the assessment of truth at all.

7      And many of the SEC allegations are just that —

8  they're labels and conclusions.  And we cite to a number of

9  examples in our complaint.  I want to briefly highlight one

10  today.  If you focus on paragraphs 88 to 90 of the amended

11  complaint, the SEC alleges that Archegos engaged in substantial

12  trading during the end of the trading day, that is, marking the

13  close, to push the prices of certain stocks upward.  That is a

14  conclusory statement, your Honor, and the two paragraphs that

15  follow that simply summarize statistical analysis of the number

16  of trading days over two stocks over a three-month period, and

17  cite some summary statistics with respect to the equivalent

18  number of shares.

19      That, by itself, does not establish marking the close.

20  Marking the close is an improper trading device where a trader

21  seeks to have an impact on the end-of-the-day closing price by

22  getting as near to those last trades as possible.  That is

23  improper.

24      So, to allege simply during that large trading window

25  of 30 minutes that Archegos engaged in trades, when that's a

N54KCFTO

```
 1    time when liquidity is at its highest and many market

 2    participants are in the market at that time without anything

 3    more, does not establish marking the close.  So that type of a

 4    conclusory allegation needs to be disregarded and not given the

 5    assumption of truth.

 6            When you strip away those conclusory allegations, what

 7    are left are factual allegations that really do not establish

 8    market manipulation by Archegos.

 9            Now, I just want to spend some time going through a

10    few of these points.

11            First, at its very essence, the SEC alleges through

12    allegations, as I said, that are conclusory or that are

13    negative inferences upon inferences from the legitimate trading

14    engaged in by Archegos or characterizing transactions as swaps,

15    as if they were equity trades, but the essence of it is that

16    Archegos manipulated the equity markets in Archegos' top ten

17    holdings by entering into off-exchange total return swaps, and

18    these are private contracts between Archegos and the

19    counterparties that are off-exchange.

20            What that means is that by engaging in those swap

21    contracts, there is no direct market impact.  And as you noted,

22    the SEC's allegations relate to the hedging by the

23    counterparty, but as we have discussed in our briefs, it is

24    uncertain whether the counterparties will, in fact, engage in

25    hedging activity in response to those swap contracts.  And we
```

N54KCFTO

```
 1   cite to a number of examples that we believe the Court can take
 2   notice of because they are either integral to the complaint or
 3   matters of public notice or public filings and the like.  And
 4   one is that in the CSX case, there was testimony by the head of
 5   the swaps desk that counterparties hedge against swap contracts
 6   in a number of ways and not always one to one, and not always
 7   at all, because they may engage in offsetting swap contracts.
 8              You'll also have the Credit Suisse report that was
 9   done by Paul Weiss and is a matter of public record where --
10              THE COURT:  But even that said, 85 percent of the
11   time, they're engaged in offsetting hedges.
12              MS. LAWRENCE:  That is true, your Honor.  But, also,
13   there was a study, a survey, by Pricewaterhouse — it was a
14   while ago — that also talked about the number of times, I think
15   46 percent was a percentage, that showed up in that survey.
16              So the point is that there is not any kind of
17   certainty around whether they hedge, how much they hedge, when
18   they hedge, or how long they hold those hedges, your Honor.
19              And that flows into the other point — the SEC makes
20   another conclusory allegation that Archegos obtained market
21   domination.  How, your Honor, does Archegos dominate the market
22   in securities where it does not have ownership of more than
23   5 percent of that stock?  These swap contracts, they don't
24   bestow beneficial ownership of the stock.
25              THE COURT:  But you can just play out a scenario where
```

1    they only have 5 percent actual equity, but they engage in swap

2    contracts in Viacom that, if you add on what they economically

3    get from the swap contracts, they get 60 percent, and let's say

4    even 85 percent of the hedging is going on by the

5    counterparties, that gets to market control, pretty much.

6         MS. LAWRENCE:  But, your Honor, it isn't market

7    control because that's economic benefit or risk.  Market

8    control is about stock ownership and being able to have control

9    over those securities.

10         You don't know day one if they hedge.  Next day, they

11    could have sold those securities and entered into offsetting

12    swap.  And proof in the pudding, your Honor, is that week of

13    March 23rd, Archegos collapsed because it had no control of

14    those securities and those owner market forces at work, and the

15    price declined.  If Archegos had control of those securities —

16    70, 80 percent — that would not have happened.

17         THE COURT:  But that also cuts the other way, I think,

18    because the fact that it collapsed shows how much they were

19    dependent on these particular top ten securities.

20         In any event --

21         MS. LAWRENCE:  But there are many funds that

22    concentrate in a small number of securities, and it is true

23    that had they not concentrated as much, then, obviously, those

24    price declines, which were the result of external forces having

25    nothing to do with Archegos, wouldn't have impacted.

N54KCFTO

1          THE COURT:  At the end of the day, it's true that

2     these allegations have to be plausible under *Twombly* and *Iqbal*,

3     and they can't be conclusory, but when you add them all

4     together, I do think they're more than any particular one in

5     terms of getting to the intent that is required under the case

6     law.

7          I want to give them a chance to respond, but finish

8     your point.

9          MS. LAWRENCE:  I just want to get to the intent,

10    because I think the difficulties with the SEC's argument that

11    if you take this legitimate trading activity, whether

12    individually or collectively, it rises to a strong inference of

13    scienter, that is not plausible, your Honor.  It's not

14    plausible because nothing in the legitimate trading activity is

15    inherently deceptive.

16         So what the SEC is saying is, the reason there's

17    manipulation here is because of all of this legitimate trading

18    activity and with manipulative intent, and the way we prove our

19    manipulative intent is with all of these legitimate trading

20    activities.  That is circular, and it's an argument that lacks

21    substance, your Honor.  It just makes no sense.

22         The other thing is that the SEC points to the

23    allocutions of former employees of Archegos and Will Tomita,

24    the former trader, as the only one that's relevant here.  We

25    think that for the same reasons that some of the SEC's

N54KCFTO

conclusionary allegations shouldn't be afforded the assumption

of truth, the same with respect to Mr. Tomita's allocution.  It

is surprising in its lack of factual matter.  All it does is

recite elements of a manipulative claim and, therefore, does

not constitute factual matter that should be afforded the

assumption of truth.

          And moreover, the SEC has pled that it's Mr. Hwang

that had the decision-making control over the trading decisions

of Archegos, and that Mr. Tomita was just following

instructions and did what he was told, and given that and

Mr. Tomita's insignificant role in the legitimate trading at

Archegos, it should be afforded minimal weight.

          THE COURT:  Thank you.

          Do you want respond to those, Mr. Zetlin-Jones?

          MR. ZETLIN-JONES:  Sure.

          Just very briefly on the issue of hedges, I think

paragraphs 37 to 39 of the complaint allege plainly and clearly

that counterparties, as a matter of common practice, would

hedge their total return swap exposures by buying the equity

shares in the market.

          And Ms. Lawrence referenced the testimony provided in

the CSX case.  I would urge your Honor to look at what the CSX

court found, which found that, as a practical matter, it is

inevitable that counterparties will hedge their total return

swap exposures by buying underlying shares in the market.

N54KCFTO

1          And Judge Winter, in his concurrence, on appeal of

2     that matter, said, although shorting -- the other hedging

3     methods for short parties exist, they are exceptional, and he

4     noted, a short party's purchasing of shares is the most

5     practical and common method of hedging, and long parties expect

6     that it will be used.

7          I guess the only other point I would address, your

8     Honor, is this notion that Mr. Tomita's allocution as Archegos'

9     head trader --

10          THE COURT:  Could you come a little closer to the mic?

11          MR. ZETLIN-JONES:  Yes.

12          -- that Mr. Tomita was Archegos' head trader, not a

13     junior employee, that his allocution should be given little

14     weight, that is an argument that goes, on its face, to the

15     weight of the witness credibility and isn't appropriate for

16     consideration on a motion --

17          THE COURT:  They argue it's just conclusory, that it

18     just says the elements of the --

19          MR. ZETLIN-JONES:  He's a percipient witness to the

20     scheme, he was a critical participant in it, and he affirms the

21     intent with which these trades were undertaken, and his account

22     is borne out by the trading patterns that the complaint

23     proceeds to allege.

24          THE COURT:  Would you respond briefly to the argument

25     that Ms. Lawrence and defendants have made about the

N54KCFTO

```
 1   plausibility of the timing, that it's just looking at the last
 2   30 minutes isn't really meaningful to close out the day as
 3   opposed to sort of the very end of the day, and then sort of
 4   looking at several months, there was X amount of trading on X
 5   days as opposed to a more robust analysis of the entire period,
 6   that that isn't enough to get plausibility?
 7           MR. ZETLIN-JONES:  So, as we allege, the entire course
 8   of conduct was designed to prop up these prices; that is, the
 9   massive buying, the accumulation of 50, 60, 70 percent of
10   freely tradeable outstanding shares of this company, was all of
11   a piece.  And the examples that we highlight — of late trading,
12   of setting the tone, of latter trade, trading in response to
13   negative news to counteract selling pressure — those are all
14   the features of the transactions and examples we give to
15   support, strengthen, the inference that this trading was being
16   undertaken with the intent to acquire.
17           THE COURT:  You probably weren't there for the Judge
18   Hellerstein argument in the criminal case, but he asked
19   something that I was also curious about, which was kind of,
20   what's the theory of the end game here?  This isn't like Credit
21   Suisse or something where there was kind of an immediate
22   benefit to Archegos or Mr. Hwang from driving up the price, as
23   alleged.  As he said, at some point, the bubble bursts, so what
24   exactly is the motivation, the self-interested motivation, that
25   would be behind a theory that this kind of manipulation is
```

N54KCFTO

1   going on?

2          MR. ZETLIN-JONES:  Yes, your Honor.

3          THE COURT:  Was it kind of a mania that didn't really

4   have much rational thinking behind the end game?  Was it kind

5   of desperation?  What was the thinking?

6          MR. ZETLIN-JONES:  I think it was a combination of

7   those, your Honor.  We allege — and I don't have the paragraph

8   offhand — we allege that his portfolio took a big hit at the

9   start of the pandemic.  It was way out.  As referenced at the

10  argument before Judge Hellerstein, I think there was a drive,

11  an ego, a desire, to be among the most wealthy people in the

12  world, and, as we allege in our complaint, he did, in fact,

13  explore and look for off ramps, a way to lock in the profits

14  achieved through manipulation, but was just unsuccessful in

15  doing so.

16          And toward that end, a lot of the manipulative trades

17  that were going on were just buying time, keeping the music

18  going for as long as he could, which, your Honor, is not

19  unusual in manipulative schemes.  Oftentimes, people will

20  undertake manipulative schemes that seem, from the start, to be

21  doing that.

22          THE COURT:  Thank you.

23          I want to turn to the set of issues involving

24  misrepresentations made to counterparties, which I think is the

25  other big theory, and this one implicates the claims involving

N54KCFTO

```
1    Mr. Halligan.

2              Do you want to take that on, Mr. Haggerty?

3              MR. HAGGERTY:  Thank you, your Honor.

4              I'll address the Court from the podium, if that's

5    acceptable.

6              THE COURT:  Sure.

7              MR. HAGGERTY:  Your Honor, Tim Haggerty, for Patrick

8    Halligan.

9              I'll address three issues principally with respect to

10   the misrepresentation allegations, and these are well briefed,

11   so I'll try to be efficient.

12             First, I'll address why the regulators haven't

13   sufficiently alleged --

14             THE COURT:  You're complimenting your own briefing?

15             I agree, it was well briefed.

16             MR. HAGGERTY:  So stipulated, your Honor.

17             So, the first issue is whether the regulators have

18   sufficiently alleged that misrepresentations were made in

19   connection with either SEC-regulated securities, purchases, or

20   sales, or CFTC-regulated swap transactions.

21             The second issue is whether the regulators have

22   sufficiently alleged that Mr. Halligan made misrepresentations,

23   as would be required for a maker liability claim under 10b-5(b)

24   or the parallel provision of the Commodity Exchange Act and its

25   regulations.
```

1          The third issue is whether the regulators have

2    sufficiently alleged a scheme liability claim against

3    Mr. Halligan, and, in particular, the application of the Second

4    Circuit's recent decision in *SEC v. Rio Tinto plc*, which

5    holds — and we think it's dispositive of this case — that a

6    plaintiff can't simply repackage misrepresentation claims and

7    call it a scheme.

8          So, those are the three issues, but I did want to

9    briefly note that I was surprised to hear Mr. Zetlin-Jones

10   refer to Mr. Halligan during the discussion of the market

11   manipulation allegations, because, as we read the SEC's

12   complaint, there's certainly no well-pled allegation that

13   Mr. Halligan engaged in any deceptive conduct with respect to

14   the alleged market manipulation.

15         And Mr. Halligan is described as — this is

16   paragraph 25 of the complaint — as a back-office professional,

17   and he's not described to have had any role in trading, his

18   name isn't mentioned in the pages or paragraphs describing the

19   market manipulation allegations.  So we do respectfully submit

20   that the market manipulation allegations should be given

21   absolutely no consideration with respect to the sufficiency of

22   the regulators' claims against Mr. Halligan, whether that's

23   under a maker liability theory, a scheme liability theory, or

24   it's with respect to the assessment of his scienter.

25         I'll turn now to the in connection with issues, and

N54KCFTO

they arise in both cases.

What I would highlight is that there's a real difference between the positions advanced by the defendants and the positions advanced by the regulators.  As I see the difference, it's that the defendants have offered the Court a standard to apply the in-connection with requirement that's consistent with the most recent decisions of the United States Supreme Court — that's *Chadbourne & Parke v. Troice* — and as well as the most recent decision of the Second Circuit interpreting the in-connection with language of the Exchange Act.  That's *Charles Schwab v. Bank of America*.

What the rule is — and it's a workable standard — is that a misrepresentation is actionable and in connection with the securities purchase or sale if the misrepresentation concerns the value of a security being traded or the consideration received in exchange for the security.

I'll read what the Second Circuit wrote in *Charles Schwab* because it's really quite explicit.  "A claim fails where the plaintiff does not allege that a plaintiff misled him concerning the value of the securities he sold or the consideration you received in return."

The SEC and the CFTC cite a number of cases that contain sound bites, which we respectfully submit are taken out of context, that might describe individual characteristics of those particular cases, but don't constitute a workable

N54KCFTO

1    standard.  And, in fact, the cases that the SEC and the CFTC

2    rely upon are entirely consistent with the standard that the

3    Second Circuit described in *Charles Schwab*.  For example, both

4    of the regulators rely extensively on the case, the Supreme

5    Court's 2002 decision in *SEC v. Zandford*.  And *in Zandford*, the

6    issue was whether the facts were their broker made unauthorized

7    transactions, unauthorized sales, in a customer's securities

8    trading account and then misappropriated the proceeds.  It's

9    really nothing like this case.  It's not even an affirmative

10   misrepresentation case in the way that this case has been

11   alleged.

12        But, in any event, the deception in *Zandford*, these

13   unauthorized trades in the customer's discretionary securities

14   account, did, in fact, coincide with the securities

15   transactions — they, in effect, were the securities

16   transactions — but it also fundamentally related to the

17   consideration that the customer received for those transactions

18   because the deception deprived the customer of the

19   consideration.  It's entirely consistent with the rule that

20   we've advanced.

21        THE COURT:  Why couldn't it be the theory that alleged

22   misrepresentations regarding makeup of portfolio, other

23   characteristics of the portfolio that Archegos had, were

24   crucial, and I guess but for those misrepresentations, the swap

25   would have been uninteresting, unpalatable, to the

N54KCFTO

1   counterparty, and, in that sense, it affects the value of the

2   swap?

3           MR. HAGGERTY:  Well, at least a few responses to that,

4   your Honor.

5           The first is -- and your Honor used the phrase "but

6   for."  And that is a rationale that's entirely foreclosed, we

7   believe, by the Second Circuit's decision in *Chemical Bank*,

8   *Chemical Bank v. Arthur Andersen*, where the Second Circuit

9   expressly held that but-for causation, that is, but for the

10  alleged misrepresentation, a securities transaction wouldn't

11  have occurred, that that's not a sufficient way for a plaintiff

12  to satisfy the in-connection with requirement.

13          Additionally, the alleged misrepresentations regarding

14  characteristics of the portfolio, at most, relate to the

15  assessment of counterparty risk, not a characteristic of the

16  value of the securities, not a characteristic of the

17  consideration received for the securities, and they were made —

18  and this is as alleged in the complaint — the alleged

19  misrepresentations were made during negotiations over capacity

20  and margin — preludes to potential opportunities for future

21  securities transactions.

22          THE COURT:  What about the risk that I don't get the

23  consideration?  I'm the counterparty, these margin issues and

24  the issues that misrepresentations involve make the likelihood

25  I'll get the consideration, you know, higher than they would be

N54KCFTO

| | |
|---|---|
| 1 | if I were told the truth.  Isn't that relating to the |
| 2 | consideration? |
| 3 | MR. HAGGERTY:  Well, your Honor, I believe that |
| 4 | argument runs directly into the Supreme Court's decision in |
| 5 | *Chadbourne & Parke v. Troice*, where the misrepresentations |
| 6 | related to the -- it was one of the Allen Stanford Ponzi Scheme |
| 7 | cases, and there were misrepresentations made about the |
| 8 | securities portfolio that was being held.  And the argument |
| 9 | that was made there was that the misrepresentations regarding |
| 10 | the securities portfolio, which is like the allegations in this |
| 11 | case, which are alleged to be about Archegos' securities |
| 12 | portfolio, made doing business with the counterparty riskier. |
| 13 | But that was held not to be sufficient in that case. |
| 14 | In other words, misrepresentations about |
| 15 | counterparties' creditworthiness, which goes to general terms |
| 16 | of the relationship -- which really relates to general terms of |
| 17 | the relationship between the customer and the bank, isn't |
| 18 | sufficient. |
| 19 | I also refer the Court, respectfully, to district |
| 20 | court decisions, both affirmed by the Second Circuit, *Bissell* |
| 21 | and *Levitin*, where alleged misrepresentations were made |
| 22 | regarding what was described in those cases as terms of the |
| 23 | relationship between the broker and the customer — in those |
| 24 | cases, the misrepresentations related to interest that would be |
| 25 | paid in connection with collateral deposited with short |

securities transactions — held not to be sufficient.

Also, in response to the question that the Court just asked, there's also not an allegation in either of the complaints that Archegos made a misrepresentation about the risks of any future securities transaction, which is really different than what is alleged, which is misrepresentations -- alleged misrepresentations about the characteristics of the securities portfolio that Archegos presently held.

THE COURT:  I think I understand the argument on in-connection with.  Do you want to move to maker liability?

MR. HAGGERTY:  Absolutely.

Your Honor, on maker liability, the Supreme Court's decision, United States Supreme Court's decision, in *Janus v. First Derivative Traders* holds that under 10b-5(b), the only person who may be primarily -- who can be held liable for a primary violation is the maker of the statement.  So in --

THE COURT:  This is the speech writer analogy?

MR. HAGGERTY:  This is the speech writer.  The court also uses the metaphor, it's less commonly discussed, but playwright, not the maker of a statement, that an actor delivers.  And, as alleged here, the regulators fall short of the requirement of *Janus* because what they allege is it's really that someone else spoke the statements — that's principally Mr. Becker — made the statements to counterparties, but the regulators seek to hold Mr. Halligan responsible as the

N54KCFTO

maker for the statements that Mr. Becker actually delivered.

But there's no well-pled allegation that Mr. Halligan had — and

this is what *Janus* requires — ultimate control over either the

content or the delivery of the statements that Mr. Becker made.

There is no authority cited for the proposition — and

this is what we do submit the regulators are asking the Court

to hold — that a supervisory relationship is sufficient to make

a supervisor the maker of the statements that a subordinate

delivers.  That actually seems facially inconsistent with the

facts of *Janus*, where the defendant was the advisor for a

mutual fund, and the misrepresentations were made with respect

to the mutual fund issued, but its advisor, the defendant,

substantially participated in the preparation of and had

substantial control over the fund.

THE COURT:  Okay.

MR. HAGGERTY:  If the Court has other questions on the

maker liability issue -- your Honor, if I may, on maker

liability, I should note that the CFTC appears to argue that

*Janus* should not apply to the maker claim that has been

asserted in that case.  That argument fails for a host of

reasons, the first of which, the Second Circuit has repeatedly

applied *Janus* to claims brought by the SEC, enforcement actions

brought by the SEC.  There is no reason that the same result

isn't appropriate with respect to claims brought by the CFTC.

But, more fundamentally, in *Janus*, the question was what does

N54KCFTO

the work "make" mean, and the court defined the word make by
looking at the dictionary and by looking at basic rules of
grammar and syntax.  And there is no reason — the CFTC offers
none, they offer no case that says to the contrary — there's no
reason that the word "make" shouldn't be given a common
application when used in the context of the securities and
commodities lawsuit.

        THE COURT:  Why don't you turn briefly to scheme
liability.

        MR. HAGGERTY:  Sure, absolutely.

        So, when the regulators filed their initial complaints
in this action, it was unsettled in this circuit whether
allegations relating to -- solely relating to the participation
and the preparation of misrepresentations could sufficiently
state a scheme liability claim.  After the Second Circuit's
decision in *SEC v. Rio Tinto* last July, it's clear that they
can't.  That's the explicit holding of that case.  The Second
Circuit's language is, "Allegations of misstatements and
omissions alone are not sufficient to state a scheme liability
claim."  That was a direct rejection of the position that the
SEC had advanced there.  And we believe it is fatal to the
claims, the scheme liability claims, that both regulators have
asserted here because the claims, scheme liability claims,
against Mr. Halligan are just a repackaging of the
misrepresentation claims based on the allegation that he had

N54KCFTO

1      some role in participation in the preparation of those

2      statements, whether it's by working with his colleagues or

3      providing content, but those are all of the same things that

4      *Rio Tinto* rejected as insufficient.

5              I point the Court to the recent -- there have been a

6      number of decisions since *Rio Tinto*, including within the

7      Southern District applying *Rio Tinto* to claims, and we referred

8      to them in our brief — *In Re: Turquoise Hill* is one of them —

9      and the statement there from Judge Liman is really clear:

10     Where the only fraudulent conduct is the making of a false

11     statement, the defendant is either liable as a maker or is not

12     liable at all.

13             In this case, under the allegations as pled,

14     Mr. Halligan is not liable as a maker under *Janus*, and he can't

15     be liable under a scheme liability theory under *Rio Tinto*.

16             THE COURT:  Okay.  Thank you.

17             Anything else you want to add?  I want to give them a

18     chance to respond.

19             MR. HAGGERTY:  No, your Honor, although I would ask

20     for, if it's acceptable to the Court, the opportunity to

21     respond.

22             THE COURT:  All right.  Great.

23             MR. HAGGERTY:  Thank you.

24             THE COURT:  Who wants to go first, Mr. Murphy or the

25     SEC?

N54KCFTO

| 1 | MR. MURPHY:  Your Honor, I'm happy to go first. |

1    MR. MURPHY:  Your Honor, I'm happy to go first.

2    THE COURT:  Okay.  You're welcome to.

3    Mr. Murphy, right?

4    MR. MURPHY:  Yes, Mr. Murphy.

5    Your Honor, I intend to speak on the in-connection

6    with element, and my colleague, Mr. Rankin, will speak on

7    issues relating to maker and scheme liability.

8    THE COURT:  All right.

9    MR. MURPHY:  One thing I want to start with --

10    THE COURT:  Could you pull the mic just a little

11    closer?

12    MR. MURPHY:  Yes, your Honor.

13    THE COURT:  Thanks.

14    MR. MURPHY:  One point I'd like to start with is the

15    point that swaps are very different from your standard

16    securities transaction.  Unlike a share of stock, swaps are

17    bilateral contracts that extend over a period of time — weeks

18    or months or even years — and this has important implications

19    for how to apply the relevant standards here for in-connection

20    with.  And due to these differences, among others, that the

21    CFTC has stated that it will be guided by, but not controlled

22    by, case law applying Rule 10b-5 in the Rule 180.1 context.

23    So, here, we've met both the standards under *Zandford*

24    and *Chadbourne*.  I want to start with *Zandford*, because we

25    think that's the applicable standard here.  The CFTC's

N54KCFTO

interpretive release under 180.1 specifically cites to *Zandford*
as an applicable case, and defendants are trying to argue here
that *Zandford* has been overruled or is somehow not good law,
but that's just not the case.  And, to the contrary, *Chadbourne*
expressly left open the coincides standard, left that standard
intact.  The Second Circuit has cited the *Zandford* coincide
standard as recently as 2021, and even after *Chadbourne* –- and
even after *Chadbourne*, courts in this district routinely cite
to the *Zandford* coincide standard.

　　　　　THE COURT:  That's sort of an odd standard — coincide
with.  That's like saying there's no connection, but they just
happened at the same time.  There's not much content to it.

　　　　　MR. MURPHY:  Your Honor, there is a bit more to it.
In addition, the standard requires that the fraud and the swap
or security are not independent events.  And then in the Second
Circuit's *Romano* case, it went into some more detail about how
the coincide standard can be met.

　　　　　So it can be met where a plaintiff's claims
necessarily allege or necessarily involve, or rest on, a swap
or a security, and it's met when the fraud induced a purchase
or sale of the swap or security, and it's met where the
misconduct and the swap are part of the same fraudulent scheme.

　　　　　In terms of why we think *Zandford* is the more
applicable standard here, particularly in the context of the
Commodity Exchange Act, is that the CEA's antifraud provisions

N54KCFTO

are substantially broader than the SEC's.  The terms value and

consideration are most applicable to purchases and sales, which

is all that is covered by Rule 10b-5, but Regulation 180.1 goes

way beyond purchases and sales into territory where it doesn't

really make sense to just talk about value or consideration.

So, for example, Rule 180.1 encompasses fraud in

connection with solicitation, execution, pendency, termination,

and all of the other payment and other obligations arising

under a swap.

So if you focus just on value or consideration, as the

defendants have argued, what you end up doing is cutting off a

large portion of the conduct that Rule 180.1 was intended to

prohibit.

Now, in terms of how we have met the *Zandford's*

coincide standard, here, we're not alleging but-for causation;

we're alleging inducement.  Archegos' misrepresentations

induced swap counterparties to enter into more broad-based

securities index swaps.  Whenever Archegos wanted to enter into

long positions, it also needed to enter into the short CFTC

swap positions.

So when Archegos made misrepresentations that induced

additional long positions, those same misrepresentations

induced additional short positions.  We also allege the CFTC

swaps here were an integral part of defendants' fraudulent

scheme.  That's because the counterparties used CFTC swaps as a

N54KCFTO

1    risk-reducing measure, and entering into these swaps was one of

2    the many ways that defendants tried to falsely assure its

3    counterparties that it was creditworthy.

4            Now, I want to turn to the *Chadbourne* standard, value

5    in consideration standard, because we've met that as well.  We

6    are not alleging misrepresentations about the terms of a

7    relationship.  We are alleging misrepresentations about the

8    value of these swaps.  As I mentioned, a swap is an ongoing

9    contractual relationship with ongoing payment obligations by

10   the parties.  So a misrepresentation about credit risk is a

11   misrepresentation about the value of a swap.

12           I think your Honor made this point earlier — that the

13   counterparties wouldn't have gotten the consideration that they

14   expected here.

15           So, I also want to note that some of our allegations

16   do relate directly to the attributes of the broad-based

17   securities index.  For example, we allege that Archegos'

18   misrepresentations misrepresented the time that it would take

19   to liquidate its entire portfolio, including the broad-based

20   security index swaps.

21           And this case, your Honor, is a perfect example of how

22   creditworthiness impacts the value of swaps as a result of

23   Archegos' misrepresentations here, the swaps at issue,

24   including the broad-based security index swaps were rendered

25   essentially valueless.

N54KCFTO

1       I also want to briefly address the *Chadbourne* decision

2   and the facts of that case.  Defendants grossly misinterpret

3   the holding of that case.  This was a SLUSA case, and the

4   outcome really hinges on the distinction between a covered

5   security and an uncovered security under SLUSA.  The defendants

6   argue that this case stands for the proposition that

7   misrepresentations about creditworthiness can never be in

8   connection with a fraud.  And that's simply incorrect as a

9   matter of common sense and as a matter of law.

10      In fact, it was undisputed in that case that the

11  representations about creditworthiness were in connection with

12  securities.  They just weren't in connection with covered

13  securities.  And that's the critical portion of that court's

14  holding.

15      THE COURT:  Thank you.

16      Do you want to turn to maker liability and scheme

17  liability?

18      MR. RANKIN:  Yes.

19      THE COURT:  Mr. Rankin?

20      MR. RANKIN:  Thank you, your Honor.

21      So I'll first address the issue of maker liability

22  under *Janus*.  I just want to highlight one point at the start,

23  your Honor:  We are not suggesting that Mr. Halligan is somehow

24  liable solely because he's a supervisor of Mr. Becker.  We're

25  not alleging any kind of vicarious liability relationship.

N54KCFTO

What *Janus* tells us to look at is to look at the specific

statement — who has control over that statement, who has

ultimate authority over that statement, who controls whether to

deliver it and how to communicate it?

In this case, your Honor, in our complaint, we've

alleged at least four different statements that Mr. Halligan

made through Mr. Becker.  We also allege that Mr. Halligan made

misstatements directly in these trade confirmations that he

signed himself that falsely represented Archegos' beneficial

holdings in various issuers.

With respect to the statements that Mr. Halligan made

through Mr. Becker, I would point your Honor to paragraph 59,

where Mr. Halligan told Mr. Becker to tell a specific swap

counterparty, Swap Counterparty 3, that Archegos' largest

position was 35 percent of its net asset value, which was

false.  Mr. Becker did so.  Paragraph 63 and 64, where

Mr. Halligan directed Mr. Becker to provide false liquidation

statistics, including representing that Archegos could

liquidate its entire portfolio, including the CFTC swaps, in

30 days to a specific swap counterparty, 4.  That was false.

I would also point your Honor to paragraph 81, where

Mr. Halligan proposed false talking points for Mr. Becker to

use, then had a followup conversation where he specifically

reviewed and approved those same talking points that Mr. Becker

delivered to counterparties.

N54KCFTO

1          I don't see how you can show greater control over the

2     specific message at issue than in those circumstances.

3          And, your Honor, we've also cited a number of cases in

4     our brief in which one individual can make misstatements

5     through another.  *Lorenzo*, especially at the D.C. Circuit

6     level, is a helpful example.  The *Glickenhaus* case from the

7     Seventh Circuit Court of Appeals is another.  And there are

8     others mentioned.

9          Unless your Honor has any questions over the *Janus*

10    issues, I'll briefly touch on the scheme liability points.

11          THE COURT:  Okay.

12          MR. RANKIN:  So as counsel for Mr. Halligan has

13    pointed out, under the *Rio Tinto* decision, there must be

14    something beyond misstatements and omissions, but I just want

15    to mention misstatements and omissions can still form part of a

16    scheme.  That decision doesn't say that misstatements and

17    omissions cannot be part of a scheme.  They can be part of a

18    scheme.  There just has to be something else, essentially.

19          And in the *SEC v. White & Case* and others, what we're

20    looking for is some kind of deceptive actions that don't

21    necessarily have to be illegal in and of themselves, but that

22    contributed to a fraudulent scheme.

23          THE COURT:  What is the "something more" here?

24          MR. RANKIN:  The "something more" here as to

25    Mr. Halligan -- first, I want to mention, again, Mr. Halligan

N54KCFTO

1    was the CFO at a small family Office, he was one of very few

2    executives at this office, and he led or was one of the

3    coarchitects of a scheme to systemically deceive swap

4    counterparties as to Archegos' positions across various

5    issuers.  He did that in a number of ways, your Honor, as we

6    alleged in the complaint.  He concealed critical financial

7    information in response to questions from counterparties.

8    Concealment is a fact that comes up in a number of S.D.N.Y.

9    cases as an example of deceptive conduct.

10          He also condoned the dissemination of false

11   information by others, principally Mr. Becker, and he conspired

12   with Mr. Becker and, at times, Mr. Tomita in undisclosed

13   meetings and calls to further the scheme and avoid detection by

14   counterparties.  I point your Honor to paragraphs 63 and 64,

15   which mention a call with Mr. Tomita and Mr. Becker;

16   paragraph 76, where he essentially directed them to tell an

17   inconsistent and misleading story to swap counterparties;

18   paragraphs 59 and 67 and paragraph 81, where the three of them

19   had a call to develop false information that Mr. Becker later

20   provided to swap counterparties.

21          But I want to mention one more point, your Honor:  An

22   entirely separate basis for scheme liability is knowingly

23   supervising an individual who is carrying out the fraudulent

24   scheme.  The facts of this case, as alleged in the complaint,

25   certainly meet that standard.  That's under the *SEC v. Collins*

N54KCFTO

1    *& Aikman* case.

2              Mr. Halligan knowingly supervised Mr. Becker in the

3    carrying out of this fraudulent scheme.  He ordered Mr. Becker

4    to not disclose the true positions with counterparties, to

5    conceal that information, he trained Mr. Becker to systemically

6    lie about that information over years, and at various times, he

7    made the comment, "if they only knew."  And as we allege in our

8    complaint, we think that that really shows it's a critical --

9    it's a critical admission of his culpable participation in the

10   scheme — if swap counterparties knew the truth, they would have

11   taken different countermeasures, but they didn't because they

12   didn't have the full picture.

13             THE COURT:  Thank you.

14             I want to give the SEC a chance to respond to

15   Mr. Haggerty.

16             MR. ZETLIN-JONES:  Sure.  And I will try to keep this

17   brief, your Honor, because Mr. Rankin has already touched on

18   much of what I intended to.

19             On in-connection with, the only thing I would add in

20   our matter is that the total return swaps that Archegos

21   executed with its counterparties, those are securities — that's

22   Section 281 of the Securities Act, Section 3810 of the Exchange

23   Act — and there does not appear to be any dispute that those

24   are secured.

25             THE COURT:  The swaps themselves?

N54KCFTO

1          MR. ZETLIN-JONES:  The swaps themselves are

2     securities.  So with that predicate, I think the in-connection

3     with, the nexus between the misrepresentations and the

4     securities transactions, it's pretty clear these lies induced

5     counterparties to sell securities to Archegos.  That's a

6     straightforward, clear direct nexus as you can imagine.

7          We disagree that there is a subject matter limitation

8     on the in-connection with standard.  I think the *Charles Schwab*

9     case, that they rely on this, was made in this particular

10    context.  That context was banks misrepresenting their

11    borrowing costs to banks on the U.S. LIBOR panel,

12    misrepresenting the borrowing costs to the British Bankers'

13    Association, which had the impact of suppressing LIBOR.  And

14    there were two claims made by *Charles Schwab* there:  One was

15    that those misrepresentations affected or in-connection with

16    their purchase or sale of floating rate instruments, that is,

17    instruments that related to and reflected LIBOR, and the court

18    in the Second Circuit affirmed that, yes, those

19    misrepresentations are in connection with those instruments.

20    Where *Charles Schwab* went too far was saying these

21    misrepresentations, which had the effect of suppressing LIBOR,

22    were also in connection with fixed-rate instruments that didn't

23    reference or relate to LIBOR in any way, and it was only in

24    that context that the court wrote a sentence that defendants

25    have been relying on.

N54KCFTO

1          THE COURT:  So, in general, you don't think that to be

2     in-connection with, that it has to relate to the value of the

3     securities or the consideration?

4          MR. ZETLIN-JONES:  I think the standard is, as the

5     Second Circuit articulated in *Romano*, it doesn't necessarily

6     allege, necessarily involve, or rest on, your Honor, and I

7     don't think there's a subject matter limitation.  We cite a

8     number of cases in our brief at page 56 and 57, where the

9     misrepresentations did not relate to the value or the

10    consideration, your Honor, but even if it did, for the reasons

11    you have articulated in your colloquy with Mr. Haggerty, these

12    did relate to the value and consideration of these swap

13    contracts.  The counterparty credit risks that were

14    misrepresented directly related to the value of the contracts,

15    Archegos' ability to perform.  This is not just some

16    theoretical relation either.  The risks that were concealed

17    materialized, and the counterparties learned, to their

18    detriment, and lost billions of dollars as a result.

19          Turning to the primary liability claim, your Honor, I

20    think paragraphs 125 and 127 of our complaint describe trade

21    confirmations that Mr. Halligan made and signed.  And I don't

22    think there's any dispute that he is the maker of those

23    confirmations.  Those confirmations misrepresented that

24    Archegos' total positions — that is, its equity positions plus

25    its swap positions — did not exceed more than 5 percent of the

N54KCFTO

```
1    issuers' outstanding shares.  He did that at a time when
2    Archegos' position in certain of these issuers that were
3    subject to the confirms were many multiples in excess of that.
4    And he's certainly the maker of those statements.
5          On scheme liability:  I think Mr. Rankin summarized
6    the issue well.  The only thing I would add to it is I think
7    Rio Tinto is far narrower than defendants are portraying.  Rio
8    Tinto describes itself as a very narrow opinion.  It considered
9    only the discrete question as to whether Lorenzo v. SEC, the
10   Supreme Court's decision from 2019, abrogated the Second
11   Circuit's prior precedent in Lentell v. Merrill Lynch.  What
12   Rio Tinto said was Lorenzo clarifies, but does not completely
13   arrogate, its prior precedent.
14         The clarification that Lorenzo adds is that
15   dissemination of a false statement can establish a defendant's
16   primary liability for a scheme.  And this, your Honor, is a
17   form of dissemination.
18         In Lorenzo, a subordinate did two things — he copied
19   and pasted a false statement created by his boss into an email,
20   and then he sent that email, at his boss' direction, and that
21   conduct alone was deemed -- based on that conduct alone, that
22   defendant was deemed sufficiently responsible to be held
23   primarily liable for the scheme to defraud the email's
24   recipients.  Nothing in Lorenzo and nothing in Rio Tinto
25   suggests that standard is any different or that its holding
```

N54KCFTO

should be limited to subordinates.  That is, by any measure, a

superior, who creates a misstatement and directs it to be made,

is as, if not more, responsible for the fraudulent scheme than

the underling who acts at his boss' director.  So, by logic, we

submit, if a person who sends a false statement on the

directive of his boss can be liable, under 10b-5(a) and (c),

then so, too, can the boss who orchestrated the scheme and

issued the directive.

            THE COURT:  Thank you.

            Mr. Haggerty, did you want to respond briefly?

            MR. HAGGERTY:  If I may, your Honor.

            THE COURT:  If it's brief.

            MR. HAGGERTY:  It is.

            Your Honor, on the in-connection with issues, the CFTC

argued that the defendants have claimed that *Zandford* has been

overruled.  The standard that we've advanced is entirely

consistent with the outcome of *Zandford*.  *Zandford* is a case

where the misrepresentation was -- or the alleged deceptive

conduct was, in fact, related to the consideration received.

            Here, in contrast, the regulators' complaints don't

even meet the *Zandford* standard, and as your Court correctly

points out, coincide, to the extent that is standard — I'm not

sure that it is one — it's really not quite so clear what that

means.

            But, here, look at the allegations with respect to,

N54KCFTO

```
1    for example, the trade confirmations that Mr. Halligan is
2    alleged to have signed with respect to a particular
3    counterparty.  The CFTC relies on that allegation with respect
4    to both the in-connection with argument and with respect to the
5    maker argument.  But nowhere in their complaint does the CFTC
6    allege that Archegos ever entered into an ETF swap or a basket
7    swap with that particular counterparty, Swap Counterparty 9.
8              So, if the requirement is that a misrepresentation
9    must coincide with the securities transaction, or if, under the
10   Romano standard, it's that a securities transaction -- a
11   complaint must necessarily allege a securities transaction,
12   then there must be a securities transaction.  And, here,
13   there's not even an alleged securities transaction with Swap
14   Counterparty 9.
15             So, under any standard, that allegation shouldn't be
16   part of the CFTC's case.
17             Counsel responded to the Charles Schwab case and
18   explained the context of that case correctly.  That case did
19   involve allegations of understatement of LIBOR rates.  And the
20   distinction between -- the different outcomes between the
21   allegations arising from the floating rate instruments and the
22   fixed rate instruments is significant, and that illustrates our
23   point.  With respect to the floating rate instruments, the
24   reason that the in-connection with requirement was satisfied
25   was because the misrepresentations related to the consideration
```

N54KCFTO

1    or the value of those instruments; with respect to the fixed

2    rate instruments, they didn't.  So we agree, I think, on

3    *Charles Schwab*.

4          I'll turn, your Honor, to the maker issues very

5    briefly.  I think both regulators discussed the *Lorenzo*

6    decision.  What is really clear, both from *Janus*, as well as

7    the D.C. Circuit's decision in *Lorenzo* on an issue that wasn't

8    ultimately subject to the litigation before the Supreme Court

9    in that case, is that attribution is key.  Attribution of the

10   statement is one of the key characteristics or indicia of the

11   control, the ultimate control, that makes an individual a

12   maker.

13         And, here, in neither complaint is there any

14   allegation that the statements that Mr. Becker uttered were

15   attributed to Mr. Halligan.  So, applying *Janus*, applying

16   *Lorenzo*, those allegations are insufficient.

17         With respect to *Rio Tinto*:  The law is clear that

18   what's required now in the Second Circuit is an inherently

19   deceptive act by the defendant that's separate from the

20   participation in the making of misrepresentations.

21         And in the *Turquoise Hill* case, Judge Liman identified

22   some examples of conduct that can be inherently deceptive —

23   things like sham contracts or –– your Honor, I want to be

24   accurate — well, your Honor, what I refer the Court to is the

25   decision in *Turquoise Hill*, which refers to the various types

N54KCFTO

| | |
|---|---|
| 1 | of conduct that is inherently deceptive and could satisfy, |
| 2 | after *Rio Tinto*, the scheme liability claim, things like sham |
| 3 | invoices or sham contracts, fake transactions, none of which is |
| 4 | alleged here.  And, in fact, listening to counsel, I was |
| 5 | writing fast, and I don't know if I got it all down, but I |
| 6 | heard things like scheme to deceive, concealed the conduct |
| 7 | related to the misrepresentations, condoned the conduct related |
| 8 | to the misrepresentations, conspired to make |
| 9 | misrepresentations.  And that's all the sorts of participation |
| 10 | in the preparation of misstatements that is insufficient after |
| 11 | *Rio Tinto*. |
| 12 | Counsel also relied on Mr. Halligan's role as a CFO |
| 13 | generically as a basis to infer that he had some role in the |
| 14 | conduct sufficient to support a scheme liability claim.  We've |
| 15 | cited a number of cases that stand very clearly for the |
| 16 | proposition that generic reliance on a defendant's role, |
| 17 | including generic allegations that a defendant, based on their |
| 18 | role, is intimately familiar with various aspects of the |
| 19 | business, are simply insufficient.  The Court's decision in the |
| 20 | *Ollie's Bargain Outlet* case discusses these issues; *Ryanair*, I |
| 21 | believe, discusses these issues; *Sotheby's* discusses these |
| 22 | issues. |
| 23 | And then, finally, counsel for the CFTC discussed the |
| 24 | *Collins & Aikman* case.  That case was 15 years before the |
| 25 | Second Circuit's decision in *Rio Tinto*, but, more |

N54KCFTO

1    fundamentally, the allegations there didn't involve solely the

2    making of misrepresentations.  So it doesn't stand for the

3    proposition necessary to the disposition of this case, about

4    how the rules of *Janus* and *Rio Tinto* and *Lorenzo* can be

5    synthesized in a way that ensures that scheme liability doesn't

6    become an end run around *Rio Tinto*.  And that's why now, in

7    this circuit, participation in the preparation of

8    misrepresentations alone isn't sufficient to make out a scheme

9    link.

10           THE COURT:  Thank you.

11           MR. HAGGERTY:  Thank you.

12           THE COURT:  We don't have that much more time, but I

13   did want to give the SEC and CFTC an opportunity to address the

14   issues on which you all have a dispute, if you want to add

15   anything.  It's briefed with the amicus brief and the response,

16   but if there's anything you all would like to add, you can.

17           Starting with the SEC, I guess.

18           MR. ZETLIN-JONES:  I would defer to my colleague from

19   our general counsel's office on this.

20           THE COURT:  You can also just rest on the amicus

21   brief, that's fine.

22           MR. LISITZA:  I rest.  If there was a particular issue

23   or concern that you wanted the SEC to --

24           THE COURT:  No, I think it's briefed, and I don't have

25   any particular questions about it at this point.

N54KCFTO

1          MR. LISITZA:  Okay.

2          THE COURT:  Okay.

3          Do you want to add anything on it?

4          MR. MURPHY:  Just briefly, your Honor.

5          The only issue before this Court is the CFTC's

6    jurisdiction.  The SEC is not a party to our case.  And so the

7    Court has no need to rule on whether the SEC has jurisdiction

8    over the ETF swap products.

9          Defendants and also the SEC are effectively asking

10   this Court to strip the CFTC of its ability to prosecute fraud

11   in these swaps markets, and the Court should reject that.

12         The CFTC has a long history of regulating derivatives

13   on broad-based securities indexes, and we have a substantial

14   expertise in that area, as well as substantial expertise in

15   regulating and policing the swaps markets.

16         The defendants' arguments, if accepted, would prevent

17   the CFTC from carrying out its statutory authority of

18   protecting the derivatives markets, and we would be unable to

19   pursue wrongdoing, such as the wrongdoing at issue in this

20   case.

21         I would note that we were the only regulatory agency

22   to bring claims in relation to the ETF swaps, and if we were

23   stripped of jurisdiction over those products, the markets would

24   be less protected and worse off.

25         With that, your Honor, I'm happy to answer any

N54KCFTO

|  |  |
|---|---|
| 1 | questions about the ETF swaps or custom basket swaps that you |
| 2 | may have. |
| 3 | THE COURT:  Thank you. |
| 4 | I gather your position is that I don't need to decide |
| 5 | this issue because, even on the SEC's views, some subset of the |
| 6 | custom basket swaps would be at issue, so I don't necessarily |
| 7 | need to decide this issue if the case were going to go forward. |
| 8 | Is that right? |
| 9 | MR. MURPHY:  That's part of it, your Honor.  There are |
| 10 | two types of broad-based swaps at issue — there are the ETF |
| 11 | swaps and the custom basket swaps.  So you're correct that even |
| 12 | if the CFTC were found to lack jurisdiction over the ETF swaps, |
| 13 | we would still have authority over the custom basket swaps, and |
| 14 | the case should go forward. |
| 15 | But, in addition, I would note that our main point is |
| 16 | the CFTC has jurisdiction regardless of whether the SEC has |
| 17 | jurisdiction.  There is a category of swaps called mixed swaps, |
| 18 | in which both the SEC and CFTC have jurisdiction.  So, really, |
| 19 | there is no need to determine the issue of the SEC's |
| 20 | jurisdiction at all.  The only question is, does the CFTC have |
| 21 | jurisdiction over the ETF swaps? |
| 22 | THE COURT:  Let me just ask if either Archegos or |
| 23 | Mr. Halligan want to address these issues? |
| 24 | MR. JOHNSON:  Yes, your Honor.  Thank you.  William |
| 25 | Johnson, on behalf of Archegos. |

N54KCFTO

1        I'll try to be brief.

2        The ETFs are security-based swaps.  The ETFs are

3   funds; they issue securities.  The funds themselves are

4   registered with the SEC as issuers of securities, and the

5   shares of those funds are also registered as securities.  That

6   makes these instruments security-based swaps.

7        THE COURT:  You agree with the SEC?

8        MR. JOHNSON:  A hundred percent.

9        They are not based on the value of the index.  They

10  are based on the value of the shares.  They are traded in the

11  secondary market, and you get whatever price you get in the

12  secondary market for them.

13       The CFTC uses the term wrapper as if it's just a

14  label.  These are not labels.  The shares are what matter here.

15  The shares are what determine that these are security-based

16  swaps.  There's no economic reality or other independent test

17  in the joint rules release or in Dodd-Frank.  The value of

18  these are expressed as the value of the shares, end of story.

19  They're not mixed swaps because they don't involve anything

20  other than the security, the share, that's the value that

21  drives the value.  There's no other instrument that's at play.

22  It is simply another version of the index argument, which has

23  failed.

24       With respect to the custom baskets, your Honor:  The

25  law is clear that where one or both parties has the ability to

N54KCFTO

1    affect the composition of the basket, it effectively turns

2    these into single-name swaps, a big list of single-name swaps.

3    If you can move them in and out with your authority or the

4    combination of the other counterparty, they're effectively

5    single-name swaps, and they're based on shares, and they're,

6    therefore, security-based swaps.

7            As the SEC points out, this is a binary concept.

8    They're either discretionary or they are determined -- the

9    composition is determined by a predetermined or automatic

10   criteria.

11           And whenever there is a determination that can be done

12   based on discretion, based on the joint rules release, that

13   makes them a narrow-based and a security-based swap.

14           THE COURT:  Okay.  Thank you.

15           I don't think I have any additional questions on those

16   issues.  Before we break, did anyone else have a burning need

17   to say anything else?

18           MR. MURPHY:  Your Honor, may I briefly respond on the

19   ETF and custom basket swaps?

20           THE COURT:  Yes.

21           MR. MURPHY:  So, we have alleged that the ETF swaps

22   are based on broad-based indexes, and, really, that's the issue

23   here, it's are our allegations sufficient?  And we have alleged

24   that these are based on broad-based security indexes.

25           If you look at the documents that defendants have

N54KCFTO

1    cited, those documents actually show that our allegations are

2    not just plausible and sufficient, they show that our

3    allegations are actually correct.  They show that the ETF swaps

4    are based on three different types of broad-based indexes.  The

5    first is the underlying market index — the S&P 500, for

6    example; the second is the portfolio of securities held by

7    those ETFs — those are groups of securities, and they're broad

8    based, so they fall within our jurisdiction; and then the third

9    is the ETF shares themselves.  So an index includes not just a

10   group of securities, but also an interest in a group of

11   securities.

12          In the prospectuses that defendants have attached,

13   they each explicitly state that the ETF shares are, quote, an

14   interest in an underlying security portfolio, in other words,

15   they meet the definition of a broad-based index.  And you can

16   find the quotes in our briefs, your Honor, so I won't read them

17   here.

18          With respect to the custom basket swaps:  Again, the

19   issue is what we have alleged.  We have alleged that these

20   custom basket swaps are broad-based security index swaps, and

21   that's sufficient at this stage.  But, again, if your Honor is

22   inclined to consider these swap agreements that defendants have

23   attached, they still show that our allegations are not just

24   plausible, our allegations are correct.

25          None of those agreements use anything like the phrase

N54KCFTO

1    discretion to change the portfolio or at-will modification or

2    anything like that.  The most that these agreements provide for

3    is that the counterparties needed to agree to some sort of

4    modification, but an agreement is not discretion, an agreement

5    is not an unfettered ability, which is what discretion really

6    means.

7             So if you look at the terms of those agreements, it

8    shows that no party actually had discretion.

9             THE COURT:  All right.  Thank you.

10            Anything else?

11            MR. LISITZA:  Just to be sure, did you want the SEC to

12   address anything about either the binary nature of the swaps

13   and custom baskets or the mixed swap?

14            THE COURT:  Not at this point.

15            All right.  Decision is reserved.  Thank you, all.

16   The briefing and argument were very well done.  And I'll

17   reserve decision.

18            Did the U.S. Attorney's Office want to speak today?

19            MR. THOMAS:  No, your Honor.

20            THE COURT:  Thank you, everyone.  We're adjourned.

21            (Adjourned)

22

23

24

25