UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COMMODITY FUTURES TRADING COMMISSION, | |
| Plaintiff, | 22-CV-3401 (JPO) |
| -v- | OPINION AND ORDER |
| ARCHEGOS CAPITAL MANAGEMENT LP, *et al*., | |
| Defendants. | |

J. PAUL OETKEN, District Judge:

The Commodity Futures Trading Commission ("CFTC") brings this action against

Defendants Archegos Capital Management LP and its Chief Financial Officer, Patrick Halligan,

alleging violations of Section 6(c)(1) the Commodity Exchange Act, 7 U.S.C. § 9(1), and CFTC

Regulation 180.1(a)(1)–(3), 17 C.F.R. § 180.1(a)(1)–(3) (2021). Pending before the Court are

Defendants' individual motions to dismiss the Amended Complaint. (ECF Nos. 42 and 46.) For

the reasons that follow, the motions to dismiss are granted.

## I.      Background

The Court assumes familiarity with the general background facts as described in its

Opinion and Order issued today in the related case brought by the Securities and Exchange

Commission (SEC). *See Securities and Exchange Commission v. Hwang et al.*, 22-CV-3402

(JPO) (S.D.N.Y.). Here, the Court recites only those facts pertinent to the instant motions. The

following facts are taken from the Amended Complaint (ECF No. 33) and are assumed true for

the purposes of resolving the pending motions to dismiss.

A. **Factual Background**

Beginning in March 2020, Archegos Fund, a fund managed by Defendant Archegos Capital Management,[1] began to pursue a long/short trading strategy using two types of swaps: (1) long, single-name total return swaps (TRS) referencing single-name securities and (2) short TRS designed to hedge the risk of the long swaps. (ECF No. 3 ¶ 3.) Archegos used two types of short TRS: those based on exchange-traded funds ("ETF Swaps") and those based on custom baskets ("Custom Basket Swaps"). (*Id.*) The CFTC refers to both types of swaps as "Broad-Based Security Index Swaps." (*Id.*) The Court will refer to them as the "Short Swaps."

The ETF Swaps referenced shares of exchange-traded funds. (*See id.* ¶ 26.) The Custom Basket Swaps "were designed to closely mimic the same broad-based securities indexes as the ETF Swaps," but were customized in various ways, like removing certain securities in which Archegos held significant long positions. (*Id.* ¶¶ 26, 28.)

To hedge Archegos's long single-name TRS positions, its swap counterparties typically purchased long cash positions in the same securities underlying the swaps. (*Id.* ¶ 29.) For Archegos, the Short Swaps "were designed to hedge against the risk of a market decline impacting the long TRS positions." (*Id.* ¶ 37.)

The CFTC alleges that beginning in March 2020 and continuing through March 2021 (the "Relevant Period"), Archegos began to build "massive, highly concentrated, illiquid long positions in a small number of single securities through long TRS," while partially hedging through the Short Swaps. (*Id.* ¶ 38.) As Archegos ran up against its counterparties' risk management limits, Defendant Halligan and other Archegos employees made false and

---

[1] For the purposes of this Opinion and Order, the Court refers to both Archegos Fund and Defendant Archegos Capital Management LP as "Archegos."

misleading statements about the size, composition, and liquidity of Archegos's overall swap portfolio to induce them to extend it additional trading capacity for long TRS positions and to preserve favorable trading terms.  (*Id.* ¶¶ 42, 55.)  During the Relevant Period, these representations were usually communicated by Scott Becker, Archegos's Director of Risk Management, or William Tomita, its head trader, to the counterparties.  (*See id.* ¶¶ 58 – 72.)  Becker generally acted at Halligan's direction, and Halligan set a routine practice of deceiving counterparties about the Fund's positions.  (*Id.* ¶ 58.)

During the week of March 22, 2021, the prices of securities underlying Archegos's concentrated long single-name TRS positions plummeted, beginning with a plunge in the price of ViacomCBS stock.  (*Id.* ¶¶ 73 – 74.)  Archegos began to face large and escalating margin calls.  (*Id.*)  The CFTC alleges that Defendant Halligan, as well as Tomita and Becker, made additional false representations to counterparties to stave off the firm's collapse, including lying to secure the return of excess margin.  (*Id.* ¶¶ 76 – 82.)  By the end of the week of March 26, 2021, Archegos had collapsed.  (*Id.* ¶¶ 84 – 86.)  Its counterparties unwound its positions, in some cases incurring billions of dollars of losses.  (*Id.*)

### B.       Procedural Background

The CFTC filed its Amended Complaint on September 2, 2022.  (ECF No. 33.)  It contains one count: fraud by deceptive device or contrivance in violation of Section 6(c)(1) of the Commodities Exchange Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-3, 17 C.F.R. § 180.1(a)(1)–(3).  Archegos and Halligan each separately moved to dismiss the Amended Complaint on November 1, 2022.  (ECF Nos. 42 and 46.)  On November 8, 2022, the United States filed a motion to intervene and to stay discovery during the pendency of the parallel criminal case, *United States v. Sung Kook (Bill) Hwang et al.*, 22-cr-240.  (ECF No. 51.)

On April 28, 2023, the SEC submitted an amicus brief addressing its regulatory authority over certain types of derivative instruments vis-à-vis that of the CFTC under the framework established by Title VII of the Dodd-Frank Act.  (ECF No. 75-1.)  The CFTC submitted a response to the amicus brief shortly thereafter.  (ECF No. 79.)  The Court heard oral argument in this and the related SEC case on May 4, 2023.  (*See* ECF No. 82.)

## II.     Legal Standard

### A.     Rule 12(b)(6)

Rule 12(b)(6) authorizes a district court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  To survive a motion to dismiss for failure to state a claim, a complainant must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This means that a complaint is properly dismissed where "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.  A complaint is also properly dismissed "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.

## III.    Discussion

Archegos and Halligan both argue that the Court need not reach the merits of this case because the CFTC has exceeded its regulatory jurisdiction.  They assert that both the long-single name TRS (which constituted Archegos's primary trading activity) and the Short Swaps (which Archegos used to hedge) are within the exclusive jurisdiction of the SEC.

### A.      Statutory Definitions

Pursuant to Title VII of the Dodd-Frank Act, Congress allocated regulatory authority to the SEC over "security-based swaps" and the CFTC over "swaps."  *See* 15 U.S.C. § 8302(b). The agencies hold joint authority over "mixed swaps."  15 U.S.C. § 8302(a)(8).  Congress also directed the agencies, in consultation with the Federal Reserve, to adopt rules further defining each term.  15 U.S.C. § 8302(d)(1).  The agencies did so via a joint rulemaking ("the Joint Release") promulgated on August 13, 2012.[2]

The statutory definition of "swap" is long and elaborate, but as relevant here, the term "swap" excludes "security-based swaps."  A security-based swap is based on a single security or loan, or on a narrow-based security index.[3]  15 USC § 78c(a)(68); 7 U.S.C. § 1a(42).  As such, swap instruments based on a "broad-based" security index or a portfolio of securities are "swaps" rather than "security-based swaps."  The rules promulgated by both agencies after the passage of Dodd-Frank further specified that "where a TRS is based on a single security or loan, or a narrow-based security index, the TRS would be a security-based swap."  Joint Release at 48264.  *See also* 15 U.S.C. 78(c)(68)(A); 7 U.S.C. §1a(42).

Finally, a mixed swap is a swap that is both (1) based on a single security or narrow-based security index and (2) also based on another financial or economic interest falling within the CFTC's regulatory authority, such as a broad-based security index.  *See* 7 U.S.C.

---

[2] Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48208, 48264 (August 13, 2012), available at: https://www.govinfo.gov/content/pkg/FR-2012-08-13/pdf/2012-18003.pdf.

[3] The statutory definition of a "narrow-based security index" is (1) an index with nine or fewer component securities or (2) an index in which the weighting or trading volume is skewed heavily towards one or more of the component securities of the index, based on specific quantitative metrics.  *See* 15 U.S.C. § 78(c)(55)(B); 7 U.S.C. § 1a(35).

§ 1(a)(47)(D).  In other words, a mixed swap is both a swap and a security-based swap.  Joint

Release at 48291.

### B.    Application

The CFTC does not dispute that the single-name long TRSs are security-based swaps

subject to the SEC's sole authority, so the Court's analysis need focus only on the two types of

Short Swaps involved here: the ETF Swaps and the Custom Basket Swaps.

#### 1.    ETF Swaps

The ETF Swaps, by definition, referenced a single security: a share (or shares) in the

given ETF.  The fact that an ETF might track the value of hundreds of index securities does not

change that essential point.  The CFTC emphasizes that "there is no material economic

difference between a swap based on a broad-based index of securities . . . and an ETF swap

based on this very same index."  (ECF No. 62 at 20.)  The CFTC's primary argument is that

while each ETF Swap referenced a share in the given ETF, each ETF was in turn based on a

broad set of securities that the underlying index was designed to track.  For example, an ETF

Swap using shares in the SPDR S&P 500 ETF Trust[4] as its reference point would be broad-based

because the SPDR S&P 500 ETF Trust tracks the value of the S&P 500, which itself is a broad-

based securities index.  Here, the interpretation of "based on" is key because the statutory

definition of a security-based swap is one that is "based on a single security or loan, or on a

narrow-based security index."

The CFTC's theory does not comport with the statutory definition of a security-based

swap.  As the SEC explains in its amicus brief, "[a]n ETF share represents an interest in the ETF,

---

[4] The CFTC alleges that TRS transactions in the SPDR S&P ETF Fund formed part of
Archegos Fund's fraudulent activity.  (*See generally* ECF No. 33-1.)

not an interest in the securities or the index of securities that the ETF is intended to track."[5]

(ECF No. 75-1 at 3.)

Next, the CFTC argues that the ETF Swaps are properly categorized as mixed swaps

subject to joint CFTC and SEC jurisdiction.  According to the CFTC, even if the Court considers

the ETF Swaps to be based on a single security, they are mixed swaps because they are *also*

simultaneously based on broad-based security indexes, which are subject to the CFTC's

jurisdiction.

The Court rejects this contention.  First, the CFTC failed to allege that the Custom Basket

Swaps are mixed swaps in its Amended Complaint.  Instead, it alleged that they are "swaps."

(ECF No. 33 ¶ 13 (citing 7 U.S.C. § 1a(47)(A) and (B)).  The CFTC cannot alter its position via

its opposition brief.  *See Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, No. 14 CIV.

9443, 2017 WL 1192888, at *2 n.2 (S.D.N.Y. Mar. 29, 2017) ("It is axiomatic that the

Complaint cannot be amended by the briefs in opposition to a motion to dismiss.")

Second, the Joint Release makes clear that the category of mixed swaps is intended to be

a "narrow" one, covering only a "small subset of Title VII instruments."  Joint Release at 48291.

It further specifies that:

> For example, a Title VII instrument in which the underlying
> references are the value of an oil corporation stock and the price of
> oil would be a mixed swap. Similarly, a Title VII instrument in
> which the underlying reference is a portfolio of both securities
> (assuming the portfolio is not an index or, if it is an index, that the
> index is narrow-based) and commodities would be a mixed swap.

---

[5] The CFTC emphasizes that the SEC's amicus brief "is not the result of joint
rulemaking, is not being used to exercise its enforcement authority, [and] does not carry the force
of law." (ECF No. 79 at 24.)  The Court acknowledges as much and relies on the amicus brief
only as persuasive authority.

*Id.* These examples illustrate the rule: that a mixed swap must be based on multiple underlying references — one that is subject to SEC authority and one that is subject to CFTC authority. That is not the case here, where the ETF Swaps incorporate only a single reference — the share of an ETF — and nothing else.

The CFTC has therefore failed to assert a plausible claim for relief with regard to its allegations stemming from the ETF Swaps.

### 2.     Custom Basket Swaps

The question whether the Custom Basket Swaps are subject to the CFTC's regulatory authority turns on whether they are properly categorized as being "based on" a narrow-based or broad-based securities index. Swaps falling into the former category are security-based swaps subject to SEC authority; swaps falling into the latter category are swaps subject to CFTC authority.

The Joint Release defines a narrow-based security index as follows:

> In some cases, the Title VII instrument[6] may give one or both of the counterparties, either directly or indirectly (e.g., through an investment adviser or through [a] third-party index provider), discretionary authority to change the composition of the security portfolio, including, for example, by adding or removing securities in the security portfolio on an ''at-will'' basis during the term of the Title VII instrument. Where the counterparties, either directly or indirectly (e.g., through an investment adviser or through [a] third-party index provider), have this discretionary authority to change the composition or weighting of securities in a security portfolio, that security portfolio will be treated as a narrow-based security index, and therefore a Title VII instrument on that security portfolio is a security-based swap.

---

[6] The agencies defined "Title VII instrument" to be "synonymous with swap or security-based swap." Joint Release at 48262.

Joint Release at 48285. *Id.* But "not all changes that occur to the composition or weighting of a

security index underlying a Title VII instrument will always result in that security index being

treated as a narrow-based security index." *Id.* The Joint Release then gives several examples of

changes that would not cause the security index to be treated as a narrow-based index, including,

as relevant here: (1) when the counterparties agree to use a security index based on

"predetermined criteria where the security index composition or weighting may change as a

result of the occurrence of certain events specified in the Title VII instrument at execution"; and

(2) when counterparties "use a predetermined self-executing formula to make other changes to

the composition or weighting of a security index underlying a Title VII instrument." *Id.* In

summary, "[i]n either of these situations, the composition of a security index may change

pursuant to predetermined criteria or predetermined self-executing formulas without the Title VII

instrument counterparties, their agents, or third-party index providers having any direct or

indirect discretionary authority to change the security index." *Id.* at 48285 – 48286. Such

predetermined criteria or formulas "must not be subject to change or modification through the

life of the Title VII instrument and must be set forth in the Title VII instrument at execution

(regardless of who establishes the criteria or formula)." *Id.* at 48286.

Defendants argue that, in resolving the motions to dismiss, the Court may properly

consider the terms of the Swap Agreement contracts that Archegos executed with each

counterparty with whom it traded Custom Basket Swaps. They assert that each Swap Agreement

permitted Archegos, its counterparty, or both to retain discretionary authority over the

composition or weighting of the securities in each Custom Basket Swap, meaning that the

CFTC's jurisdictional arguments necessarily fail. (*See* ECF No. 44; 48.) The CFTC counters

that the correct characterization of a swap based on a security index as broad-based or narrow-

based is "an inherently fact-based inquiry . . . that need not be resolved on the pleadings." (ECF

No. 79 at 12.)  To that end, the CFTC argues that the Court may not consider the terms of the

Swap Agreements at the motion to dismiss stage because they are matters outside the pleadings.

The Court concludes that it is proper to consider the terms of the Swap Agreements.  It is

true that "[b]ecause a Rule 12(b)(6) motion challenges the complaint as presented by the

plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may

review only a narrow universe of materials." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir.

2016).  Those typically include facts stated on the face of the complaint, documents attached to

the complaint or incorporated by reference, and matters of which judicial notice may be taken.

*Id.*  But "in some cases, a document not expressly incorporated by reference in the complaint is

nevertheless 'integral' to the complaint and, accordingly, a fair object of consideration on a

motion to dismiss."  *Id.*  A document is integral to the complaint "where the complaint relies

heavily upon its terms and effect."  *Id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147,

153 (2d Cir. 2002)).  The Second Circuit has cautioned that "merely mentioning a document in

the complaint will not satisfy this standard; indeed, even offering 'limited quotation[s]' from the

document is not enough."  *Id.* (quoting *Glob. Network Commc'ns, Inc. v. City of New York*, 458

F.3d 150, 156 (2d Cir. 2006)).  Instead:

> In most instances where this exception is recognized, the
> incorporated material is a contract or other legal document
> containing obligations upon which the plaintiff's complaint stands
> or falls, but which for some reason—usually because the document,
> read in its entirety, would undermine the legitimacy of the plaintiff's
> claim—was not attached to the complaint.

*Id.* (quoting *Glob. Network Commc'ns*, 458 F.3d at 157).

Here, the Swap Agreements are not expressly incorporated by reference into the

Amended Complaint, but they are integral to it.  Each Swap Agreement was a private contract

between Archegos and the counterparty, setting out the terms of their trading relationship,

including how the counterparty would be paid for executing TRSs with Archegos.  (*See* ECF No.

33 ¶ 29 ("The Swap Counterparty would then profit from the arrangement, in theory, through

Archegos Fund's payment of the fixed rate fee established in the swap agreement.))  The

Amended Complaint "relies heavily upon [the] terms and effect" of the Swap Agreements, given

that, as the CFTC puts it in its opposition brief, the Custom Basket Swaps were executed

"pursuant to (and subsequent to) those Agreements."  (ECF No. 62 at 14.)  In other words, the

parties agree that the Swap Agreement contracts governed the entire trading relationship between

Archegos and the counterparties and underlay each executed Custom Basket Swap.  A

substantial part of the CFTC's theory of liability is that Archegos misled counterparties about the

riskiness of its swap portfolio, especially the massive amount of exposure it had to a small

number of issuers.  As a result, the counterparties executed additional Custom Basket Swap

trades with Archegos, which 'coincided with' the misrepresentations.  (*See, e.g.*, ECF No. 33

¶ 66 n.7.)  If the CFTC's theory of liability turns on the execution of those trades, then it follows

that the Amended Complaint relies heavily on the terms and effect of the Swap Agreements.[7]

Additionally, it is proper under these circumstances to consider the Swap Agreements in

resolving the motions to dismiss because the harm to the plaintiff, the CFTC, is minimal.  The

Second Circuit has held that:

> [T]he harm to the plaintiff when a court considers material
> extraneous to a complaint is the lack of notice that the material may
> be considered. Accordingly, where plaintiff has actual notice of all
> the information in the movant's papers and has relied upon these

---

[7] As the Court holds in its opinion and order issued today in the related SEC action, the
fate of the CFTC's assertion that the misrepresentations were made "in connection with" the ETF
and Custom Basket Swaps turns on whether there is a plausible allegation that the
misrepresentations led to executed trades.

> documents in framing the complaint the necessity of translating a
> Rule 12(b)(6) motion into one under Rule 56 is largely dissipated.

*Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers*, 282 F.3d at

153.)  Archegos represents that the CFTC received actual notice of the Swap Agreements with

each of the counterparties referenced in the Amended Complaint because each contract was

produced to it during its pre-filing investigation.  (*See* ECF No. 44 ¶¶ 20–38 (listing Bates

number of each disclosure)).  The CFTC does not dispute that it received these disclosures.

Having determined that it is proper to consider the terms of the Swap Agreements, the

Court turns to their implications for Defendants' jurisdictional argument.  The Court has

reviewed the terms of each Swap Agreement as submitted by Defendants at ECF Numbers 44

and 48.  The terms support a conclusion that each Swap Agreement gave Archegos, the

counterparty, or both discretionary authority to change the composition of each custom basket

swap on an ongoing basis.

The CFTC argues that not all of the Swap Agreements support this conclusion.  For

example, it highlights the agreement with UBS, which contained a "Basket Modification"

provision stating that "[Archegos] may remove one or more Shares from the Basket at any time,

subject to UBS's prior consent, which consent shall not be unreasonably withheld."  (ECF No.

44-27 at 16.)  According to the CFTC, this language does not reflect any discretionary authority

on the part of Archegos because changes to the basket composition required UBS's consent.

With this example and the others offered in its opposition brief (*see* ECF No. 62 at 19–20), the

CFTC conflates discretionary authority and unilateral authority.  The Joint Release indicates that

the authority to change the basket composition can belong to one or both of the counterparties,

not that one counterparty must retain the authority to act on its own.  And while the Joint Release

frames the ability to change the basket composition on an "at will" basis as "an example" of discretionary authority, that "example" does not define the full scope of the rule.

This reading of the meaning of "discretionary authority" is logical considering the full text of the Joint Release.  It defines custom baskets whose composition is subject to change based on discretionary authority *in contrast to* those whose composition is determined by "predetermined criteria or predetermined self-executing formulas" that can cause a change in composition "without the Title VII instrument counterparties" having "any direct or indirect discretionary authority."  (Joint Release at 48285–48286.)  This framing indicates that the type of discretion permitted in the Swap Agreements necessarily requires the Court to characterize them as narrow-based rather than broad-based.

To this point, the CFTC asserts that the guidance in the Joint Release does "not purport to describe all instances in which a swap on a security index that allows for changes to the composition of the index will be characterized as a CFTC swap."  (ECF No. 79 at 10.)  Instead, according to the CFTC, there is a "spectrum" of discretionary authority, and the correct characterization of a swap based on a security index as broad-based or narrow-based is "an inherently fact-based inquiry . . . that need not be resolved on the pleadings."  (*Id.* at 12.)  Even if the CFTC is correct that the existence of discretionary authority is properly considered on a "spectrum," the text of the Joint Release makes clear that discretionary authority existed in the contracts governing the Custom Basket Swaps at issue in this case.

For those reasons, the CFTC has failed to allege a plausible theory of liability for its claims resting on both the ETF Swaps and the Custom Basket Swaps.  Because the allegations in the Amended Complaint, taken as true, cannot "raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, dismissal of the Amended Complaint is appropriate.

### C.      Leave to Replead

The CFTC requests an opportunity to replead if the motions to dismiss are granted. Defendants argue that the Amended Complaint should be dismissed with prejudice due to the futility of any further amendment.  "Although Federal Rule of Civil Procedure 15(a) provides that the district court should freely grant leave to amend when justice so requires, it is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile."  *Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998).  "Generally, a plaintiff need not be given leave to amend if [it] fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in [its] complaint."  *Melendez v. Sirius XM Radio, Inc.*, 50 F.4th 294, 309 (2d Cir. 2022) (citation and internal quotation marks omitted).  Here, the CFTC has not shown that repleading would correct the substantive deficiencies in the complaint.  Leave to replead is therefore denied on the basis of futility.

## IV.      Conclusion

For the foregoing reasons, Defendants' motions to dismiss are GRANTED.

The United States's motion to intervene and stay discovery is DENIED as moot.

The Clerk of Court is directed to close the motions at ECF Numbers 42, 46, and 51, and to close this case.

SO ORDERED.

Dated:  September 19, 2023
          New York, New York

_____
          J. PAUL OETKEN
          United States District Judge

14